1                    IN THE UNITED STATES DISTRICT COURT

2                    IN AND FOR THE DISTRICT OF DELAWARE

3                                - - -

4    ATELIERS DE LA HAUTE-GARONNE (French  :   CIVIL ACTION
     Corporation) and F2C2 SYSTEMS S.A.S.  :
5    (French Corporation),                 :
                                           :
6                Plaintiffs,               :
                                           :
7         v.                               :
                                           :
8    BROETJE AUTOMATION-USA INC. (Delaware :
     Corporation), BROETJE AUTOMATION GMBH :
9    (German Corporation),                 :
                                           :   NO. 09-598-LPS
10               Defendants.
                                 - - -
11
                             Wilmington, Delaware
12                           Monday, April 7, 2014
                             *Jury Trial - Volume A*
13
                                 - - -
14
     BEFORE:  HONORABLE **LEONARD P. STARK**, U.S.D.C.J., and a jury
15
     APPEARANCES:                      - - -
16

17            YOUNG CONAWAY STARGATT & TAYLOR, LLP
              BY:  MELANIE K. SHARP, ESQ., and
18                 JAMES L. HIGGINS, ESQ.

19            and

20            KAYE SCHOLER, LLP
              BY:  SCOTT G. LINDVALL, ESQ., and
21                 JEFFREY H. HOROWITZ, ESQ.
                   (New York, New York)
22
              and
23

24
     Valerie J. Gunning              Brian P. Gaffigan
25   Official Court Reporter         Official Court Reporter

```
 1    APPEARANCES:  (Continued)

 2

 3              KAYE SCHOLER, LLP
               BY:  PAUL I. MARGULIES, ESQ.
 4                  (Washington, District of Columbia)

 5                  and

 6              KAYE SCHOLER, LLP
               BY:  MICHELLE MAREK, ESQ.
 7                  (Chicago, Illinois)

 8                      Counsel for Plaintiffs Ateliers De La
                        Haute-Garonne and F2C2 Systems S.A.S.
 9

10              DRINKER BIDDLE & REATH, LLP
               BY:  JOSEPH C. SCHOELL, ESQ., and
11                  TODD C. SCHILTZ, ESQ.

12                  and

13              DRINKER BIDDLE & REATH, LLP
               BY:  PATRICK J. KELLEHER, ESQ.,
14                  DARREN S. CAHR, ESQ., and
                    CARRIE A. BEYER, ESQ.
15                  (Chicago, Illinois)

16                      Counsel for Broetje Automation-USA Inc.
                        and Broetje Automation GmbH
17

18

19

20

21

22                      - oOo -

23                    P R O C E E D I N G S

24              (REPORTER'S NOTE:  Jury trial proceedings were

25    held in open court, beginning at 8:44 a.m.)
```

```
 1                    THE COURT:  Good morning, everyone.
 2                    (Counsel respond, "Good morning, Your Honor.")
 3                    THE COURT:  First, let me start by having you
 4      put your appearances on the record, please.  Ms. Sharp, good
 5      morning.
 6                    MS. SHARP:  Good morning, Your Honor.  On behalf
 7      of the plaintiffs AHG, Melanie Sharp and Jim Higgins from
 8      Young Conaway Stargatt & Taylor.  The Court has also
 9      previously met my colleagues from Kaye Scholer in New York,
10      Scott Lindvall.
11                    MR. LINDVALL:  Good morning, Your Honor.
12                    MS. SHARP:  Jeff Horowitz.
13                    MR. HOROWITZ:  Good morning, Your Honor.
14                    MS. SHARP:  And Paul Margulies.
15                    MR. MARGULIES:  Good morning.
16                    THE COURT:  Good morning.  Welcome to all of
17      you.
18                    MS. SHARP:  I'm sorry, your Honor.  Michelle
19      Marek is here as well.
20                    THE COURT:  Okay.
21                    MS. MAREK:  Good morning, your Honor.
22                    THE COURT:  Good morning.
23                    MR. SCHOELL:  Good morning, Your Honor.  Joseph
24      Schoell from Drinker Biddle & Reath for defendants Broetje
25      Automation-USA and Broetje GmbH.  I'm joined today by my
```

```
 1    colleagues from the Chicago office of Drinker Biddle &

 2    Reath, who you are familiar with:  Patrick Kelleher.

 3              MR. KELLEHER:  Good morning, Your Honor.

 4              MR. SCHOELL:  Darren Cahr.

 5              MR. CAHR:  Good morning, Your Honor.

 6              MR. SCHOELL:  And Carrie Beyer.

 7              MS. BEYER:  Good morning, Your Honor.

 8              THE COURT:  Good morning.

 9              MR. SCHOELL:  And I should add, your Honor, that

10    Todd Schiltz of our office is also still working on the case

11    and may be appearing during trial as well.

12              THE COURT:  That's fine.  Okay.  Thank you very

13    much.  Welcome.

14              MR. SCHOELL:  Thank you, your Honor.

15              THE COURT:  Welcome to all of you as well.

16              So there are a few matters I wanted to put on

17    the record and raise at least one issue I need a little bit

18    of help with.  And in case you're wondering, we're not

19    starting the clock yet.  We'll start the clock and charge

20    somebody for time after I turn to you and ask you if you

21    have any new issues.

22              So first a few things for me.  The voir dire we

23    docketed this morning and I think we sent in some hard

24    copies for all of you.  The same thing with the preliminary

25    instructions.  There was just that one.  Well, I only recall
```

1    one objection which we had talked about at the pretrial

2    conference, which basically had to do with that preemption

3    issue, and I didn't think I needed to decide that issue for

4    purposes of getting through the preliminary instructions.

5    We'll take up that issue substantively when we talk about

6    disputes on the final instruction, but I just deleted for

7    purposes of the preliminary instructions the extra language

8    that was proposed by the plaintiff.

9            We added in some of our standard instructions

10   that this is a timed trial.  I think it helpful for the jury

11   to know that, and also to let them know what sidebars are in

12   case we do have any, and to let them know they can signal us

13   if they need a somewhat urgent break at times that are not

14   otherwise scheduled.

15           We received the copy of the new patent video,

16   the FJC video that you all somewhere agreed we will play

17   along with the sample patent, and we will be passing those

18   out later today to the jurors.

19           Your letter on how to do Rule 50 motions was

20   very helpful.  It appeared to me that you were in agreement,

21   and I'm in agreement with your agreement.  So the way we

22   will do that is you will just make oral motions during the

23   trial.  You will note that promptly at the appropriate time

24   but you won't even argue them orally at that time.  You will

25   argue them at a convenient time to all of us probably at a

1    break or at the end of the day, and then you have a chance

2    to follow-up in writing with up to three pages according to

3    the time limits that you provided yourselves.

4              Is there any question about the Rule 50 practice

5    for this case?

6              MR. LINDVALL:  No, Your Honor.

7              MR. KELLEHER:  No, Your Honor.

8              THE COURT:  Okay.  In terms of how to do

9    impeachment by the prior testimony, again, you putting your

10   heads together was helpful.  You didn't quite reach

11   agreement on that.

12             I'm going to adopt the plaintiffs' proposal in

13   this trial for how to do impeachment by prior testimony.

14   And that means, first of all, you did agree on this.  You

15   can use the video or you can use the text of the prior

16   testimony, and you must identify, of course, the page and

17   the line number that you are using, but then once you have

18   done that, you can go ahead and continue to read it or play

19   it, whatever the case may be, without waiting for objections.

20             If the other side does have an objection, for

21   instance, as not impeaching, not inconsistent, not

22   incomplete, wait until after the testimony is read and

23   then you can note for the record that I have this objection.

24   That preserves the objection for my purposes, and the

25   objection is noted, but obviously the testimony will be

1    read or played and I'm not going to do anything about it in

2    the course of the trial.  Then when you get to redirect, you

3    are free to try and, from your perspective, fix things by

4    reading or playing whatever additional testimony you think

5    is necessary to put what happened on cross in the proper

6    context before the jury.

7              Are there any questions about how we'll do that?

8              MR. LINDVALL:  No, Your Honor.

9              MR. KELLEHER:  No, Your Honor.

10             THE COURT:  Here is where I need a little bit of

11   help.  Sequestration of fact witnesses.  There was a dispute

12   also in that same letter about whether we should sequester

13   fact witnesses during opening statement.  I think it's AHG

14   wants to sequester and Broetje does not.  If that is still

15   AHG's request, let me hear from you briefly as to why I

16   should do that.

17             MR. LINDVALL:  Your Honor, I believe the

18   witnesses should be sequestered in opening for the same

19   reasons they are sequestered in a situation where a witness

20   is testifying because I believe both of us in opening will

21   be referring to evidence that the jury is going to be

22   hearing, and there may be testimony that the jury is going

23   to be hearing from fact witnesses.

24             Thank you.

25             THE COURT:  Okay.

 1          MR. KELLEHER:  Your Honor, our argument is

 2  pointed to Rule 615 where it speaks about excluding

 3  witnesses only so they cannot hear the testimony of other

 4  witnesses which won't be occurring in the opening statements

 5  so we don't think there is any possibility of polluting the

 6  witness knowledge pool.

 7          THE COURT:  All right.  Well, I'm going to stick

 8  for now to the letter of Rule 615.  I'm not going to exclude

 9  anybody or sequester anybody from the opening statements.

10  It's not evidence, it's not argument.  It's just an outline

11  as to what you expect the evidence to be, and I'm not

12  persuaded that it's necessary to sequester witnesses from

13  openings.  That is my ruling there.

14          We had the letters on equitable tolling.  As I

15  understand it, there is really nothing that I need to do

16  on this at this point.  We'll address the merits of the

17  equitable tolling question in context of post-trial

18  proceedings.  And I don't anticipate instructing the jury

19  or asking the jury any questions on the verdict sheet about

20  equitable tolling.  That's what I think we had agreed on in

21  the pretrial conference, and I don't think anything in the

22  subsequent letters changed that.

23          Is there any question about that?

24          MR. LINDVALL:  No.  I believe that is correct,

25  Your Honor.  One clarification, though.  We'll obviously

1    have to put in evidence to support our equitable tolling

2    claim here in the trial.

3                    THE COURT:  Right, but it will just come in

4    looking like other evidence.

5                    MR. LINDVALL:  Correct, Your Honor.

6                    THE COURT:  Is there any questions about that?

7                    MR. KELLEHER:  Your Honor, because of the nature

8    of the evidence that they're hoping to put in concerning

9    equitable tolling, we actually object heavily to the

10   substantive evidence they want to put in.  We have

11   objections to that with regard to their first witnesses.

12                   THE COURT:  Okay.  Then we'll take that up in

13   a moment when we come to it.  So as a general matter, Mr.

14   Lindvall is correct, but subject to specific objections and

15   depending how we go on the specific objections, we may have

16   to revisit the general question.

17                   MR. KELLEHER:  That's correct, Your Honor.

18                   THE COURT:  All right.  The only other thing

19   that I think is pending in front of me right now is the

20   objections to the deposition testimony.  I'm not ready to

21   give you the rulings on that yet.  I'll try to do that

22   before the end of the day today.  You didn't anticipate

23   even best case playing that today, I don't think.  Is that

24   correct?

25                   MR. LINDVALL:  I believe so, Your Honor.  Best

1    case, we'll be playing those videos, two videos at the very

2    end of the day.

3              THE COURT:  Oh.  Did you think you might get to

4    it at the end of the day?

5              MR. LINDVALL:  It depends on how quickly we

6    moved today.

7              THE COURT:  All right.

8              MR. LINDVALL:  We have one witness, and we'll

9    play the videos.

10             THE COURT:  You won't be playing it before the

11   lunch, I'm fairly confident.

12             MR. LINDVALL:  No, Your Honor, we would not.

13             THE COURT:  I'll try to get you a ruling by the

14   end of the lunch break, if I can.

15             All right.  Then in terms of Broetje's corporate

16   representative, who have you elected to have?

17             MR. KELLEHER:  Your Honor, Mr. Ken Benczkowski

18   who is the President of Broetje USA.

19             THE COURT:  Fine.  Thank you very much.  Do you

20   want to say anything about that?

21             MR. LINDVALL:  No, Your Honor.  We're going to

22   have Philippe Bornes as our representative.

23             THE COURT:  Thank you.  And I didn't mean to

24   slight Mr. Bornes.  I just know there was no dispute with

25   respect to him.

1          MR. LINDVALL:  Thank you.

2          THE COURT:  All right.  That was all I had on my

3    list.  So we are now going to start the clock, and I'll see

4    if anybody has any issues that they wanted to raise with us

5    this morning.  First from the plaintiff.

6          MR. LINDVALL:  Your Honor, we have two issues

7    with their opening slides, two objections to their opening

8    slides.

9          THE COURT:  Okay.

10         MR. LINDVALL:  And that we did not resolve last

11   night.  The first one is their Slide No. 34.

12         Their Slide No. 34, this is a part of some claim

13   language.  And they, I know they changed this, but what

14   they're doing, they're comparing a drawing in the patent to

15   the accused product.  And I believe it's improper from a

16   matter of patent law to compare a drawing to the accused

17   product and somehow argue infringement.

18         The proper way of doing that, of course, is the

19   claim language as construed by the Court with the accused

20   product.  Therefore, we object to the use of this slide.

21         THE COURT:  All right.  And there is only one

22   other that you objected to?

23         MR. LINDVALL:  Yes.

24         THE COURT:  Let's hear that one, too.

25         MR. LINDVALL:  Slide 40.

1          Slide 40, they represent this is F2C2, which is

2     our tube design, and this actually the sketch made

3     internally by their in-house legal department of what they

4     thought our product looked like.  So we believe it's a

5     misrepresentation that this sketch represents the F2C2 tube

6     design.  It did not come from our documents, it came from

7     the sketch at one of their in-house lawyers or people made

8     of what they thought our tube design is.  So we're objecting

9     to that based on his mischaracterization of what our tube is.

10               THE COURT:  Okay.

11               MR. LINDVALL:  Thank you.

12               THE COURT:  Thank you.  From defendants.

13               MR. KELLEHER:  Your Honor, with regard to Slide

14     34, we're not making a noninfringement argument that the

15     only thing that can constitute "substantially equal" is what

16     is shown in that Figure 2 from the patents.  That is merely

17     one example of that.  We're not seeking a noninfringement

18     determination based upon that, so the accusation we're

19     trying to mislead the jury right up in front on that isn't

20     accurate.

21               THE COURT:  You understand the jury will be

22     instructed that for purposes of infringement they need to

23     compare the claim language to the accused products?

24               MR. KELLEHER:  Of course.

25               THE COURT:  You are not going to argue anything

1    inconsistent with that, are you?

2              MR. KELLEHER:  No.

3              THE COURT:  And Slide No. 40.

4              MR. KELLEHER:  Then, Your Honor, with regard to

5    Slide No. 40.  These are merely the two images in the actual

6    document that was sent to Dr. Budach, who gave the opinion

7    of counsel of no infringement.  And this was sent to him in

8    2005 saying these are two tube shapes, and they asked his

9    advice on it.  So this is merely what is coming out of the

10   letter.  If they want to somehow put in evidence that he was

11   shown an incorrect slide, they'll be able to do that.

12             THE COURT:  But you anticipate the evidence of

13   the opinion of counsel is coming in at trial; correct?

14             MR. KELLEHER:  Yes, Your Honor.

15             THE COURT:  And you expect the testimony will be

16   that these two images were part of what that attorney based

17   his or her opinion on?

18             MR. KELLEHER:  Yes.  They were included in an

19   e-mail sent to him.

20             THE COURT:  All right.  Thank you very much.

21             Do you want to reply?

22             MR. LINDVALL:  No, Your Honor.

23             THE COURT:  All right.  I'm going to overrule

24   both objections.  I'm confident in the context of the whole

25   trial, this will not be unduly prejudicial or unfairly

1     confusing or in any way unfair to the plaintiff.  I think

2     both of these are probative.

3            The jury will be properly instructed on the law,

4     for instance, that you can't find infringement simply based

5     on a drawing in the patent.  That it's the claims that

6     determine the scope of the patent protection.  And that

7     largely goes to 34 and 40 given what has been represented

8     about the source of those drawings and the evidence we're

9     likely to hear about it.  Again, I think it's probative and

10    not unfairly prejudicial to the plaintiff.

11           Are there any other issues from the plaintiffs?

12           MR. LINDVALL:  No, Your Honor.

13           THE COURT:  Okay.  What about from the

14    defendants?

15           MR. KELLEHER:  Your Honor, we don't have

16    objections to the demonstrative slides that the plaintiffs

17    are planning to use on their opening.  Our objections are

18    with regard to two trial exhibits they were planning to use.

19           THE COURT:  Okay.

20           MR. KELLEHER:  And the first one, Your Honor, is

21    the English language translation of the most recent French

22    appellate court judgment where, from deposition testimony,

23    it appears they want to read the translation of the French

24    court finding that we supposedly are selling an identical

25    cassette into the record.  And we would think, Your Honor,

1    that this is getting into satellite litigation over what has

2    happened in Europe.

3                 There have been five decisions from five

4    different courts in Europe now.  Four have ruled for my

5    client, one has ruled for my opponent.  We haven't intended

6    to be reading English translations of our victories in

7    Europe into the record.  We don't think they should be doing

8    it here, especially when the only purpose it seemed to be to

9    sway the jury on the merits the their substantive trade

10   dress claim.

11                THE COURT:  So do you object to its admission as

12   well as to the reading that you anticipate them reading?

13                MR. KELLEHER:  Here is what we conceive of, Your

14   Honor.  As you know, there have been undertaken a redesign

15   of the Broetje cassette to what we will call the red

16   cassette.  We don't object to the jury knowing of the reason

17   we did that is that we lost a case in the French Court of

18   Appeals and now we have to change if we want to keep selling

19   in France.

20                But we would stop it right there.  We wouldn't

21   get into the merits what happened in France, the same way we

22   don't intend to get into the four cases that we won.  And

23   then the jury would understand why it is we're making this

24   change.  It's not just in the ordinary course of business.

25   We don't think that the jury should be hearing the words of

1    the French court.

2             THE COURT:  All right.  So what would be wrong

3    with doing it the other way and saying all five judgments or

4    opinions are fair game and put them in, if you want to?

5             MR. KELLEHER:  Because, Your Honor, I think that

6    would be a waste of time.  You would be hearing a lot of

7    decisions from Judges in Europe that aren't binding on this

8    jury here.  In France, it doesn't matter if, under their

9    law of unfair competition, selling something that looks

10   identical would be a violation of their law.  That is not

11   the law in the United States.  You have got to have a whole

12   bunch of other elements to satisfy a trade dress claim in

13   the United States, and it's only going to improperly sway

14   the jury, the same way I can read the German court decision

15   finding invalid the patents.  I don't intend to do that

16   because it's not especially probative for the jury here.

17            THE COURT:  All right.  So that's the first

18   issue?

19            MR. KELLEHER:  It is, Your Honor.  We wouldn't

20   like the text read or the language paraphrased basically in

21   the case.

22            THE COURT:  Well, I think it is an objection to

23   the admission of the actual judgment because once it's in,

24   we can't control what the jury is going to do.

25            MR. KELLEHER:  Agreed, Your Honor.

1          The second substantive exhibit, Your Honor, is

2     they want to put in a letter that was sent to my client in

3     2005 or 2006 by the French lawyers to my clients in Germany

4     accusing them of various things such as infringing the

5     European patent and accusing them of breaching the supposed

6     contract that existed between AHG and my client.

7          Your Honor, you ruled on our Motion No. 1 that

8     there can be no accusation or insinuation that we breached

9     any contract with AHG, so we think that exhibit is already

10    barred by your first ruling on the motion in limine.

11          THE COURT:  Remind me.  When did that first

12    motion in limine come up?

13          MR. KELLEHER:  You decided it at the first

14    pretrial conference in 2011.

15          THE COURT:  All right.  Thank you very much.

16          Let's hear from plaintiffs.

17          MR. LINDVALL:  Your Honor, there's one very

18    important thing that wasn't brought up, is that you already

19    decided the issue on the foreign law.  We, AHG, had brought

20    up in motion in limine number one that two years ago to try

21    to preclude the defendants from bringing in the German and

22    French decisions which at that time were both favorable to

23    them, and for the same reasons he doesn't want them in now,

24    we didn't want them in back then.

25          We made these argues.  Mr. Kelleher made his

1    arguments, and Your Honor ruled in their favor and said, and

2    I can cite, it's at DI 334, page 76:  "The foreign law that

3    defendant wishes to cite does have at least some limited

4    relevance.  The jury will decide how much weight to give

5    that evidence and a Court will, if asked, instruct the jury

6    on the nonbinding nature of foreign law.  The relevance,

7    though minimal, relates to the willfulness claim."

8              Now, let me address that for a moment.  That

9    still is true.  There's willfulness on trade secret, I meet

10   trade dress and there's willfulness in the patent claim.

11   There's also relevance with the decisions relating to the

12   equitable tolling claim.  So the relevance is still there,

13   and the judge, and Your Honor has already ruled on specific

14   things.  I believe from the minimal standpoint, they're

15   judicially estopped to come in here and argue the exact

16   opposite.

17             THE COURT:  So in your view, does that ruling go

18   to what are now five separate European decisions?

19             MR. LINDVALL:  Yes.  We've gone from four to

20   five, because what happened, one more additional French

21   decision that came out in 2012.

22             THE COURT:  And in your view, then, if I adhere

23   to the ruling I gave previously, all five are fair game to

24   be admitted and read from and used in any proper way at

25   trial?

1          MR. LINDVALL:  Yes, Your Honor.  In fact, they

2     just recently put on the exhibit list a German decision,

3     which invalidated our patent.  And --

4          THE COURT:  And you would be in support then of

5     me instructing the jury about the nonbinding nature and that

6     the legal standard may or do differ, and things such as

7     that?

8          MR. LINDVALL:  That's correct, Your Honor.

9     That's what you had suggested to me two years ago, when I

10    was on the other side.  You said, well, we can take care of

11    that through a proper jury instruction about the nonbinding

12    nature and we would propose one.

13         THE COURT:  Okay.  That's the first issue.  How

14    about let's address the second issue.

15         MR. LINDVALL:  The second issue is the same

16    thing except it's a little bit different.  Here we have a

17    document, which is really part of the story, where you move

18    along in a timeline, one of the things that happened was we

19    discovered that they were, had copied our cassette and they

20    were selling it without our knowledge.  Our lawyers sent to

21    them a basically cease and desist letter.  The cease and

22    desist letter for other reasons I believe is relevant to

23    marking because that is one of the defenses they have, is we

24    didn't mark our product.  And we believe that that serves

25    proper written notice.  What they are trying to do is

1    eliminate part of the story, and I think to keep the

2    complete story and have the jury understand what happened

3    between the parties, that needs to go in.

4            We are not going, I'm not going to get up in

5    closing or opening and say they breached the contract,

6    because you ruled on that in the MIL.  But you did say both

7    parties could tell what they understood each other's

8    obligations were under the agreement.

9            THE COURT:  And I have not -- if I've seen the

10   letter, it was years ago.  I don't recall it.

11           Is there a way that it could be redacted such

12   that any insinuations or allegations of breach of contract

13   could be eliminated?

14           MR. LINDVALL:  Yes, Your Honor, we could do

15   that.

16           THE COURT:  Because you are not going to be

17   referring to those portions of the letter in any event.

18           MR. LINDVALL:  No.  I had no plans to refer to

19   those parts of the letter.

20           THE COURT:  Okay.  Anything else?

21           MR. LINDVALL:  No, Your Honor.

22           THE COURT:  Again, reply, if you'd like.

23           MR. KELLEHER:  Yes, Your Honor.  Your ruling on

24   the motion in limine back in 2011 said that there was

25   limited relevance to one of the German Court decisions that

1    had found Broetje not to infringe in Germany, because that

2    tended to show that Broetje had a good-faith reason to rely

3    upon the advice of counsel of noninfringement because there

4    was an agreement between counsel and the Court and that was

5    the only purpose for which we were going to use it.  We were

6    not going to elaborate on exactly what had happened.  We

7    were not going to read the German Court decision into

8    evidence.

9            As for willfulness, Your Honor, it has nothing

10   to do with willfulness.  The judgment they want to read has

11   nothing to do with willfulness on the patents because the

12   patents had already expired.

13           With regard to willful trade dress,

14   infringement, this was a decision in 2010, I believe, or

15   2000, I'm sorry, yes.  2010 or 2011, and -- no, I'm sorry.

16   The appellate court decision was 2012.  That had nothing to

17   do with whether or not my client adopted the supposed trade

18   dress in 2004.  It was wilful.  You can't go back six years

19   in time in this court judgment and somehow say there was

20   willfulness.

21           THE COURT:  That was the first.

22           MR. KELLEHER:  That was the first, Your Honor.

23           With regard to the letter, it can't prove

24   marking, Your Honor, because it does not mention either of

25   the two U.S. patents by number, which is required.  And they

1     only mention the European patent.  And as you mentioned,

2     once the letter comes into evidence, the jury will see it

3     and be able to do anything they want with it.

4               THE COURT:  And what about redacting it?

5               MR. KELLEHER:  I have not thought carefully

6     about redacting, Your Honor.  I looked over it.  I will

7     concede it's a possibility that any accusation of breach of

8     contract could be redacted out.

9               THE COURT:  All right.  Thank you.

10              Well, on the first objection, I'm going to

11    overrule the objection.  I'm going to allow the five

12    decisions.  I understand there are five now decisions from

13    Europe to come in.  If the parties wish to do that, there

14    should be no effort to lead the jury into thinking that the

15    legal standards are the same or identical or anything other

16    than what they actually are in France or Germany as the case

17    may be, and I will want to instruct the jury of that reality

18    at some point in the case, at least including final jury

19    instructions.  I don't recall if you've proposed something

20    on that point already.  If you haven't, then I'm directing

21    you to meet and confer and submit something sometime this

22    week that I may consider so that there is no chance of the

23    jury being misled into thinking they must do whatever

24    another Court applying different law may have done.  But

25    with that protection and consistent with what I am reminded

1     in my ruling years ago, I'm going to overrule the

2     defendants' objection.

3             On the second issue, I'm going to overrule the

4     objection for now, but it's without prejudice to the

5     defendant renewing that objection after they take a look at

6     whatever the proposed redaction is from the plaintiff.  I

7     don't want the jury to see insinuations or allegations of

8     breach of contract, which I'm reminded I ruled shouldn't be

9     done.  Plaintiff doesn't intend to do that.  You'll need to

10    show defendant sort of proof of that through the proposed

11    redacted version of the letter and make sure that defendants

12    get a chance to see that before we call that witness to the

13    stand.  If there remains an objection, then go ahead and

14    raise it again before we call that witness to the stand.  I

15    will make the final determination then.

16            Go ahead.

17            MR. LINDVALL:  One question, Your Honor.  I

18    planned on using that document in my opening statement, but

19    I'm not using any portion to talk about the breach of

20    contract.  I just want to make sure it would be okay to use

21    it.

22            THE COURT:  Do you have a slide or something?

23            MR. LINDVALL:  It's just the actual document,

24    because the only part I was going to show, it does not say

25    anything about breach of contract.  It talks about

1    infringement.

2              THE COURT:  All right.  Well, show counsel the

3    portion you intend to show to the jury.  Assuming it does

4    not reference breach of contract, I will let you do it,

5    though if there's still an objection to it, go ahead and

6    put it on the record at some point before we get to

7    openings.

8              MR. LINDVALL:  Thank you, Your Honor.

9              THE COURT:  All right.  Any question about any

10   of that?

11             MR. KELLEHER:  No, Your Honor.

12             THE COURT:  All right.  Any other issues from

13   defendant?

14             MR. KELLEHER:  Deposition designations, Your

15   Honor, that we'll resolve later, on I suppose.

16             THE COURT:  The ones I already have in front of

17   me?

18             MR. KELLEHER:  That's correct.

19             THE COURT:  All right.  Has there been any

20   change to the universe of what I need to decide?

21             MR. KELLEHER:  I don't believe so, Your Honor.

22             THE COURT:  All right.  Okay.  Well, we are

23   going to take a look at those and try and get you a ruling

24   by the end of the lunch break.

25             Anything else?

1           MR. LINDVALL:  No.  I will note for you, make

2    your job easy, since you've ruled on the MIL, you'll see the

3    objections on part of the deposition designations, the same

4    argument on the MIL, so that will make your life a little

5    easier.

6           THE COURT:  It may, it may.

7           MR. LINDVALL:  Thank you, Your Honor.

8           THE COURT:  Okay.  All right.  I don't believe

9    the jury pool will be available until 9:30.  The patent

10   video, we're going to need to rely on you all to play that

11   at the point in which I get to that in my instruction.  I

12   know you provided a copy to us, but you are prepared,

13   somebody is prepared to play it?  Hands are being raised.

14   That's a yes.  Correct?

15          MR. LINDVALL:  Yes.

16          THE COURT:  Okay.  All right.  All right.  Well,

17   we'll be in recess for a little bit.

18          MR. LINDVALL:  Thank you.

19          (Short recess taken.)

20          THE COURT:  Good morning, everyone.  Welcome,

21   ladies and gentlemen, of our jury panel.  I am Leonard

22   Stark.  I'm a United States District Judge here in the

23   District of Delaware.  I'm the judicial officer who has been

24   selected to preside over this trial.

25               I want to thank all of you for being here this

1    morning and ask probably not for the last time that you give

2    us your patience and your attention today.  Selecting a jury

3    can be a somewhat lengthy process.  It's likely to take up

4    much of the day, but please just understand that you are

5    very important to the functioning of our system and it's

6    important that we follow the appropriate procedures.

7           The first step in that process is for you all to

8    take an oath and I will turn to my deputy, Mr. Looby, to

9    administer the oath.

10          (Jury panel sworn.)

11          THE COURT:  Thank you.  Thank you for that.

12          So the first step of this process is called voir

13   dire, and the way voir dire will work is, I'm going to read

14   you a series of questions here in the courtroom.  It is 28

15   questions.  They are all written in a yes/no format.  What I

16   ask for you to do is to try to keep in your head just a

17   sense as to whether you have answered yes to any of my

18   questions.  You need not stand, you need not raise your

19   hand.  It's fine if you can't remember the number of the

20   question that you answered yes to.  Just try to keep track

21   of whether you have a "yes" answer to any of the questions.

22   If you do, then after I've gone through the questions, I

23   will meet with you one at a time in my jury room, just right

24   behind where I'm seated, and we'll have a short discussion,

25   the attorneys and me, about what you answered yes to.  So

1    with that, let me begin to read the voir dire questions to

2    you.

3              This is a case about rivet dispensing technology

4    used in large scale manufacturing processes, including the

5    assembly of airplanes.  Broetje Automation-USA Inc. and

6    Broetje Automation GmbH are accused of infringing patents

7    owned by Ateliers de la Haute-Garonne and F2C2 Systems

8    S.A.S., and also of unfair competition, trade dress

9    infringement, and intentional interference with prospective

10   economic advantage.

11             Question number 1 is:  Do you have any personal

12   knowledge about this case, or have you heard it discussed,

13   or have any opinions about it?

14             Question 2.  Are you, a relative, or a close

15   friend personally acquainted with any officer, director, or

16   employee of the plaintiffs at Lear de la Haute-Garonne or

17   F2C2 Systems S.A.S.?

18             Three.  Have you, a relative or a close friend

19   ever done business with the plaintiffs Ateliers de la

20   Haute-Garonne or F2C2 Systems S.A.S.?

21             Question 4.  Are you, a relative or a close

22   friend personally acquainted with, or ever been represented

23   by the plaintiffs' attorneys -- the law firm of Young

24   Conaway Stargatt & Taylor, LLP and Kaye Scholer LLP, or the

25   following individual attorneys:

```
 1              Melanie K. Sharp, James L. Higgins, Samantha G.

 2    Wilson, Scott G. Lindvall, Jeffrey H. Horowitz, Paul I.

 3    Margulies, Michelle Marek, Boris M. Herzi.

 4              Question 5.  Have you, a relative or a close

 5    friend ever used products sold by the plaintiffs at Lear de

 6    la Haute-Garonne or F2C2 Systems S.A.S.?

 7              Question 6.  Have you, a relative or a close

 8    friend ever done business with the defendants Broetje

 9    Automation-USA, Inc., Broetje Automation GmbH, CLAAS Group,

10    or Deutsche Beteilgungs AG?

11              Question seven.  Are you, a relative or a close

12    friend personally acquainted with, or ever been represented

13    by the defendants' attorneys -- the law firm of Drinker

14    Biddle & Reath LLP, or the following individual attorneys:

15              Todd S. Schiltz, Joseph C. Schoell, Darren S.

16    Cahr, Patrick J. Kelleher, Carrie A. Beyer.

17              Question 8.  Have you, a relative or a close

18    friend ever used products sold by the defendants Broetje

19    Automation-USA Inc. or Broetje Automation GmbH?

20              Question 9.  Do you, a relative or a close

21    friend own stock or have any financial interest in Broetje

22    Automation-USA Inc. or Broetje Automation GmbH, CLAAS Group,

23    or Deutsche Beteilgungs AG?

24              That was 9.  Let's make this 9B.  Are you, a

25    relative or close friend personally acquainted with any
```

1    officer, director, or employee of the defendant Broetje

2    Automation-USA, Inc., Broetje Automation GmbH, CLAAS Group,

3    or Deutsche Beteilgungs AG?

4              Question 10.  Are you, a relative or a close

5    friend personally acquainted with any of the following

6    individuals who might appear as witnesses in this case:

7              And my apologies.  I'm going to butcher a lot of

8    these names.  I will try to spell those for you:

9              Jean-Marc Auriol, that's A-u-r-i-o-l.  Pierre

10   Auriol, A-u-r-i-o-l.  Ken Benczkowski,

11   B-e-n-c-z-k-o-w-s-k-i.  Dominique Blanc.  Phillippe Bornes,

12   B-o-r-n-e-s.  Thomas W. Britven.  Tim Brown.  Dr. Steffen

13   Budach, B-u-d-a-c-h.  Andreas Ditsche, D-i-t-s-c-h-e.

14   Douglas Ellis.  Pierre-Alain Girard.  Dominique Hage,

15   H-a-g-e.  Gerhard Holtmeier, H-o-l-t-m-e-i-e-r.  Heiner

16   Holzer.  Dr. Harri S. Kytomaa, K-y-t-o-m-a-a.  Dr. James

17   Langenfeld.  Michael Lawrence.  Yvan Lemelin.  That's

18   Y-v-a-n, the last name, L-e-m-e-l-i-n.  Bill Mangus.  Holger

19   Maylander.  Pascale Mazouer, M-a-z-o-u-e-r.  Francoise

20   Montsarrat.  Dr. Axel Peters.  Philippe Prat.  Robert Reno.

21   Patrice Vellvehi, V-e-l-l-v-e-h-i.

22              That was Question 10 about witnesses.

23              Question 11:  Have you, a relative or a close

24   friend ever served as a juror?

25              Question 12.  Have you, a relative or a close

1    friend ever been a plaintiff or a defendant in a civil

2    lawsuit?

3                Question 13.  Have you, a relative or a close

4    friend ever testified in court or at a deposition?

5                Question 14.  Have you, a relative or a close

6    friend ever had any experience with patents, patent law,

7    patented technology, trademarks, trademark law, or the

8    United States Patent and Trademark Office?

9                Question 15.  Do you have any beliefs or

10    feelings concerning patents or trademarks, and the efforts

11    to enforce patents and trademarks, that might make you

12    biased or prejudiced for or against such enforcement?

13                Question 16.  Do you have any opinions or

14    feelings about whether the U.S. patent system, which grants

15    exclusive rights to inventors for their inventions, helps or

16    hurts society?

17                Question 17.  Do you have any opinions about

18    whether it would be right or wrong for a person or a company

19    to profit from an invention?

20                Question 18.  Do you, a relative or a close

21    friend, have any special education, training or experience

22    in mechanical engineering, product design, or manufacturing?

23                Question 19.  Have you or a family member had

24    any legal education or training?

25                Question 20.  Do you have any particular

1    feelings about individuals or companies from outside of the

2    United States, specifically France or Germany, that would

3    impair your ability to serve as a juror and make factual

4    determinations in the context of this case?

5              Question 21.  Do you speak French or German?

6              Question 22.  Would it bother you that some

7    witnesses may need to testify using a translator?

8              Question 23.  Have you, or a relative or close

9    friend, ever worked for or done business with Gemcor, Kuka,

10   K-u-k-a, ElectroImpact, Boeing, Spirit, Vaught, V-a-u-g-h-t,

11   Dassault, D-a-s-s-a-u-l-t, Airbus, Huck, Bombardier,

12   B-o-m-b-a-r-d-i-e-r, Embraer, E-m-b-r-a-e-r, Gulfstream or

13   any other aircraft manufacturer or parts or tooling

14   provider?

15             And question 23 was have you, or a relative or

16   close friend, ever worked for or done business with any of

17   those companies?

18             Question 24.  Do you, or a relative or close

19   friend, have any experience with or knowledge of riveting

20   technology, airplanes or assembly line manufacturing, or the

21   use of riveting technology in manufacturing?

22             Question 25.  Have you or a family member had

23   any legal education or training?

24             Question 26.  On most days, jurors will be

25   expected to sit from 9:00 in the morning until 4:30 in the

1    evening.  There will be a lunch break and a break in the

2    morning and a break in the afternoon.  Trial is expected to

3    be completed by this Friday, April 11.  Does this schedule

4    pose any substantial hardship for you?

5              Question 27.  Do you have any special

6    disability, or personal issue, or medical condition that

7    would make it difficult or impossible for you to serve as a

8    member of the jury in this case, including the use of

9    medication, hearing loss, or any other issue that you

10   genuinely believe would interfere with your ability to serve

11   or prevent you from serving as a member of the jury in this

12   case?  And, finally,

13             Question 28.  Is there any other matter which

14   you believe should be called to the Court's attention as

15   having some bearing upon your qualifications or ability to

16   sit as a juror, or which you think may interfere with or

17   prevent you from rendering a fair and impartial verdict

18   based solely on the evidence and my instructions as to the

19   law?

20             That completes the 28 voir dire questions.  I

21   will now return to my juryroom along with counsel and my

22   staff will bring you in one by one if you have a "yes"

23   answer to any of those questions.

24             We will be in recess.

25             (Brief recess taken.)

```
 1                    *     *     *

 2              (Proceedings reconvened after recess in the

 3   juryroom.)

 4              THE COURT:  Good morning, everyone.

 5              I'm going to have Mr. Looby first tell us the

 6   jurors that didn't show up by their jury number.

 7              THE DEPUTY CLERK:  There is 13.

 8              Juror No. 4, Juror No. 6, No. 13, 17, 19, 20,

 9   23, 24, 29, 32, 40, 43, and 54.

10              THE COURT:  Okay.  Bring the first person in,

11   please.

12              I hope you all apologized to your witnesses that

13   I destroyed their names.

14              MR. LINDVALL:  That's how I do it.

15              MS. SHARP:  We've done much worse.

16              MR. SCHOELL:  We call it a soccer game.

17              (Juror entered juryroom.)

18              THE COURT:  Have a seat, please.  What is your

19   juror number?

20              A JUROR:  No. 1.

21              THE COURT:  Cheryl Adams.

22              A JUROR:  Yes.

23              THE COURT:  Tell us if you recall what you

24   answered "yes" to.

25              A JUROR:  The first was Question No. 12
```

1    discussing involvement in a lawsuit.  Currently I am with an

2    insurance company.

3              THE COURT:  Okay.  Is that, do you work for an

4    insurance company?

5              A JUROR:  I do not.

6              THE COURT:  So it's a personal lawsuit?

7              A JUROR:  It is.

8              THE COURT:  Okay.  And tell us which court that

9    is in.

10             A JUROR:  Currently we have a deposition.  I

11   unfortunately can't tell you.  My husband was involved in an

12   accident two years ago, hit by a drunk driver.  So that is

13   ongoing.

14             THE COURT:  I'm sorry about that.

15             A JUROR:  Thank you.

16             THE COURT:  And it's actually in litigation?

17             A JUROR:  It is currently.

18             THE COURT:  Have you been deposed?

19             A JUROR:  I've been through one deposition.

20             THE COURT:  Okay.  And the case is at least

21   headed towards trial at this point?

22             A JUROR:  Yes.  Yes.  We did schedule it July

23   2015.

24             THE COURT:  It's here in Delaware?

25             A JUROR:  Yes.

1          THE COURT:  And have you heard of any of the law

2     firms I mentioned?

3          A JUROR:  No, I have not.

4          THE COURT:  Were there other things that you

5     answered "yes" to?

6          A JUROR:  The only other item about legal

7     education or that.  I certainly have taken courses, business

8     law.  It is probably not that relevant but I did work for an

9     attorney one summer about 2001, real estate attorney.

10         THE COURT:  Was that here in Delaware?

11         A JUROR:  Yes, Gerald Dixon.  He used to be

12    located, he is retired, on King Street.

13         THE COURT:  And you took a business law course

14    or courses?

15         A JUROR:  Yes.  No, just two.  Two business law

16    courses.

17         THE COURT:  Was that prior to that employment?

18         A JUROR:  Yes.

19         THE COURT:  Here in Delaware also?

20         A JUROR:  No, actually at a university in

21    Philadelphia.

22         THE COURT:  All right.  Is there anything else?

23         A JUROR:  No, that's it.

24         THE COURT:  Let me see if the lawyers have any

25    else for you.  First from the plaintiffs.

```
 1                    MS. SHARP:  No, we don't, Your Honor.

 2                    THE COURT:  The defendants?

 3                    MR. SCHOELL:  No.

 4                    THE COURT:  Okay.  Thank you very much.  You can

 5     step out.

 6                    (Jury left juryroom.)

 7                    THE COURT:  Any motion?

 8                    MS. SHARP:  No motion.

 9                    THE COURT:  Any motion?

10                    MR. SCHOELL:  No.

11                    MR. KELLEHER:  No motion.

12                    (Juror entered juryroom.)

13                    THE COURT:  Good morning.

14                    A JUROR:  Good morning.

15                    THE COURT:  Have a seat, please.

16                    What is your juror number?

17                    A JUROR:  16.

18                    THE COURT:  Christopher Collins.

19                    A JUROR:  That's me.

20                    THE COURT:  What did you answer "yes" to?

21                    A JUROR:  Several of them.  I'm a co-owner of an

22     industrial metrology quality control company.

23                    THE COURT:  Was it industrial?

24                    A JUROR:  Quality control.

25                    THE COURT:  I'm sorry.  Industrial?
```

```
1                    A JUROR:  Industrial metrology.

2                    THE COURT:  What is that?

3                    A JUROR:  Metrology is the science of precision

4        in measurement and the industrial application is quality

5        control.

6                    THE COURT:  And you own the company?

7                    A JUROR:  I'm a co-owner.

8                    THE COURT:  Okay.

9                    A JUROR:  And part of the problem was I was able

10       to schedule my schedule around everything but this week.  I

11       have a trade show in Secaucus Tuesday and Wednesday and a

12       seminar in St. Mary's on Thursday.

13                   THE COURT:  And if you weren't able to make it

14       to those, what would be the impact on the business?

15                   A JUROR:  Not good.  I'm one of the presenters

16       for the seminar and the trade show.  I have to keep -- I'm a

17       small company.  I've got to keep everything I can get out

18       there.

19                   THE COURT:  That is partly how you get business?

20                   A JUROR:  Correct.

21                   THE COURT:  Okay.

22                   A JUROR:  And we do do work with places like

23       Boeing and some of their subcontractors.

24                   THE COURT:  Do you actually have a contract with

25       Boeing?
```

1        A JUROR:  No, not at this time.

2        THE COURT:  Were there other issues?

3        A JUROR:  Well, the patent infringement.  I'm

4    kind of sensitive to that.

5        THE COURT:  Tell us about that.

6        A JUROR:  Well, I think if you took the time and

7    effort to create something and you went through the process

8    and you had it patented, I don't think it's fair somebody

9    comes in and just kind of pinches your work.

10       THE COURT:  So if you heard that in this case

11   one side had a patent and the other one is accused of

12   infringement, do you think one side might start out a little

13   bit ahead?

14       A JUROR:  In my eyes, yes.

15       THE COURT:  Now, do you think you would be able

16   to put that aside and be fair and impartial to both sides?

17       A JUROR:  I probably could.

18       THE COURT:  Okay.  Other issues?

19       A JUROR:  That's it.

20       THE COURT:  Basically, this is bad timing for

21   you?

22       A JUROR:  Yes.  If it was last week or next

23   week, but this week it's just too many fixed things.

24       THE COURT:  Let me see if the lawyers have any

25   questions for you.  From the plaintiffs?

```
1                 MS. SHARP:  No questions.

2                 MR. SCHOELL:  No questions.

3                 THE COURT:  All right.  You can step out.  Thank

4    you very much.

5                 (Juror left juryroom.)

6                 THE COURT:  Your thoughts?

7                 MS. SHARP:  We have no application.

8                 MR. KELLEHER:  We would move to strike for

9    cause, Your Honor, just based on hardship and his indication

10   that one side would start out ahead.

11                THE COURT:  All right.  I'm more concerned about

12   the schedule.  He seams pretty clearly not to want to be

13   here and not afraid to voice it.  I'm concerned about the

14   impact on his business, and I will go ahead and strike No.

15   16.

16                THE DEPUTY CLERK:  Okay.

17                (Juror entered juryroom.)

18                THE COURT:  Good morning.  Have a seat, please.

19                A JUROR:  How are you?

20                THE COURT:  Good.  Thank you.  And you?

21                A JUROR:  Good.

22                THE COURT:  What is your juror number?

23                A JUROR:  52.

24                A COURT:  Linda Vintigni?

25                A JUROR:  Vintigni.
```

```
 1                    THE COURT:  Vintigni.  Sorry about that.

 2                    What did you answer yes to, please?

 3                    A JUROR:  Well, what I was concerned about, I

 4       work for DuPont, and so I work in a sales and marketing

 5       organization and so we deal often with the trademarks and

 6       like some of the patent stuff, you know, and some of the

 7       stuff I deal with.

 8                    THE COURT:  All right.  And what do you do at

 9       DuPont?  What's your role?

10                    A JUROR:  I'm a sales assistant, so I work with

11       what would probably be the most well-known, it's the four

12       products group.  So it's like the Teflon trademark.

13                    THE COURT:  Okay.  And have you had any role in

14       any disputes there may have been about the trademarks?

15                    A JUROR:  No.

16                    THE COURT:  Any role in disputes about patents?

17                    A JUROR:  No.

18                    THE COURT:  Are you aware of DuPont having such

19       issues?

20                    A JUROR:  Yes.  Yes.

21                    THE COURT:  And so if you heard that this trial

22       partly involves disputes over trademarks and patents, do you

23       think you would be able to fairly evaluate that for both

24       sides?

25                    A JUROR:  Well, I mean, I guess I would feel
```

1    only after having all of this, you know, time and service

2    with the company, I guess I would feel like a little bit

3    committed to, like, the integrity of the trademarks and

4    stuff like that.  But I have never been involved in any kind

5    of disputes.

6                    THE COURT:  All right.  So because DuPont has

7    trademarks, for example --

8                    A JUROR:  Yes.

9                    THE COURT:  -- you think you might start out a

10   little sympathetic here to the side that has trademarks?

11                   A JUROR:  Well, I mean, maybe, yes.

12                   THE COURT:  All right.  Now, even if you started

13   out that way, do you think, you know, as I instruct you, you

14   know, you have an obligation to be fair and impartial?

15                   A JUROR:  Okay.

16                   THE COURT:  To both sides and to listen to the

17   evidence and follow the law I give you, do you think you

18   would be able to do that?

19                   A JUROR:  Yes.  Mm-hmm.

20                   THE COURT:  All right.  Were there other issues

21   you wanted to talk about?

22                   A JUROR:  Well, the only other issue is that I

23   have a medical doctor's appointment later on this week.  I

24   was experiencing some, you know --

25                   THE COURT:  You don't have to give us details.

```
 1                    A JUROR:  Yes.

 2                    THE COURT:  That's fine.  But is it an

 3       appointment on like Thursday or Friday?

 4                    A JUROR:  Wednesday or Thursday.  I'm waiting

 5       for a call back.

 6                    THE COURT:  Okay.  And is it -- you don't know

 7       what time that appointment would be at this point?

 8                    A JUROR:  I don't.  But I mean, well, I didn't

 9       even know we could have a cellphone here, so it's not like I

10       can get the call because I thought I had to leave my

11       cellphone in the car.

12                    THE COURT:  All right.

13                    A JUROR:  So I won't be able to know that until

14       the end of the day.

15                    THE COURT:  And without getting into any

16       details, is it an appointment you want to see the doctor

17       this week?  Is it a hardship to put you off until next

18       week?

19                    A JUROR:  I do, only because I'm going out of

20       town next Thursday in the evening and so I kind of wanted to

21       start dealing with it this week.

22                    THE COURT:  Okay.  All right.  Other issues?

23                    A JUROR:  No.  There's no other issues.

24                    THE COURT:  Let me see if anyone else has

25       questions for you.
```

```
 1                    MS. SHARP:  No, Your Honor.

 2                    THE COURT:  No.  Any questions?

 3                    MR. KELLEHER:  No, Your Honor.

 4                    THE COURT:  Okay.  You can step back out.  Thank

 5     you.

 6                    A JUROR:  Okay.  Thank you.

 7                    (The juror left the jury room.)

 8                    THE COURT:  Any motion from plaintiff?

 9                    MS. SHARP:  No motion, your Honor.

10                    MR. SCHOELL:  No, Your Honor.

11                    THE COURT:  No?  All right.

12                    (Pause.)

13                    DEPUTY CLERK:  I have to go in there and get

14     them.

15                    THE COURT:  Is everything okay?

16                    DEPUTY CLERK:  Yes.

17                    THE COURT:  There's no motion on 52.  You can

18     bring in the next person.

19                    (The juror entered the jury room.)

20                    DEPUTY CLERK:  Ma'am?

21                    THE COURT:  Have a seat right here, please.

22     Tell us what your juror number is.

23                    A JUROR:  22.

24                    THE COURT:  22.  Jacqueline Hill?

25                    A JUROR:  Mm-hmm.
```

1            THE COURT:  Yes?  I'm sorry.  For the court

2    reporter's benefit, yes or no will help.  Is it yes?

3            A JUROR:  Yes.

4            THE COURT:  Okay.  Thank you.

5            And tell us, if you recall, what you answered

6    yes to, please.

7            A JUROR:  Would I be able to sit, like, from

8    9:00 to 3:00.

9            THE COURT:  Okay.

10            A JUROR:  Or --

11            THE COURT:  You have a concern about the

12    schedule?

13            A JUROR:  Yes.  I have problems sitting.  I

14    work, but it's standing all day.  I have arthritis in my

15    knees, and my left knee in particular.

16            THE COURT:  Okay.

17            A JUROR:  And I have to drive -- it took me like

18    two hours today.

19            THE COURT:  All right.  All right.  Well,

20    obviously, I'm very sorry to hear about the arthritis.  I

21    don't know if you saw where the jury box is.  It would have

22    been to my right.

23            A JUROR:  Mm-hmm.

24            THE COURT:  There's a little bit of space there.

25    If I told you it was okay to move around as need be, you can

1    stand up at times, would that help at all?

2                    A JUROR:  Yes, that helps.

3                    THE COURT:  I told you so it's roughly 9:00 to

4    4:30.  We usually take about a half-hour of breaks plus a

5    half-hour for lunch.  We can take additional breaks.  Is

6    that something you think you could do or would that be too

7    much?

8                    A JUROR:  I didn't know if I could stand.

9                    THE COURT:  Right.  You could if need be.

10                   All right.  And then the driving.  So you live

11   far away?

12                   A JUROR:  In Dover.

13                   THE COURT:  Right.  If we could put you up at a

14   hotel up here, would that be helpful at all?

15                   A JUROR:  Yeah.

16                   THE COURT:  That could help?

17                   A JUROR:  Yeah.

18                   THE COURT:  Okay.

19                   A JUROR:  Yes.

20                   THE COURT:  All right.  What other issues?  Do

21   you have some other issues?

22                   A JUROR:  No.

23                   THE COURT:  No?  That's it.

24                   A JUROR:  Just loss of pay.

25                   THE COURT:  All right.  Sorry about that.

```
 1                    All right.  Let me see if there are other

 2     questions for you.

 3                    A JUROR:  Okay.

 4                    MS. SHARP:  No additional questions, Your Honor.

 5                    THE COURT:  No?  Defendant?

 6                    MR. SCHOELL:  No questions.

 7                    THE COURT:  All right.  Step back out.  Thank

 8     you.

 9                    A JUROR:  Thank you.

10                    (The juror left the jury room.)

11                    THE COURT:  Any motion from plaintiff?

12                    MS. SHARP:  No, Your Honor.

13                    THE COURT:  From defendant?

14                    MR. KELLEHER:  We would move for cause, Your

15     Honor, just because of hardship with her having to travel so

16     much and her medical issues.

17                    THE COURT:  Okay.  Plaintiff?

18                    MR. LINDVALL:  Your Honor, she said she, as long

19     as she could stand periodically once a juror, that would be

20     overcome, and your Honor offered her residence at a hotel

21     close to here, so we think that would eliminate any of those

22     hardships.

23                    THE COURT:  Yes.  My impression was, while there

24     would still be some hardship, it was adequately remedial, I

25     suppose, from her perspective, both standing, the breaks and
```

1    the hotel, so I'm going to deny the motion.

2               DEPUTY CLERK:  Next?

3               (The juror entered the jury room.)

4               THE COURT:  Hi.  Have a seat.

5               A JUROR:  Hello.

6               THE COURT:  Tell us your juror number.

7               A JUROR:  47.

8               THE COURT:  Brandon Thompson?

9               A JUROR:  Yes.

10              THE COURT:  Okay.  And what did you answer yes

11   to, please, if you recall?

12              A JUROR:  I don't.  I have no idea.

13              THE COURT:  Okay.

14              A JUROR:  There were two or three of them.

15              THE COURT:  Do you remember generally?  Any

16   idea?

17              A JUROR:  One of them was a relative that was a

18   juror.

19              THE COURT:  Okay.

20              A JUROR:  I don't know if he was a juror.  He

21   got called for jury duty.  I don't know what he actually

22   did.  It was one of the State courts.

23              THE COURT:  Here in Delaware?

24              A JUROR:  Yes.  In Kent County.

25              THE COURT:  Okay.  And did that relative share

1    any impressions with you?

2              A JUROR:  I have no idea what he did.

3              THE COURT:  Okay.  All right.  Do you remember

4    any other general issues?

5              A JUROR:  Legal education.

6              THE COURT:  You have some legal education?

7              A JUROR:  Very, very little.

8              THE COURT:  Tell us about it.

9              A JUROR:  Basic constitutional law, OSHA

10   regulations, safety.

11             THE COURT:  And you've taken some formal classes

12   on is that?

13             A JUROR:  Yes.

14             THE COURT:  At a university?

15             A JUROR:  Yes.  College, university.

16             THE COURT:  Okay.  Both on constitutional law

17   and on some sort of regulations as well?

18             A JUROR:  Yes.

19             THE COURT:  Okay.  You're not in law school?

20             A JUROR:  No.

21             THE COURT:  All right.  So if you are on this

22   jury, I will instructing you on the law to apply here.  If I

23   were to tell you something different than what you may have

24   learned in your classes, would you be able to follow what I

25   tell you?

```
 1                    A JUROR:  Yes.

 2                    THE COURT:  All right.  Even if you think it's

 3    wrong?

 4                    A JUROR:  Yes.  I mean, you've been doing this a

 5    lot longer.

 6                    THE COURT:  All right.  Do you remember any

 7    other issues?

 8                    A JUROR:  I think that was it.

 9                    THE COURT:  You hadn't heard of any of these

10    witnesses?

11                    A JUROR:  I've never heard of the companies,

12    never heard of any of the people.

13                    THE COURT:  All right.  And no training in

14    riveting?

15                    A JUROR:  No.

16                    THE COURT:  Or airplane manufacturing?

17                    A JUROR:  No.

18                    THE COURT:  Okay.  All right.  Nothing else that

19    you recall?

20                    A JUROR:  No.

21                    THE COURT:  All right.  Let me see if there are

22    other questions for you.

23                    MS. SHARP:  No other questions.

24                    MR. KELLEHER:  No, Your Honor.

25                    MR. SCHOELL:  No questions.
```

```
 1                    THE COURT:  Thank you.  Step out, then.

 2                    A JUROR:  Thank you.

 3                    (The juror left the jury room.)

 4                    THE COURT:  Any motion?

 5                    MS. SHARP:  No motion.

 6                    MR. KELLEHER:  No, Your Honor.

 7                    THE COURT:  All right.

 8                    DEPUTY CLERK:  Next?

 9                    (The juror entered the jury room.)

10                    THE COURT:  Good morning.  Have a seat, please.

11    Tell us your juror number.

12                    A JUROR:  41.

13                    THE COURT:  Robert Rifenburg?

14                    A JUROR:  Right.

15                    THE COURT:  Okay.  So if you recall, what did

16    you answer yes to?

17                    A JUROR:  Being on a jury before.

18                    THE COURT:  Okay.  Was that here in Delaware?

19                    A JUROR:  Yes.

20                    THE COURT:  In this building, Federal Court?

21                    A JUROR:  No.  Kent County Supreme Court.

22                    THE COURT:  Okay.  And do you recall about how

23    long ago was that?

24                    A JUROR:  Two years.

25                    THE COURT:  Two years ago, approximately?
```

1                    A JUROR:  Yes.

2                    THE COURT:  And what kind of case, if you

3      remember?

4                    A JUROR:  It was against the Kent General

5      Hospital.

6                    THE COURT:  Okay.  Was it --

7                    A JUROR:  And some doctors.

8                    THE COURT:  Medical malpractice?  Something had

9      gone wrong?

10                   A JUROR:  Yes.

11                   THE COURT:  And did the jury reach a verdict?

12                   A JUROR:  Yes.

13                   THE COURT:  And do you remember which side one

14     the trial?

15                   A JUROR:  The hospital.

16                   THE COURT:  The hospital?

17                   A JUROR:  Mm-hmm.

18                   THE COURT:  They were probably the defendant?

19                   A JUROR:  Mm-hmm.

20                   THE COURT:  All right.  What was your general

21     feeling about that whole process?

22                   A JUROR:  It's kind of hard to say.

23                   THE COURT:  Let me ask you this:  This would be

24     a very different trial.  Obviously, a different court,

25     different types of issues, different parties.  Is there

1    anything about that experience that you think might affect

2    how you see this very different case here?

3              A JUROR:  No.  This sounds more like a patent

4    infringement of some sort.

5              THE COURT:  Right.  Okay.  Were there other

6    issues you wanted to raise with us?

7              A JUROR:  The -- I've done some work at an

8    aircraft assembly plant as a maintenance contractor,

9    basically.

10             THE COURT:  Okay.  Were you involved in the

11   manufacturing of the aircraft?

12             A JUROR:  No.

13             THE COURT:  Okay.

14             A JUROR:  Just heating of the hangars.

15             THE COURT:  Of the a facility itself?

16             A JUROR:  Yes, the facility.

17             THE COURT:  Do you know in those facilities

18   where you've worked what types of equipment they were using

19   in connection with the manufacturing of the airplanes?

20             A JUROR:  No, basically not.

21             THE COURT:  Had you heard of any of the

22   companies I mentioned before today?

23             A JUROR:  No.

24             THE COURT:  No.  Any other issues you wanted to

25   raise?

1          A JUROR:  The -- it's going to cause a financial

2     hardship for the travel and the days off for my company and

3     myself.

4          THE COURT:  Okay.  Let's talk about the

5     financial hardship to you.  Will you not be getting paid if

6     you are here?

7          A JUROR:  Right.

8          THE COURT:  And for the company, what would be

9     the impact to them if you are not at work this week?

10         A JUROR:  They usually charge the customers and

11    that would be the income that they won't be getting and the

12    work being done.

13         THE COURT:  Right.  All right.  And then in

14    terms of the travel, about how far away are you?

15         A JUROR:  75 miles.

16         THE COURT:  And if we were able to put you up at

17    a hotel here in Wilmington, would that help?

18         A JUROR:  No.  That would make it worse.

19         THE COURT:  It would make it worse?

20         A JUROR:  Yes.

21         THE COURT:  Okay.  All right.  Were there other

22    issues?

23         A JUROR:  No.  That about covers it.

24         THE COURT:  Okay.  Let me see if there are

25    questions from anyone else for you.  From plaintiff?

1          MS. SHARP:  Just a follow-up question on your

2     experience as a juror.  Was that experience good, bad, or

3     are you just neutral about it?

4          A JUROR:  It was bad for me because of the

5     financial distress it caused and it took a week-and-a-half.

6          MS. SHARP:  Okay.  I see.  Thank you.

7          A JUROR:  Mm-hmm.

8          THE COURT:  Any questions from defendant?

9          MR. KELLEHER:  No, Your Honor.

10         THE COURT:  No?  Okay.  All right.  You can step

11    back out.  Thank you very much.

12         A JUROR:  All right.

13         (The juror left the jury room.)

14         THE COURT:  Motion from plaintiff?

15         MS. SHARP:  I think that he has articulated real

16    concerns about having to sit here for the duration of the

17    trial.  I leave to your Honor's discretion whether that

18    rises to the level of hardship, but I'm concerned

19    particularly since he has been through the experience

20    before, that he's simply not going to be happy or attentive

21    as he sits here.

22         THE COURT:  All right.  What's the defendants'

23    view?

24         MR. KELLEHER:  Nothing from us, Your Honor.

25         THE COURT:  Okay.  I'm going to go ahead and

1   strike him.  I'm concerned.  I think he is trying to be

2   helpful, but he clearly seems concerned, and the hardship

3   from last time around I think is still impacting him and I

4   don't want to do that to him again, so we'll strike 41.

5              (The juror entered the jury room.)

6              THE COURT:  Good morning.

7              A JUROR:  Good morning.

8              THE COURT:  Have a seat, please.  Tell us your

9   juror number.

10              A JUROR:  45.

11              THE COURT:  William Starcher?

12              A JUROR:  That's it.

13              THE COURT:  Okay.  And what did you answer yes

14   to, if you remember?

15              A JUROR:  Yes.

16              THE COURT:  Even a general idea.

17              A JUROR:  I did take some legal courses in

18   school, but I swear I've forgotten everything.  I'm in

19   accounting, so we had business law and some other one, which

20   I can't even remember the name of it.

21              THE COURT:  Okay.

22              A JUROR:  The only definitely "yes" was I served

23   on a jury before.

24              THE COURT:  About how long ago did you serve on

25   a jury?

```
 1                    A JUROR:  At least ten years, ten years ago.

 2                    THE COURT:  Here in Delaware?

 3                    A JUROR:  Yes.

 4                    THE COURT:  Was it Federal or State Court?

 5                    A JUROR:  State.

 6                    THE COURT:  All right.  What do you remember

 7      about what kind of case it was?

 8                    A JUROR:  It was someone who -- armed robbery

 9      for a convenience store.

10                    THE COURT:  A criminal case?

11                    A JUROR:  Yes.

12                    THE COURT:  And was there a verdict?

13                    A JUROR:  Yes.

14                    THE COURT:  Conviction or acquittal?

15                    A JUROR:  Guilty.

16                    THE COURT:  Guilty.  Okay.  And what was your

17      impression of that whole experience?

18                    A JUROR:  Interesting.  It wasn't a long -- just

19      a couple days.  I think it was only brought to court because

20      it was a third strike situation.  It was kind of a cut and

21      dry, it seemed any way, video of a person doing it.

22                    THE COURT:  Okay.  All right.  So this is a very

23      different case, as you probably gather, civil case,

24      different burden of proof and different law.

25                    Would you be able to put aside that past
```

1   experience and follow the law I would give you about the

2   issues in this case?

3                   A JUROR:  Oh, yes.

4                   THE COURT:  Okay.  Other issues you wanted to

5   raise with us?

6                   A JUROR:  Just hardship with being my boss, have

7   to present the budget and audit to the finance committee

8   this Friday.  Then I have several other applications due,

9   which I'm sure I can try to do during the evening one night

10  this week.

11                  THE COURT:  But there's a particular meeting on

12  Friday?

13                  A JUROR:  Yes.  Finance committee meeting.

14                  THE COURT:  And what time of day is that?

15                  A JUROR:  10:00 o'clock.

16                  THE COURT:  In the morning?

17                  A JUROR:  Yeah.

18                  THE COURT:  Okay.  All right.  So we're

19  typically done here at 4:30.  I don't know if that leaves

20  you time and energy later in the day to keep things moving

21  along at your job, but if you were here Friday at 10:00, is

22  there someone else who can make that report for you?

23                  A JUROR:  My boss.

24                  THE COURT:  Your boss?

25                  A JUROR:  Like I said, he won't like it, but --

1                    THE COURT:  It can be done.  Okay.

2                    A JUROR:  Yeah.

3                    THE COURT:  All right.  Are there other issues?

4                    A JUROR:  No, that's it.

5                    THE COURT:  Okay.  Let me see if there are more

6       questions for you.

7                    First, from plaintiff?

8                    MR. LINDVALL:  No.

9                    MS. SHARP:  No.

10                   THE COURT:  Defendant?

11                   MR. KELLEHER:  No, Your Honor.

12                   THE COURT:  All right.  Thank you.

13                   A JUROR:  Thank you.

14                   THE COURT:  Head back out.  Thank you.

15                   (The juror left the jury room.)

16                   THE COURT:  Any motion from plaintiff?

17                   MS. SHARP:  No.

18                   THE COURT:  Defendant?

19                   MR. KELLEHER:  No.

20                   (Juror entered juryroom.)

21                   THE COURT:  Good morning.

22                   A JUROR:  Good morning.

23                   THE COURT:  Have a seat, please.  Tell us your

24      juror number.

25                   A JUROR:  9.

```
 1                THE COURT:  Reginald Brown.

 2                A JUROR:  Yes.

 3                THE COURT:  If you recall, what did you answer

 4     "yes" to, please?

 5                A JUROR:  My medication is one thing.  I carry

 6     these with me all the time because I'm diabetic.  I have

 7     Agent Orange from Vietnam.

 8                THE COURT:  I'm sorry.

 9                A JUROR:  Thank you.  And usually if I don't

10     have these -- I keep Snicker bars but my sugar drops down on

11     me and I start getting sick, and I already passed out.  And

12     I have to eat normally around 12:00 o'clock or so or

13     sometimes I will start to get to shaking and stuff, and I

14     have to do it then and at dinnertime.

15                And not on this court thing, but Friday, Friday

16     we already had a commitment to go to Chesapeake, Virginia on

17     the motorcycle for a two day event down there.

18                But this is my main thing right here

19     (indicating), and then there is like my feet be burning all

20     the time.  I forget what you call it.  Plus I got memory

21     pills for my VA.  Most of my medicine comes from the VA.

22     They got the memory for me, they got this for me

23     (indicating).  I can't even remember most of it.

24                THE COURT:  Well, you have given us plenty to

25     talk a little bit about.  I'm sorry.  I need to inquire a
```

1 little bit about some of the conditions you have mentioned.

2     Let's start with the memory pills.  Do you have

3 problems with your memory?

4     A JUROR:  Yes.  I mean when you get older you

5 forget a lot, too, but I guess it's running through my

6 family and one day I was in Newport and I know I had to go

7 around that gas station and get back on 141.  I went around

8 there three times.  I couldn't see the road.  I couldn't

9 remember where the road was at.  Sometimes it affects me.

10 Sometimes I can go ride around and remember real good.

11     THE COURT:  And you are taking some sort of

12 medication for that?

13     A JUROR:  Yes.  I can't remember the name of the

14 medicine but it has the tiny little pills I've got to take

15 at night.

16     THE COURT:  And then the diabetes and the need

17 to eat and these other pills you have?

18     A JUROR:  My insulin, I take that, the pen.  I

19 stick myself with that pen, 75/25.

20     THE COURT:  All right.  And so we typically take

21 about a 15 minute break in the morning, 15 minute break in

22 the afternoon, half hour break usually around 12:30.  We

23 can be somewhat flexible on that, and we can let you take

24 additional breaks any time you need it.

25     But all that said, you would be sitting in that

1    jury box for, you know, portions of six to seven hours over

2    the course of the day.  Is that something you think you

3    could do?

4                    A JUROR:  I have to have some food with me.

5                    THE COURT:  Right.  If we let you do that, would

6    that take care of at least some of the concerns?

7                    A JUROR:  Yes.  I guess.

8                    THE COURT:  Okay.

9                    A JUROR:  As long as I get some food.  Because

10   once I start eating -- I have to eat.  If I have orange

11   juice or something like that, I have to drink that orange

12   juice to bring me back.

13                   THE COURT:  Right.  All right.  And then this

14   event you have on Friday, that is some sort of vacation or

15   something?

16                   A JUROR:  Yes.  It's about 90 of us riding

17   motorcycles.  Not all of us riding motorcycles.  Some of us

18   riding vehicles.  Some of them are not hardcore riders like

19   us, some of them ride in vehicles.

20                   THE COURT:  And when is that scheduled to leave?

21                   A JUROR:  9:00 o'clock Friday morning and to

22   come back Sunday.

23                   THE COURT:  All right.  Thank you.  Let me see

24   if there is any questions for you.  Plaintiffs?

25                   MS. SHARP:  No questions.

```
 1                    MR. KELLEHER:  No, Your Honor.

 2                    THE COURT:  No.  All right.  You can step back

 3     out.  Thank you very much.

 4                    A JUROR:  Okay now.

 5                    (Juror left juryroom.)

 6                    THE COURT:  All right.  I think you know we

 7     could accommodate all that but I don't see the need to do

 8     that and take any risks.

 9                    MS. SHARP:  Agree.

10                    MR. SCHOELL:  Agree.

11                    MR. KELLEHER:  Agree.

12                    THE COURT:  All right.  He is going to be

13     stricken or is stricken.

14                    THE DEPUTY CLERK:  No. 9.

15                    THE COURT:  No. 9.

16                    (Juror entered juryroom.)

17                    THE COURT:  Good morning.  You can have a seat,

18     please.  Tell us your juror number.

19                    A JUROR:  51.

20                    THE COURT:  51.  Charles Vineyard?

21                    A JUROR:  Yes.

22                    THE COURT:  What did you answer "yes" to, if you

23     recall.

24                    A JUROR:  Juror duty.

25                    THE COURT:  You have been a juror before?
```

```
1                    A JUROR:  Yes.  It was civil.

2                    THE COURT:  Here in Delaware?

3                    A JUROR:  Yes.

4                    THE COURT:  About how long ago?

5                    A JUROR:  15 years.

6                    THE COURT:  Okay.  And do you remember anything

7    about what kind of civil case it was?

8                    A JUROR:  Yes.  The man was suing his insurance

9    agent because of insufficient coverage.  When his building

10   burned down, it wasn't covered and he was suing his agent

11   for not selling him enough insurance, more or less.

12                   THE COURT:  Right.  And do you recall if there

13   was a verdict?

14                   A JUROR:  Yes, not guilty.

15                   THE COURT:  So you ruled for the insurance

16   company?

17                   A JUROR:  Yes.

18                   THE COURT:  All right.  Okay.

19                   A JUROR:  Or agent.

20                   THE COURT:  Agent, right.  Did you have any

21   general feelings about that whole process?

22                   A JUROR:  About what I expected.

23                   THE COURT:  All right.  Are there any other

24   issues you wanted to let us know about?

25                   A JUROR:  No.
```

1                    THE COURT:  That's it.

2                    A JUROR:  Not that would impact this.

3                    THE COURT:  All right.  Let me see if there are

4       other questions for you from the plaintiff.

5                    MS. SHARP:  Are there any general impressions

6       you had of your experience as a juror that you think might

7       have any impact on what you would do here?

8                    A JUROR:  Not that I'm aware of.

9                    MS. SHARP:  Okay.  Thank you.

10                   THE COURT:  Defendants?

11                   MR. KELLEHER:  Nothing from us, Your Honor.

12                   THE COURT:  Okay.  Thank you very much.  You can

13      step out.

14                   (Juror left juryroom.)

15                   THE COURT:  Is there any motion from plaintiffs?

16                   MS. SHARP:  None.

17                   THE COURT:  Defendant?

18                   MR. KELLEHER:  No, Your Honor.

19                   THE COURT:  Okay.

20                   THE DEPUTY CLERK:  Next.

21                   (Juror entered juryroom.)

22                   THE COURT:  Good morning.

23                   A JUROR:  Good morning.

24                   THE COURT:  Tell us your juror number, please.

25                   A JUROR:  10.

```
 1                    THE COURT:  Anita Brown.

 2                    A JUROR:  Yes.

 3                    THE COURT:  Okay.  If you recall, what did you

 4     answer "yes" to, please?

 5                    A JUROR:  It was the one about being a juror.

 6                    THE COURT:  Okay.

 7                    A JUROR:  I have.

 8                    THE COURT:  Here in Delaware?

 9                    A JUROR:  No, both times in Philadelphia.

10                    THE COURT:  So twice in Philadelphia.  And about

11     how long ago were they?

12                    A JUROR:  Years.  Many, many years.

13                    THE COURT:  More than five years ago?

14                    A JUROR:  Yes, yes.  More than five.

15                    THE COURT:  Do you remember anything about what

16     kind of cases they were?

17                    A JUROR:  One had to do with drugs.  I know

18     that.

19                    THE COURT:  Criminal case?

20                    A JUROR:  A criminal case.

21                    And the other one had to do with, it was the

22     first one I been on, it had to do with an asbestos case.

23     Medical, I guess.  Medical.

24                    THE COURT:  And was there a verdict in the

25     criminal case?
```

1              A JUROR:  There was.

2              THE COURT:  Do you remember what it was?

3              A JUROR:  Not guilty.

4              THE COURT:  Not guilty.  And how about in the

5      asbestos case?  Did you all reach a decision?

6              A JUROR:  Not guilty.

7              THE COURT:  Is there anything about those two

8      experiences that you think might impact how you experience

9      this very different case here?

10             A JUROR:  No.

11             THE COURT:  No?

12             A JUROR:  (Shaking head no.)

13             THE COURT:  All right.  Were there other issues

14     you wanted to tell us about?

15             A JUROR:  I think the other one had to do -- oh,

16     for that particular number?

17             THE COURT:  Well, first I guess anything else

18     about your jury experience that you think we should know.

19             A JUROR:  No.

20             THE COURT:  All right.  Other numbers?  Other

21     questions?

22             A JUROR:  I think there was something to do with

23     a deposition.

24             THE COURT:  Have you been deposed before?

25             A JUROR:  I have.

```
 1                    THE COURT:  Tell us a little bit about that.
 2                    A JUROR:  When you say deposed, I was actually
 3       giving my own deposition.
 4                    THE COURT:  Right.  Someone was asking you
 5       questions?
 6                    A JUROR:  Right.  Um-hmm.
 7                    THE COURT:  What kind of case was it?
 8                    A JUROR:  An accident.
 9                    THE COURT:  Car accident?
10                    A JUROR:  Car accident.
11                    THE COURT:  And what was your role in that?
12                    A JUROR:  I was the person that was in the
13       accident.
14                    THE COURT:  Okay.  And so you were placed under
15       oath and asked certain questions?
16                    A JUROR:  Yes, um-hmm.
17                    THE COURT:  Did that case ever go to trial?
18                    A JUROR:  No.
19                    THE COURT:  Okay.  What was your feeling about
20       that whole experience?
21                    A JUROR:  It was interesting.
22                    THE COURT:  All right.  Are there other issues
23       you wanted to tell us about in response to my questions?
24                    A JUROR:  No.
25                    THE COURT:  Let's see if there are any questions
```

1    for you, from plaintiff.

2                 MS. SHARP:  No questions.

3                 MR. SCHOELL:  Just to clarify you mentioned, you

4    testified about an accident.  Were you a party to a lawsuit?

5                 A JUROR:  Yes, I actually did the suing.

6                 MR. SCHOELL:  Okay.  You were suing somebody in

7    a lawsuit?

8                 A JUROR:  Yes.

9                 MR. SCHOELL:  And you had your deposition taken

10   as a result of that?

11                A JUROR:  Yes.

12                MR. SCHOELL:  How did things work out for your

13   lawsuit?  Were you satisfied?

14                A JUROR:  Yes.  Yes, I was.

15                MR. SCHOELL:  About how long ago was that?

16                A JUROR:  Three years.  Four years now.

17                THE COURT:  And that was here in Delaware?

18                A JUROR:  It was.

19                THE COURT:  All right.  Is there anything else?

20                MS. SHARP:  No, Your Honor.

21                MR. KELLEHER:  Ma'am, one other question.

22                A JUROR:  Yes.

23                MR. KELLEHER:  You work for the Internal Revenue

24   Service?

25                A JUROR:  I do.

1                    MR. KELLEHER:  Does working for the Federal

2     Government give you any impressions about the United States

3     Patent Office?

4                    A JUROR:  No.

5                    MR. KELLEHER:  I don't have any other questions.

6                    THE COURT:  Thank you very much.  You can step

7     out.

8                    A JUROR:  Thank you.

9                    THE COURT:  Thank you.

10                    (Juror left juryroom.)

11                    THE COURT:  You didn't mean that as a joke.

12                    (Laughter.)

13                    THE COURT:  Did you have any motions from the

14     plaintiffs?

15                    MS. SHARP:  No.

16                    THE COURT:  From defendants?

17                    MR. KELLEHER:  Nor from us.

18                    (Juror entered juryroom.)

19                    THE DEPUTY CLERK:  Have a seat here.

20                    THE COURT:  Good morning.

21                    A JUROR:  Good morning.

22                    THE COURT:  Tell us please what your juror

23     number is.

24                    A JUROR:  53.

25                    THE COURT:  53.

```
 1                    A JUROR:  Yes.

 2                    THE COURT:  You should be Donald Williams.

 3                    A JUROR:  Yes.

 4                    THE COURT:  Okay.  What did you answer "yes" to,

 5      if you recall.

 6                    A JUROR:  I was a juror on a case in Kent

 7      County.  It was a civil case.

 8                    THE COURT:  About how long ago?

 9                    A JUROR:  A little over a year.

10                    THE COURT:  Okay.  And what kind of civil case

11      was it?

12                    A JUROR:  It was an injury related.  The

13      dependent was hurt in an accident and she was trying to

14      recoup some medical assistance in that respect.  And the

15      defendant had or the, yes, the defendant.  Yeah.  The

16      defendant was, had already did the right things as far as

17      she had insurance, did that.  The plaintiff, she had signed

18      off on her medical, after two years, that the insurance

19      company was covering.  And then she was just trying to get

20      more money in regard to medical.

21                    THE COURT:  And --

22                    A JUROR:  Injury.

23                    THE COURT:  -- did you reach a verdict?

24                    A JUROR:  Yes, we did.

25                    THE COURT:  And which side?
```

1          A JUROR:  It was for the plaintiff, but it was a

2    minimum amount.  She was covered to see a physician over a

3    period of time.  I think it was like ten years.  So she was

4    given that to see him in regard to the injury.

5          THE COURT:  All right.  So how did you feel

6    about that whole experience?

7          A JUROR:  Well, I was the head juror.

8          THE COURT:  Okay.

9          A JUROR:  So I listened to all the folks in

10   there on their opinions for the facts that were given.  We

11   thought we came up with a positive result that helped both

12   sides.  You know, we didn't -- there was no one-sided thing,

13   I felt.  I thought we were fair, and I thought the people on

14   the jury did a good job.

15         THE COURT:  Okay.  Are there other things you

16   wanted to tell us about?

17         A JUROR:  No.  It was a pleasure doing it at the

18   time.  I've been a resident of Delaware for about 20-some

19   years, and I'm a retired Air Force Master Sergeant.  And

20   right now, I work as an educator with the Caesar Rodney

21   School District, the special needs kids.

22         THE COURT:  Okay.  Did you have a "yes" to any

23   of the other long questions I asked?

24         A JUROR:  No, I had no idea where it was going.

25   In the Air Force, I worked as an inspector for fuels, but

1    it wasn't on aircraft.  It was fuels like systems that

2    refuelled aircraft.  And then I was also a lab tech or in

3    charge of fuel-related sampling of presidential aircraft and

4    things like that.

5              THE COURT:  That sounds interesting.

6              A JUROR:  Yes, it was, pretty much.

7              THE COURT:  But you had not heard of the

8    companies that I mentioned?

9              A JUROR:  No, I couldn't even pronounce some of

10   them.

11             THE COURT:  Neither could I.  And you never

12   worked in manufacturing of an aircraft?

13             A JUROR:  No, sir.

14             THE COURT:  Okay.

15             A JUROR:  No, Your Honor.

16             THE COURT:  Is there anything else you wanted to

17   tell us?

18             A JUROR:  No.

19             THE COURT:  Let's see if the plaintiffs have any

20   questions for you.

21             MS. SHARP:  No.

22             THE COURT:  Defendants?

23             MR. KELLEHER:  No, Your Honor.

24             THE COURT:  Okay.  Thank you very much.

25             (Juror left juryroom.)

1          THE COURT:  Is there any motion from plaintiffs?

2          MS. SHARP:  No.

3          THE COURT:  Defendants?

4          MR. KELLEHER:  No, Your Honor.

5          THE COURT:  Okay.

6          THE DEPUTY CLERK:  Next.

7          (Juror entered juryroom.)

8          THE COURT:  Good morning.

9          A JUROR:  Thank you.

10         THE COURT:  Have a seat, please; and tell us

11    your juror number.

12         A JUROR:  Sure.  38.

13         THE COURT:  David Pickrell.

14         A JUROR:  That's me.

15         THE COURT:  And what did you answer "yes" to, if

16    you recall?

17         A JUROR:  Well, it was primarily the last one.

18    But as far as the length of time, I look forward to

19    dedicating time for at least two days, but I run a business

20    here in Newark.  It's a European company.  I have to collect

21    reports at the end of each month, and these have to be over

22    there by the 10th, so ...

23         And as far as I'm familiar with manufacturing.

24    That is what we do.  I don't see any other issues.  I'm

25    familiar with aircraft manufacturing.

```
 1                    THE COURT:  You are or are not?

 2                    A JUROR:  I am.  I don't do business with it.

 3     I'm familiar with aviation and working on aircraft.

 4                    THE COURT:  All right.  Let's talk a little bit

 5     more about the business.  So the information we have says

 6     the company is Chiorino.

 7                    A JUROR:  Chiorino.  It's an Italian company.  I

 8     run the U.S. subsidiary.  We've got 15 other subsidiaries in

 9     other countries in Europe.

10                    THE COURT:  And what type of report is it that

11     you are in the midst of preparing for them?

12                    A JUROR:  It's the monthly managing directors

13     report of the sales.  We have 27 employees here, 10 outside

14     people.  We're a conveyor belt manufacturer.

15                    THE COURT:  Okay.

16                    A JUROR:  And we do food processing, paper

17     converting, airport baggage manufacturing.  Everything that

18     touches a belt one way or another.

19                    THE COURT:  So some number of the 27 employees

20     provide information to you last week, that is, at the end of

21     the month?

22                    A JUROR:  Yes, it comes through our computing

23     system or accounting system.  That is gathered and put

24     together in the first ten days or seven or eight days of

25     each month.
```

1          THE COURT:  And, right now, the information is

2     due in Italy a couple days from now?

3          A JUROR:  Correct.

4          THE COURT:  And if you were unable to get that

5     information to them on I think it's Wednesday, what would

6     happen?

7          A JUROR:  Well, I probably wouldn't lose my job,

8     but it's all the subsidiaries must have their information at

9     the headquarters at the beginning of the month, by the 10th

10    of the month.

11         THE COURT:  And it's part of your responsibility

12    to get that done?

13         A JUROR:  Yes.

14         THE COURT:  Okay.  And you say they manufacture

15    conveyor belts.  Is that how you have some familiarity with

16    aviation or is it from something else?

17         A JUROR:  We've supplied belts either through

18    airport baggage handling.  We've done some work, I'm going

19    back many years, with Boeing for food processing.  There are

20    some belt designs that run through the hull of the aircraft,

21    ramp snakes for loading the aircraft and the like.

22         THE COURT:  Had you heard of any of the

23    companies I mentioned today?

24         A JUROR:  No.

25         THE COURT:  Other than Boeing?

```
 1                    A JUROR:  Not the ...

 2                    THE COURT:  Not the plaintiffs or the

 3      defendants?

 4                    A JUROR:  Yeah, but all the other companies.

 5                    THE COURT:  All right.  Are there any other

 6      issues you wanted to tell us about?

 7                    A JUROR:  No.  I mean I'm familiar a little bit

 8      with trademarks.  We have some.  That's important to me.

 9                    THE COURT:  Okay.  Is there anything else?

10                    A JUROR:  No.

11                    THE COURT:  No.  Okay.  Let me see if the

12      lawyers have any questions for you.  Plaintiffs?

13                    MS. SHARP:  No questions.

14                    THE COURT:  Defendants?

15                    MR. KELLEHER:  No, Your Honor.

16                    THE COURT:  Okay.  You can step out.  Thank you

17      very much.

18                    (Juror left juryroom.)

19                    THE COURT:  Is there any motion from plaintiffs?

20                    MS. SHARP:  No motion.

21                    THE COURT:  Any motion?

22                    MR. KELLEHER:  No, Your Honor.

23                    THE COURT:  Okay.

24                    (Juror entered juryroom.)

25                    THE COURT:  Good morning.  Have a seat, please.
```

1    And tell us your juror number.

2              A JUROR:  Three.

3              THE COURT:  Kathleen Allen.

4              A JUROR:  Yes.

5              THE COURT:  If you recall, what did you answer

6    "yes" to?

7              A JUROR:  My husband was a juror.

8              He also is on a number of patents.  He is listed

9    as a patent -- or he works, he is a computational biologist

10   with DuPont, and then plant patents.

11             And my father worked for Boeing.

12             THE COURT:  Okay.

13             A JUROR:  For years.

14             THE COURT:  All right.  We'll come back and talk

15   about those.  Were there any other issues?

16             THE JURORS:  Those are the ones I remember.

17             THE COURT:  It's hard to remember.  I threw a

18   lot out there.

19             So your husband, first he was a juror.  Was that

20   here in Delaware?

21             A JUROR:  Yes.

22             THE COURT:  Do you know if it was in this

23   federal court or in state court?

24             A JUROR:  I don't know.

25             THE COURT:  Okay.  Do you know anything about

1    what kind of case it was?

2              A JUROR:  It was a medical malpractice case.

3              THE COURT:  Okay.  And about how long ago?

4              A JUROR:  15 years.

5              THE COURT:  Okay.

6              A JUROR:  It has been a while.

7              THE COURT:  All right.  Is there anything about

8    his experience that might affect how you would perceive

9    being on a jury here?

10             A JUROR:  I don't think so.

11             THE COURT:  All right.  And he is listed on some

12   patents.  As an inventor?

13             A JUROR:  Yes.  It's -- they are group

14   inventors.

15             THE COURT:  Okay.  About how many patents do you

16   think?

17             A JUROR:  Probably -- I'm guessing -- over 20, I

18   would think.

19             THE COURT:  All right.  And has he ever

20   expressed to you any feelings about the patent application

21   process?

22             A JUROR:  He doesn't do the -- it's patented by

23   DuPont.

24             THE COURT:  All right.

25             A JUROR:  But --

```
 1                THE COURT:  Has he -- well, let me ask you

 2   first:  Do you have any strong views about the patent

 3   system?

 4                A JUROR:  He's patenting, they are patenting

 5   genetic material and we have a lot of discussions about

 6   whether that's something you can do or not.

 7                THE COURT:  All right.  And do you know if any

 8   of the patents he has been part of have ended up in any

 9   lawsuit?

10                A JUROR:  I don't know.  It's a possibility.

11                THE COURT:  Okay.

12                A JUROR:  I don't know.

13                THE COURT:  Do you have any feelings about

14   patent lawsuits?

15                A JUROR:  We have a lot of philosophical

16   discussions about whether you can patent a gene.

17                THE COURT:  Right.

18                A JUROR:  Whether a plant gene or it's something

19   that you've genetically modified.

20                THE COURT:  All right.  And your father worked

21   for Boeing?

22                A JUROR:  Yes.

23                THE COURT:  Do you know what kind of work he did

24   for them?

25                A JUROR:  He was an engineer with Boeing VTOL
```

1    Helicopters.

2                  THE COURT:  Okay.  And about how long ago was

3    that employment?

4                  A JUROR:  A long time ago.  He passed away in

5    1980, and at that time he was working for Hughes

6    Helicopters, so he had left Boeing and was with Hughes.

7                  THE COURT:  All right.

8                  A JUROR:  In California.

9                  THE COURT:  All right.  Do you have any strong

10   feelings about Boeing as a result of his experience?

11                 A JUROR:  No.

12                 THE COURT:  No.

13                 A JUROR:  You know, part of my childhood,

14   really.

15                 THE COURT:  Right.  Okay.  Is there anything

16   else that you remember that you thought you should mention

17   to us?

18                 A JUROR:  No.

19                 THE COURT:  Let me see if there are other

20   questions for you.

21                 Plaintiff?

22                 MS. SHARP:  No.

23                 MR. KELLEHER:  No, Your Honor.

24                 THE COURT:  Thank you very much.

25                 A JUROR:  Thank you.

```
 1                    (The juror left the jury room.)

 2                    THE COURT:  Any motions?

 3                    MS. SHARP:  No.

 4                    THE COURT:  Any motion?

 5                    MR. KELLEHER:  No, Your Honor.

 6                    THE COURT:  All right.

 7                    (The juror entered the jury room.)

 8                    THE COURT:  Good morning.

 9                    A JUROR:  How are you doing?

10                    THE COURT:  Your juror number, please?

11                    A JUROR:  46.

12                    THE COURT:  John Thomas?

13                    A JUROR:  That's correct.

14                    THE COURT:  Okay.  And if you recall, what did

15      you answer yes to, please?

16                    A JUROR:  Being here financially is going to

17      crush me.  I'm a self-employed contractor and I have no

18      employees, so if I'm not at work, nothing is getting

19      done.

20                    And I also have a bad kidney that's only

21      18 percent of what the full size should be.  So if it starts

22      to act up, and it's going to, I'm going to have to cause a

23      disturbance every 15 minutes to go to the bathroom.

24                    THE COURT:  Okay.  All right.  Well, I'm sorry

25      to hear that.
```

1               Let's talk just first for a moment briefly about

2    your employment.  You're employed.  What did you do?

3               A JUROR:  Contractor, carpenter.

4               THE COURT:  Okay.  And if you weren't spending

5    the week with us, what would you be doing?

6               A JUROR:  Tiling and painting.

7               THE COURT:  Okay.  And you have some jobs lined

8    up for this week?  Yes?  Just for the record, yes?

9               A JUROR:  Mm-hmm.  Yes.  I'm sorry.

10              THE COURT:  All right.  And nobody is going to

11   be paying you this week if you are not there doing that?

12              A JUROR:  Right.  And I will lose the work.

13              THE COURT:  It will go to somebody else?

14              A JUROR:  It needs to be done, yes.

15              THE COURT:  All right.  Okay.  Well, I'm going

16   to be excusing you for cause, but I'm going to need to have

17   you stay for the remainder of the process.  Of course, you

18   can feel free to come and go from the jury room.

19              A JUROR:  Okay.

20              THE COURT:  From the jury room, use the restroom

21   and all of that.

22              A JUROR:  Just ask the guy if I have to go, or

23   tell him?

24              THE COURT:  Yes.  Listen to whatever they are

25   telling you, but there are bathrooms out there.

```
1                    A JUROR:  Right.

2                    THE COURT:  And use them, of course, as you

3       need, but I do need you to stick around for the rest of the

4       process, but I'm not going to make you sit on the jury in

5       light of your situation.

6                    A JUROR:  Thank you.  Appreciate it.

7                    THE COURT:  Okay.

8                    (The juror left the jury room.)

9                    THE COURT:  46 is stricken for cause.

10                   (The juror entered the jury room.)

11                   THE COURT:  Good morning.

12                   A JUROR:  Good morning.

13                   THE COURT:  Tell us what your juror number is,

14      please.

15                   A JUROR:  11.

16                   THE COURT:  Judith Bungori?

17                   A JUROR:  Bungori.

18                   THE COURT:  Bungori.  Do you remember anything

19      you answered yes to?

20                   A JUROR:  On a jury.

21                   THE COURT:  You've served on a jury.

22                   A JUROR:  And I've been deposed.

23                   THE COURT:  Okay.  Did you serve on a jury here

24      in Delaware?

25                   A JUROR:  No.  In Baltimore.
```

```
 1                    THE COURT:  Baltimore?

 2                    A JUROR:  Yes.

 3                    THE COURT:  About how long ago?

 4                    A JUROR:  Oh, about 15 years ago or so.

 5                    THE COURT:  And do you remember anything about

 6    the case?

 7                    A JUROR:  It was a kidnap and rape case.

 8                    THE COURT:  Criminal charges?

 9                    A JUROR:  Yeah.  Yeah.

10                    THE COURT:  All right.  Did the jury reach a

11    verdict?

12                    A JUROR:  Yes.

13                    THE COURT:  Do you remember what it was?

14                    A JUROR:  Not guilty.

15                    THE COURT:  Okay.  How did you feel about that

16    experience?

17                    A JUROR:  It was a great experience, but there

18    was no proof and that was the sad part.  We had to follow

19    the guidelines and --

20                    THE COURT:  So --

21                    A JUROR:  I'm pretty sure he was guilty.  That's

22    how I felt, but I voted not guilty because of the steps we

23    had to take.

24                    THE COURT:  And the Judge instructed you on the

25    law?
```

1                    A JUROR:  Absolutely.

2                    THE COURT:  And you did your best to follow the

3       law?

4                    A JUROR:  Yes.

5                    THE COURT:  Okay.  Do you think that experience

6       would have any impact on how you might see this very

7       different civil trial 15 years later?

8                    A JUROR:  I don't know about an impact, but I

9       know that I have to follow the law, whatever it may be, so

10      whatever is put out to me.

11                   THE COURT:  Okay.  That was the only time you

12      served on a jury; is that correct?

13                   A JUROR:  Yes.

14                   THE COURT:  All right.  And you say you've been

15      deposed.  When was that?

16                   A JUROR:  Oh, gosh, maybe that was about

17      15 years or more.

18                   THE COURT:  All right.  What kind of case was

19      it?

20                   A JUROR:  I worked for Jiffy Lube International,

21      and there was some kind of litigation going on, partnership

22      versus Jiffy Lube and something, and I don't remember too

23      much of it.  I was asked questions.

24                   THE COURT:  And was it related to your work?

25                   A JUROR:  Not to my work, no.

1          THE COURT:  All right.  But you were placed

2     under oath and asked questions?

3          A JUROR:  Yes.

4          THE COURT:  Okay.  Were you a party in the

5     lawsuit?

6          A JUROR:  No.

7          THE COURT:  No.  And did you have to do anything

8     else other than appear for this deposition?

9          A JUROR:  No.

10          THE COURT:  Do you know how the case ended up?

11          A JUROR:  I think in favor of the corporate

12     office, Jiffy Lube.

13          THE COURT:  Okay.

14          A JUROR:  In their favor.

15          THE COURT:  And do you have any feelings about

16     that process and your involvement in it?

17          A JUROR:  No, because I really didn't understand

18     the whole thing except they were questioning me as it

19     relates to what my part was or working there or so on and so

20     forth.  But, no.  I was just questioned, yes/no-type

21     answers.

22          THE COURT:  All right.  Any other things I asked

23     this morning that you want to tell us about?

24          A JUROR:  No.

25          THE COURT:  No?  Okay.  Let's see if the lawyers

1    have questions for you.

2              MS. SHARP:  No questions.

3              MR. KELLEHER:  No, ma'am.  No, Your Honor.

4              THE COURT:  Thank you very much.

5              A JUROR:  You're welcome.

6              (The juror left the jury room.)

7              THE COURT:  Any motion?

8              MS. SHARP:  No motion.

9              MR. KELLEHER:  No motion.

10             THE COURT:  All right.

11             DEPUTY CLERK:  There's no motion?

12             THE COURT:  No motion.

13             Good morning.  Have a seat, please.  Tell us

14   your juror number.

15             (The juror entered the jury room.)

16             A JUROR:  Wow.  Slightly intimidating.  48.

17             THE COURT:  48.  We promise, we'll let you walk

18   out of here.

19             A JUROR:  I wouldn't be sitting in certain seats

20   in here, I will tell you that.

21             THE COURT:  48, Nathan Trombino?

22             A JUROR:  Yes.

23             THE COURT:  Okay.  What did you answer yes to,

24   if you recall?

25             A JUROR:  I was a defendant in a civil lawsuit.

```
 1                    THE COURT:  Here in Delaware?

 2                    A JUROR:  Yes.

 3                    THE COURT:  About how long ago?

 4                    A JUROR:  Oh, '02 or '03.

 5                    THE COURT:  And what kind of case was it?

 6                    A JUROR:  It was a car accident.

 7                    THE COURT:  So you were involved in the

 8      accident?

 9                    A JUROR:  Yes.

10                    THE COURT:  Okay.  And did the case go to trial?

11                    A JUROR:  It did not.  It went to, I think it

12      was arbitration.

13                    THE COURT:  Okay.

14                    A JUROR:  Or mediation.  One of those.  I can't

15      remember.

16                    THE COURT:  All right.  Did you have to testify?

17                    A JUROR:  No, I did not.

18                    THE COURT:  Did you testify before in a

19      deposition before whatever that proceeding was?

20                    A JUROR:  I got a summons by a sheriff.  I went

21      into a room and I wasn't in, like, an actual courtroom or

22      trial.  It was kind of like a room like this and there was I

23      think some arbitrators in there.  I just kind of testified

24      what happened in the car accident and that was it.

25                    THE COURT:  And do you know what the result of
```

1    that process was?

2              A JUROR:  It was a settlement.

3              THE COURT:  Okay.  Was it between the, your --

4    did you have insurance?

5              A JUROR:  Yes.

6              THE COURT:  So was it your insurance company?

7              A JUROR:  Yes.

8              THE COURT:  They were in a dispute with whoever

9    else was involved in the accident?

10             A JUROR:  I pulled out in front of someone

11   because there was like a snowbank that was there and I

12   couldn't see.  I pulled out and a car hit me.  So she sued

13   the insurance company, State Farm.

14             THE COURT:  Okay.

15             A JUROR:  Which is my insurance.

16             THE COURT:  All right.  And whatever the

17   settlement or resolution was, did you have any feelings

18   about it, if you even were told what it was?

19             A JUROR:  No.  It didn't really affect me at

20   all.

21             THE COURT:  Okay.  Any other things that you

22   answered yes to?

23             A JUROR:  No.  That's it.

24             THE COURT:  No?  Okay.  Any questions?

25             MS. SHARP:  No, Your Honor.

1          THE COURT:  Any questions?

2          MR. KELLEHER:  No, Your Honor.

3          THE COURT:  All right.  Thank you very much.

4          A JUROR:  Thank you.

5          (The juror left the jury room.)

6          THE COURT:  Any motion?

7          MS. SHARP:  No, there's no motion, Your Honor,

8   but I think there's something I should bring to your

9   attention.  Karen Pascale, a partner in my firm, believes

10  she may have been an arbitrator in his case.  I was

11  concerned about asking and stirring the memory, but I

12  thought I should bring that to your Honor's attention.

13          THE COURT:  Yes.  I appreciate that.  I don't

14  know if that's --

15          MR. KELLEHER:  No concerns.

16          THE COURT:  No concerns?  Okay.  All right.  And

17  no motion for any other reason?

18          MR. KELLEHER:  No motion.

19          THE COURT:  Okay.  Thank you.

20          (The juror entered the jury room.)

21          THE COURT:  Good morning.  Have a seat and tell

22  us your juror number, please.

23          A JUROR:  Eight.

24          THE COURT:  Michael Bender?

25          A JUROR:  Yes.

1           THE COURT:  Okay.  And if you recall, what did

2    you answer yes to?

3           A JUROR:  I think one of the questions was if

4    you know somebody that worked for Boeing.  My girlfriend's

5    father, Frank Shamiro, he works at Boeing.

6           Also I, I work in a barber shop, so I only get

7    paid -- I don't get any paid time off or any of that.  It's

8    my buddy's shop, but I run the shop because he opened a new

9    one.  We have a person on vacation this week.  With me being

10   out also, it would be a burden to not just me financially,

11   but the shop as well.  We work right on the campus of U.D.

12   and we're pretty busy this time of year.

13          THE COURT:  All right.  Let's talk about both of

14   those things --

15          A JUROR:  Okay.

16          THE COURT:  -- further.  Your girlfriend's

17   father works at Boeing.  Where is that?

18          A JUROR:  The one right here, I think it's in

19   Philadelphia.  I'm not exactly sure what he does there.  I

20   know, I think he works on the planes, but I mean, I just --

21   I didn't know if they had -- if it may have been of any

22   relevance.  I just wanted to let you know.

23          THE COURT:  Has he or your girlfriend ever

24   expressed any strong opinions about Boeing?

25          A JUROR:  No, no, nothing like that.  I mean, my

1    main thing was the, me with my work.  I just figured I'd

2    tell you that, too.

3                    THE COURT:  Yes.  All right.  So let's talk

4    about that.

5                    A JUROR:  And we just recently purchased a house

6    in January, so with the addition of the mortgage and all of

7    them bills, me being out a week would be.

8                    THE COURT:  Would be difficult?

9                    A JUROR:  Yes.  I mean, I know they say $40 a

10   day, but, you know --

11                   THE COURT:  You're doing better than that?

12                   A JUROR:  It costs like $60 just to fill up the

13   gas tank.

14                   THE COURT:  So do you, if you weren't here, what

15   types of hours might you be working this week?

16                   A JUROR:  I work 9:00 to 7:00, Monday through

17   Friday, and then 9:00 to 4:00 on Saturdays.

18                   THE COURT:  And is the shop open later than

19   7:00?

20                   A JUROR:  No.  Just 9:00 to 7:00 on Monday

21   through Friday and then 9:00 to 4:00 on Saturday.

22                   THE COURT:  And about how many people are at the

23   shop?

24                   A JUROR:  We have six chairs, including me,

25   myself, so we have six barbers, and one guy is out this

1    whole month due to some things he had to straighten up.  So

2    with me being out, that will leave us down to four, and

3    everybody is supposed to get at least a day off.  So some

4    days you might be looking at three and I mean we're pretty

5    busy in there.  I mean, there's days I've done 27 haircuts

6    just one after another.

7              THE COURT:  And what about the managerial

8    responsibilities?  What do you do?

9              A JUROR:  I open and close, so I'm there first

10   thing in the morning.  I'm the last one to leave, count up

11   the register at night.  And like I said, my buddy just

12   opened a new shop, so he's up there, and I started running

13   this one down here for him.

14             THE COURT:  And what will happen?  Is there

15   somebody else that would just have to do that, I guess?

16             A JUROR:  I have another guy who, I mean, we

17   could give the key to open and close, but, like I said, with

18   somebody already being out and me being out, it would be --

19   I mean, I've talked to my boss.  He's aware of it.  I mean,

20   I guess they would have to make do.  But it would be a lot

21   easier if, you know, if I could be there.

22             THE COURT:  Right.  All right.  Were there other

23   issues you wanted to raise with us?

24             A JUROR:  No, that's it.

25             THE COURT:  Let me see if there are other

1     questions for you.

2                 MS. SHARP:  No other questions.

3                 MR. KELLEHER:  No, Your Honor.

4                 THE COURT:  Thank you.

5                 A JUROR:  Thank you.  Appreciate it.

6                 (The juror left the jury room.)

7                 THE COURT:  Any motion from plaintiff?

8                 MS. SHARP:  Yes.  I think so because of the

9     hardship he has expressed, he seemed to be pretty emphatic

10    about it.

11                THE COURT:  Right.

12                MR. KELLEHER:  We would concur.

13                THE COURT:  Okay.  Well, I will grant that joint

14    request and we'll strike number 8.

15                (The juror entered the jury room.)

16                THE COURT:  Good morning.

17                A JUROR:  Good morning, Your Honor.

18                THE COURT:  Your juror number, please?

19                A JUROR:  18.

20                THE COURT:  Deborah Dalton?

21                A JUROR:  Yes.

22                THE COURT:  Okay.  And if you remember, what did

23    you answer yes to, please?

24                A JUROR:  I've been on a jury before, selected

25    as Juror 1.  And I do have some medical issues that do

1    concern me.

2                  THE COURT:  Okay.  Let's talk first about the

3    jury service.

4                  A JUROR:  Yes.

5                  THE COURT:  Was that here in Delaware?

6                  A JUROR:  It was.  It was approximately 11 years

7    ago.

8                  THE COURT:  Okay.  And do you remember what kind

9    of case it was?

10                 A JUROR:  It was the Devon Mills case.  It was a

11   high profile case that was in Dover at the time.  I'm sorry.

12                 THE COURT:  I probably have forgotten if I knew.

13   So some of us may not know.  Tell us a little bit about that

14   case.  Is it a criminal case?

15                 A JUROR:  Yes, it was.  He was released from

16   prison and was stalking one of the prison guards, and

17   they had found him in the apartment hiding in her closet.

18   And they had seminal fluids and other things that were

19   used for the case.  And we were on it, I guess, four to

20   five days.

21                 THE COURT:  Okay.

22                 A JUROR:  And then, of course, everything was

23   guilty.

24                 THE COURT:  Okay.

25                 A JUROR:  Three felonies and seven misdemeanors.

1    I was Juror 1.

2              THE COURT:  Right.  So you had to be the

3    foreperson, I guess?

4              A JUROR:  I was, yes.

5              THE COURT:  Okay.  So what was your general

6    feeling about that experience?

7              A JUROR:  Initially, the first day I went to the

8    Judge and ask if I could be removed from the case because I

9    didn't feel comfortable knowing he had access to my name and

10   where I was employed, and then once the Judge and the

11   district attorney spoke with me, I felt a little more

12   assured and I stayed with the case.

13             THE COURT:  Okay.  All right.

14             A JUROR:  I was on one other, but I wasn't

15   called.  I had jury duty, but I wasn't selected, I should

16   say.

17             THE COURT:  Thank you.  All right.

18             And you have medical issues.  I don't want to

19   pry, but I, what impact might any of them have?

20             A JUROR:  I have M.S., multiple sclerosis and I

21   do work and function, but I do have problems periodically

22   with visual or a little bit of vertigo, sometimes with

23   walking.

24             THE COURT:  Okay.

25             A JUROR:  Trip or fall.  But I do function and

1   drive.  But it can be an issue at times.

2            THE COURT:  Okay.  I'm sorry to hear that, of

3   course.

4            A JUROR:  Thank you.

5            THE COURT:  You've seen a little bit of the

6   layout of the room.

7            A JUROR:  Yes, I have.

8            THE COURT:  So the jury sits off to my right.

9            A JUROR:  Yes.

10           THE COURT:  And we're only going to have eight

11  jurors.  There are seats I think for 14 in there, and the

12  door from the jury box leads basically into this room.  We

13  take a break about 15 minutes morning and afternoon,

14  half-hour for lunch.  We could take more breaks, and if

15  someone needed a break just sort of suddenly, they can walk

16  out and, you know, collect themselves in here.

17           With all of that, how would you feel about, you

18  know, spending the week with us?

19           A JUROR:  I would be fine.  I feel honored.

20           THE COURT:  Okay.  All right.  Anything else you

21  want to talk about?

22           A JUROR:  No.  That's all.

23           THE COURT:  Let me see if others have questions

24  for you.

25           MR. LINDVALL:  No questions.

1             MR. KELLEHER:  No questions.

2             THE COURT:  All right.  Thank you very much.

3             A JUROR:  Thank you.

4             THE COURT:  Go back in the courtroom.

5             (The juror left the jury room.)

6             THE COURT:  Any motion?

7             MR. LINDVALL:  No.

8             MR. KELLEHER:  No, Your Honor.

9             THE COURT:  Okay.

10            (The juror entered the jury room.)

11            THE COURT:  Good morning.

12            A JUROR:  Good morning.  How are you?

13            THE COURT:  Have a seat, please.  Tell us your

14   juror number.

15            A JUROR:  31.

16            THE COURT:  Peggy McLaurin?

17            A JUROR:  Yes.

18            THE COURT:  Okay.  If you remember, what did you

19   answer yes to?

20            A JUROR:  There was a question regarding if I

21   had ever testified, and approximately seven to eight years

22   ago I did testify in a case regarding identity theft.

23            THE COURT:  Identity theft?

24            A JUROR:  Yes.

25            THE COURT:  Was it a criminal case?

```
 1                      A JUROR:  Yes.

 2                      THE COURT:  All right.  And you testified at

 3      trial?

 4                      A JUROR:  Yes.

 5                      THE COURT:  And what was the nature of your

 6      testimony?

 7                      A JUROR:  It was actually regarding myself.

 8                      THE COURT:  Were you the victim?

 9                      A JUROR:  Yes.

10                      THE COURT:  Sorry.

11                      A JUROR:  Yes.

12                      THE COURT:  And so you had to appear in court

13      and talk about what had happened to you?

14                      A JUROR:  Yes, mm-hmm.

15                      THE COURT:  Was it in front of a jury?

16                      A JUROR:  No.

17                      THE COURT:  Just a Judge?

18                      A JUROR:  Yes.

19                      THE COURT:  And what was your feeling about that

20      experience?

21                      A JUROR:  Well, I felt that the Judge ruled

22      fairly in the case.  I mean, it was pretty cut and dry that

23      they had proof of what had happened.

24                      THE COURT:  Okay.  You were satisfied with the

25      outcome?
```

1          A JUROR:  Yes.

2          THE COURT:  Okay.  Anything else you answered

3      yes to?

4          A JUROR:  I guess one of the latter questions

5      toward the end regarding hardship.

6          THE COURT:  All right.

7          A JUROR:  And I guess I'm just thinking about my

8      job as a teacher and being away from my children for a

9      whole, possibly a whole week.

10          THE COURT:  You teach what level?

11          A JUROR:  First grade.

12          THE COURT:  All right.  So there's a substitute

13      there today?

14          A JUROR:  There's a substitute today.

15          THE COURT:  Have you all had spring break yet?

16          A JUROR:  No.

17          THE COURT:  No?

18          A JUROR:  That comes starting Good Friday.

19          THE COURT:  Right.

20          A JUROR:  And then the following week.

21          THE COURT:  All right.  And are you -- I know

22      you had some snow days.  Are you adding time back on?

23          A JUROR:  We have 20 additional minutes added to

24      our school day.

25          THE COURT:  Each day?

 1                    A JUROR:  Each day.  And then the students will
 2      have one-and-a-half days to make up beyond that.
 3                    THE COURT:  In June, maybe?
 4                    A JUROR:  Yes.
 5                    THE COURT:  Okay.  All right.  So totally
 6      understandable.  You would rather be there with your
 7      students, but there is someone there who is teaching them
 8      this week?
 9                    A JUROR:  Yes.
10                    THE COURT:  To the best they can.  Okay.  Other
11      issues you wanted to raise?
12                    A JUROR:  No.  That's all.
13                    THE COURT:  Any questions?
14                    MS. SHARP:  No, no questions.
15                    MR. KELLEHER:  No, Your Honor.
16                    THE COURT:  All right.  Thank you very much.
17                    A JUROR:  Thank you.
18                    (Juror left juryroom.)
19                    THE COURT:  Is there any motion?
20                    MS. SHARP:  No motion.
21                    MR. KELLEHER:  No motion.
22                    (Juror entered juryroom.)
23                    THE COURT:  Good morning.  Have a seat, please.
24                    A JUROR:  Hi.
25                    THE COURT:  Tell us your juror number.

1           A JUROR:  My juror number?  21.

2           THE COURT:  Carmela Golebiowski.

3           A JUROR:  That's correct.  Good job.

4           THE COURT:  All right.  What did you answer

5      "yes" to, please?

6           A JUROR:  I don't know the question number but I

7      believe it was knowing somebody working at Boeing.

8           THE COURT:  Okay.  That's a question.  I don't

9      know what number it was either.

10          A JUROR:  Okay.  I do know somebody pretty well

11     but he retired and was working at Boeing.  He is a neighbor.

12     I did speak with him once in awhile, whenever I would see

13     him.

14          THE COURT:  Do you know what he did at Boeing?

15          A JUROR:  What he did?  I do not know exactly

16     what he did.  I know his name, but I don't know.

17          THE COURT:  Has he expressed a strong feeling

18     pro or con about Boeing to you?

19          A JUROR:  Pro or con?  Not really.  If anything,

20     it's good things.  Nothing bad.

21          THE COURT:  Do you have any strong feeling about

22     Boeing as a company?

23          A JUROR:  No, I don't.

24          THE COURT:  Okay.  Had you heard of other

25     companies that I listed?

1               A JUROR:  No.

2               THE COURT:  Okay.  Other issues that you wanted

3       to raise with us?

4               A JUROR:  No.

5               THE COURT:  No?

6               A JUROR:  No.

7               THE COURT:  Is there any questions?

8               MS. SHARP:  No questions.

9               THE COURT:  Any questions?

10              MR. KELLEHER:  No questions, Your Honor.

11              THE COURT:  All right.  Thank you very much.

12              A JUROR:  All right.

13              (Juror left juryroom.)

14              THE COURT:  Is there any motion?

15              MS. SHARP:  No motion.

16              MR. KELLEHER:  No motion, Your Honor.

17              THE DEPUTY CLERK:  Next.

18              (Juror entered juryroom.)

19              THE COURT:  Good morning.

20              A JUROR:  Good morning.

21              THE COURT:  Have a seat, please.

22              Tell us your juror number.

23              A JUROR:  26, I believe.

24              THE COURT:  We'll figure it out together.

25      Dolores Lee.

1            A JUROR:  Yes.

2            THE COURT:  Then you are 26.

3            A JUROR:  Okay.

4            THE COURT:  And if you remember, what did you

5    answer "yes" to?

6            A JUROR:  Oh, dear.

7            THE COURT:  That's fine.  Do you remember

8    generally any areas?

9            A JUROR:  Yes, about Boeing.

10           THE COURT:  About Boeing.  Okay.  Tell us about

11   Boeing.

12           A JUROR:  Well, my husband is an electrical

13   engineer.  He worked for Lochhead Morrison.  He went to

14   Boeing for different meetings and stuff like that.  That's

15   about the only thing that I know he had any interest in.

16   Plus the fact I was told -- I got lost and went to the other

17   courthouse.

18           THE COURT:  Oh, I'm sorry.

19           A JUROR:  That they would dismiss me because I

20   was 70 years old.  Does that still hold with this jury?

21           THE COURT:  I haven't heard that.

22           A JUROR:  Oh.  They were going to send me home.

23           THE COURT:  Really.

24           A JUROR:  At one point.

25           THE COURT:  That may be their system.  I'm not

```
 1    familiar with that over here.  Do you have any concerns

 2    about your ability to serve as a juror?

 3                   A JUROR:  No.

 4                   THE COURT:  No.  Okay.  In terms of, let's go

 5    back to Boeing for just a minute.

 6                   A JUROR:  Um-hmm.

 7                   THE COURT:  Do you have any strong feelings

 8    about Boeing as a company?

 9                   A JUROR:  No.

10                   THE COURT:  Had you heard any of the other

11    companies I mentioned?

12                   A JUROR:  No.

13                   THE COURT:  No.  Okay.  Do you remember any

14    other general areas you wanted to raise with us?

15                   A JUROR:  No.

16                   THE COURT:  No?  Okay.

17                   A JUROR:  Not that I can remember.  No.

18                   THE COURT:  Okay.  Let me see if anybody else

19    has questions for you.

20                   MS. SHARP:  No, no questions.

21                   A JUROR:  Nothing?

22                   MR. KELLEHER:  No, Your Honor.

23                   THE COURT:  All right.

24                   A JUROR:  Thank you.

25                   THE COURT:  Thank you very much.
```

```
 1                    (Juror left juryroom.)

 2              THE COURT:  Is there any motion from plaintiff?

 3              MS. SHARP:  No.

 4              THE COURT:  Defendant?

 5              MR. KELLEHER:  No, Your Honor.

 6              THE COURT:  Do they have a rule against older

 7    jurors?

 8              MR. SCHOELL:  I'm trying to remember.  Actually,

 9    when she mentioned it, there might have been something in

10    the court's juror plan which I didn't bring with me.

11              THE COURT:  For our court or for the state?  You

12    don't know?

13              MR. SCHOELL:  I don't remember specifically but

14    I do think obviously it's an option.  It doesn't get you out

15    of the venire, but I know I have seen it and maybe it's in

16    state court.

17              MS. SHARP:  I associate it with state court, but

18    my experience is it is inconsistently applied there.

19              THE COURT:  Even there?

20              MS. SHARP:  You have to know to ask.

21              THE COURT:  Interesting.  Well, thank you.

22              THE DEPUTY CLERK:  That's what I understand,

23    too.  I think if you ask they let you out.

24              THE COURT:  How about that.  Okay.

25                    (Juror entered juryroom.)
```

```
 1                    THE COURT:  Good morning.

 2                    A JUROR:  Hi.  It's hot.

 3                    THE COURT:  Tell us your juror number, please.

 4                    A JUROR:  7.

 5                    THE COURT:  Deborah Bartell.

 6                    A JUROR:  Yes.

 7                    THE COURT:  All right.  And if you recall, what

 8      did you answer "yes" to, please?

 9                    A JUROR:  I think there was three.  One was the

10      patent, and then the two legal.  I'm a paralegal.  My patent

11      background, I was a paralegal at one point with Richards

12      Layton and I did paralegal work with one trial.  I don't

13      recall, I think it was Judge Farnan.  And I was just

14      basically the paralegal that worked that trial, and just the

15      legal background.

16                    THE COURT:  So you are currently a paralegal?

17                    A JUROR:  Yes.  Now it's corporate litigation.

18                    THE COURT:  Which firm are you with?

19                    A JUROR:  Prickett Jones.

20                    THE COURT:  So you certainly have heard of Young

21      Conaway?

22                    A JUROR:  Yes, I have.

23                    THE COURT:  Do you know Ms. Sharp?

24                    A JUROR:  I don't think so.  I have heard the

25      name, so forth, but I don't think we ever worked together.
```

1                 MS. SHARP:  That's my recollection as well.  I

2     recognize your name, but I don't think we have been on cases

3     together.

4                 THE COURT:  Do you have any strong feelings

5     about Young Conaway as a firm?

6                 A JUROR:  No, it's a good law firm.

7                 THE COURT:  How about Drinker Biddle?  Have you

8     heard of them?

9                 A JUROR:  Yes.

10                THE COURT:  Do you know Mr. Schoell?

11                A JUROR:  (Looking around.)

12                THE COURT:  No?

13                A JUROR:  Obviously, I'm looking around.  No, I

14     don't.

15                THE COURT:  Do you have any strong feelings

16     about Drinker Biddle as a firm?

17                A JUROR:  No.

18                THE COURT:  Okay.  And you used to work at

19     Richards Layton.  About how long ago was that?

20                A JUROR:  I've been at Prickett for about three,

21     three and-a-half years, so ...

22                THE COURT:  Was the trial, the patent trial

23     here, was that during your time at Richards?

24                A JUROR:  About the middle.  I was at Richards

25     for about three years.

```
 1                    THE COURT:  What was your impression of patent

 2     litigation here in this building?

 3                    A JUROR:  Patent litigation is interesting.

 4                    (Laughter.)

 5                    THE COURT:  Okay.

 6                    A JUROR:  It was over one little fragment of

 7     difference in the patent.  Yeah.

 8                    THE COURT:  Do you think you could be fair and

 9     impartial to both sides in this patent litigation trial here?

10                    A JUROR:  Yes.

11                    THE COURT:  And given your legal training and

12     legal experience, do you think you would be able to follow

13     whatever legal instructions I give you whether you think

14     they're right or wrong?

15                    A JUROR:  Yes.  Otherwise, I will get in a lot

16     of trouble.  Yes.

17                    THE COURT:  Okay.  And I guess tell us about

18     your training.  Do you have formal training in the law?

19                    A JUROR:  Yes.  I'm paralegal certified, the

20     University of Delaware paralegal certified.  And then I have

21     done a variety of backgrounds, did some other things.  When

22     I went to Richards, it was basically corporate litigation

23     and then handle IP work.  Now it's more briefing and brief

24     filings.  That is pretty much is the background I have, and

25     document production and trial prep.
```

1              My first paralegal job was asbestos litigation.

2     So there was trial prep with that.

3              THE COURT:  Is there anything else you wanted to

4     tell us?

5              A JUROR:  No, that's it.

6              THE COURT:  Let me see if there is more

7     questions for you from the plaintiffs.

8              MS. SHARP:  No other questions.

9              THE COURT:  Defendants.

10             MR. SCHOELL:  Just to make a record.  Do you

11    know if you know or met Mr. Todd Schiltz who is my colleague

12    working on this case?

13             A JUROR:  I'm really bad with names and faces,

14    but that doesn't sound familiar.

15             MR. SCHOELL:  All right.  I just wanted to

16    check.

17             A JUROR:  I think in the one case Richards went

18    to trial with, it wasn't against any of the firms here.

19             MR. SCHOELL:  Thank you.

20             THE COURT:  All right.  Thank you very much.

21             A JUROR:  Thank you.

22             (Juror left juryroom.)

23             THE COURT:  Is there any motion from plaintiffs?

24             MS. SHARP:  No motion.

25             THE COURT:  Defendants?

```
 1              MR. KELLEHER:  No.

 2              MR. SCHOELL:  No.

 3              A JUROR:  Hello.

 4              THE COURT:  Good morning.  Have a seat.

 5              A JUROR:  Hi.

 6              THE COURT:  Tell us your juror number, please.

 7              A JUROR:  14.

 8              THE COURT:  Gloria Cardenti?

 9              A JUROR:  Cardenti.

10              THE COURT:  If you remember, what did you answer

11      "yes" to?

12              A JUROR:  It was:  Have you ever served as a

13      juror?  I didn't know whether to say yes on that.  I was an

14      alternative.  But there was another question:  Has anyone in

15      your family or have you ever been a defendant?  And my

16      husband was.  He wasn't the main defendant but he was listed

17      in a case -- he is an electrical contractor, and I work for

18      him -- because he was a subcontractor for a builder.  So I'm

19      familiar with that.

20              THE COURT:  Okay.  Let's talk first about your

21      jury service.  You were an alternative?

22              A JUROR:  About six years ago.

23              THE COURT:  Here in Delaware?

24              A JUROR:  Um-hmm.

25              THE COURT:  Was it here in federal court?
```

1               A JUROR:  Um-hmm.

2               THE COURT:  All right.  For the record, that's a

3       "yes," right?

4               A JUROR:  Oh, yes.  I'm sorry.  Yes.

5               THE COURT:  I don't know how to spell "um-hmm."

6       He probably does.

7               So that was here in federal court?

8               A JUROR:  Yes.

9               THE COURT:  What kind of trial, if you remember?

10              A JUROR:  There was a gentleman charged with

11      mail fraud, using the postal service system.

12              THE COURT:  So it was a criminal case?

13              A JUROR:  It was a criminal case.

14              THE COURT:  And you sat through the evidence and

15      the closing argument, and then they dismissed you before

16      deliberation?

17              A JUROR:  Yes.  That was a bummer.

18              THE COURT:  Well, I was going to ask you how you

19      felt about that.  So ...

20              A JUROR:  He was guilty.  (Laughter.)

21              THE COURT:  Did you find out what the jury

22      decided?

23              A JUROR:  I kept track, and I saw it in the

24      paper.

25              THE COURT:  And he was?

1          A JUROR:  He was guilty.

2          THE COURT:  All right.  What was your general

3   feeling about that experience?

4          A JUROR:  It was interesting.  I just, I

5   appreciated the way the lawyers brought different things

6   into view because he had some things hidden in different

7   areas, and, of course, the police found it.

8          Just the way that they went about to prove the

9   guilt impressed me.  And his nervousness or the people that

10  served as his, I guess ...

11         THE COURT:  Lawyers?

12         A JUROR:  Yes -- not his lawyers, the people

13  they would bring in as a reference or whatever.  Yes, it

14  didn't fly well.

15         THE COURT:  Okay.

16         A JUROR:  Not in my opinion.

17         THE COURT:  All right.  And then your husband

18  unfortunately has been named as a defendant.

19         A JUROR:  Yes.  What happened was it's a builder

20  and a homeowner was disgruntled evidently with his

21  residential home.  My husband is a electrical contractor.

22  He was named in the suit.  Long story short, after a year

23  and-a-half of haggling with the lawyers, he was removed.

24         THE COURT:  He is not a party anymore?

25         A JUROR:  He is not a party anymore as of last

1    month.  But there was quite a bit of back and forth between

2    the homeowner's lawyer and our lawyer.

3                    THE COURT:  And did you or your husband have to

4    hire your own lawyer?

5                    A JUROR:  Um-hmm.

6                    THE COURT:  Yes?

7                    A JUROR:  Um-hmm.  Yes.  I'm sorry.

8                    THE COURT:  And that sounds like it's been a

9    frustrating experience?

10                   A JUROR:  Frustrating in the sense, and lawyers,

11   you get billed for every little whip stitch.  You know, he

12   sends an e-mail, we send an e-mail back.  And it's like I

13   get the bill.  I'm the office manager so I was a little

14   frustrated because some of it was really ridiculous.

15                   THE COURT:  Right.

16                   A JUROR:  But, everybody makes a buck.

17                   THE COURT:  Had you heard of any of the lawyers

18   or law firms I mentioned?

19                   A JUROR:  Actually, Hitchens I believe.  There

20   was a name on there and I recognized the name but it wasn't

21   James.  Was it James Hitchens?

22                   THE COURT:  Let me take a look.

23                   MR. SCHOELL:  James Higgins.

24                   A JUROR:  Higgins.

25                   THE COURT:  James Higgins.

```
1                    A JUROR:  I know it was Hitchens I was thinking
2     of.  I'm sorry.  When you said it, I was thinking Hitchens.
3                    MR. SCHOELL:  There is a Morris James Hitchens.
4                    A JUROR:  Yes, and it's Hitchens.
5                    THE COURT:  Was there anything else you wanted
6     to tell us about?
7                    A JUROR:  No, that's the only reason I said "yes."
8                    THE COURT:  Let me see if there are other
9     questions for you.
10                    MS. SHARP:  No, no other questions.
11                    MR. SCHOELL:  No questions.
12                    THE COURT:  All right.  Thank you very much.
13                    (Juror left juryroom.)
14                    THE COURT:  Is there any motion?
15                    MS. SHARP:  No, Your Honor.
16                    MR. KELLEHER:  No, Your Honor.
17                    MR. SCHOELL:  (Shaking head no.)
18                    (Juror entered juryroom.)
19                    THE COURT:  Good morning.  Have a seat, please.
20                    Your juror number is?
21                    A JUROR:  27.
22                    THE COURT:  Amy Mabrey.
23                    A JUROR:  Um-hmm.  That's me.
24                    THE COURT:  That is correct then.  And if you
25     recall, what did you say "yes" to?
```

1             A JUROR:  No. 26.

2             THE COURT:  All right.  Wow.  You do remember

3     it.

4             A JUROR:  That's because it was next to 27.

5             THE COURT:  Right.  26 has to do with the

6     schedule, right?

7             A JUROR:  Right.

8             THE COURT:  Would this schedule pose a real

9     hardship for you?

10            A JUROR:  Yes, it would.

11            THE COURT:  Tell us about that.

12            A JUROR:  I work for the United States Postal

13    Service.  I'm a rural carrier.  I work in a very small

14    office.  There are only two carriers.  I do not have a

15    substitute so I have to borrow from other offices and it's

16    very hard to get a day off.  I had to work to get here

17    today.  So it would cause a hardship.

18            THE COURT:  Okay.

19            A JUROR:  I'm needed at my job.

20            THE COURT:  And as a result, what, the mail

21    might not get delivered?

22            A JUROR:  Correct.  It would kick back to your

23    postmaster.  And as I say our office, it's small, so it's

24    only one postmaster and she has to do her job.

25            THE COURT:  All right.  Is there anything else

1     you wanted to tell us?  Any other "yeses" that you recall?

2                    A JUROR:  No.

3                    THE COURT:  Nothing else?

4                    A JUROR:  Nothing else.

5                    THE COURT:  Let's see if there are questions for

6     you.

7                    MS. SHARP:  No, no questions.

8                    THE COURT:  Defendants?

9                    MR. SCHOELL:  No.

10                   MR. KELLEHER:  No, Your Honor.

11                   THE COURT:  Okay.

12                   A JUROR:  Okay.

13                   THE COURT:  You can step back out.

14                   A JUROR:  Thank you.

15                   (Juror left juryroom.)

16                   THE COURT:  Is there any motion?

17                   MS. SHARP:  No motion.

18                   THE COURT:  Any motion?

19                   MR. KELLEHER:  No, Your Honor.

20                   THE COURT:  It seems strange that I would strike

21    a federal employee.

22                   MR. HOROWITZ:  There is a preemption issue here.

23                   THE COURT:  I do imagine they are strapped and I

24    think she would be distracted.  It's painful to her to think

25    that maybe the mail might not get delivered, so I'm going to

1    sua sponte strike No. 27.

2                    (Juror entered juryroom.)

3                    THE COURT:  Have a seat, please.

4                    Tell us your juror number.

5                    A JUROR:  25.

6                    THE COURT:  Elizabeth Krasley.

7                    A JUROR:  Yes.

8                    THE COURT:  And if you remember, what did you

9    answer "yes" to?

10                   A JUROR:  I work for DuPont so I'm actually

11   familiar with patent litigation.

12                   THE COURT:  All right.  Tell us how you are

13   familiar with it.

14                   A JUROR:  So the project that I'm working on is

15   currently in a case against Gevo.  It's the Butamax Gevo

16   case at DuPont.

17                   THE COURT:  Is that pending here in this court?

18                   A JUROR:  Yes.

19                   THE COURT:  And what is your role in that?

20                   A JUROR:  I'm a scientist on the project.  I

21   have never been deposed but I have been questioned by

22   lawyers, and I'm subject to the whole agreement, too, so ...

23                   THE COURT:  Do you know what the status of that

24   case is?

25                   A JUROR:  It's ongoing.

```
 1                    THE COURT:  Right.

 2                    A JUROR:  Well, okay.  It's ongoing.  The next

 3     case will be I think in July.

 4                    THE COURT:  All right.  And what was your role

 5     as a scientist on the project?

 6                    A JUROR:  I was the strain construction

 7     engineer.  So I took the microorganism and I added genes.  I

 8     morphed the biology, that's what I did.  So they wanted a

 9     lot of my notebooks and files and stuff like that.

10                    THE COURT:  How long have you worked at DuPont?

11                    A JUROR:  Seven years.

12                    THE COURT:  Are you a named inventor on the

13     patent?

14                    A JUROR:  No.

15                    THE COURT:  Is it a DuPont patent that is at

16     issue?

17                    A JUROR:  Yes.

18                    THE COURT:  Well, do you have any feelings as a

19     result about patent litigation?

20                    A JUROR:  It hasn't really left me with a great

21     taste in my mouth, to be perfectly honest.

22                    THE COURT:  Tell us just a little bit more about

23     that.

24                    A JUROR:  It's just my first -- I used to work

25     in academia, and coming to a business, it's sort of, it's we
```

1    have to take a lot of extra precautions in order to do our

2    work.  And a lot of things that we thought we had inventions

3    for, we had to go to like litigation, that kind of stuff.

4    It's hindered a lot of our work stream.  So it's very

5    frustrating on my end as a scientist to have to deal with

6    that kind of stuff.

7              I have never been deposed, so I have never had

8    the pleasure of going through that.  I have heard about it.

9    But we have a lot of instruction on what we're supposed to

10   do and that kind of stuff, and I have been in meetings with

11   lawyers, and they have asked me questions.  So it's been a

12   little intimidating, to be perfectly honest.

13             THE COURT:  So this is in part a patent

14   litigation suit here.

15             A JUROR:  Right.

16             THE COURT:  Do you think that the frustration

17   you felt in your work might impact how you see things in

18   this very different patent lawsuit?

19             A JUROR:  I don't know.  I can't say either way.

20             THE COURT:  Do you think you might start out

21   rooting for the patentee as opposed to the alleged

22   infringer?

23             A JUROR:  I would say that would be the

24   direction I would lean towards, yes.

25             THE COURT:  Now, of course, you would be

1    instructed you need to give both sides a fair chance and

2    weigh the evidence, apply the law that I give you.

3                    A JUROR:  Right.

4                    THE COURT:  Do you think you would be able to do

5    that?

6                    A JUROR:  (Pause.)  Yes.

7                    THE COURT:  You think so.  Okay.

8                    Are there other issues you wanted to talk about?

9                    A JUROR:  No, that was my main one.

10                   THE COURT:  Okay.  Let me see if the lawyers

11   have any more questions for you before you go.

12                   A JUROR:  Okay.

13                   MS. SHARP:  No, no questions.

14                   THE COURT:  Defendants?

15                   MR. KELLEHER:  No, Your Honor.

16                   THE COURT:  All right.  You can step out.  Thank

17   you.

18                   A JUROR:  Thank you.

19                   (Juror left juryroom.)

20                   THE COURT:  Is there any motion?

21                   MS. SHARP:  No motion.

22                   THE COURT:  Any motion?

23                   MR. KELLEHER:  Yes.  I guess, Your Honor, we

24   would make a motion to strike for cause given her statement

25   she thinks she would start out pro-patentee and she

1    struggled to answer the question that she could be fair.

2              THE COURT:  Do you oppose that?

3              MR. LINDVALL:  I think she ultimately answered

4    she could be fair, and considering her background I believe

5    she would be fair when she was properly instructed.

6              THE COURT:  I'm going to go ahead and grant the

7    motion.  I think it could reasonably go very either way, but

8    she did very visibly struggle and she volunteered a lot of

9    frustration with the patent system, not to mention the

10   lawyers.  And I don't want to take any risk on that so I'm

11   going to go ahead and strike her.  No. 25, it was.

12             (Juror entered juryroom.)

13             THE COURT:  Good morning.

14             A JUROR:  Good morning.

15             THE COURT:  Have a seat, please.

16             Tell us your juror number.

17             A JUROR:  33.

18             THE COURT:  Ann Mera.

19             A JUROR:  Yes.

20             THE COURT:  What did you answer "yes" to, if you

21   recall.

22             A JUROR:  I've been a juror before.  And my

23   uncle used to actually work on the airplanes before he

24   passed away, and he would go and find out why they crashed.

25   He was responsible for that.  And the company that I worked

123

1     for uses Young Conaway as an attorney.

2             THE COURT:  Okay.  Let's talk about those things

3     a little bit more.

4             When was your jury service, approximately?

5             A JUROR:  Four years ago.

6             THE COURT:  Here in Delaware?

7             A JUROR:  Yes.

8             THE COURT:  Do you remember, state or federal

9     court?

10            A JUROR:  I believe state.

11            THE COURT:  It wasn't in this building?

12            A JUROR:  No.  I didn't know this building

13    existed.

14            THE COURT:  So then it would have been state

15    court.  Was it a criminal case?

16            A JUROR:  Um-hmm.

17            THE COURT:  And do you remember anything about

18    what type of criminal charges they were?

19            A JUROR:  He had, I don't know the names, but he

20    had beaten his girlfriend up and caused a miscarriage.

21            THE COURT:  And there was a conviction?

22            A JUROR:  Yes.

23            THE COURT:  He was found guilty?

24            A JUROR:  Um-hmm.

25            THE COURT:  How did you feel about that whole

1    experience?

2              A JUROR:  I just thought justice was served.

3              THE COURT:  All right.  And you have an uncle

4    who was an airplane crash investigator?

5              A JUROR:  Yes.  He has passed away now but he

6    did that his whole life.  He would go to all the different

7    sites around the world if a plane crashed, or if there was a

8    problem with one, he would try to figure out why.

9              THE COURT:  Did he ever express to you feelings

10   about how airplanes are manufactured?

11             A JUROR:  He would just say they were safe.

12             THE COURT:  He would say they were safe?

13             A JUROR:  Right.

14             THE COURT:  And you don't know anything about

15   the process of manufacturing airplanes; correct?

16             A JUROR:  Uh-uh.

17             THE COURT:  Sorry.  For the record.

18             A JUROR:  No.

19             THE COURT:  You don't know?

20             A JUROR:  No.

21             THE COURT:  All right.  And you've heard of

22   Young Conaway?

23             A JUROR:  Yes.  I actually do, I work for a very

24   small company and they actually do bill us.

25             THE COURT:  Okay.  Are you involved in

1    interacting with Young Conaway?

2              A JUROR:  I don't believe I am.  If I am, I

3    don't know the attorneys that represented us, but we did

4    actually have to go to court about seven years ago, and,

5    yes, I did have to go.  And they're the only people that

6    I can think of that would have represented us, and so I

7    would think that would have been at that time.  And, yes,

8    I was one of the people that did go to court to represent

9    us.

10             THE COURT:  And so you were in court.  Did you

11   have to testify also?

12             A JUROR:  No, we didn't.  We got held over to

13   have to go to court.  Like --

14             THE COURT:  The trial didn't actually happen?

15             A JUROR:  The trial didn't happen because we

16   settled.

17             THE COURT:  Okay.

18             A JUROR:  Because it would have been less cost

19   efficient to go to trial.

20             THE COURT:  What kind of case, just generally,

21   was it?  What were the allegations?

22             A JUROR:  I work for a credit union and the

23   plaintiff said that we didn't give him his money, and we

24   had, but the statements had cut off.  It was an ACH.  So he

25   actually received two deposits in the same month the month

1    before.

2              So he had his statement the following month, in

3    September, and thought he did not receive any money.  And we

4    had won in the lower court, but then he represented himself

5    in the next step of the courts because he could appeal.  And

6    at that point we did win that, yes, we had given him his

7    money, but maybe we owed him some interest.  So that is what

8    the case was being held over for.

9              THE COURT:  Okay.  All right.  And you're not

10   certain, but you believe Young Conaway represented --

11             A JUROR:  I do believe they are, yes.

12             THE COURT:  All right.  Do you know Ms. Sharp

13   here from Young Conaway?

14             A JUROR:  No.  I wouldn't remember anyone.  It

15   has been so long.

16             THE COURT:  Okay.  And given the ongoing

17   interaction with Young Conaway and your company, do you have

18   any feelings about Young Conaway as a firm?

19             A JUROR:  No.

20             THE COURT:  Do you think their side might start

21   out a little bit ahead in your mind?

22             A JUROR:  I wouldn't think so.

23             THE COURT:  All right.  Other issues or concerns

24   you wanted to raise with us?

25             A JUROR:  No.

1          THE COURT:  No?  Let me see if there are other

2     questions for you.

3               From the plaintiff?

4          MS. SHARP:  No questions.

5          THE COURT:  From defendant?

6          MR. KELLEHER:  Just one question, Your Honor.

7          THE COURT:  Sure.

8          MR. KELLEHER:  Would it be difficult to reach a

9     decision against Young Conaway's client realizing that their

10    client has been paying them?

11         A JUROR:  I wouldn't --

12         MR. KELLEHER:  I'm sorry.

13         A JUROR:  I think I'm pretty open-minded.  I

14    don't think that that would, you know, go either way with

15    me.

16         MR. KELLEHER:  Okay.  And would there be any

17    difficulty finding against Young Conaway's client in this

18    case, realizing that they might end up having to pay our

19    side any money?

20         A JUROR:  I wouldn't think so.

21         MR. KELLEHER:  Thank you.

22         THE COURT:  All right.  Anything else?

23         MS. SHARP:  No other questions.

24         THE COURT:  All right.  You can step out.

25         A JUROR:  Thank you.

```
 1                  THE COURT:  Thank you.

 2                  (The juror left the jury room.)

 3                  THE COURT:  Any motion?

 4             MS. SHARP:  No motion.  And I just don't have

 5    any knowledge one way or another about current

 6    representation.  It's not something that anyone mentioned.

 7    Historically, I do recall in distant past.

 8                  THE COURT:  Okay.

 9             MS. SHARP:  But that's the most I know.

10                  THE COURT:  All right.  Any motion?

11             MR. KELLEHER:  We don't have a motion, Your

12    Honor.

13                  THE COURT:  Okay.  All right.

14                  (The juror entered the jury room.)

15                  THE COURT:  Good morning.

16             A JUROR:  Hi.

17                  THE COURT:  Have a seat, please, and tell us

18    your juror number.  That's all right.

19             A JUROR:  28, I believe.

20                  THE COURT:  28.  Okay.

21             A JUROR:  Yes.

22                  THE COURT:  I've got a list here.  You can have

23    a seat.  Lance Martin?

24             A JUROR:  Yes.

25                  THE COURT:  Okay.  It is 28, then.
```

1    If you recall, what did you answer yes to,

2 please?

3    A JUROR:  I was a juror three, four years ago.

4    THE COURT:  Okay.

5    A JUROR:  Down the road.

6    THE COURT:  In State Court?

7    A JUROR:  Yes.

8    THE COURT:  All right.  Do you remember what

9 kind of case it was?

10    A JUROR:  A woman, a woman's purchase was stolen

11 out of her closet, I do believe.

12    THE COURT:  Criminal case?

13    A JUROR:  Yes.

14    THE COURT:  And did you reach a verdict?

15    A JUROR:  Yes.

16    THE COURT:  Do you remember what it was?

17    A JUROR:  Not guilty.

18    THE COURT:  Not guilty.  How did you feel about

19 that whole process?

20    A JUROR:  I don't know.

21    THE COURT:  You don't have any good recollection

22 of it?

23    A JUROR:  No.

24    THE COURT:  Okay.  Anything else that you

25 remember answering yes to on my list?

```
 1                    A JUROR:  I did have tubes in my ears and I do

 2      have some hearing loss.

 3                    THE COURT:  Okay.  Did you have trouble hearing

 4      me this morning?

 5                    A JUROR:  I don't think I did.  And I don't

 6      think I do all the time, but there's times I think I do.

 7                    THE COURT:  All right.

 8                    A JUROR:  Sometimes I feel I should hear

 9      something and I don't, but, you know...

10                    THE COURT:  Do you feel comfortable if you were

11      having trouble hearing, would you feel comfortable sort of

12      raising your hand or somehow letting us know?

13                    A JUROR:  No.

14                    THE COURT:  You would be uncomfortable doing

15      that.  Just for the record, you are saying yes.  Correct?

16                    A JUROR:  Yes.

17                    THE COURT:  So if you were sitting there and

18      things were going by and you couldn't quite hear, you think

19      you would just sit there?

20                    A JUROR:  Maybe.  It depends on how many times I

21      can't hear something.  I mean, I feel uncomfortable being

22      here right now.

23                    THE COURT:  I'm sorry about that.  I don't mean

24      to make you uncomfortable.  Is it because of the hearing or

25      are there other reasons?
```

1          A JUROR:  No.  Just in general.  My anxiety

2     level is sky high right now.

3          THE COURT:  All right.  None of us mean to do

4     that to you.

5          A JUROR:  I know.

6          THE COURT:  All right.  Do you have other

7     specific concerns other than the hearing you mentioned to

8     us?

9          A JUROR:  You said something about Germany and

10    France?

11         THE COURT:  Yes.

12         A JUROR:  I'm not sure exactly what you were

13    talking about.

14         THE COURT:  I think the question was, so you

15    might, if you are on this jury, you might hear that some of

16    the companies involved or some of the individuals involved

17    are from other countries, including Germany and France.

18         A JUROR:  Mm-hmm.

19         THE COURT:  So we wondered if you had any strong

20    feelings about foreigners or Germans or French in

21    particular.

22         A JUROR:  My brother is in Germany right now.

23    He was a pilot in the Navy.

24         THE COURT:  Okay.

25         A JUROR:  So I've been over there a couple

1    times, but I don't have any feelings, you know.

2              THE COURT:  Do you think you could be fair to

3    somebody or a company from Germany?

4              A JUROR:  I don't see why not.

5              THE COURT:  Okay.  You mentioned your brother is

6    a pilot?

7              A JUROR:  Yes.  Was a pilot.

8              THE COURT:  Was a pilot?

9              A JUROR:  He still works for the Navy.  I think

10   he's a contractor now over there.

11             THE COURT:  Did he ever -- does he know anything

12   about manufacturing airplanes?

13             A JUROR:  I don't know if he knows.  I don't

14   know if he knows anything about manufacturing them.

15             THE COURT:  All right.  He has never told you

16   about that?

17             A JUROR:  No.  No.

18             THE COURT:  All right.  Other things you can

19   think of that you wanted us to know?

20             A JUROR:  I do have an 85-year-old mother.

21   She's not under my care or anything, but she does need my

22   help from time to time.

23             THE COURT:  Okay.

24             A JUROR:  I mean for a day, it's not big deal.

25             THE COURT:  But over the course of a week, she

1    might need you?

2            A JUROR:  Yes.

3            THE COURT:  Okay.  Anything else?

4            A JUROR:  No.  That's about it.

5            THE COURT:  Okay.  I'm going to give the lawyers

6    a chance to ask you questions if they want to.

7            Anything from plaintiff?

8            MS. SHARP:  No.

9            THE COURT:  No?  From defendant?

10           MR. KELLEHER:  No, Your Honor.

11           THE COURT:  No?  Okay.  You can go back into the

12   courtroom.

13           A JUROR:  Thank you.

14           THE COURT:  Thank you very much.

15           (The juror left the jury room.)

16           THE COURT:  Any motion from plaintiff?

17           MS. SHARP:  Yes.  For cause as a result of the

18   concern about hearing and the unwillingness to share with

19   the Court when he wouldn't be able to hear.

20           THE COURT:  All right.  Any position?

21           MR. KELLEHER:  We concur, Your Honor, especially

22   since some people will be speaking with accents, that may be

23   a problem.

24           THE COURT:  All right.  Okay.  Well, even those

25   with perfect hearing sometimes have trouble hearing what's

1    going on in a case like this, and so I will grant that joint

2    motion and we'll strike No. 28.

3                    (The juror entered the jury room.)

4                    THE COURT:  Good morning.  Have a seat, please.

5                    A JUROR:  Good morning.

6                    THE COURT:  Tell us your juror number.

7                    A JUROR:  37.

8                    THE COURT:  Kenneth Olsen?

9                    A JUROR:  That's me.

10                    THE COURT:  Okay.  And what did you answer yes

11    to, please?

12                    A JUROR:  I worked for Boeing.

13                    THE COURT:  You do or you did?

14                    A JUROR:  Did.

15                    THE COURT:  Okay.

16                    A JUROR:  About six, or about three years ago.

17    I'm out of the C17 simulator IP instructor pilot.  I

18    flew Boeing planes.  Currently a Fed-Ex pilot flying an

19    airbus.

20                    THE COURT:  Okay.

21                    A JUROR:  When I was in the Air Force before I

22    retired for about an hour-and-a-half, I was a military

23    magistrate at Dover Air Force base.

24                    THE COURT:  Okay.  All right.  Other issues you

25    wanted to mention?

```
1                    A JUROR:  No.

2                    THE COURT:  No.  Okay.  So when you worked for

3        Boeing, was that as a pilot?

4                    A JUROR:  It was a pilot at the T simulators.

5                    THE COURT:  Okay.  Did you have anything to do

6        with the manufacturing?

7                    A JUROR:  No.

8                    THE COURT:  Do you know anything about airplane

9        manufacturing?

10                   A JUROR:  I know where it happens, but besides

11       that, no.

12                   THE COURT:  All right.  Other than Boeing, had

13       you heard of the companies I mentioned?

14                   A JUROR:  No.

15                   THE COURT:  And you're currently a pilot?

16                   A JUROR:  For Fed-Ex.

17                   THE COURT:  For Fed-Ex.  Okay.  And you have

18       some experience in the Air Force, you said?

19                   A JUROR:  Yes.

20                   THE COURT:  Okay.  And through all of that, no

21       manufacturing experience?

22                   A JUROR:  No.

23                   THE COURT:  All right.  Anything else?

24                   A JUROR:  No.  That's it.

25                   THE COURT:  No?  Let me see if others have
```

```
1    questions for you.

2              MS. SHARP:  No questions.

3              THE COURT:  No?

4              MR. KELLEHER:  No questions.

5              MR. SCHOELL:  No.

6              THE COURT:  Thank you very much.

7              (The juror left the jury room.)

8              THE COURT:  Any motion?

9              MS. SHARP:  No motion.

10             THE COURT:  Any motion?

11             MR. KELLEHER:  No motion, Your Honor:

12             (The juror entered the jury room.)

13             THE COURT:  Good morning.  Have a seat.

14             A JUROR:  Hi.

15             THE COURT:  Your juror number, please?

16             A JUROR:  39.

17             THE COURT:  Christopher Pontani?

18             A JUROR:  Yes.

19             THE COURT:  All right.  What did you answer yes

20    to?

21             A JUROR:  Let's see.  Do I speak French?  I took

22    it in high school.

23             THE COURT:  Okay.

24             A JUROR:  Just four years.  A course in college,

25    but nothing, nothing crazy.  I can't speak it fluently.
```

```
 1                    THE COURT:  You don't regularly speak French?

 2                    A JUROR:  No, not at all.  I would go to

 3       Montreal and try to order a beer in the stadium.

 4                    THE COURT:  Did you succeed?

 5                    A JUROR:  Kind of.  They all speak English

 6       anyway.

 7                    THE COURT:  Okay.  Other things that you

 8       remember?

 9                    A JUROR:  The company I work for, I currently

10       work for an eight freight forwarder.  It's just

11       transportation.  Nothing to do with manufacture or anything

12       like that.

13                    THE COURT:  What is your job there?

14                    A JUROR:  I guess my job -- basically, I deal

15       with, like, air rates, corporate air freight.  So, you know,

16       dealing with our core carriers, dealing with quality issues,

17       rates, stuff like that.

18                    THE COURT:  You don't have anything to do with

19       purchasing aircraft?

20                    A JUROR:  No.  We don't deal with anything like

21       that.

22                    THE COURT:  All right.

23                    A JUROR:  I mean, we have the office in

24       Frankfurt that we deal a lot with.  I think we deal with

25       Germans.
```

```
 1                THE COURT:  Do you have any general feelings
 2   about doing business with Germans?
 3                A JUROR:  No.  The Germans are Germans.  They've
 4   got their ways, but we're fine.  You know, sometimes you've
 5   got to gently persuade them on how to see things your way,
 6   but it's not dread, I've got to see the Germans again.
 7   Different than Malaysia.  That's a different story
 8   altogether.
 9                THE COURT:  We're not asking that about that
10   story.
11                A JUROR:  No.
12                THE COURT:  But with respect to the Germans, if
13   you heard that some of the companies or witnesses here are
14   German, you can give them a fair chance?
15                A JUROR:  Oh, yeah.  It doesn't make a
16   difference either way.
17                THE COURT:  All right.  Other issues you wanted
18   to tell us about?
19                A JUROR:  You said schedule-wise.  Currently, I
20   have my 9:00 to 5:00.  I also deliver newspapers in the
21   early morning.
22                THE COURT:  You do that?
23                A JUROR:  I do that right now, but that's not an
24   issue for you, is it?
25                THE COURT:  Well, we would want you here a
```

1    little bit before 9:00 each day.

2                    A JUROR:  That's not a problem.

3                    THE COURT:  Okay.  All right.  And then we let

4    you go usually about 4:30 every day.

5                    A JUROR:  Yes, that's fine.

6                    THE COURT:  Okay.  Any other issues?

7                    A JUROR:  I'm trying to think.  I think that's

8    pretty much it.

9                    THE COURT:  Okay.  Let me see if anyone else has

10   questions for you.

11                   MS. SHARP:  Does your work involve doing any

12   business with French companies?

13                   A JUROR:  Not -- I mean, I know we have French,

14   you know, we have an office somewhere in France.  I know we

15   have -- deal with, you know, we have, you know, global

16   customers or international customers, but I mean nothing

17   that deals directly.

18                   MS. SHARP:  Okay.  No other questions.

19                   THE COURT:  Any questions?

20                   MR. KELLEHER:  No, Your Honor.

21                   THE COURT:  All right.  Okay.  You can step back

22   out.

23                   A JUROR:  Thanks.

24                   THE COURT:  Thank you.

25                   (The juror left the jury room.)

```
 1                    THE COURT:  Any motion?

 2                    MS. SHARP:  No motion.

 3                    THE COURT:  Any motion?

 4                    MR. KELLEHER:  No motion.

 5                    THE COURT:  All right.

 6                    (Pause.)

 7                    DEPUTY CLERK:  That's it.

 8                    THE COURT:  That's it?

 9                    DEPUTY CLERK:  Yes.

10                    THE COURT:  Okay.  Well, do you need a minute?

11                    DEPUTY CLERK:  No, I'm fine.

12                    THE COURT:  So why don't you tell us who has

13       been stricken, either by me or they weren't here.  Everyone

14       who is not in the pool any longer.

15                    DEPUTY CLERK:  No. 4, No. 6, No. 8, No. 9, No.

16       13, No. 16, 17, 19, 20, 23, 24, 25, 27, 28, 29, 32, 40, 41,

17       43, 46 and 54.

18                    THE COURT:  Okay.  Those are all the ones that

19       are no longer in the pool.

20                    Any questions about that from plaintiff?

21                    MS. SHARP:  No, Your Honor.

22                    MR. KELLEHER:  There might have been a few that

23       were left in I think that might have been on the list, if I

24       heard correctly.  I'm not entirely certain, though.

25                    THE COURT:  Okay.  So the question to you, then,
```

1    is, anyone that we just said are stricken that you have a

2    question about?

3              MR. KELLEHER:  23.

4              THE COURT:  23 you think may be in?

5              MR. KELLEHER:  24.

6              DEPUTY CLERK:  23 and 24 are absent.

7              MS. SHARP:  Some of the no shows.

8              THE COURT:  Yes.  That was a list of no shows

9    plus stricken.

10             MR. SCHOELL:  That matched up with --

11             THE COURT:  Okay.  They matched up with yours?

12   No issues from defendant?

13             MR. KELLEHER:  That's fine.

14             THE COURT:  Okay.  All right.  We're going to

15   take a short recess.  There are a couple restrooms here if

16   anybody needs and then I will come back in the courtroom in

17   about five, six minutes and we'll go forward with the next

18   step.

19             Any questions before we do that?

20             MS. SHARP:  No questions.

21             THE COURT:  From you?

22             MR. KELLEHER:  No, Your Honor.

23             THE COURT:  Okay.  All right.

24             (Short recess taken.)

25             THE COURT:  All right, ladies and gentlemen of

1    the our jury pool.  Thank you for your patience.  We're

2    about to begin the final steps of the jury selection

3    process.  What will happen first is my deputy, Mr. Looby

4    here, will randomly draw the numbers of 14 of you.  If you

5    hear your number, your jury number called, then please

6    follow his guidance and take a seat where he points to for

7    you to do so up here in the jury box.

8              After we have 14 of you seated, we have what are

9    called peremptory strikes, whereby each side gets to strike

10   three of you for whatever reason or for no reason at all,

11   and that process happens silently through the passing of a

12   clipboard back and forth, so we'll need to be quiet and

13   allow counsel to make their peremptory decisions in the time

14   that they need for that.

15             Once they are done with that, we will, six of

16   you will be removed and we'll end up with our jury of eight.

17   So if you could continue to give us your patience, that will

18   be great.  We'll move along as quickly as we can.

19             Mr. Looby, you may go ahead.

20             DEPUTY CLERK:  Juror No. 38, please come

21   forward, the first seat in the first row of the jury box.

22             Juror No. 11, the second seat in the first row.

23             Juror No. 3.

24             Juror No. 15.

25             Juror No. 5.

1                    Juror No. 21.

2                    Juror No. 36.

3                    Juror No. 1, first seat in the second row.

4                    Juror No. 37.

5                    Juror No. 51.

6                    Juror No. 53.

7                    Juror No. 49.

8                    Juror No. 35.

9                    Juror No. 48.

10              THE COURT:  We'll proceed with the striking

11   process.

12              (Silent striking process takes place from 11:59

13   a.m. until 12:05 p.m.)

14              (Clipboard passed up to the Court, who reviews

15   it.  )

16              THE COURT:  Are there any objections to the

17   striking process from the plaintiffs?

18              MR. LINDVALL:  No, Your Honor.

19              THE COURT:  From the defendants?

20              MR. KELLEHER:  No, Your Honor.

21              THE COURT:  All right.  We will go ahead and

22   proceed.

23              THE DEPUTY CLERK:  The following jurors will

24   return to the back of the courtroom.

25                    Juror No. 11.

1               Juror No. 3.

2               Juror No. 5.

3               Juror No. 1.

4               Juror No. 53.

5               Juror No. 35.

6               (Jurors placed in order in the jury box.)

7               THE COURT:  The eight of you in the jury box,

8      bear with us a moment.

9               The rest of you who have spent the morning with

10     us, thank you very much for your time and your patience and

11     your willingness to serve.  You are not on our jury, and you

12     are all excused and free to go.  Have a good rest of your

13     day.  Thank you.

14              (Unselected jurors excused at 12:07 p.m.)

15              THE COURT:  All right.  For my eight in the jury

16     box, I believe Mr. Looby has passed around materials.  Our

17     first step is to administer another oath.  So we'll go ahead

18     and do that.

19              (Jury placed under oath at 12:07 p.m.)

20              THE COURT:  Thank you.  So it's just about

21     lunchtime so in a moment I'm going to let you go temporarily

22     to go get some lunch.  Before you head out for lunch, Mr.

23     Looby will show you back to the juryroom.  I saw some, if

24     not all of you, back there this morning for our discussion,

25     but that will be sort of your home base during the course of

1    the trial.

2              I'll have plenty to say when we get back after

3    the lunch break, but until then, just a couple quick things.

4              You all have these juror stickers.  I know

5    they're not all that attractive but I need to ask you to

6    wear those during the course of the trial.  That's so those

7    of us involved in the case and who work at the court know

8    that you are jurors because we're not supposed to be

9    interacting with you during that time.

10             You will learn, if you haven't already,

11   temperature control in this courtroom is very challenging.

12   What frequently happens unfortunately during the course of

13   the day it is too hot and too cold so the best strategy is

14   to bring layers and feel free to put things on, take them

15   off during the course of the day.  I apologize in advance

16   for that.  And,

17             Finally, although you haven't really heard much

18   about the case, you are not to talk but case to one another

19   or to anybody else until the case is completed.  And I'll

20   tell you more about that later, but this is just to let you

21   know during the time you are away for lunch don't talk about

22   the case.

23             We'll let you have until 1:15 to find some

24   lunch.  So please be back in our juryroom at 1:15 so we

25   can get started.  I will be reading you some additional

1    instructions, and then we'll get to opening statements.  But

2    after you are taken back to the juryroom, you will be free

3    to go until 1:15.  Thank you very much.

4              (Jury left courtroom.)

5              THE COURT:  All right.  Before we break, you can

6    have a seat.  I'll be looking at the deposition objections

7    over the break.  I started looking at them.  It looks like

8    some of them may be tied up with an issue I already decided

9    this morning.  Am I correct about that?  Is that your

10   understanding?

11             MR. LINDVALL:  Your Honor.  It's the motion in

12   limine.

13             MR. KELLEHER:  Yes, Your Honor.

14             THE COURT:  All right.  So defendants would

15   agree, although you object, that a lot of what you are

16   objecting to already I kind of ruled against you.

17             MR. KELLEHER:  Has it mooted, yes.

18             THE COURT:  All right.  Well, I will get you

19   specific rulings when we come back.

20             Is there anything further before we break, from

21   plaintiffs?

22             MR. HOROWITZ:  Nothing further, Your Honor.

23             THE COURT:  From the defendants?

24             MR. KELLEHER:  Nothing, Your Honor.

25             THE COURT:  All right.  We will be in recess.

```
 1                    (Lunch recess taken.)

 2                    *      *      *

 3                    Afternoon Session, 1:26 p.m.

 4                    THE COURT:  The jurors are all here, so we're

 5      going to bring them in.

 6                    (The jury entered the courtroom.)

 7                    THE COURT:  All right, ladies and gentlemen of

 8      the jury.  Welcome back.

 9                    Mr. Golden, I will ask you to pass out some of

10      the materials to our jurors.

11                    What you are being handed are copies of the

12      preliminary jury instructions and a sample patent.

13                    (The clerk handed materials to the jury.)

14                    THE COURT:  I'm going to be reading to you the

15      preliminary jury instructions.  Feel free to follow along as

16      I read, if you wish.  That copy will stay with you during

17      the trial.  The sample patent will be referred to in a video

18      that we will be showing you as part of my instruction.  I

19      will tell you about the video when we get there in a couple

20      of moments.  But let me begin with these preliminary jury

21      instructions.

22                    Members of the jury:

23                    Now that you have been sworn in, I have the

24      following preliminary instructions for guidance on your role

25      as jurors in this case.
```

1          Section 1 is called the parties and their

2     contentions.

3          This case is an action involving patent

4     infringement under the patent laws of the United States,

5     unfair competition under the common law and the Lanham Act,

6     trade dress infringement, and intentional interference with

7     prospective economic advantage.  The parties are Ateliers de

8     la Haute-Garonne and F2C2 Systems S.A.S., whom I may refer

9     to collectively as plaintiffs or AHG, on the one hand, and

10    Automation-USA Inc. and Broetje Automation GmbH, whom I may

11    refer to collectively as defendants, Broetje, or the Broetje

12    Parties on the other hand.

13         Ateliers de la Haute-Garonne is the owner of

14    United States Patent No. 5,011,339 and United States Patent

15    No. 5,143,216.  You may hear the lawyers and witnesses in

16    this case refer to these patents as the '339 patent and the

17    '216 patent, respectively.  Together, the '339 patent and

18    the '216 patent may be referred to as the asserted patents

19    or AHG's patents.  AHG alleges that the other plaintiff,

20    F2C2 Systems S.A.S., is the exclusive licensee of the

21    asserted patents.  AHG contends that each of the Broetje

22    Parties infringes claims 1, 2, and 6 of the '339 patent and

23    also infringes claims 1 and 2 of the '216 patent by making,

24    using, offering for sale and/or selling within the United

25    States devices that embody the inventions disclosed and

1    claimed.  The lawyers and witnesses and I may sometimes

2    refer to these devices as the Broetje Parties' cassettes or

3    Automated Fastener Feed Systems, or as the accused product,

4    or the accused products.  AHG alleges that Broetje's alleged

5    patent infringement is willful.

6         The Broetje Parties contend that the accused

7    products do not infringe the asserted patents, that they did

8    not willfully infringe the asserted patents, and that in any

9    event the asserted patents are invalid.  To fulfill your

10   duty as jurors, you must decide whether claims 1, 2, and 6

11   of the '339 patent and claims 1 and 2 of the '216 patent

12   have been infringed and also whether those claims are

13   invalid.

14        AHG also contends that the similarity in

15   appearance of the Broetje Parties' Automated Fastener Feed

16   Systems to AHG's own products confuses consumers into

17   mistakenly believing that they are purchasing AHG products,

18   when in fact the products were made by the Broetje Parties.

19   As a result, AHG contends each of the Broetje Parties is

20   liable for unfair competition and trade dress infringement.

21   The Broetje Parties deny these claims.

22        AHG also contends that each of the Broetje

23   Parties have intentionally interfered with AHG's prospective

24   economic advantage by selling to customers the accused

25   products.  AHG alleges that customers believe that they are

1   purchasing AHG products when they are in fact purchasing the

2   Broetje Parties' accused products.  The Broetje Parties deny

3   these claims.

4           Section 2, duty of the jury.

5           It will be your duty to find what the facts are

6   from the evidence as presented at the trial.  You, and you

7   alone, are the judges of the facts.  You will have to apply

8   those facts to the law as I will instruct you at the close

9   of the evidence.  You must follow that law whether you agree

10  with it or not.

11          You are the judges of the facts.  I will decide

12  which rules of law apply to this case.

13          Nothing I say or do during the course of the

14  trial is intended to indicate what your verdict should be.

15          Three, evidence.

16          The evidence from which you will find the facts

17  will consist of the testimony of witnesses, and documents

18  and other things admitted into evidence.  In addition, the

19  evidence may include certain facts as agreed to buy the

20  parties or as I instruct you.

21          Certain things are not evidence.

22          One, statements, arguments, and questions by

23  lawyers are not evidence.

24          Two, objections to questions are not evidence.

25  Lawyers have an obligation to their clients to make an

1    objection when they believe testimony or exhibits being

2    offered into evidence are not admissible under the Rules of

3    Evidence.  You should not be influenced by a lawyer's

4    objection or by my ruling on the objection.  If I sustain or

5    uphold the objection and find that the matter is not

6    admissible, you should ignore the question or document.  If

7    I overrule an objection and allow the matter into evidence,

8    you should treat the testimony or document like any

9    evidence.  If I instruct you during the trial that some item

10   of evidence is admitted for a limited purpose, you must

11   follow that instruction and consider that evidence for that

12   purpose only.  If this does occur during the trial, I will

13   try to clarify this for you at that time.

14          Three, anything you see or hear outside the

15   courtroom is not evidence and must be disregarded.  You are

16   to decide this case solely on the evidence presented here in

17   the courtroom.

18          In judging the facts, it will be up to you to

19   decide which witnesses to believe, which witnesses not to

20   believe, and how much of any witness' testimony to accept or

21   reject.

22          Four, direct and circumstantial evidence.

23          Some of you may have heard the terms direct

24   evidence and circumstantial evidence.

25          Direct evidence is simply evidence like the

1   testimony of an eyewitness which, if you believe it,

2   directly proves a fact.  If a witness testified that he saw

3   it raining outside, and you believed him, that would be

4   direct evidence that it was raining.

5       Circumstantial evidence is simply a chain of

6   circumstances that indirectly proves a fact.  If someone

7   walked into the courtroom wearing a raincoat covered with

8   drops of water and carrying a wet umbrella, that would be

9   circumstantial evidence from which you could conclude that

10  it was raining outside.

11      It is your job to decide how much weight to give

12  the direct and circumstantial evidence.  The law makes no

13  distinction between the weight that you should give to

14  either one, nor does it say that one is any better evidence

15  than the other.  You should consider all the evidence, both

16  direct and circumstantial, and give it whatever weight you

17  believe it deserves.

18      Section 5, burdens of proof.

19      In any legal action, facts must be proven by a

20  required standard of evidence, known as the burden of proof.

21  In a patent case such as this, there are two different

22  burdens of proof that are used.  The first is called

23  preponderance of the evidence.  The second is called clear

24  and convincing evidence.

25      AHG is accusing the Broetje Parties of patent

1    infringement, trade dress infringement, unfair competition,

2    and intentional interference with prospective economic

3    advantage.  AHG has the burden of proving its claims and the

4    amount of its money damages, if any, by what is called a

5    preponderance of the evidence.  That means AHG has to

6    produce evidence which, when considered in light of all of

7    the facts, leads you to believe that what AHG claims is more

8    likely true than not.  To put it differently, if you were to

9    put the evidence of AHG and the Broetje Parties concerning

10   infringement on opposite sides of a scale, the evidence

11   supporting AHG's claims would have to make the scales tip

12   somewhat on its side in each instance.  If the scale should

13   remain equal or tip in favor of the Broetje Parties, you

14   must find for the Broetje Parties.

15            If you find that the Broetje Parties infringed

16   one or more of the patent claims that have been asserted in

17   this case, then as a separate question, AHG has the burden

18   of proving its additional contention that the infringement

19   was willful by clear and convincing evidence.  Clear and

20   convincing evidence is evidence that produces an abiding

21   conviction that the truth of a factual contention is highly

22   probable.  Proof by clear and convincing evidence is, thus,

23   a higher burden than proof by a preponderance of the

24   evidence.

25            In this case, in addition to denying AHG's

1    claims, the Broetje Parties assert that all of the asserted

2    patents are invalid.  The asserted patents, however, are

3    presumed to be valid.  The Broetje Parties have the burden

4    of proving that the asserted patents are invalid by clear

5    and convincing evidence.

6         Those of you familiar with criminal cases will

7    have heard the term proof beyond a reasonable doubt.  That

8    burden does not apply in a civil case and you should,

9    therefore, put it out of your mind in considering whether or

10   not AHG or the Broetje Parties have met their burden of

11   proof.

12        Six, patent video.

13        Before I describe the parties' contentions

14   further, at this time we are going to show a 17-minute video

15   that will provide background information to help you

16   understand what patents are, why they are needed, the role

17   of the Patent Office, and why disputes over patents arise.

18   This video was prepared by the Federal Judicial Center, not

19   the parties in this case, to help introduce you to the

20   patent system.  During the video, reference will be made to

21   a sample patent.  A copy of this patent has been given to

22   you, not in your jury binder, but handed to you so that you

23   may follow along with the video.

24        I will ask Mr. Golden to please turn the lights

25   down.

1                    Thank you.  Go ahead and play the video.

2                    (Videotape played as follows.)

3                    "JUDGE FOGEL:  Hello.  I'm Jeremy Fogel.  I've

4        been a United States District Judge since 1998 and I'm now

5        the Director of the Federal Judicial Center.

6                    As you probably know by now, this is a patent

7        case, so you may be wondering, how can I sit in judgment on

8        a case like this when I'm not entirely sure what a patent

9        is?  We hope to answer that concern with this brief video,

10       which will give you some of the background needed to do your

11       job.

12                   This case will involve some special issues that

13       the Judge and lawyers will explain to you, but all patent

14       cases involve some basics that you will learn about.  This

15       video will discuss what patents are, why we have them, how

16       people get them, and why there are disputes that require us

17       to call in a jury like you.  We'll also show you what

18       patents look like.

19                   The United States Constitution gives Congress

20       the power to pass laws relating to patents.  Article 1,

21       Section 8, Clause 8, allows Congress to promote the progress

22       of science and useful arts by securing for limited times to

23       authors and inventors the exclusive right to their

24       respective writings and discoveries.

25                   A patent, then, is an official grant by the

1    United States Government that gives its owners certain

2    rights to an invention.  Those include the right to stop

3    others from making, using, selling, or offering for sale the

4    invention that is claimed in the patent.  A patent lasts for

5    a specific period of time, usually 20 years from the date

6    that the application is filed by the inventor, but because

7    it takes an average of three years for the Patent and

8    Trademark Office to act on the application, the effective

9    life of the patent is closer to 17 years.

10          A patent represents a bargain made between the

11   government and the inventor.  In return for the right to

12   prevent others from using the invention, the inventor must

13   enhance the public knowledge, or what we sometimes call the

14   state of the art, by adding something new and useful to it.

15   A famous example is Thomas Edison's invention of the light

16   bulb.  Harnessing electrical power for illumination

17   transformed society and led to many other important

18   breakthroughs.

19          During the lifetime of the patent, its

20   disclosure may inspire new inventions, and after it expires,

21   the invention is free for anyone to use.  It is this

22   combination of something new and valuable to the public that

23   justifies granting time limited patent protection to the

24   inventor.

25          A patent is in many ways like a deed to a piece

1    of property.  It grants the owner the right to keep people

2    off the property or to charge them a fee, like rent, for

3    using it.  And just as a deed indicates boundaries defining

4    the landowner's property, a patent claim defines the

5    patentee's domain.  The patent system works because the

6    inventor is required to describe the invention in clear and

7    specific terms so that the public knows what the boundaries

8    of the invention are.

9              Once a patent is issued by the government, it

10   becomes available for public inspection.  In that way,

11   anyone who learns of the patent can read it and understand

12   exactly what the inventor invented and the limits of the

13   patents set forth in the claims.

14             Now that we understand what a patent is, let's

15   take a closer look at the term invention.  An invention is a

16   new way of solving a problem or a useful new machine,

17   manufacture or composition of matter.  The patent process

18   begins in the mind of the inventor, and in particular, when

19   the invention is formulated in the mind of the inventor.

20   Patent lawyers call this conception.  This is when the idea

21   occurs to the inventor clearly enough that he or she can

22   write it down and explain it to someone.

23             To qualify for a patent, the invention needs to

24   be new and useful.  Also, it must not be obvious to one of

25   ordinary skill in the field.  If the inventor believes these

1    requirements are met, he or she will prepare an application

2    for filing with the Patent and Trademark Office, whose

3    headquarters are in Alexandria, Virginia, just outside of

4    Washington, D.C.

5            The Patent and Trademark Office, often called

6    the PTO, is the agency of the federal government whose job

7    it is to examine patent applications, to make sure they were

8    in proper form and comply with the requirements of the law.

9    The inventor can prepare an application for filing with the

10   PTO, but usually, it is drafted by a patent attorney or a

11   patent agent who specializes in what is called prosecuting

12   patent applications.  That is the process by which they are

13   evaluated.

14           The attorney or agent works with the inventor to

15   be sure the invention is described and claimed in a way that

16   complies with the law and the regulations of the PTO.

17   98 percent of patent applications are made online using the

18   PTO's electronic filing system, although a few paper

19   applications are still made.

20           When the PTO receives the inventor's

21   application, it is first checked to see if it is complete

22   and complies with all the PTO's application requirements.

23   It then assigns the submission to a Patent Examiner, a staff

24   person with a background in the field or art the invention

25   falls within to evaluate the application and decide whether

1    a patent can be granted.

2              You have been given a sample patent to refer to

3    as you watch this video, so you already have a sense of what

4    a patent looks like.  But now let's take a closer look at

5    the three main parts of a patent.

6              To begin with, there are some basic identifying

7    information on the first page.  This material is highlighted

8    in your handout.

9              On the upper right side of the page is the

10   number assigned to the patent by the PTO and on the left

11   side is a title that describes the invention and the names

12   of the inventors and sometimes the company to who they've

13   assigned the patent.  Also on the left is the date when the

14   patent application was filed, and back on the right, the

15   date when the patent was issued.

16             There also is more detailed information on the

17   first page, including a list of numbers following the

18   caption field of search.  These numbers identify previously

19   issued patents the Examiner looked at or searched to make

20   sure the applicant's claimed invention really is something

21   new, not obvious, and thus patentable.

22             Also listed on the first page are what we call

23   references.  That is, previous patents or articles that

24   describe the technology or prior art known at the time the

25   application was filed.  It may seem strange to you that we

1    call this pre-existing technology prior art even though it

2    has nothing to do with artists.  We use the word art in its

3    historical sense, to include inventions and other subject

4    matter reasonably related to the claimed invention.  We also

5    refer to the latest technology as state of the art, and we

6    say of someone who can understand and apply the technology

7    that he or she is skilled in the art.

8           The second major part of the patent is what we

9    call the specification, or written description.  As is the

10   case in your sample, it is usually the longest part of the

11   patent.  It includes an abstract, which is a brief summary

12   of the invention.  A background section describes the nature

13   of the problem the invention is supposed to solve, one or

14   more drawings, called figures, that illustrate various

15   aspects of the application, and a detailed description of

16   one or more embodiments of the invention.

17          An embodiment is a specific device or method

18   that uses the invention, such as a particular form of light

19   bulb.

20          The third and most important part of the patent

21   is the claims.  These are the numbered paragraphs that

22   appear at the end.  The claims are what give the public

23   notice of the boundaries of the invention.  They are similar

24   to the description of property you may have seen in a

25   deed referring to precise measurements taken on the ground.

1    The Judge will instruct you further on how any technical

2    or ambiguous terms in the patent claims should be

3    understood.

4              Now that we've discussed the main parts of a

5    patent, let's look at how the PTO processes patent

6    applications, what we referred to earlier as prosecution of

7    a patent application.

8              This process begins when the inventor's

9    application arrives at the PTO.  There, it receives a filing

10   date.  Under the American Invents Act of 2011, filing dates

11   will determine who is awarded the patent if there are

12   competing valid applications.  In 2012, the PTO received

13   nearly 600,000 patent applications and issued more than

14   270,000 patents.  After determining that the application is

15   complete, the receiving branch also decides what field of

16   technology an application relates to and assigns it to the

17   appropriate examining group.

18             In order to make that decision, the Patent

19   Examiner usually looks at patents that have been issued

20   previously in the same or closely related fields of art.

21   The Examiner has computer databases that contain information

22   used to accomplish this task.

23             Another fart part of the job is to decide if the

24   inventor's description of the invention is complete and

25   clear enough to meet the requirements for a patent,

1    including the requirement that the description enables

2    someone of ordinary skill in the field to actually make and

3    use it.

4              However, because the job of examining so many

5    applications is challenging, the law requires the applicant

6    to tell the Examiner whatever he or she knows about the

7    prior art that might be important to the Examiner's decision

8    on whether to allow the patent.  We call this the

9    applicant's duty of candor.

10             One way the applicant can satisfy this duty is

11   by bringing pertinent prior art to the attention of the

12   Examiner, either in the original application, or in other

13   submissions called Information Disclosure Statements.  In

14   this way, the decisions of the Examiner are based on both

15   the information provided by the applicant and on the

16   information the Examiner finds during his or her prior art

17   search.

18             Sometimes the Examiner concludes that the

19   application meets all the requirements we've discussed and

20   allows the patent to issue at this first stage, but more

21   frequently the Examiner will reject the application as

22   deficient in some respect.  This decision will be

23   communicated by the Examiner in what is called an Office

24   Action, which is a preliminary notice to the applicant of

25   what the Examiner finds insufficient or unpatentable.  For

1    example, the Examiner may reject certain claims as being

2    unpatentable because a journal article written and published

3    by another person prior to the effective filing date of

4    the patent application disclosed what the applicant was

5    currently claiming.  At that point, the applicant prepares a

6    written response, either agreeing or disagreeing with the

7    Examiner.

8            An applicant who agrees with the Examiner can

9    suggest amendments to the application, designed on overcome

10   the Examiner's rejection.  Alternatively, an applicant who

11   disagrees with the Examiner's office action can explain the

12   reasons for the disagreement.

13           This exchange of Office Actions and responses

14   goes on until the Examiner issues a Final Office Action,

15   which may reject or allow some or all of the applicant's

16   claims.  The overall process is referred to as the

17   prosecution history of the application.

18           The written incoming and outgoing correspondence

19   between the PTO Examiner and the applicant is also called

20   the file wrapper.  In the past, these file wrappers were all

21   in paper form as were the submitted applications.  Now they

22   are most often electronic and may occasionally be paper as

23   well.

24           Most patent applications filed on or after

25   November 29th, 2000 are published by the PTO 18 months after

1    the inventor has filed his or her application so that the

2    public may inspect it.

3              Once a final PTO office action has occurred

4    and one or more claims have been allowed, the applicant is

5    required to pay an issuance fee and the patent is printed.

6    Then, on the date shown on the upper right-hand corner, the

7    first page of the patent, it is issued by the PTO and the

8    inventor receives all the rights of the patent.  That date

9    is highlighted on your sample.

10             Once a patent has issued, the inventor or the

11   person or company the inventor has assigned a patent to can

12   enforce the patent against anyone who uses the invention

13   without permission.  We call such unlawful use infringement,

14   but the PTO and its examiners have no jurisdiction over

15   questions relating to infringement of patents.  If there is

16   a dispute about infringement, it is brought to the Court to

17   decide.

18             Sometimes in a court case you are also asked to

19   decide about validity.  That is whether the patent should

20   have been allowed at all by the PTO.  A party accused of

21   infringement is entitled to challenge whether the asserted

22   patent claims are sufficiently new or nonobvious in light of

23   the prior art or whether other requirements of patentability

24   have been met.  In other words, a defense to an infringement

25   lawsuit is that the patent in question is invalid.

1          You may wonder why it is that you would be asked

2     to consider such things when the patent has already been

3     reviewed by a Government Examiner.   There are several

4     reasons for this.

5          First, there may be facts or arguments that the

6     Examiner did not consider, such as prior art that was not

7     located by the PTO or provided by the applicant.   In

8     addition, there is of course the possibility that mistakes

9     were made or important information overlooked.   Examiners

10    have a lot of work to do and no process is perfect.

11         Also, unlike a court proceeding, prosecution of

12    a patent application takes place without input from people

13    who might later be accused of infringement, so it is

14    important that we provide a chance for someone who is

15    accused of infringement to challenge the patent in court.

16         In deciding issues of infringement and validity,

17    it is your job to decide the facts of the case.   The

18    Judge will instruct you about the law, which may include

19    the meaning of certain words or phrases contained in the

20    patent.

21         So it is your primary duty as jurors to resolve

22    any factual disputes and in some cases, such as infringement

23    and validity, to apply the law to those facts.   To prove

24    infringement, the patentholder must persuade you by what is

25    called a preponderance of the evidence relating to the facts

1   of the case that the patent has been infringed.

2          To prove invalidity, the alleged infringer must

3   persuade you by what is called clear and convincing evidence

4   that the patent is invalid.

5          The Judge in your case will explain these and

6   other terms and provide additional specific instructions at

7   the appropriate time.

8          Good luck with your task, and thank you for your

9   service.

10          (End of patent video.)

11          THE COURT:  All right.  Ladies and gentlemen,

12   we'll pick back up on the preliminary jury instructions.

13   I'm now at page 7.  Section 7 is entitled General Guidance

14   Regarding Patents.

15          I will now give you a general overview of what a

16   patent is and how one is obtained.  You may have heard some

17   of this in the patent video we just watched.

18          A.  Constitutional Basis For Patent Grant.

19          The United States Constitution, Article I,

20   Section 8, grants the Congress of the United States the

21   power to enact laws "to promote the progress of science and

22   useful arts, by securing, for limited times, to authors and

23   inventors, the exclusive right to their respective writings

24   and discoveries."

25          B.  Exclusionary Right and Term of a Patent.

1            The United States Patent and Trademark Office is

2   responsible for reviewing patent applications and granting

3   patents.  Once the "Patent Office" or "PTO" has issued a

4   patent, the patent owner has the right to exclude others

5   from making, using, selling, or offering for sale the

6   invention throughout the United States for the length of the

7   patent term.

8            A person who, without the patent owner's

9   authority, makes, uses, sells, or offers to sell a product

10  or employs a method that is covered by one or more claims

11  of a valid patent, infringes the patent.  A person can

12  also induce others to infringe a patent by suggesting to

13  other persons or companies that they undertake acts that

14  constitute infringement.  This is called inducing

15  infringement.  A person can also contribute to another's

16  infringement of a patent, which is called contributory

17  infringement.

18            C.  The Parts of a Patent.

19            I will next briefly describe the parts of a

20  patent and some of the procedures followed by those

21  attempting to obtain patents.  Many of the terms I will use

22  in this description are contained in a "Glossary of Patent

23  Terms" which I have given to you along with a copy of these

24  preliminary instructions.  I will read this glossary to you

25  and you should also feel free to refer to the glossary

1    throughout the trial.

2         For an invention to be patentable, it must be

3    new, useful, and, at the time of invention was made, must

4    not have been obvious to a person having ordinary skill in

5    the art to which the subject matter pertains.

6         Under the patent laws, the Patent Office examines

7    patent applications and issues patents.  A person applying

8    for a patent must include a number of matters in his or her

9    application, including (1) a detailed description of the

10   invention in terms sufficiently full, clear, concise and exact

11   to enable any person skilled in the art to which the invention

12   pertains to be able to make and use the invention; (2) a

13   disclosure of the best mode of carrying out the invention

14   known to the inventor testimony of filing; and (3) one or

15   more claims.

16        The application includes a written description

17   of the invention called a "specification" and may include

18   drawings that illustrate the invention.  The specification

19   concludes with one or more claims that particularly and

20   distinctly define the subject matter that the inventor

21   regards as his or her invention.  When a patent application

22   is received at the Patent Office, it is assigned to an

23   Examiner, who examines the application, including the

24   claims, to ascertain whether the application complies with

25   the requirements of the U.S. patent laws.  The Examiner

1    reviews files of prior work of others in the form of files

2    of patents and publications.  This type of material is

3    called "prior art."  Prior art is generally technical

4    information and knowledge that was known to the public

5    either before the invention by the applicant or more

6    than one year before the filing date of the application.

7    Documents found in the search of prior art are called

8    "references."  In conducting the search of prior art, the

9    Examiner notes in writing on the file the classes or

10   subclasses of art searched.

11              The compilation of the papers concerning the

12   proceedings before the Patent Office is called the

13   "prosecution history," "file wrapper," or "file history."

14   The Patent Office does not have its own laboratories or

15   testing facilities.  The Examiner may "reject" the patent

16   application claims if he or she believes that they are

17   applications for inventions that are not patentable in light

18   of the prior art, or because the patent specification

19   does not adequately describe the claimed inventions.  The

20   applicant may then amend the claims to respond to the

21   Examiner's rejections.  If, after reviewing the prior

22   art, the Examiner concludes that the claims presented by

23   the applicant patentably define the applicant's claimed

24   invention over the most relevant known prior art, the

25   application is granted a U.S. patent.

1          D.  Infringement Disputes and Invalidity.

2              The PTO and its examiners do not decide infringe-

3     ment issues.  If there is a dispute about infringement, it is

4     brought to the Court to decide.  Here, you are also asked to

5     decide about validity, that is, whether the patent should have

6     been allowed by the PTO.  A party accused of infringement is

7     entitled to challenge whether the asserted patent claims are

8     sufficiently new or nonobvious in light of the prior art or

9     whether other requirements of patentability have been met.  In

10    other words, a defense to an infringement lawsuit is that the

11    patent in question is invalid.

12             8.  Summary of the Patent Issues.

13             In this case, you must decide several things

14    according to the instructions that I will give you at the

15    end of the trial.  Those instructions will repeat this

16    summary and will provide more detail.  One thing you will

17    not need to decide is the meaning of the patent claims.

18    That is one of my jobs -- to explain to you what the patent

19    claims mean.

20             By the way, the word "claims" is a term of art

21    and I will instruct you on its meaning at the end of the

22    trial.  Meanwhile, you will find a definition in the

23    glossary attached to these preliminary instructions.

24             In essence, you must decide:

25             (1) whether AHG has proven by a preponderance of

1    the evidence that Broetje infringed one or more of the

2    asserted claims of the '339 patent or the '216 patent;

3            (2) whether AHG has proven by clear and

4    convincing evidence that Broetje willfully infringed one or

5    more of the asserted claims of the '339 patent or the '216

6    patent;

7            (3) whether Broetje has proven by clear and

8    convincing evidence that one or more of the asserted claims

9    of the '339 patent or the '216 patent are invalid; and

10           (4) what damages AHG is entitled to receive from

11   Broetje.

12           Section 9.  Summary of the Non-Patent Issues.

13           In this case, you must decide several other

14   things which do not relate to patents.  These other things

15   you must also decide according to the instructions that I

16   will give you at the end of the trial.  In essence, you must

17   decide:

18           (1) whether AHG has proven by a preponderance of

19   the evidence that Broetje unfairly competed against AHG;

20           (2) whether AHG has proven by a preponderance of

21   the evidence that Broetje infringed AHG's trade dress;

22           (3) whether AHG has proven by a preponderance of

23   the evidence that Broetje intentionally interfered with

24   AHG's prospective economic benefit; and

25           (4) what damages AHG is entitled to receive from

1    Broetje.

2                      Section 10.  Conduct of the Jury.

3                      Now, a few words about your conduct as jurors.

4                      First, I instruct you that during the trial you

5    are not to discuss the case with anyone or permit anyone to

6    discuss it with you.  Until you retire to the juryroom at

7    the end of the case to deliberate on your verdict, you

8    simply are not to talk about this case.  If any lawyer,

9    party, or witness does not speak to you when you pass in the

10   hall, ride the elevator, or the like, remember it is because

11   they are not supposed to talk with you, nor you with them.

12   In this way, any unwarranted and unnecessary suspicion

13   about your fairness can be avoided.  If anyone should try to

14   talk to you about the case, bring the matter to the Court's

15   attention promptly.

16                     Second, do not read or listen to anything

17   touching on this case in any way.

18                     Third, do not try to do any research or make any

19   investigation about the case on your own.

20                     Let me elaborate.  During the course of the

21   trial, you must not conduct any independent research about

22   the case, the matters in the case, and the individuals or

23   entities involved in the case.  In other words, you should

24   not consult dictionaries or reference materials, search the

25   Internet, websites, blogs, or any other electronic means.

1    Also, should there happen to be a newspaper article or radio

2    or television report relating to this case, do not read the

3    article or watch or listen to the report.  It is important

4    that you decide this case based solely on the evidence

5    presented in the courtroom.  Please do not try to find out

6    information from any other sources.

7              I know that many of you use cellphones,

8    Blackberries, iPhones, the Internet, and other tools of

9    technology.  You also must not talk to anyone about this

10   case or use these tools to communicate electronically with

11   anyone about the case.  This includes your family and

12   friends.  You may not communicate with anyone or post any

13   information about the case on or through your cellphone,

14   through e-mail, your BlackBerry or iPhone, text messages, on

15   Twitter, through any blog or website, through any Internet

16   chatroom, or by way of any other social networking within

17   sites, including Facebook, MySpace, LinkedIn, and YouTube.

18             Finally, do not form any opinion until all the

19   evidence is in.  Keep an open mind until you start your

20   deliberations at the end of the case.

21             During the trial, you may, but are not required

22   to, take notes regarding testimony.  For example, exhibit

23   numbers, impressions of witnesses, or other things related

24   to the proceedings.  A word of caution is in order.  There

25   is generally, I think, a tendency to attach undue importance

 1    to matters which one has written down.  Some testimony which

 2    is considered unimportant at the time presented, and thus

 3    not written down, takes on greater importance later in the

 4    trial in light of all of the evidence presented.  Therefore,

 5    you are instructed that your notes are only a tool to aid

 6    your own individual memory and you should not compare your

 7    notes with other jurors in determining the content of any

 8    testimony or in evaluating the importance of any evidence.

 9    Your notes are not evidence, and are by no means a complete

10    outline of the proceedings or a list of the highlights of

11    the trial.  Also, keep in mind that you will not have a

12    transcript of the testimony to review.  So, above all, your

13    memory will be your greatest asset when it comes time to

14    deliberate and render a decision in this case.

15              In addition, please make sure that note-taking

16    does not distract you from your tasks as jurors.  You must

17    listen to all the testimony of each witness.  You also need

18    to decide whether and how much to believe each witness.

19    That will require you to watch the appearance, behavior, and

20    manner of each witness while he or she is testifying.  You

21    cannot write down everything that is said and there is

22    always a fear that a juror will focus so much on note-taking

23    that he or she will miss the opportunity to make important

24    observations.  If you do take notes, you must leave them in

25    the jury deliberation room which is secured at the end of

1    each day.  And, remember that they are for your own personal

2    use.

3              I will give you detailed instructions on the law

4    at the end of the case, and those instructions will control

5    your deliberations and decision.

6              I also ask that you wear your juror

7    identification tags where people can see them, so persons

8    involved in the case don't accidently engage you in

9    conversation.  Even if it is innocent conversation, it might

10   draw into question your impartiality.  So please make sure

11   that people can identify you as jurors in the case.

12              11.  Sidebars.

13              During the trial, it may be necessary for me

14   to talk with the lawyers out of your hearing by having a

15   bench conference, which is also called a sidebar.  If that

16   happens, please be patient.

17              We are not trying to keep important information

18   from you.  These conferences are necessary for me to fulfill

19   my responsibility to make sure that evidence is presented to

20   you correctly under the law.

21              We will, of course, do what we can to keep the

22   number and length of these conferences to a minimum.  While

23   we meet, feel free to stand up and stretch and walk around

24   the jury box, if you wish.

25              I may not always grant an attorney's request for

1       a sidebar.  Do not consider my granting or denying a request

2       for a conference as any indication of my opinion of the case

3       or of what your verdict should be.

4               Section 12.  Course of the Trial.

5               The trial will now begin.  First, each side may

6       make an opening statement.  An opening statement is neither

7       evidence nor argument.  It is an outline of what that party

8       intends to prove, and is presented to help you follow the

9       evidence as it is offered.

10              After the opening statements, AHG will present

11      its witnesses, and Broetje may cross-examine them.  The

12      Broetje will present its witnesses, and AHG may

13      cross-examine them.

14              After all the evidence is presented, the

15      attorneys will make their closing arguments to summarize and

16      interpret the evidence for you, and I will give you

17      instructions on the law and describe for you the matters you

18      must resolve.

19              You will then retire to the jury room to

20      deliberate on your verdict.

21              At the end of this trial and before you begin in

22      your deliberations, I will read and give you a copy of

23      written instructions on the law.

24              13, trial schedule.

25              Though you may have heard me say this during

1    voir dire, I want to again outline the schedule I expect to

2    maintain during the course of this trial.

3             This case is expected to take five days to try.

4    We will normally begin the day at 9:00 a.m.  We will go

5    until around 12:30 p.m. and, after a 30-minute break for

6    lunch, from about 1:00 p.m. to 4:30 p.m.  There will be a

7    15-minute break in the morning and another 15-minute break

8    in the afternoon.  If you need a break at some additional

9    time -- perhaps to use the restroom, or perhaps because you

10   are feeling drowsy -- you should try to get my attention or

11   my staff's attention by waiving or standing, and we'll do

12   our best to accommodate you.

13             The only significant exception to our schedule

14   may occur when the case is submitted to you for your

15   deliberations.  On that day, the proceedings might last

16   beyond 4:30 p.m.  We will post a copy of this schedule for

17   your convenience in the jury deliberation room.

18             Finally, please understand that this is a timed

19   trial.  That means the Court has allocated to each party a

20   maximum number of hours in which to present all portions of

21   its case.  This allows me to assure you that we expect to be

22   completed with this case by Friday, that is by April 12th.

23   If that's not Friday, I might be off by a day, but by

24   Friday, whatever date that is.  Of course, to keep on

25   schedule, it is important that you be here promptly each

1    morning and be ready at the end of each of our scheduled

2    breaks.

3              And, finally, for me, I want to read to you this

4    glossary of patent terms, which should be the last two pages

5    attached to your preliminary instructions.

6              Applicants means the named inventors who are

7    applying for the patent.

8              Assignment means transfer of ownership rights in

9    a patent or patent application from one person or company to

10   another.

11             Claims means that part of a patent which defines

12   the metes and bounds of the invention.  These are found at

13   the end of the patent specification in the form of numbered

14   paragraphs.

15             Disclosure or description.  That part of the

16   patent specification which explains how the invention works

17   and usually includes a drawing.

18             Elements means the required parts of a device or

19   the required steps of a method.  A device or method

20   infringes a patent if it contains each and every element of

21   a patent claim.

22             File wrapper/file history means the written

23   record of proceedings in the U.S. Patent and Trademark

24   Office, also known as the Patent Office or PTO, including

25   the original patent application and subsequent

1          communications between the Patent Office and the applicant.

2                    Ordinary skill in the art means the level of

3          experience, education, and/or training generally possessed

4          by those individuals who work in the area of the invention

5          at the time of the invention.

6                    Patent application.  The initial papers filed in

7          the Patent Office by an applicant.  These typically include

8          a specification, drawings, claims and the oath or

9          declaration of the applicant.

10                    Patent Examiners means personnel employed by the

11          Patent Office having expertise in various technical areas

12          who review or examine patent applications to determine

13          whether the claims of a patent application are patentable

14          and the disclosure adequately describes the invention.

15                    Prior art means any information that is used to

16          describe public, technical knowledge prior to the invention

17          by applicant or more than a year prior to his or her

18          application.

19                    Prior art references.  Any item of prior art,

20          publication, patent or product, used to determine

21          patentability.

22                    And, finally, specification.  The part of the

23          patent application or patent that describes the invention,

24          and may include drawings.  The specification does not define

25          the invention, only the claims do.

1            That completes the preliminary instructions.

2    We're going to give you your afternoon break just a little

3    bit early today.  I know I need a break after all of that

4    reading.  So we'll give you about 15 minutes.  During the

5    break, no talking about the case and we'll get you back here

6    for opening statements in just a little bit.

7            (The jury was excused for a short recess. )

8            THE COURT:  All right.  Have a seat for just a

9    minute.  I want to give you the rulings on the deposition

10   objections.  Then I will give you a break.

11           So we have before us first the defendants'

12   objections to the depositions of Dr. Peters' deposition.

13   The defendants' objections are overruled.  In the Court's

14   view, the designations relate to the foreign proceedings and

15   the reasons for change in the products.  These are, this is

16   probative evidence and the Rule 403 balance does not favor

17   exclusion.  The Court's ruling now is I think consistent

18   with the motion in limine ruling and the ruling given on the

19   objections this morning.

20           Then we have plaintiffs' objections to the

21   counter-designations relating to Mr. Benczkowski.  The

22   counter-designation objection with respect to page 140, that

23   objection is overruled, meaning you can play this

24   counter-designation.  We find that this counter-designation

25   is necessary and appropriate for completeness purposes.

1    However, the objection to the counter-designation at page

2    154, that objection is sustained as that testimony is not

3    necessary for completeness.  Therefore, do not play the

4    counter-designation at page 154.

5              Just as a general matter, be sure when you play

6    the deposition, I assuming you're playing them by video,

7    make sure that you don't interrupt in the middle of a

8    sentence, play the complete question and complete answer and

9    don't play what the attorneys said, you know, in terms of

10   argument.  Some of the highlighting, I think, just is a

11   little bit off, so you want to make sure that we don't play

12   things for the jury that they don't need.

13             Any questions before we take a short recess from

14   plaintiff?

15             MR. LINDVALL:  No, your Honor.

16             THE COURT:  Okay.  From defendant?

17             MR. KELLEHER:  No, your Honor.

18             THE COURT:  All right.  We'll take a recess.

19             (Short recess taken.)

20             THE COURT:  Bring the jury in.

21             (The jury entered the courtroom.)

22             THE COURT:  All right.  Welcome back, ladies and

23   gentlemen.  We're now ready for opening statements.  I will

24   call on the plaintiff for opening.

25             MR. LINDVALL:  Good afternoon.  My name is Scott

1    Lindvall and I represent the plaintiffs, AHG and F2C2.  And

2    with me is my co-counsel.

3              One gentleman I would like to introduce before I

4    start is Mr. Phillippe Bornes.  He is one of the inventors

5    of the patent and he's also the founder, co-founder of F2C2,

6    1 of the plaintiffs.

7              Now, the Judge instructed you a little bit about

8    what this case is, but what we believe this case is about is

9    deliberate, unlawful copying, and what the evidence is going

10   to show in this case is that Broetje intentionally copied

11   both the appearance of the cassettes and infringed the

12   patents.  We're going to go through, and we'll show you

13   proof of that.

14             Before I go into the story of what happened

15   here, I want to give you a brief roadmap about what I'm

16   going to say.  What happened here, Mr. Phillips and his

17   father-in-law, Mr. Auriol, found a problem in the industry

18   with the way of delivering rivets and I will get it into in

19   a little more detail.  After several years of working, they

20   came up with an idea and they patented that idea.  After

21   they patented it, they went out and tried to sell it.

22             It ultimately, Broetje and AHG and F2C2 came to

23   an arrangement, a business arrangement, where the two of

24   them would sell these items.  And what would happen, let me

25   be a little more specific, AHG would sell the product, the

1    patented product, to Broetje, and then Broetje then could go

2    and resell it.  And I will go into it in a little more

3    detail on that later.

4            This relationship lasted for about 8, 9,

5    10 years, and somewhere around the end of that relationship,

6    Broetje decided not to use AHG's product anymore and decided

7    to develop their own product.  And what we will show you,

8    will show you, the evidence will show is that Broetje

9    decided to copy AHG's product without permission and without

10   AHG's knowledge.  And it took several years before AHG even

11   discovered that this was going on, and we'll go through some

12   documents and what have you in a minute to show you that

13   evidence.  As a result of that, AHG has been harmed and they

14   are requesting some type of compensation.

15           Now, before we start, let me just show you what

16   the product is.  You've probably been curious to see what

17   this whole dispute is about.

18           May I leave, Your Honor?

19           THE COURT:  You may.

20           MR. LINDVALL:  We're going to call, these are

21   called cassettes.  You're going to hear cassettes through

22   the whole period of time.  This is AHG's cassette.  This is

23   their design and it has tubes in here which are patented,

24   and you'll see these cassettes over and over and over again.

25   And you can look at the design, look how they're colored,

1    the handles and what have you.  And we'll talk about the

2    tube and cross-section.  This is what the case is about.

3    These are both AHG's.

4              Now, if you could put up slide one, please.

5              Now, who are the parties in this case?  Just to

6    give you an understanding of what we're going to be talking

7    about, the first party is AHG.  And AHG was founded almost a

8    hundred years ago by Mr. Auriol, and that's not to say

9    Mr. Auriol invented the patent with Mr. Bornes, but it has

10   been in the business has been in the Auriol family for

11   almost a hundred years.  It's a family-owned business, has,

12   I don't know, 100, 200 employees, and their business is to

13   make rivets.  And rivets, you may or may not know, they're

14   usually pretty fairly small and they use a rivet machine and

15   they're injected into two pieces of metal to attach the

16   metal together.

17             And what AHG is known for is making these rivets

18   particularly in aerospace industry.  So as you see these

19   planes flying around, there's a good chance they may be AHG

20   rivets holding them together.

21             Go to the next slide, please.

22             The other party is F2C2 Systems.  F2C2 Systems

23   was a company that was created and founded by Mr. Bornes and

24   is wholly owned by AHG.  You may ask yourself why that

25   happened, is because F2C2, once they came up with this

1   patented invention, decided to create a separate company to

2   market and sell this product because their main line product

3   is rivets, so they wanted to sell a separate company, to

4   sell this, the invention here that Mr. Bornes had come up

5   with.

6            The defendant, defendants in this case are two

7   defendants, and we'll call them Broetje.  One is Broetje

8   USA.  It's a subsidiary of Broetje, and the other one is

9   Broetje Germany, which is the parent company located in

10  Germany.

11           And Broetje, just for a little bit of

12  background, was brought by a company called CLAAS Group

13  during the relevant time frame, and that was 2003 to 2012.

14  CLAAS Group is a large German conglomerate.

15           And Broetje manufactures what we call automated

16  riveting machines for the aerospace industry.  Remember I

17  told you AHG manufactures the rivets?  Well, Broetje

18  manufactures these large machines which punch these rivets

19  into the fuselage or the wing to keep them together.  So

20  that's the relationship between AHG and this company.

21           The thing that links this to is you have the

22  rivets on one end and the rivet machine on the other end,

23  but how do you deliver the rivets to that machine?  And

24  that's what we're going to be talking about soon.

25           Go to the next slide, please.

1          Let's briefly go over what the claims are in

2    this case so you understand.  You saw a lot today about

3    patent infringement and this is a patent infringement case

4    in part.  We have two U.S. patents that we'll be discussing

5    throughout this case.  We have some experts who will talk

6    about it and there will be a lot of discussion about the

7    patents.  It's more than just patents.  This case also is a

8    trade dress case.  Trade dress case, what we're alleging is

9    that they, Broetje, copied the appearance of our cassette.

10          We believe that the evidence is going to

11   show that our cassette had a certain look and feel.  When

12   customers saw it, they knew that was AHG's product and,

13   what we want to show to you is that they copied that

14   appearance.

15          The third claim is unfair competition, which is

16   based on the copying of the appearance.

17          And the last one is intentional interference

18   with prospective economic relations.  That's a mouthful,

19   there's no doubt about it.

20          But that essentially says Broetje's wrongful

21   acts prevented AHG from establishing or maintaining business

22   relationships.  By them copying us, we'll show the evidence,

23   the evidence will show that that precluded us from

24   developing economic relationships with other customers

25   because of that copying.

```
 1                    Next slide, please.

 2                    Okay.  This is a exhibit.  I have some slides.

 3       You will see my slides.  What I'm going to show you mostly

 4       today are actual documents from the case that you will see

 5       through witnesses.  And this is one of the first documents

 6       you are going to see.

 7                    This is a document which is a brochure, but it

 8       shows you the components of this system that F2C2 is selling

 9       to Broetje, or now selling to other parties.

10                    The first and most important component you

11       see are the two components I showed you, now we call the

12       cassette.

13                    And the cassette, along with the cassette, we

14       have what is called a loading station.  That is where you

15       insert this cassette into the loading station, and the

16       loading station fills these long wound-up tubes, it fills it

17       up with rivets.  So the cassette now has a tube filled with

18       rivets, maybe thousands of rivets in there.

19                    Once that is filled up with specific kind of

20       rivet, then the cassette then placed inside a rack.  And

21       each of these racks, each of these cassettes may have a

22       different type of rivet, and then that is programmed to

23       work in tandem with the rivet machine that Broetje makes to

24       deliver, when necessary, a certain type of rivet to the

25       machine so the machine can then punch that rivet and put
```

1   those two pieces of metal together, maybe a fuselage, wing,

2   or some other part of the aircraft.  And that is how they

3   work together.  These three components work together as a

4   function.  They work together.

5          So what we have here, again, I'll go through

6   the flow again.  We have the filled cassette.  The loading

7   station fills the cassette with these rivets, small little

8   rivets.  Fills the tubes inside there.  The cassette is then

9   placed in a rack.  And then the rack with a switch or some

10  type of interface then feeds the different rivets to the

11  robots.  These are rivet machines.  These are much larger.

12  You will see some very large rivet machines that Broetje

13  makes.

14         So that's the AHG's technology.  That is the

15  technology that Mr. Bornes here came up with, he created,

16  and his cassette has the patented aspect of it, and the rack

17  and loading station are also part of his creation.

18         This is his creation in a plant environment.

19  And you can see the rack with the cassettes.  You can see

20  the loading station here which loads the different cassettes

21  with rivets.  And then you can see the riveter here, the big

22  riveter.  And you can see it's part of a fuselage of a

23  plane, and it's riveting the fuselage to the plane to

24  connect the metal.  It ultimately comes from the rivets.  It

25  goes to the cassette.  The cassette then delivers the rivets

1     and goes right into the plane.

2               What is important here, you have to make sure

3     you have the same rivet going in where they're supposed to

4     go.  If there is a mistake made and it is the wrong rivet,

5     you can imagine either the rivet machine can jam, which is

6     downtime, or you can possibly put the wrong rivet into a

7     plane and that can be a safety issue.  So it's important to

8     have the right rivets and no foreign material are injected

9     into the press.  But that is a problem that was solved by

10    Mr. Bornes.

11              Here, on this part of the exhibits, this gives

12    you some of the customers, AHG's customers today that it

13    sells Mr. Bornes' technology.  And you can see we have these

14    aircraft manufacturers:  Boeing, Airbus -- those are two of

15    the largest commercial aircraft manufacturers -- as well as

16    others.

17              We have some companies you may not be so much

18    familiar with.  They're what we call integrators.  Broetje

19    is an integrator.  They're the ones that make the rivet

20    machine, and they usually sell the rivet machine to the

21    Boeings of the world or the Airbuses of the world.  It's

22    possible we can do business with either one of these types

23    of companies.

24              Okay.  Let's go to slide 5.

25              Now what I'm going to do is walk you through a

1    timeline of events.  And as I go through this timeline, I'm

2    going to show you what the evidence is, how we're going to

3    present the evidence and what the evidence is going to show,

4    and I'm going to show you actual documents as we go through

5    that and show you the story that happened here.  Because

6    every litigation, every dispute has a story.  I think it's

7    important for you to understand the story.

8            So in 1980, to be more specific maybe 1986,

9    around there, Mr. Bornes and his father-in-law Mr. Auriol

10   realized there was a problem in the industry.  Now, I just

11   briefly associated it to you.

12           It used to be these rivets would be delivered to

13   the rivet machine, in these big bowls, vats.  They were open

14   to the manufacturing facility.  And you can imagine these

15   big facilities, foreign material can drop in these vats.

16   And if the foreign material gets in there and ultimately

17   gets to the rivet machine, like I said, the rivet machine

18   may jam or it may deliver something that shouldn't have

19   gotten into the plane and caused downtime or maybe even a

20   safety issue.  And that was a true problem in the industry

21   and you will hear Mr. Bornes talk about it.

22           And so they decided because they were in the

23   business of making rivets, they decided, well, maybe we can

24   come up with an idea how to solve this, because others had

25   tried and failed.

1          What the evidence will show is that Mr. Bornes

2    and Mr. Auriol spent several years experimenting with

3    different ways of doing this, and they came up with a way.

4    You are going to find out it's simple but it's very elegant.

5    And the way they came up was they created a tube, and you

6    will see these tubes in here, and these tubes have a very

7    unique cross-section.  They're not the kind of tubes you can

8    go and buy at the hardware store or anywhere else.  You have

9    to have them especially manufactured, but they came up with

10   a special shape, a pentagon shape.  With that pentagon

11   shape, it allowed there to be grooves, what we call grooves

12   or passageways which allow air to flow around these rivets.

13          Now let me back up for second.  You may think

14   what am I talking about here?

15          The tubes can hold a couple thousand rivets.  If

16   you just have a plain circular tube and you put the rivets

17   in there, you put compressed air in there to push them

18   through so they can be delivered, they found out it jammed.

19          It's a great idea to use the tube because no

20   foreign material can get in there, so you solve that

21   problem.  But they found the problem was whenever they

22   compressed the air, it jammed up.

23          So to distribute the air evenly among all the

24   rivets, they figured out a way to create grooves inside the

25   tube so the air flows around each of the rivets and the

1    rivets could evenly enter into the rivet machine without any

2    jamming in the tube itself.

3            So that was their invention, again, and there

4    will be evidence shown there were other people trying to do

5    the same thing.  They failed in the industry.  This was the

6    first successful solution for a cassette-based system.

7            So after they came up with that, they applied

8    for a patent, in 1988.  They came up with -- as you saw in

9    the invention, when you come up with what you think is an

10   invention, you go to your patent attorney and you apply for

11   a patent.  And, ultimately, the patent application, they

12   issued two U.S. patents from that.

13           And if we can show the two U.S. patents.

14           And you will see these by several witnesses,

15   including the experts.  And these are the two patents that

16   were issued.  And you can see Mr. Auriol and Mr. Bornes as

17   the inventors of these two patents.

18           And we are calling this the '216 and the '339

19   patents.  And you will hear that lingo sometimes, too, when

20   we call them that or you will hear them called the AHG

21   patents because AHG is the owner of these patents.

22           Now, I call this the post-invention period.  So

23   they have invented something, they've got patents.  What do

24   you do with it?  You go out and try to sell it.

25           What the evidence will show is that AHG went out

1    and marketed it, and they went to a company called British

2    Aerospace.  British Aerospace is a fairly large aircraft

3    manufacturer located in England, and they went to British

4    Aerospace and showed this new way of delivering rivets to

5    rivet machines.

6                     If we could show PTX-598, please.

7                     And here is a letter.  This letter is dated

8    August 20th, 1991.  It's a couple years after, well about

9    the same time they got the patents issued, 1991.  And the

10   letter is from a Colin Warner who was a representative of

11   AHG.  And he is writing to Mr. Holtmeier of Broetje

12   Automation.

13                    And if we can turn the page.

14                    And attached to this -- and this "PB" is Philip

15   Bornes.

16                    It states up here at the top, it states:  BAE

17   Preston.  BAE Preston is British Aerospace in Preston,

18   England will be buying the riveting machine from this German

19   company.

20                    What he is saying is British Aerospace is going

21   to buy Broetje's rivet machine.

22                    Okay.  If you could go down to the third one.

23   That's right.

24                    It says:  As you can see from my letter to him,

25   I have sent details -- explaining that this is a proprietary

1    item -- and suggesting he contacts you directly.

2           Now, what had happened here was British

3    Aerospace had seen the Broetje system and they wanted

4    Broetje to use AHG's system with the Broetje machine.

5    Broetje had some of their own feeding systems but they

6    wanted to use AHG.  So this is the first commercial interest

7    they got which they got soon after the patents.

8           Can we go back to slide 5, please.

9           So several years went by after the two parties

10   started talking, Broetje and AHG, and they ultimately

11   entered into an agreement.  And this agreement was for

12   AHG to provide its cassette-based rivet feeding system to

13   Broetje, so Broetje could then use it on their rivet

14   machines worldwide, where they sell these rivet machines

15   worldwide.

16          And let me walk through quickly the agreement

17   that was entered into between the parties.  It's PTX-358T,

18   please.  And if we could look at page 10.

19          You will notice some of these exhibits are in

20   French, and then we have English translations.  That is to

21   help you out.  If you go back to the juryroom and you want

22   to look at these, you will see there are English

23   translations.

24          Here is the first part.  This is just a

25   forwarding e-mail where Mr. Holtmeier, the general manager

1    of Broetje, is attaching a draft of the contract with the

2    provisional signature, I guess, or sign.

3           And he states:  With signing the contract please

4    let us have more detailed technical information as well as

5    visit to Dassault, and one or two locations of Dassault.

6           Now it's interesting.  Please let us have more

7    technical information.  One of the things you will learn

8    here is once they entered into the contract, Mr. Bornes,

9    whenever requested or even not requested, sent Broetje lots

10   of technical information about the system and how it worked.

11          Now, if we go to page 12, please.

12          And here is part of the actual agreement.  And

13   if we highlight this part here.  And the agreement states:

14   AHG has developed, makes and sells a rivet-feed tube

15   system -- that's what I just explained to you -- for

16   automatic riveting machines -- which is what Broetje has --

17   which is the subject of patent protection, and which system

18   allows to feed selected rivets.

19          We are already telling Broetje in 1994 this is

20   subject to patent protection, understanding that this is

21   protected, what we are giving them.

22          If we could turn to page 13, article 2, please.

23          Now, this article essentially says, without me

24   reading it to you, the agreement was that AHG would provide

25   its system to Broetje in Germany and any customers in

1    Germany would be Broetje's exclusive territory.  It still

2    allowed AHG to sell its system to anyone else in any other

3    country in the world except Germany, so the exclusivity of

4    this agreement was only in Germany between AHG and Broetje.

5    Again, AHG was free to sell it anywhere else but in Germany.

6              If we could turn to page 14, please.  And

7    article 4.

8              Here is another part of the contract.  And here,

9    it says:  The dealer Broetje agrees not to sell directly or

10   indirectly feed systems with identical or similar tubes to

11   those under this contract and likely to compete with them,

12   using the tube and box principle.

13             The box you will find out is a translation.

14   It's really the cassette.  So it's the tube and a cassette.

15   So Broetje is agreeing not to sell directly and indirectly

16   feed systems that compete.

17             If we could go to page 16, please.  Article 16.

18   It's page 16.

19             Yes, here it is.  Article 11.  I'm sorry.

20             It says here:  The dealer -- remember the dealer

21   is Broetje -- agrees not to disclose to third parties the

22   confidential documents and information provided to it by AHG

23   in connection with this contract.  And this secrecy clause

24   shall survive the expiration of this contract.

25             If we could turn to the other part of this.

1           And it says:  In addition, the dealer -- which

2     is Broetje -- agrees not to use, directly or indirectly,

3     such documents and information after the expiration of this

4     contract.

5           So this technical information that Mr. Bornes

6     had been providing or was going to provide to Broetje, Mr.

7     Bornes felt protected.  He could give it to them and he

8     wouldn't worry about them competing or them trying to use

9     that information.

10          That was the obligation that Mr. Bornes believed

11    existed the.

12          Now, let's go back to slide 5, please.

13          Now, this relationship after the 1994 contract

14    was entered into lasted for about nine or ten years.  So AHG

15    kept on providing these cassette-based systems with the rack

16    and the loading station, cassettes and provided about nine

17    or ten years.  Somewhere around 2002, though, the

18    relationship changed.

19          Let me back up for one second.  There is one

20    part I forgot to tell you.

21          During this time of eight to nine years, AHG's

22    products started gaining notoriety in the industry, and that

23    is what the evidence will show.  The evidence is going to

24    show that the AHG riveting or their technology for rivet

25    distribution machine, cassette-based one, that there is no

1    other cassette-based rivet feeding system that was used

2    either by Broetje or there was no acceptable cassette-based

3    system that was being offered in the industry.  And what

4    the evidence will show is that AHG's cassette-based system

5    became a de facto system in the industry.

6              Now, go back to the timeline.  You see what I

7    was going to bring up to you.  We're now in 2002, and the

8    agreement was entered into in 1994, and the relationship now

9    changed.

10             Let's bring up JTX-66, please.

11             Now, JTX-66 again is an actual document.  It's

12   an e-mail from Mr. Maylander who is an employee of Broetje.

13   And he is in their sales department.  This was sent on June

14   18th, 2002, and it was sent to Mr. Bornes.  You can see

15   Mr. Bornes here.

16             And the subject line says:  Our Meeting From

17   Last Week.

18             And it states in there:  I have informed

19   Mr. Holtmeier -- now, remember, Mr. Holtmeier was the

20   general manager of Broetje.  I have informed Mr. Holtmeier

21   about your activities with Gemcor.

22             Before we move to the next sentence, who is

23   Gemcor?  Gemcor is one of those things I call integrators.

24   They're just like Broetje.  They make large rivet machines.

25   They're a competitor to Broetje, Gemcor is.  Gemcor is

1    located in Buffalo New, York.  And they compete, in fact,

2    you will see here, they're referred to as Broetje's main

3    competitors -- the Coke-Pepsi type of thing.

4              So what had happened is AHG came out there and

5    they said -- they came, they told Broetje, by the way, we're

6    going to try to sell to Gemcor.  Because remember I told you

7    they were only prohibited in Germany?  They could sell

8    anybody else in the world.  Mr. Bornes told them that.  He

9    wasn't hiding anything.

10             So what does this show?  It shows that

11   Mr. Holtmeier is extremely disappointed and unhappy about

12   your behavior.  He is upset that now AHG is going to go out

13   and sell to Gemcor even though the contract or the

14   obligation was limited just to Germany.

15             He says:  Now you are dealing with our main

16   competitor Gemcor, and with this deal Gemcor gets all the

17   experience we have paid for.

18             So now Broetje is upset because they have been

19   buying this cassette-based system from AHG all along and

20   then AHG decided we should start selling to other companies

21   in the world.  We have the right to do that, so let's go out

22   and do it.  And they did it, and Mr. Bornes told them about

23   it and said we're going to approach Gemcor.  We're going to

24   try to sell it.

25             So that's what happened.  And you can see right

1    now that Broetje was not happy.

2              Okay.  Now, can we turn to, back to slide 5.

3              So what did Broetje do when they found this out?

4    Broetje began to develop their own cassette-based rivet

5    feeding system using AHG's cassette as an example.

6              Let's turn to JTX-14, please.

7              This exhibit, it's a Broetje document.  It's a

8    proprietary document to Broetje, dated June 23rd, 2003.

9    This was a little bit of time after Mr. Maylander's e-mail,

10   about six/eight months, and this is an internal document.

11   AHG didn't know anything about this.

12             What this document is, I'll walk through a

13   couple pages of this.  This document is a document where

14   Broetje decided we're going to build our own cassette-based

15   system.  But we're going to use AHG as our example in doing

16   that.  And that is what the evidence is going to show.

17             Let's go first to page 13.

18             And this is an internal document of Broetje, for

19   the engineers to develop their own.  You can see here with

20   the photographs we have here.  We have an AHG rack, and over

21   here, part of I believe a loading system which is F2C2

22   Systems.  So they're looking and at taking pictures of AHG's

23   system and F2C2's system and rack and helping develop their

24   own.

25             Let's turn to page 15.

1          You can't see this.  There is no AHG on here,

2     but you will hear testimony from one of both Broetje's own

3     testimony who says these are close-ups of AHG's technology.

4          If we go to the next page.

5          Again, this is another close-up of AHG's

6     technology.

7          Again, this is an internal development document

8     by Broetje.

9          Let's turn to page 18, please.

10          This probably looks familiar from what I showed

11     you earlier.  This is a picture of AHG's cassette, again,

12     being used by Broetje to develop their own cassette-based

13     feeding system.

14          Let's look at page 19.

15          Again, that is a picture of AHG's cassette, used

16     in their internal document.

17          Go to the next page, please.

18          This is the back side of AHG's cassette-based

19     system.  Again, in their internal document for their

20     development.

21          The next page, please.

22          Here is a close-up of what we call a separator

23     in a cassette.  Again, AHG's product.

24          So you can see about six months after the e-mail

25     where Mr. Holtmeier, the general manager, got very upset

```
 1   because AHG decided to go with Gemcor, Broetje decided to go
 2   internal and develop their own using AHG's technology or
 3   their own as an example.  This was done without telling Mr.
 4   Bornes or anyone at AHG.
 5              Now, let's turn to PTX-657.
 6              Now, this is another e-mail from Broetje, and
 7   this is approximately a month after that document where we saw
 8   they were already starting development.  And Mr. Neugebauer
 9   of Broetje is sending an e-mail to Mr. Bornes.  And he has a
10   "PS" here which is very interesting.
11              He tells -- this is a Broetje employee who is
12   telling Mr. Bornes.  He goes:  PS:  Just between you and
13   me -- he is not supposed to be saying it -- the company is
14   very, very deeply unsatisfied concerning the situation with
15   Gemcor.
16              They're upset now Broetje is selling to their
17   main competitor although the obligation, there is no
18   obligation that they can't sell to them.
19              There are several discussions in-house, also
20   with our mother company -- now, who is the mother company?
21   That is CLAAS.  That is the mother company because they
22   brought Broetje -- how to react on that obstacle.  The
23   situation is in that way, that nobody accepts that you are
24   quoting together with Gemcor against us in new projects.
25              Then he goes on to say:  It seems to be that
```

1    there is a possibility that we will quit the relationship

2    with you.  You should really think about a possible solution.

3              In other words, you have got to quit selling to

4    Gemcor or we're going to go forward.  The interesting thing,

5    this is six months after they started developing their own

6    product, but this again is a "just between you and me"

7    e-mail and telling Mr. Bornes what is going on or what may

8    be going on.

9              Okay.  You may ask yourself, okay, so we had

10   this internal document.  They went to development.  What

11   came out of the development?

12             Your Honor, may I?

13             THE COURT:  You may.

14             (Mr. Lindvall gets a couple cassettes.)

15             MR. LINDVALL:  This is AHG's cassette I showed

16   you before.  This is Broetje's cassette that came out of

17   development.  The handles.

18             So what came out of the development, that

19   internal development by using AHG as an example was almost

20   an identical copy.

21             Okay.  Let's go to slide 5, please.  I'm almost

22   done.

23             So let's fast forward a couple years to about

24   2005.  At this point in time, Broetje, as we found out, has

25   already developed the cassette.  They still hadn't told us.

1    And in some time in 2005, Mr. Bornes happened to be going

2    through a German plant and saw a Broetje cassette, and it's

3    the first time he had ever seen one or heard they were doing

4    this.

5              So he was obviously surprised.  You will hear

6    his testimony.  He will be the first person testifying maybe

7    today or tomorrow morning, and you will hear his testimony

8    about this.

9              So also in 2005, Broetje terminates the

10   agreement with AHG.  He says the contract, we're going to

11   terminate it.

12             So once we found out they're going to terminate

13   the agreement and that we discovered they were having a

14   cassette now -- if we could look at PTX-547, please.  And if

15   we could look at page 8.

16             This is a letter, by the way, from AHG's lawyers

17   because at that point in time, they really, Mr. Bornes

18   discovered that Broetje cassette and saw it was just like

19   his, they sent a lawyer -- they sent a letter, had the

20   lawyer sent a letter to Broetje saying don't be doing this,

21   your cease-and-desist type letter.

22             You see right here it says this letter also

23   serves as a formal notice to cease all acts of infringement

24   or unfair competition in this regard, as my client

25   hereinafter reserves the right to the claims that it might

1   bring before the courts.

2           So AHG is upset so they brought this action.

3   This is in 2005, this letter comes out.

4           So let's just go back.  Let's go to PTX-567 now.

5           Now, here is another internal document.  And if

6   you could go to page 2.

7           This is from -- go back to that first, please.

8           Let me explain where this comes from.  This

9   comes from a Dr. Budach.  Dr. Budach is an internal German

10  patent lawyer who works at CLAAS.  Remember, CLAAS is the

11  mother company of Broetje.  And it is to an employee at

12  Broetje.  And this is in September 2005 after they finished

13  developing their product, and it's called Design of Tube

14  Cross-Section For Rivet Feeder System.

15          If we could go to the page 2.  No, the next.  Go

16  back to that first page.

17          I'm sorry.  Go to the next page.

18          And it says it right here.  And Dr. Budach, as a

19  German patent lawyer, is responding to a query from the

20  Broetje lawyer and he says:  The use of a round tube with

21  incorporated groove first of all represents an infringement

22  of the patent in question.

23          The patent in question they're talking about

24  is the AHG European patent.  Now, this is an internal memo

25  between CLAAS and Broetje.  The tube they're talking about

1    is the tube inside the cassette that I told you that they

2    have a patent on.  So looking at the cross-section.

3             And later on, Dr. Budach concludes with:  With

4    deliberate use of third-party property rights, CLAAS

5    internal management approval would have to be obtained.  We

6    could possibly discuss briefly by phone beforehand whether

7    that is necessary here.

8             So after the fact, after they have developed and

9    after the cassette has been found, they're delivering in

10   Germany, Mr. Bornes has discovered, they get the legal

11   department on there and figure out what their exposure is,

12   whether they can keep on doing it, what they're going to do,

13   or how they're going to do it.

14            They even have the option is what the evidence

15   shows here that they could just go ahead and keep infringing,

16   See what happens.  See what AHG does.

17            Okay.  Let's go back to slide 5, please.

18            Now, AHG filed suit.  What they ultimately did,

19   AHG, to protect their rights they filed suit in Germany in

20   2006.  You see up here.

21            And then when they filed suit in Germany, they

22   also discovered that Broetje now is marketing cassettes in

23   AHG's backyard in France:  Right here in 2006, it's

24   discovered again they're now selling in France.

25            The next one.

1          And then in 2007, AHG discovers Broetje is now

2    selling cassettes in the United States.  And what you will

3    hear about the evidence with that, it's more difficult to

4    discover that.  And you will hear Mr. Bornes talk about it.

5    It's difficult for a French national to walk into a Boeing

6    plant or any other type of plant in the United States

7    without being escorted, going through all types of security.

8    It's not like they can go and look around and see if there

9    is a Broetje cassette or not.  But they did ultimately

10   discover one in 2007.

11          Now, what was the result of the cassette in

12   France?  They filed an action in 2008 in France because of

13   that.  And then this action that we're here today was filed

14   in May 2009, to stop the wrongful conduct here in the United

15   States.

16          So where does the dispute stand today?  Well,

17   fairly recently, the French court came out with a judgment.

18          And if we could pull up PTX-613T.  And if we

19   could go from the fourth paragraph at the bottom, please.

20          And this is the finding by the French court.  It

21   says:  Stating that by copying in a servile manner the

22   appearance of the cassettes produced and commercialized by

23   companies AHG and F2C2 system, thus creating a risk of

24   confusion with the activities of these two companies,

25   Broetje Automation GmbH -- which is Germany -- committed

1    acts of unfair trading with regard to AHG and F2C2 System,

2    engaging its responsibility grounded in the provisions of

3    so-and-so.

4              This is not U.S. law, and the Judge will tell

5    you that.  But this is what the French court recently found

6    in late 2012.

7              So what happened now?  Now they have a judgment

8    against them.  The French court has found it copied,

9    identical design.  They also found they infringed the French

10   patent.  I haven't shown you that part.

11             So what has Broetje finally done now?  They

12   started developing in 2003 and today it's 2014.

13             May I approach, Your Honor?

14             THE COURT:  You may.

15             (Mr. Lindvall picks up two cassettes.)

16             MR. LINDVALL:  This is the one they were using

17   for a number of years.  You saw it a copy of AHG and now

18   what they have done, they changed the appearance, the color,

19   handle, the naming and what have you.

20             This is what they could have done a long time

21   ago, but the French court, after this, now this is what

22   they're going to be producing worldwide now.  And as you can

23   see, there is a lot of difference there.

24             Okay.  Let's go to slide 67.  I'll wrap this up.

25             Now, you are going to hear from a couple

1    witnesses from us.  We don't have a lot of witnesses, we

2    have some.

3              Mr. Bornes, sitting at the table, you are going

4    to hear from him first.  He is going to go through this

5    story and he is going to tell the story from his viewpoint,

6    his eyes, what happened to him, and what it did to the

7    company, what it did to F2C2, what it did to him personally.

8    As you recall, he is the founder and technical manager of

9    F2C2, one of the inventors of the patent.

10             The other person you are going to hear from, just

11   a couple others but is Dr. Harri Kytomaa who is an expert, and

12   he is going to tell you why there is infringement here.  And

13   as you can see, he is well credentialed.  He has a Ph.D. from

14   CalTech.  He was a professor at MIT, and he is a technical

15   expert who will support the testimony of Mr. Bornes.

16             You also will hear from a witness that is

17   related to damages and another witness about the sales, but

18   that will be it.

19             Thank you very much.

20             THE COURT:  Thank you.

21             I'll now call on defendants.

22             MR. KELLEHER:  Thank you, Your Honor.

23             Hello, ladies and gentlemen.  My name is Patrick

24   Kelleher.  I represent the defendants in this case Broetje

25   Automation USA and their parent company, Broetje automation

1    GmbH.

2              With me at counsel, I have one of my clients,

3    Ken Benczkowski who is the president of Broetje Automation

4    USA, and my fellow colleagues as well.

5              There are two principal accusations that have

6    been made against my clients.  One is that they have copied

7    the look of the AHG and F2C2's products.  The other is that

8    they have copied how F2C2 and AHG's products work.

9              The short answer to both of those accusations is

10   no and no.

11             As to the look, the evidence is going to show we

12   did not copy them, they copied us.

13             As to how it works, my client scrupulously made

14   sure we did not copy their patents.

15             As Mr. Lindvall has shown you, we knew about

16   their patents.  They told us about them.  We went and got an

17   attorney.  When these things were being designed in 2003, we

18   got advice so we would not infringe their patents.  And you

19   will see we purposely made a change in the tubes on the

20   inside of our cassette to avoid their patents.  That is

21   called designing around.  It's encouraged in our law and

22   that is what we did.

23             And then later on we went into the German courts

24   and we won.  You heard about the French court judgment.  In

25   the French courts, we have been found not to be infringe and

1   their patents were found to be invalid.

2           So the look of the cassettes.  That is what is

3   called trade dress.

4           So what they're alleging is that my client

5   purposefully chose the way our cassette would look to match

6   the way their cassette looks in order to confuse customers

7   into thinking that they're buying from them rather than from

8   us.

9           The evidence will show the truth is the exact

10  opposite of that.

11          Now, in a minute we'll tell you the back story

12  so you will understand why my clients felt the need to

13  ultimately design their own cassette, but let me briefly

14  summarize what is going on here.

15          Your Honor, may I step into the well?

16          THE COURT:  You may.

17          (Mr. Kelleher retrieves a cassette.)

18          MR. KELLEHER:  So this is the Broetje cassette.

19  As you will see, it's metal on all five sides except for the

20  very top.

21          My client first sold that cassette in the United

22  States in 2004 to a company that makes aircraft called

23  Vought in Dallas.  Now, what happened after that?

24          Your Honor, may I step into the well again?

25          THE COURT:  You may.

1                    (Mr. Kelleher gets another cassette.)

2                    MR. KELLEHER:   In 2005, we have this AHG metal

3        cassette as well that Mr. Lindvall says we copied.

4                    And one more time, Your Honor?

5                    (Mr. Kelleher gets another cassette.)

6                    MR. KELLEHER:   Now, the problem with that is

7        that when my client sat down in 2003 to design their own

8        cassette, their product didn't look anything like that metal

9        box.   This plastic box is what they used to make.   This is

10       what they used to sell to us, and this is what we used to

11       incorporate into our product.

12                   We purposely did not copy this.   We came up with

13       the idea of surrounding it with metal so it would be more

14       sturdy, because the handle tended to crack here when you

15       pulled this in and out of the rack.   We did several other

16       things as well.

17                   This, the separator here that was described, my

18       client put that on the inside so it would be more safe when

19       it is pulled in and out of the rack.

20                   Now, we also redesigned the tube on the inside.

21                   So in order to win on their trade dress claim,

22       they're going to have to prove that they had the look and

23       use in the United States first and we then copied them and

24       confused people.

25                   The problem is we had the look in the United

1    States first in 2004.  They changed their design afterwards

2    to look more like ours, and now they're saying we copied

3    them.

4            So the way it works.  The inventors described

5    their invention as being a way to be sure you can get rivets

6    to flow down a tube without sticking.  And the idea is to

7    have grooves or passageways along the walls so the air can

8    pass all the way up the tube to the very first fastener.

9            These are a few of the examples of what the

10   tubes look like in their patent.  You heard Mr. Lindvall say

11   that before the patent application was filed, the inventors

12   came up with a pentagon tube.  There's no pentagon tube

13   disclosed anywhere in the patent.

14           I got a few slides ahead of myself.  Now, this

15   is what Broetje's tubes look like.  I call this a soft

16   pentagon.  As you heard from the video, it's going to be

17   your responsibility to determine whether or not the claims

18   of their patents, the numbered paragraphs at the very end,

19   cover what it is that my client is doing, and the way you'll

20   be doing that is, you'll be looking at the particular

21   elements written out in the patents.  There are a number of

22   elements in these patents, but there are three elements in

23   particular that are required by these patents you find are

24   not in my client's tubes.

25           The rivet head has to be substantially equal to

1    the area of the cross-section on the inside of the tube and

2    that's not true for my client's product.  The ratios are

3    like 135 percent or 140 percent.

4          The passageway or groove has to open into the

5    hollow center.  The problem is that, looking here in the

6    center, the five points of our pentagon that they say are

7    the grooves of passage ways don't open into anything.

8    They're part of the main channel.

9          Last, the axis of the rivets has to be pointing

10   in the same direction as the axis of the tube that they are

11   sitting in, and the problem is that does not happen in my

12   client's tubes.  Instead, you'll find that they zig-zag.

13   The axes are pointing in all different directions rather

14   than the one axis of the tube.

15         Now, you heard the word "invalid" described in

16   the Judge's instructions and the video, and what that means

17   is that these are patents that should not have issued from

18   the Patent Office.  There are things the Patent Office

19   didn't know about or the Patent Office made a mistake with

20   what they did know about.

21         This is a patent application from England from

22   1980 called Shinjo or Komaki.  Those are two of the

23   inventors.  Now, the Patent Examiners did know about this

24   particular patent application when they approved my

25   opponent's patent, but you'll see it's a coiled-up tube

1    filled with fasteners.  And there's this passage, this text

2    in the Komaki/Shinjo application, saying the channels 2A are

3    dimensioned so that there is sufficient space for the

4    compressed air to exert a force on the individual nuts 8,

5    thereby ensuring a smooth movement towards the other end, 5,

6    of the tube 2.

7              So what I mentioned earlier, what the inventors,

8    Mr. Auriol, Mr. Bornes say was their invention finding a way

9    to use passageways or grooves along the wall to get air all

10   the way up to the tube to the very first path there is

11   something that has already been described a decade earlier

12   in this piece of prior art in England.  We'll talk more

13   about this piece of prior art during the trial.

14             There's another piece of prior art you will

15   hear about.  This is a U.S. patent from 1968 to a gentleman

16   named Brosene.  This is a cassette filled with tubes, filled

17   with rivets.  So you will see that people were using

18   cassettes filled with tubes, filled with rivets in this

19   country for decades before it was supposedly invented by my

20   opponents.

21             So, ladies and gentlemen, that was a quick

22   summary of what I think the evidence is going to show.  Let

23   me give you a little bit more detail now.

24             So who are my clients?  Broetje Automation GmbH

25   and Broetje Automation-USA.  My clients make and sell these

1    gigantic machines to companies like Boeing and Airbus and

2    Spirit and Gulf Stream that they use to manufacture

3    aircraft.  So here, for example, is one machine that

4    my client sells to manufacture the Boeing 787 Dreamliner.

5            You'll note the man -- whoops, standing down

6    here.  That's to give you a sense of the size of these

7    machines that we sell.

8            Now, one of the components of this machine is

9    the rivet feed system, so that's the system that's used to

10   select a particular size fastener.  And move it into place,

11   and then the fastening machine blows that rivet all the way

12   up to the top of this machine (indicating), to the rivet

13   here, and they put together two pieces of a fuselage.

14           Now, the plaintiff company AHG used to make a

15   rivet feed system.  As Mr. Lindvall mentioned, around the

16   year 2000-2001, the company F2C2 came into existence and

17   took over the business completely, and my client stopped

18   dealing with AHG and only dealt with F2C2 after that.

19           So we dealt with them for a number of years as

20   was mentioned.  We gave them a number of suggestions over

21   the years to improve the product they were selling to us

22   because we had a lot of problems with it.  Those

23   improvements got incorporated into their system to make it

24   work better.

25           And we would have been willing to keep working

1    with them, but despite the things we had taught them and

2    they incorporated into their product, there were still so

3    many problems that we had from them in terms of the

4    workmanship of the products, their quality control, their

5    delivery times, their responsiveness for repairs, and

6    repeated problems with rivets sticking in the loading

7    stations and in the cassettes and in the racks that they

8    slide into.  And when that happens, an entire assembly line

9    can shut down.

10           You can imagine what Boeing does when an

11   assembly line shuts down.  They are responsible for building

12   multiple planes a week that they sell for tens of millions

13   of dollars.  They do not react kindly to my company when

14   this machine shuts down because there's a problem with the

15   rivets.

16           And then to make matters worse, on the side,

17   F2C2 started selling to our chief competitor, Gemcore, and

18   Gemcore is now getting the benefit of all of the things we

19   have taught to F2C2 over the years to make their product

20   work better.  That's basically giving away our know-how to

21   our chief competitor after the investment we had put into

22   it.

23           So let me give you some details of some of the

24   problems we had during the history.

25           Around 2001, 2001-2001, we started sending

1    formal reports called fault reports to F2C2 because of the

2    problems we were having with their machines.  And you will

3    meet the author of most of these reports, a man named

4    Mr. Neugebauer, an e-mail from whom you saw during

5    Mr. Lindvall's presentation.  Mr. Neugebauer is actually

6    here in the courtroom right now.

7           So here are two examples of problems that we

8    had.  On this first one, it's a fax that was sent in 2001,

9    and it says, Urgent.  Rivet feed problem.  Help us.  The

10   machine DASA standstill.  DASA is a company that today is

11   known as Airbus.  Their entire riveting machine is standing

12   still and not working because there's a rivet stuck in it

13   and we are pleading for help.

14          The second fault report, No. 10 down here

15   (indicating), this is for a company called Shorts Brothers,

16   now called Bombardier.  They're now in Ireland.  And we have

17   multiple cassettes that are having a problem because the

18   fastener sticks in the microactuators.  That's the separator

19   at the end, a chamfer problem.  That's things rubbing

20   together.  Rivets stuck during loading process in the

21   loading fitting, so meaning we can't fill up the cassettes

22   so we can't make the automation process, the assembly

23   process, keep going.

24          Let me give you another example.  This is Fault

25   Report No. 3.  This customer, it says Wichita.  That's

1    Boeing, Wichita.  All of these cassettes, they were

2    delivered for use with the Boeing machine, and they were

3    manufactured so poorly, they did not even slide into the

4    F2C2 rack they are supposed to slide into.

5              Over three years we sent more than 50 of these

6    formal fault reports to F2C2.  There are also many e-mails

7    and faxes and phone calls and think of those fault reports.

8    If we sent 50 over the course of three years, that means

9    every three or four weeks we had a problem so serious, we

10   had to send one of these things.  This was just intolerable

11   for our customers, Boeing and Airbus and Vought and Spirit

12   and Gulf Stream, and our name was on the line and so we have

13   to do something about it.  We had to make our own system to

14   replace this system, which was hurting our reputation with

15   our customers, and we were forced to undertake our own R&D

16   project in 2003.

17             So as I mentioned, at that time the cassette

18   that we bought, we bought from F2C2 was this plastic

19   cassette (indicating) with these numbered counters on the

20   front and separator on the outside and this, this string to

21   hold the cap in place on the back.  And just in case you

22   missed it, in the middle of this cassette it says, F2C2

23   system AHG.  So everyone knows where that's from.

24             So that's what we had to look at.  We decided we

25   need to replace it with something that met our quality

1    requirements.  And so this is what we came up with.  We

2    decided to make it metal, as I mentioned, on all five sides

3    so it's more sturdy.

4              It's difficult to see on this particular version

5    because of this tab, but we'll show you ones that don't have

6    this tab over it.  But we moved the separator on the inside

7    so it's less likely to be injured.  You'll find out we made

8    a different tube.  And you'll notice we don't say AHG F2C2

9    on this cassette that we sell.  We put the Broetje on it, on

10   the front.

11             And then a year later, so that was 2004 we

12   started selling that, as I mentioned, in Dallas to a company

13   called Vaught in 2004.  And then in 2005, this gets released

14   by AHG F2C2.  As you'll see, they are selling something that

15   is metal on all five sides.  It does not have the Broetje

16   name on it, of course.  It has their name.  Now, you're not

17   going to have to take my word for the years that these

18   things came out.  You'll see the documentary evidence that

19   we sold first Broetje metal sets in 2004.

20             You will see a document prepared by F2C2 called

21   history of cassettes or historique cassettes, and it's

22   filled with photographs and text concerning the development

23   of their product over 15 years plus.  This, you'll notice,

24   is the 2002 Generation 4 product.

25             As you'll notice, this is the metal box prepare

1    (indicating), I'm sorry, the plastic box that we just looked

2    at.  This is what they were selling us in the early 2000s

3    that we were then incorporating into our gigantic machines

4    and reselling to companies like Boeing and Airbus.

5            This, then, is a few pages forward in that

6    document that you'll see, and now in 2005 we have Generation

7    5, and now we have the metal box.

8            So let's go to the specific legal claims that

9    are involved in the case.  There are the two basic claims,

10   trade dress, which takes up all the unfair competition,

11   interference with respect to economic advantage, ideas,

12   and the second theory is the patents.  So as I said, the

13   trade dress and unfair competition claims are about the

14   work of the cassette, and the patent case is about how it

15   works.

16           So you've probably heard the word "trademark" no

17   doubt.  You may not have heard the word "trade dress" before

18   this case.  They're very similar concepts.  They're the name

19   of a manufacturer.  That tells you where the product comes

20   from:  Coca-Cola, Pepsi.  Those names are trademarks, but

21   the way their products look, if the look can communicate to

22   you who the manufacturer is, that's trade dress.

23           So you look at the Pepsi and Coke cans.  You see

24   a read can with a white swoosh.  You know that's a Coke can

25   even without the words Coca-Cola being there.  Likewise, you

1    can see the Pepsi can.  The word "Pepsi" doesn't need to be

2    there.  The blue and the red, white and blue circle tells

3    you that's Pepsi.  That's trade dress.

4              So the plaintiffs say that our customers are

5    confused because they think that they are buying F2C2

6    cassettes because they think the two metal boxes like alike.

7    The evidence is going to show that's not true.  As I

8    mentioned several times now, we used the metal box first.

9    They only sold a plastic box before.  There's no reason that

10   airplane manufacturers would associate a metal box with

11   F2C2.  They hadn't sold one to them.  Only we had.

12             Something else that the evidence will show you

13   is that we tell our customers in writing who the

14   manufacturer is of our Broetje brand cassettes.  This is a

15   delivery note showing the importation into the United States

16   of in the Netkasseten cassette or rivet cassettes.  This is

17   one of the first shipments in 2004.  This is to Vought in

18   Dallas.  It specifically tells them that Broetje Automation

19   is the manufacturer of these cassettes and that they're made

20   in Germany.  Likewise, as I mentioned, the brand names of

21   the companies are on these cassettes.  Ours say Broetje.

22   Theirs say F2C2.

23             Now, something to think about is who the

24   customers are.  The evidence is going to show these are

25   incredibly sophisticated customers.  They make airplanes.

1    They're concerned about what the products are going into the

2    airplanes.  They are concerned with the machines that build

3    them.  They don't want these things to fall out of the sky.

4    They're regulated.  They're incredibly demanding.  They

5    purchase our machines through a very complicated

6    specification process.  They don't pick these cassettes off

7    a shelf and are not likely to confuse them because they're

8    sitting side by side.  This doesn't happen.  These things

9    are built to order after the specification has been sent out

10   by the manufacturers and we have won the bid.

11            Now, there's one, there are two other things to

12   think about with regard to trade dress.  What you will learn

13   is that you are not allowed to use the idea of trade dress

14   to basically get a monopoly over something that's

15   functional.  And the problem with the so-called trade dress

16   that they point to, the metal box that they say is their

17   trade dress, is, it's all functional.

18            What is the purpose of the transparent lid?  So

19   you can see inside and see the tube, and see if it's still

20   full with rivets or if there's a jam, you can see where the

21   jam is.  It has a handle.  The purpose of the handle is to

22   be able to carry this thing around like a suitcase or to

23   slide it in and out of the racks that it has to go into.

24            What's the purpose of the metal is to make

25   it more sturdy than the old plastic used to be, because

1       that would crack and things would pull in and out of the

2       racks.

3              What's the purpose of these two things in the

4       back?  These are the engagements where it slides into the

5       rack.  The air comes in here and the rivets go out there.

6       These things slide into a rack.  If these things were in

7       different places, they wouldn't fit into the openings.

8              Lastly, for trade dress, as I said, the way the

9       product looked has to communicate to people who the

10      manufacturer is.  That is called secondary meaning.  The

11      public associates the way something looks, who the

12      manufacturer is.  That can only be acquired over time, a

13      product configuration, the way a product looks.  As I

14      mentioned, we sold our metal cassette first, so there's no

15      way that secondary meaning for a metal box would have

16      developed with regard to F2C2 when they didn't sell the

17      metal box until we started selling the metal boxes.

18             So for all of these reasons, when we're done

19      this trial, I'm going to ask you to return a verdict of no

20      trade dress infringement for my client.

21             Now, there's a second part of the case, the

22      patent case, and that's about how the cassettes work.  So as

23      I mentioned, the AHG patents have these tubes that manage to

24      get air down the full length of the tube to reach the first

25      rivet.  As I mentioned, my client has the soft pentagonal

225

1    tubes.  This is a further example of this, this idea of

2    substantially -- some of the elements of the claims require

3    that the rivet heads be substantially equal to the area of

4    the internal cross-section of the tube.  And this image on

5    the right (indicating) is what a rivet looked like sitting

6    inside of one of my client's tubes.  They're not

7    substantially equal in area to the inside of the tube.

8           There's no place where what you will hear F2C2

9    say are the grooves or passageways five points.  There's

10   nowhere that those points open into the hollow center.  They

11   are already part of a hollow center.  As I mentioned, the

12   axes of the rivets are supposed to be in line with the axis

13   of the tube.  That isn't true with my client's product

14   because you see that the axis of the tube goes that way and

15   the axes of the rivets zig-zag along that way.

16          Now, in 2003, when my client was undertaking its

17   development of this product, they knew that there were a lot

18   of patents out there and they specifically knew about the

19   AHG patents.  So personnel at Broetje automation in Germany

20   called the head patent lawyer at their parent company CLAAS.

21   That's Dr. Steffen Budach.  You will hear his testimony.

22   He's here in the courtroom today.  And you will see the

23   documents that show we purposely changed our product so we

24   wouldn't infringe their patents.

25          In 2003, in November, a request was sent to a

1    third-party tube manufacturer in Germany saying, can you

2    manufacture a tube like this for us (indicating), a circular

3    tube that has grooves in the sides.  A few weeks later

4    there's another letter to the same tube manufacturer saying,

5    no, no, no.  Stop.  We don't want that tube after all.  We

6    want this tube.  We want this soft pentagon tube.

7           So what happened in the meantime?  Dr. Budach

8    told them you cannot order this tube.  This thing might

9    infringe their patent, which calls for grooves and

10   passageways along the walls.  Use this.  This does not

11   have grooves and passageways, he told them.  And what do

12   they do?  They rejected that design and they adopted the

13   soft pentagon.  So that got used in the product that was

14   released in 2004, the soft pentagon.

15          In 2005, you saw part of Dr. Budach's response

16   in 2005, when my company followed up again to double-check

17   with Dr. Budach.  In 2005, my client got that threatening

18   letter from F2C2 and AHG saying, stop all of your

19   infringement.

20          So they said, we should check with Dr. Budach

21   again and they did.  They sent him a message.  And they

22   showed him these two shapes.  There's a third.  You'll see

23   that one, but these are the two main ones.

24          They said, this is what F2C2's tube looks like.

25   This is the one that we have been using.  Is it all right if

1    we continue using this because we've just been accused of

2    infringement.

3              And Dr. Budach wrote back and he said, yes.  It

4    is safe to continue using this (indicating).  The portion of

5    the e-mail back from Dr. Budach that Mr. Lindvall showed you

6    was on page 2 of the e-mail.  On page of the e-mail, you

7    will see his advice saying, no.  Use this.  It doesn't

8    infringe.

9              And so what happened after that?  You saw from

10   the time, the timing chart that Mr. Lindvall put up that

11   they sued us in Germany.  And what happened there?  We won.

12   In the lower court, three Judges found that we did not

13   infringe their European patent.  And that was appealed and

14   that was affirmed.  And my client also filed a separate

15   lawsuit in the German Patent Court, asking the German Patent

16   Court to declare their European patent invalid.  A few

17   months ago, that's what they did.  The European patent has

18   been declared invalid in Germany.  Now, of course, that, of

19   course, validates what Dr. Budach told my client.  Use that

20   shape of a tube.  It won't infringe.

21             Now, as Mr. Lindvall mentioned, they also sued

22   us in France.  What happened in France?  Mr. Lindvall

23   mentioned that recently, they won.  That's true in some

24   respects, but they lost first.  It was the appellate court

25   that recently ruled in their favor.

1            At the trial court level, my client won.  The

2   patents were found invalid.  And significantly this issue

3   about whatever kind of a contract might have been entered

4   into in 1994, they sued us for improperly terminating a

5   contract under French law and we won.  The Court

6   specifically found that my client did not breach any

7   contractual obligations either to AHG or to F2C2.  And what

8   about this French Appellate Court judgment they are talking

9   about?  They affirmed that.

10           MR. LINDVALL:  Your Honor, I'm sorry.  I have to

11   object.

12           THE COURT:  Do you want to have a sidebar?

13           MR. LINDVALL:  They mentioned about breach.

14           (Sidebar conference held out of the hearing of

15   the jury as follows.)

16           THE COURT:  You'll have to speak loudly.  They

17   can't hear us.

18           MR. KELLEHER:  Yes.

19           THE COURT:  I think the objection is, we weren't

20   going to be talking about any suggestion of breach and now

21   you've told them there isn't a breach.

22           MR. KELLEHER:  The motion in limine ruling was

23   that they were not allowed to suggest that we were in

24   breach.  He has been suggesting, I'm afraid all the way

25   through his opening, there were provisions of his contract

1    that we were not allowed to use their confidential

2    information for anything, that supposedly apparently we're

3    in violation of that.

4             THE COURT:  Are you telling me you thought that

5    he violated my order in his opening?

6             MR. KELLEHER:  I think he did, Your Honor.

7             THE COURT:  You didn't bring that up with me,

8    did you?

9             MR. KELLEHER:  I'm trying to cure it now.

10            THE COURT:  You think -- hold on.  Do you think

11   what you have just done is consistent with my ruling that

12   the jury was not to hear any suggestion of breach?

13            MR. KELLEHER:  Yes, Your Honor.  I do think it

14   is.

15            THE COURT:  All right.  How is you putting

16   breach explicitly in front of the jury consistent with my

17   ruling?

18            MR. KELLEHER:  I will explain it this way, Your

19   Honor.  I understood the ruling as being they, we filed a

20   motion saying they should not be permitted to suggest that

21   we breached.  I don't believe the ruling said that we were

22   not allowed to discuss it if they raise an issue.

23            THE COURT:  Well, certainly, I take it, you have

24   no objection at this point.  Breach is out and they have a

25   chance to respond and present whatever evidence they want

1    about breach.  That's your position, I take it?

2                    MR. KELLEHER:  I suppose that's fair, Your

3    Honor.

4                    THE COURT:  Do you have an issue?  I mean --

5                    MR. LINDVALL:  He has opened the door.

6                    THE COURT:  We're now all in agreement, they've

7    opened the door.

8                    MR. LINDVALL:  Yes.

9                    THE COURT:  I mean, not that we can do anything

10   now.  I'm surprised you didn't come talk to me first

11   about -- hold on.  I will give you a chance to talk.

12                   I mean, if you thought that they violated my

13   order, and certainly my eyebrows were lifted a couple times,

14   but there was no objection.  There was no request for a

15   sidebar.  I think he was trying to be careful.  Arguably, he

16   may have gone over the line.  We'll never know.  But I am

17   surprised that you wouldn't come talk to me first before

18   really kind of walking indisputably across the line that you

19   have drawn.  But your response?

20                   MR. KELLEHER:  I want to apologize, Your Honor.

21   I honestly went against your expectations.  I thought I was

22   staying within the lines.  I am wrong, obviously.

23                   THE COURT:  Anything else you want to say?

24                   MR. LINDVALL:  No, Your Honor.  He has opened

25   the door.

1          THE COURT:  Yes.  The door is open.

2          MR. LINDVALL:  Thank you.

3          (End of side bar conference.)

4          THE COURT:  You may continue.

5          MR. KELLEHER:  Thank you very much, Your Honor.

6          And the decisions of the French Appellate Court

7   are now on appeal to the French Supreme Court.  Some day

8   we'll have the final answer, but it won't be unfortunately

9   while this trial is going on.

10          So the last issue I want to touch on is this

11   idea about whether the patents are valid or not.  You heard

12   the testimony the prior art a few times during the video and

13   during the Judge's instructions.  And the idea here is that

14   you're not allowed to take away from the public something

15   that's already in the public domain, so you can't get a

16   patent unless something is new.  If someone has already done

17   it, it's not new.  And even if it's new, no one has done the

18   exact same thing, it's only a tiny bit different from what

19   went before such that that leap would be obvious.  You are

20   not supposed to get a patent for that reason and I think the

21   evidence will show that what they say is their invention

22   actually wasn't new and was in fact obvious.

23          So you've seen this one.  This is the Shinjo-

24   Komaki patent application.  This is the language that I

25   pointed to earlier in my discussion here, that these

1    disclosed the exact same invention with regard to their

2    patents that they filed eight years later.

3             This is the Brosene stud feeding mechanism,

4    which discloses essentially rivets going into a tube inside

5    a cassette, and this is in the 1960s.

6             You're going to see a few other patents, pieces

7    of prior art during this case.  This is a patent called

8    Minbiole from 1972 and it involves conveying and treating

9    pieces through tubes that have these various intricate

10   grooves and passageways carved into the side.  And so you'll

11   see that people were using things carved into the sideways,

12   the sides of tubes to help propel things to them decades

13   before the inventors came up with it here.

14            This is another patent that you'll see, a patent

15   called Mauer.  This is a rivet/stud feeder using intricate

16   shapes for feeding rivets.  We have an octagon here and a

17   pie shape here.

18            So, ladies and gentlemen, at the end of the

19   case, just as I ask you to return a verdict of no liability

20   with regard to the trade dress, I'm going to ask you to

21   return a verdict of no patent infringement, no willful

22   infringement and no damages whatsoever in favor of my

23   client.  Thank you very much.

24            THE COURT:  Thank you.

25            Turn to plaintiff to call their first witness.

 1                    MR. HOROWITZ:  Your Honor, at this time, the

 2      plaintiff calls Philippe Bornes.

 3                    THE COURT:  Okay.  I'm sorry.  Is he going to

 4      have a translator help him?

 5                    MR. HOROWITZ:  Your Honor, he's going to have a

 6      translator next to him.  We're going to try and do it in

 7      English, but just in case.

 8                    THE COURT:  I think we may need the assistance

 9      already of the translator.

10                    Go ahead.

11                    MR. HOROWITZ:  May I approach?

12                    DEPUTY CLERK:  Shall I swear the interpreter

13      also, Your Honor?

14                    THE COURT:  Counsel, do you want us to swear the

15      interpreter?

16                    MR. KELLEHER:  I think we should, Your Honor.

17                    THE COURT:  Okay.  Any objection to that?

18                    MR. HOROWITZ:  No objection, Your Honor.

19                    THE COURT:  All right.

20                    (BEATRICE BEER, Interpreter, sworn.)

21                    ... PHILLIPPE BORNES, having been duly sworn as

22      a witness, was examined and testified as follows ...

23                    THE COURT:  Thank you, Mr. Bornes.  Welcome.

24                    You may pass out the binders.

25                    MR. HOROWITZ:  Thank you, Your Honor.

Bornes - direct

1          (Binders handed to the Court and the witness.)

2          MR. HOROWITZ:  And, Your Honor, per your

3    pretrial instructions, may I briefly make a statement about

4    who Mr. Bornes is?

5          THE COURT:  You may.

6          MR. HOROWITZ:  Although it follows very briefly

7    on what Mr. Lindvall told you in his opening remarks, this

8    is Philippe Bornes.  He's a co-inventor of the patents that

9    we're going to be talking to you about over the next few

10   days.

11         He was the technical manager and the head of

12   research and development at that company called AHG and then

13   he was the general manager.  He really started and ran this

14   company F2C2, which was responsible for the rivet feed

15   distribution system that Mr. Lindvall and Mr. Kelleher

16   showed you in their opening statements.

17                         DIRECT EXAMINATION

18   BY MR. HOROWITZ:

19   Q.    Mr. Bornes, where do you live?

20   A.    I live in France.

21   Q.    And is French your native language?

22   A.    Yes.

23   Q.    Will you do your best during your testimony, are you

24   going to try to do this in English?

25   A.    Yes.

Bornes - direct

```
 1   Q.      And are you married, sir?

 2   A.      Yes.

 3   Q.      How long have you been married?

 4   A.      For 40 years.

 5   Q.      Do you have any kids?

 6   A.      Yes.  I've got seven kids.

 7   Q.      What about grandchildren?

 8   A.      And also seven grandchildren.

 9   Q.      Could you tell us about your educational background?

10   A.      Yes.  I am French engineer.  I have been, graduated

11   from one of the top ten engineering schools in France.  The

12   name of this school is Ensta, E-n-s-t-a.

13   Q.      Are you currently working or employed?

14   A.      No.  I am retired now.

15   Q.      When did you retire?

16   A.      Last October, 2013.

17   Q.      What was your job before you retired?

18   A.      Just before, I was working for a company named

19   LATecis in France and I was project manager there.

20   Q.      Tell the jury what LATecis -- I'm probably not

21   pronouncing that correctly.  I'll do my best.  But tell me

22   what that company is?

23   A.      So it's a subsidiary of Latecoere, who is a company

24   in France which manufactures parts of planes and also some

25   studies, and in LATecis, I was mainly working on manufacturing
```

Bornes - direct

1    engineering tools for aircraft components for doing

2    transport of jets, or to manufacture planes.

3    Q.      It's involved in the aerospace industry?

4    A.      Yes.

5    Q.      And in what years did you work there?

6    A.      I worked there from 2007 until 2012.

7    Q.      Before LATecis, where did you work?

8    A.      I was working at AHG.

9    Q.      And AHG, were you working at AHG when you went to

10   LATecis, or were you working at F2C2?

11   A.      Excuse me, yes.  Before, I just work for F2C2, and

12   then AHG before.

13   Q.      So just make it clear for the jury, which did you

14   work for first, AHG or F2C2?

15   A.      I work first for AHG, then F2C2.

16   Q.      Okay.  I want to talk to you about F2C2 first and

17   work backwards a little bit.  Okay?

18   A.      Okay.

19   Q.      What years did you work at F2C2?

20   A.      I worked there from 2001 to 2007.

21   Q.      What is F2C2, and why was it created?

22   A.      F2C2 in fact is company that we have created from

23   AHG.  It's a subsidiary from AHG.  And, in fact, when we

24   were manufacturing the cassette rivet system, it's the

25   manufacturing some machines and, in fact, AHG was involved

Bornes - direct

1   in rivet manufacturing, so we decided to make F2C2 to rivets

2   only in the way to make, sell, and promote the cassette

3   system.

4   Q.    What is a rivet?  I think the jury probably knows at

5   this point, but just explain it to us in your own ...

6   A.    So a rivet is a part of metal with a head and a tail.

7   And when you put it on two parts of the plane, you dig a

8   hole.  You put the rivet inside the hole and then you

9   squeeze it tight, and then the two parts are assembled.

10  Q.    It holds the plane together?

11  A.    Yes, a lot of them.

12  Q.    Who created F2C2?

13  A.    So F2C2 has been created by Jean-Marc Auriol, my

14  father-in-law.  AHG and me.

15  Q.    How many employees did F2C2 have when you worked

16  there from 2001 to 2007?

17  A.    It's a small company.  We were four to five people

18  there.

19  Q.    Who owns F2C2?

20  A.    AHG.

21  Q.    And who owns AHG?

22  A.    AHG is owned by my father-in-law, Jean-Marc Auriol,

23  and his family, his wife and his son -- and children.

24  Q.    What did you do at F2C2?  What was your role there?

25  A.    I was general manager for F2C2.

Bornes - direct

1    Q.    Explain to the jury what that meant to be the general

2    manager of F2C2.

3    A.    Yes.  You know, it was a small company so I was

4    involved in the techniques, also with the customer

5    relations, and also from time to time also I went to

6    customer to sell machines.

7    Q.    Now, you said before F2C2 you worked at AHG.  I want

8    to talk to you a little bit about AHG now.  Okay?

9    A.    Yes.

10   Q.    Okay.  First of all, help us out.  What is the name

11   of the full French name of AHG.  Could you say it for us?

12   A.    AHG stand for Ateliers De La Haute-Garonne.

13   Q.    And we're going to call it AHG.  That's what we're

14   talking about; right?

15   A.    Yes.

16   Q.    And what is AHG?

17   A.    AHG is the family company.  It's family owned by my

18   father-in-law, his wife and children.

19   Q.    Are all of the owners and operators of AHG and F2C2

20   family members of Jean-Marc Auriol?

21   A.    Yes.

22   Q.    And he was your father-in-law or is your

23   father-in-law?

24   A.    Yes.

25   Q.    Okay.  And who is the head of AHG?

Bornes - direct

1    A.     Jean-Marc Auriol.

2    Q.     Who else from the Auriol family is involved with AHG?

3    A.     His wife and all his children.

4    Q.     When did -- all his children?

5    A.     Yes.

6    Q.     When did you start working at AHG?

7    A.     So, in fact, I met my wife when I was in engineer

8    school, and then we get married.  And we got our first

9    children 15 days after graduation.  And because I wanted to

10   work in the aircraft company, it was natural for me to work

11   with my father-in-law.

12   Q.     Did you go straight to work for your father-in-law

13   when you finished engineering school?

14   A.     Yes.

15   Q.     Do you remember what year that was?

16   A.     It was in July of 1975.

17   Q.     And what was AHG's business?

18   A.     It sold rivets, mainly.

19   Q.     Who did they manufacture rivets for?  What industry?

20   A.     It's got cold forging.  It's using what we call

21   heaters.  It's a press which are manufacturing this for us.

22   Q.     But what are the rivets used for?  Where did they put

23   the rivets when they're made?  What industry?

24          (Translator and witness confer.)

25   A.     Yes, they are using aircraft industry.  Excuse me.

Bornes - direct

1   Q.      And how long did you work at AHG before you began

2   work at F2C2 in 2001?

3   A.      26 years.

4   Q.      And over those 26 years, I'm sure you didn't have the

5   same exact job, but can you give the jury a sense of what

6   your role was at AHG?

7   A.      So at the beginning, as I told you, this industry is

8   using cold heater roll, and this work is not very well

9   known.  So, in fact, the first work I was to do was to see

10  the machine manufacturers to collect what is best way to set

11  the machine to make them work.  And then I came back to AHG,

12  and there I teach people best way to set these type of

13  machine.

14  Q.      Who were some of AHG's customers for these rivets,

15  these airplane rivets?

16  A.      Mainly worldwide, the aircraft manufacturers.

17  Q.      Can you give us a sense of names of some of the

18  companies?

19  A.      Yes.  So in France, you have Airbus, Dassault.  In

20  the United States, you have Boeing, Lochhead.  Almost all of

21  them.  Northrop and so on.

22  Q.      I'm sorry.  Were you finished?

23  A.      Yes.  In Brazil, Embraer.  There was customers all

24  over the world.

25  Q.      I think you said this but I wasn't sure.  Was some of

Bornes - direct

1    the customers in the United States?

2    A.    Yes.  Boeing, Northrop, Lochhead.  Spirit was Boeing

3    before.  Almost all of them.

4    Q.    And during your 30 year plus career in the airplane

5    industry and the riveting industry, were you ever named as

6    an inventor on any patents?

7    A.    Yes.  I have got more than 50 patents.

8    Q.    What area of technology do most of your patents

9    relate to?

10   A.    So they are relating to rivets, cassette delivery

11   systems and tools.

12   Q.    Now, you have a binder in front of you.  I've

13   provided one to counsel in court as well with some exhibits,

14   so I'm going to ask you now to open the binder.  We're going

15   to go through some of these together.

16          Could you turn to JTX-1 and JTX-2 in your

17   binder?

18   A.    (Witness complies.)

19   Q.    Okay.  Could you tell us what JTX-1 and JTX-2 are?

20   A.    They are the two patents that we got for the cassette

21   system.

22   Q.    Are these the '216 and '339 patents?

23   A.    Yes.

24   Q.    Who are the inventors on these patents?

25   A.    It was Jean-Marc Auriol and me.

Bornes - direct

```
 1    Q.      And who owns these patents?

 2    A.      AHG.

 3            MR. HOROWITZ:  Your Honor, at this time I would

 4    offer into evidence JTX-1 and JTX-2.

 5            THE COURT:  Any objection?

 6            MR. KELLEHER:  No objection.

 7            THE COURT:  They are both admitted.

 8            (PTX-1 and PTX-2 are admitted into evidence.)

 9    BY MR. HOROWITZ:

10    Q.    Mr. Bornes, if you could tell us generally what does

11    the invention cover in these patents?

12    A.    So these patents are made of the coiled tube which

13    have some groove inside to make sure that even if the coil

14    is complete with rivet inside, the air would be able to flow

15    all around the rivets and making the same pressure all along

16    all the rivets so the first one is able to move and through

17    the tube.

18            And also there is two stoppers, meaning to make

19    sure that no rivet can go out of them or in them.

20    Q.      Okay.  Let me break that down a little bit.  You said

21    that there is tubes with grooves; is that right?

22    A.      Yes.

23    Q.      And the grooves allow the air to flow through and

24    push all the rivets?

25    A.      Yes.
```

Bornes - direct

1    Q.     Okay.  And just to be clear, if the air can't get

2    through the tube, what happens to the rivets?

3    A.     If you, you have no way to make sure that the air

4    will go on all the rivets, you will try to push the rivet by

5    the last one.  So you can increase the pressure and it will

6    go anywhere around the tube.  The tube will increase but

7    they won't circulate inside.

8    Q.     And then I think you mentioned the other piece being

9    stop members.

10   A.     Yes.

11   Q.     What is the point of these step members?

12   A.     It's to make sure what you have done when you stop

13   rivets, you put them in the tube, you don't want them to

14   fall out, and you don't want to have some going back inside.

15   Q.     And just briefly, let's show the jury.  If you could

16   turn to JTX-1.2, the second page.

17   A.     Yes.

18   Q.     And tell us, what is in Figure 1 or what is

19   represented in Figure 1 of the patent?

20   A.     So in Figure 1, you can see the tube with a lot of

21   rivets inside.  There is the groove which is called 2b.

22   Q.     So the groove is labeled 2b?

23   A.     Yes.  So this is a way for the air to go from the

24   bottom of the tube to the top of the tube in that case, and

25   then you have the rivet inside and you have both sides of

Bornes - direct

1    the tube, the stoppers.

2    Q.    Now, what is your understanding of the purpose of

3    drawings or figures or pictures like this in a patent?

4    A.    It's to show the principle of the patent.

5    Q.    To show the principle of the patent?

6    A.    Yes.

7    Q.    Let's look at Figure 2 on JTX-1.2.  I think this was

8    shown in opening statement.

9              Could you tell us what is shown here in Figure

10   2?

11   A.    Yes.  So this shows the section, cross-section of the

12   tube.  You can see the tube with the internal shape with

13   three grooves.  This is groove 2b which will allow the air

14   to flow around the rivet inside, and you can see a rivet

15   inside the tube.

16   Q.    And, again, is this just an illustration of a

17   principle that you developed?

18   A.    Yes, but that doesn't mean all the measure of the one

19   we have to use.

20   Q.    When you came up with this invention -- you can take

21   this down, Joe -- was there a problem in the industry that

22   you had become aware of and that you were trying, you and

23   Jean-Marc Auriol were trying to solve when you came up with

24   this?

25   A.    Yes.  In fact, the problem was that we have a lot

Bornes - direct

1    of problems with the feed system of the riveting machine and

2    we wanted to work on that point.

3    Q.      Turn in your binder to PDTX-12.

4    A.      (Witness complies.)

5    Q.      Are you there?

6    A.      Yes.

7    Q.      Okay.  Do you recognize PDTX-12?

8    A.      Yes.  That's the bowl.  It's one of the two type of

9    systems which were used at that time.  This bowl.

10   Q.      And would this help you explain to the jury the

11   problem that you were trying to solve?

12   A.      The problem was before we invent this tube, the

13   feeding system was linked, directly linked.  That means you

14   have just like the feed of the machine and there was some

15   rivets inside.  Well, you can see that some other false

16   brother could fall down, and this would directly send the

17   rivet to the rivet -- to the riveter.

18   Q.      Is this what would be called an open system?

19   A.      Yes.

20   Q.      Okay.

21   A.      Yes.  And, you know, we could have some product in

22   inside directly coming from the batch of rivets that you put

23   inside.

24   Q.      Let me pause there for a second.  False brother, you

25   have said that a couple times now.  I just want to make sure

Bornes - direct

1    what folks understand.  Is that another way of saying the

2    wrong size or type of rivet?

3    A.      Yes.  That's it.

4    Q.      So mixing in something that is incorrect into the

5    hopper?

6    A.      Yes, or bowl, or even a screw or anything.

7    Q.      And what is the problem that can happen if you have a

8    false brother or the wrong size rivet in or the wrong type

9    of rivet or screw?  What can happen?

10   A.      It's the first should be the successful brother.  You

11   have seen the big machine that Broetje are doing.  Direct

12   from the fit system to the head riveter, you have 45 meter

13   on tube.  So when you send one of this fastener rivet inside

14   the tube, if it goes somewhere, you will need to know where

15   it is and find a way to put it out of that because if it is

16   blocking because it is not a good size, it's not so easy to

17   put them out.  So that means a lot of downtime on the

18   machine.  But it's not worse.

19          The worse is if the fastener is not a good one

20   is sent up to the riveter and the riveter try to squeeze it,

21   in that case you can have false assembly so you can damage a

22   panel or you have some problem with safety because you don't

23   have the good strength.  So this could be a very big

24   problem.

25   Q.      And had you spoken to people in the industry about

Bornes - direct

1   these problems?

2   A.      Yes.

3   Q.      How long did it take you and Jean-Marc to do the work

4   that led to your solution that ultimately was the patent?

5   A.      Two to three years.

6   Q.      And when?  What years did you do that work?

7   A.      It was the mid-80s.

8   Q.      The mid-1980s?

9   A.      Yes.

10  Q.      And what year did you first apply for the patents on

11  your invention?

12  A.      It was in 1988.

13  Q.      And why, Mr. Bornes, did you file for a patent on

14  your invention?

15  A.      Because it is our work to make this working, and we

16  wanted to be recognized as being the inventor of this

17  product and also we want to be protected.

18  Q.      To be protected?

19  A.      Yes.

20  Q.      Did there come a time when you and Mr. Auriol and

21  AHG -- and were you still at AHG when you first developed

22  this?

23  A.      Yes.

24  Q.      Okay.  Did there come a time when you commercialized

25  and sold a product that contained your invention?

Bornes - direct

1    A.    Yes.  It was in 1991.

2    Q.    Okay.  Let's take a look in your binder at PTX-152.

3    A.    (Witness complies.)

4    Q.    Could you tell us what PTX-152 is?

5    A.    It's a commercial brochure that we have done for the

6    cassette system.

7              MR. HOROWITZ:  Your Honor, I would offer into

8    evidence PTX-152.

9              MR. KELLEHER:  No objection.

10              THE COURT:  It's admitted.

11              (PTX-152 admitted into evidence.)

12   BY MR. HOROWITZ:

13   Q.    Who is the intended audience for PTX-152, this

14   document entitled The Distribution System Presentation.

15   A.    This is all customers like airplane manufacturers or

16   companies like Broetje.

17   Q.    Potential customers?

18   A.    Customers, yes.

19   Q.    Let's turn to PTX-152.5.  The fifth page.  It's

20   entitled Production Figures at the top.  Do you see that?

21   A.    Yes.

22   Q.    Okay.  Could you tell us and tell the jury what is

23   shown here?

24   A.    So here you can see our cassette system.  The

25   cassette system is made from three components.

Bornes - direct

```
 1                  So the first component is the rack we can say.
 2       So the rack is the place where the cassette, when they are
 3       plug in, and then from the cassette we can send to the head
 4       riveter, and you can have the rivet you want.
 5       Q.     What is the next component?
 6       A.     And then you have the loading station.  To be able to
 7       be plugged on the rack, the cassette needs to be filled with
 8       the rivet we want to use.  So in this machine, we are taking
 9       the rivet, and then we place them into the cassette.
10                  And then the third one is the cassette.  It's a
11       part of the system containing our patented tube.
12       Q.     Did you say it was the heart of this system?
13       A.     Excuse me?  Yes, the heart of our system.
14       Q.     What did you mean by that?
15       A.     Because the system won't work without cassette.  It's
16       really where we put the invention, and the station is a part
17       of the system which is needed to be able to work with the
18       cassettes.
19       Q.     And is the cassette the part of the three piece
20       system that contains the patented tube?
21       A.     Yes.
22       Q.     How many grooves are in the tube that you chose to
23       use in this system?
24       A.     With this cassette, the tube is using five grooves
25       which are on the top of the pentagon.
```

Bornes - direct

1    Q.      And how did you go about figuring out that you wanted

2    to use five grooves in the shape of a pentagon in your tube?

3    A.      It depend on the test we have done because we need --

4    at the beginning, we did not have enough sales.  We need

5    enough tube to provide the tube with complete tube with

6    shape inside.  So what we have to do is take a tube with

7    the circular shape and then we manufacture some tubes to be

8    able to make the groove by putting the material out.  And

9    when we make that, it was the best way to do it.  So we go

10   on with this five tube.

11   Q.      Did it involve testing?  I'm sorry.  Was this testing

12   that you were describing?

13   A.      Yes.

14   Q.      Let me show you another exhibit.

15           MR. HOROWITZ:  Your Honor, may I approach?

16           THE COURT:  You may.

17   BY MR. HOROWITZ:

18   Q.      Mr. Bornes, I have just handed you PTX-178.  Do you

19   recognize that collection of tubes right there?

20   A.      Yes.  That is some part of our tube.

21   Q.      Are these your patented tubes?

22   A.      Yes.

23   Q.      Samples?

24   A.      Yes.

25           MR. HOROWITZ:  Your Honor, at this time I would

Bornes - direct

 1   offer PTX-178 in evidence.

 2                MR. KELLEHER:  No objection.

 3                THE COURT:  It's admitted.

 4                (PTX-178 admitted into evidence.)

 5   BY MR. HOROWITZ:

 6   Q.    Rather than hand out the tubes, at least for now, why

 7   don't we turn in your bind to PDTX-13?  Take your time.

 8   A.    (Witness complies.)

 9   Q.    Do you recognize what is shown in PDTX-13?

10   A.    Yes.

11   Q.    Can you tell us what this is?

12   A.    That is a cut of our tube where we can see the five

13   grooves and the pentagon shape.

14   Q.    So just to be clear, this is a cross-section of your

15   tube?

16   A.    Yes.

17   Q.    And what is the shape of the cross-section of your

18   tube?

19   A.    You can see that is a pentagon with the five ends.

20   Q.    Pentagon shape?

21   A.    Yes.

22                MR. HOROWITZ:  Your Honor, are we going to go

23   until 4:30?

24                THE COURT:  We're going to go a few more

25   minutes, yes.  4:30.

Bornes - direct

1          MR. HOROWITZ:  I just want to gauge my modules

2    here.

3    BY MR. HOROWITZ:

4    Q.    I want to talk to you about when these systems are

5    sold.  Okay?

6    A.    Yes.

7    Q.    When a system is sold, how is it sold?  The three

8    components.

9    A.    You need three components to be able to have complete

10   system.  So we always sell at least one rack, one loading

11   station, and cassettes.  It's the only way to be able to

12   make it work.

13   Q.    So they're all sold together, the cassette, the rack,

14   the loading station?

15   A.    Yes, it's a complete system.

16   Q.    Could you turn to in your binder back to PTX-152,

17   which is already in evidence.  And PTX-152.7 in particular.

18   A.    Yes.

19   Q.    And when you get there, could you tell us what is

20   shown on PTX-152.7?

21   A.    Yes, it's a logo of our customers.

22   Q.    And are those all examples of customers of AHG and

23   F2C2?

24   A.    Yes.

25   Q.    Which ones are -- I should ask you, are any of these

Bornes - direct

1    customers in the United States?

2    A.    Yes.

3    Q.    Can you give us a few examples?

4    A.    Yes.  You have Boeing and you have Spirit.  And you

5    have also Gemcor and Kuka.

6    Q.    Turn in your binder to PTX-150 and 151.

7    A.    Yes.

8    Q.    And we can do these together I think.  Can you

9    identify PTX-150 and 151 for us and tell us what they?

10   A.    Right.  They are some files that we give to our

11   customers, or potential customers.

12           MR. HOROWITZ:  Your Honor, I would offer into

13   evidence PTX-150 and PTX-151.

14           MR. KELLEHER:  No objection.

15           THE COURT:  They are both admitted.

16           (PTX-150 and PTX-151 are admitted into evidence.)

17   BY MR. HOROWITZ:

18   Q.    Where would you give out flyers like this?

19   A.    It was many trade shows, like the Paris air show, Le

20   Bourget, or some shows like A.C. in U.S., like Ohio.

21   Q.    Let's slow down a little bit.  What is a trade show?

22   A.    A trade show is, in fact, a place where people are

23   in the industry, come and see what is new news of their

24   supplier and so on and so forth.  So a lot of engineers

25   involved in assembly of planes were coming on these shows.

Bornes - direct

1  Q.      And could you give us -- I think you said this but I

2  want to make sure we get it.  Could you give us at least one

3  example of a trade show you were just describing?

4  A.      So like the air show in Le Bourget which occurs every

5  two years, and Aerofast SAE in states which occur each year.

6  This one is not on the same place, it moving, and it has

7  been at least been in Europe twice or three times.

8  Q.      And sometimes the United States?

9  A.      Yes.  It should be in the United States.

10  Q.      And you said SAE.  We don't need to know what the

11  initials stand for, but just in general what is SA?

12  A.      SA is a big society in U.S. who is involved in

13  automotive and aircraft industry, and they mainly

14  manufacture, build standards, a lot of standards.  And they

15  also make papers for engineers.

16  Q.      Please turn in your binder to PTX-131.

17  A.      (Witness complies.)  Yes.

18  Q.      Could you identify for us what PTX-131 is?

19  A.      Yes.  This is one of the paper that has been done for

20  Aerofast.

21  Q.      Who is the author of the papers?

22  A.      It's Raymond McCann and me.

23  Q.      So you are one of the authors?

24  A.      Yes.

25          MR. HOROWITZ:  Your Honor, I would offer into

Bornes - direct

1    evidence PTX-131.

2                    MR. KELLEHER:  No objection.

3                    THE COURT:  It's admitted.

4                    (PTX-131 is admitted into evidence.)

5    BY MR. HOROWITZ:

6    Q.     What is the title of the paper authored here?

7    A.     It's The Modular Cassette Fastener and Delivery

8    System.

9    Q.     And was this paper prepared in relation to any of the

10   events that you were just describing, the trade show type of

11   event?

12   A.     Yes.  It was for the Aerofast in 2000.

13   Q.     Was that sponsored by SAE?

14   A.     Yes.

15   Q.     Could you turn to Figure 2, which I believe is a

16   PTX-131.6 in this paper that you published in relationship

17   to the show?

18   A.     Yes.

19   Q.     Could you tell us what this is showing?

20   A.     This is showing an AHG rack with the cassette inside.

21   Q.     Why did you publish a picture of your racks with

22   cassettes inside in a journal article or in a trade show

23   journal article like this?

24   A.     It is to promote our system.  It goes to a lot of

25   engineers involved in assembly, automatic assembly.  We see

1    that.  It's a way to show them what we are doing.

2              MR. HOROWITZ:  Your Honor, I'm going on to my

3    next module.  I don't know if I can do it in two minutes.

4              THE COURT:  That's fine.  I think it's a good

5    stopping point.  Thank you very much.

6              MR. HOROWITZ:  Thank you.

7              THE COURT:  Ladies and gentlemen of the jury,

8    that completes our first day with you today.  Thank you very

9    much for your time today.

10             Tomorrow, please be here in time to begin at

11   9:00 o'clock.  We will be able to provide lunch to you.

12   When you come in in the morning, there will be a menu or

13   menus waiting for you.  So if you can get here a few minutes

14   to spare, you can figure out what you want for lunch, we'll

15   take care of getting that for you.

16             While you are apart from us, no talking to

17   anybody about the case.  Don't do any research related to

18   the case.  If there happens to be any media coverage of the

19   case, don't look at it, and we'll wish you a very good night

20   and see you in the morning.

21             (Jury left courtroom.)

22             THE COURT:  Mr. Bornes, you may step down.

23   Anyone else is free to go.

24             I just want to talk to counsel for a moment.

25   You can have a seat or head out, whatever the rest of you

1      like.

2                   MR. HOROWITZ:  Phillippe, you can come down.

3                   THE COURT:  Where are we on updating the jury

4      instructions and the verdict sheet?  I don't know if I gave

5      you a deadline for doing that but I know there have been

6      some decisions.  You all should take a look at that I think

7      and see if you reduced any of the disputes.  Is that

8      something you thought about doing?  And I don't know if I

9      gave you a deadline or not.  I don't recall.

10                  MR. LINDVALL:  Your Honor, I don't believe there

11     is a deadline.  We did do lots of meeting and conferring.  I

12     thought we reduced it down to a fair amount of.  I would say

13     maybe five to ten disputes.

14                  THE COURT:  So progress has been made?

15                  MR. LINDVALL:  Yes.  But it may be, we're at the

16     point where maybe a charge conference would be useful, not

17     tonight.

18                  THE COURT:  Sure.

19                  MR. LINDVALL:  Maybe like Wednesday or something

20     like that.

21                  THE COURT:  I'm thinking Wednesday.

22                  MR. LINDVALL:  Okay.

23                  THE COURT:  But I would like to have a chance to

24     study what the disputes are in advance of that.  Could you

25     all get me by the end of the trial day tomorrow an updated

1    version of the jury instructions and the verdict sheet

2    showing me where the remaining disputes are?

3              Take a moment to confer.

4              (Counsel confer.)

5              MR. LINDVALL:  Your Honor, I believe Mr. Cahr

6    reminded me you probably have the most recent version with

7    the limited disputes.  They should be fairly easily

8    detectable when you review that.

9              THE COURT:  I'm sorry.  What I already have, you

10   say?

11             MR. LINDVALL:  Yes.

12             THE COURT:  So there hasn't been any further

13   progress?

14             MR. CAHR:  No.  Your Honor, you already narrowed

15   it a lot.  We met and conferred a number of times, so I think

16   what you have now is a fairly narrow number of substantive

17   issues.

18             THE COURT:  All right.  Well, I certainly know

19   at least on the equitable tolling question, we talked about

20   that subsequent to your submission.  It will be helpful for

21   me for you to take one more pass at looking at it, see if

22   there is anything further that you can resolve before we dig

23   into it, and the same on the verdict sheet for us as well.

24             So could that be done by, say, 5:00 p.m.

25   tomorrow, get a submission to us?

1          MR. CAHR:  Sure.

2          MR. LINDVALL:  Yes, Your Honor.

3          THE COURT:  All right.  Figure sometime

4    Wednesday we'll have a prayer conference and we'll discuss

5    whatever those remaining disputes are.

6          Okay.  Is that anything else from plaintiffs

7    before we break for the day?

8          MR. LINDVALL:  The only question I have, it's

9    probably not a question for you, but the physical exhibits,

10   can these be left in the courtroom or do they have to be

11   taken out?

12         THE COURT:  Ask Mr. Golden when I step out.  I

13   don't know the answer to that.

14         MR. LINDVALL:  Okay.  Thank you.

15         THE COURT:  Any from defendants?

16         MR. KELLEHER:  No, Your Honor.

17         THE COURT:  Okay.  We'll look you for you at

18   8:30 tomorrow morning.

19         (Proceedings adjourn at 4:32 p.m.)

20

21       I hereby certify the foregoing is a true and accurate
     transcript from my stenographic notes in the proceeding.

22

23                          /s/ Brian P. Gaffigan
                          Official Court Reporter
24                          U.S. District Court

25