1                    IN THE UNITED STATES DISTRICT COURT

2                    IN AND FOR THE DISTRICT OF DELAWARE

3                              -  -  -

4    ATELIERS DE LA HAUTE-GARONNE (French  :   CIVIL ACTION
     Corporation) and F2C2 SYSTEMS S.A.S.  :
5    (French Corporation),                 :
                                           :
6              Plaintiffs,                 :
                                           :
7         v.                               :
                                           :
8    BROETJE AUTOMATION-USA INC. (Delaware :
     Corporation), BROETJE AUTOMATION GMBH :
9    (German Corporation),                 :
                                           :   NO. 09-598-LPS
10             Defendants.
                               -  -  -

11
                         Wilmington, Delaware
12                       Tuesday, April 8, 2014
                         *Jury Trial - Volume B*

13                             -  -  -

14
     BEFORE:  HONORABLE **LEONARD P. STARK**, U.S.D.C.J., and a jury

15
     APPEARANCES:                      -  -  -

16

17            YOUNG CONAWAY STARGATT & TAYLOR, LLP
              BY:  MELANIE K. SHARP, ESQ., and
18                 JAMES L. HIGGINS, ESQ.

19                 and

20            KAYE SCHOLER, LLP
              BY:  SCOTT G. LINDVALL, ESQ., and
21                 JEFFREY H. HOROWITZ, ESQ.
                   (New York, New York)

22                 and

23

24
     Valerie J. Gunning              Brian P. Gaffigan
25   Official Court Reporter         Official Court Reporter

```
 1    APPEARANCES:   (Continued)

 2

 3              KAYE SCHOLER, LLP
              BY:  PAUL I. MARGULIES, ESQ.
 4                  (Washington, District of Columbia)

 5                  and

 6              KAYE SCHOLER, LLP
              BY:  MICHELLE MAREK, ESQ.
 7                  (Chicago, Illinois)

 8                      Counsel for Plaintiffs Ateliers De La
                      Haute-Garonne and F2C2 Systems S.A.S.
 9

10              DRINKER BIDDLE & REATH, LLP
              BY:  JOSEPH C. SCHOELL, ESQ., and
11                  TODD C. SCHILTZ, ESQ.

12                  and

13              DRINKER BIDDLE & REATH, LLP
              BY:  PATRICK J. KELLEHER, ESQ.,
14                  DARREN S. CAHR, ESQ., and
                  CARRIE A. BEYER, ESQ.
15                  (Chicago, Illinois)

16                      Counsel for Broetje Automation-USA Inc.
                      and Broetje Automation GmbH
17

18

19

20

21

22                      - oOo -

23                    P R O C E E D I N G S

24              (REPORTER'S NOTE:  Jury trial proceedings were

25    held in open court, beginning at 8:30 a.m.)
```

```
 1                    THE COURT:  Good morning, everyone.

 2                    (The attorneys respond, "Good morning, Your

 3       Honor.")

 4                    THE COURT:  I understand some issues.  First,

 5       anything from plaintiffs?

 6                    MR. HOROWITZ:  Yes, Your Honor.

 7                    Per the pretrial order, defendants gave us

 8       notice that they're going to call their first witness

 9       perhaps today.  And they gave us a list of exhibits, and

10       it's Mr. Ken Benczkowski from Broetje USA.  He is actually

11       seated I believe as the corporate representative.  And this

12       is the very issue that I raised with you at the pretrial

13       conference because I had a sense this was coming.

14                    They put on their list, and it's not a long

15       list, several exhibits where Mr. Benczkowski has absolutely

16       zero personal knowledge, so I am moving under Federal Rule

17       of Evidence 602 to preclude the use of these documents by

18       Mr. Benczkowski because there is no foundation.

19                    THE COURT:  Were they objected to in the

20       pretrial order?

21                    MR. HOROWITZ:  Yes, they were.

22                    THE COURT:  Upon what basis were they objected

23       to?

24                    MR. HOROWITZ:  Including 602.

25                    THE COURT:  All right.  Do you have any other
```

1    bases to object to them today?

2              MR. HOROWITZ:  That's my primary basis.  And

3    would you like to hear the reasons for that?

4              THE COURT:  To prove that he does not have

5    personal knowledge?

6              MR. HOROWITZ:  Yes.

7              THE COURT:  Sure.  Remind me, though, did I make

8    a decision at the pretrial conference on this?

9              MR. HOROWITZ:  You said to raise this with you

10   at this time as opposed to at the time of the witness.

11             THE COURT:  Thank you for doing that.  Okay.

12   Yes, tell me.  I mean ordinarily -- well, not ordinarily.

13   Sometimes we don't necessarily require the personal

14   knowledge if someone else is going to have it.  But to the

15   extent you understand what they intend to do with the

16   exhibit and you want to press your objection, tell me why I

17   shouldn't allow it.

18             MR. HOROWITZ:  Yes, I would like to press it

19   because Mr. Benczkowski didn't come to Broetje, and it was

20   Broetje USA in 2008.  These are documents from Broetje

21   Germany in 2004, 2005, 2006.  Mr. Benczkowski has testified

22   at his deposition that he neither reads, nor writes, nor

23   speaks German.  These documents are mostly written or

24   contain an awful lot of German.  He has absolutely no

25   percipient knowledge of these documents.  He can't.  In

1    fact, Broetje USA didn't even begin to exist until 2006.

2              There is also, in a separate category, an

3    e-mail, and I do believe this is a separate category, in

4    2009 that he is not cc'd on, and I don't think -- I have to

5    go back and look.  I apologize.  I'm not sure any of their

6    witnesses are cc'd on it that they intend to call.  So these

7    are classic documents where there just is no foundation.

8              THE COURT:  All right.  Let me hear from Broetje

9    on this.  Thank you.

10              MR. KELLEHER:  Good morning, Your Honor.

11              THE COURT:  Good morning.

12              MR. KELLEHER:  Looking at the exhibit list, I

13    see that many of these exhibits they're objecting to now do

14    not have any objections from AHG in their column.

15              But aside and apart from that, what these

16    documents are, are the business records of the companies.

17    Mr. Benczkowski is the President of Broetje USA, and he

18    ultimately is the main custodian of all the documents of the

19    companies.  We know those two companies work together.

20              What these kind of documents are, Your Honor,

21    are, among others, the shipping documents showing that we

22    tell the customers that the cassettes are manufactured by

23    Broetje Automation in Europe.  There is German on them.  For

24    instance, they say cassettes.  Directly underneath them,

25    they say the translation which is the translation since

1      these are sent to customers in the United States.

2              Other things are like communications with

3      customers which are business records.  The other things are

4      financial information and sales information pulled from the

5      database which is a compilation of business record

6      information.  So I think he is a proper witness to get these

7      things in as our business records.

8              THE COURT:  So the business records would be an

9      exception to any hearsay objection.  But we don't seem to

10     have a hearsay objection.

11             MR. KELLEHER:  Right.

12             THE COURT:  Your response to the lack of

13     personal knowledge is?

14             MR. KELLEHER:  He has a personal knowledge of

15     what the records of the companies look like because he is

16     the President of Broetje USA.

17             THE COURT:  And you will lay a foundation he has

18     personal knowledge of the records of the business not just

19     at the USA level but also at the German level?

20             MR. KELLEHER:  The companies work together, and

21     they have access to each other's records.

22             THE COURT:  All right.  So that is the first

23     category of documents, I take it.

24             MR. KELLEHER:  Yes, Your Honor.

25             THE COURT:  And the e-mail, are you familiar

1    with the e-mail of 2009?

2              MR. KELLEHER:  Yes, Your Honor.  That is a

3    reverence to communications from customers to Laura Ballard,

4    who is the spare parts engineer at Broetje USA.  And they

5    were inquiring about purchasing F2C2 spare parts.  And she

6    responded we have no more dealing with F2C2.  Here is their

7    contact information.  So these kind of communications which

8    are made in the ordinary course of business and are kept and

9    are made by a person with knowledge.  They would be business

10   records.

11             THE COURT:  Tell me again the woman's name and

12   what is her position?

13             MR. KELLEHER:  Laura Ballard.  B-a-l-l-a-r-d.

14   And she is a spare parts engineer, so she --

15             THE COURT:  At Broetje USA?

16             MR. KELLEHER:  At Broetje USA.

17             THE COURT:  Does she report to Mr. Benczkowski?

18             MR. KELLEHER:  Directly.

19             THE COURT:  All right.  Is there anything else?

20             MR. KELLEHER:  I think I addressed everything,

21   Your Honor.

22             THE COURT:  Okay.  Mr. Horowitz, did you want to

23   respond?

24             MR. HOROWITZ:  Your Honor, just to clarify.  I

25   did misspeak.  The 602 objections are not on the -- of

1     course, it would be pursuant to who they are going to call.

2     That is why I raised it with you at the pretrial conference.

3              THE COURT:  Are there any objections?

4              MR. HOROWITZ:  Yes.  For example, the Ballard

5     document, there is a hearsay objection.  And my response is

6     if you follow the logic of their argument, all of this comes

7     regardless of who they use it with and how they use it, that

8     can't be.

9              THE COURT:  What about the point that it comes

10    in through a witness who has personal knowledge as to how

11    the business records are kept at the company?

12             MR. HOROWITZ:  If they have personal knowledge

13    of how the business records are kept, they may be able to

14    establish the elements, but they still can't -- I mean I'm

15    not sure how Mr. Benczkowski can testify as to the business

16    records were kept at Broetje Germany in 2004, 2005 and 2006

17    when he is President of Broetje USA in 2008.  He doesn't

18    have that knowledge.

19             THE COURT:  Well, it may be saying how they are

20    kept is too narrow on my part.  If he is going to testify in

21    substance, I work at Broetje USA, I interact as part of my

22    job with Broetje Germany, and these are the types of

23    documents that I see regularly and rely on as part of that

24    capacity, isn't that adequate personal knowledge for the

25    documents to come in?

1          MR. HOROWITZ:  If he can say that he reviews and

2     relies upon them, I guess.  I question how he can do that

3     about 2004, 2005 documents written in Germany four or five

4     years before he began at the company, but I don't disagree

5     with your premise.

6          THE COURT:  Okay.  And what about the e-mail?

7          MR. HOROWITZ:  The e-mail, that is, again that

8     is classic hearsay.  He is not on the e-mail.  I mean if you

9     follow that logic, that any witness at a company can testify

10     about any e-mail, that it would come in regardless of who is

11     testifying, and that doesn't make any sense.  It would have

12     to be somebody that had personal knowledge of that e-mail

13     and was on the e-mail because the substance of that e-mail

14     is going to come in once that document comes in.

15          THE COURT:  All right.  I'm going to overrule

16     these objections.  I'm satisfied that to the extent there

17     are hearsay objections that a foundation will be laid that

18     these are business records kept in the ordinary course of

19     business and the type of documents that are seen by and

20     relied on by the personal at Broetje USA as well as Broetje

21     Germany.  I'm satisfied at least based on the representations

22     that there a foundation laid and Mr. Benczkowski is a proper

23     witness who has adequate knowledge from his professional

24     capacity as to how these documents are used at the company,

25     including Broetje USA.  I'm satisfied that he will likely

 1    testify that is truly going to with respect to somewhat

 2    historical documents that were created before he got there

 3    but remain in the custody and control of the company.

 4              With respect to the e-mail, the representation

 5    is that it was written by or at least copied to an

 6    individual who reports to him and is kept in the ordinary

 7    course of business.  And I think that satisfies enough at

 8    least the objections on hearsay and lack of personal

 9    knowledge.  So we'll let those documents be used.

10              Are there other issues from plaintiffs?

11              MR. HOROWITZ:  No, Your Honor.

12              THE COURT:  Okay.  Are there any issues from

13    defendants?

14              MR. CAHR:  Yes, Your Honor.

15              THE COURT:  Okay.

16              MR. CAHR:  I will handle a couple of them.

17              THE COURT:  Okay.

18              MR. CAHR:  Mr. Kelleher will handle one or two

19    as well.

20              First, one of the witnesses who will be called

21    today is Dominique Hage.  And Dominique Hage is going to put

22    in some documents relating directly to the French judgment.

23    We just want to maintain our objections.  We understand you

24    have already ruled on them.  So that is just a matter of

25    just maintaining and preserving our objection.

1              THE COURT:  Okay.  The objection is noted then.

2              MR. CAHR:  Thank you very much, Your Honor.

3              Another witness who will be up is Douglas Ellis

4    who is the damages expert.  And, Mr. Ellis, there will two

5    separate sets of issues, and the easier one I'll deal with

6    first which is the exhibits that he plans on using.

7              One of the exhibits he intends on using is

8    marked JTX-32.  This is an internal spreadsheet generated in

9    connection with the internal information of F2C2 and/or AHG.

10   It is not something that he has.  We're talking about

11   personal knowledge.  This is something which is a summary of

12   information that he did not summarize.  Somebody else did.

13   This was created internally.  We don't have the documents,

14   all of the information that this witness used to create.

15             It is thus objectionable as hearsay under 105,

16   901, 1006, 705.  We noted all of these objections prior.

17   It's just outside the scope of what can be introduced by

18   him.

19             Now, that said, if somebody else within the

20   company brings that in, we certainly have no objection to

21   him testifying.  It's a document he relied on as an expert.

22   He is certainly allowed to talk about it.  He is certainly

23   allowed to perhaps even use it as a demonstrative.  But he

24   is not allowed to be the percipient witness who brings it

25   into evidence.

1                   JTX-58 is a similar situation.  He certainly

2       is able to talk about it.  It's something he relied on.

3                   THE COURT:  Another spreadsheet.

4                   MR. CAHR:  Another spreadsheet.  It's not a

5       document which he has any personal knowledge of.  He didn't

6       do the summary.  Again, if someone else brings it into

7       evidence, he can certainly talk about it, but he is not a

8       proper party to bring that into evidence.

9                   The Exhibit 595 is an annual report from CLAAS,

10      the participant company, during the relevant period of

11      Broetje.  Obviously, this is something that could be brought

12      in through some other witness, perhaps one of ours, but it

13      is not something which has -- he has no personal knowledge.

14      You know, whether he printed it off the Internet or did

15      what, I just have no idea, but entering it into evidence

16      through the damages expert is just inappropriate.

17                  THE COURT:  It's publicly available?

18                  MR. CAHR:  It is publicly available.

19                  THE COURT:  It's filed with some government

20      agency?

21                  MR. CAHR:  You know --

22                  MR. KELLEHER:  I don't know for a fact, Your

23      Honor.  CLAAS is a family owned company.  I'm not sure it's

24      publicly held.

25                  THE COURT:  It's certainly not filed with the

1    SEC here in the U.S.?

2              MR. CAHR:  No, it is not.  They're a German

3    entity.  To be perfectly frank, I don't know the exact

4    details of its larger availability, but certainly it's

5    something that he can talk about having relied on.  He's a

6    damages expert.  He can talk about that all he wants, but

7    entering it into evidence through him, the damages expert,

8    just does not work.

9              Then there is a larger issue which the parties

10   have actually mostly agreed on, but not completely.

11   Obviously, there are hearsay issues and different Courts

12   have addressed differently the question of whether or not an

13   expert report itself can or should be entered into the

14   record as evidence, and certainly with a damages expert

15   report, doubly.  The parties agreed that as a half step, as

16   something which both parties would feel very comfortable

17   with, we can take out the CVs from the, from the expert

18   reports and utilize the CVs as newly created exhibits that

19   both sides can use for all four of the experts, and that we

20   agreed that the expert reports themselves are not

21   admissible.

22             However, they do want, AHG does want to be able

23   to offer select, select attachments from the expert report

24   as exhibits.  And, again, this goes to what we were talking

25   about before.  It's obviously hearsay.  It's obviously based

273

1    on all sorts of other things.  He can certainly talk about

2    it.  He can use it as a demonstrative.  And certainly, if

3    they can bring those documents in through some other

4    witness, although in this particular case, unlike the other

5    ones, I don't know that they could, then he can testify

6    about it.  But I think the general principle of them being

7    excluded is hearsay is very much applicable here.

8              THE COURT:  Are these things like certain

9    calculations and analyses that he has done?

10             MR. CAHR:  Correct.  It's all of those things.

11   And, again, we have no objection to either side sitting here

12   with a projector, sticking the, sticking the expert report

13   under the projector.  And, in fact, one thing we want to

14   ask you about is how we mark those for your preference.  But

15   the -- and putting them under there and showing this

16   particular number and saying, well, explain this.  But it's

17   not evidence.  It's not something that should be provided as

18   such.  And it seems to sort of defeat the whole notion of

19   how we define the difference between the damages expert and

20   the evidentiary value of the things that they are relying

21   on.

22             THE COURT:  Okay,

23             MR. CAHR:  We have one other -- -- I have

24   another issue involving Ellis involving a demonstrative.  If

25   you would like, these are a little long.  We can break it

1    up.

2              THE COURT:  Yes.

3              MR. CAHR:  This probably makes more sense.

4              THE COURT:  Let's figure out which one of these

5    are the easy ones.

6              MS. SHARP:  Good morning, Your Honor.  On the

7    issue of the attachments to the expert report, we didn't

8    agree to newly created exhibits.  We did agree that the CVs

9    go in, so the remaining issue is the attachments.  The

10   attachments --

11             THE COURT:  First of all, your agreement that

12   CVs go in is fine, so you can all put the CVs in.  How

13   about, did you agree that the reports as a whole are not

14   admissible?  Is that agreed?

15             MS. SHARP:  We did agree that the reports as a

16   whole are not.

17             THE COURT:  I'm fine with both of those.  The

18   attachments, though?

19             MS. SHARP:  So the final issue is the attachment

20   that reflects the calculations.  The attachments are

21   compilations of underlying data that have been verified.

22   The attachments are obviously information debts.  There's

23   an enormous information of information in them.  They

24   certainly can be shown.  They would be put on the screen.

25   They are difficult to read because they are numbered

1    calculations.

2              So my understanding was we had an open question

3    because each side would probably, for its damages expert,

4    or, yes, for its damages expert want to put in those

5    attachments so that the jury could refer back to them.

6              So is --

7              THE COURT:  I think the open question is they

8    don't want to do it.  Is that correct?

9              MR. CAHR:  Your Honor, we're more than happy to

10   use them as demonstratives and have them blown up even so

11   that everyone can see it.  But having them as evidence I

12   think just gives them -- well, promotes that, really.

13             THE COURT:  You are not trying to do something

14   that you are depriving them of.  You don't want to put your

15   calculations in?

16             MR. CAHR:  We're fine with nobody's coming in

17   and just having the ability just to, you know, stick them

18   under the projector and talk about it.

19             THE COURT:  So the proposal is they would just

20   be demonstratives, use them as proper demonstratives, but

21   they won't be admitted into evidence, so they won't go back

22   to the jury room.  Does the plaintiff agree to that?

23             MS. SHARP:  We don't agree to the proposal

24   because we think that that would be difficult and

25   cumbersome, particularly in a timed trial, and that these

1    documents would meet the hearsay objection because they are

2    compilations and additions of the verified underlying data.

3                THE COURT:  All right.

4                MS. SHARP:  And it would simply make the issue

5    much clearer for the jury if the jury chooses to refer back

6    to the calculations.

7                THE COURT:  All right.  Well, I guess go

8    backwards to the exhibits objection, because I don't know if

9    I understood that the documents underlying even the

10   calculations that we just talked about are verified as going

11   to be admitted.  So I take it that you say that they are, at

12   least for yours, but what about these exhibits that we began

13   with?

14               MS. SHARP:  For Exhibits 32 and 58, I understand

15   defendants to agree that Mr. Ellis can testify about the

16   content of the exhibits, and I think we'd be satisfied to

17   put them in through another witness.

18               THE COURT:  Okay.  Fine.  Then they won't be

19   admitted through Mr. Ellis.

20               MS. SHARP:  The annual report is the publicly

21   available document on the Internet.  I don't know the answer

22   to whether it's filed with a public agency, Your Honor.  As

23   I stand here, I don't know that answer, but certainly

24   Mr. Ellis is entitled to rely on the hearsay in that

25   document.  We believe that will go in through a Broetje

1    witness.

2              THE COURT:  Is it any prejudice to you for him,

3    Mr. Ellis, just to testify about it, use it as a

4    demonstrative, but not admit it into evidence through him?

5              MS. SHARP:  As long as the defendant doesn't

6    then get up and say, you never saw any document and imply

7    that the jury will never see any document and thereby

8    undermine the witness' testimony as being only verbal

9    and not based on a document, then there would be no

10   prejudice.

11             THE COURT:  Well, I was -- I think there's no

12   objection to him testifying about the annual report, saying

13   the annual report exists, and there may not even be an

14   objection to you calling it a demonstrative exhibit and

15   showing it to the jury.

16             Did I understand that correctly?

17             MR. CAHR:  If, Your Honor, if he wants to show

18   it to the jury and, you know, stick it under the projector

19   and show it, I don't think that under the circumstances as a

20   damages expert, we would have any objection.

21             THE COURT:  All right.

22             MS. SHARP:  We're fine with that, then, Your

23   Honor.

24             THE COURT:  So it just won't come into evidence

25   unless you move it through some other witness, but you won't

1    move it through Mr. Ellis.

2              MS. SHARP:  Understood.

3              THE COURT:  All right.  Thank you.

4         Then I think the only dispute remains, what

5    about the summary attachments to both experts' calculations

6    and so I have the question to Broetje, is it -- do you have

7    any reason to dispute the representation of Ms. Sharp that

8    all of the underlying documents that are summarized and

9    utilized, I guess, in the calculation are coming into

10   evidence anyway?

11             MR. CAHR:  Your Honor, I don't know that, and

12   these are being offered effectively for the truth of the

13   matter asserted, that these are the actual numbers that are,

14   that should be relied on.  When we're talking about a

15   damages expert, the whole principle is that he's relying on

16   information that you have brought into evidence through

17   someone who actually has percipient knowledge of that, of

18   that information.

19             And basically what's happening here is a whole

20   step is being skipped and he is the one bringing into

21   evidence documents that he did not summarize, that he was

22   not involved in producing.  And it's certainly something is

23   that he relied on.  It is completely within the scope of

24   what a damages expert can do to talk about the things he

25   relied on.  You know, hey, I was referred to this summary

1    chart which said this, this, this and this.  But to actually

2    get it into evidence, you need to have an evidentiary basis

3    to do so.

4              And as you know, I mean, there's magic to the

5    principle that the financial document is actually presented

6    as evidence, and I just don't think that as a damages

7    expert, he's in any position to do that.  That is not to say

8    that there is not some, not some other witness who could get

9    that in, and if some other witness gets it in, you know,

10   we're fine with him being questioned about it as an exhibit,

11   but it just can't get in through him.

12             THE COURT:  All right.  Ms. Sharp, I may have

13   misunderstood the representation.  I think the

14   representation was these are, these documents are coming in

15   through somebody because they've all been vetted as

16   underlying data for the company.  Is that correct?

17             MS. SHARP:  Not in every single instance, not

18   every single of the 15,000 underlying documents that the

19   calculations were based on is coming in independently.

20   That's one of the reasons that the summary is necessary.

21             In terms of the risk that Mr. Cahr has

22   identified, it's going to be clear to the jury that these

23   are summary calculations and Mr. Ellis will explain them.

24   These are summaries of underlying data.  He identifies on

25   the summaries the underlying source.

1          THE COURT:  Why not, to make a complete

2     record, why not move the 15,000 pages in through a proper

3     witness?

4          MS. SHARP:  With the sponsorship requirement in

5     a timed trial, that may be nearly impossible.

6          MR. CAHR:  We would even be willing, if their

7     witness has knowledge, if they want to move those 15,000

8     documents in and it's someone who created the sales summary

9     and can testify with knowledge about that, that's fine.  But

10    what we're talking about here is a situation where I have

11    not seen in the witness -- I mean, their case-in-chief is

12    going to end today, and so we know what all of the exhibits

13    are that are going to be presented with all of the witnesses

14    in their case-in-chief.  None of them have anything which

15    would support any of the things in this, in these

16    compilations.

17          You know, there's no -- there's no, you know,

18    nothing there saying, well, this example, this example and

19    this example is how we create this compilation, and I am

20    someone who is involved in the financial management of the

21    company, so I understand how that is kept in the normal

22    course of business, so this particular spreadsheet which ran

23    through this particular method is an accurate reflection.

24    That would be fine.  But there's no -- we've seen what all

25    the exhibits are that are going to be entered into their

1    case-in-chief and none of them do that.

2              THE COURT:  Ms. Sharp, do you want to have the

3    last word?

4              MS. SHARP:  I'm told that we can put all of the

5    underlying documents in through Mr. Hage, but we would

6    probably need to do it en masse because of the sheer

7    quantity.

8              THE COURT:  Right.

9              MS. SHARP:  And all of those underlying

10   documents obviously were not on the list of exhibits we said

11   we would use with him.

12             THE COURT:  Is there an objection to that

13   approach?

14             MR. CAHR:  If all 15,000 of them were produced

15   to us and we had a chance to review them, that's fine.

16             THE COURT:  Well, we don't have much time.

17             MR. CAHR:  No, but that's what I'm saying.  I

18   mean, that's why it is just improper, an improper thing to

19   put in.

20             THE COURT:  Ms. Sharp, have they been produced?

21             MS. SHARP:  They have been produced.  They were

22   part of the exchange identified in the expert reports and

23   available for and subject to examination at Mr. Ellis'

24   deposition examination, the same documents that were

25   provided to defendants' expert.

1          THE COURT:  Mr. Cahr, do you have any reason to

2    doubt that?

3          MR. CAHR:  You know what, if they are all

4    documents that have been provided to us and once we see

5    them, we agree, then that's fine.  You know, if --

6          THE COURT:  Well, I'm not sure by what you mean

7    once you see them.

8          MR. CAHR:  I can't honestly represent that

9    15,000 of documents were produced to me when I don't

10   remember or know offhand.  Obviously, a lot of those things

11   took place three years ago, too.  But I mean, certainly, if

12   they are willing to move in, to move in documents with a

13   proper foundation and they are able to move in those

14   documents with a proper foundation with someone who can say

15   these documents connect up to this summary in this

16   particular fashion and they're documents that have been

17   properly disclosed to us, that's normal trial practice.

18   That's fine.

19          THE COURT:  Ms. Sharp?

20          MS. SHARP:  Your Honor, it sounds as if the

21   resolution would be to request permission to recall Mr. Hage

22   so that Mr. Cahr could look at the underlying documents and

23   we could do this in a short period of time as possible.  It

24   does not seem like we're going to be able to get it done

25   today.

 1            THE COURT:  Okay.  Well, if that's what the

 2    plaintiff is proposing, is that acceptable to defendant?

 3            MR. CAHR:  So the idea would be, it would be

 4    Mr. Hage's normal testimony today, but just that one issue

 5    would remain outstanding until we were able to --

 6            THE COURT:  Presumably re-call him tomorrow

 7    after you've had a chance to confirm the representations

 8    made that these documents were all produced to you and you

 9    had an opportunity to look at them.

10            MR. CAHR:  Well, here's what I would suggest.

11    It would be useful if the foundation were actually laid for

12    them today in the, in the testimony so that we would have a

13    sense of whether or not -- basically, so we would understand

14    the whole framework for the documents.  Then we can take a

15    look at them and then it may not even be necessary to recall

16    him.  We may be able to agree without even having to call

17    him again.

18            THE COURT:  Ms. Sharp, do you want to proceed

19    that way?

20            MS. SHARP:  I'm not sure I do understand what

21    you are saying.  That we would do a foundation?

22            THE COURT:  I will give you a chance to confer

23    on it.  We have Mr. Bornes first.  And then when is Mr. Hage

24    getting on?

25            MR. CAHR:  Right thereafter.

```
 1            MR. HOROWITZ:  I believe direct -- either
 2   directly after our video, short video, and then in short
 3   order after Mr. Bornes.
 4            THE COURT:  Okay.  We're going to take at least
 5   a short break for me to step out and then make sure the jury
 6   is here.  So I will have you confer during that time frame.
 7   But were there other issues related to Mr. Hage that we have
 8   to deal with?
 9            MR. CAHR:  Not related to Mr. Hage.
10            THE COURT:  Mr. Ellis?
11            MR. CAHR:  There's one more thing about
12   Mr. Ellis and then one more thing about Mr. --
13            THE COURT:  And Ellis and Kytomaa are after
14   Bornes and Hage?
15            MR. CAHR:  Yes.
16            THE COURT:  All right.  We'll have a chance to
17   deal with those issues.  If I have to, I will take another
18   break, but we'll get through Bornes and Hage.
19            So first I'm going to take a short break.  You
20   all figure out if you can work out the Hage issue.  If you
21   can't, when I come back, I will give you a ruling on that
22   and then we'll bring the jury in.
23            Whatever we do as demonstratives, you should
24   just, you know, if you are making marks on it or whatever,
25   mark it as a new demonstrative, give it a demonstrative
```

1    number and that will identify it for the record.

2            MR. CAHR:  That's great, your Honor.  And there

3    are -- the remaining issues for Ellis are his demonstrative

4    and the remaining issues for Kytomaa are the demonstrative.

5    They are not being called right this second.  We can talk

6    about those at the next break.

7            THE COURT:  We'll deal with those eventually.

8            MR. CAHR:  All right.

9            THE COURT:  All right.  We're in recess.

10           (Brief recess taken.)

11           *      *      *

12           (Proceedings reconvened after recess.)

13           THE COURT:  The jury is here and we want to

14    bring them in.  Have you made any progress on the issue we

15    were discussing?

16           MR. CAHR:  We have.  We're not quite done but we

17    actually have made progress.

18           THE COURT:  Do you agree with that?

19           MS. SHARP:  Yes.

20           THE COURT:  I guess before we call the witness,

21    if there remains a dispute, let's have a sidebar and we'll

22    sort that out.

23           MR. CAHR:  That probably makes the most sense.

24           THE COURT:  All right.  We'll bring the jury

25    back in.

```
 1                    MR. HOROWITZ:  Your Honor, before the jury comes

 2    in, maybe I can do one quick housekeeping matter.

 3                    THE COURT:  Yes.

 4                    MR. HOROWITZ:  I apologize.  I just, in your

 5    binder and your clerk's binder and I thought everybody

 6    else's, in light of your ruling yesterday during opening

 7    statements, we now have an unredacted PTX-546.

 8                    THE COURT:  Okay.  You can pass that up.

 9                    (Document passed forward.)

10                    THE COURT:  Any objection to that?

11                    MR. KELLEHER:  That matches your ruling.

12                    THE COURT:  Right.  Okay.  Thank you.  You can

13    bring the jury in.

14                    (Jury returned.)

15                    THE COURT:  Good morning, ladies and gentlemen

16    of the jury.

17                    THE JURORS:  Good morning.

18                    THE COURT:  We are prepared to proceed.  We'll

19    have Mr. Bornes come back to the stand, please, along with

20    our translator assistant.

21                    ... PHILLIPPE BORNES, having been previously

22    sworn, was examined and testified further as follows ....

23                    THE COURT:  Good morning to both of you.

24    Mr. Bornes, I remind you that you remain under oath.

25                    THE WITNESS:  Yes.
```

Bornes - direct

1          THE COURT:  You may proceed when you are ready.

2          MR. HOROWITZ:  Thank you, Your Honor.

3              DIRECT EXAMINATION (Continued)

4    BY MR. HOROWITZ:

5    Q.    Good morning, Mr. Bornes.

6    A.    Good morning.

7    Q.    Yesterday, you told us yesterday afternoon that you

8    were the general manager of F2C2 from 2001 to 2007?

9    A.    Yes.

10   Q.    And when you transitioned from AHG to F2C2, did your

11   work on the rivet distribution system that you were doing

12   change in any way?

13   A.    No.

14   Q.    As the parent company of F2C2, what role, if any, did

15   AHG continue to play or play in the day-to-day operations of

16   F2C2?

17   A.    F2C2 is a small company.  So we didn't have men to do

18   everything which is needed to be done in the company.  And

19   AHG has all the departments inside.  So we decided that the

20   department like accountancy were being done for F2C2 by AHG.

21   Q.    When you say accountancy, do you mean accounting to

22   keep the books?

23   A.    Yes.

24   Q.    And that was done by AHG?

25   A.    Yes.

Bornes - direct

1    Q.      For F2C2?

2    A.      Yes.

3    Q.      In 2001, when you and Jean-Marc Auriol created F2C2,

4    did you put any agreements in place, any written agreements

5    about the relationship between AHG and F2C2?

6    A.      Yes.

7    Q.      If you could turn in your binder in front of you?

8    Yes.  Please turn to PTX-610.  610.

9    A.      (Witness complies.)

10   Q.      What is PTX-610?

11   A.      So this is an agreement between Jean-Marc Auriol,

12   Anthony Dal Garron, me, and F2C2 System.

13   Q.      And who signed this agreement?

14   A.      So it is signed by Jean-Marc Auriol for him and on

15   behalf of Ateliers De La Haute-Garonne, and also for me on

16   behalf of F2C2 System.

17   Q.      So you and Jean-Marc signed it on behalf of F2C2 and

18   AHG and yourself?

19   A.      Yes.

20   Q.      Okay.  And what year was it signed?

21   A.      It was in 2001.

22   Q.      What was the purpose of this agreement, PTX-610?

23   A.      It was to give an exclusive license to F2C2 to use

24   all patent which are dealing with the cassette system.

25   Q.      What was the financial arrangement agreed upon

Bornes - direct

1   between F2C2 and AHG with respect to this exclusive license?

2   A.      F2C2 was to give 15 percent on all sales to AHG.

3   Q.      15 percent?

4   A.      Yes.

5   Q.      What patents, which patents did you understand to be

6   covered by this agreement?

7   A.      All the patents worldwide, including U.S. patents.

8   Q.      Would that include the '216 and '339 patents?

9   A.      Yes, the ones we saw yesterday.

10  Q.      And under this agreement, could AHG license the rivet

11  distribution system technology --

12  A.      No.

13  Q.      Let me finish.   (Continuing): -- to anyone other than

14  F2C2?

15  A.      No.

16  Q.      Did AHG ever license the patents to anyone other than

17  F2C2?

18  A.      No.

19  Q.      If you could turn in your binder to JTX-38 and

20  JTX-38T?

21  A.      Yes.

22  Q.      Could you identify and tell us what JTX-38 and

23  JTX-38T are?

24  A.      It's also an agreement between Jean-Marc Auriol, AHG,

25  me, and F2C2 System.

Bornes - direct

1    Q.     And what year was this agreement?

2    A.     It was in 2008.

3    Q.     And what kind of agreement was it?

4    A.     It's also exclusive license to use all the patents

5    for the cassette system.

6              MR. HOROWITZ:  Your Honor, at this time I would

7    offer PTX-610, JTX-38, and JTX-38T in evidence.

8              MR. KELLEHER:  No objection.

9              THE COURT:  They are all admitted.

10             (PTX-610, JTX-38, and JTX-38T are admitted into

11   evidence.)

12   BY MR. HOROWITZ:

13   Q.     Mr. Bornes, I want to switch gears with you a little

14   bit.  Okay?

15   A.     Yes.

16   Q.     I want to talk to you about the relationship between

17   your companies, AHG and F2C2, and the defendant Broetje.

18   A.     Yes.

19   Q.     When was AHG's first contact with this company

20   Broetje?

21   A.     It was in 1991.

22   Q.     And who is Broetje?

23   A.     Broetje is a big company in Germany which is

24   manufacturing a rivet -- automatic riveting machine.

25   Q.     Automatic riveting machines?

1    A.      Yes.

2    Q.      How did this first contact between AHG and Broetje

3    come back?

4    A.      It was about to sell to British Aerospace in England.

5    It want to make new automatic riveting system, so they

6    asked Broetje to make the riveter and they want to put our

7    cassette system.

8    Q.      To use your cassette system?

9    A.      Yes.

10   Q.      With the Broetje riveting machine?

11   A.      Yes.

12   Q.      Did you personally work on this project in 1991

13   involving Broetje, AHG, and BAE?

14   A.      Yes.

15   Q.      If you could turn in your binder to PTX-107, please.

16   A.      Yes.

17   Q.      And could you identify for us what PTX-107 is?

18   A.      Yes.  It is a the letter written by Corin Warner who

19   was our representative in England to Mr. Gerhard Holtmeier

20   from Broetje.  It was in August 2001 -- 1991.  Excuse me.

21   Q.      1991.  And what is on the second page of PTX-107?

22   A.      So this is a memo sent by Mr. Corin according to AHG

23   speaking about a meeting which has been done there with

24   Broetje, BAE, and him.

25   Q.      In 1991, did you receive a copy of this letter and

Bornes - direct

1    this memo?

2    A.    Yes.

3    Q.    And how do you know that?

4    A.    Because if you look to 18, on it is written PB, that

5    is my initials.

6    Q.    That is your initials?

7    A.    Yes.

8              MR. HOROWITZ:  Your Honor, I would offer PTX-107

9    into evidence.

10             MR. KELLEHER:  No objection.

11             THE COURT:  It is admitted.

12             (PTX-107 is admitted into evidence.)

13   BY MR. HOROWITZ:

14   Q.    Turning back to the letter briefly, PTX-107.1.  Are

15   you referenced in this letter?

16   A.    Yes, it is written that I am the technical manager

17   for this project.

18   Q.    And if you turn to PTX-107.2, what was reported in

19   the first few paragraphs in this memo at that time about the

20   project you were involved in?

21   A.    So it was written that BAE Preston will be buying the

22   riveting machine from this German company.

23             Originally, Broetje were going to supply the

24   rivet feed system, but Mr. Greg Thompson at BAE said he

25   wants the AHG system.

Bornes - direct

1    Q.      Okay.  And what is recorded in the next paragraph?

2    A.      It says that:  As you can see from my letter to him,

3    I have sent details -- explaining that this is a proprietary

4    item -- and suggesting they contact you directly.

5    Q.      And Gerhard Holtmeier would like to see the system to

6    understand how it works.  Who was Gerhard Holtmeier?

7    A.      It was the general manager from Broetje.

8    Q.      The general manager?

9    A.      Yes.

10   Q.      And in the paragraph below you just read to the

11   jury, how did you or how was the system, AHG's system

12   characterized to Broetje in 1991 in this very first

13   transaction?

14   A.      It was proprietary.

15   Q.      Proprietary item?

16   A.      Yes.

17   Q.      If you could turn to PTX-358 and 358T in your binder,

18   please?

19   A.      (Witness complies.)

20   Q.      When you get there, could you identify PTX-358 and

21   358T for us, please?

22   A.      Yes.  It is the fax has been sent to Mr. Holtmeier in

23   April 1994.

24   Q.      And what is contained with the fax?

25   A.      So it's containing the agreement we have signed with

Bornes - direct

1    Broetje in 1994.

2    Q.    And did you understand this to be a contract?

3    A.    Yes.

4              MR. HOROWITZ:  Your Honor, I would offer in

5    PTX-358 and PTX-358T in evidence.

6              MR. KELLEHER:  No objection.

7              THE COURT:  They're admitted.

8              (PTX-358, PTX-358T admitted into evidence.)

9    BY MR. HOROWITZ:

10   Q.    Please turn to PTX-358T.12 and the contract in 1994

11   between AHG and Broetje.  Do you see that?

12             Let me know when you are there.

13   A.    Yes.

14   Q.    What is set forth in the second part?  It says in the

15   second part with regard to the general purpose of the

16   contract?

17   A.    Well, it says that Broetje Company makes automatic

18   riveting machines.  AHG has developed, makes and sells a

19   rivet feed tube system for automatic riveting machines,

20   which is the subject of patent protection, and which system

21   allows to feed selected rivets.

22   Q.    So how does this contract characterize AHG's rivet

23   distribution system?

24   A.    That's the subject of patent.

25   Q.    It's the subject of patent protection?

Bornes - direct

1   A.      Yes.

2   Q.      Going to the top of the next page, 358T.13, what does

3   the contract say with respect to Broetje and its general

4   provisions here?

5   A.      It says that Broetje has expressed its interest in

6   this new tube feed system and has contracted AHG with a view

7   to being allowed by the latter to sell in Germany, in an

8   exclusive manner, that new system made by AHG.

9   Q.      So it says Germany in an exclusive manner.  What did

10  you understand that to mean?

11  A.      That means that Broetje has -- only was right to sell

12  our system in Germany.

13  Q.      And who did Broetje buy the system from to sell in

14  Germany?

15  A.      Buying from us.

16  Q.      From AHG and then --

17  A.      Or F2C2.  At that time, only AHG.

18  Q.      Okay.  Did this agreement limit at all who AHG or

19  F2C2 could sell its cassette system to outside of Germany?

20  A.      No.

21  Q.      Okay.  Go down to Article 2 on the same page.  And

22  the last sentence of Article 2, what is provided with

23  respect to how Broetje is agreeing to promote the sales of

24  AHG's system?

25  A.      Yes.  Broetje agrees to promote the sales of the AHG

Bornes - direct

1    feed systems in the most loyal, serious and efficient way

2    possible.

3    Q.     So Broetje agreed to be loyal in promoting the sales

4    of AHG's cassette system?

5    A.     Yes.

6    Q.     Let's turn to Article 4 at PTX-358T.14.

7    A.     So, in fact, the dealer Broetje agrees not to sell

8    directly or indirectly feed systems with identical or

9    similar tubes to those under this contract and likely

10   to compete with them, i.e., using the tube and box

11   principle.

12   Q.     Okay.  And the box here, it uses the word "box."

13   What does that refer to?

14   A.     Box is used there for cassettes.

15   Q.     Let's just show the jury, so there's no confusion

16   here, let's look at the original French.  If you could turn

17   to Article 4, it's at PTX-358T3.  And if you could look at

18   the same provision and tell us what word is used there.

19   A.     Yes.

20   Q.     For the word "box."

21   A.     We can see there that it's written "cassette."

22   Q.     Okay.

23   A.     I can read it in French, but I don't think it's --

24   Q.     358T3.  It's T, 358T. That's okay.

25   A.     Article 4.

Bornes - direct

1    Q.      Article 4.

2                THE COURT:  358T.  Not 358.  Correct?

3                MR. HOROWITZ:  Yes.  Yes.  Only lawyers could

4    come up with this number system, but, yes.  358T.  There we

5    go.

6    BY MR. HOROWITZ:

7    Q.      And I believe this is what Mr. Bornes just testified

8    to.  I'm not going to try (indicating).  The word

9    "cassettes"; right?

10   A.      Yes.

11   Q.      All right.  Let's go back to Article 11, which is at

12   PTX-358T.16.

13               What does Article 11 of the contract

14   between AHG and Broetje provide?  And what does it say?

15   A.      The dealer agrees not to disclose to third parties

16   the confidential documents and information provided to it by

17   AHG in connection with this contract.  The secrecy clause

18   shall survive the expiration of this contract.

19   Q.      And what does the next sentence say?

20   A.      In addition, the dealer agrees not to use, directly

21   or indirectly, such documents and information after the

22   expiration of this contract.

23   Q.      And who is the dealer here agreeing not to use

24   directly or indirectly such documents and information after

25   expiration of the contract?

Bornes - direct

1    A.      This is for Broetje.

2    Q.      Last provision I want to turn your attention to,

3    Article 12, and, in particular, the second paragraph of

4    Article 12.  What is provided in that section?

5    A.      In addition, in order to guarantee the end client the

6    high quality of the technical results of the new rivet feed

7    system of AHG, Broetje agrees to impose on all clients

8    buying the AHG rivet feed system the exclusive use of the

9    boxes, that means cassettes, specially developed and

10   patented by AHG and intended for that new system.  Indeed,

11   such boxes allow to store a high number of rivets in an even

12   manner and to improve their selective distribution.

13   Q.      All right.  And to be clear, again, the word "boxes"

14   means what?

15   A.      Cassettes.

16   Q.      And is this again another reference to the fact that

17   your system was patented?

18   A.      Yes.

19   Q.      And this is in the 1994 contract?

20   A.      Yes.

21   Q.      Now, did you consider this 1994 contract to be the

22   beginning of a formal relationship with Broetje?

23   A.      Yes.

24   Q.      Let me turn you to PTX-167.  Could you identify this

25   PTX-167 for us, please?

299

Bornes - direct

1   A.     Yes.  It is mail that I received from Lutz Neugebauer

2   from Broetje in July 2003.

3   Q.     Okay.  I apologize.  PTX --that's the wrong exhibit.

4   Let's try again.  167.

5   A.     Oh, excuse me.

6   Q.     That's okay.  It happens.

7   A.     Sorry.

8   Q.     That's okay.  Take your time.  All right.  Do you

9   have PTX-167?

10  A.     Yes.

11  Q.     Okay.  Could you tell us what PTX-167 is?

12  A.     This is the fax I received from Mr. Holtmeier in

13  2000.

14  Q.     You said this was a fax you received from

15  Mr. Holtmeier.

16  A.     Yes.

17  Q.     Take a look at who it's sent to and who signed it.

18  A.     I'm sorry.  It's a fax that I have sent to

19  Mr. Holtmeier in 2000.

20  Q.     And what did you attach to this fax that you sent to

21  Mr. Holtmeier in 2000?

22  A.     I attached European patent for the system.

23  Q.     Let's?

24          MR. HOROWITZ:  Let me offer in evidence PTX-167.

25          MR. KELLEHER:  No objection.

Bornes - direct

```
 1           THE COURT:  It's admitted.

 2    (PTX-167 was admitted into evidence.)

 3    BY MR. HOROWITZ:

 4    Q.    What was your purpose in sending or faxing this

 5    letter with the European version of the patent to

 6    Mr. Holtmeier in January of 2000?

 7    A.    I just sent it to him because he requested it.

 8    Q.    He requested it?

 9    A.    Yes.

10    Q.    And, again, Mr. Holtmeier was who?

11    A.    He was the general manager for Broetje.

12    Q.    And in the first sentence, you used, you say, the

13    patent -- I will just read it:  I send you the patent we had

14    in Europe so that it will be also in German.  This is the on

15    the rifles into the tube.

16                What you did mean by the rival on the tube?

17    A.    The grooves that we followed on the tube which is on

18    our patented tube.

19    Q.    The grooves in your tube?

20    A.    Yes.

21    Q.    How does this patent that you sent to Mr. Holtmeier

22    in January of 2000 relate, if at all, to the United States

23    patents we're here talking to this jury about?

24    A.    So, in fact, this European patent is the mother

25    patent from which we can -- we have a, also worldwide
```

Bornes - direct

1    patents and the U.S. patents.

2    Q.    And I think you said the mother of the worldwide

3    patents?

4    A.    Yes.

5    Q.    Including the U.S. patents?

6    A.    Yes.

7    Q.    If you turn quickly just to show the jury what we're

8    talking about.  If we could put up PTX-167.10 in this

9    document 167.10.  And while that's being pulled up, if you

10   could just take a look, what is shown in PTX-167.10, the

11   European version of the patent?

12   A.    So we can see the tube with the groove inside, which

13   is named 2B.  The tube is filled with rivets and you have

14   the two proper means, both sides of the tube.

15   Q.    Okay.  And let's bring up JTX-1.2, which is already

16   in evidence, which is the U.S. patent.  And how do these

17   compare?

18   A.    It's the same figures.

19   Q.    The same figures?

20   A.    Yes.

21   Q.    Once you entered into this formal relationship or

22   this contract with Broetje in 1994, how long did this

23   relationship last?

24   A.    It lasted from 1994 to, up to 2005.

25   Q.    And during the course of that, about eleven-year

Bornes - direct

1    relationship, did Broetje request technical information

2    regarding your system?

3    A.    Yes.  A lot of times.

4    Q.    Okay.  A lot of times?

5    A.    Yes.

6    Q.    Okay.  What kind of information did Broetje request

7    all the time?

8    A.    They requested all they need to make sure the system

9    is working and including drawings, schematics, everything

10   they need to know exactly what was our system.

11   Q.    Now, you said drawings and schematics and

12   technological type of information?

13   A.    Yes.

14   Q.    Did AHG consider this type of information to be

15   proprietary?

16   A.    Yes.

17   Q.    Did you provide it to Broetje even though you

18   considered it to be proprietary?

19   A.    Yes.

20   Q.    Why did you give it to Broetje if it was proprietary

21   to AHG?

22   A.    It was in our agreement in 1994.  I was protected

23   from that.

24   Q.    You thought you were protected?

25   A.    Yes.

Bornes - direct

1    Q.    Please turn to PTX-118.  Give the jury just a brief

2    example.  When you get to PTX-118, if you could tell us what

3    this is.

4    A.    Yes.  This is a -- it was a fax from Broetje, some

5    technical information.  It was done in 1994.

6    Q.    October of 1994?

7    A.    Yes.

8    Q.    Yes?

9    A.    Yes.

10          MR. HOROWITZ:  Your Honor, I would offer in

11   evidence PTX-118.

12          MR. KELLEHER:  No objection.

13          THE COURT:  It's admitted.

14          (PTX-118 was admitted into evidence.)

15   BY MR. HOROWITZ:

16   Q.    And in this letter, what is it that you received

17   from Broetje?  What is it that they are requesting from

18   you?

19   A.    Okay.  Regarding to your loading station, we want to

20   please you to give us more detailed information (drawings,

21   photos, and so on) during your stay in Wiefelstede on

22   October 19th, 1994.

23   Q.    And did you provide that kind of information when you

24   went to Broetje?

25   A.    Yes.

Bornes - direct

1   Q.      And is this just but one example?

2   A.      Yes.

3   Q.      Did there come a time when you noticed a change in

4   your relationship with Broetje?

5   A.      Yes.

6   Q.      When did you notice that change?

7   A.      That was in 19 -- in 2002.

8   Q.      Let's take a look at JTX-66 in your binder.  What is

9   JTX-66?

10  A.      This is the e-mail I received from Mr. Maylander from

11  Broetje in 2002.

12  Q.      Did you say e-mail you received?

13  A.      Yes.

14  Q.      In June of 2002?

15  A.      Yes.

16  Q.      Who is Mr. Maylander?

17  A.      Mr. Maylander is the director of marketing, in that

18  time was director of marketing inside for Broetje.

19  Q.      For Broetje?

20  A.      Yes.

21  Q.      An e-mail from Broetje to you?

22  A.      Yes.

23              MR. HOROWITZ:  Your Honor, I would offer into

24  evidence JTX-66.

25              MR. KELLEHER:  No objection.

Bornes - direct

1              THE COURT:  It's admitted.

2    (JTX-66 was admitted into evidence.)

3    BY MR. HOROWITZ:

4    Q.     What is the subject of the e-mail?

5    A.     It was about a meeting we were having the week

6    before.

7    Q.     The first sentence in this e-mail from Mr. Maylander,

8    he writes to you --

9    A.     Yes.

10   Q.     -- Dear Mr. Bornes, I have informed Mr. Holtmeier --

11   again, is that the CEO of Broetje?

12   A.     Yes.

13   Q.     About your activities with Gemcore.

14                   Do you see that?

15   A.     Yes.

16   Q.     What is that referring to?

17   A.     The fact that we are selling our cassette system to

18   Gemcore.

19   Q.     Who is Gemcore?

20   A.     Gemcore is an American company and they are making

21   also automatic rivets.

22   Q.     According to Mr. Maylander, in the next few sentences

23   here when he wrote this e-mail to you in June of 2002, what

24   was the CEO of Broetje's reaction, Mr. Holtmeier's reaction,

25   to the fact you were doing business with Gemcore?

Bornes - direct

1    A.     He is extremely disappointed and unhappy about your

2    behavior especially because our both companies have

3    developed an ARS with a lot of cost on both sides.

4              Now we are dealing with our main competitor,

5    Gemcore, and with this deal Gemcore gets all the experience

6    we have paid for.

7    Q.     How does Mr. Maylander characterize Gemcore in this

8    e-mail?

9    A.     Said it was their main competitor.

10   Q.     Main competitor?

11   A.     Yes.

12   Q.     Let's read the next sentence.  He says, even taking

13   the special discount for us respectively, the higher cost

14   for Gemcore into consideration, he is upset.

15   A.     Yes.

16   Q.     Mr. Holtmeier is disappointed, unhappy, upset you're

17   dealing with the main competitor.  Is that what you were

18   told?

19   A.     Yes.

20   Q.     Does this e-mail mention fault reports or technical

21   problems with your system?

22   A.     Not at all.

23   Q.     Now, the e-mail says, both companies had developed an

24   ARS, a system, a rivet system; right?  Your system?

25   A.     Yes.

Bornes - direct

1    Q.      With a lot of cost on both sides.

2            Do you see that?

3    A.      Yes.

4    Q.      What was Broetje's role in the arrangement with AHG

5    in its system?  What was the role?  Tell us.  What did they

6    do?

7    A.      They're to buy systems from us in Germany and then

8    install our system in, on their, their own machine.

9    Q.      Did they provide technical input into your machine?

10   A.      No.

11   Q.      Did they provide financial input into your machine?

12   A.      No.

13   Q.      Okay.  Who developed and maintained and put their

14   money into this machine?

15   A.      We did.

16   Q.      We, being AHG?

17   A.      And F2C2.

18   Q.      Were there occasions when Broetje would provide you

19   with complaints from customers?

20   A.      Yes.  We know they are requesting our system, direct

21   contact with consumers, so when there is improvement to do,

22   they tell us there's a need for that to be done.

23   Q.      Is that the same thing as putting financial or

24   technical information into your machine by Broetje?

25   A.      I don't think it's the same.

Bornes - direct

1    Q.      Now, had you always done business with other

2    companies around the world besides Broetje?

3    A.      Yes.

4    Q.      Even before this e-mail?

5    A.      Yes.

6    Q.      How would you characterize the relationship between

7    AHG and Broetje after you got this e-mail?

8    A.      It changed a lot.  It was less friendly.  I received

9    a full report and also angry letters and so on.  So they

10   wound up giving us that.

11   Q.      Let's turn to PTX-657.  What is PTX-657?

12   A.      This is an e-mail I received from Mr. Neugebauer in

13   2003.

14   Q.      And who was Mr. Neugebauer working for when he sent

15   you this e-mail?

16   A.      He was project manager for Broetje.

17          MR. HOROWITZ:  Your Honor, I would offer in

18   evidence, PTX-657.

19          MR. KELLEHER:  No objection.

20          THE COURT:  It's admitted.

21          (PTX-657 is admitted into evidence.)

22   BY MR. HOROWITZ:

23   Q.      And what was Mr. Neugebauer's role at Broetje?

24   A.      He is the project manager.

25   Q.      Now, in this e-mail to you, what is the date of this

Bornes - direct

1    e-mail?

2    A.      It's 2003, in July.

3    Q.      July of 2003.  In this July 2003 e-mail to you, what

4    does Mr. Neugebauer say with respect to Gemcor and your

5    relationship with Gemcor?

6    A.      So he says:  Just between you and me, the company is

7    very, very deeply "unsatisfied" concerning to the situation

8    with Gemcor.  There are several discussions in-house, and

9    also with our mother company how to react on that obstacle.

10   The situation is in that way, that nobody accepts that you

11   are quoting together with Gemcor against us in new projects.

12   (We understand that in retrofit and also only there where we

13   are not quoting.)  It seems to be that there is a

14   possibility that we will quit the relationship with you.

15   You should really think about a possible solution.  (It's my

16   opinion.)

17   Q.      Mr. Neugebauer's e-mail references the mother company

18   of Broetje.  Who is that?

19   A.      That is CLAAS.

20   Q.      And who is CLAAS?

21   A.      CLAAS is a German company.

22   Q.      And he told you in this e-mail that there is a

23   possibility that Broetje is going to quit the relationship

24   with you because you are doing business with Gemcor; is that

25   right?

Bornes - direct

1    A.    Yes.

2    Q.    Again, does this e-mail, at the time, at the time in

3    July of 2003, mention fault reports?

4    A.    No.

5    Q.    Does it mention technical problems?

6    A.    No.

7    Q.    Does it suggest you should try and find a solution

8    that so that they can continue to do business?

9    A.    No.

10   Q.    Let me ask it this way.  What is the reason given

11   here that Gemcor is thinking about not doing business -- I'm

12   sorry -- that Broetje is thinking about not doing business

13   anymore?

14   A.    It's because I was doing business with Gemcor.

15   Q.    Now, let's talk about these fault reports and

16   technical issues for a moment.  Over your 11 year

17   relationship with Broetje, how many cassettes did you sell

18   to them?

19   A.    Thousands.

20   Q.    Did any of those thousands of cassettes ever have

21   technical problems?

22   A.    Yes.  Sometimes, yes.

23   Q.    What was the process with Broetje when they would buy

24   a system from you to resell to one of its customers?

25   Explain to the jury how that worked.

Bornes - direct

1    A.      Well, in fact, they were building the machine.  We

2    send our system.  We first make the system.  We make the

3    cassette on it, and then we send it to Broetje.  Then there

4    the machine was installed on their own riveter.  All the

5    test verify that everything was working well.  Then they

6    disassemble the system, they send it to the final customer,

7    and then they reinstall it.  That work for months, even a

8    year.

9    Q.    And in that process, when, and under what

10   circumstances, did technical problems with your cassettes

11   usually arise?

12   A.    It arrives usually just at the beginning when we make

13   the first test, and we, we solve them, and it works.

14   Q.      Okay.  And are you talking about when you first

15   install them at Broetje or when Broetje disassembles it and

16   sends it to the customer or both?

17   A.      Excuse me.  (Witness and translator confer.)

18              Yes.  In fact, it could be both, you know,

19   because in between each of this iteration, there has been

20   some transportation and during some transportation and fine

21   tuning, it could be this, I would say, needed to be done

22   again.

23   Q.    So when the cassettes are in the system when first

24   installed is usually when this arose?

25   A.      Yes.

Bornes - direct

1   Q.      What would AHG and then F2C2 do when it received a

2   fault report or a report of a technical problem?

3   A.      We try to solve it as quick as possible, solve the

4   problem.

5   Q.      Did your agreement allow Broetje to make cassettes

6   and sell them in place of yours if there were technical

7   problems with your cassettes?

8   A.      Not at all.

9   Q.      Did Broetje ever come to you and tell you that they

10  were developing their own cassettes because of extensive

11  fault reports?

12  A.      No.

13  Q.      Did any of your other customers stop doing business

14  with you because of extensive technical problems?

15  A.      No.

16  Q.      Now, did there come a time when you became aware that

17  Broetje had begun selling its own cassettes?

18  A.      Yes.

19  Q.      When did you first learn this?

20  A.      It was in 2005, in Germany.

21  Q.      And how did you become aware in 2005 in Germany?

22  A.      Because I had been in the plants in Germany where I

23  have to work on one of our system and I saw these cassettes.

24  Q.      And you saw whose cassettes?

25  A.      Broetje cassettes.  They were plugged in our rack and

Bornes - direct

1    loading station.

2    Q.      So to be clear, you saw Broetje's racks in AHG's

3    loading stations?

4    A.      Broetje cassettes, yes.

5    Q.      I'm sorry.  Broetje cassettes in AHG's loading

6    stations?

7    A.      Yes.

8    Q.      And Broetje's cassettes in AHG's racks?

9    A.      Yes.

10   Q.      And this was in 2005 in Germany?

11   A.      Yes.

12   Q.      Prior to seeing this in 2005 in Germany, were you

13   aware that they were making their own cassettes?

14   A.      No.

15   Q.      Again, had Broetje ever told you that they were doing

16   this?

17   A.      No.

18   Q.      Now, did you and AHG consult with lawyers when you

19   found out that this was happening?

20   A.      Excuse me.  (Translator and witness confer.)

21           Yes.

22   Q.      Okay.

23   A.      Yes.

24   Q.      Lawyers in France?

25   A.      Yes.

Bornes - direct

1   Q.     Let's turn to PTX-547.

2   A.     (Witness complies.)

3   Q.     What is PTX-547?

4   A.     It is the letter from our lawyer about this case.

5   Q.     And were you involved in working with the lawyers on

6   that case?

7   A.     Yes.

8   Q.     Okay.

9          MR. HOROWITZ:  Your Honor, I would offer --

10  BY MR. HOROWITZ:

11  Q.     What's the date of the letter?  I'm sorry.

12  A.     Yes, it's April 2005.

13  Q.     Okay.  Is it sent from yours lawyers to Broetje?

14  A.     Yes.

15         MR. HOROWITZ:  Your Honor, I would offer in

16  PTX-547.

17         MR. KELLEHER:  I have no objection subject to

18  the earlier discussion.

19         THE COURT:  It is admitted.

20         (PTX-547 is admitted into evidence.)

21  BY MR. HOROWITZ:

22  Q.     Please turn to PTX-547.8.

23  A.     (Witness complies.)

24  Q.     What does the letter from AHG's lawyers to Broetje

25  tell Broetje with respect to providing them formal notice of

Bornes - direct

1  infringement?

2  A.    This letter also serves as a formal notice to cease

3  all acts of infringement or unfair competition in this

4  regard, as my client hereinafter reserves the right to the

5  claims that it might bring before the courts.

6  Q.    Thank you.  Did you find out even after this letter

7  that Broetje was selling its cassettes anywhere else in the

8  world other than Germany?

9  A.    Yes, they did it in France.

10  Q.    And what year did you find out in France?

11  A.    In 2006.

12  Q.    Again, when the cassettes were seen in France in

13  2006, whose racks and loading stations were their cassettes

14  being used with?

15  A.    In that time, I think it was also in AHG loading

16  station.

17  Q.    When you found out about the cassettes in Germany in

18  2005, and the cassettes in France in 2006, did you try and

19  discover whether this was also happening here in the United

20  States?

21  A.    No, because it's not possible.

22  Q.    Why was it impossible to do that?

23  A.    Because I'm from a small French company and the only

24  way to see their cassettes in the states is to be in plant

25  where they are, and it is I cannot come there in the

Bornes - direct

1    manufacturers and say I just want to visit your plant to see

2    something like that.  So the only way to be inside is to be

3    invited by this company, and you are always escorted when

4    you are there, so you can't go anywhere.  It's the only way

5    for us to really know if they are using cassettes in the

6    states.

7    Q.    It really wasn't possible?

8    A.    Yes.

9    Q.    Have you personally seen Broetje's cassettes?

10   A.    Yes.

11   Q.    And when you saw Broetje's cassettes, how did they

12   compare to AHG's cassettes when you were looking at them?

13   A.    It's looking the same.

14   Q.    Have you seen the tubes that Broetje uses inside its

15   cassettes?

16   A.    Yes.

17   Q.    What shape of the tube are they using?

18   A.    The internal pentagonal shape.

19   Q.    The pentagon shape?

20   A.    Yes.

21   Q.    And with respect to the outer appearance of Broetje's

22   cassettes, you said they look the same.  What features in

23   particular made them look the same to you?

24   A.    They are the same cover.  They have the same aluminum

25   casing.  They have the same white end.  They have the same

Bornes - direct

1    inlet and outlet.  It's really looks like the same.

2    Q.      When you developed your cassettes with the look that

3    you just described for the jury, were you focused on the

4    appearance of the cassette?

5    A.      Yes, sure.

6    Q.      What design features or what look did you

7    specifically choose for your cassette?

8    A.      So for the cassette, we wanted them to have a look

9    like a briefcase with the handle because they are needed.

10   They are used to transport the rivet from the loading

11   station to the racks, so we needed to carry them, in order

12   to have this type of flow.

13            And when we use this type of aluminum metal and

14   black handle and plastic is complete system.  The rack are

15   the same.  The loading station are the same.

16   Q.      Okay.  So you used it not only on the cassettes but

17   also the racks and station, so the AHG system?

18   A.      Yes.  In that time, all people making this type of

19   system were using the system with the machines, so it was

20   different than the other.  It was like one to us.

21   Q.      Did you choose these features that you just described

22   for us on the cassette in particular?  Did you choose them

23   for functional purposes only?

24   A.      No.

25   Q.      Did some of them have functional purposes?

Bornes - direct

1    A.      Yes, sure.

2    Q.      Did you choose them for their functional purposes or

3    for some other reason?

4    A.      We choose them for the look first because we could

5    not have any kind of other color or anything.  The function

6    is just if you think about the handle, the function of the

7    handle is the handle.  But the color, the shape, the

8    dimension, where you place it is the function.

9    Q.      Whose name appeared -- are you okay?

10   A.      Yeah.  Yeah.

11   Q.      Whose name appeared on your cassettes?

12   A.      In the cassette, there were name AHG, and then F2C2

13   and AHG.

14   Q.      Where did AHG and F2C2 advertise its cassettes?

15   A.      We advertise them in the trade show like Paris air

16   show.  Also in show like Aerofast from SAE in states.  Also

17   when we visit our customers.

18   Q.      And we went through this a bit yesterday.  The jury

19   saw some of those flyers you would use at trade shows?

20   A.      Yes.

21   Q.      Was it all around the world that you would advertise

22   your cassettes?

23   A.      Yes.

24   Q.      With this appearance that you described?

25   A.      Yes.

Bornes - direct

1    Q.    When did you come up with this design for your

2    cassette?

3    A.    Early 90s.

4    Q.    And in the first years you sold your cassettes in the

5    early 1990s, did it have the all aluminum sides or the metal

6    box look that has been, or the metal box that has been

7    referred to here?

8              MR. KELLEHER:  Objection, Your Honor.  Leading.

9              THE COURT:  Overruled.  He can answer.

10             THE WITNESS:  Excuse me?

11             THE COURT:  You can answer the question.

12             THE WITNESS:  Can you repeat?

13   BY MR. HOROWITZ:

14   Q.    When you first sold your cassettes in the early

15   1990s, and you described for us its appearance, when you

16   first sold it, did it have the aluminum on all the sides?

17   A.    Yes.

18             MR. KELLEHER:  Objection, Your Honor.  Motion in

19   limine.

20             THE COURT:  I'll see you at sidebar.

21             (Sidebar conference held.)

22             THE COURT:  First, just for the record, on the

23   leading, yes, strictly speaking there has been a lot of

24   leading but with the language problems, I thin, it's kind of

25   necessary so the jury can actually get what he is saying.

Bornes - direct

1                    MR. KELLEHER:  That's why I have not objected.

2                    THE COURT:  And I appreciate that.  So that was

3      my thinking.  But what is the motion in limine?

4                    MR. KELLEHER:  We had a motion in limine, Your

5      Honor, concerning the geographical limits of trademark and

6      trade dress law where the sale was not in the U.S.

7                    MR. CAHR:  And you cannot establish trade dress

8      rights based on the appearance that you used in the other

9      country, only the appearance you made in commerce in the

10     United States.  And there is no allegation in this case that

11     they made those sales in the early '90s in the United States

12     with the metal box.

13                   MR. LINDVALL:  Your Honor.

14                   MR. HOROWITZ:  Mr. Lindvall wants to respond.

15                   MR. LINDVALL:  Your Honor, in the MIL they

16     precluded us from using any instances of actual confusion

17     outside the United States.  That was the MIL.  And you

18     granted their motion and said we cannot refer to any

19     instances of actual confusion outside the United States.

20     Because we did have confusion in Ireland since.  We want to

21     get that into evidence and move on.  You granted that.  That

22     was the limit of the MIL.

23                   THE COURT:  What you are doing is just

24     establishing where it was sold, what it looked like?

25                   MR. HOROWITZ:  Yes.

Bornes - direct

1        THE COURT:  You are not getting into confusion?

2        MR. HOROWITZ:  No, I'm not.  Also, that was

3    also a few questions ago.  Now I'm establishing -- I keep

4    forgetting my question.  It was objected to but it's not

5    that issue at all.

6        Oh, it's the cassette came out in the '90s with

7    the aluminum sides when they first started selling it.

8        MR. CAHR:  But that only goes to secondary

9    meaning, and secondary meaning is only relevant as to when

10   it was, how it was sold in the U.S., and so the look of any

11   cassettes sold outside the United States is irrelevant to

12   secondary meaning.

13       THE COURT:  I think they are telling the story

14   and the chronology including the parties' relationship, the

15   development of the product.

16       MR. CAHR:  Okay.

17       THE COURT:  Do you disagree with that?

18       MR. CAHR:  I do, but ...

19       THE COURT:  Okay.

20       MR. CAHR:  I can tell you ruled.

21       THE COURT:  Is there anything you want to add?

22       MR. KELLEHER:  I'll leave it at that, Your

23   Honor.

24       THE COURT:  Okay.  Then I'm overruling the

25   objection.  You can continue.

Bornes - direct

1          (Sidebar conference ends.)

2          THE COURT:  You can continue.

3    BY MR. HOROWITZ:

4    Q.     Mr. Bornes, the first years you sold your cassettes

5    in the early 1990s, did it have all the all aluminum sides

6    that you described?

7    A.     Yes.  The first one, yes.

8    Q.     Did there come a time later in the '90s when you

9    switched to these plastic sides?

10   A.     Yes.

11   Q.     In switching to the plastic a few years later, how

12   did you think that would affect the overall look of the

13   cassettes?

14   A.     The same.

15   Q.     And did there come a time when you went back to the

16   aluminum sides?

17   A.     Yes.

18   Q.     Why did you go back to the aluminum sides?

19   A.     Because in fact it was the use of the cassette, we

20   have first have some problem of cracks on the plastic where

21   the handle was.  Because when you slide in and out the

22   cassette on the rack, it was hard.  You know, you can have

23   cracks.

24   Q.     Keep the microphone in front of you so they can hear.

25   A.     Excuse me.

Bornes - direct

1    Q.      I know it's tough.

2    A.      I have a problem.

3            THE COURT:  The microphone moves as well.

4    BY MR. HOROWITZ:

5    Q.      Yes.  There you go.

6    A.      Because when you slide the cassette in and out of the

7    racks, you have pressure on the handle of the cassette and

8    it cause some cracks on it.  So when we first use them, the

9    way to solve it was with bigger washer on aluminum plate,

10   but then you come back to the complete aluminum casing.

11           And also we have experience some squash on the

12   plastic on the side when you slide it in and out, so you

13   know it has no need to keep the plastic on this case and it

14   was cheaper to make it with the aluminum casing.

15   Q.      So you went back to the aluminum?

16   A.      Yes.

17   Q.      Before switching back to the aluminum, what

18   communications, if any, did you have at Broetje about your

19   plans to do so?

20   A.      So when we have these cracks at the beginning, we

21   took some I would say feedback from Broetje from the

22   customers, so we have talk with them about that, and we said

23   that we, it was possible solution to go back to complete

24   casing aluminum, but, in fact, first of all, we begin to try

25   to find a solution without to do that.

Bornes - direct

1   Q.      When you had these conversations with Broetje about

2   that possibility of going back to the aluminum sides, what

3   year was that?

4   A.      It was prior to 2003.

5              MR. HOROWITZ:  Your Honor, may I approach?

6              THE COURT:  You may.

7              MR. HOROWITZ:  Actually, Your Honor, what would

8   be best here is if the witness could step down into the well

9   and use the physical exhibits.

10             THE COURT:  He may do so.

11             And, Mr. Kelleher, if you need to move around in

12  order to be able to see, that's fine.

13             MR. HOROWITZ:  Your Honor, may I move this table

14  into the well?

15             THE COURT:  Yes.

16  BY MR. HOROWITZ:

17  Q.      Let me first show you Mr. Bornes JTX-64A and ask if

18  you could identify that cassette for us?

19  A.      This is a --

20             THE COURT:  And try to keep your voice up so we

21  can all hear you.

22             THE WITNESS:  Yes, excuse me.  Sorry.

23  BY MR. HOROWITZ:

24  Q.      You can use the table if you need to.  That's why

25  it's here.

Bornes - direct

1    A.      That is an AHG cassette.

2    Q.      And let me show you JTX-3 and ask you to identify

3    that for us, please.

4    A.      This is the Broetje cassette.

5    Q.      And one more.  Let me show you DTX-1223A and ask you

6    to identify that, please.

7    A.      This is also an AHG cassette.  The one with the

8    plastic around the sides.

9              MR. HOROWITZ:  And, Your Honor, I would move

10   into evidence JTX-3 -- well, offer to move into evidence,

11   JTX-3, JTX-64A and DTX-1223A.

12             MR. KELLEHER:  No objection.

13             THE COURT:  Those are all admitted.

14             (JTX-3, JTX-64A, DTX-1223A admitted into evidence.)

15   BY MR. HOROWITZ:

16   Q.      Now, Mr. Bornes, can you show us with JTX-3, the

17   Broetje cassette, and JTX-64A, the AHG cassette with the

18   metal sides, when you were talking about the features that

19   you said were the same when you first saw the Broetje

20   cassette, can you point those out for the jury?

21   A.      Yes.  So you can see on the top, the same plastic.

22   You have the aluminum cases.  You can see the under is the

23   same.  If you look to the inlet and outlet, they are the

24   same plastic and same black metal.  And if you put them into

25   an AHG rack, it will be working both of them.

Bornes - direct

1   Q.      Mr. Bornes, why don't you put down the AHG cassette,

2   64A, the aluminum one, and pick up the plastic one and show

3   us, in terms of the features that you were referencing when

4   you said it was the same, why you thought that and try to

5   explain it?

6               THE COURT:  Mr. Bornes, do your best to speak

7   up, please, so we can hear you.

8               THE WITNESS:  Yes.  Excuse me.

9   BY THE WITNESS:

10  A.      So you can see they are similar.

11  Q.      And what features in particular?  Can you point those

12  out to the jury?

13  A.      They're the same, the same handle, black handle.  You

14  have also aluminum casing.  You have the same inlet and

15  outlet.  So for me, it look like the same.

16  Q.      Mr. Bornes, you can put down all the cassettes but

17  the Broetje one.  Keep the Broetje one, if you would please.

18  I want to ask you now, is there something called a

19  microactuator on this cassette?

20  A.      Yes.

21  Q.      Can you point it out to the jury?

22  A.      It's a system which is just inside there.

23  Q.      Okay.  Now is the microactuator in a different place

24  on your two cassettes?

25  A.      Yes.

Bornes - direct

1    Q.      Okay.

2    A.      In our cassette system is here, outside the cassette.

3    Q.      In 2003 -- are you with me?

4    A.      Yes.

5    Q.      What, if anything, was sent to Broetje with respect

6    to microactuators inside the cassette?

7    A.      Yes.  In fact, in 2003, Broetje ask us to work on a

8    cassette which make sure that it was not possible to send

9    two rivets at the same time.  On the other cassette, we have

10   some microactuator where with very big blow, we can put two

11   rivets going out.  So they ask us to work on one system.  So

12   we develop a system with microactuator like on this

13   cassette.  We sent them 10 cassettes and also drawings and

14   all documents to understand the way it works.

15   Q.      Ten cassettes in 2003 with the microactuator inside

16   the cassettes and the technical drawings?

17   A.      Excuse me?

18   Q.      And the technical drawings?

19   A.      Yes.

20   Q.      If you could pick up the plastic cassette.  I'm

21   trying to create record here.  It's easier said than that

22   done.  DTX-1223A, and then look at the bottom of it.

23           If you could put it on the table in front of the

24   jury, so you can pick up the next Komaki September.

25           JTX-3, the Broetje cassette, yes.  And show the

Bornes - direct

1    jury the bottom.  Is there a white plastic piece on the

2    bottom?

3    A.      Yes, here and there.

4    Q.      What does that do?

5    A.      In fact, this has no functional reason.  It's because

6    before using this small label, we were using only the minute

7    system, and this system was bigger than this one.  So they

8    go inside the cassette because it was tubing.  So this is

9    only needed to, I would say, to cover the hole which was

10   done before.

11   Q.      It was just plastic filler to cover the hole?

12   A.      Yes.

13   Q.      And the fact that that appeared in Broetje's

14   cassettes, what does that tell you about its relationship to

15   your cassette?

16   A.      That means they copy our cassette because there is no

17   need for that.  Then when we redesign after having put all

18   our stuff on this type of aluminum box, we just make this.

19   Because there is no need for this big plastic.  This is only

20   spacer to have the right position here.

21   Q.      So when you redesigned your cassette because you no

22   longer had the boxes that had the plastic piece on the

23   bottom, it was changed?

24   A.      Yes.

25                   MR. HOROWITZ:  Stand there for a second.  We're

Bornes - direct

1    done with those cassettes.

2              If he may, Your Honor, I have two more cassettes

3    to show them.

4              THE COURT:  Two more?

5              MR. HOROWITZ:  Yes.

6              THE COURT:  Are you able to hear this,

7    Mr. Kelleher?

8              MR. KELLEHER:  Pretty much, Your Honor.

9              THE COURT:  All right.  You can continue.

10   BY MR. HOROWITZ:

11   Q.    All right.  I'm going to try to do this at once to

12   move this along.  One of these is PTX-569.  Let me hand you

13   PTX-569.  Well, we'll do them one at a time.  Can you tell

14   the jury what that is, PTX-569?

15   A.    This is a cassette done by Hawk system.

16   Q.    Who is Hawk?

17   A.    Hawk is a rivet manufacturer in the United States.

18              MR. HOROWITZ:  Okay.  Your Honor, I would offer

19   PTX-569 in evidence.

20              MR. KELLEHER:  No objection.

21              THE COURT:  It's admitted.

22              (PTX-569 is admitted into evidence.)

23   BY MR. HOROWITZ:

24   Q.    Just describe for the jury what the Hawk cassette is,

25   what you are holding there.

Bornes - direct

1    A.      So, in fact, it's made with two rude parts, with a

2    spacer; and there, there is a rolled tube inside.

3    Q.      Could this kind of cassette, the Hawk cassette, ever

4    be used with an AHG loading station or rack?

5    A.      No, it is not possible.

6    Q.      Let's put that down.

7    A.      (Witness complies.)

8    Q.      And here is PTX-570.  If you could tell us what

9    PTX-570 is?

10   A.      It's also a cassette made by ElectroImpact.

11   Q.      And who is ElectroImpact?

12   A.      It is an American riveting system, machine

13   manufacturer.

14   Q.      And could that ElectroImpact cassette ever be used

15   with AHG racks?

16   A.      No.  And, in fact, while our cassette is used like

17   they are here, this one where you vertically use it.

18   Q.      So whose cassette was ElectroImpact using when you

19   left F2C2?

20   A.      Yeah.

21   Q.      Whose were they using?

22   A.      Whose?

23   Q.      Whose cassette.

24   A.      ElectroImpact were using their own cassette system.

25   Q.      Did there come a time when they switched?

Bornes - direct

1   A.      Yes.

2   Q.      Who did they switch to?

3   A.      They switch to AHG system.

4   Q.      The last thing I want before you sit down.  You can

5   put that down.

6   A.      (Witness complies.)

7   Q.      If you could show the jury what the cassettes, when

8   they're stacked in racks, would look like when you are

9   walking through a factory floor?

10  A.      Just like that (indicating).

11  Q.      So if you are walking through a factory floor, you

12  stack them one on top of the other.  You have stacked JTX-3,

13  JTX-64A and DTX-1223A on top of each other with the handles

14  facing the jury.  Is that the view that you would have if

15  you are walking through the factory with racks?

16  A.      Yes.

17  Q.      Or in loading stations?

18  A.      Yes.

19  Q.      Mr. Bornes, we're done with the demonstration.  If

20  you could return to your seat?  Thank you.

21  A.      (Witness complies.)

22  Q.      Mr. Bornes, do you know of any other successful

23  cassette-based system that is being used besides AHG, F2C2

24  System or Broetje System?

25  A.      That's working now or?

Bornes - cross

1    Q.      Yes, that work.  That are successful.

2    A.      No, except Broetje.

3    Q.      Okay.  So AHG and Broetje?

4    A.      Yes.

5    Q.      When Broetje began selling its own cassettes, did it

6    have any impact on your business?

7    A.      Yes, we lost a lot of sale because they were our main

8    customer.  So because of that, AHG -- F2C2 System lost a big

9    amount of money.  And that I was not able to give this money

10   on to company, I lost my shares and my job.

11   Q.      You lost your shares and your job?

12   A.      Yes.

13           MR. HOROWITZ:  No further questions at this

14   time, Your Honor.

15           THE COURT:  Okay.  Thank you.  We'll have

16   cross-examination.

17           MR. KELLEHER:  Your Honor, could I approach?

18           THE COURT:  You may.  Yes.

19           MR. KELLEHER:  Your Honor, could I hand a

20   witness binder to the witness?

21           THE COURT:  Yes, you may do so.

22                   CROSS-EXAMINATION

23   BY MR. KELLEHER:

24   Q.      Mr. Bornes, customers do not choose, make their

25   decision to buy cassettes like this when they're sitting

Bornes - cross

 1    stacked in aircraft manufacturing facility, do they?

 2    A.    Can you just -- I'm sorry.  I'm not used to your

 3    voice.

 4    Q.    Yes.  A customer like Boeing --

 5    A.    Yes.

 6    Q.    -- does not make the decision to purchase cassettes

 7    like this when they are sitting on a factory floor stacked

 8    like this?

 9    A.    Yes.

10    Q.    You say that you have known since at least 2005 that

11    Broetje has been selling their own cassettes; correct?

12    A.    Yes.

13    Q.    And that is because you discovered them at an Airbus

14    facility in Nordenham, Germany?

15    A.    Yes.

16    Q.    And the reason you noticed they were Broetje

17    cassettes is because it says Broetje right here on the

18    front?

19    A.    In fact, it was look like that.  I need a lot of time

20    to realize that they were Broetje cassettes on this machine.

21    Q.    It took --

22    A.    And then also when I approach, I see that label.

23    Sure.

24    Q.    You saw the label?

25    A.    Yes.

Bornes - cross

1   Q.      And why did you bother approaching if you hadn't seen

2   the label yet?  Did they look different?

3   A.      Not that much, but I have to look to see, yes, what

4   we are looking.

5   Q.      So what aroused your curiosity?  The fact that it was

6   metal instead of plastic?

7   A.      I don't remember exactly.

8   Q.      There were no metal F2C2 cassettes at Nordenham at

9   that time, were there; is that correct?

10  A.      Yes.  No, it wasn't.

11  Q.      Do you remember a Broetje project in Dallas, Texas in

12  2004 for the company called Vought, sometimes called

13  Triumph?

14  A.      Yes.

15  Q.      And do you remember, that was Project 1588 and 1589?

16  A.      I think so.  I cannot tell you that right now.

17  Q.      And for that project, my client, Broetje, ordered a

18  number of racks from F2C2?

19  A.      Yes.

20  Q.      And they also ordered a number of loading stations;

21  is that correct?

22  A.      Yes.

23  Q.      And they did not order any cassettes?

24  A.      They ordered cassettes.  2,000 cassettes.

25  Q.      I'm sorry.  For that project --

Bornes - cross

1    A.    Yes.

2    Q.    -- they did not order any cassettes?

3    A.    They actually ordered 200 cassettes and then they

4    canceled the order.

5    Q.    And when did they cancel the order?

6    A.    I don't remember.

7    Q.    And they never renewed the order?

8    A.    Excuse me?

9    Q.    They never renewed the order?

10   A.    No.  No.

11   Q.    And you asked several times of Mr. Neugebauer when

12   the order was going to be renewed; is that correct?

13   A.    Yes.

14   Q.    And it never was?

15   A.    Yes.

16   Q.    But you delivered the racks?

17   A.    Yes.

18   Q.    And you delivered the loading stations?

19   A.    Yes.

20   Q.    And so you knew that Broetje had a machine for its

21   customer in Dallas, Texas in 2004 that had racks and loading

22   stations, but no F2C2 cassettes?

23   A.    Yes.

24   Q.    And didn't you find that suspicious?

25   A.    You know, I just want -- I was working with Broetje

Bornes - cross

1    for a lot of time, so I was -- I told them and, in fact, I

2    have already seen some project where some manufacturer buy

3    new machines and never use it.  So I don't know if something

4    changed.  They did not want to buy the cassettes if they

5    know they don't want to use the machine, and Broetje never

6    said to me that they didn't -- why did it cancel this order

7    of cassettes?  So how could I know it?

8    Q.    Mr. Bornes, in the witness binder that my opponent

9    used with you, could you turn to PTX-547.

10   A.    Yours?  It's yours?

11   Q.    I'm sorry.  My friend here.  The other binder.

12   A.    Okay.  What number?

13   Q.    547.

14              MR. KELLEHER:  Your Honor, this has been

15   admitted.  Could I put it on the screen?

16              THE COURT:  You may, yes.  Mr. Bornes, we'll

17   also show it on the big screen and probably the little one,

18   too.

19              THE WITNESS:  Yes.

20   BY MR. KELLEHER:

21   Q.    Could we please turn to page 3 of the English

22   language translation, which would be page .7.

23              Mr. Bornes, you'll see the third paragraph from

24   the bottom.  In fact, on several occasions, you ordered

25   racks that were delivered to the end customer without the

Bornes - cross

1    corresponding cassettes being ordered from my client.

2              Do you see that?

3    A.    Yes.

4    Q.    The Vought project is one of those; is that correct?

5    A.    I think it's the only one.

6    Q.    The only one.  So your lawyers put that in this

7    letter as being something suspicious; isn't that correct?

8    A.    Yes.

9    Q.    Do you know a gentleman --

10   A.    Let me -- this was written after we knew that you

11   were making cassettes.  So you know we can think about that

12   after a while.

13   Q.    And you know a gentleman named Ray Lecann,

14   L-a-c-a-n-n?

15   A.    Yes.

16   Q.    All right.  Was he your sales representative in the

17   United States?

18   A.    Yes.

19   Q.    And he's a dual French/United States citizen; is that

20   correct?

21   A.    Yes.

22   Q.    So he could visit aircraft facilities, is that

23   correct, without the problems that a French citizen would

24   have?

25   A.    I don't know if he can just come there.  I don't

Bornes - cross

1    know.

2    Q.    Broetje has many employees who are German citizens;

3    is that right?

4    A.    Yes.

5    Q.    And they gain access to these facilities in the

6    United States; is that right?

7    A.    Yes.  If you are invited by the customer to come on a

8    specific place, you can.  I have been there, too, but if I

9    want to go in a place where I've never been, where no

10   machines, I can't, I can't, because I have no reason to come

11   there and nobody would say, okay.  Come and visit my

12   company.  If I have some work to do someplace, it's

13   possible, sure, but if not, it's impossible.

14   Q.    And where was it in the United States that you first

15   saw Broetje brand cassettes?

16   A.    It was -- in fact, it was in Spirit, I think.

17   Q.    Spirit, so Wichita?

18   A.    Yes.

19   Q.    And were you invited there to do repairs?

20   A.    Yes.

21   Q.    I wonder, Mr. Bornes, during the period of time when

22   you sold your cassettes to my client and they installed the

23   racks and the cassettes into their machine, did you ever

24   sell cassettes that had the Broetje name on them?

25   A.    No.

Bornes - cross

1    Q.    Would you please look to JTX-65 in the binder that I

2    gave you.

3    A.    Yes.

4    Q.    This is the second Amended Complaint in this lawsuit

5    by AHG and F2C2 against my two clients.

6              Have you seen this document before?

7    A.    Before?  No.

8              MR. KELLEHER:  Your Honor, given what it is,

9    could I publish one paragraph on the screen?

10             THE COURT:  Is there an objection?

11             MR. HOROWITZ:  Your Honor, I think I would have

12   to object.  It's not in evidence.

13             THE COURT:  Tell us which paragraph by number.

14             MR. KELLEHER:  Paragraph 26.

15             MR. HOROWITZ:  Your Honor, I maintain my

16   objection.

17             MR. KELLEHER:  And, Your Honor, I would offer

18   this paragraph as a statement by my party opponent.

19             THE COURT:  Hold on a second.  26.  Is that

20   correct?

21             MR. KELLEHER:  Yes.

22             THE COURT:  We are looking at JTX-5; is that

23   correct?

24             MR. KELLEHER:  Yes, Your Honor.

25             THE COURT:  The document filed 9/3/09; is that

Bornes - cross

1   correct?

2            MR. KELLEHER:  Correct.

3            THE COURT:  So your request is to show just that

4   paragraph?

5            MR. KELLEHER:  Just paragraph 26.

6            THE COURT:  To the jury.

7            And the objection is?

8            MR. HOROWITZ:  The objection is it's hearsay,

9   it's a legal document, and there's no foundation for using

10  it with this witness.

11           THE COURT:  Could you establish a foundation

12  with the witness?

13           MR. KELLEHER:  Well, first, it's a statement by

14  the party opponent, so it's not hearsay.

15  BY MR. KELLEHER:

16  Q.    Mr. --

17           THE COURT:  I'm just asking you, you're willing

18  to do that; is that correct?

19           MR. KELLEHER:  Yes.

20           THE COURT:  Okay.  I'm going to overrule the

21  objection subject to laying the foundation.  We will only,

22  if there is a foundation, show that paragraph to the jury.

23           MR. KELLEHER:  Okay.

24  BY MR. KELLEHER:

25  Q.    Mr. Bornes, your client began -- I'm sorry.  AHG and

Bornes - cross

1   F2C2 began suing my client in 2006, I believe?

2   A.    Yes.

3   Q.    You were still with the company at that time?

4   A.    Yes.

5   Q.    And so first we were sued in Germany?

6   A.    Yes.

7   Q.    And then we were sued in France?

8   A.    I think for the Germany, yes, and for the French, no.

9   Q.    We were not sued in France?

10  A.    No, no.  I was not there I think.  It was the second

11  part of 2007 in France and I quit in July.

12  Q.    Right.  But you're aware that AHG and F2C2 sued my

13  clients in France?

14  A.    Yes.

15  Q.    And you are also aware that your, AHG and F2C2 sued

16  my clients here in the United States, which is why you are

17  here today?

18  A.    Not at that time.

19  Q.    You're aware now, though; right?

20  A.    Well, yes, sure.  Now, yes.

21  Q.    And you are sitting at counsel table as the corporate

22  representative?

23  A.    Yes.

24  Q.    Isn't that correct?

25  A.    Yes.

Bornes - cross

1              MR. KELLEHER:  Your Honor, I would move to

2   publish paragraph 26.

3              THE COURT:  Still an objection?

4              MR. HOROWITZ:  No objection.

5              THE COURT:  No objection?  You may do it.

6   BY MR. KELLEHER:

7   Q.    So, Mr. Bornes, this says, Upon information and

8   belief, it was commonly recognized by the industry that the

9   rivet dispensing products provided by Broetje and that bore

10  the Broetje brand had originated with and were manufactured

11  by AHG.

12              Do you see that?

13  A.    Yes.

14  Q.    That's not true, is it?

15  A.    People seeing our products and machines and know that

16  it was our system.  I can -- just let me read again.

17              THE COURT:  You're going to translate that for

18  him?  Okay.

19              (Pause while the witness and the translator

20  conferred.)

21              THE WITNESS:  For me, it's true.  If I would

22  understand, I understand that this means that at the

23  beginning, when Broetje used the cassette system, they start

24  on their machine.  Everybody in the world knows that this

25  system were made by AHG.  That's true.

Bornes - cross

1   BY MR. KELLEHER:

2   Q.      And that, and that's what --

3   A.      And they were aware of the Broetje label on the

4   machine.  That's true.

5   Q.      This says the rivet dispensing product that bore the

6   Broetje brand.

7              Do you see that?

8   A.      Yes, but it was -- it says that it was before they

9   put their label, it was done by AHG.

10  Q.      And those things, this document says bore the Broetje

11  brand when, in fact, you never provided rivet dispensing

12  products to my client that bore the Broetje brand.  They

13  always said F2C2 and AHG; is that right?

14  A.      Yes.  Yes.  It's confusing from my point of view.

15  Q.      So you and --

16  A.      You know, I didn't -- I said yes, but I never been

17  everywhere where you have placed machines, and also what I

18  know is at the beginning, when we put the AHG sticker on the

19  machine, Broetje throw them away to make sure that nobody

20  see AHG.

21              So you could have also made some labels

22  after if I don't see them.  I cannot assure that you never

23  delivered cassettes with labels, but I cannot assure that

24  you did not.

25  Q.      You cannot assure that we did either?

Bornes - cross

1    A.      Sure.

2    Q.      You've never gone to a facility and seen a cassette

3    where my client took the plastic lid off and ripped out your

4    label; is that right?

5    A.      No, I didn't see that.

6    Q.      So you and your father-in-law, Mr. Jean-Marc Auriol,

7    are the two inventors on the two United States patents; is

8    that correct?

9    A.      Yes.

10             MR. HOROWITZ:  Your Honor, I just would ask that

11   he take down the statement now.

12             THE COURT:  If we're done questioning about

13   that, yes.

14   BY MR. KELLEHER:

15   Q.      Would it be fair to interpret your patents in the

16   United States and in Europe as involving rifles into the

17   walls of the tubes?

18   A.      Yes, you can say that.

19   Q.      And could you please look at JTX-35 in the binder.

20             THE COURT:  Which binder?

21             MR. KELLEHER:  Both actually, Your Honor, but

22   we'll use mine now.

23             THE COURT:  Okay.

24             MR. KELLEHER:  This has already been admitted.

25   May we put it up?

Bornes - cross

1                THE COURT:  You may, if it's admitted.

2                THE WITNESS:  Yes.

3                MR. KELLEHER:  So, Your Honor --

4       BY MR. KELLEHER:

5       Q.     I'm sorry, Mr. Bornes.  This is the letter that you

6       sent to Broetje in the year 2000; is that correct?

7       A.     Yes.

8       Q.     Okay.  And you told Broetje that your patents

9       involved rifles into the tube; correct?

10      A.     Yes.

11      Q.     And so they would be reasonable to accept that as

12      true; is that correct?

13      A.     Yes.  If you mean that rifles are used as I told

14      the -- just before.

15      Q.     And rifles, say you take a long gun, rifle.

16      A.     Yes.

17      Q.     Yes?  One of the things that helps the accuracy of

18      the bullet is that there are grooves carved into the inside

19      of the barrel; isn't that right?

20      A.     Yes.

21      Q.     Could you turn to 1357 in your book.

22                THE COURT:  The one you gave him?

23                MR. KELLEHER:  I'm sorry, your Honor?

24                THE COURT:  Is it the one you gave him?

25                MR. KELLEHER:  Yes.  Correct.

1          THE COURT:  The larger one.

2          THE WITNESS:  Yes.

3   BY MR. KELLEHER:

4   Q.    Mr. Bornes, is this a schematic for the two that if

5   F2C2 used in its products in 2002?

6   A.    Yes.

7          MR. KELLEHER:  Your Honor, I would move the

8   admission of DTX-1357.

9          MR. HOROWITZ:  No objection, your Honor.

10         THE COURT:  It's admitted.

11   (DTX-1357 was admitted into evidence.)

12   BY MR. KELLEHER:

13   Q.    So, Mr. Bornes, this is the tube that F2C2 was using

14   in 2002 for the products it delivered to my client; is that

15   correct?

16   A.    Yes.  It's a drawing sent to people who are

17   manufacturing the tube as the tube, you know, when we, the

18   rifle, making the groove by ourselves.  That I would say

19   what is the drawing, which has been used to make them, but

20   it's not exactly the shape.  We've got to manufacture it

21   because these products are extruded, and when you extrude

22   plastic, the plastic has to be -- it's liquid.  It's hot.

23   When it becomes less warm, it retracts a little bit, so it's

24   not exactly the shape we receive.  But it was the drawing,

25   which is used to manufacture them.

Bornes - cross

1    Q.     Okay.  And when you say "extruded," you're talking

2    about pulling a tool through the inside of the tube?

3    A.     No, no.

4    Q.     Could you explain?

5    A.     It was explained to me that when you are at the

6    beginning, we have enough cassettes to build, so we use

7    tubes which were only simple tubes.  And then we made some

8    tools to make the groove, which is going along the tube,

9    make -- putting metal out and making the groove.

10          When we had enough, we could go to another type

11   of manufacturing the tube, which was extrusion, but you need

12   to order 2,000 metal long tubes and so on to be able to do

13   that.

14          And in that case, you have plastic that is hot

15   and liquid and you push the plastic through the tube, which

16   has the shape, and then there is something which making it

17   out of the machine while it's being pushed.  And then the

18   plastic is cooled down, and when it's cooled down, the

19   plastic retracts.

20          So it's the shape that here is the one which is

21   used to make the tool.  But the rivets on the tube after was

22   more or less looking like that, that's the shape.

23   Q.     And so the, well, say the five grooves or points on

24   the circle in this drawing, would you say those are the

25   rifles you were referring to earlier?

Bornes - cross

1    A.      It's a groove, yes.

2    Q.      And when you do this extrusion process, you're

3    talking about when you push a tool into the, into the --

4    A.      It's plastic which is pushed --

5    Q.      Right.  When you push the plastic, the aim is to

6    create those kind of rifles in the wall?

7    A.      Yes.

8    Q.      You indicated in your testimony yesterday that you

9    and Mr. Auriol began trying to develop what eventually was

10   patented in 1986 and filed a patent application in France in

11   December 1988; is that correct?

12   A.      Yes.

13   Q.      Would Mr. Auriol be lying if he said you actually

14   only spent a few months doing that development?

15   A.      No, sir.  I spent more than that.  I spent two years

16   and more.

17   Q.      And -- but if he said it was just a few months, that

18   would be wrong?

19   A.      I think, yes.

20   Q.      When you and Mr. Auriol began this development

21   process, would it be fair to say that you had no prior

22   experience working with feeding rivets through tubes?

23   A.      Yes.

24   Q.      Would you agree that putting a rivet in a tube is not

25   very original?

Bornes - cross

1    A.     No.

2    Q.     You would not --

3    A.     No, it's not original.  Excuse me.

4    Q.     Thank you.

5           And would you agree, you did not invent the

6    concept of putting a rivet tube into a cassette?

7    A.     No, I didn't.  In fact, the -- what we developed and

8    what we invented, it's a way to put very big amounts of

9    rivet with tube.  If you put a few of them, it's very easy

10   to make them circulating the tube.

11          For instance, when you have a very big

12   amount of rivet, that all of these rivets are taking all the

13   space on the tube, which is impossible, because when you

14   have the bigger amount, you find a lot of rivets in each

15   position possible.  So in that case, all the, the rivets

16   will, if you have only one surface inside, shape, they

17   would, they would use a rivet anywhere.

18          So in that case, the air is not about to

19   blow out.  When you want to make them running into the tube,

20   you have to push all the rivets with the last one, and this

21   you can -- you know, when you have enough rivets, you will

22   make the tube increase, and you are, you have the chance and

23   so on, but it won't work.

24          That's why we were using these grooves that

25   have air going.  You know, the rule has to be not where the

Bornes - cross

1    rivet could be to make sure that if it's open or not,

2    there's a place where there's a place for the air to be all

3    around the tube and to be able to make the rivet moving.

4    Q.    The claims in your patents don't actually require a

5    certain number of rivets to be used, do they?

6    A.    I don't remember.  I can't tell you.  But it was, it

7    has been done for that.

8    Q.    But you did not invent the concept of using tubes

9    filled with rivets in a cassette?

10   A.    I don't think so.

11   Q.    Could you please turn to PTX-610 in the binder I gave

12   you.

13   A.    This one here?

14          MR. KELLEHER:  And, Your Honor, this is already

15   in evidence.  May I publish it?

16          THE COURT:  You may.

17          MR. KELLEHER:  If we could turn to page .6.

18   BY MR. KELLEHER:

19   Q.    So we've looked at this document earlier on,

20   Mr. Bornes.  This document, among other things, shows the

21   ownership percentage of the European patent; is that

22   correct?

23   A.    Yes.  It's all the patents.  We have to -- all the

24   sales.  That means the sales in Europe, sales all over the

25   world.  So this 15 percent of all the patents.

Bornes - cross

1            MR. KELLEHER:  Jonathan, could we move up to the

2       packages?

3       BY MR. KELLEHER:

4       Q.     There's a company here, Ateliers de la haute Garonne

5       Rivets.

6            Do you see that, the fourth item, which is said

7       to have a 47.50 percent share?

8       A.     Share?

9       Q.     That's a different company from the company above it,

10      Ateliers de la Haute-Garonne; is that correct?

11      A.     This says no, no -- excuse me.  This has nothing to

12      do with shares.

13      Q.     It's a different --

14            THE COURT:  Don't say shares.

15            MR. KELLEHER:  Yes, Your Honor.

16      BY MR. KELLEHER:

17      Q.     Mr. Bornes, not say shares of the company, but say

18      percentage ownership of the intellectual.

19      A.     It was the percentage of varieties that F2C2 means to

20      all this personal opinion.

21      Q.     It says the undersigned parties and lists them are

22      co-owners of the patents?

23      A.     Yes.

24      Q.     Do you see that?

25      A.     Yes.

Bornes - cross

1    Q.       According to the following terms.

2    A.       Yes.

3    Q.       And then it lists different percentages for the four

4    entities, for you and Mr. Bornes and then the two entities?

5    A.       Yes.

6    Q.       And so Ateliers de la Haute-Garonne, who is the

7    plaintiff here, has only a 2.5 percent share; isn't that

8    correct?

9    A.       Yes.

10   Q.       And there's a separate company called Ateliers De La

11   Haute-Garonne Rivets?

12   A.       Yes.

13   Q.       And that had a 47.50 percent share?

14   A.       Yes.

15   Q.       They're not a party to this case?

16   A.       No, because the share of Ateliers De La Haute-Garonne

17   Rivets has been transferred to Ateliers de la Haute-Garonne.

18   Q.       Do you know if that document was produced to us in

19   this litigation?

20            MR. HOROWITZ:  Objection, Your Honor.

21            THE COURT:  Sustained.

22   BY MR. KELLEHER:

23   Q.       You are not a party to this case; is that correct?

24   A.       Yes.

25   Q.       Okay.  And Mr. Auriol is not a party to this case; is

Bornes - cross

 1    that correct?

 2    A.    No.

 3    Q.    And so for sales that would have been made when this

 4    contract is in effect, F2C2 would have to pay a 15 percent

 5    royalty; is that correct?

 6    A.    Yes.

 7    Q.    So that would be a 15 percent cost of sales to F2C2

 8    for any products that it sold to Broetje?

 9              THE INTERPRETER:  The witness is asking for the

10    witness to be repeated slowly.

11    BY MR. KELLEHER:

12    Q.    I apologize.  So that would be a 15 percent cost of

13    sales by F2C2 for any sales that it made to Broetje?

14    A.    I didn't understand the term of cost in that.  We

15    have -- F2C2 us to pay 15 percent of all the sales to, with

16    this percentage.

17    Q.    If I understood the testimony correctly, the very

18    first sale of the invention was to British Aerospace or

19    sometimes called BAE?

20    A.    Yes.

21    Q.    In the early nineties?

22    A.    Yes.

23    Q.    Approximately 1991?

24    A.    Yes.

25    Q.    So this was three years after you were able to file a

Bornes - cross

1    patent application?

2    A.     Yes.

3    Q.     You weren't able to sell any in between those three

4    years?

5    A.     No.  That was the first one.

6    Q.     And the British Aerospace project, that was a

7    relatively secret military aircraft project; correct?

8    A.     Yes.

9    Q.     And the facility was not open to the public?

10   A.     Yes.

11   Q.     And the facility was not even opened to my client,

12   Broetje?

13   A.     I suppose it was like for me, yes.

14   Q.     It was closed to you as well?

15   A.     Yes.

16   Q.     No one at British Aerospace could see what it was

17   that you delivered; correct?

18   A.     Correct.

19   Q.     Do you know if my client ever even saw what you

20   delivered?

21   A.     Yes, because we studied system on their machine

22   before.

23   Q.     Mr. Bornes, could you turn to PTX-129?

24   A.     (Witness complies.)

25   Q.     Mr. Bornes, do you know what this is?

Bornes - cross

1  A.      Yes.  It's kind of a paper about the history of the

2  cassettes.

3  Q.      And it was prepared by Mr. Gerhard of F2C2?

4  A.      Yes.

5           MR. KELLEHER:  Your Honor, I offer this into

6  evidence.

7           MR. HOROWITZ:  Your Honor, may we approach?

8           THE COURT:  Sure.

9           (Sidebar conference held.)

10          MR. HOROWITZ:  I just wanted to bring the

11  document.  I apologize.

12          THE COURT:  Right.  Okay.  So PTX-129.

13          MR. HOROWITZ:  Right.  My difficulty is this.

14          THE COURT:  Speak up.

15          MR. HOROWITZ:  I'm sorry.  I'm worried with the

16  jury.

17          THE COURT:  They can't hear you.

18          MR. HOROWITZ:  The difficulty is this.  While

19  this is a document that was produced in litigation, clearly

20  to Broetje, it was a document that was prepared for purposes

21  of the French litigation.  It was prepared by this man,

22  Mr. Gerhard, in 2010 and after Mr. Gerhard left the company

23  and so it's difficult in a sense that I understand they want

24  to cross-examine him with it, but to use it to offer it into

25  evidence through Mr. Bornes, they cannot lay the appropriate

1    foundation because he doesn't have percipient knowledge of

2    the document.

3             THE COURT:  All right.

4             MR. KELLEHER:  It was prepared.  It is prepared

5    by my party opponent.  An interrogatory answer is prepared

6    in litigation, too.  That doesn't make it inadmissible.

7    Mr. Bornes does know what this is.  He has seen it before.

8    I have seen it before.  The mere fact he had left the

9    company before it was made doesn't mean he doesn't know what

10   it is and its contents.  It's the history of the development

11   of the cassette all the way back to the 1990s all the time

12   up to where he left the company and the photographs of the

13   cassettes he has been testifying about.

14            THE COURT:  Anything?

15            MR. HOROWITZ:  The difficulty is as to the

16   accuracy and the veracity of it, he can't say because he

17   didn't prepare it.  It's not his document.  It's difficult.

18   I do think he can cross-examine him on it.  But to offer it

19   into evidence, he is not the appropriate sponsor with which

20   to do that.

21            THE COURT:  I think if you can lay the extra

22   foundation, which I don't think you got to yet, that he has

23   seen it before, I will overrule the objection.  Feel free to

24   make the objection again if you like.  But if he makes the

25   foundation, I will overrule it.

Bornes - cross

1              MR. HOROWITZ:  Then I will probably not then.

2              THE COURT:  Well, you have made it here, so.

3              MR. KELLEHER:  Your Honor, as long as we're

4     here.

5              THE COURT:  Yes.

6              MR. KELLEHER:  We have an exhibit in our list

7     that is a translation to English of this document.  I

8     would, assuming this gets into evidence, I would offer the

9     translation as well although probably use just the photographs.

10             THE COURT:  Has the translation been provided?

11             MR. HOROWITZ:  It's been provided.

12             MR. KELLEHER:  I can give you a number.

13             MR. HOROWITZ:  I know that.  My question is

14    there was some discussion about this this morning.  Has it

15    been certified?

16             MR. KELLEHER:  It is certified.

17             MR. HOROWITZ:  Then that is appropriate.

18             THE COURT:  How much more cross do you think you

19    have?

20             MR. KELLEHER:  At least have an hour.

21             THE COURT:  Okay.  Well, let's see if this

22    document comes into evidence, and then we'll take a break.

23             MR. KELLEHER:  Okay.

24             THE COURT:  Okay.  Thanks.

25             (Sidebar conference ends.)

Bornes - cross

```
1              THE COURT:  Thank you for your patience, ladies

2    and gentlemen.  You may continue.

3    BY MR. KELLEHER:

4    Q.     So Mr. Bornes, this document, we're looking at

5    PTX-129, you have seen this before?

6    A.     Yes.

7    Q.     When did you see it before?

8    A.     I don't remember.  It was after I left the company.

9    Q.     Do you remember, Mr. Bornes -- I know it's been a few

10   years but you and I have met before.  I took your deposition

11   in New York City about three years ago.

12   A.     Yes.

13   Q.     And did I show this document to you during that

14   deposition?

15   A.     I think so, but I'm not sure.

16   Q.     Would you just turn to page PTX-129.3?

17   A.     Yes.

18   Q.     There is a photograph of a cassette here?

19   A.     Yes.

20   Q.     Is this the cassette or a similar cassette that was

21   delivered to British Aerospace?

22   A.     Yes.

23   Q.     And just flipping through a few of the pages, do

24   you recognize these photographs as being the AHG or F2C2

25   cassette as it developed over time?
```

Bornes - cross

1    A.      It's the first one we have had, yes.

2    Q.      I apologize.  Could you flip through a few pages, as

3    many as you like?

4    A.      Yes, I managed to while I was waiting.

5    Q.      So these pictures show the development of the

6    cassette over the years; is that correct?

7    A.      Yes.

8              MR. KELLEHER:  Your Honor, I would move the

9    exhibit into evidence.

10             MR. HOROWITZ:  Your Honor forgive me.  I know it

11   said I wouldn't do this, but I don't think that is an

12   appropriate foundation.

13             THE COURT:  I'm going to overrule the objection.

14   The document is admitted.

15             (PTX-129 is admitted into evidence.)

16             THE COURT:  Ladies and gentlemen of the jury,

17   we're going to give you your morning break at this point.

18   Of course, no talking about the case during the recess, and

19   we'll get you back here about 15 minutes or so.

20             (Jury left courtroom.)

21             THE COURT:  Feel free to step down, if you like.

22             We had some issues that we didn't get to this

23   morning.  I'd like to take some of those up now, but anyone

24   else is free to stay or leave.

25             MR. HOROWITZ:  Your Honor, one housekeeping

Bornes - cross

1     issue.  On my direct examination, I forgot to move into

2     evidence, PTX-570, which is one of the cassettes.

3                 MR. KELLEHER:  No objection.

4                 THE COURT:  All right.  Do it again when the

5     jury is in.  Maybe on your redirect.

6                 MR. HOROWITZ:  Okay.

7                 THE COURT:  And we'll make a record of it.

8                 All right.  So, first of all, did we resolve the

9     one issue?

10                MR. CAHR:  I made a proposal to them.  I haven't

11    had a chance to.

12                THE COURT:  You all --

13                MR. CAHR:  -- or maybe you have an answer.  My

14    proposal is that basically we agree that both sides will

15    admit as exhibits the attachments and CVs from the expert

16    reports without either party waiving any objections as to

17    Daubert or anything like that.  Just, that's fine.  And then

18    for the data compilation, sales summaries, we won't make

19    them do the 15,000 documents or anything like that as long

20    as they're able to get it in through a proper witness, but

21    an expert is not.  So Dominique Hage can testify about that,

22    for example.  Then that can come in without having to show

23    us all the 15,000.

24                THE COURT:  He testify that the 15,000 pages

25    exist but we need not show.

Bornes - cross

1           MR. CAHR:  Right.  That this is the summary that

2    was created by the company.  This is a summary.  All the

3    typical things that would show it would be reflective of

4    business records, but Hage would have to get it in.

5           THE COURT:  Ms. Sharp.

6           MS. SHARP:  Your Honor, there are two issues.  I

7    don't think that that is a resolution because it doesn't

8    resolve the issues of whether the underlying documents are

9    coming in.  And this cuts both ways.  It's not a question

10   of relieving plaintiffs from putting in their underlying

11   documents.  Defendants is going to have the same problem, so

12   whatever cuts one way cuts the other.

13          THE COURT:  As I understand it, the proposal is

14   everyone gets their exhibits to the expert report in as long

15   as you at least have somebody from your company say there

16   are underlying documents that provided the basis for the

17   inputs I guess to these exhibits.

18          MS. SHARP:  If that is the proposal.

19          THE COURT:  That is what I understood.

20   Mr. Cahr, am I wrong?

21          MR. CAHR:  That is what I'm proposing.

22          MS. SHARP:  So the witness simply says the

23   statement without having to be handed every one of the

24   documents.

25          THE COURT:  And without those documents even

1    being offered into evidence.

2              MR. CAHR:  Right.  Right.  Just like I mean

3    there is like each side has three or four summaries.  Just

4    to hand those summaries to the witness and say, yes, this is

5    a summary that reflects this.  They don't have to talk about

6    the underlying document, every one of the underlying

7    documents.

8              THE COURT:  So is it Mr. Hage?

9              MR. CAHR:  Yes, Mr. Hage.

10             THE COURT:  Would be on the floor, the expert

11   Ellis; correct?

12             MR. CAHR:  Yes.

13             THE COURT:  The proposal is you would show the

14   exhibits of the Ellis report to Mr. Hage.

15             MR. CAHR:  Well, these particular ones aren't

16   exhibits to the expert report.  That is the problem I have

17   with the expert bringing them into evidence.

18             MS. SHARP:  Your Honor.

19             MR. CAHR:  There is two sets of those.

20             MS. SHARP:  Your Honor, if I may.

21             I think where we were before the break, because

22   the proposal doesn't resolve the underlying issue, if we

23   might have a little bit more time this break and try to

24   address it at lunch.

25             THE COURT:  That's fine.  And what about the

Bornes - cross

1    other issues?

2            MR. CAHR:  There is one other -- there are two

3    other quick issues.  We have objections to the demonstratives

4    that are being used by Mr. Ellis.  We have objections based

5    on -- I apologize.  I may have grabbed the wrong thing.

6            We have objections based on Daubert to a number

7    of these things, that they reflect incorrect calculations.

8            We have objections based on the fact that, for

9    example, in the other claims on page 093 of this document,

10   which I would be happy to show you, they include claims

11   going back to 2003, but the other claims could not begin as

12   a matter of law until the first one was sold in the United

13   States which both parties agree was in 2004.  This renders

14   the entire thing inaccurate.  So all of those, all of those

15   claims are inaccurate.

16           There are a number of claims here which deal

17   with loading stations and racks that are included as part

18   of convoyed sales.  But this includes ones that are sold

19   entirely with projects with round tubes that are not

20   accused.

21           So basically the problem is that the numbers

22   themselves as reflected in the supplemental report that we

23   received a few weeks ago, they're wrong.  And the entire

24   thing is poisoned by it because -- I mean these are clear

25   factual errors that as a matter of law can't be cured.  You

Bornes - cross

1    can't get trade dress damages from before we were using the

2    trade dress.  You simply can't.

3                 And you can't get loading -- convoyed sales on

4    loading stations and distribution racks which were being

5    sold entirely projects with unaccused products.  So I mean

6    basically -- and he should be excluded and his demonstrative

7    should be excluded and his testimony should be excluded.

8                 THE COURT:  On these points, not on everything.

9                 MR. CAHR:  On everything, too.  But I'm just

10   sort of summarizing the highlights.  This is something that

11   if you want us to brief, we'll be happy to, but, and I think

12   pretty clearly these are fatal problems with the report.

13                THE COURT:  We're expecting Mr. Ellis to testify

14   later today; correct?

15                MR. CAHR:  We are.

16                THE COURT:  All right.  Well, we're hear from

17   plaintiffs.

18                MS. SHARP:  We vetted these issues last night,

19   and the articulation that I'm hearing in the courtroom seems

20   to pass what our discussion was last night.  So, again, we

21   might benefit from a specific head-to-head discussion again

22   before Your Honor hears it.

23                This was the information that was disclosed in

24   the supplemental reports that Your Honor directed.  Round

25   tubes were backed out at Your Honor's direction in the

Bornes - cross

1    limitation of what could be said about the round tubes and

2    that only that they were not accused, not that they were not

3    infringing.  And the remainder of the objections go only to

4    the weight of the evidence, not to the correctness or the

5    sufficiency.

6              As to each of the specifics that were discussed

7    last night and pointed out on the slides, we provided to

8    Mr. Cahr information to confirm to him that round tubes were

9    not included in the slide that he was complaining about.

10   For example, PDTX-103.

11             And then on the starting date, this is the

12   starting date for the other claims, and the period of

13   damages essentially.  There were some sales in the U.S. in

14   2003 and that is what is included.

15             When the attachments go in with the expert

16   reports, the calculations are done year by year.  So if, on

17   cross-examination or somehow there is some proof that 2003

18   or some other year shouldn't have been included, then the

19   jury would be able to discern the appropriate years and time

20   periods and simply add those columns.

21             THE COURT:  So Mr. Cahr argues first there were

22   incorrect calculations.  Do you know what incorrect

23   calculations he is referring to or allegedly incorrect?

24             Ms. SHARP:  Defendants disagree with, as is very

25   common in these cases, with plaintiffs' damages report.

Bornes - cross

1        There is just a difference in how the two experts calculated

2        it.  Beyond that, I don't understand the objection.

3                  THE COURT:  And there is going to be evidence

4        that you think will support a finding that there a sale,

5        that the first sale was not as late as 2004 but was in fact

6        2003?

7                  MS. SHARP:  There are underlying documents that

8        show sales in 2003.

9                  THE COURT:  All right.  And then on the convoyed

10       sales being based on round tubes, your representation is

11       there are no calculations that are providing an opinion that

12       your client should get damages for any convoyed sales where

13       the tubes that were part of that were round tubes?

14                 MS. SHARP:  That is correct.  In the

15       supplemental report, the round tube numbers were essentially

16       backed out.

17                 THE COURT:  And whatever opinion or

18       demonstrative is used in court will reflect that removal of

19       the round tubes; correct?

20                 MS. SHARP:  That is correct.

21                 THE COURT:  Is there anything else you want to

22       say?

23                 MS. SHARP:  No, Your Honor.

24                 THE COURT:  Mr. Cahr.

25                 MR. CAHR:  A couple of very important I think

Bornes - cross

1    things to note regarding what Ms. Sharp just said.

2           Yes, the round tube cassettes were excluded but

3    the loading stations and distribution racks that were sold

4    entirely with non-accused products are included as convoyed

5    sales.  That's just incorrect.  And,

6           Second of all, the plaintiff has admitted

7    that -- I don't think there is really any question about

8    this, that our first use, our first use of the metal, the

9    metal Broetje cassette was in 2004, and there are damages

10   claims in 2003.  And, moreover, the sales in 2004 were of

11   cassettes with AHG loading stations and racks as we were

12   just hearing from Mr. Bornes, because that was the reason

13   why racks and loading stations from AHG were still delivered

14   but Broetje cassettes were used.  Those loading stations

15   which were AHG loading stations and AHG racks are being

16   concluded by Mr. Ellis as part of the damages base.  That

17   is simply wrong and it's fatal to the entirety of his

18   opinion.

19           THE COURT:  Why is this coming up just now?

20           MR. CAHR:  Well, first of all, we just got the

21   demonstrative last night.  We got the expert report on --

22   what date was that?  The expert reports were just literally

23   exchanged in the past few weeks.

24           THE COURT:  Consistent with my ruling; correct?

25           MR. CAHR:  Correct, consistent with your ruling.

Bornes - cross

1              THE COURT:  What is it you propose now?  That

2      you brief a new round of Daubert motions -- Let me finish

3      the question.

4              MR. CAHR:  Oh, I'm sorry.  My apologies, Your

5      Honor.

6              THE COURT:  And I decide it all before we get to

7      Mr. Ellis's testimony later today?

8              MR. CAHR:  I guess there is a couple of

9      different ways this can be handled.

10              One, we could put off Mr. Ellis's testimony and

11      in the meantime we could exchange short briefs on the topic.

12              Two, we could voir dire the witness briefly off

13      time for both parties just to figure out what the story is

14      on it.

15              Or I quite frankly think that unless there is a

16      representation specifically that all the things I just said

17      aren't true, I think that his report probably could be

18      stricken on the spot.  I mean I don't think there is really

19      any -- I mean those fact are facts and nothing Ms. Sharp

20      just said just now contradicted any of them.

21              THE COURT:  All right.  Let me get Ms. Sharp

22      back briefly.

23              I understood the representations made last time

24      you were up here to contradict the things Mr. Cahr has just

25      told me.  That the calculations are really just a matter of

Bornes - cross

1      opinion, that you believe there is evidence of a sale as

2      early as 2003, and that you were backing out any sales

3      related to even convoyed sales relating to use of round

4      tubes.  Did I understand you correctly?

5               MS. SHARP:  Yes, Your Honor.  The round tubes

6      are backed out in the patent damage calculations because

7      that is where the round tubes are relevant.

8               I believe they were also backed out of the

9      entire cassette -- I have to confirm the extension of that

10     preposition to the other damages, that they don't need to

11     be backed out from the other damages.  I just don't know

12     the answer as I stand here.  I believe we confirmed last

13     night that they were backed out, but I don't want to

14     misrepresent.

15              The expert reports, as Your Honor noted, were

16     provided on the schedule the Court ordered.  None of these

17     topics were raised even at the most recent pretrial

18     conference.

19              THE COURT:  None of these objections?

20              MS. SHARP:  These objections, yes.

21              THE COURT:  All right.  Well, I'm not going to

22     order a new round of Daubert.  I'm not going to strike

23     Mr. Ellis.  I do want to get further representation as to

24     whether the convoyed sales related to round tubes were

25     backed out from the other damages calculation.  I don't know

Bornes - cross

1   that that will impact anything, but I would like to know

2   that before we get to Mr. Ellis, and if there remains a

3   dispute on that, we'll talk about it at that time.

4                MS. SHARP:  Understood.

5                MR. CAHR:  And just for clarity, that includes

6   the representation that all convoyed sales of projects which

7   included, say, all round tubes were not included in this

8   calculation.

9                THE COURT:  Ms. Sharp?

10               MR. CAHR:  Loading stations and distribution

11  racks.

12               MS. SHARP:  I believe we provided all these

13  representations last night.  We'll cover them again and

14  provide them again.

15               THE COURT:  All right.

16               MS. SHARP:  Both to Mr. Cahr and the Court.

17               THE COURT:  You meet and confer on that and

18  someone let me know before we get Mr. Ellis up here whether

19  there's a remaining dispute about that that I need to

20  resolve.  Understood?

21               MS. SHARP:  Understood.

22               MR. CAHR:  Thank you very much, Your Honor.

23               THE COURT:  You have issues with respect to one

24  more issue?

25               MR. CAHR:  Yes.  Dr. Kytomaa.

Bornes - cross

1                MR. KELLEHER:  Your Honor, I think this will be

2     a short objection.

3                We received the slides of demonstratives for Dr.

4     Kytomaa's examination last evening and we have a Rule

5     37/Judge Farnan rule objection for a number of the slides

6     that -- I could be incorrect.  I don't recall ever having

7     seen the substance of the opinions that these slides

8     reflect.  I understand you don't strike these things or bar

9     them.  I read them into the record and they proceed at their

10    peril.

11               THE COURT:  Right.  If you want to put on the

12    record certain testimony that you expected is going to be

13    elicited with these slides as going beyond the expert

14    report, go ahead and put that on the record.

15               MR. KELLEHER:  Should I read the slide numbers

16    now, Your Honor.

17               THE COURT:  I think that would be an efficient

18    way to do it.  Yes.

19               MR. KELLEHER:  PDTX-29, 33, 37, 39, 42, 48, 53,

20    58, 60, 61, 62, 64, 65, 66, 67, 68 and 69.  I think I forgot

21    63.

22               THE COURT:  Okay.

23               MR. KELLEHER:  I apologize.  Mr. Cahr reminds me

24    there were a few Judge Farnan rule objections on Mr. Ellis'

25    slides as well.  PDTX-98, 116 and 117.

Bornes - cross

1          THE COURT:  The testimony associated with that

2     from Mr. Ellis, you're objecting to it as beyond the scope

3     of his expert report?

4          MR. KELLEHER:  Yes, Your Honor.

5          THE COURT:  All right.  I'm just going to note

6     the objection, the prior ruling.  If plaintiffs want to say

7     anything or need any clarification on that?

8          MR. LINDVALL:  No, Your Honor.  We obviously

9     disagree.

10          MS. SHARP:  And we provided the references to

11     paragraphs and pages last night.

12          THE COURT:  Okay.  Thank you.  Any other issues

13     we expect to come up today?

14          MR. CAHR:  I think that's it, Your Honor.

15          THE COURT:  All right.  We'll give you a short

16     break.

17          (Short recess taken.)

18          THE COURT:  Anything else to discuss before we

19     bring them in?

20          MR. KELLEHER:  No, Your Honor.

21          THE COURT:  No?  Ms. Sharp, nothing else before

22     we bring the jury back in?

23          MS. SHARP:  I agree, Your Honor.

24          THE COURT:  All right.  Let's bring them in.

25          MR. LINDVALL:  Do you want the witness back on

Bornes - cross

 1    the stand?

 2              THE COURT:  Yes.  Thank you.  Mr. Bornes?

 3              (The jury entered the courtroom.)

 4              THE COURT:  Ladies and gentlemen, we are ready

 5    to continue.

 6              Mr. Kelleher, you may proceed.

 7              MR. KELLEHER:  Thank you, Your Honor.  A

 8    housekeeping matter first.

 9              Earlier I showed the jury JTX-35.  Thinking it

10    was the, it had been admitted as PTX-167, JTX-35 is just the

11    first page of that statement.  Could I move JTX-35 into

12    evidence?

13              MR. HOROWITZ:  Your Honor, it's already in

14    evidence as PTX-167, the full document.  This is just an

15    excerpt of that.

16              THE COURT:  Right.  It's just one page.  Do you

17    object to admitting one page?

18              MR. HOROWITZ:  I don't object.  It's

19    unnecessary.

20              THE COURT:  Probably unnecessary, but I will

21    admit it.  So the document is admitted.

22              MR. KELLEHER:  Thank you very much, Your Honor.

23              (JTX-35 was admitted into evidence.)

24    BY MR. KELLEHER:

25    Q.    Mr. Bornes, before we look at this Historique

Bornes - cross

1   cassette documents, you mentioned earlier that you believed

2   that AHG had entered into a contract with Broetje in the

3   mid-1990s; is that correct?

4   A.    Yes.

5   Q.    F2C2 never signed a contract like that with Broetje;

6   isn't that right?

7   A.    Yes, that's right, because we continue with where we

8   are.

9   Q.    Actually, F2C2 and Broetje operated on an order-by-

10  order basis; isn't that correct?

11  A.    No.  The agreement was -- was working for us.

12  Q.    F2C2 was not a party to the agreement?

13  A.    Yes.

14  Q.    Yes, it was not?

15  A.    It's not part of the agreement.  The fact that we

16  go on working together doesn't mean that the agreement

17  was -- in fact, in my mind, sure.

18  Q.    Why don't we look at PTX-129.

19            MR. KELLEHER:  And, your Honor, could I move the

20  admission of Exhibit DTX-1944 as the certified translation

21  of this document?

22            THE COURT:  Any objection?

23            MR. HOROWITZ:  No, Your Honor.

24            THE COURT:  It's admitted.

25            MR. KELLEHER:  Thank you.

Bornes - cross

1    (DTX-1944 Exhibit was admitted into evidence.)

2    BY MR. KELLEHER:

3    Q.    Mr. Bornes, would you please look at 129.3.

4    A.    Yes.

5    Q.    And this is the cassette or the same type of cassette

6    that was sold to British Aerospace in 1991?

7    A.    Yes.

8    Q.    Was that the only one of its kind that was sold?

9    A.    I think so.

10   Q.    And that was in England?

11   A.    Yes.  The one that was on the feeding system that we

12   have sent to Broetje to be on the military site.

13   Q.    So it was delivered to Germany and then ultimately

14   ended up in England?

15   A.    Yes.

16   Q.    It never came to the United States?

17   A.    No.

18   Q.    Okay.  Could we please turn to the next page, .4.

19   A.    Yes.

20   Q.    Okay.  So this says 1991/1995.  You can see the name

21   of Dassault Aviation; is that correct?

22   A.    Yes.

23   Q.    Would it be correct to say that in the early 1990s,

24   AHG entered into a relationship with the company Dassault to

25   industrialize your product?

Bornes - cross

1    A.    Yes, that's right.

2    Q.    Okay.  And would you say that after that

3    industrialization was complete, it became easier to sell the

4    product?

5    A.    Yes.

6    Q.    And it's true that AHG agreed to pay Dassault a

7    royalty on every sale; is that correct?

8    A.    Yes.

9    Q.    Do you know for how long AHG and F2C2 paid that

10   royalty?

11   A.    I don't remember.

12   Q.    Was it well into the 2000s?

13   A.    I don't remember.

14   Q.    Was that royalty still being paid when you left F2C2?

15   A.    When I left, it was done for awhile, yes.

16   Q.    Was it 15 percent?

17   A.    No.  I think it was ten percent.

18   Q.    Okay.  Could you turn to page .5.  Okay.  This rack

19   that is shown here, is this a rack that AHG sold to Broetje

20   and Broetje built into a system for delivery to Boeing

21   Wichita?

22   A.    I think so.

23   Q.    Okay.  So that's the mid-1990s?  '96?

24   A.    Yes.

25   Q.    Okay.  And the cassettes that were delivered by AHG

Bornes - cross

1   to this rack, they're made of plastic?

2   A.    Yes.

3   Q.    And you can actually see the inside of the tubes on

4   this cassette in this photo?

5   A.    Yes.

6   Q.    Would you please turn to page .7.  So just look at

7   Generation 1.  Now here's Generation 2.  And this is still

8   plastic; is that correct?

9   A.    Yes.

10  Q.    And would you turn forward to page .13.  This is the

11  year 2000 and this is Generation 3; is that right?

12  A.    Yes.

13  Q.    And the cassette is still made of plastic?

14  A.    Yes.

15  Q.    And would you turn forward to page .19.

16  A.    Excuse me?

17  Q.    .19.

18  A.    19?

19  Q.    So now we're up to the year 2000 and this is marked

20  as Generation 4; is that correct?

21  A.    Yes.

22  Q.    All right.  And this cassette is still made of

23  plastic?

24  A.    Yes.

25           MR. KELLEHER:  And, Your Honor, may I enter the

Bornes - cross

1    well?

2              THE COURT:  You may.

3    BY MR. KELLEHER:

4    Q.    And so what's shown in this paragraph is this

5    cassette here (indicating), DTX-1223A?

6    A.    Yes.

7    Q.    Which has these, these number dials on the front; is

8    that right?

9    A.    Yes.

10   Q.    And it has a colored tape around the coils?

11   A.    Yes.

12   Q.    And it has AHG and F2C2's name on it?

13   A.    Yes.

14   Q.    And it has this little string to hold the cap when it

15   comes off?

16   A.    Yes.

17   Q.    This cap was taken off when you are loading rivets;

18   is that right?

19   A.    That's right.

20   Q.    And then after they're all loaded, it's put back on?

21   A.    Yes.

22   Q.    And this is to make sure it does not fall off?

23   A.    Yes.

24   Q.    And could you turn to page 21.

25   A.    Yes.

Bornes - cross

1    Q.     So this says 2003, Cassettes Weforma.

2           Do you see that?

3    A.     Yes.

4    Q.     This was never really widely sold, was it?

5           THE INTERPRETER:  He wants to rehear the

6    question.

7    BY MR. KELLEHER:

8    Q.     Sorry.  This particular cassette was never widely

9    sold?

10   A.     No.  We just manufactured ten of them.  It was

11   another company that asked us to work on this system just

12   for them, so we develop it and then we sell them ten

13   cassettes.

14   Q.     And this one is still plastic?

15   A.     Yes.

16   Q.     Would you flip forward to page 24.  So now we come go

17   to the year 2005.

18   A.     Yes.

19   Q.     This is Generation 5 of the cassette?

20   A.     Yes.

21   Q.     And this one is aluminum on five sides; is that

22   correct?

23   A.     Yes.

24   Q.     When was the first time this thing was sold in Europe

25   after this was developed in 2005?

                         Bornes - cross

1    A.     I don't remember.  Probably in 2005, but I don't

2    remember exactly.

3    Q.     When is the first time it was sold in the United

4    States after it was developed in 2005?

5    A.     I don't...

6    Q.     Would you please turn to page 30, Mr. Bornes.

7           So, Mr. Bornes, this says 2009/2010, Generation

8    5B.

9           Do you see that?

10   A.     Yes.

11   Q.     And looking at this photograph, I now see that there

12   are blue stripes or piping on the side of the cassette; is

13   that correct?

14   A.     I -- you see that -- it's painted?  It's painted on

15   the cassette?

16   Q.     Yes.  Do you see a blue stripe on the wall of the

17   cassette?

18   A.     Oh, okay.  Yes.  Yes.

19   Q.     Okay.  Are you familiar with this new variety of the

20   cassette?

21   A.     Not completely.

22   Q.     Have you ever seen it before?

23   A.     No.

24   Q.     Okay.  Do you know if Mr. Hage at F2C2 would know

25   about this?

Bornes - cross

1   A.      Yes.

2   Q.      We'll ask him.

3   A.      Okay.

4   Q.      Mr. Bornes, when you discovered that Broetje was now

5   selling its own cassette in Germany and you looked at it,

6   would it be fair to say that it did not have any of those

7   numerical counters on the front?

8   A.      Yes.

9   Q.      And would it be fair to say that it did not have any

10  colored tape?

11  A.      Yes.

12  Q.      And would it be fair to say that it did not have that

13  string in the back for holding the cap?

14  A.      Excuse me?  Yes.  Yes.

15  Q.      And would it be fair to say that it did not have the

16  name F2C2 or AHG on it?

17  A.      Yes.

18  Q.      And would it be fair to say that it had the Broetje

19  name on it?

20  A.      Yes.  But you know that doesn't mean that they are

21  not looking alike.  There are some small, small difference.

22  Q.      Mr. Bornes, would you turn to Exhibit 10, DTX-1037.

23          Do you recognize this document?

24  A.      Yes.

25  Q.      Would you look on page 18.

Bornes - cross

1    A.      Yes.

2    Q.      Is that your signature?

3    A.      Yes.

4    Q.      Okay.  And are the words, I declare, I declare under

5    the penalty of perjury under the laws of the United States

6    of America that the foregoing is true and correct?

7    A.      Yes.

8    Q.      And is the title of this document on the front page,

9    Response of Atelier de la Haute-Garonne to notice of

10   investigation and verified complaints of All Fast Fastening

11   Systems and affirmative defenses filed in the United States

12   International Trade Commission?"

13   A.      Yes.

14   Q.      Do you remember this lawsuit?

15   A.      Yes.

16   Q.      Do you remember that AHG was accused of trademark

17   infringement by a company called Allfast?

18   A.      Yes.

19   Q.      And that was, they accused you have importing rivets

20   that infringed their trademarks?

21   A.      Yes.

22   Q.      And you swore under oath that the contents of this

23   document are true; is that correct?

24   A.      Yes.

25              MR. KELLEHER:  Your Honor, could I move into

383

Bornes - cross

1    evidence DTX-1037?

2              MR. HOROWITZ:  Your Honor, I would object to its

3    admission in evidence.

4              THE COURT:  On what basis?

5              MR. HOROWITZ:  Hearsay.

6              THE COURT:  Mr. Kelleher?

7              MR. KELLEHER:  It's the sworn statement of the

8    witness.

9              THE COURT:  It's written by counsel, but the

10   witness has sworn that it is correct; right?

11             MR. KELLEHER:  Yes, Your Honor, and at the time,

12   he was an officer of the company.

13             THE COURT:  Overruled.  It's in.  The document

14   is admitted.

15   (DTX-1037 was admitted into evidence.)

16   BY MR. KELLEHER:

17   Q.    Mr. Bornes, would you please turn to page 15.  So

18   there's a paragraph 83.

19                    It says, starting on the third line at the

20   end, all such certificates of conformance and packing slips

21   prominently and clearly displayed AHG's company name, logo,

22   and part number.  Such information had the effect of

23   identifying AHG as the source of rivets that were included

24   in the shipment of which each such certificate of

25   conformance and/or packing slip were a part.  The size and

Bornes - cross

1    prominence of the text used for the terms, and so forth, was

2    less than that used for AHG's company logo.

3              Do you see that?

4    A.    Yes, I see it.

5    Q.    And the purpose of this was to say that because the

6    company logo were accompanying your rivets, that would

7    prevent the possibility of confusion?

8    A.    In fact, it was not -- it was some, some later, you

9    said later?

10   Q.    I will ask the question again:  The purpose of this

11   was to say that customers were not confused because AHG's

12   logo was there?  Yes?

13   A.    Yes.

14   Q.    Mr. Bornes, on the AHG cassette, is there a purpose

15   to the clear lid?

16   A.    Yes.  We can, we can look to the tubing with the

17   cover, through the cover.

18   Q.    Would you please look to PTX-206.

19   A.    Yes.

20   Q.    Do you recognize this as an F2C2 advertisement?

21   A.    Yes.

22              MR. KELLEHER:  Your Honor, I would move the

23   admission of PTX-206.

24              MR. HOROWITZ:  No objection, Your Honor.

25              THE COURT:  It's admitted.

Bornes - cross

1    (PTX-206 was admitted into evidence.)

2    BY MR. KELLEHER:

3    Q.    So, Mr. Bornes, there's a paragraph that begins, a

4    translucent lid.

5    A.    Yes.

6    Q.    It says, a translucent lid allowing to visually check

7    the fasteners during the loading process and during feeding

8    process.

9          Do you see that?

10   A.    Yes.

11   Q.    Okay.  Would it be fair to say that you advertised

12   the benefit of a clear top to the cassette?

13   A.    Yes.

14   Q.    All right.  Is there a purpose to having a handle on

15   the cassette?

16   A.    Yes, sure.

17   Q.    What is that?

18   A.    It's to carry it.

19   Q.    Is it also to slide the cassette in and out of the

20   rack?

21   A.    Also, yes.

22   Q.    And if the handle were on top of the cassette, would

23   that interfere with the use of the cassette?

24   A.    Yes.

25   Q.    If the handle were off center to one of the sides,

Bornes - cross

1   would that interfere with the use of the cassette?

2   A.     Not sure.  Could be working.  It depends on the size

3   and what the artist placed, because when you take the

4   cassette, you slide it on the rack, as you said.  You have

5   the handle on one end and you carry the cassette with the

6   other one.  And the, if it was on the side, it should work

7   the same.

8   Q.     But if you were carrying it like a suitcase, it would

9   no longer be the center of gravity; isn't that right?

10  A.     You know the outlets are the same, the same weight.

11  So it could be, depending on weight and so on.  I'm not

12  100 percent sure.

13  Q.     The reason that F2C2 began dealing with the company

14  Gemcor was because not enough business was being received

15  from Broetje; is that correct?

16  A.     You know, when you have a company, part of your job

17  is to make sure that you increase yourself in any case.

18  Q.     Would it be fair to say that Broetje was angry that

19  F2C2 began dealing with Gemcor because during the course of

20  the relationship with Broetje, there had been a number of

21  suggestions by my client to make the system better?

22  A.     Yes.  Because as we said before, you buy system from

23  us and you sell them to your customer, and your customers

24  tell you what feedback they have.  So you have to tell the

25  customer, if you want to make some change on the cassette

Bornes - cross

1    because of the needs of the customer, we need you to tell us

2    what was, what they want.  Sure.

3    Q.      Would it be fair to say that you actually offered to

4    compensate my client for the fact that you had begun selling

5    to Gemcor?

6                    (Translator and witness confer.)

7    A.      I don't think so.

8    Q.      Did you ever tell Mr. Maylander at my client that you

9    would be willing to pay a percentage of the revenue you were

10   receiving from Gemcor to compensate Broetje for the fact

11   that you were now selling to them?

12   A.      To give money to Broetje for that?

13   Q.      Yes.

14   A.      I'm not familiar with that.  What I surely did at

15   that time, because Broetje buy me a lot of machine, they pay

16   less than what Gemcor was to pay me because we begin to go

17   work with them.  That's true.  But giving money to Broetje,

18   I don't know that.

19   Q.      After F2C2 and Broetje stopped doing business

20   together, F2C2 cassettes and other products were still

21   available to United States customers, right?  Through

22   Gemcor?

23   A.      Yes.

24   Q.      Have you visited the Boeing facility at Long Beach?

25   A.      Yes.

Bornes - cross

1    Q.      And do you know a gentleman named Michael Lawrence?

2    A.      Yes.

3    Q.      How do you know him?

4    A.      Excuse me?

5    Q.      How do you know him?

6    A.      Because he was working, I think it was not Boeing but

7    he was working for Boeing when we install the machine.

8    Q.      And would you consider him to be a person

9    knowledgeable concerning rivet bead systems?

10   A.      Yes.

11   Q.      So I understand that Broetje contacted AHG in

12   approximately 1994 about doing this project for Boeing

13   Wichita; is that correct?

14   A.      Yes.

15   Q.      When you delivered those cassettes to Broetje for

16   that project, was that only the second time that AHG had

17   sold its cassettes?

18   A.      Can?

19   Q.      Yes.  The first sale was to British Aerospace about

20   1991.

21   A.      Yes.

22   Q.      Then in 1994, Broetje contacted you about another

23   purchase.

24   A.      Yes.

25   Q.      This is for Boeing Wichita?

Bornes - cross

1    A.    Yes.

2    Q.    Was that the second sale?

3    A.    From us?

4    Q.    Yes.

5    A.    No, I think we have sold some machine to Dassault

6    before.

7    Q.    To Dassault.  That's right.  Do you know how many to

8    Dassault?

9    A.    Maybe one.  No.  Yes.  Yes.  At that time, one.

10   Q.    So then was the sale to Broetje for Boeing Wichita

11   the third sale?

12   A.    With Broetje, yes.

13   Q.    What about anyone else?  Any other customers?

14   A.    At that time, we just sell to British Aerospace and

15   to Dassault, yes.

16   Q.    So the sale for Boeing Wichita would have been the

17   third sale of your invention?

18   A.    Yes.  Yes.  I understood first.  I'm sorry.  It's

19   confusing.

20   Q.    Could you please look at PTX-188?

21            MR. KELLEHER:  Which, Your Honor, my notes say

22   is already in evidence.

23            MR. HOROWITZ:  I'm not sure that is correct.

24            THE COURT:  You do believe it is or you don't?

25            MR. HOROWITZ:  I don't believe it is.  I can

Bornes - cross

1    check.

2                    THE COURT:  You don't think it is?

3                    MR. KELLEHER:  I'll merely ask the question.  We

4    can get it in later if it's not already.

5    BY MR. KELLEHER:

6    Q.     The magnetic code reader.

7    A.     Yes.

8                    MR. KELLEHER:  Your Honor, may I enter the well?

9                    THE COURT:  Yes.

10   BY MR. KELLEHER:

11   Q.     The magnetic code reader that is at the back of the

12   cassette?

13   A.     Yes.

14   Q.     This allows the rack to have information about the

15   rivets that are inside; is that right?

16   A.     Yes.

17   Q.     Was it at Broetje's request that this was added to

18   the product?

19   A.     This one, no.  There are others.  At beginning, we

20   have one which was the read only system, and this one we

21   have basic because we want to know exactly what was inside

22   the cassette.  So each time we put a rivet out, we can tell

23   the machine how it works.  So this one no, but the first one

24   yes.

25   Q.     The first one yes?

Bornes - cross

1    A.     Yes.

2    Q.     Is that was for Boeing Wichita?

3    A.     Yes, just as that because previously we have the

4    counter on the back of the cassette for the same function.

5    And they say that this function, they prefer to buy this

6    only with the contact label.

7    Q.     Mr. Bornes, could you look to Exhibit 252?

8              THE COURT:  PTX-252?

9              MR. KELLEHER:  Correct, Your Honor.

10   BY THE WITNESS:

11   A.     Yes.

12   Q.     Do you recognize this as a letter or a fax from

13   Broetje in 1997 to you?

14   A.     Yes.  I don't know if I receive it because there is

15   nothing saying that, but it's a kind of fax I could have

16   receive at that time, yes.

17             MR. KELLEHER:  Your Honor, I would offer this

18   into evidence as unobjected to on the exhibit list.

19             MR. HOROWITZ:  Well, in that case, no objection,

20   Your Honor.

21             THE COURT:  Okay.  It's admitted.

22             (PTX-252 is admitted into evidence.)

23   BY MR. KELLEHER:

24   Q.     Could you turn forward to page 15?

25   A.     (Witness complies.)

Bornes - cross

1    Q.      Why don't we make that 14, actually.

2    A.      Yes.

3    Q.      And it says:  Dear Mr. Bornes, attached the corrected

4    page.  Kind regards, someone at Broetje.  Annex:  Circuit

5    diagram.

6            And over the next few pages, are those circuit

7    diagrams that my client sent to you for the use of the code

8    reader?

9    A.      Excuse me.  I didn't catch the question.

10   Q.      Are these circuit diagrams ones that were sent by my

11   client to you?

12   A.      Yes.

13   Q.      To make the code reader work properly?

14   A.      Yes.

15   Q.      I wonder, did my client also suggest putting more

16   light sensors in the rack to better understand what is going

17   on in the cassette in the rack?

18   A.      You know, I don't remember exactly what.  And I don't

19   know what you are asking.  We have a lot of things that

20   are on the rack that would provide it, and perhaps you have

21   asked for some more.  I don't recall exactly.  But like

22   that, I can't tell you because a lot of things are on this

23   machine.

24   Q.      Do you remember that my client suggested adding a

25   throttle to the machine to control the air pressure in the

393

Bornes - cross

1    tubes?

2    A.     Yeah.  I don't remember if it was even -- it could

3    be.  I don't remember when we spoke about some type of

4    problem.  This could have been.  I don't recall exactly.

5    But you know even though is if you speak about some troubles

6    and you speak suggestions.

7              I also, when I was working for Broetje, when we

8    install your machines, sometimes you know I have to wait

9    eight hours to be able to work for two hours because Broetje

10   have some problems to resolve, and sometime I give them

11   some ideas on the way to do it.  I never said that because

12   of that, it was proprietary of the machine.  So, yes, we

13   cannot have some discussion with people from Broetje about

14   the product, but in fact we always make, all has to be done

15   on the machine to make them work.  So even if you give some

16   suggestion, we were not involved on the design on the way

17   the machine was done.

18   Q.     Could you turn to Exhibit No. 43, please?  JTX-43.

19   A.     (Witness complies.)

20   Q.     Do you recognize this as an order from my client to

21   F2C2?

22   A.     Yes.

23              MR. KELLEHER:  Your Honor, I would offer the

24   admission of Exhibit JTX-43 as unobjected to.

25              MR. HOROWITZ:  No objection, Your Honor.

Bornes - cross

1              THE COURT:  It's admitted.

2              (JTX-43 is admitted into evidence.)

3    BY MR. KELLEHER:

4    Q.     So this is an order from Broetje to AHG for a system

5    to be installed at a Shorts Brothers in Ireland; is that

6    correct?

7    A.     Yes.

8    Q.     And I see Paragraph No. 1 says there is a rack.

9    Paragraph No. 2 says there is cassettes?

10   A.     Yes.

11   Q.     Do you see that?

12              Would you turn to the next page?

13   A.     (Witness complies.)

14   Q.     About halfway down the page, you see circuit diagram?

15   A.     Yes.

16   Q.     And it says:  Will be prepared by Broetje Automation.

17   Do you see that?

18   A.     Yes.

19   Q.     And do you see:  Software will be prepared by Broetje

20   Automation?

21   A.     Yes, this was the order from Broetje.  They want to

22   be able to drive the system, by their own system.  So we

23   give them the schematics so they will be able to make it by

24   themselves.  And after awhile, we decided that it was not

25   working well, so we have put on the system our own system to

Bornes - cross

1    drive it because we feel it was better with that.  Yes.

2    Q.     Mr. Bornes, you indicated that after you received the

3    e-mail from Mr. Maylander at my client complaining about the

4    relationship, the new relationship with Gemcor, that you

5    began to receive a lot of fault reports.  Do you remember

6    that?

7    A.     Yes.

8    Q.     Did you ever receive any fault reports before that?

9    A.     Yes, sure.  Far less.

10   Q.     Far less?

11   A.     Yes.  The amount was increasing.

12   Q.     Did you ever receive a letter from Mr. Neugebauer

13   at my client indicating that Broetje was considering other

14   options for the rivet feed system because of the technical

15   problems that we had had with you?

16   A.     Yes.

17               MR. HOROWITZ:  Objection, Your Honor.  I believe

18   I know which exhibit this is going to, and we should

19   approach on that exhibit.

20               THE COURT:  All right.  We'll have a discussion

21   at sidebar.

22               (Sidebar conference held.)

23               MR. HOROWITZ:  I assume this is going to be --

24               THE COURT:  Did you want to talk to him?  You

25   guys can go talk among yourselves.

Bornes - cross

1                 (Attorneys confer.)

2                 THE COURT:  All right.  What is the issue?

3                 MR. HOROWITZ:  What this is, is there is an

4       exhibit.

5                 THE COURT:  Speak up.

6                 MR. HOROWITZ:  DTX-1018.  It's a letter that he,

7       counsel, if I'm not misrepresenting, correct me, not offered

8       into evidence, but he wants to examine on the content of the

9       letter which is why I stood up because I recognized.  This

10      is a letter we did object to on the objection list, the

11      pretrial order.

12                As you can see, it's unsigned.  There is no

13      evidence that it was ever sent or received by Mr. Bornes.

14      We asked the 30(b)(6) witness at his deposition because

15      obviously he was focused on this.  They couldn't verify that

16      it was sent or received by Mr. Bornes and therefore not only

17      should it not come into evidence but I think it is very

18      highly prejudicial, 401, 402.  And he should not be allowed

19      to cross-examine on the content because there is no evidence

20      to it's authentication.

21                THE COURT:  All right.  Mr. Kelleher.

22                MR. KELLEHER:  Your Honor, I'm not planning on

23      getting this exhibit in with this witness.  I'm going to

24      get it in through the author, Mr. Neugebauer, who will be

25      testifying later who will testify he did in fact send it.  I

Bornes - cross

1    asked him whether or not he ever received a letter from any

2    client indicating they were considering changing rivet feed

3    suppliers because of technical problems.  He already

4    answered yes to that question.

5              My only follow-up was going to be did he receive

6    it before he received the later letter from Mr. Neugebauer

7    saying because of Gemcor that they might be changing

8    suppliers.

9              THE COURT:  I understand you are not going to

10   try to move the letter in through him.  Are you showing it

11   to him?

12             MR. KELLEHER:  No, Your Honor.

13             THE COURT:  Is it in the binder?

14             MR. KELLEHER:  I don't know.

15             MR. HOROWITZ:  It is in the binder.

16             THE COURT:  I mean you are not planning to have

17   him look at it.

18             MR. KELLEHER:  Yes.

19             THE COURT:  And you are representing

20   Mr. Neugebauer will be here live to testify?

21             MR. KELLEHER:  Yes, he was here yesterday.

22             THE COURT:  And he said he wrote this letter and

23   mailed it to Mr. Bornes?

24             MR. KELLEHER:  Yes.

25             THE COURT:  All right.

Bornes - cross

1            MR. KELLEHER:  And for the 30(b)(6) issue, the

2     letter itself was not a 30(b)(6) topic, and whether or not

3     my witness would have been able to say whether a thousand

4     different documents were sent and received, 30(b)(6)

5     depositions are not memory tests like the case law says.

6            THE COURT:  It seems with that representation

7     that it's a fair topic for cross-examination, but maybe I'm

8     missing something.

9            MR. HOROWITZ:  Well, the topic of

10    cross-examination of Mr. Neugebauer or whether or not he

11    sent an unsigned letter, of course, we can cross-examine on

12    that, I agree, but I don't think that it's fair to use with

13    this witness in front of the jury because it's prejudicial.

14           THE COURT:  Right.  Did I misunderstand?  You

15    are not going to use the letter; correct?

16           MR. KELLEHER:  Correct.

17           THE COURT:  So, what, you have one more

18    question?

19           MR. KELLEHER:  My one more question is:  Did

20    you receive that letter before you received the later letter

21    from Mr. Neugebauer?

22           THE COURT:  Did you receive a letter before?

23           MR. KELLEHER:  Yes.

24           THE COURT:  You are not going to have him look

25    at the letter?

Bornes - cross

1              MR. KELLEHER:  He already said yes in response

2     to my question.

3              MR. HOROWITZ:  In response to that, the man said

4     yes to 98 percent of the questions asked.

5              THE COURT:  All right.

6              MR. HOROWITZ:  But if there is one additional

7     question ...

8              THE COURT:  To the extent there is an objection

9     it's overruled.  We'll have the one more question and we'll

10    move on.

11             MR. KELLEHER:  Thank you, Your Honor.

12             (Sidebar conference ends.)

13             THE COURT:  You may continue.

14    BY MR. KELLEHER:

15    Q.    Mr. Bornes, that letter concerning Mr. Broetje

16    considering a new rivet bead supplier, did you receive that

17    letter before you received the letter we looked at earlier

18    today, the e-mail from Mr. Neugebauer earlier today --

19    A.    Yes.

20    Q.    -- that Gemcor was considering a new supplier?  I

21    think yes was your answer.

22    A.    Okay.

23             THE COURT:  Was yes the answer?

24             MR. HOROWITZ:  Your Honor, just to be sure.

25             THE TRANSLATOR:  Repeat the question.

Bornes - cross

1                    (Translator and witness confer.)

2                    THE WITNESS:  It's hard to understand you, sir.

3                    THE COURT:  Let's ask the question again.

4                    MR. KELLEHER:  I will try one more time.

5                    THE COURT:  Is there an objection?

6                    MR. HOROWITZ:  There is an objection.  I don't

7      want to approach again but I have a solution that I would

8      propose that would be more fair and practical to the witness

9      on this question.

10                   THE COURT:  You have an objection to the

11     question that was asked?

12                   MR. HOROWITZ:  Yes.  Yes, I do.

13                   THE COURT:  All right.  I'll see you at sidebar.

14                   (Sidebar conference held.)

15                   THE COURT:  All right.  What is the issue?

16                   MR. HOROWITZ:  My proposed solution is he is

17     asking him about a specific letter.  He characterized it in

18     his question as a specific letter.  I think the witness

19     should, without showing it to the jury, should see the

20     letter that he is talking about as the predicate for his

21     question and answer the question in that context because I

22     think it's unfair for the witness, in the abstract,

23     especially with the translation issues, to not have the

24     letter in front of him as he is asking about a specific

25     letter.

Bornes - cross

1          THE COURT:  What is your position?

2          MR. KELLEHER:  I think that is for redirect.

3          THE COURT:  You want a general answer to "did he

4     receive a letter before he got the e-mail;" right?

5          MR. KELLEHER:  Yes.

6          THE COURT:  All right.  I'm going to allow him

7     to get an answer to that question.  You can -- I take it you

8     are not going to object if he wants to show him the specific

9     letter on redirect.

10          MR. KELLEHER:  I don't.

11          THE COURT:  Okay.

12          MR. HOROWITZ:  One last thing.  I apologize but

13     that wasn't the question that was just asked.  He is

14     referring to the letter as opposed to the general question.

15          THE COURT:  I do think "the" and "a" even in

16     English can get a little confused at times, and we also had

17     a break in between the first question and the second

18     question.  So you are going to ask essentially, I don't know

19     what words you'll use, but did you receive a letter from

20     Mr. Neugebauer before you got the e-mail that we have

21     already seen; correct?

22          MR. KELLEHER:  Yes.

23          THE COURT:  Okay.  Thank you.

24          (Sidebar conference ends.)

25

Bornes - redirect

1    Q.    Mr. Bornes, I'm going to try one more time.  So did

2    you receive a letter from Mr. Neugebauer at Broetje saying

3    that Broetje was considering using a new supplier because of

4    the technical, because of technical problems before you

5    received the letter or e-mail from Mr. Neugebauer saying

6    Gemcore was the problem?

7    A.    Yes.

8                    MR. KELLEHER:  I don't have any more problems.

9                    THE COURT:  Thank you.  Redirect.

10                   MR. HOROWITZ:  Just a few questions, Mr. Bornes.

11                   Before I forget, Your Honor, I forgot to move in

12   PTX-570, and at this time I would offer into evidence

13   PTX-570, which is one of the cassettes that we used with the

14   jury.

15                   MR. KELLEHER:  No objection.

16                   THE COURT:  All right.  It's admitted.  Thank

17   you.

18                   (PTX-570 was admitted into evidence.)

19                   MR. HOROWITZ:  If we could pull up DTX-1944 that

20   you were asked questions about.  It's in the back of the

21   binder that plaintiffs' counsel used with you.

22                   THE COURT:  Identified as PTX-129.  Same

23   document; is that correct?

24                   MR. HOROWITZ:  It is PTX-129.  I believe he also

25   offered the English translation, DTX-1944.

Bornes - redirect

```
 1              MR. KELLEHER:  I did.  You'll notice, Your
 2   Honor, DTX-1944 contains the marking.  PTX-129, the
 3   translator left it out.
 4              THE COURT:  Thank you for that clarification.
 5              MR. HOROWITZ:  I'm going to use the English
 6   translation for everybody's benefit --
 7              THE COURT:  Fine.
 8              MR. HOROWITZ:  -- including mine.
 9                    REDIRECT EXAMINATION
10   BY MR. HOROWITZ:
11   Q.    If we could turn to a page you were asked about,
12   DTX-1944.0024.
13              Do you see that?
14              THE COURT:  What was that page again?
15              MR. HOROWITZ:  It's -- this is it.  PTX-19.24,
16   or DTX-1944.024.
17              THE WITNESS:  Yes.
18   BY MR. HOROWITZ:
19   Q.    Are you with me?  Looking at the fourth bullet point
20   down, what does it say with regard to --
21   A.    Oh, excuse me.  I have the only one in French.
22   Q.    Okay.  It's at the back.  It's at the back of the
23   binder.  The very back.
24   A.    Oh.  I'm sorry.  Okay.  Excuse me.  24.  Okay.
25   Q.    You were asked about this document; right?
```

Bornes - redirect

1   A.      Yes.

2   Q.      Okay.  But you weren't directed to this bullet point,

3   were you?

4   A.      No.

5   Q.      If you take a look at the first sentence, what does

6   the first sentence say about use of the aluminum envelope or

7   the three-sided aluminum cassette?

8   A.       It said, recommissioning of the rigid aluminum

9   envelope of the 1990s.  The envelope is embellished with a

10  polycarbonate window on its side so that the rivets can be

11  seen when the cassette is in a distribution rack or filling

12  machine.

13  Q.      So that's the aluminum, the aluminum cassette that

14  you were using in the 1990s before you went to plastic?

15  A.      Yes.

16  Q.      And were you going back to that look and feel that

17  you had before with the aluminum?

18  A.      Yes.

19  Q.      Okay.  If you could turn, just going to do a couple

20  things.  PTX-206.1.

21  A.      Yes.

22  Q.      Just waiting for -- 206, PTX-206.  You were asked

23  about this advertisement.

24          Do you see that?

25  A.      Yes.

Bornes - redirect

1   Q.     All right.  And if you go to the first sentence where

2   it says, a cassette consists of, what's the first thing that

3   it says underneath, a cassette consists of?

4   A.    It's a coil of patented tube which allows the free

5   flow of fasteners.

6   Q.     A coil of patented tube which allows the free flow of

7   fasteners.  Was that your patent on the tube?

8   A.     Yes.

9   Q.     And this was actually put in advertisements that were

10  sent out about your system?

11  A.     Yes.

12  Q.     You were asked a little bit about the letter that

13  your lawyer sent to Broetje in 2005, your French lawyers,

14  when you found out about what Broetje was doing; is that

15  right?

16  A.     Yes.

17  Q.     And they were asking you questions about whether or

18  not you investigated in the United States and, you know, why

19  couldn't you have figured out before 2007 what was going on

20  in the United States.

21         Do you recall that?

22  A.     Yes.

23  Q.     When you sent the letter to -- your lawyers sent the

24  letter to Broetje in 2005, did Broetje write you back and

25  say, oh, by the way, here's a list of the countries we're

Bornes - redirect

1    doing this in?

2    A.      No.

3    Q.      Did they volunteer to you that they were doing this

4    in the United States?

5    A.      Yes.

6    Q.      Did they tell you?

7    A.      No.

8    Q.      Did they tell you?

9    A.      Excuse me.  No, they didn't.  They didn't tell me.

10   Q.      Did they leave it to you to find out on your own?

11   A.      Yes.

12   Q.      Did they ever tell you what they were doing with

13   these cassettes?

14   A.      No.

15            MR. HOROWITZ:  No further questions, Your Honor.

16            THE COURT:  All right.  Mr. Bornes, you may step

17   down.  Thank you very much.

18            THE WITNESS:  Thank you.

19            (Witness excused.)

20            THE COURT:  Who is the next witness going to be?

21            MR. LINDVALL:  Your Honor, we have very video

22   clips.

23            THE COURT:  How long is the first one?

24            MR. HOROWITZ:  Your Honor, the total for the

25   first one is 21 minutes.

Bornes - redirect

1          THE COURT:  Okay.  We'll play the 21 minutes and

2     then we'll have our lunch break.

3          MR. LINDVALL:  A brief introduction?

4          THE COURT:  Yes, you may.  Of course.

5          MR. LINDVALL:  You're going to be looking at

6     deposition testimony.  It's going to be video on the screen

7     and we will be playing excerpts from a deposition of Dr.

8     Axel Peters.  Now, he's the Chief Operating Officer of

9     Broetje.  He's an employee of Broetje and he's the Chief

10    Operating Officer.  And this is Broetje Germany.

11         He will discuss the development and use of

12    Broetje's rivet distribution system and also Broetje's

13    awareness of AHG's patents and Broetje's redesign of its

14    cassette in response to the French Court judgment.

15         Please note, though, you'll see various clips.

16    The final clip was done over a telephone, so you'll hear a

17    different sound, between Germany and the U.S., so the sound

18    quality may be poor.  Dr. Peters also will be testifying

19    during that portion through a translator from German to

20    English.

21         Thank you.

22         THE COURT:  All right.  Ladies and gentlemen,

23    understand a deposition is testimony that is given under

24    oath but out of Court and we'll turn the lights down.

25         Go ahead and play it, please.

408

Peters - designations

1                    (Videotaped deposition of Dr. Axel Peters was

2       played as follows.)

3                    "Question:  For the record, could you please

4       state your full name?

5                    "Answer:  Axel Peters.

6                    "Question:  Now, Dr. Peters, as you understand,

7       you're under oath in this proceeding?

8                    "Answer:  Yeah.

9                    "Question:  Okay.  Dr. Peters, who are you

10      currently employed by?

11                   "Answer:  Broetje Automotive GmbH.

12                   "Question:  What is your position?

13                   "Answer:  I am chief operating officer.  Head of

14      operations.

15                   "Question:  When did you become employed by

16      Broetje Germany?

17                   "Answer:  2008.

18                   "Question:  Can you give me a better idea?  Was

19      it -- what month in --

20                   "Answer:  September.

21                   "Question:  Now, you understand that you're here

22      to testify on behalf of Broetje Germany, correct?

23                   "Answer:  Uh-huh.

24                   "Question:  And that your answers or your

25      responses to my questions will be responses to behalf of the

Peters - designations

1    company?

2              "Answer:  Yes.

3              "Question:  Okay.  Have you seen this document

4    before, Exhibit --

5              "Answer:  No, I haven't seen this one.

6              "Question:  Do you know whether this letter,

7    this agency contract, refers to AHG's fastening system or

8    not, fastening feeding system?

9              "Answer:  Just says something from agency

10   contract.

11             "Question:  And you don't know what the agency

12   contract is?

13             "Answer:  No.  I haven't seen it.

14             "Question:  Do you know what other systems other

15   than fastening systems that Broetje was discussing with AHG

16   in this time frame?

17             "Answer:  I don't think any other systems.

18             "Question:  You think that the only systems that

19   were being discussed between AHG and Broetje in this time

20   frame were the fastening feeding systems?

21             "Answer:  Might be, yeah.

22             "(Exhibit 41 marked for identification.)

23             "Question:  So you what you've marked as Exhibit

24   41.  This has production numbers BA1238 through 1294.

25             "Answer:  Yeah.

Peters - designations

1    "Question:  Have you ever seen this document?

2    "Answer:  Yeah."

3    (Videotaped deposition stopped.)

4    MR. LINDVALL:  Your Honor, at this time we are

5 going to move to enter into evidence JTX-14 and have it

6 published side by side so the jury can understand his

7 testimony.

8    THE COURT:  Any objection?

9    MR. KELLEHER:  No objection.

10    THE COURT:  All right.  It's admitted.

11 (JTX-14 was admitted into evidence.)

12    (Videotaped deposition resumed.)

13    "Question:  What is this?

14    "Answer:  It's an internal documentation for the

15 development of the rivet feeding system.

16    "Question:  Okay.  And this is dated June 23,

17 2003?

18    "Answer:  Yes.

19    "Question:  And this is all proprietary,

20 correct?

21    "Answer:  Yes.

22    "Question:  Okay.  And this document relates,

23 you said, to the development by Broetje of a rivet feeding

24 system?

25    "Answer:  Yes.

411

Peters - designations

1              "Question:  And what was the purpose of

2      developing a rivet feeding system?

3              "Answer:  The purpose was to have our own

4      feeding system.

5              "Question:  And in 2003, is that when CLAAS

6      purchased Broetje?

7              "Answer:  I don't -- you have to ask -- no, I

8      can't really say that.  I can't really prove that.

9              "Question:  Okay.  Now, if you look on page

10     BA1250 of Exhibit 41.

11             "Answer:  Yeah.

12             "Question:  The left-hand photograph, what is

13     that?

14             "Answer:  It's an AHG system.

15             "Question:  What type of system is that?  Do you

16     know?

17             "Answer:  It's a loading station.

18             "Question:  Loading station?

19             "Answer:  Yeah.

20             "Question:  Do you know why AHG's loading

21     station system photograph was in Broetje's development

22     document for their own system?

23             "Answer:  Because it's an example of an existing

24     equipment on the market.

25             "Question:  And Broetje had used AHG systems?

1          "Answer:  Yes.

2          "Question:  If you would turn to page BA1255 on

3     Exhibit 41.

4          "Answer:  Yes.

5          "Question:  1255.  Are you on that?

6          "Answer:  55.  Oh, sorry.

7          "Question:  Yeah.  1255.

8          "Answer:  Yeah.

9          "Question:  Do you know what that is that's

10    shown?

11         "Answer:  Yes.

12         "Question:  What is it?

13         "Answer:  Rivet cassette.

14         "Question:  And who manufactures this rivet

15    cassette?

16         "Answer:  AHG.

17         "Question:  Okay.  Do you know why this -- AHG's

18    rivet cassette is being shown in Broetje's internal

19    documentation relating to its development of its own

20    cassette?

21         "Answer:  Because it's an example of the rivet

22    cassette.

23         "Question:  And why would there be an example of

24    a rivet cassette shown?

25         "Answer:  Because you want to develop your own

1    system.  Because we wanted to develop our own system.

2                "Question:  And if you turn to the next page of

3    Exhibit 41, do you know what -- whose cassette this is?

4                "Answer:  1256?

5                "Question:  1256, yes.

6                "Answer:  This is also AHG.

7                "Question:  How can you tell?

8                "Answer:  Because we didn't use this counters in

9    front, the number counters.

10               "Question:  Okay.  And if you turn to the next

11   page on 1257 --

12               "Answer:  Yeah.

13               "Question:  -- page 1257, Exhibit 41, do you

14   know whose cassette system this is?

15               "Answer:  Also AHG.

16               "Question:  Okay.  And how can you tell that?

17               "Answer:  I guess because of the closer here.

18   The -- how is you say -- the cap.

19               "Question:  With the little chain on it?

20               "Answer:  Yes.

21               "Question:  And is that because Broetje didn't

22   have the little chain?

23               "Answer:  We didn't have this chain, no.

24               "Question:  Okay.  And if we turn to the next

25   page on BA1258 of Exhibit 41, do you know whose cassette

Peters - designations

1    that is?

2                "Answer:  Yes.

3                "Question:  Whose?

4                "Answer:  AHG.

5                "Question:  And what's that a photograph of?

6                "Answer:  It's the separator.

7                "Question:  Okay.  Do you know why the

8    photograph of the AHG separator for the cassette is shown in

9    Broetje's internal documentation to develop its own

10   cassette?

11               "Answer:  Because it's an example of a

12   separator.

13               "Question:  Now, if you turn to page BA1262 of

14   Exhibit 41.

15               "Answer:  Yes.

16               "Question:  Do you know whose cassettes those

17   are?

18               "Answer:  Yes.

19               "Question:  Whose?

20               "Answer:  AHG.

21               "Question:  How do you know they're AHG's

22   cassettes?

23               "Answer:  Because it's a plastic cover -- or

24   plastic side sheets.

25               "Question:  Okay.  If you turn to the next page

Peters - designations

1    on BA1263 of Exhibit 41, do you know whose portion of the

2    rack that is?

3              "Answer:  It must be also AHG.

4              "Question:  Okay.  And if you turn to BA1264

5    of Exhibit 41, do you know whose portion of the rack that

6    is?

7              "Answer:  Also AHG.

8              "Question:  Okay.  Now, you bought cassettes for

9    approximately, what, seven years from AHG?  Seven,

10   eight years until you developed your own product?

11             "Answer:  Yeah.

12             "Question:  So you -- so you bought the product

13   and sold it to your customer for seven or eight years?

14             "Answer:  Yes.

15             "Question:  AHG's product; correct?

16             "Answer:  Yes.

17             "Question:  And it wasn't until that period of

18   time went by that you decided to develop your own system?

19             "Answer:  Correct.

20             "Question:  And in developing your own system,

21   you used as an example of developing your own system AHG's

22   own product; correct?

23             "Answer:  Yes.

24             "Question:  How long did it take Broetje to

25   develop its own fastener feeding system that's shown in

416

Peters - designations

1   Exhibit 41?  Do you know how long that development took?

2                "Answer:  One year.

3                "Question:  Okay.  And do you know whether

4   anyone at Broetje told AHG that Broetje was developing their

5   own fastener feeding system during this time frame?

6                "Answer:  I don't know that.

7                "Question:  You don't know one way or another?

8                "Answer:  I don't know if anybody told

9   something.  I don't know.

10               "Question:  And the intent was to replace AHG's

11  fastener feeding system with Broetje's fastener feeding

12  system?

13               "Answer:  Yes.

14               "Question:  Okay.  So Broetje had completed its

15  development of its own fastener feeding system in the time

16  frame in 2004?  Does that sound right?

17               "Answer:  End of 2004, yeah.

18               "Question:  Now, if we look on page BA1263 of

19  Exhibit 41, do you know what component we're looking at

20  there?

21               "Answer:  Yes.

22               "Question:  What component is that?

23               "Answer:  It's the rack.

24               "Question:  Okay.  And who made the rack in --

25  at the time this document was produced?

1               "Answer:  F2C2.

2               "Question:  And that would likely be F2C2's

3       component; correct?

4               "Answer:  I guess, yeah.

5               "Question:  And next page, on BA1264 on Exhibit

6       41, and what component is this?  Is this part of the rack?

7               "Answer:  Yes.

8               "Question:  And that would likely be F2C2's,

9       correct?

10              "Answer:  Yes.

11              "Question:  In Exhibit 41, the only rack,

12      loading station, and cassette that is shown as an example is

13      AHG's; is that correct?

14              "Answer:  Yeah.  In this document, yes.

15              "Question:  Okay.  Now, other than AHG's

16      cassette, are there any other cassettes that can fit on

17      Broetje's fastening machines?

18              "Answer:  No.  If you are just talking about

19      cassettes.

20              "Question:  Okay.  What about racks?  Are there

21      any -- any other racks besides AHG's racks that can be used

22      with Broetje's fastening machines?

23              "Answer:  If you are just talking about racks,

24      no.

25              "Question:  In the 2000 time -- 2003 time frame,

1    did anyone have any loading systems which could be used to

2    load either -- well, load AHG cassettes?

3                    "Answer:  Not to load AHG cassettes, no.

4                    "Question:  So only AHG loading systems could be

5    used to load AHG cassettes?

6                    "Answer:  At this time, yes."

7                    "Question:  If you could look at Exhibit 11,

8    please.

9                    "Answer:  Yes.

10                   "Question:  Okay.  Have you ever seen this

11   document do before?

12                   "Answer:  Some kind of, yeah.

13                   "Question:  Okay.  What's the purpose of this

14   document?

15                   "Answer:  It's a user manual.

16                   "Question:  Do you have these user manuals in

17   English also?

18                   "Answer:  Yeah, we should have.

19                   "Question:  And this is for the Broetje

20   cassette?

21                   "Answer:  Yes.

22                   "Question:  These type of documents are

23   maintained on your servers in Germany?

24                   "Answer:  Yes.

25                   "Question:  Okay.  And you'd expect you'd have

Peters - designations

1    an English version of this document in your servers?

2              "Answer:  If we didn't provide any, yes.

3              "Question:  If we could look at Exhibit 12,

4    please.

5              "Answer:  Uh-huh.

6              "Question:  Have you seen Exhibit 12 before?

7              "Answer:  Yes.

8              "Question:  And what is the purpose of this

9    document?

10             "Answer:  Description of the AFFS.

11             "Question:  Is this a description of the AFFS of

12   AHG or Broetje?

13             "Answer.  It's from AHG.

14             "Question:  And was this document created by

15   Broetje?

16             "Answer:  Yes.

17             "Question:  And is this used with customers?

18             "Answer:  No.

19             "Question:  Who's it used with?

20             "Answer:  It's internal presentation of the

21   system.

22             "Question:  Why would you have an internal

23   presentation of the system?

24             "Answer:  To know what the system is with, what

25   components are there and so on.  To know what the system is,

1    yeah.

2                   "Question:  To understand the function and

3    operation of the system?

4                   "Answer:  Just to show what the components are,

5    and, yeah, what the function of each component is.

6                   "Question:  Who would -- who at Broetje -- what

7    type of person would -- at Broetje would have access to this

8    type of documents?  Engineers?

9                   "Answer:  Engineers, yeah, for example, because

10   you have the dimensions in here you need when you want to

11   place them on the machine.

12                  "Question:  And why is a document like this

13   created?

14                  "Answer:  You need to know how things look, how

15   they behave, and how you can use them in your system.  Just

16   to have an overview.

17                  "Question:  Did you know that AHG had U.S.

18   patents?

19                  "Answer:  Yes.

20                  "Question:  Okay.  And you knew that before this

21   lawsuit was filed?

22                  "Answer:  Yes.

23                  "Question:  Do you know when Broetje learned

24   that AHG had U.S. patents?

25                  "Answer:  2003.

Peters - designations

1              "Question:  In 2003?

2              "Answer:  Yes.

3              "Question:  And the U.S. patents that Broetje

4    learned about were Exhibits 2 and Exhibit 3?

5              "Answer:  Yes.

6              "Question:  And that was -- they learned about

7    those patents in 2003; correct?

8              "Answer:  Yes.

9              "Question:  And do you know when Dr. Budach

10   created his opinion relating to the U.S. patents, Exhibit 2

11   and Exhibit 3?

12             "Answer:  Yes.

13             "Question:  When?

14             "Answer:  2003.

15             "Question:  Besides AHG, do you know of any

16   other companies which sell cassettes such as Exhibit 7, or

17   as AHG's cassette, which could be used with Broetje's

18   fastening machines in the United States?

19             "Answer:  No.

20             "Question:  So when I mention PTX-605, that is

21   the actual physical redesign cassette that you have with

22   you?

23             "Answer:  Ya.

24             "Question:  You understand that, Dr. Peters?

25             "Answer:  Yes.  I said yes already."

Peters - designations

1                MR. LINDVALL:  Your Honor, for context, may I

2        have PTX-615.

3                THE COURT:  Yes.  615?  You may.

4                MR. KELLEHER:  No objection.

5                MR. LINDVALL:  It's the redesign.

6                THE COURT:  615 is not in evidence yet?

7                MR. LINDVALL:  No, it is not.

8                THE COURT:  So you are moving?

9                MR. LINDVALL:  We'll move it.

10               THE COURT:  615 is admitted.

11               (PTX-615 is admitted into evidence.)

12               THE COURT:  For the record, it is being left on

13       the table near the jury box.

14               MR. LINDVALL:  I'm sorry.  The cassette is the

15       exhibit number PTX-650.

16               THE COURT:  650?

17               MR. LINDVALL:  650.  I'm sorry.

18               THE COURT:  Any objection to 650?

19               MR. KELLEHER:  No objection.

20               THE COURT:  Exhibit 650 is admitted.

21               (PTX-615 is admitted into evidence.)

22               THE COURT:  Go ahead and play the rest of it.

23               "Question:  Okay.  What does the Exhibit PTX-615

24       show?

25               "Answer:  615 shows a photography of the

Peters - designations

1    cassette.

2              "Question:  Okay.  And is this the same cassette

3    as the cassette PTX-650 that you have with you?

4              "Answer:  Ya.

5              "Question:  Now, Dr. Peters, were you yourself

6    personally involved in the redesigning of the cassette?

7              "Answer:  Ya.

8              "Question:  Okay.  And when did Broetje begin

9    redesigning this cassette?

10             "Answer:  After we got a court judgment in

11   France.

12             "Question:  And what about the court judgment in

13   France caused you to redesign the cassette?

14             "Answer:  We were informed by our legal staff

15   that we would have to redesign, newly design the cassette.

16             "Question:  Okay.  Did they tell you why you had

17   to redesign the cassette?

18             "Answer:  So that the cassette would be clearly

19   recognizable as our cassette.

20             "Question:  And what is PTX-651?

21             "Answer:  651 is the construction drawing of the

22   cassette.

23             "Question:  Okay.  And is this the construction

24   drawing of the new cassette, the new redesign cassette?

25             "Answer:  It is not redesigned, it has just

Peters - designations

1  changed in color, and that's the design for the change.

2              "Question:  Okay.  So you said the cassette had

3  changed in color.  What colors had changed in the cassette

4  from the original Broetje cassette?

5              "Answer:  The handle is now the silver color.

6              "Question:  Okay.  So the color of the handle

7  changed from black to silver; is that correct?

8              "Answer:  Ya.

9              "Question:  Okay.  Has shape of the handle

10  changed?

11              "Answer:  There is a slight change in the

12  geometry.

13              "Question:  Okay.  What about the change -- has

14  there been any change in colors of the, the chrome color

15  that the original Broetje cassette had?

16              "Answer:  The sheet metal covering of the

17  cassette has been changed to red.

18              "Question:  Okay.  Now, has the coloring of the

19  clear plastic cover changed?

20              "Answer:  We added the company branding to the

21  plastic cover and we left the openings for the hose and the

22  separator.

23              "Question:  Now, was there any change with

24  respect to the function of the cassette?

25              "Answer:  We did not make any changes in the

425

Peters - designations

1   function of the cassette.

2          "Question:  Now, let's look at the Exhibit

3   PTX-652.  It's a drawing.

4          "Answer:  Okay.  652.1.  Okay.  Yes.

5          "Question:  Yes.  What is Exhibit PTX-651.1?

6          "Answer:  It's a drawing of the inside view of

7   the cassette.

8          "Question:  And this is a drawing of the new

9   cassette?

10         "Answer:  It's a drawing of the old and a new

11  cassette.  The changes -- the changes that are shown are for

12  the cover.

13         "Question:  Okay.  And what has changed with

14  respect to the cover?

15         "Answer:  The cover is more closed, and the two

16  windows can be seen as well as the Broetje logo.

17         "Question:  Now, how long did it take to make

18  these changes to the cassette?

19         "Answer:  The constructive changes were

20  implemented fairly quickly.  What is a little bit more time

21  consuming is the coloring change of the metal covering.

22         "Question:  Have you provided this new cassette

23  to any customers?

24         "Answer:  The cassette still is a prototype

25  because we cannot put it yet into production.

1          "Question:  And does Broetje have any plans,

2     once it takes care of that issue, to use these cassettes

3     with any customers or provide these cassettes to any

4     customers?

5          "Answer:  We will in the future use this

6     cassette as a matter of course.

7          "Question:  Okay.  And will you use this with

8     all customers, including customers in the United States?

9          "Answer:  As soon as we got the cassette

10    working, we will do that.

11         "Question:  Okay.  Do you have an estimate in

12    when this cassette will be finalized?

13         "Answer:  Within the next one or two months.

14         "Question:  I understand that the only thing

15    that has changed with the new cassette is the colors and the

16    shape of the handle; is that correct?

17         "Answer:  That, and the printing on the cover.

18         "Question:  Okay.  And I understand that there

19    has been nothing changed that would affect the function of

20    the cassette; is that correct?

21         "Answer:  We did not institute any functional

22    changes.

23         "Question:  Now, did you make any changes to the

24    cross-sectional shape of the tubes that will be used?

25         "Answer:  No, we did not make any changes on

1      the -- on the tubes.

2              "Question:  Dr. Peters, is there a way for you

3      to give me an approximate estimate of what it costs Broetje

4      to redesign this cassette?

5              "Answer:  I cannot give an estimate because we

6      did not make material design changes, and purchasing is now

7      working on the color.  And otherwise, the changes we made to

8      the drawing took about two or three hours, but the new

9      cassette definitely will be higher in price.

10             "Question:  Do you understand that the French

11     court found that the Broetje cassette was identical, had an

12     identical exterior appearance to the cassette from AHG and

13     F2C2 Systems?

14             "Answer:  We were told that we had to change our

15     design.

16             "Question:  Okay.  And you were told that by

17     your lawyers; correct?

18             "Answer:  Dr. Budach is the internal patent

19     attorney.

20             "Question:  So it was Dr. Budach that told you

21     that you had to change the design?

22             "Answer:  Ya.

23             "Question:  Does Dr. Budach still represent

24     Broetje?

25             "Answer:  Yes, in this matter.

1    "Question:  Okay.  And is Dr. Budach still

2 employed by CLAAS?

3    "Answer:  Ya.

4    "Question:  Now, let me show you what has been

5 marked as, it's PTX-613T.

6    "Answer:  Ya.

7    "Question:  And this is a translated version of

8 the ruling by the Paris Court of Appeals.  Do you see this?

9    "Answer:  Ya.

10    "Question:  Have you ever seen the decision by

11 the French court?

12    "Answer:  I've seen the decision in German.

13    "Question:  Okay.  Now, if you could turn to the

14 page PTX-613T.23.

15    "Answer:  Ya.

16    "Question:  Okay.  And if you look at the

17 paragraph, one, two, three, the seventh paragraph down.

18    "Answer:  Ya.

19    "Question:  And there is a statement in there,

20 it says, quote, but on the fact that this company

21 commercializes cassettes that are identical to those from

22 AHG at F2C2 Systems.

23    "Do you see that?

24    "Answer:  Ya.

25    "Question:  Okay.  And then the next paragraph,

429

Peters - designations

1    if you look at the next paragraph on page -- it's PTX-613

2    T.23.  At the end, it says that the latter company,

3    referring to Broetje, quote, is commercializing a cassette

4    with an identical exterior appearance to the cassette from

5    AHG and F2C2 System.

6              "Do you see that?

7              "Answer:  I cannot make any statements on

8    counsel matters.

9              "Question:  Okay.  But do you have an

10   understanding that that's what the French court found?

11             "Answer:  As I stated, Dr. Budach gave us

12   instructions to change the color of the cassette.

13             "Question:  Okay.  Do you understand that

14   Dr. Budach gave those instructions to you because the French

15   court found that the Broetje cassette was identical in

16   exterior appearance to the AHG and F2C2 cassette?

17             "Answer:  You will have to check that with

18   Dr. Budach.

19             "Question:  Now, Dr. Peters, what was the goal

20   of the project which led to what we see as Exhibit PTX-650,

21   which was is the redesign cassette?

22             "Answer:  As I said before, our legal staff

23   insists that we change the way the cassette looks."

24             (Designations end.)

25             MR. LINDVALL:  Thank you, Your Honor.  I move to

Peters - designations

1    admit the exhibits that we laid the foundation on and they

2    would be JTX-7, JTX-8, JTX-14, PTX-613T, PTX-615, PTX-650,

3    PTX-651, and PTX-652.

4            THE COURT:  Any objections?

5            MR. KELLEHER:  I'm reserving what we had done

6    earlier but no objection otherwise.

7            THE COURT:  Okay.  Those are all admitted.

8            (JTX-7, JTX-8, JTX-14, PTX-613 T, PTX-615,

9    PTX-650, PTX-651, and PTX-652 are admitted into evidence.)

10           MR. LINDVALL:  Thank you, Your Honor.

11           THE COURT:  Well, we reached a good time for our

12   lunch break.  Ladies and gentlemen of the jury, I understand

13   your lunches are here so we'll get those to you almost

14   immediately.  Of course, no talking about the case after the

15   break and we'll get you back after the lunch.

16           (Jury left courtroom.)

17           THE COURT:  All right.  We'll check in about

18   half an hour and see if there is anything we need to discuss

19   before we bring the jury in.

20           We will be in recess.

21           (Lunch recess taken.)

22           *       *       *

23           Afternoon Session - 1:00 p.m.

24           THE COURT:  Bring the jury in.

25           MR. CAHR:  Your Honor, we just came to an

Peters - designations

1    agreement.

2                THE COURT:  All right.  We'll put the agreement

3    on the record.  That's fine.

4                MR. CAHR:  Sure.

5                MS. SHARP:  Your Honor, I think that we've

6    already put on the record the agreement is the reports do

7    not go in, that every attachment to the reports goes in,

8    both the original report and the supplemental report.

9    Neither side will comment on the absence of underlying

10   documents being admitted.  That is they won't complain that

11   there's some sort of failure of proof or insufficiency for

12   not putting those documents in.

13                And if there's something, I can make the

14   representations that the Court was looking for with respect

15   to the Daubert issues.  Round tubes were appropriately

16   backed out where it was required to be done in both

17   instances.  In some situations, systems were used with

18   infringing cassettes and cassettes with round tubes, so it

19   was still appropriate to include those systems because they

20   were used with both.  But the round tubes had been backed

21   out where they were supposed to be.

22                THE COURT:  All right.  And when you say

23   "exhibits," it would be the exhibits that are attachments

24   you are satisfied you can use with your expert or other

25   witnesses, whatever it is from the expert report that you

Peters - designations

1    wanted to use?

2              MR. CAHR:  And --

3              THE COURT:  I'm asking first Ms. Sharp.

4              MS. SHARP:  Yes.  That's correct, Your Honor.

5              THE COURT:  All right.  Mr. Cahr?

6              MR. CAHR:  And just to be clear, our agreement

7    also extends to the financial summaries that we would be

8    offering as well through Dr. Peters and other witnesses.  So

9    basically both sides have agreed that the financial

10   summaries that we are going to be offering are not going to

11   be challenged in terms of all of the underlying documents,

12   and so, you know, they'll just come in.

13             MS. SHARP:  Every time I think we've got it

14   pinned down, there's something else added that's not fair.

15   Well, they won't be challenged in the sense that we can

16   still cross on whether the calculations were accurate, but

17   we will not challenge the admission.

18             MR. CAHR:  Right.  No, no.  No.  Yes.

19             MS. SHARP:  Got it.

20             THE COURT:  The fact that the underlying

21   documents are not in evidence will not be a basis for

22   cross-examination.

23             MS. SHARP:  Right.

24             MR. CAHR:  Exactly right.

25             THE COURT:  I think you have an agreement.

1          MR. CAHR:  And then just for clarity, the

2    Daubert issues that we described in connection with the

3    demonstrative, we understand from your ruling that we're

4    just going to go forward with that.  So we just would

5    reserve our objections and we'll deal with that afterwards.

6          THE COURT:  Right.  Your objections are on the

7    record.  That's certain.

8          MS. SHARP:  I note only that the objection to

9    the supplemental report, the sole objection was hearsay.

10   Daubert was not raised before today.

11         MR. CAHR:  No, that's not true.  They were

12   raised --

13         THE COURT:  Well, whatever objections have been

14   raised have been ruled on, so let's bring the jury in.

15         MR. CAHR:  Okay.

16         (The jury entered the courtroom.)

17         THE COURT:  Welcome back, ladies and gentlemen.

18   I hope you've had a good lunch.  We are prepared to call.  I

19   will call on Mr. Lindvall to call the next witness.

20         MR. LINDVALL:  Your Honor, it is going to be one

21   more videotape.  It's going to be the videotape of Kenneth

22   Benczkowski, who is the Broetje representative here.  Again,

23   he's a Broetje employee.  We're offering him in our case,

24   AG's case.  And we will play excerpts from his deposition.

25              And he's the President of Broetje USA.  He will

434

Benczkowski - designations

1    testify about Broetje's knowledge of AHG's patents and the

2    development of Broetje's accused rivet distribution system.

3                    THE COURT:  And about how long do you think this

4    runs?

5                    MR. HOROWITZ:  15 minutes, Your Honor.

6                    THE COURT:  Okay.  Thank you very much.

7                    (Designations of Kenneth Benczkowski placed into

8    the record.)

9                    "Question:  Could you please state your name for

10   the record?

11                   "Answer:  Kenneth Benczkowski.

12                   "Question:  And, Mr. Benczkowski, who are you

13   currently employed by?

14                   "Answer:  I'm employed by Broetje Automation

15   USA.

16                   "Question:  How long have you worked for Broetje

17   Automation USA?

18                   "Answer:  Six years.  This is my sixth year.

19                   "Question:  Okay.  What as your position with

20   Broetje USA?

21                   "Answer:  Currently, I'm the president.

22                   "Question:  And how long have you been President

23   of Broetje USA?

24                   "Answer:  Since 2008.

25                   "Question:  What was your position with Broetje

435

Benczkowski - designations

1    before that?

2              "Answer:  Vice President, Chief Operating

3    Officer.

4              "Question:  When did you first become aware that

5    AHG had U.S. patents relating to the cassettes?

6              "Answer:  When I received the notice for the

7    case.

8              "Question:  Okay.  No one had, from Broetje

9    Germany, had told you anything about these U.S. patents?

10             "Answer:  No.

11             "Question:  But you knew they had European

12   patents; correct?

13             "Answer:  Yes.

14             "Question:  Now, other than those two

15   individuals, did you talk to anyone else about this lawsuit,

16   other than attorneys?

17             "Answer:  Bernd Schroeder.

18             "Question:  Okay.  Who is he?

19             "Answer:  He is general manager of Broetje

20   Germany.

21             "Question:  And what were those discussions with

22   Mr. Schroeder?

23             "Answer:  Basically the same.  What was the

24   status of the case.

25             "Question:  What did he say?

436

Benczkowski - designations

1          "Answer:  He basically reiterated that -- the

2     summary of the -- of where we stood with the German and

3     French suits.

4          "Question:  So just to go back to clarify one

5     area, Broetje was surprised that AHG filed this lawsuit in

6     the U.S. in light of the decisions in Germany and France; is

7     that correct?

8          "Answer:  To clarify, we were just surprised

9     that a suit would be brought in the U.S.  Not because of

10    outcomes in other countries.  Just the fact that it seemed

11    very late in the game and the fact that these suits in other

12    cases were not going well in other places, to the best of

13    our understanding.  Just didn't make a lot of sense.

14         "Question:  And why didn't it make sense, though?

15         "Answer:  We did not feel that it was viable.

16         "Question:  Have you ever seen an opinion of

17    outside counsel relating to whether or not the patents in

18    Exhibit 2 or Exhibit 3 are infringed?

19         "Answer:  No.

20         "Question:  Have you ever seen an opinion of

21    outside counsel to show whether the patents which are shown

22    in Exhibit 2 and Exhibit 3 are invalid?

23         "Answer:  No.

24         "Question:  Have you, yourself, in your position

25    as CEO for Broetje USA, ever requested an opinion of counsel

Benczkowski - designations

1    to determine whether the patents, Exhibit 2, Exhibit 3, are

2    infringed or not?

3              "Answer:  No.

4              "Question:  Why not?

5              "Answer:  Based on the fact that we are selling

6    systems that are originating in Germany and the fact that

7    these systems have, again, related back to the suits that

8    were placed in Germany and France, did not really see the

9    need.

10             "Question:  Okay.  Now, did Dr. Budach ever give

11   an opinion relating to the validity of either Exhibit 2 or

12   Exhibit 3?

13             "Answer:  I do not know.

14             "Question:  Okay.  To the best of your

15   knowledge, Dr. Budach gave an opinion in the e-mail relating

16   to the infringement of the patents in Exhibit 2 and

17   Exhibit 3; is that correct?

18             "Answer:  No, they were not related to these two

19   documents at all.

20             "Question:  Okay.  What was Dr. Budach's opinion

21   related to, his e-mail opinion?

22             "Answer:  I believe it was related to the suit

23   with the German court.

24             "Question:  So it related to the German patent?

25             "Answer:  Correct.

438

Benczkowski - designations

1          "Question:  Have you ever seen an opinion of

2    counsel, whether in-house or outside counsel, relating to

3    the infringement or invalidity of Exhibits 2 or Exhibit 3?

4          "Answer:  No.

5          "Question:  This e-mail that you saw, Dr. Budach's,

6    was this in German or in English?

7          "Answer:  It was in German.

8          "Question:  Okay.  So you weren't able to read

9    it; is that correct?

10         "Answer:  No.

11         "Question:  How did you understand what it

12    meant?

13         "Answer:  I was told what it said.

14         "Question:  Who told you.

15         "Answer:  Bernd Schroeder.

16         "Question:  When did Mr. Schroeder tell you?

17         "Answer:  When I raised the question after the

18    suit was raised.

19         "Question:  Okay.  So when, at that point in

20    time, rather than just talked about the status of the case,

21    he also said that Dr. Budach had come up with an opinion

22    relating to the AHG German patent?

23         "Answer:  I don't believe it was stated in that

24    manner.  It was more to the fact that we have an opinion

25    that says we do not infringe.

Benczkowski - designations

1            "Question:  Were you involved in Broetje's

2    decision to stop using AHG's cassette?

3            "Answer:  No.

4            "Question:  Okay.  And that was a decision made

5    at Broetje Germany?

6            "Answer:  Yes.

7            "Question:  Now, in your experience, working at

8    Broetje, have you seen any AHG cassettes being used with

9    Broetje fastener machines?

10           "Answer:  Yes.

11           "Question:  Okay.  Is that even true today?

12           "Answer:  Yes.

13           "Question:  Okay.  And, for example, can you

14   give me some examples of locations where the AHG cassettes

15   are being used with the Broetje fastener machines?

16           "Answer:  Yes.  There are machines in Wichita

17   which use the AHG cassette as well as the rack and loading

18   station.

19           "Question:  There are some Broetje fastener

20   machines which use an AHG rack, cassette, and loading

21   station?

22           "Answer:  Yes.

23           "Question:  Other than AHG's or Broetje's rack,

24   cassette, and loading stations, do you know of any other

25   third-party rack, cassettes, or loading stations that are

Benczkowski - designations

1    used with a -- with Broetje fastening machines?

2              "Answer:  No.

3              "Question:  Do you know whether there are any

4    third parties who market to Broetje's U.S. customers rack,

5    cassettes, or loading stations which can be used with the

6    Broetje fastening machine?

7              "Answer:  No.

8              "Question:  You don't know of any other parties

9    other than Broetje and AHG?

10             "Answer:  As far as supply of?

11             "Question:  Supply of rack, cassettes, and

12   loading stations for the Broetje.

13             "Answer:  Correct.  I know of no others.

14             "Question:  Okay.  Now, with respect to the AHG

15   rack, cassette, and loadings stations that are being used on

16   Broetje fastening machines, do you know who maintains those,

17   those components?

18             "Answer:  The customers maintain their

19   components.

20             "Question:  Okay.  So the customers would

21   maintain the AHG rack, cassette, and loading stations?

22             "Answer:  Yes.

23             "Question:  Okay.  You said that Broetje USA

24   started back in around 2006; correct?

25             "Answer:  Yes.

Benczkowski - designations

1            "Question:  Exhibit 7.  Can you identify what

2      Exhibit 7 is?

3            "Answer:  Yes.  This is a Broetje cassette.

4            "Question:  Okay.  And is this in its current

5      form does it look like?

6            "Answer:  It appears to be, yes.

7            "Question:  Okay.  As far -- as long as you have

8      worked at Broetje, has it changed in any way?

9            "Answer:  No, this has been the configuration.

10           "Question:  So is it your testimony, or the

11     testimony of Broetje, that this is representative of all of

12     the different cassettes that Broetje uses for its fastener

13     machine?

14           "Answer:  Yes.

15           "Question:  The Broetje riveting machine, the

16     large machine -- let's exclude the feed system, let's

17     exclude the racks, cassettes, and loading stations -- how

18     many of those machines are there in the United States, to

19     the best of your knowledge?

20           "Answer:  Approximately 40.

21           "Question:  Okay.  And out of the 40

22     approximately, there's 10 or 11 of those have the AHG rack,

23     cassette, and loading machine -- loading station; correct?

24           "Answer:  Yes.

25           "Question:  Let me show the what we've marked as

442

Benczkowski - designations

1    Plaintiffs' Exhibit No. 8.  It has production numbers BA3229

2    through 3232.

3              "Have you ever seen this document?

4              "Answer:  Not in this specific form, but similar.

5              "Question:  Do you know what the purpose of this

6    document is for?

7              "Answer:  This is usually used in a presentation

8    that we will make to the customer as part of the sales process.

9              "Question:  Okay.  And I notice this is in

10   English; correct?

11             "Answer:  Yes.

12             "Question:  Would this be maybe the type of

13   presentation you would make to a customer in the U.S.?

14             "Answer:  It would be one page of a rather large

15   presentation that will go through all the detail of all the

16   components of a system.

17             "Question:  Now, this particular document is

18   called automatic fastener feed system; correct?

19             "Answer:  Yes.

20             "Question:  And you have heard of that before;

21   right?

22             "Answer:  Yes.

23             "Question:  Okay.  And the automatic fastener

24   feed system is made of the cassette, the fastener loading

25   station, and a rack; correct?

Benczkowski - designations

1              "Answer:  And also the manual feed.

2              "Question:  Where's the manual feed?  Oh, the

3      manual feed down at the bottom there?

4              "Answer:  Right.

5              "Question:  Now, if you turn to the second page

6      of Exhibit 8, BA3230.  And this is of a cassette; correct?

7              "Answer:  Yes.

8              "Question:  And this is -- this is the same as

9      Exhibit 7 which is in front of you?

10             "Answer:  Yes.

11             "Question:  Now, does Broetje manufacture their

12     own cassettes?

13             "Answer:  Yes.

14             "Question:  Okay.  Do they manufacture their own

15     racks?

16             "Answer:  Yes.

17             "Question:  Do they manufacture their own

18     loading stations?

19             "Answer:  Yes.

20             "Question:  I'll show you what I've marked as

21     Plaintiffs' Exhibit No. 12, production numbers BA3213

22     through 3222.

23             "Have you ever sen this document before?

24             "Answer:  Perhaps not this document, but

25     similar.

Benczkowski - designations

1              "Question:  Do you know what this would be used

2        for?

3              "Answer:  This would be part of an old

4        presentation.

5              "Question:  Who would you make this presentation

6        to?

7              "Answer:  This would be made to an aerospace

8        customer.

9              "Question:  Okay.  Now, I notice there's a

10       proprietary sticker emblem on here on the left.

11             "Do you see that?

12             "Answer:  Yes.

13             "Question:  What's the purpose of that?

14             "Answer:  The purpose of that is to protect our

15       intellectual property from being copied or distributed to

16       others within the confines of our customer base.

17             "Question:  Okay.  Do you consider the drawings

18       and what as in this document to be proprietary to Broetje?

19             "Answer:  We consider everything that we share

20       with a customer to be proprietary.

21             "Question:  And would you consider the drawings

22       in here to be highly confidential information to Broetje?

23             "Answer:  It is highly confidential to us, so

24       as not to be disclosed to others, to prevent others from

25       copying --

Benczkowski - designations

1            "Question:  Okay.

2            "Answer:  -- our concepts.  It's on every one of

3     our presentations.

4            "Question:  Let's look on page BA3216 -- by the

5     way, do you know when this document was created?

6            "Answer:  No, I don't.

7            "Question:  Okay.  If we look at BA3216, which

8     is the fourth page in.  And do you know who makes the racks

9     that are shown there?

10            "Answer:  Based on the label, it says 'AHG.'

11            "Question:  Okay.  So at this particular time,

12     Broetje was marketing AHG racks?

13            "Answer:  It appears so.

14            "Question:  Now, if you look on page BA3221 of

15     Exhibit 12.  And do you know who appears to have

16     manufactured the loading station shown there?

17            "Answer:  It also says 'AHG.'

18            "Question:  Now, if you turn to the last page of

19     Exhibit 12, there's a cassette, correct?

20            "Answer:  Correct.

21            "Question:  Do you know who manufactured that

22     cassette?

23            "Answer:  That would be AHG.

24            "Question:  And how do you -- how can you tell

25     that?

Benczkowski - designations

1          "Answer:  From the appearance of the escapement

2     mechanism.

3          "Question:  Okay.  Could you be more particular?

4          "Answer:  The upper right-hand corner of the

5     cassette.

6          "Question:  Okay.  And that's how you can tell

7     that from an AHG versus a Broetje cassette?

8          "Answer:  How I can, yes.  And, also, if you

9     look at this -- it appears something is written on this

10    tape, and the fact that it's color tape would also be

11    indicators that it's someone else's.

12         "Question:  Okay.  So the fact that there's a

13    different color tape and the escapement has a little bit of

14    different design, is the differences you see in the AHG

15    versus the Broetje cassette?

16         "Answer:  The handle appears to be different.

17    So does the cap on the opposing end of the tube.

18         "Question:  Is there any internal legal

19    department at Broetje, either Germany or USA?

20         "Answer:  No.

21         "Question:  Broetje relies on its parent

22    company, CLAAS, for legal advice?

23         "Answer:  We will first go to CLAAS, and then,

24    if instructed by CLAAS, we will then seek other counsel.

25         Question:  And Broetje Germany and Broetje USA

Benczkowski - designations

1    are wholly owned subsidiaries of CLAAS; is that correct?

2              "Answer:  Broetje USA is a wholly-owned

3    subsidiary of Broetje Germany, and then Broetje Germany is,

4    of course, opened by CLAAS, yes.

5              "Question:  A hundred percent owned by CLAAS?

6              "Answer:  Pardon?

7              "Question:  Is Broetje Germany a hundred percent

8    owned by CLAAS?

9              "Answer:  Yes.

10             (End of videotaped deposition.)

11             THE COURT:  Turn the lights back up.

12             MR. LINDVALL:  Your Honor, we have one document

13   we'd move for admission.  It's JTX-4.

14             MR. KELLEHER:  No objection.

15             THE COURT:  Okay.  It's admitted.  Thank you.

16   (JTX-4 was admitted into evidence.)

17             THE COURT:  Call your next witness.

18             MR. LINDVALL:  Yes, Your Honor.  We call

19   Dominique Hage.

20             THE COURT:  Okay.

21             ...  DOMINIQUE HAGE, having been duly sworn as a

22   witness, was examined and testified as follows ...

23             THE COURT:  Good afternoon to you and welcome,

24   Mr. Hage.

25             I will note for the record is translator is in

Hage - direct

1    his vicinity as well in case it's necessary.

2              You may proceed.

3              MR. LINDVALL:  Your Honor, may I approach the

4    witness with an exhibit?

5              THE COURT:  You may.

6              (Mr. Lindvall handed an exhibit book to the

7    witness.)

8                    DIRECT EXAMINATION

9    BY MR. LINDVALL:

10   Q.    Good afternoon, Mr. Hage.

11   A.    Good afternoon.

12   Q.    Could you first state your name for the record.

13   A.    My name is Dominique Hage.

14   Q.    Okay.  Now, Mr. Hage, where do you live?

15   A.    I live in Toulouse, southwestern France.

16   Q.    Okay.  Now, what is your nationality?

17   A.    I'm French.

18   Q.    And who are you currently employed by?

19   A.    I work for F2C2.

20   Q.    Now, what is your job title at F2C2?

21   A.    Vice President of Sales?

22            THE COURT:  Just wait until the question is

23   completed before you answer.  I need you to wait until the

24   question is completed before you answer.

25            THE WITNESS:  No problem.

Hage - direct

```
 1                THE COURT:  Okay.  Go ahead.
 2    BY MR. LINDVALL:
 3    Q.     Now, could you explain to the jury what relationship
 4    is between AHG and F2C2.
 5    A.     F2C2 Systems is a fully owned subsidiary of AHG.
 6    Q.     Now, how long have you been Vice President of Sales
 7    at F2C2?
 8    A.     Since July 2007.
 9    Q.     Okay.  Could you briefly describe to the jury what
10    your responsibilities are as Vice President of Sales.
11    A.     My responsibility includes promoting the sales of our
12    equipment, customer relation, customer support, various
13    trade events to which we attend.
14    Q.     And could you briefly explain to the jury what F2C2
15    sells.
16    A.     F2C2 designs, manufactures and sells fastener or
17    rivet fit systems, which are based around the cassette,
18    which is the center of the system.  A load station, which is
19    to fill rivets into the cassette and a rack, which is used
20    to receive the cassettes and use the cassettes, rivets, to
21    supply rivets to the automatic riveter.
22    Q.     Okay.  Do those three components, the cassettes, the
23    racks and loading station, all function as one operational
24    unit?
25    A.     They do.
```

Hage - direct

1    Q.      Now, Mr. Hage, who are F2C2's primary customers in

2    the United States for the cassette based rivet distribution

3    system?

4    A.      The primary customers for our rivet distribution

5    system in the U.S. are what I'm going to call integrators,

6    the people manufacturing automatic riveters.

7    Q.      Okay.  And could you name some of those integrators.

8    A.      Certainly.  I could think of Kuka system, located

9    in Michigan.  Then you have Gemcore in upper New York

10   State.  You've got automatic integrated technology in Plano,

11   Texas.  Then you have ElectroImpact in Washington State.

12   Q.      Now, do these companies that you just named, do they

13   compete with Broetje?

14   A.      They do.

15   Q.      And do these companies provide the cassette-based

16   rivet feed systems made by F2C2?

17   A.      They do.  They use our system.

18   Q.      Now, do you sell to customers other than integrators?

19   A.      We have a commercial relation as well with the

20   aircraft manufacturers, who are the end users of the

21   automatic riveter, of course.

22   Q.      All right.  And who are some of those aircraft

23   manufacturers in the United States that F2C2 has a business

24   relationship with?

25   A.      Well, I think the largest, Boeing, then you have Gulf

Hage - direct

1    Stream, Spirit, who is next to Bowing.

2    Q.    Do you do any business with Vought?

3    A.    We do business with Vought from time to time.

4    Q.    Now, do you know of any other company using or

5    selling a cassette based rivet distribution system in the

6    United States that competes with F2C2's system?

7    A.    Yes.  Broetje sells a copy of our cassettes.

8    Q.    Is there anyone than Broetje that competes with F2C2

9    in the United States?

10   A.    No.

11   Q.    Has Broetje ever offered to sell its cassette based

12   rivet feeding system to integrated companies, to the best of

13   your knowledge?

14   A.    Has been approached in 2008 and the integrator

15   approach was Kuka System in Michigan.

16   Q.    And what do you understand Broetje was trying to sell

17   to Kuka in Michigan?

18   A.    Cassette feeding system.

19   Q.    And it was going to be Broetje's cassette feeding

20   system?

21   A.    That they used?

22   Q.    Yes.

23   A.    No.  They used ours.

24   Q.    But what Broetje was offering was not AHG's system.

25   It was Broetje's own system; is that correct?

Hage - direct

1    A.      That's correct.

2    Q.      Okay.  And did AHG bid for this job also?

3    A.      I beg your pardon?

4    Q.      Did AHG also offer to sell its system to Kuka?

5    A.      Yes.  We were offering our system as well to this

6    company.

7    Q.      Okay.  And what system did Kuka ultimately buy,

8    Broetje's or AHG's?

9    A.      We didn't win the contact.  F2C2 did.

10   Q.      Now, could you explain what capabilities F2C2 has to

11   meet customer demands for the F2C2 cassette-based rivet

12   distribution system?

13   A.      Of course.  We have a plant in France where we're

14   going to manufacture all those stations and some rack

15   systems and cassette systems.  But since the business is

16   increasing tremendously for us, in the U.S. specifically, we

17   have started implementing relationship with some

18   subcontractors on U.S. soil to start building our systems

19   here for the U.S. market.  And the demand has been really

20   going up in the past years and our system has been on the

21   market for some time and it has become a standard in the

22   industry.

23   Q.      Now, has F2C2 ever had any difficulties in meeting

24   its customer demands?

25   A.      No.  We have no problem with that.

Hage - direct

1    Q.      Now, let me show you what has been marked as PDTX-14.

2    It's in your book there.  This is for demonstrative

3    purposes.

4              Do you recognize this?

5    A.      Yes.  It's a chart of financial flow.

6    Q.      Okay.  Could you explain how this chart was

7    generated.

8    A.      This chart is being generated from inputs coming from

9    AHG accounting department.

10   Q.      Okay.  And to the best of your knowledge, do you

11   believe it's an accurate depiction?

12   A.      I do believe it's accurate.

13   Q.      And as part of your job responsibilities, you have an

14   understanding of AHG's accounting department?

15   A.      To some extent, yes.

16              MR. LINDVALL:  I move to admit the exhibit as

17   evidence.

18              THE COURT:  There's no objection?

19              MS. BEYER:  No objection.

20              THE COURT:  It's admitted.  PDTX-14; correct?

21              MR. LINDVALL:  Yes, Your Honor.  Thank you.

22   BY MR. LINDVALL:

23   Q.      Okay.  The blue line, what does the blue line

24   represent?

25   A.      The blue line represents the volume of sales

Hage - direct

1    generated by business with Broetje automation from year 2000

2    to 2013.

3    Q.      Okay.  Now, I see in the blue line (AHG's sales to

4    Broetje), the blue line here reaches a peak around 2002.  By

5    the way, this is in Europe; is that correct?

6    A.      This is in Europe, right.

7    Q.      What's approximate exchange rate, euro to a dollar?

8    A.      Nowadays, unfortunately, it's 1.37.

9    Q.      So it takes a dollar 37 to buy one euro?

10   A.      That's right.

11   Q.      And in approximately 2002 you reached a peak, and

12   these are sales to Broetje; is that correct?

13   A.      That's right.

14   Q.      And it goes down; is that correct?

15   A.      It does.

16   Q.      Okay.  And do you have any knowledge of why the sales

17   start decreasing to Broetje?

18   A.      Well, there has been a very sharp decrease in volume

19   of orders coming from Broetje Automation in this period of

20   time.

21   Q.      Okay.  And did AHG have any understanding in the

22   2002, 2003, 2004 time frame on why the orders were starting

23   to decline?

24   A.      No, no idea.

25   Q.      Okay.  Now, the red line, what does the red line

1   represent?

2   A.      The red line represents the amount of sales we did

3   with other customers, such as integrators or aircraft

4   manufacturers other than Broetje during this period.

5   Q.      Okay.  And I notice that the, there was an increase

6   in sales starting particularly around 2004, 2005; is that

7   correct?

8   A.      That is correct.

9   Q.      Okay.  And more recently, since 2010, there has been

10  a fairly high amount of sales; is that correct?

11  A.      That's true.  If you take a look at the 2004 area

12  there, you can see that our total was really low and we

13  needed to react and expand our business and customer base.

14  This is what the company did then until business really

15  picked up towards the aircraft sales and we now had a record

16  year in 2013.

17  Q.      Okay.  What do you attribute this sudden increase in

18  sales to?  Well, the sales increase from 2010 on wards?

19  A.      Well, our equipment is known and appreciated by

20  industry and they do require it in that specification.

21  Q.      Now, has F2C2 had business relationships with

22  aircraft manufacturers in the United States?

23  A.      Yes.

24  Q.      And do you know approximately when these

25  relationships began?

Hage - direct

1    A.      Probably around mid-nineties.

2    Q.      And, again, who were the aircraft manufacturers that

3    F2C2 had business relationships with?

4    A.      Boeing, to begin with, Gulf Stream.  That's the ones

5    I'm thinking of.

6    Q.      Spirit, did you have a business relationship with?

7    A.      Yes, of course.  Spirit.  But then it was Boeing.

8    Q.      All right.  Now, what is the relationship between

9    F2C2's integrator, customer in the United States and

10   Broetje?

11   A.      They compete against each other.

12   Q.      And then what is the relationship between AHG or

13   F2C2's cassette-based rivet distribution system and

14   Broetje's cassette-based rivet distribution system?

15   A.      They're in competition.

16   Q.      And they're in competition with either, with each

17   other with the use in aircraft manufacturers; is that

18   correct?

19   A.      Yes.  The end user is the aircraft manufacturer.

20   Q.      Were there any instances where F2C2 sold complete

21   systems to aircraft manufacturers in the United States?

22   A.      Excuse me.  I missed the beginning.

23   Q.      Sure.  Have there been any instances where F2C2

24   Systems has sold complete systems to aircraft manufacturers

25   in the United States?

457

Hage - direct

1    A.    Yes.  Sorry.  The first instance, amazing.  It

2    happened in Boeing Long Beach, which is the home of -- this

3    is where the C-17 is assembled, as this is a plant for

4    nationals to have access to it, defense protected.

5                So technical people there wanted to upgrade

6    one of the riveting, the drilling machine they had for the

7    floor to drilling and riveting, and they wanted to use the

8    F2C2 system.  So they went through a group in Michigan to

9    purchase the system from us and install it on their machine

10   to upgrade it.

11   Q.    Now, how many cassettes has F2C2 sold in total?

12   A.    It's around over 10,000, I would say.

13   Q.    Okay.  And do you know how many of those cassettes

14   F2C2 sold to Broetje?

15   A.    To Broetje directly, that would be in the area of

16   3,000.

17   Q.    Okay.  Now, during the course of AHG or F2C2's

18   relationship with Broetje, how much of F2C2's revenue came

19   from Broetje?

20   A.    At the peak period, I would say around 85,

21   90 percent.

22   Q.    And what was that revenue for?

23   A.    The sale of complete cassettes, rack and load station

24   systems.

25   Q.    Now, are you aware of any cassette based feeding

Hage - direct

1    systems on the market?

2    A.      No, except the one we mentioned, Broetje, none.

3    Q.      Okay.  Let me show you what has already been admitted

4    into evidence as PTX-569.  Now, do you recognize what has

5    been marked as PTX-569?

6    A.      Yes, I do.

7    Q.      And what is that?

8    A.      It's a cassette that has been put together by former

9    U.S. rivet manufacturer called Huck Company.

10   Q.      And was this Huck cassette system ever successful?

11   A.      It never really took off the ground.  It has been

12   used to some extent and then it has been dropped.

13   Q.      Okay.  Do you know whether it is being used today or

14   not?

15   A.      Beg your pardon?

16   Q.      Is it being used today?

17   A.      No, it is not.

18   Q.      Let me show you what has been marked as PTX-570.  Do

19   you recognize this cassette?

20   A.      Yes, I do.

21   Q.      And who makes this cassette?

22   A.      This cassette is being made by ElectroImpact.

23   Q.      And who is ElectroImpact.

24   A.      ElectroImpact is a very large integrator in the U.S.

25   Q.      Do you know whether the ElectroImpact cassette was

Hage - direct

1    used successfully in the industry?

2    A.    It has been used for a certain time on the machine,

3    and in England I believe they were using it on a wing

4    riveting machine for the MS3 plane.

5    Q.    Is it still being used today?

6    A.    No, it's not being used any more.

7    Q.    And what cassette based feeding system does

8    ElectroImpact use today?

9    A.    ElectroImpact is using F2C2 System cassettes.

10   Q.    Do you know of any other companies that have tried to

11   developed a cassette based feeding system?

12   A.    Quite a few actually.  Over the time, you had Gemcore

13   in the U.S. that tried to develop a cassette-based system,

14   and Dassault company.  Airbus tried as well.  I can think of

15   a company that is now, in fact, called Brohio (phonetic)

16   were manufacturing customers and they tried to develop a

17   cassette developing rivets.

18   Q.    Okay.  Now, do you know whether any much these

19   companies were successful with their cassette-based feeding

20   systems?

21   A.    No, they dropped their attempt probably at pre-sales

22   level.

23   Q.    And to the best of your knowledge, whose systems are

24   these companies using today?

25   A.    Gemcor is using F2C2 System.  Dassault is using F2C2

Hage - direct

1   System.  Airbus is using F2C2 System on some of their

2   machines.

3   Q.     And what do they use it on the other machines?

4   A.     Well, if they buy machines from Broetje, they would

5   use the Broetje system.

6   Q.     Now, when did F2C2 first discover that Broetje was

7   manufacturing and selling its own cassette?

8   A.     I think the first appearance.

9              MS. BEYER:  Objection.

10             THE COURT:  Is there an objection?

11             MS. BEYER:  There is.  Rule 602.

12             THE COURT:  Do you have a response?

13             MR. LINDVALL:  Well, I will lay a foundation.

14             THE COURT:  Okay.

15  BY MR. LINDVALL:

16  Q.     As part of your job, do you have an understanding --

17  well, let me move on.  We've heard Mr. Bornes talk about

18  this.  This is probably not a useful time.

19             Do you recall whether F2C2 ever discovered a

20  cassette in France, a Broetje cassette?

21  A.     In France, yes.

22  Q.     Okay.  When was that?  Do you recall?

23  A.     That was in October 2006, in Meaulte, at the area

24  site which is to be called Airbus before they sold the

25  company.

Hage - direct

1          MS. BEYER:  Objection.

2   A.     Just like Boeing sold Spirit.

3          THE COURT:  The objection?

4          MS. BEYER:  Rule 602 again, Your Honor.

5          MR. LINDVALL:  I think it's too late.  The

6   witness answered the question.

7          THE COURT:  I won't strike the answer, but do

8   you have any more in this area?

9          MR. LINDVALL:  No, Your Honor.

10         THE COURT:  Move on then.

11  BY MR. LINDVALL:

12  Q.     Now, what did F2C2 do after it learned about this

13  cassette in France?

14  A.     We took legal action in November.

15         MS. BEYER:  Objection again, Your Honor.  I'm

16  sorry.

17         THE COURT:  Same basis?

18         MS. BEYER:  Rule 602, yes.

19         THE COURT:  How about you ask him a few

20  questions about whether he has a basis for these answers.

21         MR. LINDVALL:  Okay.

22  BY MR. LINDVALL:

23  Q.     Mr. Hage, are you familiar with Broetje cassettes?

24  A.     I've seen some.

25  Q.     And in your job as Vice President of F2C2, have you

Hage - direct

1    learned the history and the relationship between Broetje and

2    F2C2?

3    A.      You mean, how do you say?  The association between

4    the two companies?

5    Q.      Yes.

6    A.      Oh, yes.  Yes.

7    Q.      And are you aware that Broetje and F2C2 were

8    competitors?

9    A.      Since recent date, yes.

10   Q.      Okay.  Are you aware of the history in, for example,

11   2006 and 2007 between Broetje and F2C2?

12   A.      Yes, I am.

13   Q.      Okay.  And is that, when you have become aware of

14   that history, was that in the normal course of your duties?

15   A.      As part of it, yes.  I'm involved in various

16   litigation that are taking place.

17   Q.      Now, Mr. Hage, do you know what F2C2 did after it

18   discovered the cassette in France?

19   A.      Took legal action.

20   Q.      Okay.  And do you know when it took that legal action?

21   A.      November of 2008.

22   Q.      Now, when did F2C2 first learn that Broetje was

23   selling its own cassettes in the United States?

24   A.      We learned about Broetje selling cassettes in the

25   U.S. in September of 2007.

Hage - direct

1    Q.     And that was after you joined the company; correct?

2    A.     Yeah, that was after I joined the company.  It was in

3    Wichita, Spirit, where I sent the engineer, and seen some

4    Broetje machine there.

5    Q.     Now, once F2C2 realized that they had, Broetje had

6    been selling in France, why didn't F2C2 then do an

7    investigation in the United States?

8              MS. BEYER:  Objection.  Rule 602 again.

9              THE COURT:  Overruled.

10   BY MR. LINDVALL:

11   Q.     You can answer the question.

12   A.     Okay.  You know, aircraft manufacturer facilities

13   aren't open to the public.  You have security concerns of

14   the confidentiality concerns.  And before you are invited,

15   you need to send a full copy of the passport so they can

16   screen you, and you come in as invited.

17             Once you are invited, you come to meet the party

18   you are going to do business with.  And from security, you

19   will be escorted to where you carry out your business.  And

20   if by any chance you can spot something that catches your

21   eyes like something looking like your machine, you will see

22   what I call a chance encounter.  You are not allowed to roam

23   the factory, to look at what they're doing and with what

24   they're doing it with.

25   Q.     And during this period of time from 2007 to 2008, did

Hage - direct

1   F2C2 employ any persons who were American citizens?

2   A.    No.

3   Q.    Now, once they made the discovery of Broetje selling

4   the cassette in the United States, what did Broetje -- I'm

5   sorry.  Withdraw that question.

6         What did you do after you made the discovery

7   that Broetje was selling cassettes in the United States?

8   A.    We filed a suit against them.

9   Q.    Okay.  Do you recall when that started?

10  A.    That started in May 2009.

11  Q.    And that's why we're here today?

12  A.    That's correct.

13  Q.    Now, have there been any recent decisions by the

14  French court relating to Broetje's cassette in litigation

15  between the two companies?

16  A.    There has been a French court ruling in December of

17  2012.

18  Q.    And have you seen the decision from the French court?

19  A.    Yes, I have.

20  Q.    And in the normal course of your business, is it part

21  of your duty to understand these types of decisions?

22  A.    Yes, it is.

23  Q.    Why?

24  A.    As I'm involved in litigation in France as well.

25  Q.    But in your duties as Marketing, Vice President of

Hage - direct

1    Sales, is it there any reason for you to have an

2    understanding of what is going on in litigation between the

3    two companies?

4    A.    Yes.  When you have a favorable ruling from a court

5    on writing your rights have been wronged, it's always useful

6    to use it commercially, for example.

7    Q.    Okay.  And what is your understanding of the impact

8    of the French decision on F2C2's business?

9    A.    Well, it has done us a lot of good in term of people

10   recognized that our system had been wronged and this ruling

11   set things right again.

12   Q.    And what is your understanding of Broetje's ability

13   to sell cassettes today in France?

14   A.    The ruling is preventing Broetje to market their

15   cassettes on the French area.

16              MR. LINDVALL:  Could we show the Exhibit

17   PTX-613T, please?  And I'd like to draw your attention to

18   page 30.  And if you could go from the fourth paragraph from

19   the bottom, please.

20   BY MR. LINDVALL:

21   Q.    Mr. Hage, have you seen this?  Have you read this

22   before?

23   A.    Yes, I have seen this.

24   Q.    Could you read this to the jury, please?

25   A.    Yes, I can.

1          Maybe I will use that.

2    Q.    Sure.  It's PTX-613T, and it's page 30, dot 30.

3    A.    Page 30.

4    Q.    Yes.

5    A.    Thank you.

6          If I read that paragraph.  "Stating that by

7    copying in a servile manner, the appearance of the cassettes

8    produced and commercialized by the companies AHG F2C2

9    System, thus creating a risk of confusion with the

10   activities of these two companies, Broetje Automation

11   committed acts of unfair trading with regard to AHG and F2C2."

12         MR. LINDVALL:  Thank you.  I have no further

13   questions.

14         THE COURT:  All right.  Cross-examination.

15                    CROSS-EXAMINATION

16   BY MS. BEYER:

17   Q.    Good afternoon, Mr. Hage.

18   A.    Good afternoon, counselor.

19   Q.    People in the industry have known that F2C2 has

20   accused Broetje of copying its cassettes since at least

21   2008; isn't that correct?

22   A.    I'm sorry.  Could you repeat that question?  You go

23   too fast at the beginning, please.

24   Q.    Sure.  People in the industry have known that F2C2

25   has accused Broetje of copying its cassettes since at least

Hage - cross

1    2008; isn't that correct?

2    A.    Yes, I think so.

3    Q.    You told Boeing in 2008 that F2C2 was suing Broetje

4    in France and that its next step was to initiate a legal

5    action in the USA?

6    A.    Yes, that's right.

7    Q.    And you sent that e-mail to William Bankston at

8    Boeing in June 2008?

9    A.    Yes, I did.

10         MS. BEYER:  May I approach the witness, Your

11   Honor?

12         THE COURT:  You may.

13         (Document passed forward.)

14         THE WITNESS:  Thank you.

15   BY MS. BEYER:

16   Q.    Mr. Hage, do you recognize this document?

17   A.    Excuse me.  I'm reading the other pages.

18         Yes.

19         MS. BEYER:  Your Honor, I'd like to move into

20   evidence Defendants' Trial Exhibit 1062.

21         MR. LINDVALL:  No objection, Your Honor.

22         THE COURT:  DTX-1062 is admitted.

23         MS. BEYER:  Thank you.

24         (DTX-1062 admitted into evidence.)

25   BY MS. BEYER:

Hage - cross

1    Q.     Mr. Hage, this is the e-mail you sent to Boeing in

2    2008?

3    A.     Yes, it is.

4    Q.     And it is addressed to William Bankston?

5    A.     Well, among others.

6    Q.     And attaching copies of the legal action against

7    Broetje?

8    A.     That's true.  You got to keep your customers

9    informed.

10          MS. BEYER:  I am finished with that exhibit,

11    Jonathan.  Thank you.

12    BY MS. BEYER:

13    Q.     Mr. Hage, isn't it true Boeing has been using the

14    ElectroImpact cassette-based feeding system in the United

15    States for more than 15 years?

16    A.     Isn't it true that Boeings has been using what

17    cassette system?

18    Q.     An ElectroImpact cassette-based rivet feeding system.

19    A.     It's possible.  It's in Boeing plant in Everett, if

20    that's the case.

21    Q.     And AHG and F2C2 have never sued ElectroImpact for

22    infringe or trade redress, have they?

23    A.     We have no reason to sue ElectroImpact for patent

24    infringement.  We only have to take a look at the cassette

25    system.  It has nothing to do with ours.  It's different.

Hage - cross

1    The actual architecture is not the same as ours.  They've

2    tried.  They used a system that has been working for some

3    time that they have discontinued and it does not go against

4    our interest.

5    Q.    So AHG and F2C2 have never sued ElectroImpact for

6    trade dress infringement based on PTX-570, the cassette we

7    have been looking at?

8    A.    Certainly not.  It doesn't look like our cassette at

9    all.

10   Q.    Mr. Hage, you were aware of the decision in front of

11   the Paris Court of Appeal that you were discussing with

12   Mr. Lindvall is on appeal to the Supreme Court in France?

13   A.    Yes.

14          MS. BEYER:  Could we put you up Exhibit 613T,

15   please?  To page 25.

16          Can we highlight paragraph 1, please?

17   BY MS. BEYER:

18   Q.    Mr. Hage, isn't it true that the Paris Court of

19   Appeal stated the business relations between AHG and Broetje

20   Automation GmbH had ceased as from 2001 and that AHG in no

21   way demonstrated that the alleged termination was sudden,

22   nor that it caused any prejudice to AHG?

23   A.    This is an interesting question.  But I think it

24   has been in suit reviewing the pieces that have been

25   communicated to you, especially the termination agreement

Hage - cross

1    that F2C2 received from your client in 2004 or 5, I believe.

2    Q.     Mr. Hage, isn't it true that the Paris Court of

3    Appeal found that AHG and Broetje Automation GmbH had ceased

4    business in 2001 and that AHG had not demonstrated that the

5    alleged termination was sudden or that it caused any

6    prejudice to AHG?

7    A.     What I can -- what you have seen from the graph

8    demonstrated earlier on today, Big Business, Broetje

9    Automation was around 2003.  So we had a big, strong,

10   growing commercial relationship at that time.

11   Q.     Mr. Hage, that was F2C2, was it not?  Not AHG.

12   A.     Yes, it was F2C2.

13   Q.     And the Court found that there no prejudice to AHG?

14   A.     F2C2 and AHG are very intimately related because we

15   belong to AHG and they run most of our administrative

16   operation, like accounting.

17   Q.     Could you take a look at paragraph 7, please?

18   A.     (Witness complies.)

19   Q.     Mr. Hage, isn't it true that the Paris Court of

20   Appeal upheld the lower court decision dismissing F2C2

21   claims for wrongful termination of business relations

22   because F2C2 had failed to execute its contractual

23   obligations by delivering defective products to Airbus that

24   weren't made for more than a year?

25   A.     With the Court's permission, I might have to develop

Hage - cross

1    that a little bit.

2              THE COURT:  Do you want a long or short answer?

3              MS. BEYER:  I'd like the short answer to start.

4    BY MS. BEYER:

5    Q.    Isn't it true that that is what the Court said?

6    A.    What happens is --

7              THE COURT:  Mr. Hage, do your best to answer the

8    question that is asked.

9              Why don't you ask the question again.

10   BY MS. BEYER:

11   Q.    Mr. Hage.

12   A.    Yes.

13   Q.    Your answer to the question is yes?

14   A.    Yes, it is.

15   Q.    And isn't it true that the Paris Court of Appeals

16   also upheld the lower court's ruling that Broetje did not

17   breach any obligation of confidentiality to AHG or F2C2?

18   A.    No, they did.

19             MS. BEYER:  Could we please look at page 26.

20   Let's highlight the third an fourth paragraphs, please.

21   BY MS. BEYER:

22   Q.    Mr. Hage, would you please read this?

23   A.    Considering that it has emerged, in contacting the

24   two companies, Siemens, and SMC-Pneumatik, to manufacture a

25   separator as claim by the frequent Patent No. FR 2 870 761

Hage - cross

1   (as it happens, cancelled for absence of novelty).  Broetje

2   Automation GmbH has not breached any obligation of

3   confidentiality or loyalty likely to engage its

4   responsibility.

5           Considering that the initial ruling which

6   dismissed the claims served by the applicants against

7   Broetje Automation GmbH for violation of contractual

8   obligations, will therefore be upheld.

9   Q.    Isn't it true that the Paris Court of Appeals did not

10  breach any obligation of confidentiality to AHG or F2C2?

11  A.    Well, I have to apologize but this is not my legal

12  expertise.  We are talking about patents.

13  Q.    When you were talking to Mr. Lindvall, you explained

14  that it was part of your job to be familiar with the court

15  rulings and you seemed fairly familiar with the other

16  portions.  Is it just this portion that you are not familiar

17  with?

18  A.    No, I'm not familiar with this one.  My involvement

19  in the litigation has been mainly to unearth documents from

20  the archive.  And I did assist to the first ruling of the

21  Paris court.

22  Q.    Mr. Hage, in the German litigation concerning AHG's

23  corresponding patent, three courts have ruled against AHG

24  and in favor of Broetje, haven't they?

25  A.    That's right.

Hage - cross

1    Q.      And isn't it true that a German court found that

2    Broetje had not infringed the European patent and that

3    decision was affirmed by an appellate court?

4    A.      That's the ruling.

5    Q.      Isn't it also true that the German patent court

6    recently ruled that the counterpart patent is invalid under

7    German law in view of the Shinjo-Komaki references.

8    A.      That is possible.  I didn't read the ruling.

9    Q.      You don't have any reason to disagree with that

10   those?

11   A.      No, I don't.

12   Q.      Mr. Hage, isn't it also true that the German patent

13   court reviewed the invalidity portion of the decision from

14   the French Court of Appeals in favor of AHG and rejected it

15   as unconvincing?

16   A.      I told you I haven't read that ruling.  So if it is

17   written in the ruling, that is a yes.

18   Q.      Mr. Hage, you testified that your primary customers

19   in the United States included several integrators, including

20   Gemcor and Kuka and ElectroImpact.  Do these integrators

21   also sell other fastener-feed systems besides F2C2's?

22   A.      I can think of a few, yes.

23   Q.      For example, Gemcor also sells vibratory belt

24   systems?

25   A.      Yes.

Hage - cross

1    Q.      And ElectroImpact sells hopper systems?

2    A.      That's right.

3    Q.      And F2C2 currently has commercial relationships with

4    the aircraft manufacturers Boeing, Gulfstream, and Sprint?

5    A.      Currently being today?

6    Q.      In the past five years.

7    A.      Yes, I would say yes.

8    Q.      And with Vought also?

9    A.      Vought.  No, it's far older than that.

10   Q.      Mr. Hage, do you have any personal knowledge as to

11   whether in the instance you were describing with Kuka and

12   Broetje whether Kuka approached Broetje for a quote or it

13   was the other way around?

14   A.      This has been discussed with some Kuka personnel.

15   Q.      You don't have any reason to -- if somebody from

16   Broetje were to testify that Kuka approached Broetje and

17   asked for a quote for the system, you wouldn't have any

18   reason to disagree with them, would you?

19   A.      I probably would not disagree with that.

20   Q.      Mr. Hage, is it correct -- isn't it correct that AHG

21   and F2C2 paid a royalty to Dassault for a period of time on

22   the rack system?

23   A.      This is true.

24   Q.      And that royalty was for 15 percent; is that correct?

25   A.      That's correct.

Hage - cross

1   Q.      And F2C2 and AHG paid that royalty through at least

2   2007; correct?

3   A.      Correct.

4              MS. BEYER:  Could I have slide 1, or PTX-129,

5   please?

6              Your Honor, may I approach the witness?

7              THE COURT:  You may.

8              THE WITNESS:  Thank you.

9              (Document passed forward.)

10  BY MS. BEYER:

11  Q.      Mr. Hage, you have seen this document before,

12  correct?

13  A.      Yes, I have seen this document.  Of course.

14  Q.      Would you please turn to page 129.30?

15  A.      Will you repeat the number, please?

16  Q.      Sure.  129.30.

17  A.      Yes, I'm here.

18  Q.      The cassette pictured on page 129.30 is a new recent

19  version of F2C2's cassette; is that correct?

20  A.      That is very correct.

21             MS. BEYER:  May I approach the witness, Your

22  Honor?

23             THE COURT:  You may.

24             (Ms. Beyer approaches with cassette.)

25             THE WITNESS:  Yes, that is one.

Hage - cross

1           MS. BEYER:  I'll set it here.  I don't want to

2      break it.

3           The exhibit I placed over here is premarked as

4      JTX-64B.

5      BY MS. BEYER:

6      Q.    Mr. Hage, is this cassette the cassette shown in the

7      photo on 129.30?

8      A.    It's got a very similar look.  It's probably the

9      same.

10          MS. BEYER:  Your Honor, I would like to move

11     JTX-64B into evidence.

12               MR. LINDVALL:  No objection.

13               THE COURT:  It's admitted.

14               (JTX-64B is admitted into evidence.)

15     BY MS. BEYER:

16     Q.    Mr. Hage, JTX-64B, this cassette was introduced by

17     F2C2 within the past four years or so; is that correct?

18     Five years?

19     A.    Yes, that's the current generation.

20     Q.    So this the cassette you sell today?

21     A.    Yes.

22               MS. BEYER:  Thank you.  I have no further

23     questions.

24               THE COURT:  Okay.  Redirect.

25               MR. LINDVALL:  I have a couple questions, Your

Hage - redirect

1          Honor.

2                         First, if we could put up PTX-613T, please.

3                         You got that Jeff?  PTX-613T?  Good.  If you can

4          turn to page 30, please.

5                              REDIRECT EXAMINATION

6          BY MR. LINDVALL:

7          Q.     Now, you were shown some parts of this, and first

8          this part right here we talked about earlier, Mr. Hage, the

9          fourth paragraph on the bottom.

10                        If you could highlight that, Jeff, please.

11         A.     Yes, I read this portion.

12         Q.     And this portion is where the French court found that

13         Broetje had committed acts of unfair trading; correct?

14         A.     Yes, that is correct.

15         Q.     And that is based on copying in a servile manner the

16         appearance of the cassettes; correct?

17         A.     Correct.

18         Q.     Okay.  But if we could go to the fourth paragraph

19         from the top, please.

20                        And I don't believe we went over this paragraph,

21         did we, with the jury?  If you could read this paragraph to

22         the jury, please.

23         A.     Yes.

24                        Stating that Broetje Automation committed acts

25         of infringement with regard claims 1 to 7, 11 and 12 of the

478

Hage - redirect

 1   French section of European Patent No. EP 0 373 685 to the

 2   detriment of AHG, AHG rivets and to Messrs. Jean-Marc Auriol

 3   and Phillippe Bornes, holders of the patent and to the F2C2,

 4   holder of an exclusive rights operating license for this

 5   patent.

 6   Q.     Now, I noticed that it says the F2C2 System is a

 7   holder of exclusive rights operating license for this

 8   patent; is that correct?

 9   A.     That is right.

10   Q.     Is that in your understanding?

11   A.     Yes, sir.

12   Q.     Okay.  Now, if you could, remember that they were

13   told about two types of other feeding system, the vibratory

14   bowl and a hopper system?

15   A.     Yes.

16   Q.     Are those substitutes for the AHG or the Broetje

17   cassette-based feeding system?

18   A.     It's one way to substitute.  That is another way to

19   feed rivets.

20   Q.     Can they be interchangeable and have the same

21   abilities?

22   A.     No, the difference was the F2C2 and let's say the

23   vibratory bowls is that they take a lot of real estate on a

24   machine.  They're open, and you can have some foreign

25   objects falling into them and thus jamming the machine.

Hage - redirect

1              You cannot, it is not as versatile as the

2       cassette system, but it is usable when you have a small

3       rivet definition that does not carry a lot of references.

4              Then you have the hopper system which is more

5       compact but still limited by a number of cartridges you have

6       to use for each type of rivets, down here.  So it multiply

7       the cartridges by so many numbers.

8                    MR. LINDVALL:  Okay.  Thank you.

9                    No further questions.

10                   THE COURT:  All right.  Thank you, Mr. Hage.

11      You may step down.

12                   THE WITNESS:  Thank you.

13                   (The witness hits microphone.)

14                   THE WITNESS:  Excuse me.

15                   THE COURT:  That's okay.

16             The plaintiff may call their next witness.

17                   MR. LINDVALL:  Your Honor, I'd like to call

18      Dr. Harri Kytomaa please to the stand.

19                   THE COURT:  Okay.

20                   ... HARRI KYTOMAA, having been first duly sworn,

21      was examined and testified as follows ...

22                   THE COURT:  Welcome to you, Dr. Kytomaa.

23                   THE WITNESS:  Thank you.

24                   MR. LINDVALL:  May I approach?

25                   THE COURT:  You may approach, and you may

1    proceed when ready.

2                    DIRECT EXAMINATION

3    BY MR. LINDVALL:

4    Q.    Good afternoon, Dr. Kytomaa.

5    A.    Good afternoon.

6    Q.    Now, Dr. Kytomaa, would you please give us a summary

7    of your education?

8    A.    Sure.  I received a bachelor's degree in engineering

9    science from England in 1979.

10           After that, I started my graduate studies at

11   CalTech or California Institute of Technology in 1980.

12           And I graduated with my master's degree there in

13   1982 and my Ph.D. in mechanical engineering in 1986.

14           MR. LINDVALL:  Your Honor, I forgot to give the

15   transition statement, but it may be useful to do it right

16   now for the jury.

17           THE COURT:  Okay.

18           MR. LINDVALL:  Dr. Harri Kytomaa is an

19   experienced mechanical engineer who has been asked to study

20   the technical aspect and provide his professional opinions.

21   He is not an AHG or Broetje employee.

22   BY MR. LINDVALL:

23   Q.    Now, Dr. Kytomaa, can you take a look at PTX-543,

24   please, in your exhibit book?

25   A.    (Witness complies.)

Kytomaa - direct

1    Q.      And what is PTX-543?

2    A.      It is a copy of my resume.

3              MR. LINDVALL:  I move to admit.

4              MR. KELLEHER:  No objection.

5              THE COURT:  It's admitted.

6              (PTX-543 is admitted into evidence.)

7    BY MR. LINDVALL:

8    Q.      Now, what was your Ph.D. thesis focused on, Dr.

9    Kytomaa?

10   A.      My Ph.D. thesis was focused on fluid mechanics and in

11   particular, the motion of particular materials in the fluid.

12   Q.      Can you give the jury an example what you mean by

13   fluid?

14   A.      Yes.  Fluid mechanics within the field of mechanical

15   engineering is considered to be the flow of gases and

16   liquids.  So in this context, air is a fluid.

17   Q.      Do you have any experience in the aerospace industry?

18   A.      I do.

19   Q.      Can you describe that experience?

20   A.      Yes.  I've carried out quite a few projects in the

21   context of the aerospace industry, including working on gas

22   turbines or jet engines, specifically the design of the

23   turbine blades and more specifically the fan blades that you

24   see the front end of airplane engines.

25              I've also worked on the air circulation within

1    the cabin of very large aircraft as well as the design of

2    fluid filled vibration dampeners used in engines, internal

3    combustion engines of smaller aircrafts.  So those are

4    piston engines, and their crankshafts and the crankshafts,

5    just like in a car, will actually experience vibration

6    caused by the motion of the pistons.  So these are specific

7    devices that are designed to dampen those vibrations.

8    Q.     Dr. Kytomaa, do you hold any professional licenses?

9    A.     I do.  I'm a certified professional engineer in

10   several states:  in California, Louisiana, Maine, Michigan,

11   Massachusetts, New York, and Washington state.

12   Q.     And what is your present occupation?

13   A.     I am an employee of a company called Exponent.

14   Q.     And what is your position with Exponent?

15   A.     Well, I have three titles.  I'm a Principal Engineer,

16   which is a technical title.  I also run our group, called

17   Thermal Sciences.  And I'm also Corporate Vice President,

18   President of the firm.

19   Q.     What is the business of Exponent?

20   A.     Exponent is an engineering and scientific consulting

21   company.

22   Q.     How many employees does Exponent have?

23   A.     Between 800 and 900.

24   Q.     And how many of your work at Exponent is dedicated to

25   testifying as an expert witness?

483

Kytomaa - direct

1    A.      Quite a bit of my work is done outside of the context

2    of any legal considerations.  Probably more than half has

3    nothing to do with litigation.

4    Q.      Okay.  What is your hourly rte, Exponent charges in

5    this case?

6    A.      $495 an hour.

7    Q.      Is that a fixed consulting fee?

8    A.      It is.

9    Q.      Do you personally receive this fee?

10   A.      No, I wish I did.

11   Q.      Are you paid on a fixed salary by Exponent?

12   A.      I am.  I am a full-time salaried employee.

13   Q.      Is your income or salary dependent on the outcome of

14   this litigation in any way?

15   A.      No, it has nothing to do with it.

16   Q.      Now, could you explain to the jury what you were

17   asked to do?

18   A.      Yes.  I was asked to review the patents in this case,

19   the patent prosecution history that you have already heard

20   about as well as the Court's ruling on the meaning of the

21   claims of the patent.

22              I was asked also to review the cassettes.  So

23   specifically the AHG and the Broetje cassettes.

24              In the course of my work, I also reviewed

25   documents by AHG, some of which have been shown already here

Kytomaa - direct

1    as well as documents from Broetje.

2              I have also spoken with employees of AHG.  And I

3    performed my own inspection and testing at Gemcor of the

4    operation of both AHG and Broetje cassettes.

5    Q.    Now, you mentioned the Court's claim construction

6    order.  How did you use the claims, the Court's claim

7    construction order in forming your opinions?

8    A.    I used the Court's claim construction, which is

9    really the Court's definition of the meaning of the words in

10   the claims in interpreting the claims of the patent, which

11   is how I then arrived at my own opinions as to whether there

12   is infringement or not.

13   Q.    Okay.  You also mentioned that you reviewed the file

14   histories of the AHG patents; is that correct?

15   A.    Yes.

16   Q.    Okay.  If you could look at PTX-124 and PTX-125 in

17   your book, please.

18   A.    Yes.

19   Q.    Are these the file histories of the two patents, the

20   '216 patent and '339 patent which we have also been calling

21   the AHG patents?

22   A.    These are rather large documents but, yes, they

23   appear to be the prosecution histories.

24              MR. LINDVALL:  I move to admit PTX-124 and 125.

25              MR. KELLEHER:  No objection.

Kytomaa - direct

1              THE COURT:  They're admitted.

2              (PTX-124, PTX-124 admitted into evidence.)

3    BY MR. LINDVALL:

4    Q.    Now, can you tell the jury generally what you

5    concluded as a result of your analysis of the patents in the

6    Broetje products?

7    A.    Yes.  So there are two elements really of the work I

8    did.  One was to look at infringement.  The other one was

9    validity.  So in the context of infringement, I found that

10   both the '216 and '339 patents were infringed upon by the

11   Broetje products.

12             I also made a determination that AHG, the

13   cassette made by AHG practices those same patents.  And I

14   also found that those patents are perfectly valid, so

15   they're not invalid.

16   Q.    Did you prepare any expert reports in this case?

17   A.    I did.

18   Q.    And can you explain how many?

19   A.    Yes.  So I issued four reports in this case.  The

20   first report was on the subject of infringement.  Then my

21   second report was on the subject of validity.  And then I

22   issued another two reports, supplemental reports responding

23   to issues that have been raised by the other side.

24   Q.    Now, who wrote your expert reports in this case?

25   A.    I did with my colleague, Dr. Tim Morse who reports to

Kytomaa - direct

1  me.

2  Q.      Now, I understand you prepared materials to aid you

3  in your presentation today; is that correct?

4  A.      Yes, I prepared two things really.  A stack of

5  PowerPoint slides as well as an animation to help explain

6  elements of the patents.

7  Q.      Okay.  Now, what patents did you consider in

8  rendering your opinions regarding the Broetje product?

9  A.      So, I considered the '339 patent and the '216 patent

10 that are shown on the screen.

11 Q.      Okay.  And what claims in particular are you prepared

12 to testify about today in these two patents?

13 A.      So on the '339, that's a method patent, I have

14 address the claims 1, 2, and 6.  And the '216 patent, the

15 one on the right, is an apparatus patent.  So it's an

16 apparatus patent.  There, I have looked at claims 1 and 2.

17 Q.      Okay.  And could you explain to the jury the general

18 scope of these patents?

19 A.      Yes.  These are patents for the storage of objects

20 that look like rivets or rivets inside tubes and for

21 dispensing those rivets using compressed air.

22 Q.      Now, can you explain to the jury what a rivet is?

23 And they have heard this term many times.

24 A.      Sure.  Yes, a rivet is like a fat nail that is blunt

25 at the end, and it is used to fasten mechanical objects.

487

Kytomaa - direct

1    Those objects, particularly think of two metal plates.  A

2    hole is drilled through the two plates and the rivet is

3    inserted.  Then it is compressed and deformed to now hold

4    the two metal sheets together.

5    Q.    Okay.  And do you know what the focus of these two

6    patents, the '216 and '339 is?

7    A.    Yes.  The focus of the patents is the use of

8    passageways or grooves to allow air past the rivets and to

9    arrive all the way to the first rivet, to allow it to be

10   dispensed.

11             MR. LINDVALL:  Your Honor, I know different

12   jurisdictions have different requirements, but I would like

13   to offer Dr. Kytomaa as an expert in mechanical engineering.

14             THE COURT:  Is there any objection to that?

15             MR. KELLEHER:  No, Your Honor.

16             THE COURT:  All right.  He is so recognized as

17   that.

18   BY MR. LINDVALL:

19   Q.    Now, can you explain to the jury what the purpose of

20   grooves and passageways are?

21   A.    Yes.  The purpose of the grooves or passageways on

22   the inside of the tube is to overcome the problem of

23   jamming.  The problem of jamming arises when you place many

24   rivets in side a tube and try to dispense them with

25   compressed air.  The passageways or the grooves allow the

Kytomaa - direct

1    air to pass past the rivets, to arrive at the very first

2    rivets, and to allow those to be dispensed, overcoming the

3    problem of jamming.

4    Q.    Now, have you prepared anything to show the jury this

5    concept?

6    A.    I have.  I have an animation as well as some images

7    that I will show later on.

8    Q.    Is this an animation that you actually prepared?

9    A.    Yes, I prepared that.  We have our own animators that

10   help people like me describe concepts.

11            MR. LINDVALL:  If we could put up PDTX-80,

12   please.

13   BY MR. LINDVALL:

14   Q.    And if you need it to be stopped, you will just have

15   to tell Jeff.

16   A.    Yes.  So rivets have an axis, just I'm showing here,

17   just like the axis of a top, for example.  And if you place

18   a single rivet in a tube, which is the prior art that was

19   something that was known already, into a circular tube,

20   there is really no difficulty in passing that down the tube

21   using compressed air.

22            But in the presence of many rivets in a circular

23   tube, now the problem arises that they jam.  And so, here,

24   that's what this picture is showing.

25            So the invention of the '339 and the '216

Kytomaa - direct

1    patents, the two patents, have grooves that are shown here,

2    and those grooves allow the passage of air past the many

3    rivets and allow the air to transport the rivets forward as

4    the air flows.

5                And, here, I will show the motion of the rivets.

6    That is intermittent, and the reason it is intermittent is

7    there are stop members at the end of the tube that allow the

8    passage of one rivet at a time.

9    Q.    Thank you.  Now, Dr. Kytomaa, in the course of

10   forming your opinions -- you can take that down.

11               In the course of forming your opinions, did you

12   gather an understanding of what a cassette-based rivet

13   distribution system is?

14   A.    Yes.

15   Q.    And what is it?

16   A.    Yes.  The system really comprises of three

17   components.  One is the loading type station, loading

18   station, where the cassettes are loaded.  Then the cassette

19   itself.  And then racks into which the cassettes are placed

20   to then deliver rivets to a robot or a machine that does the

21   riveting.

22   Q.    Okay.  Now, let's go through the components of the

23   cassette-based rivet distribution system.  Have you created

24   any slides for that?

25   A.    I have.  I have images of that.

Kytomaa - direct

 1          So here you can see a vibratory bowl.  And you

 2   can see it's actually -- I hope you can see this better than

 3   I can.  The light is not very good.  But there is a spiral

 4   that rises on the left side going towards, away from the

 5   photographer, and as this bowl vibrates, the rivets rise up

 6   on that ramp and then ultimately come up to the right of the

 7   vertical blue stripe at a station where the orientation of

 8   the rivet is detected optically and rivets that are oriented

 9   incorrectly are rejected and thrown back into the bowl.

10          So that's the loading station.  They're

11   specifically showing the bowl.  And on the right-hand side

12   actually, that machine on the right-hand side is the AHG

13   loading station.

14   Q.     Now, what is in the next slide?

15   A.     So this is an image of the AHG cassette that you have

16   seen many of already.  And inside the tube, you will see

17   that there are rivets.

18   Q.     Is this a tube filled with rivets right here?

19   A.     That's correct.

20   Q.     And you see the rivets in this tube?

21   A.     Yes.  And they are aligned in the direction of the

22   length of the tube.

23   Q.     Typically, how many rivets may be in one of these

24   cassettes?

25   A.     Thousands of rivets.  It depends on the size of the

491

Kytomaa - direct

1    tube, but up to thousands of rivets.

2    Q.     And what is on your next slide?  What is this?

3    A.     So this is the third component that I mentioned.

4    That is, racks.  So you have already seen photographs of the

5    racks in various manuals, but these are the racks into which

6    the cassettes go.

7           On the left-hand side, you see an AHG cassette

8    in the rack, and there are no other cassettes, it's just

9    one.

10          And on the right-hand side, you can see two AHG

11   racked side by side, and you can see at the top the blue

12   labels read "AHG" with a multitude of cassettes in the racks.

13   Q.     These photographs we're looking at, did you take

14   these photos?

15   A.     I took these photographs.  I took these photographs

16   during my Gemcor inspection in Buffalo, Upstate New York.

17   Q.     Why did you visit Gemcor?

18   A.     I wanted to perform testing of both the Broetje and

19   the AHG cassettes to see them in operation and to see how

20   they performed.

21   Q.     Now, what other ways of feeding rivets to a

22   cassette-based rivet distribution machine exists?

23   A.     So there are two other methods you already heard

24   about.  One I just showed you, the vibratory bowl.  The

25   other is a hopper method.

Kytomaa - direct

1              The hopper, really all it is is think of a

2     container that allows the rivets to flow downward by

3     gravity, often by the aid of vibration as well.  So those

4     are the two or methods of feeding rivets, vibratory bowls

5     and hoppers.

6     Q.    Are there any advantages associated based with the

7     cassette-based rivet distribution system as opposed to these

8     other ways of feeding rivets?

9     A.    Yes.  First of all, the cassette-based system allows

10    you to feed rivets fast to the riveting robots, saving time

11    associated with manufacturing.

12              But also, as you saw from the rack just there,

13    the rack can be filled with many types of rivets, and so the

14    riveting machine can then very quickly select one from one

15    robot to another for purposes of manufacturing.

16              The other very important aspect of the use of

17    cassettes is that once you have oriented and placed the

18    rivets inside the cassette, they are prevented from falling

19    out, on the one hand, but also foreign objects cannot enter

20    the cassette.  And that is one of the problems associated

21    with the other technologies.

22    Q.    And what role does the cassette play in the

23    cassette-based rivet distribution system you just described?

24    A.    Well, the cassette is really the heart of the system.

25    It's the main component of the system.  It is loaded at the

Kytomaa - direct

1    loading stations, and then it is the cassette that you place

2    into the racks.  So it is the critical working component of

3    the system.

4    Q.    And what role does the grooved tube that you talked

5    about earlier that are described in the patents play in the

6    cassette?

7    A.    The grooved tube allows you to, on the one hand,

8    store a large number of rivets, larger than was possible

9    with a circular tube without a groove, and then to dispense

10   those using compressed air.

11   Q.    Now, how do the cassettes, racks, and loading

12   machines operate together?

13   A.    They operate as one functional unit.  They're one

14   system.

15   Q.    Now, Dr. Kytomaa, have you had an opportunity to

16   observe a Broetje cassette-based rivet distribution system?

17   A.    Yes.

18   Q.    Okay.  And is that with Gemcor that you just

19   described to the jury?

20   A.    That's correct.

21   Q.    Now, I'm going to show you, Dr. Kytomaa, what has

22   been marked as JTX-3.  Do you recognize this?

23            MR. LINDVALL:  May I approach, Your Honor?

24            THE COURT:  You may approach.

25            (Cassette passed forward.)

Kytomaa - direct

```
 1    BY THE WITNESS:

 2    A.      Thank you.

 3    Q.      Do you recognize this?

 4    A.      Yes, I do.

 5    Q.      What is it?

 6    A.      This is a Broetje cassette.

 7    Q.      Okay.  Did you study this cassette in the course of

 8    forming your opinions?

 9    A.      Yes, I have.

10    Q.      Okay.  Is there anything else you studied in forming

11    your opinions besides the cassette?

12    A.      Yes.  I mean I've also used the cassettes with the

13    loading station as well as a rack.

14    Q.      Okay.  So do you actually took this cassette and

15    inserted it into a loading station and a rack?

16    A.      Yes.

17    Q.      And did you watch it in operation?

18    A.      Yes, I did that.  Yes.

19    Q.      Now, did you memorialize your observations that you

20    made at Gemcor?

21    A.      Yes.  During of the course of my inspection, I took

22    over 100 photographs and also shot some video of the

23    cassettes in operation.

24            MR. LINDVALL:  Okay.  We'd like to show some

25    video right now.  If we could bring up PTX-117, please.
```

Kytomaa - direct

1    BY MR. LINDVALL:

2    Q.    First, can you describe this first video?  What is

3    this?

4    A.    Yes.  So here, this is a close-up actually of the

5    tubes that you can see also in this cassette.  The tubes.

6    And you can actually read Broetje on the side of the tubes.

7    And you can see that there are rivets that are arranged in

8    the direction of the length of the tube, and that they're

9    progressing one rivet dimension at a time, in an

10   intermittent manner.

11   Q.    The little metal, are these the rivets, the cylinders

12   you see?

13   A.    Those are the rivets.

14   Q.    And each of those are contained in one tube; is that

15   right?

16   A.    That's right.  There, you can see something like the

17   top 5, but my estimation is that there might be about, that

18   is, 20 revolutions or so of that tubing in that cassette.

19   Q.    Now, let's look at the next video you took and

20   explain to the jury what this video is of.

21   A.    Yes.  So in this image, this is also a Broetje

22   cassette in operation in a rack.  So what I'm doing here,

23   and I'm sorry for the noise but I'm looking at the

24   dispensing end that is dispensing the rivets.  And you can

25   see the rivets that are coming out one at a time, and you

496

Kytomaa - direct

1    can also see at the top left there are these actuated

2    elements.  Those are the stop members that actually allow

3    one rivet to exit while trapping the next rivet that is

4    then ready to be released in its turn.

5    Q.     And these are the rivets being released to the rivet

6    machine?

7    A.     That is correct.  So this end here is the dispensing

8    end that we're looking at on the screen.  And these are

9    the stop members that you can see working intermittently

10   together.

11                  MR. LINDVALL:  I'd like to move into evidence

12   PTX-177.

13                  MR. KELLEHER:  No objection.

14                  THE COURT:  All right.

15                  (PTX-177 is admitted into evidence.)

16                  THE COURT:  And I think now is a good time for

17   our afternoon break --

18                  MR. LINDVALL:  It would be a good time.

19                  THE COURT:  -- for the jury.

20                  Ladies and gentlemen of the jury, no talking

21   about the case during the break.  We'll get you back here

22   shortly.

23                  (Jury left courtroom.)

24                  THE COURT:  All right.  We will be in recess.

25                  (Brief recess taken.)

Kytomaa - direct

```
 1                    *      *      *

 2              (Proceedings reconvened after recess.)

 3              THE COURT:  Bring the jury back in.

 4              (Jury returned.)

 5              THE COURT:  Welcome back.  We are ready to

 6   proceed.

 7              You may have a seat, Doctor.

 8              THE WITNESS:  Thank you.

 9              THE COURT:  You may proceed.

10              MR. LINDVALL:  Thank you.

11   BY MR. LINDVALL:

12   Q.    Dr. Kytomaa, I forgot to ask you a question when we

13   talked about your qualifications.  Do you recall?

14   A.    (Nodding yes.)

15   Q.    I forgot to ask you, have you ever been a professor?

16   A.    Yes.

17   Q.    Where were you a professor?

18   A.    Yes.  After I graduated from graduate school in

19   California Institute of Technology, I was a professor at

20   MIT or Massachusetts Institute of Technology in Mechanical

21   Engineering.

22   Q.    How long were you a professor?

23   A.    Eight years.

24   Q.    Now, we were just talking about the Broetje cassette;

25   correct?
```

Kytomaa - direct

1    A.    Yes.

2              MR. LINDVALL:  May I approach, Your Honor?

3              THE COURT:  Yes.

4    BY MR. LINDVALL:

5    Q.    Let me show you a cassette.  The videos you were

6    taking, they were taken at Gemcor that we just saw; correct?

7    A.    Yes, that's correct.

8    Q.    And you also did some testing, similar testing with

9    the AHG cassette like you have in your hand?

10   A.    Yes.  I tested both AHG and Broetje cassettes.

11   Q.    Okay.  When you were at Gemcor, did the cassette

12   look like the cassette you have there for the AHG?

13   A.    Yes.

14   Q.    And did that cassette have some markings on it, some

15   tape or whatever around the back and the sides?  Did you

16   have an understanding what that was for?

17   A.    Yeah.  Yes.  I mean these cassettes are manufactured

18   with sheet metal, and the sheet metal is manufactured

19   elsewhere and then sent to the location of manufacturing of

20   the cassettes, and the sheet metal itself is protected by a

21   piece of tape.

22              But I can show you, you can just peel this tape

23   off just like this.  This is strictly a protective layer

24   both with the shipping of the sheet metal to AHG and for

25   protecting the cassettes in transportation when they are

499

Kytomaa - direct

1    ultimately supplied to the enduser.

2    Q.      Thank you.  (Mr. Lindvall takes the cassette back.)

3            Now, Dr. Kytomaa, earlier you stated you were

4    prepared to offer opinions concerning the infringement of

5    claims 1, 2, and 6 of the '339 patent, and 1 and 2 of the

6    '216 patent?

7    A.      Yes.

8    Q.      And what are those opinions again?

9    A.      That the Broetje cassette claims 1, 2 and 6 of the

10   '339 patent.

11   Q.      What is your understanding of the law of infringement?

12   A.      The law requires that infringement occurs when all

13   elements of any one claim are all satisfied by the product

14   or the allegedly infringing product.  When that happens,

15   there is infringement.

16   Q.      During your analysis, what burden of proof did you

17   apply?

18   A.      So, legally, the burden of proof is by a

19   preponderance of evidence.  So what that means is that AHG

20   has a burden to show that it is more likely than not that

21   Broetje infringes on the patents.

22   Q.      Now, let's move to the '339 patent, please.  And the

23   first part of claim 1 of the '339 patent.

24           First of all, could you describe briefly what

25   this is, what you see on this slide, PDTX-024?

Kytomaa - direct

1    A.      Yes.  So the claims of the patent are the numbered

2    paragraphs at the end of the patent.  This is the first

3    numbered paragraph, and this is, it is the claims that

4    define the bounds of the invention.  So this is the first

5    claim.

6    Q.      So let's go through each element of the claims.  So

7    each claim is made of a number of elements?

8    A.      Yes.

9    Q.      And we can show how each element is found in the

10   Broetje cassette; is that correct?

11   A.      Yes.  Just to the clear for the jury.  So here you

12   have a claim and so for a product infringement claim, the

13   product has to meet every element of this claim.  And there

14   are many elements that I will go through here.

15   Q.      Okay.  Now, what is the first part of claim 1 of the

16   '339 patent?

17   A.      So it is a process for dispensing identical pieces

18   having a symmetry of revolution about an axis.  And I have

19   already shown you that rivets, for example, have a symmetry

20   of revolution about an axis.

21   Q.      And how does the Broetje cassette meet this element?

22   A.      Well, Broetje uses their cassettes with rivets that

23   have an axis.

24   Q.      What is the next element of claim 1?

25   A.      So here is -- I apologize here.  This is, I added

Kytomaa - direct

1   this just to show the rivets have an axis.  Yes.

2   Q.      And this is a depiction of a rivet you see here?

3   A.      That is a rivet, and you can see the axis.

4   Q.      Okay.  It uses the term "a symmetry of revolution."

5   Can you explain to the jury what is meant by symmetry?

6   A.      Yes, and I showed that with the animation, but

7   essentially if you turn the rivet about its axis, it looks

8   the same in every angle.

9   Q.      Would you give an analogy?

10  A.      Yes.  It's like a top.  Mentioned earlier if you spin

11  a top, it looks the same at all time.  It spins about its

12  own axis.

13  Q.      Can you turn to the next slide, please.  And what is

14  the next element of the claim?

15  A.      So this is -- and I will read:  Providing a tube

16  having a hollow center and a shape corresponding to the

17  transverse section of the greatest diameter of the pieces

18  for assuring a peripheral guiding of said pieces at the

19  level of this section.

20          Now, this element of the claim was interpreted

21  and a definition of this was provided by the Court.  And

22  here's the Court's construction.  So, and I -- and I have in

23  quotations here, first, the piece from the highlighted

24  yellow section and I will read:  Shape corresponding to the

25  transfers section of the greatest diameter of the pieces

Kytomaa - direct

1    means the shape of the hollow center of the tube is

2    compatible with the greatest diameter of the pieces.

3    Q.    All right.  Just to make sure the jury is clear, the

4    Court's definition of this claim language is what follows

5    the means; is that correct?

6    A.    Right.  So the shape corresponding to the transfers

7    sections language that I just took from, you can see

8    starting there, that's just a direct quotation of an element

9    of the claim and then the Court's interpretation is the

10   italicized.

11   Q.    And is the Court's interpretation you followed in

12   forming your opinions?

13   A.    Yes, that's correct.

14   Q.    Let's go to the next slide, please.

15   A.    And here's an image showing that the tube has a

16   hollow center.

17   Q.    And then let me stop you for a minute.

18   A.    Sure.

19   Q.    What does this slide depict, first of all?

20   A.    So the, the -- there are three things here.  First at

21   the top is the element of the claim that we're talking about

22   using the Court's definition, so I've just inserted there at

23   the top in the text.

24             The bottom left is an image that has been

25   provided by Broetje in their own responses to

Kytomaa - direct

1    interrogatories.  So legal brief, a legal document, they

2    provided this image.

3              And on the right I simply help, I created this

4    diagram to help understand the hollow center that is

5    described in the language up top.

6    Q.    All right.  So how does Broetje's cassette meet this

7    particular element of claim 1 of the '339 patent?

8    A.    So clearly the tube has a hollow center, and the

9    shape of the hollow center is compatible with the greatest

10   diameter of the pieces, but in the images that you saw of

11   the Broetje cassette operating, clearly, the two are

12   compatible.  Otherwise, the two wouldn't work.

13   Q.    What is your understanding of compatible as being

14   used there?  How did you use it?

15   A.    Well, the compatibility is such that, and you can

16   read on, actually.  It says, for assuring a peripheral

17   guiding of the pieces at the level of this section.  So they

18   have to be compatible so that the rivet can move inside the

19   tube and is guided by the walls of the tube.

20   Q.    Turn to the next element of claim '339.  What is this

21   element?

22   A.    Arranging the pieces one after another in the

23   interior of the tube two with their axes of revolution

24   extending along the longitudinal axis of said tube.  And

25   this tube was interpreted and defined by the Court.

Kytomaa - direct

1         And the Court's construction of this

2    language highlighted in yellow is the following:  Pieces

3    inserted one after another with their axes of revolution

4    extending in the direction of the length of the tube.

5    Q.    Okay.  Now, how does Broetje's cassette meet this

6    element?

7    A.    When the pieces are arranged in the tube of the

8    Broetje cassette, they are arranged with their axes of

9    revolution extending in the direction of the length of the

10   tube.

11   Q.    Okay.  And --

12   A.    So here is what I, what I've done here is I have two

13   images that are also from, from Broetje document.  If you

14   could do the following, please, controlling the images.  If

15   you can actually make bigger the six images at the very

16   bottom left of the document, the six.

17   Q.    These right here?

18   A.    Yes.  Can you make those bigger, because I just want

19   to explain, this is from a Broetje document.

20   Q.    And just for the record, it says JTX-9?

21   A.    Yes.

22   Q.    All right.

23   A.    Yes.  So as you can see in this particular Broetje

24   document, you see many tubes, six tubes with various kinds

25   of rivets aligned and they're all arranged in an orientation

Kytomaa - direct

1    of their axis that goes along the length of the tube.  All

2    right?

3                  And then what I did was to take one of those

4    images, this one here, and I just sort of cleaned it up.

5    Okay?  So you can see the rivets outlined in the orientation

6    of the direction of the tube.

7    Q.    Okay.  Let's go to the next element.

8    A.    And feeding one end of said tube with a compressed

9    fluid for assuring the transfer of the pieces toward an open

10   dispensing end of said tube, admitting the compressed fluid

11   into the one end of the tube behind the piece closest to

12   said one end of the tube.

13                 And I also have an image for that and so here is

14   the Broetje cassette.  So this is my photograph of the very

15   Broetje cassette you saw a video of and you'll recognize

16   the top right, you'll see the top members there.  I had a

17   close-up of that very area (indicating).

18                 And so the first thing you see is that during my

19   inspection, the rivets were aligned in the orientation of

20   the length of the tube.  You can see that by just looking at

21   the tube.  And that with respect to this specific element,

22   the compressed air is admitted at the top left end.  You can

23   see the label.

24                 And the rivets move counterclockwise in this

25   coil, the coil two, and are ultimately dispensed at the top

Kytomaa - direct

1    right end in accordance with the opening and closing of the

2    stock methods.

3    Q.    And you had the video earlier you showed the jury

4    where you actually saw that at Gemcore in your testing?

5    A.    Yes.  I mean, this, this cassette is installed in a

6    rack and I operated the rack and I show a video of the top

7    right-hand corner.  In fact, you saw two videos of this.

8    Q.    Okay.  Can we go to the next element, please, the

9    last element of the '339 patent.

10   A.    Distributing the fluid along the length of the tube

11   through at least one longitudinal passageway on the internal

12   surface of said tube and opening into the hollow center

13   thereof for exerting the pressure of the fluid along the

14   hollow center in the spaces (E) between the pieces, to the

15   piece (1P) closest to the dispensing end on which said

16   pressure acts for assuring the transfer toward the

17   dispensing end.

18             I know this is an enormous mouthful, but I

19   will explain.  So I have a slide that explains this.  So

20   what this element speaks to is at least one longitudinal

21   passageway, and I've shown in this image at the top and the

22   bottom the passageways, longitudinal passageways, and the

23   longitudinal passageways allow air to enter the gaps in the

24   rivets.  That's where the red arrows show.  And ultimately

25   allowing air to pass all the way to the leading rivet that

Kytomaa - direct

1    is also dispensed by the compressed air.

2    Q.    And did you observed the Broetje cassette meeting

3    this element?

4    A.    Yes.

5    Q.    And is that shown in your earlier videos?

6    A.    Yes.  The two videos.  Essentially, the video that

7    showed the rivets moving in the tube bundle as well as the

8    close-up close to the dispensing end that you saw.

9    Q.    By the way, the Broetje cassette that you used, the

10   tube, what was the shape of the cross-section of that tube

11   that you observed?

12   A.    It was, it was pentagon.

13   Q.    If we can go to the next slide.

14   A.    That's a, that's a shape with five sides.

15   Q.    So do you have an opinion as to whether the Broetje

16   cassette infringes the claim of, that claim 1 of the '339

17   patent?

18   A.    Yes.  So just to complete it now, all of the elements

19   of the claim 1 and it's very clear to me that the Broetje

20   product, cassette, meets every element, every single element

21   of claim 1.  And we're done with claim now.  I'm going to

22   move on to 2 and then 6.

23   Q.    Okay.  Let's look at claim 2.

24          Now, first of all, could you explain to the jury

25   what's meant by, a process as in claim 1?  This is called a

Kytomaa - direct

1    dependent claim; is that correct?

2    A.    Yes.  So a dependent claim always starts with, a

3    process for an apparatus as in.  A process as in claim 1

4    means that, that the process that we just went through is

5    really what we're talking about here.  Okay?  And then some

6    additional detail that I will go into.

7    Q.    This is an additional limitation to all the other

8    limitations or elements that you just went through; is that

9    correct?

10   A.    Yes.  And just as -- just to explain, claim 1 talked

11   about at least one longitudinal passageway.  All right.  And

12   so this sort of builds upon that.

13   Q.    Okay.

14   A.    So let me -- let me read.  So this is quoted again:

15   A process as in claim 1, and including distributing the

16   compressed fluid -- can you go back one slide?  I'm not

17   sure.

18            Yes, okay.  Let me read -- I will read either.

19   A process as in claim 1, and including distributing the

20   compressed fluid along the interior of a plurality of linear

21   grooves, and many linear grooves, arranged about the hollow

22   center.

23   Q.    Okay.

24   A.    And so here you can see the same photograph that

25   was taken by Broetje, showing a rivet inside a Broetje tube,

509

Kytomaa - direct

1    and you can see the orthogonal shape of the interior of the

2    tube.  And my schematic there shows the hollow center with

3    the dotted line and the five grooves around the hollow

4    center.

5    Q.    And, again, the source of this picture is from

6    PTX-128; is that correct?

7    A.    Yes.  I mean, that's, that's my recollection.  I

8    don't remember the exact number of the, of the document.

9    Q.    You saw the document?

10   A.    I saw the document, and it was a Broetje document.

11   Q.    Can we go to the next slide, please.  And this is

12   claim 6 of the '339 patent; correct?

13   A.    Yes.

14   Q.    And what is new or what's the additional element in

15   claim 6?

16   A.    So this is a dependent claim 1 on claim 1.  It's a

17   process in claim 1 and including pretty narrowly orienting

18   the pieces in the tube, so orienting the pieces inside the

19   tube like you saw them with stop members 3 and 4 provided at

20   the end of the tube and withdrawing the stop member situated

21   at the dispensing end for assuring the dispensing.

22   Q.    Now, is this claim limitation met by the Broetje

23   cassette?

24   A.    It is.  The -- I've showed you already -- well, first

25   of all, the preliminary orienting the pieces is shown in

Kytomaa - direct

1    there, in Broetje's own materials, as you can see on the

2    image here, and then those pieces are then controlled by

3    stock members that I showed you a video of on the Broetje

4    cassette.

5    Q.    Okay.  So the video that you showed the jury also

6    supports this thing, claim element; is that correct?

7    A.    Yes.  The video specifically showed the stop members

8    in operation.  I mean, when you look at a cassette, you'll

9    see them stationary.  You don't see them alternating, and

10   ultimately allowing the rivet to be dispensed, but with a

11   movie, you can see the rivet.

12              Essentially, what you have is two stop

13   members.  The leading one traps the rivet and then when that

14   opens up, it releases the rivet without letting the one

15   behind it pass.  Then it closes and allows the, the one

16   before pass, and so on.

17   Q.    All right.  So what is your conclusion with respect

18   to claims 1, 2 and 6 of the '339 patent and the Broetje

19   product?

20   A.    That the Broetje product infringes claims 1, 2 and 6.

21   Q.    All right.  Now let's move to the next patent, the

22   '216 patent.  And could you describe to the jury what this

23   is?

24   A.    Yes.  So this is an apparatus patent.  '339 was a

25   method patent.  This is an apparatus patent.  And the first

Kytomaa - direct

1    element of it reads, an apparatus for orienting identical

2    pieces, comprising at least one tube having a hollow center

3    for housing and guiding a plurality of said pieces aligned

4    one after another.

5    Q.      Okay.  How does the Broetje cassette meet this

6    element?

7    A.      So the, the Broetje cassette is an apparatus.  It

8    accepts pieces that are oriented and it accepts identical

9    pieces and it has a tube.  The tube has a hollow center, and

10   I showed that on the far right, that houses and guides many

11   of these pieces that are outlined one after another.

12   Q.      Okay.

13   A.      So it meets this element.

14   Q.      Now, the photos you have on this slide, PDTX-416,

15   where's the one on the far left?  Where is that taking

16   you?

17   A.      So I took that photograph at my inspection and this

18   is a Broetje tube.  If you were able to, to magnify this

19   image, you would be able to read Broetje on there, and it

20   has rivets inside.

21   Q.      Okay.  And the cassette here is a Broetje cassette

22   (indicating)?

23   A.      Yes.

24   Q.      At the center?  And what is on the right?

25   A.      This is a Broetje tube.

512

Kytomaa - direct

1    Q.     Let's go to the next element of claim 1 and 2.  What

2    is that?

3    A.     At least one groove arranged on the internal surface

4    of the tube in such a manner as to open into the hollow

5    center along the length thereof.

6    Q.     Okay.  How does the Broetje cassette meet this

7    element?

8    A.     So here again, you see the same photograph and I show

9    five grooves, so that satisfies the, the -- that requirement

10   of at least one groove.  And all of these five grooves, if

11   you look at any ONE groove, it has approximately a

12   triangular shape and it opens into the hollow center of the

13   tube.  And you can see in the Broetje photograph there, I

14   labeled with a, with a yellow arrow the groove.

15   Q.     Let's move to the fourth element of claim 1.  What is

16   that?

17   A.     And stop members 3, 4 situated at the ends of the

18   tube for retaining the pieces.

19   Q.     Okay.  Does the Broetje, how does the Broetje

20   cassette have this element?

21   A.     So at the dispensing end, there are stop members.

22   We've already talked about those.  Now, those are the ones

23   you see on the left of this image and, in fact, the close-up

24   image looking into the, into the tube shows the little black

25   lines there that are labeled stop members.  So that's at the

Kytomaa - direct

1    dispensing end.

2                    And at the end where the compressed air is

3    supplied, the stop member that prevents or contains the

4    rivets within the cassette is a cap that is screwed onto the

5    end that normally accepts the compressed air.

6    Q.    So let's move to the next element of claim 1 of the

7    '216 patent.  What is that element?

8    A.    Said tube being filled with said pieces comprising

9    rivets arranged in a column.

10   Q.    All right.  And how does the Broetje cassette have

11   this element?

12   A.    Well, the entire intent of the Broetje cassette is to

13   fill the tube with rivets and their marketing materials show

14   that and we've already seen video that I shot that shows

15   that as well.

16   Q.    All right.  Let's move to the final element of claim

17   1 of the '216 patent.  What is that element?

18   A.    Said rivets having heads such that the transverse

19   cross-section of the heads correspond to the transfers

20   cross-section of the tube, and such that the cross-sectional

21   area of the heads substantially equals the cross-sectional

22   area of the tube excluding the at least one groove.  There's

23   a typo.  That o-n should be one.

24   Q.    Okay.  And there's this term substantially equals.

25   There is a definition or a Court construction of what this

514

Kytomaa - direct

1   limitation is?

2   A.    Yes.  The Court has interpreted this particular

3   element and I have it here.  So, first, I -- yes.  So let me

4   read through it.

5         So this is the Court's interpretation:  The

6   shape of the head of the rivet is compatible with the shape

7   of the hollow center of the tube.  Remember, the hollow

8   center was the sort of larger circle that you can inscribe

9   inside the tube.  Such that the cross-sectional area of the

10  head of the rivet is of sufficient size as compared to the

11  cross-sectional area of the hollow core.  So the rivet has

12  to be big enough is what it says.  Such that there is

13  sufficient space between the rivet and the surface of the

14  hollow core.  So what that means is, but there has got to

15  be enough space between the rivet and the whole center of

16  the tube.  To permit the rivet to move without difficulty

17  from upstream to downstream as a result of the compressed

18  fluid.

19  Q.    Okay.  Now, how does the Broetje cassette meet this

20  element?

21  A.    So I've highlighted the key components here, because

22  I understand there's a lot of text here.  But the shape of

23  the head of the rivet has to be compatible with the head of

24  the hollow center ultimately to permit the rivet to move

25  without difficulty from upstream to downstream.  And that is

Kytomaa - direct

1     what the Broetje cassette does.  I mean, the shape of the

2     rivet is compatible with the Broetje tube and it does move

3     without difficulty from upstream to downstream.

4     Q.     And did you --

5     A.     By means of compressed air.  I'm sorry.

6     Q.     Sorry.  Did you observe that in the video that you

7     had?

8     A.     I did.  I mean, I observed it and then I documented

9     it.

10    Q.     Okay.  And would you rely on PTX-128?

11    A.     Yes.  I chose this particular image because we all

12    agree that this is a Broetje tube and rivet.

13    Q.     All right.  If we could go to claim 2 of the '216

14    patent.  Again, because this is a dependent claim that

15    contains all the elements you've just gone through and then

16    adds one element; is that correct?

17    A.     Yes.

18    Q.     And what is the additional element it adds?

19    A.     This is, again, a dispensing apparatus as in claim 1,

20    and wherein said tube includes a plurality of said grooves

21    arranged about its hollow center.  So the claim 1 had at

22    least one groove.  This claim says there are many grooves.

23    Q.     Okay.  And how did Broetje's cassette meet this

24    limitation?

25    A.     So this shows just as you saw a moment ago.  You can

516

Kytomaa - direct

1    see five grooves.  That's a plurality of grooves.  That's

2    many grooves.

3    Q.    Okay.  And if we go to the next.  Cassette

4    comparison.  If we go back one more, please.

5              Now, do you have an opinion that the Broetje

6    cassette infringes claim 1 of the '216 patent?

7    A.    Yes.

8    Q.    And what is that opinion?

9    A.    It does.

10   Q.    Okay.  And with respect to the -- we discussed

11   infringement of the patents by Broetje's cassettes so far;

12   is that correct?

13   A.    Yes.

14   Q.    All right.  Is there any way to use a cassette

15   without infringing it?

16   A.    Yes.

17   Q.    And how?

18   A.    There are two ways:  Either by knowingly selling --

19   Q.    Well, let me back up.  Listen to my question.  Is

20   there any way to use a cassette without infringing it?

21   A.    No.  No.  I mean, using the cassette infringes the

22   very claims that we've gone through.

23   Q.    All right.  Did you reach an opinion as to

24   contributory infringement?

25   A.    Yes.

517

Kytomaa - direct

1   Q.      Okay.  And what is your understanding of contributory

2   infringement?

3   A.      So contributory infringement is to sell an infringing

4   product in the U.S., knowing that there are -- it has patent

5   protection.

6   Q.      Okay.  And knowing it does not have any substantial

7   noninfringing uses?

8   A.      That's correct.

9   Q.      Okay.  In your opinion, does the Broetje cassette

10  have any substantial noninfringing uses?

11  A.      No.  It has -- I mean, the point here, just to be

12  clear, is that the only other feeding systems are the

13  hoppers that we talked about and those are not alternatives.

14  Those have their own issues that the invention overcomes.

15  Q.      Now, did you reach an opinion as to infringement by

16  inducement?

17  A.      Yes.

18  Q.      And what is your understanding of induced

19  infringement?

20  A.      So induced infringement is to induce another party to

21  infringe upon the patent by practicing the method of

22  specifically here, the '339 patent as a method patent.

23  Q.      Did you reach a conclusion with respect to that?

24  A.      Yes.

25  Q.      What is your conclusion?

518

Kytomaa - direct

1    A.    Coy my conclusion is that Broetje did induce others

2    to infringe, and so there is induced infringement.

3    Q.    Okay.  Let me show you what has been marked as

4    PTX-168 in your book.  And what is PTX-168?

5    A.    PTX-168 is the Broetje instruction manual.

6    Q.    Okay.

7              MR. LINDVALL:  I move to admit this exhibit.

8              MR. KELLEHER:  No objection.

9              THE COURT:  It's admitted.

10   (PTX-168 was admitted into evidence.)

11   BY MR. LINDVALL:

12   Q.    Okay.  And what is the purpose of PTX-168, this

13   instruction manual?

14   A.    So this instruction manual instructs the owner of, of

15   a Broetje fastener feed system, so the feed system really is

16   three things:  Loading station, the cassettes and the racks

17   on how to operate the system.

18   Q.    All right.  Now, if an operator follows this

19   instruction manual, is it your opinion that the '339 patent

20   would be infringed?

21   A.    Yes.

22   Q.    Now, let me show you JTX-54 and ask you what that is.

23   JTX-54.

24   A.    That is Broetje's maintenance manual.

25              MR. LINDVALL:  I move to admit JTX-54.

Kytomaa - direct

1          MR. KELLEHER:  No objection.

2          THE COURT:  It's admitted.

3     (JTX-54 was admitted into evidence.)

4     BY MR. LINDVALL:

5     Q.    All right.  What's a maintenance manual for?

6     A.    It is to -- for owners of the Broetje system to

7     maintain that system.

8     Q.    Now, what is your opinion on whether Broetje induces

9     infringement of the asserted claims of the '339 patent?

10    A.    They do.  They do induce infringement.

11    Q.    Okay.  Now, what alternatives were there to using

12    cassettes with the invention described in the '339 and '216

13    patent?

14    A.    There were none.

15    Q.    Okay.  And would a hopper system be an acceptable

16    alternative?

17    A.    No.

18    Q.    Why not?

19    A.    It has all sorts of problems.  First of all, you

20    heard a lot already about the dangers of associated with

21    foreign materials getting into the laboratory bowl that then

22    may cause problems.

23               Secondly, it does not allow riveting at the

24    same speed, does not give the flexibility of being able to

25    change from one rivet to another rivet type.  You have to

Kytomaa - direct

1    recognize that these roadblocks, the riveting machines are

2    very sophisticated machines that can operate fast, and the

3    vibratory bowl just does not accommodate the high accuracy

4    and speed of those rivets.

5    Q.    Okay.

6    A.    And the same is true with the hoppers as well.

7    Q.    Thank you.

8          MR. LINDVALL:  I'd like to move for admission,

9    counsel just reminded me, of JTX-9.

10         MR. KELLEHER:  No objection, Your Honor.

11         THE COURT:  Okay.  It's admitted.

12         MR. LINDVALL:  PTX-543.41 through 50.  It's a

13   C.V.

14         MR. KELLEHER:  No objection.

15         THE COURT:  Admitted.

16         (PTX-543.41 through 50 were admitted into

17   evidence.)

18         MR. LINDVALL:  PTX-128, which is the

19   interrogatory.  And we will agree to just take the portion

20   in there that relates to this.

21         MR. KELLEHER:  Yes, Your Honor.  No objection to

22   that.

23         THE COURT:  No objection?

24         MR. LINDVALL:  We will take out the questions

25   that don't relate to the opinion in the interrogatory

Kytomaa - cross

1    response.

2              THE COURT:  Okay.  It's admitted.

3    (PTX-128 was admitted into evidence.)

4              MR. LINDVALL:  And PTX-103.  That, Your Honor,

5    that's something that's a claim construction order.  It's

6    not the decision.

7              MR. KELLEHER:  No objection to the order.

8              THE COURT:  It's admitted.

9    (PTX-103 was admitted into evidence.)

10             MR. LINDVALL:  And just to clear this up, what I

11   showed you earlier, the AHG cassette with the protective

12   tape covering on it was JTX-64B, 64B as in boy.  Okay?

13             (JTX-64B was admitted into evidence.)

14             Thank you, Your Honor.  No further questions.

15             THE COURT:  Okay.  Cross-examination.

16                       CROSS-EXAMINATION

17   BY MR. KELLEHER:

18   Q.    Hello again, Dr. Kytomaa.  How are you?

19   A.    Hello, sir.

20   Q.    When you were at MIT, how many classes in rivet feed

21   technology did you teach?

22   A.    We did not have a class on rivet feed technology, but

23   we had a class that I taught at the undergraduate, graduate

24   level on fluid mechanics that is part and parcel of

25   technology.

Kytomaa - cross

1    Q.      And how many rivet feed systems have you designed?

2    A.      I've not designed any.

3    Q.      And how many have you repaired?

4    A.      I'm not a repair technician.

5    Q.      Do you feel that your learning in the field of fluid

6    dynamics is transferable over to the field of rivet feeding?

7    A.      Absolutely, from the standpoint of being able to

8    analyze the invention associated with the '339 and the '216

9    patents.  Yes, sir.

10   Q.      Now, a little while ago, you opined or, that is, gave

11   the opinion that the "substantially equal" limitation of the

12   '216 patent is satisfied.  Did you do any measurements or

13   calculations to come to that conclusion?

14   A.      What I did was to take the Court's interpretation of

15   that language and then to apply that interpretation that I

16   have already shown you to make a determination as to whether

17   the Broetje product as well as the AHG product meet that

18   element of the claim.  That's what I did.

19   Q.      So that means you did not do any measurements or

20   calculations?

21   A.      But it was not necessary because the Court's

22   interpretation specifically does not require any measurements.

23   Q.      Okay.  And you're familiar with the prosecution

24   history of the '216 patent; correct?

25   A.      Yes.  To some extent, yes.

Kytomaa - cross

1    Q.     So you are aware that the "substantially equal"

2    limitation was added by the Examiner as a requirement to

3    grant the patent?

4    A.     Oh, that may be.  I don't have any immediate

5    recollection of that.

6    Q.     But you would agree that the '216 patent requires a

7    close relationship of the tube and the rivet head such that

8    the tube is only slightly larger than the rivet head?

9    A.     What the '216 patent, specifically the element that

10   you talk about, requires is the shape of the head of the

11   rivet is compatible with the shape of the hollow center to

12   allow the rivet to move without difficulty from upstream to

13   downstream.  And this is a court document issued by the

14   United States District Court, sir.

15            MR. KELLEHER:  Your Honor, I would like to play

16   a portion of Dr. Kytomaa's deposition.

17            THE COURT:  Tell us where it is.

18            MR. KELLEHER:  Page 133, lines 21 to 24.

19            THE COURT:  Do you have it on video?

20            MR. KELLEHER:  Yes, Your Honor.

21            THE COURT:  You may play it.

22            (Video shown without audio, but text attached to

23   bottom of screen.)

24            THE COURT:  I assume we have audio with it, too.

25            MR. KELLEHER:  We're working on that, Your

Kytomaa - cross

1    Honor.

2                    "Question:  But you say that the patents teach a

3    tube of only slightly larger cross-sectional area than the

4    head of the rivet, right?

5                    "Answer:  Yes.  Correct."

6                    MR. KELLEHER:  Now, Dr. Kytomaa, I wonder if my

7    opposing counsel would be good enough to put up slide 39 of

8    Dr. Kytomaa's presentation.

9                    THE COURT:  I'm sure they would.

10   BY MR. KELLEHER:

11   Q.      Okay.  So, Dr. Kytomaa, what you have done there is

12   you have drawn this pentagon, and I call that a proper sharp

13   pentagon with points; right?

14   A.      Yes, that is a pentagon.  Yes.

15   Q.      Whereas the Broetje tube is actually a bit softer at

16   the five points; isn't that true?

17   A.      Yes, I would agree with that.

18   Q.      And you have drawn a dashed imaginary circle touching

19   at five points on the pentagon?

20   A.      Yes.

21   Q.      And you call the inside of that a hollow center?

22   A.      Yes.

23   Q.      Isn't it true that there is nothing in either of

24   these two patents about drawing imaginary circles?

25   A.      That's actually incorrect.

Kytomaa - cross

1    Q.      Where in the world is that in the two patents?

2    A.      Okay.  If I may read.

3    Q.      Yes.

4    A.      So I'm reading from column 4, line 32 -- 31.

5            This apparatus comprises cylindrical tube having a

6    hollow central core, 2a, of a cylindrical form, the diameter

7    of which is adapted to that of the largest cross-sectional,

8    cross-section of the rivets to be distributed in such a manner

9    as to contain the rivets and to guide them on their periphery

10   with a play of several tenths of a millimeter.

11           So there are two words there that are

12   unambiguous with respect to the circular character of the

13   image that I have shown.  One is that the central, hollow

14   central core has a cylindrical form, and the second is that

15   it has a diameter.

16           THE COURT:  Which patent were you reading from,

17   Doctor?

18           THE WITNESS:  I'm reading from the '216 patent,

19   column 4, line 31.

20           THE COURT:  Thank you.

21   BY MR. KELLEHER:

22   Q.      On the left there is a rivet in one of Broetje's

23   tubes; isn't that right?

24   A.      Say that again, please?

25   Q.      On the left, there is a rivet inside one of Broetje's

1    tubes?

2    A.     Yes.

3    Q.     Okay.  And so you are saying that the circle on the

4    right that you have drawn is equivalent to the largest

5    diameter of that rivet head?

6    A.     The circle that I have drawn is the largest diameter,

7    maximum diameter that you could accommodate in such a tube.

8    Q.     Okay.  But that is not what Broetje does.  They use a

9    much smaller rivet; isn't that true?

10   A.     The Court's construction -- let me read that again

11   because I think it's important for the '216 patent on this

12   very section -- reads:  The transverse cross-section of the

13   head corresponds to the transverse cross-section of the tube

14   such that the cross-section area of the head -- I'm sorry.

15   I'm actually reading the wrong document.

16          The shape of the head of the rivet is compatible

17   with the shape of the hollow center of the tube such that

18   the cross-sectional area of the head of the rivet -- which

19   is the, you can see here, is of sufficient size as compared

20   to the cross-sectional area of the hollow core, so the rivet

21   is big enough; and I continue -- such that there is

22   sufficient space between the rivet and the surface of the

23   hollow core.  So there is enough space between the tube to

24   permit the rivet to move without difficulty from upstream to

25   downstream as a result of the compressed flow.

Kytomaa - cross

1          So there is two things that are required by the

2     Court's construction.  One is that the head be big enough

3     but that there also be enough space so that the rivet can

4     move without difficulty.

5     Q.     And there is nothing in the Judge's claim construction

6     about drawing imaginary circles.

7     A.     I'm using the language from the patent specification,

8     which is the body of the patent that speaks both in the '216

9     and the '339 of the largest diameter that the two could

10    accommodate.

11    Q.     Now, the portions of the pentagon that you have

12    designated as being grooves.

13    A.     Yes.

14    Q.     The shank of the rivet, the more narrow part than the

15    head, that can actually fit into the portions you have

16    described as the grooves, can't it?

17    A.     Not really.

18    Q.     Why not?

19    A.     I mean it depends on the exact diameter of the shank,

20    but the radius of the groove that I have labeled there is

21    smaller.  That is, it's some sort of a narrower dimension

22    than a typical radius of a shank.  But obviously rivets vary

23    in exact size.

24          MR. KELLEHER:  John, can you pull up Exhibit

25    No. 1 for the '216 patent?  Can you go one more page

Kytomaa - cross

1    forward?

2    BY MR. KELLEHER:

3    Q.     So, Doctor, here in Figure 1 of the '216 patent, that

4    depicts a column of rivets; is that right?

5    A.     Yes.

6    Q.     And here in these, the shank of the rivet is only

7    about half the diameter of the rivet head; is that right?

8    A.     I wouldn't come to that conclusion.  I'd say it's a

9    little less than that in this image, but I haven't measured

10   it.  I mean to be specific, I haven't needed to measure it

11   because that doesn't come to play in the dimensions.

12   Q.     But if a rivet of those dimensions was put into

13   Broetje's tube, the shank would fall into the areas you have

14   described as the tubes?

15   A.     I don't know.  I mean this is a patent schematic, so

16   I -- and the patent itself doesn't speak about that at all,

17   so I don't know.

18   Q.     With regard to the '339 patent and the stop member

19   element and also with regard to the '216 patent and its stop

20   member elements, the claims talk about withdrawing the stop

21   member before the rivets are dispensed; is that right?

22   A.     Yes.

23   Q.     And in Broetje's product -- I don't have the proper

24   one here.  In Broetje's product, the actuators that are at

25   the end of the tube and inside the cassette, they go back

1    and forth like this (indicating), right?  As the rivets come

2    out?

3    A.      Yes.

4    Q.      So they stay integrated into the cassette; right?

5    A.      No, the stop member actually that performs the

6    stopping does get out of the way of the rivet.  Otherwise,

7    it wouldn't work.

8    Q.      It gets out of the way of the rivet, you said.  But

9    it stays integrated as a part of the cassette?

10   A.      Yeah.  I mean it is, yes.  It's a part of the

11   cassette, and it gets out -- it steps out of the way of the

12   rivet for purposes of dispensing, that's correct.

13   Q.      But it's not detached from the cassette itself?

14   A.      The dispensing end is not detached, that's correct.

15   Q.      You mentioned that there is a problem with round

16   tubes jamming; is that correct?

17   A.      If you --

18   Q.      Actually, the rivets jamming in the round tubes.

19   A.      Right.  Right.  Yes, I described that and I showed an

20   animation of that.  Yes.

21   Q.      Are you aware that a number of the cassettes that my

22   client Broetje has sold in the United States have a round

23   tube rather than a pentagonal tube?

24   A.      I have heard that, yes.

25   Q.      Do you know whether those round tubes experience

Kytomaa - cross

1    problems with jamming of the rivets?

2    A.      If the round tube were long enough, I expect that

3    they would.

4    Q.      Have you tested it with any of Broetje's cassettes to

5    see if they have that problem?

6    A.      No, I have not tested them.  And as you heard me

7    speak before, the jamming issue arises when you have many

8    rivets, a large number of rivets, above 500 or so.  And I'm

9    not -- I don't know exactly what cassettes Broetje sells

10   that have round tubes.  I have actually not seen them or

11   inspected them, but what I do know is that if the cassettes

12   are designed to deliver larger diameter rivets in which case

13   only a smaller number of rivets would fit into the cassette,

14   then to me it would make sense that those particular

15   cassettes may not have the jamming problem.

16   Q.      Also, Doctor, I should ask, you mentioned that there

17   that this invention helps prevent, I'm sorry, allows one to

18   use a large number of rivets; is that correct?

19   A.      That's correct.

20   Q.      There is no element of any of these claims that

21   limits these claims to a particular number of rivets, is

22   there?

23   A.      No, not at all, although in practice, as you know,

24   in industry, the two main players, Broetje and AHG are

25   perfectly happy to practice that with long tubes.

Kytomaa - cross

1    Q.      But even using three rivets could potentially

2    infringe these claims; is that correct?

3    A.      The number of rivets does not enter into the claim,

4    the element analysis.  And we have gone through all of the

5    elements and we didn't talk about a number of rivets.  All

6    we talked about is the invention.  So I would say, yes,

7    you're right.  That is, the number of rivets doesn't matter

8    with respect to whether a certain product infringes or not.

9    Q.      So even three could be enough plurality of pieces to

10   infringe?

11   A.      Well, recognize that the '216 is an apparatus patent

12   and the apparatus patent does not talk about the number;

13   right?  So it certainly would infringe even with three.  And

14   the method patent also doesn't say anything about the number.

15   The benefits are really the situation where the numbers of

16   rivets is large.

17   Q.      And we were speaking a moment ago about circular

18   tubes.  You don't contend that circular tubes are covered by

19   any of the claims of the two patents, do you?

20   A.      That's correct.  The circular tubes don't have

21   grooves or passageways.  That's correct.

22               MR. KELLEHER:  Thank you, Your Honor.  That's

23   everything.

24               THE COURT:  Redirect?

25               MR. LINDVALL:  No, Your Honor.  No redirect.

532

Ellis - direct

1            THE COURT:  Okay.  Doctor, you may step down.

2    Thank you.

3            Plaintiffs may call their next witness.

4            MS. SHARP:  Your Honor, plaintiffs next witness

5    is Douglas Ellis.  He has been asked to study financial and

6    other data to give testimony on the subject of damages and,

7    specifically, the profits that AHG has lost as a result of

8    Broetje's conduct as well as the extent to which Broetje has

9    been unjustly enriched as a result of its wrongful conduct.

10           THE COURT:  Okay.  Thank you.  Mr. Ellis.

11           ... DOUGLAS ELLIS, having been first duly sworn,

12   was examined and testified as follows ...

13           THE COURT:  Welcome, Mr. Ellis.

14           THE WITNESS:  Thank you.

15           MR. HOROWITZ:  May I approach, Your Honor?

16           THE COURT:  You may.

17           (Binders passed forward.)

18           THE COURT:  You may proceed.

19                  DIRECT EXAMINATION

20   BY MS. SHARP:

21   Q.    Good afternoon, Mr. Ellis.

22   A.    Good afternoon.

23   Q.    Can you describe, please, for the jury, your formal

24   education?

25   A.    Yes.  I have a bachelor's degree of finance from

533

Ellis - direct

1    Brigham Young University, a law degree from Washington

2    University in St. Louis, and an MBA from the University of

3    Pennsylvania.

4    Q.     What sort of topics did earning those degrees require

5    you to study and master?

6    A.     I studied accounting, economics, statistics,

7    marketing, research, writing, things like that.

8    Q.     Have you put to use your specialized formal education

9    in finance and law and business administration into use in

10   your career?

11   A.     Yes.  I do that every day in the job that I do.

12   Q.     And what is the job that you do?

13   A.     I'm a business consultant and advisor.  I value

14   intellectual property like patents and trade secrets and

15   things like that for companies and in litigation.

16   Q.     And just to be clear, can you describe for us what

17   you mean by intellectual property matters?

18   A.     Sure.  Intellectual property is the stuff that we're

19   talking about here.  We all got a crash course in what a

20   patent is.  Patents, trade secrets, invention, even designs,

21   those are the intellectual property that I value.

22   Q.     What percentage of your professional time is devoted

23   to matters involving intellectual property issues?

24   A.     More than 90 percent.

25   Q.     Over the course of your career, how many intellectual

Ellis - direct

1    property matters have you worked on?

2    A.      Over a hundred.

3    Q.      And did any of those cases involve the aerospace

4    industry?

5    A.      Yes.  I've done some work on airline industry

6    reservation systems.  I've done work on aircraft engine

7    technology.  And, of course, this case, so I have some

8    understanding of the industry.

9    Q.      Have you been recognized as an expert in intellectual

10   property issues in Delaware courts before today?

11   A.      Yes.  In the Delaware Court of Chancery.

12   Q.      Can I ask that you turn, please, in your witness

13   binder to JTX-55.

14   A.      Yes.

15   Q.      Do you recognize that document?

16   A.      I do.  It's my resume.

17           MS. SHARP:  Your Honor, this was the subject of

18   agreement with counsel, so I ask that we publish it to the

19   jury.

20           MR. CAHR:  That's okay, your Honor.

21           THE COURT:  All right.  If there's no objection,

22   it's admitted.  I mean, do you want it admitted also?

23           MS. SHARP:  Yes, sir, I do.  Thank you.

24           MR. CAHR:  And that's fine, Your Honor.

25           THE COURT:  Okay.  Admitted and published.

Ellis - direct

1          (JTX-55 was admitted into evidence.)

2     BY MS. SHARP:

3     Q.     We'll just page through this, but let me ask you

4     generally to describe to the jury what this document is.

5     A.     This basically includes my relevant work experience

6     and education.

7     Q.     And this might go without saying, but you are not

8     providing your expertise here for free; is that correct?

9     A.     That's right.  My firm bills me at an hourly rate of

10    $425 an hour, and I have a staff that help me at rates from

11    $90 to about $625 an hour.

12    Q.     Is your pay based in any way on the outcome of this

13    litigation?

14    A.     It is not.

15    Q.     Where do you work?

16    A.     I work at Duff & Phelps.  I'm a managing director in

17    their intellectual property practice.

18    Q.     And how long have you been at Duff & Phelps?

19    A.     Since August 2008.

20    Q.     So let me turn, then, to more specifics about this

21    case.  What did you do in this case?

22    A.     In this case, I analyzed, I think a list will pop up

23    here, but I analyzed about 15,000 pages of documents

24    produced by both Broetje and AHG.  Inside that pile of

25    documents was data, marketing stuff, e-mails, pictures.  I

Ellis - direct

1    analyzed various industry publications.

2              I performed my own independent research.  I

3    toward Gemcore's Buffalo facility.  We heard about Gemcore.

4              I interviewed outside accountants for AHG and,

5    among other things, you see there, I filed, summarized my

6    findings and calculations and filed two expert reports in

7    this case.

8    Q.    So let's focus for just a moment on the reports that

9    you filed.  Were those reports accompanied by attachments

10   that described exactly what it was that you evaluated here?

11   A.    Yes.  Those attachments summarized my findings.

12   Q.    Can you turn first, please, to JTX-56.

13   A.    Yes.

14   Q.    And I am focusing specifically on pages 54 through

15   96.

16             MS. SHARP:  Your Honor, I would move the

17   admission of JTX-56 as it was the subject of agreement as

18   well.

19             MR. CAHR:  That's okay, Your Honor.

20             THE COURT:  Okay.  It's admitted.

21             (JTX-56 was admitted into evidence.)

22   BY MS. SHARP:

23   Q.    You also have the document in front of you.  Can you

24   describe, please, what the attachments are very generally?

25   If we page through JTX-56 at page 54, 55, 56 and continuing

Ellis - direct

1    on and on, what are we seeing in these lists?

2    A.      These are the documents -- this is basically the pile

3    of 15,000 documents, or pages that I looked through.  I

4    basically make a list of everything I received, reviewed, or

5    relied upon.

6    Q.     Now, if we stop for just a moment, in this list,

7    each of these documents begins with AHG.  What does that

8    mean?

9    A.      These are documents produced by AHG.  We call those

10   Bates numbers.  They have a stamp on them so we can

11   reference the document that we are using.

12   Q.     And what generally were they?  What generally were

13   these documents?

14   A.      Again, all kinds of things.  They included numbers,

15   data, sales, pictures, the brochures that we saw earlier,

16   all kinds of things.

17   Q.     And if we jump forward to JTX-56 at page 92, is that

18   closer to the end of the list of things that you reviewed

19   after 42 pages?

20   A.      It looks like it.

21   Q.     There, some of the documents are preceded by the

22   initials BN.  What are those documents?

23   A.      Those are Broetje documents.

24   Q.     So --

25   A.      They were the same way AHG documents.  They come from

Ellis - direct

1    Broetje, so they have their number on them.

2    Q.    And your list continues by including in the next

3    pages JTX-56.93 and later some additional categories of

4    information.  What are those categories of information?

5    A.    Again, we capture some of the independent research

6    that we did.  There's some case law that we used that's

7    relevant for damages, deposition testimony, things like

8    that.

9    Q.    All right.  Now, did you recently supplement your

10   original report?

11   A.    I did.  I received updated financial information

12   because my first report was filed in 2011 and we just

13   updated the numbers through the end of 2013.

14   Q.    Let me ask you to turn to PTX-621.

15            MS. SHARP:  And, Your Honor, I would move the

16   admission of PTX-621 based on counsel's agreement.

17            MR. CAHR:  Your Honor, our agreement is that all

18   of the attachments for both of these will be included and

19   all actually they don't appear to be all included, both of

20   these, but subject to that --

21            THE COURT:  I'm not sure.  Is there an

22   objection?

23            MR. CAHR:  Yes.  I object unless they're

24   included.  If they are included, I'm fine with that.

25            MS. SHARP:  We're happy to include them.  There

Ellis - direct

1    may have been a copying error in the notebooks.

2                    MR. CAHR:  Thank you.

3                    THE COURT:  Subject to that.

4                    (PTX-621 was admitted into evidence.)

5    BY MS. SHARP:

6    Q.      So PTX-621.

7    A.      Sure.

8    Q.      Focusing on that document, is that your supplemental

9    report?

10   A.      These are the attachments to my supplemental report.

11   Q.      And to be clear on where we were, this is a series of

12   calculations you did more recently because you received

13   updated financial data; is that right?

14   A.      That's right.  It brings the stuff I did before up to

15   current.

16   Q.      Do those attachments also include pages that

17   show calculations and tabulations of the data that you

18   reviewed?

19   A.      Yes.  It -- there aren't that many pages here, but it

20   summarizes a ton of work.

21   Q.      And, in addition to the work that is summarized, are

22   there also charts that show calculations as attachments to

23   your report?

24   A.      Yes.  Most of these show calculations.

25   Q.      And if we can just stay on this topic until we see it

1    through to the end.

2             Can you point us to a specific page of Exhibit

3    PTX-621 that is an example of a calculation you did and

4    describe, just call out the number and describe for us how

5    you did the calculations by year.

6    A.    Sure.  Let's look at Attachment 5.

7    Q.    And what's the number in the bottom right of

8    attachment five?

9    A.    621.30.

10   Q.    And if we can have 621.30.

11   A.    So the numbers are really tiny, but what I've done

12   here is from 2003 to 2013, I counted up all of the Broetje

13   unit sales of systems that we're talking about here, the

14   Automated Fastener Feed System.  And to do that, if you look

15   down at the bottom at sources, this stuff was scattered

16   everywhere, so we had to pour through the documents and find

17   them.  And so this reflects maybe the hardest part of work

18   that we did, and that's finding what was sold and counting

19   it out.

20   Q.    Is it correct that your calculations were done year

21   by year by year so that there's a total for each year?

22   A.    That's correct.  That's how we did it.

23   Q.    And without going through each one of these small

24   print documents, would it be fair to say that this is a good

25   example of one of your summary calculations and the

Ellis - direct

1   calculations that you did year by year?

2   A.     Yes, it is.

3   Q.     Okay.  I think we understand now what you looked at

4   in order to formulate your opinions, so I'm going to ask you

5   simply, first, to summarize your opinions and conclusions,

6   and then we'll step back and work through them in a bit more

7   detail.

8          What did you calculate in this case?

9   A.     In this case, I calculated lost profits for Broetje's

10  infringement of AHG's patents.  I also calculated -- and

11  the number is up there and that's $2,099,943 for the period

12  2003 through December 7, 2009.  That's when the patents

13  expired.

14         I also calculated, if I can go to the next one,

15  the amount of damages associated with the other claims.

16  That's the trade dress infringement, unfair competition,

17  that stuff.  And Broetje's unjust enrichment is $12,411,632.

18  And lost profits associated with these claims amount to

19  $3,109,769.

20  Q.     You've identified two categories of damages

21  basically, a category for patent infringement and a category

22  for the other claims, what we're generally referring to as

23  copying claims.  Are those two measure of damages, lost

24  profits in the first instance and unjust enrichment in the

25  second duplicative?

Ellis - direct

1   A.      Lost profits in the first instance is a measure of

2   the harm to AHG.  So the amount that you mean to make AHG

3   whole, put them back where they were if the infringement

4   hadn't happened.  On the unjust enrichment side, that's a

5   different measure.  That's a measure of the benefit to

6   Broetje.  So the idea is that the wrong-doer shouldn't

7   benefit from the wrongdoing.  So what I did was I measured

8   that benefit and you give away those ill-gotten gains.

9   Q.      Before we go into a little bit more detail about the

10  calculations, let's be clear about what you did not

11  calculate.  Did you do any calculation relating to punitive

12  damages which are requested here?

13  A.      I did not.  None of these numbers here have anything

14  to do with what I call punishment.  My measures are

15  different than that.

16  Q.      And why did you not calculate punitive damages?

17  A.      As I understand it, that's not my job.  The Judge

18  will instruct the jury on how to do that.

19  Q.      Let's turn, then, to the first element of your

20  calculation, so the first category, lost profits, and

21  talk a little bit about the actual number crunching that

22  you did.

23          I think you've already described to us that

24  these are profits that AHG would have made but for Broetje's

25  infringement; is that right?

Ellis - direct

1    A.      That's right.  In the absence of Broetje's

2    infringement, these are the profits AHG would have made,

3    yes.

4    Q.      And if we could turn to slide 94.  Can you walk us

5    through how a damages expert such as yourself quantifies

6    lost profits?

7    A.      Sure.  It's pretty, it looks pretty simple.  You just

8    calculate AHG's lost sales and multiply that by AHG's

9    profits.  The kind of profits we use are incremental

10   profits.  And to get lost sales, you count up the accused

11   units or the infringing ones and you multiply by AHG's

12   prices.

13   Q.      So does it make sense for us to start with the second

14   of these equations, lost sales, because that's the first

15   element in the lost profits calculation?

16   A.      Sure.

17   Q.      To determine lost sales, how did you determine?  If

18   we could just go back one slide for judgment a moment.  The

19   first thing you had to determine was the number of Broetje

20   units sold; is that correct?

21   A.      That's right.  I had to count those up.

22   Q.      And then if we can move to the next slide, how did

23   you do that?

24   A.      So we looked at Attachment 5, which was sort of the

25   sum total of this, this work.  Broetje provided a few sales

Ellis - direct

1    summaries.  They also provided some invoices, purchase

2    orders, packing slips, things like that, and we looked at

3    all of those documents and found these sales and added them

4    up.

5    Q.    Why -- well, do you feel that the total number of

6    sales that you relied on is 100 percent accurate in

7    capturing all units Broetje has sold?

8    A.    No.  It's accurate in what I counted, but it's

9    incomplete.

10   Q.    And why do you say that it's incomplete?

11   A.    There's several reasons.  First of all, Broetje

12   provided sales summaries, but those sales summaries were

13   inconsistent with the underlying documents, and they

14   provided multiple summaries and they were inconsistent with

15   each other.  Even the final summary has the wrong dates on

16   it and wrong prices.

17              So when I see something wrong, I go back

18   and I try to look at the underlying data and see if I can

19   try to make some sense of it.  So I started looking at

20   invoices and packing slips and things like that, but all of

21   those sets are incomplete, too.  I don't have a full set of

22   invoices or purchase orders, so I just counted up what I

23   could.

24   Q.    Do you have a sense of the magnitude by which the

25   number of Broetje units is understated?

Ellis - direct

1    A.      I don't.  I do have one other data point, and that is

2    we heard testimony earlier today that Broetje had, as of

3    May 2011, they have 40 installations in the U.S., 10 or 11

4    are AHG.  Even looking at all of this data, we're still

5    unable to account for eight.

6    Q.      Let's go back to slide 94.  So you've described to us

7    how you calculate for purposes of calculating lost sales the

8    number of Broetje units.  That number is multiplied by AHG's

9    prices; is that correct?

10   A.      That's correct.

11   Q.      Why do you use AHG's prices?

12   A.      Because these are AHG's lost sales, or AHG's lost

13   profits, so we're trying to look at what AHG would have made

14   on those sales had it made the sale.

15   Q.      What was your source for AHG's prices?

16   A.      AHG provided me with average selling prices for the

17   system components by year and I used those.

18   Q.      How did you go about determining that that was a

19   reliable calculation to rely on?

20   A.      Yes.  So I -- that's a summary document.  So I

21   basically, I took that and I compared that against the

22   underlying documents I had, and it was matching up.

23   Q.      So let's go to slide 98 and do the lost sales

24   calculations so we can get that first component of the

25   lost profits calculation.  Can you walk us through this

Ellis - direct

1    slide 98?

2    A.      Sure.  This is just the result of multiplying those

3    Broetje accused units by AHG's prices and that gives us lost

4    sales of 5.575 million.

5    Q.      All right.  And then if we could go to slide 97 to go

6    back to the equation that you told us about to calculate

7    lost profits.  What's the next component of that

8    calculation?

9    A.      So the next component is to take those lost sales and

10   multiply them by the profit AHG would have made if it had

11   made a sale.  So to do that, I asked AHG to produce

12   incremental cost information, which it did.  I looked at the

13   historical incremental cost that added up to be about -- and

14   that's really the variable profit -- and that added up to be

15   about 44 percent or so.

16            And then I looked at the lost sales and I said,

17   well, if AHG had made these extra sales, what additional

18   costs would they have incurred?  And they probably would

19   have had to hire another TC person, get more insurance, so

20   the cost goes back up.  I subtracted seven percent from the

21   44 and I used 37 percent in this case.

22   Q.   So as this trial approached, did you ever have an

23   opportunity in connection with receiving updated data to

24   test your 2011 calculation against the real world of profit

25   margin?

Ellis - direct

1   A.      Yes, I did.  When I got new data and I analyzed it,

2   you guys saw the chart, where the -- AHG sales just take

3   off.  Those are enough sales to capture the lost sales

4   here.

5              So I could see what happened in the real world

6   and how AHG's margin changed, and it did go down, like I

7   predicted, but it only went to 40 percent.  But I used a

8   lower margin, a lower profit, 37.

9   Q.      So what's the impact of using this lower margin of

10  37 percent on your total calculation?

11  A.      The number would be bigger if I used the 40 percent.

12  Q.      So if we can go to slide 99, as we have.  As a result

13  of carrying out the lost profit equation, what is your

14  conclusion about the amount of profits AHG lost because of

15  Broetje's infringement?

16  A.      The amount is --

17  Q.      Of its patents?

18  A.      The amount is $2,099,943.

19  Q.      How do you know that AHG would have made those sales

20  if Broetje had not?

21  A.      For a lot of reasons.  The totality of the work I did

22  all supports this, but we've heard that there are only two

23  systems that work on AHG's, or Broetje's machines.  It's

24  AHG's patented system or Broetje's accused infringing

25  system.  If you are not selling the one, you're going to

Ellis - direct

1   sell the other.

2   Q.      Focusing still on this slide 99, is your calculation

3   of lost profits for patent infringement limited to the

4   profit AHG lost to Broetje on the cassettes only?

5   A.      No, it's not.  I included other components of the

6   system, so when AHG -- when looking at AHG's lost profits, I

7   look at what AHG would have expected to make if Broetje had

8   not infringed.

9           And so these things we've heard all day are

10  sold.  They are part of the system, they're called the

11  system.  The distribution racks, loading station exists

12  because of the cassettes and they all work together, so I

13  just included them all.

14  Q.      So if we can turn to slide 100, is the inclusion of

15  those component sales known by particular terminology in the

16  world of patent infringement damages?

17  A.      Yes.  In my job, I would call the distribution rack

18  loading stations convoyed or collateral sales.  I would

19  probably call the parts, the replacement parts that I

20  include as derivative sales because they're sold later.

21  Q.      And to be clear, your calculations also included the

22  derivative sales?

23  A.      That's right.  The replacement parts.

24  Q.      How did you determine that it was appropriate to

25  include the distribution racks and loading stations as

549

Ellis - direct

1    convoyed sales in the lost profit calculation?

2    A.    I did an analysis.  I looked at the functional links

3    between the system components, the marketing links and the

4    economic links.

5    Q.    And if we could just step through those relatively

6    quickly, turning to slide 101, what did you conclude about

7    the functional link between the system components?

8    A.    All of the documents and testimony I've heard

9    supports that this is a single functional unit.  The

10   cassettes and loading stations and distribution racks are

11   just made to go together.  They're made to work together and

12   are just one unit.

13   Q.    In addition to the functional link between the

14   components, is there a marketing link between the system

15   components?

16   A.    Yes.  So for that, I looked to see what AHG and

17   Broetje do in terms of how they hope to make sales.  I look

18   at the marketing literature and brochures and its sales.

19   All of them have these three components of the system

20   together.  In fact, AHG calls theirs the consent delivery

21   system, and Broetje calls theirs the automated fast and

22   feed system.  So they're both hoping to sell them all

23   together.

24   Q.    In addition to the functional marketing link, is

25   there also an economic link between the system components?

1    A.     Yes.  So the economic link I look at, it's different

2    than marketing because that's what they hope people buy, and

3    then I look at what you people actually do, how do they vote

4    with their dollars.

5           We heard earlier today that these things are

6    sold together, so I wanted to check with the sales data I

7    had to see if that's true.  These pie charts you can see are

8    generally, generally have the same proportions, and what

9    that's showing me is whenever customers buy these products,

10   they are buying them in the same proportions.  They are

11   buying them together.  If I -- if customers didn't do that,

12   you would see different proportions here.

13          And what I looked at was how Broetje purchased

14   from AHG when the relationship was good.  Then I looked at

15   how AHG sold to customers.  And then I looked at Broetje's

16   selling patterns during the damages period, how it's selling

17   now.  And that confirms to me that everything sold in the

18   same proportions and this is a single system in that way.

19   There is an economic link.

20   Q.    So I think that we've completed the discussion of

21   convoyed sales at least in the time that we have available.

22   So let me move to another topic.

23          Is there any additional support for your

24   conclusion that AHG should be awarded lost profits because

25   of Broetje's infringement of AHG's patents?

Ellis - direct

1    A.      Yes.  I did some additional analysis as well.

2    Q.      And can you describe for us -- and I would ask for

3    slide 104 -- the additional analysis that you did?

4    A.      Sure.  I applied a four part test that is commonly

5    used, that I commonly used to show lost profits.  This is

6    the Panduit test.  It's based on a case, *Panduit v Stahlin*

7    *Bros*.  And the four factors that are commonly used are

8    listed up there and I analyzed those.

9    Q.      The first factor listed, the first Panduit factor

10   listed on this slide is quantifying the "but for" lost

11   profits.  Have we covered that Panduit element?

12   A.      Yes, we've gone through the calculations already.

13   Q.      The next component listed is demand.  And if we could

14   have slide 105.

15           How do you know there is demand for AHG's

16   patented technology?

17   A.      This analysis is simple.  You just look at sales.

18   Your customers buy it.  And here we have AHG cassette

19   sales of $5.5 million and Broetje's cassette sales of

20   $2.6 million.

21           This is a dual purpose slide, by the way.  These

22   numbers go through 2013.  If you are going to take them

23   through December 7th, 2009, the number would be $5.4 million

24   in total -- $4 million for AHG and $1.4 for Broetje as

25   cassette sales.

Ellis - direct

1    Q.     I see.  So you are saying what the numbers would be

2    if you stopped these in 2009?

3    A.     That's right.  But these sales numbers establish

4    demand.

5    Q.     So we've talked about quantifiable lost profits and

6    demand.  What about the next factor?

7           And I would ask for slide 106.  No acceptable

8    noninfringing substitutes.

9           What is that?

10   A.     So this is another complicated way of saying what

11   would customers have purchased if Broetje had not infringed?

12   And we heard that AHG and Broetje are the only two

13   technologies used on Broetje's machines.  So if Broetje had

14   not infringed and sold its accused products, they would have

15   probably purchased -- they would have purchased from AHG

16   just like they had for the ten years prior.

17   Q.     Did you reach any conclusion as to whether in this

18   case there were any acceptable noninfringing substitutes?

19   A.     Yes, I reached a conclusion that there is not.  And

20   that is again based on testimony we've heard as well as the

21   technical expert opinion of Dr. Kytomaa.

22   Q.     And if we could move quickly.  That is what your

23   reference is, the testimony we just heard?

24   A.     Yes.

25   Q.     And to slides 108 and 109.

553

Ellis - direct

1    A.     Yes.  This just reiterates testimony we've heard

2    today and additional testimony in Dr. Peters' deposition.

3    Q.     And if we could have slide 110.

4    A.     Yes.  And that is just my conclusion.  There is no

5    acceptable noninfringing substitutes to AHG's patented

6    technology.

7    Q.     And there is one more Panduit factor that we have not

8    yet discussed.  The last of the four is manufacturing and

9    marketing capacities; is that right?

10   A.     Yes.

11   Q.     Have you reached a conclusion with respect to AHG's

12   manufacturing and market capacity to make the sales that

13   Broetje made by infringing?

14   A.     Yes, I have.  My conclusion is that AHG had the

15   manufacturing and marketing capability or capacity to handle

16   those lost sales.

17          From the manufacturing side, I looked at AHG's

18   ability to ramp up and make the extra sales.  As we have

19   seen in that chart, with the sales ramping up, we know AHG

20   can make those levels of sales.  They have a flexibility

21   manufacturing process that utilizes outside suppliers in the

22   United States.

23   Q.     So very quickly with slide 112.  Have we now covered

24   your conclusions with respect to the four Panduit factors?

25   A.     Just about.  Can we go back to the last slide quickly?

Ellis - direct

1          From the marketing side, AHG's deal with Broetje

2     with market, we saw that.  But also there is a limited

3     number of customers in this industry.  We hear the same

4     names over and over.  And AHG markets.  In fact, their

5     product is now the standard in the industry and so people

6     just request it.  And that is called pole marketing.

7     Q.    I'm sorry, I cut you off on that answer.  I didn't

8     mean to.

9          So if we now completed your analysis of lost

10    profits for patent infringement, can we turn then to the

11    second?

12              THE COURT:  Let me stop you there first.  Do you

13    think you will need more than five minutes to do that?

14              MS. SHARP:  It's very close, Your Honor.

15              THE COURT:  Well, we'll leave it for tomorrow.

16    That's fine.

17              Ladies and gentlemen, we'll let you go about

18    five minutes early today.  Thank you for your attention

19    today.  Tomorrow will be very similar I think to today.

20    We'll order lunch for you, if you get here in time to do

21    that, and we'll try to begin close to 9:00 o'clock.

22              Of course, no talking about the case, no

23    research, no reading about anything related to the case.

24    And have a good evening.  See you tomorrow.

25              A JUROR:  You, too.

1              THE COURT:  You may step down, Mr. Ellis.

2              You may have a seat or leave.  I'm going to give

3    you my rulings on the objections.  I need somebody to stay

4    to listen to me for that.

5              All right.  So first of all, everything that is

6    listed as an objection in the letter that came in under

7    Mr. Schoell's signature yesterday, last night, all the

8    objections are overruled.  And let me tell you briefly why.

9              First, we have AHG objections to testimony

10   designated by Broetje from Mr. Auriol.

11             The first one relating to the misspelling of his

12   name on a patent.  That is overruled.  I think that at least

13   has some minimum probative value relating to at least the

14   possibility of human error at the PTO.

15             The objections with respect to the designations

16   at page 48, overruled.  I believe it's proper inventor

17   testimony.

18             The objections to pages 77, 78, overruled.  The

19   questions there were proper.  They relate to potential

20   design-around.  Evidently, the jury is going to see the

21   witness fighting the question and refusing to answer, all of

22   which would go to evaluating his credibility.

23             Then we have AHG's objections to the testimony

24   designated from Mr. Hage at page 49.  That is overruled.  The

25   witness has knowledge of whether customers are sophisticated

1    and whether they would know who makes the products they buy.

2    It's not an improper expression of lay opinion.  I'm not even

3    sure it's opinion.  And,

4              Finally, we have Broetje's objections to AHG's

5    counterdesignations with respect to Mr. Hage.  Those are

6    overruled as well.  We believe that the counterdesignations

7    offered by AHG were not untimely.

8              So that's the rulings on what was pending for

9    us.

10             We're expecting the submission on the jury

11   instructions and the verdict sheet in just a little bit.

12             MR. KELLEHER:  It may have already happened,

13   Your Honor.

14             MR. HIGGINS:  Your Honor, it has been filed and

15   presumably delivered also.

16             THE COURT:  All right.  Terrific.  Thank you.

17             Is there anything else pressing at this time

18   from plaintiffs?

19             MR. LINDVALL:  No, Your Honor.

20             THE COURT:  All right.  From defendants?

21             MR. KELLEHER:  No, Your Honor.

22             THE COURT:  All right.  We'll look for you

23   tomorrow.  We'll find time to argue those objections

24   sometime tomorrow.  I don't know at which point of the day

25   it will be.

1        We will be in recess.  Have a good night.

2             (Proceedings adjourn at 4:26 p.m.)

3

4        I hereby certify the foregoing is a true and accurate
transcript from my stenographic notes in the proceeding.

5

6                    /s/ Brian P. Gaffigan
                    Official Court Reporter
7                    U.S. District Court

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25