1          IN THE UNITED STATES DISTRICT COURT

2          IN AND FOR THE DISTRICT OF DELAWARE

3                         - - -

4    ATELIERS DE LA HAUTE-GARONNE (French  :   CIVIL ACTION
     Corporation) and F2C2 SYSTEMS S.A.S.  :
5    (French Corporation),                 :
                                           :
6               Plaintiffs,                :
                                           :
7          v.                              :
                                           :
8    BROETJE AUTOMATION-USA INC. (Delaware :
     Corporation), BROETJE AUTOMATION GMBH :
9    (German Corporation),                 :
                                           :   NO. 09-598-LPS
10              Defendants.
                                 - - -

11
                         Wilmington, Delaware
12                       Wednesday, April 9, 2014
                         *Jury Trial - Volume C*

13                            - - -

14
     BEFORE:  HONORABLE **LEONARD P. STARK**, U.S.D.C.J., and a jury

15
     APPEARANCES:                   - - -

16

17           YOUNG CONAWAY STARGATT & TAYLOR, LLP
             BY:  MELANIE K. SHARP, ESQ., and
18                JAMES L. HIGGINS, ESQ.

19                and

20           KAYE SCHOLER, LLP
             BY:  SCOTT G. LINDVALL, ESQ., and
21                JEFFREY H. HOROWITZ, ESQ.
                  (New York, New York)

22                and

23

24
     Kevin Maurer                      Brian P. Gaffigan
25   Official Court Reporter           Official Court Reporter

```
 1    APPEARANCES:  (Continued)

 2

 3              KAYE SCHOLER, LLP
                BY:  PAUL I. MARGULIES, ESQ.
 4                   (Washington, District of Columbia)

 5                   and

 6              KAYE SCHOLER, LLP
                BY:  MICHELLE MAREK, ESQ.
 7                   (Chicago, Illinois)

 8                        Counsel for Plaintiffs Ateliers De La
                          Haute-Garonne and F2C2 Systems S.A.S.
 9

10              DRINKER BIDDLE & REATH, LLP
                BY:  JOSEPH C. SCHOELL, ESQ., and
11                   TODD C. SCHILTZ, ESQ.

12                   and

13              DRINKER BIDDLE & REATH, LLP
                BY:  PATRICK J. KELLEHER, ESQ.,
14                   DARREN S. CAHR, ESQ., and
                     CARRIE A. BEYER, ESQ.
15                   (Chicago, Illinois)

16                        Counsel for Broetje Automation-USA Inc.
                          and Broetje Automation GmbH
17

18

19

20

21

22                         - oOo -

23                    P R O C E E D I N G S

24              (REPORTER'S NOTE:  Jury trial proceedings were

25    held in open court, beginning at 8:30 a.m.)
```

1              THE COURT:  Good morning, everyone.

2              (The attorneys respond, "Good morning, Your

3     Honor.")

4              THE COURT:  Issues from the plaintiff this

5     morning?

6              MR. HOROWITZ:  Yes, Your Honor.  We have a

7     couple.

8              MR. LINDVALL:  Yes, Your Honor.

9              MR. HOROWITZ:  Mr. Lindvall will start.

10             THE COURT:  Okay.

11             MR. LINDVALL:  I will be brief.  There is really

12    two, a couple global issues.  One issue is with several of

13    their witnesses, their expert witness and a couple of their

14    lay witnesses, they have documents, they have prior art,

15    U.S. patents, patent applications, what you have.  And we

16    don't have any problem with their witnesses testifying about

17    it and even reading statements of the prior art in the

18    record, but we don't think they should be admitted as

19    evidence because they're hearsay, and under the hearsay

20    rule, 803(18), the Lerner treatise rule says to the extent

21    called to the attention of an expert witness upon

22    cross-examination, or relied upon expert witness in direct

23    examination, statements contained in published treatment

24    tease, periodicals, pamphlets, subject to history, medicine

25    or other science or art, establishes a reliable authority --

1    and we're not challenging him on reliable authority or

2    not -- by the testimony or admission of the witness or by

3    other expert testimony, judicial notice.  And it says that

4    can be allowed in under the hearsay exception.

5            But it says the last sentence says:  If

6    admitted, the statements made be read into evidence but not

7    be received as exhibits.

8            And what we're saying is that the exhibits we

9    don't have a problem with the exhibits themselves being

10   used, published to the jury, and statements read from them

11   but we do have a problem with them being admitted as

12   exhibits.

13           THE COURT:  This is the prior art they're

14   relying on to invalidate the patents?

15           MR. LINDVALL:  Yes, Your Honor.

16           THE COURT:  I have never hard this argument

17   before.  Do you have any authority that has ruled this way?

18           MR. LINDVALL:  The only authority we looked at,

19   I can, all I can say honestly is that other courts I have

20   been before have ruled that way an kept the prior art out.

21           THE COURT:  Okay.

22           MR. LINDVALL:  And there is --

23           THE COURT:  Do you have --

24           MR. LINDVALL:  Do you want to do that first,

25   hear from them first?

1            THE COURT:  Let's hear all of them.

2            MR. LINDVALL:  Okay.  There is one last one.

3    There is an exhibit for Mr. Neugebauer.  It's DTX-1943.  And

4    what we have here is a document that was created fairly

5    recently.  It's a compilation of fault reports.  And each

6    document is a separate document that was sent or may have

7    been sent or some documents don't even show that they have

8    been sent.

9            So it's a compilation put together in some way

10   but it doesn't seem to make sense.  A lot of them don't have

11   dates.  They have a merged date, it looks like a printout

12   from a database.  Others don't have any indication that they

13   were sent anywhere.  It looks like it's an internal

14   database.  So it's a compilation that was created, it looks

15   like it was created for litigation not in the ordinary

16   course of business.  And we're objecting to that based on

17   that.  I have no problem if they want to introduce the

18   individual documents in there, and we won't object to them,

19   but I have a problem with them trying to bring in a whole

20   set of basically correspondence under one exhibit.  And this

21   is DTX-1943.

22            Your Honor, that is all we have.

23            THE COURT:  Okay.  Thank you.  I'll hear from --

24            MR. LINDVALL:  I'm sorry.  I just --

25            MR. HOROWITZ:  I'll do mine.

```
 1                    THE COURT:  We'll cut it at Mr. Lindvall's

 2   issues for now and we'll hear defendants response to those

 3   two.

 4                    MR. KELLEHER:  Good morning, Your Honor.

 5                    THE COURT:  Good morning.

 6                    MR. KELLEHER:  First, concerning the idea that

 7   prior art references should be considered as hearsay.  I'm

 8   also not very familiar with the idea.  I think there is two

 9   conceptual problems with looking at prior art references as

10   hearsay.

11                    First of all is that in a patent case you look

12   at the prior art references to see what they disclose, what

13   is on the page.  You are not really looking for the truth

14   of the matter asserted, merely what it says.  Even if they

15   were offered for the truth, Your Honor, they're ancient

16   documents.  Every single one of them is more than 20 years

17   old.

18                    THE COURT:  And that would be an exception to

19   the hearsay rule?

20                    MR. KELLEHER:  That's right.  803(16) I think.

21                    THE COURT:  Okay.  What about the Neugebauer?

22                    MR. KELLEHER:  Mr. Neugebauer is a compilation

23   that we put together.  Over about three years or so, my

24   client sent 54, 55 fault reports to F2C2.  And in our

25   business records, we found and produced several chunks that
```

1    are consecutive.  I think it's 1 to 23 in one place and

2    another chunk someplace else, but nowhere did we find one

3    set of all of them together.

4              So what we did is we did put together and mark

5    as an exhibit here a list, a consecutive set of all the ones

6    we could find.  I think there two missing.  And the author

7    of the vast majority of them, Mr. Neugebauer is going to be

8    here to testify and authenticate what they are, and we think

9    it would be helpful for the jury to have one set of the

10   consecutive order to look through if they want to.

11             THE COURT:  Why admit that into evidence as

12   opposed to just make it a demonstrative?

13             MR. KELLEHER:  We have the actual person, Your

14   Honor, who can identify what all of the documents are.  We

15   are using several of them on formally admitting them into

16   evidence, but it could give the jury a full record of the

17   relationship between the parties, should they choose to flip

18   through the document.

19             THE COURT:  I'm sorry.  Are all 55 approximately

20   of the underlying fault reports going to come into evidence?

21             MR. KELLEHER:  We were only going to use fewer

22   than ten as direct exhibits with the witnesses, Your Honor.

23             THE COURT:  Do you have this exhibit here?  Do

24   you have a copy of it?

25             MR. KELLEHER:  Yes, Your Honor.

1                    THE COURT:  May I see it, please?

2                    MR. LINDVALL:  Here is one.

3                    MR. KELLEHER:  May I approach, Your Honor?

4                    THE COURT:  Yes.  Thank you.

5                    (Document passed forward.)

6                    THE COURT:  Mr. Kelleher, these are a series of

7      individual fault reports?

8                    MR. KELLEHER:  They are, Your Honor.  There are

9      a few that were sent on the same day but it is a series.

10                   THE COURT:  And what will Mr. Neugebauer

11     essentially represent about these?

12                   MR. KELLEHER:  He will represent that these were

13     reports of actual problems that existed either as customers

14     at Boeing or at the Broetje facility during the construction

15     of the machines.  Customers, that they were sent as well.

16                   THE COURT:  And that some, if not many, are from

17     him but not all of them?

18                   MR. KELLEHER:  It is true that not all of them,

19     Your Honor, are, though he was very often the project

20     manager on the projects for which they were sent.

21                   THE COURT:  What will he say about the ones that

22     he was not the author of?

23                   MR. KELLEHER:  Your Honor, I cannot represent

24     with 100 percent accuracy, but I think he would be able to

25     testify with regard to each one of them that he knew it was

1    sent.

2              THE COURT:  Okay.  Is there anything else?

3              MR. KELLEHER:  No, Your Honor.

4              THE COURT:  Mr. Lindvall, you can reply if you

5    want.

6              MR. LINDVALL:  Two quick replies.  The

7    statements of ancient documents, it's 803(16), says

8    statements of a document in existence 20 years or more, the

9    authenticity establishes.  So it allows the statement of the

10   document to get in, not the document itself.

11             Now let me quickly address Mr. Neugebauer.

12             THE COURT:  What about they're not really being

13   offered for the truth of the matter asserted, they're really

14   just being offered to what was said in the report?

15             MR. LINDVALL:  I believe they are being offered

16   as evidence that is already out there.  This has already

17   been discovered.  So you'd have to obviously offer it for

18   the truth of the matter asserted if the experts are relying

19   on it to say, okay, it was out there.  And the jury has to

20   rely on it to be the truth of the matter asserted.

21   Otherwise, it's not any good from the standpoint of being

22   used for prior art.

23             With Mr. Neugebauer, if you looked at the

24   exhibit, Your Honor, especially in the end, there is

25   actually like internal charts or reports which we can't

1    figure out at all.  There is no indication they were sent to

2    anybody, and that is our problem we have.  It's a collection.

3                    THE COURT:  Give me an example of what you are

4    talking about.  I haven't seen them.

5                    MR. LINDVALL:  Unfortunately, I gave you mine.

6                    THE COURT:  Oh.  You can have this back.

7                    MR. LINDVALL:  Thank you.

8                    (Document passed back.)

9                    MR. LINDVALL:  For example --

10                   THE COURT:  They're showing it on the screen,

11   too.  So we should be able to see it.

12                   MR. LINDVALL:  Will you put up, for example,

13   DTX-1943.56, please?  There is a number of these.  And there

14   is no indication here that these were actually sent to

15   anyone.  There is no indication of the facts or anything

16   like that.

17                   You know, to tell you the truth, we looked at

18   those and we have even talked with Mr. Bornes.  He has never

19   seen this style anymore, and there is a whole load of these.

20   And we have other ones.

21                   For example, the issue we have, we have no

22   problems with these individually going in so they can lay

23   the foundation, but to get everything in through this -- let

24   me give you another example.

25                   If you can turn to 1943.10.  In this one, for

1     example, Your Honor, if you look at the date, this is all we

2     have here (indicating).  And there is no fax header or

3     anything like that to indicate it was sent.

4            Now, they do have something that clearly has it,

5     but what they're trying to do we believe is that they have a

6     load of documents, some which I think we would actually have

7     no objection to but some we would have an objection to, and

8     to try to get it in as one exhibit and avoid all these

9     objections or maybe just get a sample of these and then get

10    the whole compilation in we believe is unfair.

11           THE COURT:  All right.  For the record, on page

12    10, you pointed me to the top of the telefax which seems to

13    have some sort of maybe metadata but no actual date.  But I

14    see down further in the actual fault reports it says date

15    18/06/11.  Do you have any reason to doubt that that is the

16    date?

17           MR. LINDVALL:  I don't know, Your Honor.  I

18    don't know what the witness would say.

19           THE COURT:  All right.

20           MR. LINDVALL:  That may be the date of the fault

21    report or something like that, but I don't know if the date

22    was actually sent to, the document was sent to Dr. Bornes.

23    The other documents, there is a whole list of these ones

24    which look like internal documents that have no indication

25    that they were ever sent.

1             THE COURT:  All right.  Mr. Kelleher, let me get

2      you back up here.

3             As Mr. Kelleher is are coming back up, you are

4      going to get overruled, the objection with respect to the

5      prior art.

6             First off, as I say, that is not an objection I

7      have ever heard before.  And I think if there is authority

8      for it, I would have hoped I would have heard of it by now

9      or hear it today.

10            I think it's probably right that the prior art

11     is not actually, strictly speaking, being offered for the

12     truth of the matter asserted but simply to show what was out

13     there and known or believed by one of ordinary skill in the

14     art at the time.

15            But in any event, I'm confident that there is

16     sufficient reliability that what is stated in the prior art

17     is relied on by one of skill in the art such that I don't

18     believe the hearsay objection is meritorious.  So that one

19     is overruled.

20            But on these Neugebauer exhibits, if you would

21     address these last points about some of them look like

22     charts that maybe Mr. Bornes never saw.

23            MR. KELLEHER:  Right.  Pardon me, Your Honor.

24     For many of these, you may notice, you may not have noticed,

25     but when we assembled this, we pulled fault reports from

1    their document production if we could find it.  We pulled

2    the default reports from our document production if we

3    couldn't find an AHG Bates label because there is a mix.  I

4    don't want the Court to not understand that.

5              For the ones that you can't obviously tell they

6    were sent because there is a fax number on it, it's just how

7    Broetje kept their record of it back in the time period of

8    2001 where they did the scanning technology.  There is

9    Wikipedia or something.  Some of them would be printed out

10   for the database, perhaps not signed, that sort of thing.

11   I think Mr. Neugebauer will testify about that.

12             THE COURT:  All right.  But he is in substance

13   going to explain as best as he knows these documents were

14   all sent to somebody at AHG?

15             MR. KELLEHER:  I think so, Your Honor.  I can't

16   say I'm 100 percent sure.

17             THE COURT:  Why not make you go through it

18   document by document and we see what he says and the ones he

19   can authenticate will come in and the ones he won't, we

20   won't?

21             MR. KELLEHER:  I can do that, Your Honor.

22             THE COURT:  All right.  Let's do that then.

23             MR. KELLEHER:  Understood.

24             THE COURT:  Is there anything else?  There is I

25   think for plaintiffs.

1              MR. HOROWITZ:  Good morning, Your Honor.

2              THE COURT:  Good morning.

3              MR. HOROWITZ:  Dr. Budach is scheduled to

4    testified either later today, if we get to it, or perhaps

5    tomorrow.  Dr. Budach is an internal German patent attorney

6    at clause, the mother company of Broetje.

7              Defendants are relying on Dr. Budach's opinion

8    in this case which is an e-mail written in September of 2005

9    with respect to the German litigation that was beginning at

10   that time.

11             Last night, at 9:27 p.m. for the very first time

12   we were sent this demonstrative slide.

13             About an hour later, we were sent the next

14   demonstrative slide.

15             That's an expert witness slide, expert opinion

16   slide.  Nowhere in Dr. Budach's prior e-mail opinion of

17   September 2005 does any of this appear.  Not one word of it

18   appears in there.

19             THE COURT:  Does he reference these three prior

20   art references?

21             MR. HOROWITZ:  Absolutely not.  It's not in

22   there.  It's not in there.  This is an attempt, it's a clear

23   attempt at the 11th hour.

24             First of all, we're supposed to get

25   demonstratives at 7:00 p.m.  I'm not going to scream and

1   yell about that, but at 11:00 o'clock at night to get what

2   amounts to expert opinion with diagrams comparing the United

3   States patent which he never offered an opinion about, he is

4   not a United States patent attorney, he is not an expert in

5   United States patent law and showing these pictures, and

6   then discussing some of the claims, some of the claim

7   language above, it's not appropriate.

8           This violates Rule 26.  He is here to testify

9   by the way as a fact witness as to what he did and didn't do

10  with respect to proffering evidence as to the company, 2003,

11  2004, 2005, even the redesign.  He is a fact witness.

12          THE COURT:  And you have deposed him?

13          MR. HOROWITZ:  Yes.  In fact, may I show you a

14  brief clip?  Because one of the things he said about his

15  2005 e-mail opinion I think you should see in relationship

16  to this.

17          THE COURT:  Sure.

18          "Question:  But this -- the family that you have

19  shown here, this is something that was created on September

20  8, 2005; is that correct?

21          "Answer:  Yes, September 2005.

22          "Question:  Okay.  And was this created to

23  assist you in your Exhibit 160, which is dated September 8,

24  2005 also?

25          "Answer:  Yes.

1          "Question:  Other than the opinion you show

2    here on Exhibit 160, were there any other opinions relating

3    to either the infringement or validity of the AHG European

4    patent 0 373 685?

5          "And to clarify, I mean written opinions.

6          "Answer:  I'm assuming that I didn't prepare

7    any other written opinions because we were already in the

8    preparation phases of the German infringement proceeding

9    and there were external attorneys involved."

10         MR. LINDVALL:  This was not in that opinion.  He

11   expressly testified that he had no other opinions.  And

12   the night before he is scheduled to testify, literally the

13   night before, at 10:30 at night, we get that slide, which is

14   clearly an attempt to offer an expert opinion.  We don't

15   think he should be allowed to use it.

16         THE COURT:  Let's hear what defendants have to

17   say.

18         MR. KELLEHER:  First of all, a few factual

19   issues.  Dr. Budach's advice was given in 2003.  The client

20   followed up with him in 2005 to double check his opinion

21   after there was an accusation of infringement.  That is the

22   2005 e-mail that is being referred to.  His advice did cover

23   the U.S. patent.  That is shown in writing in the 2003

24   opinion.  And, lastly, the fact that he is not a U.S.

25   attorney doesn't matter after he may see it.

1          Your Honor, what this is, he is a fact witness,

2    not an expert witness.  Things get a little strange when you

3    have an advice-of-counsel defense in a case.

4          He is not offered under Rule 26 as an expert but

5    he is someone who is giving opinions, in a sense, because it

6    bears on the state of mind of my client.

7          What this is, it is a demonstrative that

8    explains what was in his mind for why he gave the opinion

9    that there were no -- I am sorry, my clients' tube doesn't

10   have any grooves, there is not going to be infringement.

11   And part of his reason for believing that was looking at the

12   prior art, the Shinjo patent that is disclosed in the body

13   of the patent, figuring that it can't be what's in the prior

14   art.  It has to be something new and nonobvious.

15         So this demonstrates what was in his mind when

16   he gave the opinion of counsel that my client should adopt

17   the soft pentagon because it wouldn't infringe the AHG

18   patent that is shown in the middle.  That is what this is.

19         He is a fact witness.  It is a demonstrative to

20   help explain his testimony.  They used demonstratives to

21   help explain the testimony of the fact witness Mr. Bornes

22   and fact witness Mr. Hage yesterday.

23         THE COURT:  So the substance of his testimony is

24   going to be, he is going acknowledge he didn't write any of

25   this down in 2003 or 2005?

1              MR. KELLEHER:  He actually did make a reference

2       to the prior art I believe in the 2005 e-mail.  This is what

3       was in his mind.

4              THE COURT:  Is he going to testify that he wrote

5       something down about Shinjo?

6              MR. KELLEHER:  Perhaps only in his notes, Your

7       Honor.  I don't know the exact answer to that question.

8              THE COURT:  Were those notes produced?

9              MR. KELLEHER:  When we waived the privilege, we

10      disclosed everything that he did.

11             THE COURT:  You did?

12             MR. KELLEHER:  Yes.

13             THE COURT:  He is going to say, essentially,

14      that this is what was in his mind and led him to give an

15      opinion to his client that there was neither infringement

16      nor invalidity under the U.S. -- there was neither

17      infringement nor a valid patent, including the U.S. patent.

18             MR. KELLEHER:  The opinion, Your Honor, is

19      really one of noninfringement, that this shape would not be

20      covered by AHG's patents because that is the best

21      interpretation of that patent, because otherwise it would be

22      invalid because it would be covered by the prior art

23      discovered in the patent.

24             Really, it is a noninfringement opinion.

25             THE COURT:  So his opinion isn't going to be

1    that this U.S. patent in front of us is invalid, it's just

2    that I thought it would be invalid if it covered the

3    defendants' products.

4              MR. KELLEHER:  He might believe it's invalid,

5    Your Honor.  But that is not the opinion that he is going to

6    give.

7              THE COURT:  What about the fact that this

8    demonstrative came in pretty late, perhaps as late as 11:00

9    p.m. past night?

10             MR. KELLEHER:  I don't think it was as late as

11   11.  It was a little bit late.  Both sides, Your Honor, have

12   missed a number of deadlines in the case.  We haven't made a

13   peep about it.

14             This is the first time you have heard anyone

15   complain about missed deadlines.  We also have

16   demonstratives to produce for our technical expert, which I

17   think was a 60- or 70-slide deck, and we had only one person

18   working on it.  We are working to get all these out as

19   quickly as we can.

20             THE COURT:  Thank you.  Mr. Horowitz, you can

21   respond.

22             MR. HOROWITZ:  There is nothing in the 2003

23   document that they are referring to and now at trial trying

24   to claim is when their opinion was given.  There is nothing

25   about validity in there.  They can represent to you that

1    this isn't about validity, but look at the bottom of the

2    diagram.  It says "invalidity."

3              THE COURT:  Right.  But if he is going to say,

4    In my head I concluded that this patent would be invalid if

5    it were broad enough to cover my clients' product, you don't

6    have any objection to him saying that if that's what his

7    testimony is.  Correct?

8              MR. HOROWITZ:  I don't think he should be

9    allowed to use what I consider to be a very prejudicial

10   document with the jury with these pictures and offer what

11   would amount to a second bite at the apple as an expert when

12   he didn't see it contemporaneously at the time.  There is no

13   document that Mr. Kelleher could point you to that says any

14   of this.  There is nothing about Shinjo -- he did provide

15   written documents.  Two.  In 2003 he wrote a document.  In

16   2005 he wrote a document.  None of this is in there.  It is

17   simply not there.

18             THE COURT:  I don't think this will be the last

19   time we hear this today or tomorrow.  But you are losing me

20   on why -- if the man is going to get up there and say, yeah,

21   I never wrote it down but it was in my head, is there

22   anything objectionable about that testimony?

23             MR. KELLEHER:  I guess he could give that

24   testimony.  I don't think he should be allowed to give it

25   with respect to this document.

1        THE COURT:  If this accurately illustrates the

2   testimony he is going to give, and granted, I think you will

3   have some powerful cross-examination, fine, but doesn't this

4   illustrate the testimony that we are being told he is going

5   to give reflects what was in his head?

6        MR. HOROWITZ:  I think the document itself, even

7   understanding the nexus -- I understand your question.

8   First of all, I think the document itself is prejudicial.  I

9   think he is going to say he is not giving an invalidity

10  opinion, if Mr. Kelleher is representing that correctly.

11  But it says "invalidity."  He didn't provide an invalidity

12  opinion at the time.  Here, they are suddenly, magically,

13  the night before trial they have a new expert opinion that

14  offers an invalidity opinion.

15       It is procedurally inappropriate, even if

16  demonstratively it would be okay, because it illustrates his

17  testimony.  This is expert opinion that is appearing in this

18  case for the very first time the night before trial.  That's

19  why it's inappropriate.

20       THE COURT:  I am going to overrule the

21  objection.  I understand the concern.  But I am told that

22  the man is going to testify that in his head in 2003 and/or

23  2005, thoughts about Shinjo and about this patent covered my

24  product, then it's so broad it's invalid, either on direct

25  or cross, I am confident it will be established, there is

1    nothing in writing evidently to support that, that is fair

2    grounds for cross-examination.  If the testimony is going to

3    come in, as I am told it will, on direct, then this

4    demonstrative is consistent with that.

5              While there may be prejudice to it, I think it's

6    not an improper demonstrative, based upon what I am told the

7    testimony will be.

8              Any other issues from plaintiff?

9              MR. Horowitz:  No, Your Honor, thank you.

10             THE COURT:  Issues from defendant?

11             MR. KELLEHER:  Your Honor, just something for

12   the record.  We a few days ago had designated to play some

13   of the deposition testimony of Mr. Bornes.  Plaintiffs

14   rightfully objected that he is not a party or officer of a

15   current party.  And he is present.  And they thought we

16   would call him live.  We were willing to do that.

17   Apparently, Mr. Bornes is really under the weather.  They

18   said they would no longer object to us playing his testimony

19   by deposition.  They have the designations.  And it is our

20   plan to go forward, assuming there is no objection.

21             MR. HOROWITZ:  There is no objection.

22             THE COURT:  Sorry to hear that, Mr. Bornes.

23             Anything else?

24             MR. KELLEHER:  That is all.

25             THE COURT:  We did get the jury instructions and

1    verdict sheet.  Let's plan to talk about those at the end of

2    the trial day today.  So whoever is going to be arguing

3    those and answering my questions, make sure you are

4    available at 4:30 today.

5              We will take a recess and come back for the

6    jury.

7              (Brief recess taken.)

8              *    *    *

9              (Proceedings reconvened.)

10             THE COURT:  Bring the jury in.

11             MR. LINDVALL:  Your Honor, one thing for the

12   record, please --

13             THE COURT:  Sure.

14             MR. LINDVALL:  -- that I inadvertently

15   particularly forgot.

16             We just want to note Mr. Lawrence's slides.  We

17   forgot.  Just make, on the record, the Farnan rule I guess

18   we started calling it, which you referred to in your

19   pretrial conference with his slides 2, 3, 4, 49, 50, 51,

20   with respect to those slides.  We object to them just to

21   preserve our right to object to them on that.  Thank you.

22             THE COURT:  The objection as beyond the scope of

23   the expert report is noted.

24             MR. LINDVALL:  Yes, Your Honor.

25             THE COURT:  Is there anything else before we

1    bring in the jury?

2                 MR. LINDVALL:  No, Your Honor.

3                 THE COURT:  No, okay.  Let's bring the jury in.

4                 (Jury returned.)

5                 THE COURT:  Good morning, everyone.

6                 A JUROR:  Good morning.

7                 THE COURT:  We are prepared to proceed.  We'll

8    bring Mr. Ellis I think it was back to the stand.

9                 ... DOUGLAS ELLIS, having been previously duly

10   sworn, retook the stand and testified further as follows ...

11               THE COURT:  Welcome back, Mr. Ellis.  I remind

12   you that you remain under oath.

13               You may proceed.

14                    DIRECT EXAMINATION (Continued)

15   BY MS. SHARP:

16   Q.    Good morning, Mr. Ellis.

17   A.    Good morning.

18   Q.    Do you still have in front of you the notebook of

19   exhibits that we handed you yesterday?

20   A.    It looks the same to me, yes.

21               MS. SHARP:  So if we can start with slide 113.

22   BY MS. SHARP:

23   Q.    I had hoped when we broke yesterday that we had

24   completed our discussion of the patent infringement damages

25   but as I reviewed my notes and as you shared with me, I

582

Ellis - direct

1   skipped over a slide pretty quickly.  So I would ask that we

2   go back to slide 111.

3   A.      Yes.

4   Q.      To put this back in context, we were discussing the

5   Panduit factors; is that correct?

6   A.      That's right.

7   Q.      I think I may have cut you off a bit on the marketing

8   proposition, so let me ask you what your conclusions are

9   with respect to AHG marketing capacity to make the sales

10  that Broetje made?

11  A.      Yes.  My conclusion was that they did have marketing

12  capacity.  They did direct marketing, as we've heard

13  earlier.  They also utilized pole marketing which is

14  customers requesting AHG's product and then people coming

15  to buy from them.  And then, of course, the deal they had

16  with Broetje.

17  Q.      And can you give us some examples of the customers

18  that Broetje was selling to in the United States in that

19  time period?

20  A.      Yes.  It would be Boeing, Spirit, Vought.  Those

21  types of customers.

22  Q.      Any other names that you can think of?

23  A.      Not off the top of my head.

24  Q.      Now turning to slide 118, have we now completed the

25  discussion of patent infringement damages?

Ellis - direct

1    A.      Yes.

2    Q.      Turning next to the damages for the other claims.

3            What is your understanding of the other claims

4    in this case?

5    A.      The other claims as I understand it relate to

6    copying, so the benefit that Broetje received from copying

7    at AHG's cassettes.

8    Q.      And what is the economically appropriate measure of

9    damages assuming Broetje's wrongful conduct in connection

10   with what you have described as those other claims, the

11   copying claims?

12   A.      Sure.  So I made two measures.  One is the harm

13   to AHG, and that is what we're seeing here.  That is

14   $3.1 million.

15   Q.      If I may interrupt.

16   A.      Sure.

17   Q.      I'm asking a different question.  Maybe we could take

18   this slide down.  Really, I just want to make sure we're

19   back where we left off.

20   A.      Oh, sure.

21   Q.      We've talked about patent infringement damages, and I

22   want to understand what this measure of award is.  How is

23   this different from the patent infringement lost profits

24   measure?

25   A.      Right.  So patent infringement is, as I explained

Ellis - direct

1    earlier, harm to AHG.  And the measures I'm doing for the

2    copying claims includes a harm to AHG but I also measured

3    the benefit to Broetje for its wrongdoing.

4    Q.    And is that what you called unjust enrichment?

5    A.    That's right.

6    Q.    And can you explain for us what that concept is?

7    A.    Sure.  The concept of unjust enrichment is that

8    Broetje should not benefit from the wrongdoing and then that

9    should be disgorged or given back to put them back where

10   they would have been without the wrongdoing.

11   Q.    So now is where I think we probably should move to

12   slide 115.

13   A.    Sure.

14   Q.    How did you calculate the amount by which Broetje was

15   unjustly enriched?

16   A.    I multiplied Broetje units by Broetje prices to get

17   to $12,411,632.

18        This analysis is slightly different than my

19   earlier one.  For patent infringement, I looked at the order

20   dates, the count of units; and for this one I looked at

21   shipping dates or delivery dates.

22   Q.    But for the Broetje units calculation, whether you

23   count -- well, is it correct that you matched the purchase

24   orders to the shipping documentation?

25   A.    To the best of my ability, yes.

Ellis - direct

1    Q.     So you didn't double count a purchase order and

2    shipping for this same order; correct?

3    A.     That's right.

4    Q.     You counted only once?

5    A.     That's right.  So in my attachment 5, I show my order

6    date, but that can be, those are only counted once and those

7    are -- those total units are also consistent with shipping

8    dates.

9    Q.     So the equation for unjust enrichment is shown here,

10   and that is Broetje units times Broetje prices?

11   A.     That's right.

12   Q.     What source did you use for the Broetje prices?

13   A.     Again, the same file of underlying documents like

14   invoices and the like.

15   Q.     Why is this number for unjust enrichment larger than

16   the number for lost profits?

17   A.     For several reasons.  The first reason is we're

18   going for a longer time frame.  Patent infringement ends in

19   December 7, 2009 and here we're going through the end of

20   2013.

21           In addition, we're looking at revenues and not

22   backing out costs in this calculation whereas lost profits

23   is just a profit number.  Those are the things I can recall.

24   Q.     Did Broetje's placement in the supply chain have

25   anything to do with the difference in this number?

1   A.      Yes.

2   Q.      Are there slides that you asked us to prepare to help

3   illustrate this proposition?

4   A.      I have.  I think it's the next slide here.

5           This just illustrates that the numbers should be

6   bigger.  So AHG pays a manufacturer, and that is a cost to

7   AHG.  They mark up the product and sell it at wholesale to

8   Broetje, and then Broetje marks it up again and sells it at

9   what I would call retail.  So AHG's profit is just isolated

10  right there in the supply chain.

11  Q.      So we're looking at, what, PDTX-116 and you are

12  talking about the supply chain before the wrongful acts;

13  correct?

14  A.      That's right.  When everything was working.

15  Q.      So if we move to slide 117, what did the supply chain

16  look like after Broetje's wrongful acts?

17  A.      So now it's Broetje's capturing the profit at the

18  manufacturer level.  They're capturing the profit AHG would

19  have made.  They're also capturing the profit they were

20  making before.  So the numbers should naturally be a higher

21  number.

22           MS. SHARP:  And if we could take this slide down.

23  BY MS. SHARP:

24  Q.      I think you also said in connection with the reasons

25  why the measure of damages for the other claims is a larger

Ellis - direct

1    number, that there were issues with Broetje's cost data.

2    Can you explain that to us?

3    A.    Sure.  I think I have a slide on that.  But --

4              MS. SHARP:  And I would ask for slide 118.

5    BY THE WITNESS:

6    A.    Yes.  So this is slightly different than the data

7    that I used to count of the accused units.  That data was

8    incomplete, but what I did find was reliable.  The data

9    that I received here was just plain unreliable.  And here,

10   I listed up some reasons why.

11             Dr. Peters testified that they don't have cost

12   data specific to these system components, so what they did

13   is they gave us this project level information.  And we saw

14   the pictures of the giant rivet machine.  And this is a tiny

15   piece, less than five-six percent.  They gave us that level

16   of profit and cost information, and it's just wrong to use

17   that kind of stuff for this exercise.

18             There is nothing I found that shows that the

19   project level costs and profit actually applies to these

20   components.  In fact, everything I'm seeing is inconsistent

21   with the other data in the case.

22   Q.    So is it correct that you did not have reliable costs

23   data that you could use to subtract costs from revenues?

24   A.    That's right.  Because it was unreliable, I didn't

25   feel comfortable using it.

Ellis - direct

1    Q.      Whose burden is it to prove cost data in connection

2    with this calculation?

3    A.      It would be Broetje's burden as I understand it.

4            MS. SHARP:  Now, if we could go to slide 114,

5    because I know we've been talking about unjust enrichment

6    and that calculation.  Actually, I'm sorry, slide 119.

7    BY MS. SHARP:

8    Q.      In the second category of other claims, there are two

9    calculations:  unjust enrichment and lost profits.  Is it

10   correct that lost profits is an alternative calculation?

11   A.      It is.  The one I would use is the unjust enrichment

12   calculation, because the lost profits, even though for

13   patent infringement, even though it doesn't cover all of

14   the harm to AHG, it's a harm to AHG measure.  The unjust

15   enrichment is a benefit to Broetje measure, so it's

16   different.

17   Q.      Is that another way of saying in your opinion, the

18   appropriate measure of damages is unjust enrichment?

19   A.      Yes, in the amount of $12,411,632.

20   Q.      The alternative calculation here of lost profits, was

21   that conceptually, in terms of the equation, any different

22   from the lost profits equation that you discussed earlier?

23   A.      No.  The analysis is, from a substantive standpoint,

24   it's the same, or very similar.

25           MS. SHARP:  I don't have any other questions at

Ellis - cross

1    this time.

2                    THE COURT:  Okay.  Cross-examination.

3                        CROSS-EXAMINATION

4    BY MR. CAHR:

5    Q.      Good morning, Mr. Ellis.

6    A.      Good morning.

7    Q.      And just to get this out of the way.  You made a

8    mistake in your most recent report and there were some

9    things in zeroes rather than dollars and you corrected that.

10   So that mistake is no longer of record; is that correct?

11   A.      I didn't -- I presented the data properly but I agree

12   with you, I think I might have had a Euro sign and I should

13   have had a dollar sign but the data was correct.

14   Q.      But as soon as you recognized it, you corrected it so

15   it's good?

16   A.      That's what I tried to do.

17   Q.      Now, Mr. Ellis, you believe that each and every sale

18   by Broetje of the accused cassettes from 2003 stretching

19   forward to 2013 would have been made by AHG instead; is that

20   correct?

21   A.      Which claims are you talking about?

22   Q.      Let's take trade dress, for example.

23   A.      Okay.

24   Q.      You believe every sale made by Broetje of a cassette,

25   a distribution rack, or a loading station from 2003 all the

Ellis - cross

1   way through 2013, every one of those sales made by Broetje

2   would have been made by AHG; is that correct?

3   A.      I did for my lost profit analysis but not for my

4   unjust enrichment analysis.

5   Q.      Okay.  So let's just take the lost profit analysis.

6   The lost profits, from 2003 to 2009, you believe that every

7   single one of the sales that were made by AHG would have

8   been made by Broetje -- that were made by Broetje -- strike

9   that.  Every single sale that would have been made by

10  Broetje from 2003 to 2009 would have been made by AHG?

11  A.      Okay.  So we're talking about --

12  Q.      Lost sales.

13  A.      -- lost sales for patent infringement, 2003 to 2009.

14  Q.      Yes.

15  A.      Yes, I agree with that statement.

16  Q.      And for your lost profits analysis for the trade

17  dress from 2003 to 2013, you believe that every sale that

18  would have been made by Broetje during that period of time

19  alternatively would have been made by AHG but for the acts

20  of infringement that you are alleging?

21  A.      That's right, with one small qualifier for the

22  copying claim.

23  Q.      And by copying, you mean trade dress?

24  A.      Trade dress, copying, yes.  I might characterize that

25  analysis as slightly different.  That would be 2005 to 2013

591

Ellis - cross

1   if we went off delivery dates as opposed to order dates.

2   Q.    Okay.  But --

3   A.    Your units don't change.  It all adds up to equal the

4   same total.

5   Q.    But correct me if I'm wrong.  You're -- actually it's

6   probably easier to take a look at this.

7              MR. CAHR:  Can I have exhibits 621.24, please,

8   up on the screen?

9              I hope we can turn that sideways.

10  BY MR. CAHR:

11  Q.    If you could highlight just the years 2003 and 2004,

12  please.

13             This is a summary of Broetje's unjust enrichment

14  revenues 2003 to 2013.  So you were including years before

15  2005 in your unjust enrichment calculation, were you not?

16  A.    Yes.  I think you are getting at a distinction

17  between when the order was placed and when the product was

18  shipped or delivered.

19  Q.    But you just said -- correct me if I am wrong -- a

20  couple of minutes ago while you were being questioned by Ms.

21  Sharp that for the unjust enrichment calculation you

22  entirely used shipping dates while for the lost profits

23  analysis you entirely used order dates?

24  A.    I think the answer is yes.  When you collapse it all

25  into 2013 from this time period, I think it's true under

592

Ellis - cross

1    both instances.  I counted every product once, so it might

2    have been ordered in '03, delivered in '05, ordered in '04,

3    delivered later.

4             Now, at the tail-end, I think Broetje only gave

5    us delivery, so I really couldn't count up the orders.  I

6    didn't have a basis to do that.  So it would only make a

7    difference on that cutoff whether you ordered in 2013 and

8    delivered, then I would count that.  In this case I didn't

9    because Broetje didn't provide me the information.

10   Q.   But this says you did, it says that you included 2003

11   and 2004 unjust enrichment damages in your calculation,

12   which would mean that you were using order dates.

13            But you had said before that you were using ship

14   dates.  Obviously, that is an important distinction.  That's

15   just this one little section I am talking about is what,

16   450, or $460,000?

17   A.   That I don't see that substantively.  There is no

18   substance to that distinction that you are making.  It was

19   ordered in '03.  Whether it was delivered in '05, that's

20   fine.  I am still counting it.  It's from the full-time

21   period.

22   Q.   Do you have any specific information about when the

23   first use date in commerce was of the trade dress?

24   A.   No, I don't.

25   Q.   So if the first use date of the trade dress turned

593

Ellis - cross

1   out to be 2004, this would be incorrect.  Correct?

2   A.    No.

3   Q.    Why not?

4   A.    Because I only counted the sales ones, so you might

5   see the order in '03.  If it was delivered in '04 and '05, I

6   didn't count twice.  It's just counted once.

7          So the delivery dates matter, for unjust

8   enrichment, I counted the right numbers.

9          The order date matters for unjust enrichment, I

10  also counted the right dates.  The number is not going to be

11  different.  It only matters on the tail-end in 2013, for the

12  timing difference.

13  Q.    Just to clarify, let's say that in 2003 somebody

14  ordered a system, and it was delivered with AHG racks and

15  AHG loading stations and a Broetje cassette.  Do you believe

16  that the AHG rack and the AHG loading station should be

17  considered as part of your damages?

18  A.    No.  In fact, that very situation happened.  We heard

19  Mr. Bornes testify in 2003 there was these big orders for

20  the entire system, and Broetje took the AHG racks and

21  loading stations.  So customers ordered what they thought

22  they were getting.  They thought they were getting AHG.

23  Then Broetje took those orders and two years later delivered

24  Broetje cassettes with AHG racks and distribution -- loading

25  stations and distribution racks.

Ellis - cross

1   Q.     But it's true you included those loading stations and

2   distribution racks in your collaboration, didn't you?

3   A.     That is untrue.  We excluded those.  I only counted

4   the cassettes that were Broetje and I did not count the

5   racks and loading stations.

6   Q.     Could we please go to 621.23, please.  Could you

7   please highlight 2003 and 2004.  If it turned out that in

8   2004 only -- fit turned out that in 2003 and 2004 the only

9   distribution racks ordered were delivered as AHG racks, AHG

10  distribution racks and AHG loading stations, this would be

11  incorrect?  This is a hypothetical.

12  A.     I am not following your hypothetical, because you are

13  trying to apply it to the facts.  And every single item on

14  here said Broetje.  So I don't understand --

15  Q.     If the facts turn out to be that nothing was

16  shipped -- let me take that back.  Strike that.

17           If the facts turn out to be that nothing was

18  ordered or shipped in 2003 or 2004 that was a loading

19  station or distribution rack made by Broetje, that your

20  inclusion would make it wrong, if the facts show that to be

21  the case?

22  A.     I agree, if that's true.  But, in fact, we found for

23  these two distribution rack and loading stations, those

24  items, we found that there were Broetje orders, clearly.  I

25  stand by my calculation.

Ellis - cross

1    Q.     That's fine.  We will talk about those things later.

2    If that was the case, this would be wrong?

3    A.     I don't think so.  I didn't do what you are

4    suggesting --

5    Q.     Not to say that your calculations were wrong.  I am

6    saying if that turns out to be the case, your calculation is

7    wrong?

8    A.     Maybe let me try and restate.  You are saying if I am

9    wrong, I am wrong?  I agree with that.

10   Q.     If the facts turn out to be that the information that

11   you were utilizing was incorrect, that these calculations

12   would then not reflect the correct calculation?

13   A.     So if I relied on a document from Broetje that was

14   incorrect, it would be wrong.  I agree with that.

15   Q.     All right, we will move on.

16          You were saying that but for the sales made by

17   Broetje, AHG would have made all of those sales, going back

18   to what we were talking about a few minutes ago?  Is that

19   correct?

20   A.     Yes.

21   Q.     And just to be complete, you didn't separately

22   calculate damages for intentional interference or those

23   things, on the lost profits side, it's the same analysis?

24   A.     That's right.

25   Q.     Is it your opinion that Broetje won every single

1    system bid from 2004 until 2013?

2    A.    Maybe help me understand what you are saying.  They

3    won every system bid?

4    Q.    Yes.  So if Boeing is interested in building a new

5    replacement for the C17, and they want to have machinery

6    installed to rivet the fuselage of those replacements for

7    the C17, and they go to Broetje, ElectroImpact, Gemcor, is

8    it your opinion that Broetje won every single one of the

9    bids like that that took place between 2004 and 2013?

10   A.    I have no opinion, because I don't think Broetje

11   produced any bids.  But I would assume based on my

12   experience that Broetje didn't win all the bids.  Maybe they

13   did.  I don't think they would have.

14   Q.    Do you know if ElectroImpact and Gemcor only

15   installed AHG fastener systems for bids they may have won?

16   A.    I did visit Gemcor and talked to them.  And I

17   understand the story on ElectroImpact.

18         What I know is that AHG's technology for this

19   application is the standard in the marketplace.  So that's

20   just what's happened.  Nothing else has survived.  It's just

21   this and Broetje.

22   Q.    Nothing else has survived.  So Gemcor doesn't sell

23   vibratory bowl systems?

24   A.    They do.  When I visited their plant, I saw one.

25   They were attaching it to a rivet machine, and I asked them

Ellis - cross

1    about it, because they were showing me a system with AHG's

2    loading station and distribution rack, and they told me that

3    for the application, vibratory bowls are never used.  They

4    showed me this other machine.  They said it's a whole

5    different deal in their mind.

6              The machine that I was getting on, you need an

7    elevator to go up to the top.  The other machine was this

8    really small one.

9    Q.    And F2C2 mostly sells to integrators in the United

10   States.  Correct?  Is that your understanding?

11   A.    I think that might differ by year, based on the sales

12   data.  But they do sell to both integrators and the end

13   customers.

14   Q.    Would you disagree with the representation -- I think

15   this is right -- that during the let's say 2004 till 2009,

16   that the vast majority of AHG's sales were to Gemcor?

17   A.    I don't know that to be true.  I don't have any

18   information one way or another on that.

19   Q.    Phrasing it differently, before the split between

20   Broetje and AHG, were most of AHG's sales through Broetje?

21   A.    That's true, yes.

22   Q.    And Mr. Hage, yesterday, said that the integrators --

23              MS. SHARP:  Objection to the question because

24   Mr. Cahr is recounting testimony.

25              MR. CAHR:  I will rephrase it.

Ellis - cross

1        THE COURT:  All right.

2   BY MR. CAHR:

3   Q.     Did you hear Mr. Hage yesterday talk about the

4   integrators and the importance of the integrators to AHG?

5   A.     Yes.  He also talked about the importance of all

6   customers.  I agree that every customer is important.

7   Q.     When they are selling to integrators, really, the

8   integrators are the ones who are making the sale to Boeing

9   or to Northrop Grumman or Spirit or Vought.  Isn't that

10  correct?

11  A.     Yes, its just like my supply chain, they would be

12  marking it up and selling it to someone else.

13  Q.     Do you believe that the marketing efforts of Gemcor

14  or ElectroImpact or any of those integrators might have an

15  impact on the successful sale of those products?

16  A.     I don't doubt that.  It's a combination of customers

17  requesting the technology.  It just being the standard in

18  the industry, everyone is pushing to sell this stock.  I

19  don't have any doubt on that.

20  Q.     Did you perform any market analysis to determine what

21  percentage of the decision-making is based on the automatic

22  fastener feed system versus the large riveting machine?

23  A.     Can you restate that question?

24  Q.     Did you perform any marketing analysis to determine

25  what percentage of the decision-making process from these

Ellis - cross

1    companies, like Boeing, are driven by the choice of the

2    automatic fastener feed system versus the enjoys of the

3    gigantic Gantry riveting system?

4    A.    A quantitative analysis, no.

5    Q.    And do you believe that -- if it would be okay, could

6    you put up PDTX-118.

7               This is your slide.  Correct?

8    A.    Yes.

9    Q.    And you note at the back that Broetje, when it was

10   providing these project cost information numbers, that they

11   were providing numbers that reflected that the sales of the

12   cassette systems were six percent of the total system that

13   was being purchased?

14   A.    On the high end, yes.

15   Q.    So if someone is making a choice about which gigantic

16   Gantry riveting system that they are going for purchase,

17   which is going to determine how well their planes

18   successfully remain in the air, do you think that perhaps

19   the quality of the riveting system might play a role of some

20   kind in their choice of which company to go with?

21   A.    Riveting system, rivet delivery system?

22   Q.    Does ElectroImpact or Broetje or Gemcor, in

23   responding to a bid from Boeing, say to them, we will

24   provide this part of it, but don't worry, we will find

25   someone else to provide the rest?  Or do they say, we are

Ellis - cross

1    going to provide to you a package and this is going to be

2    our response?

3    A.     They probably try to provide a package.  But I know

4    that Boeing specifically requested AHG's technology by name.

5    So I think so -- we have heard earlier, these are smart

6    people, these engineers.  They understand that the rivet

7    machine is probably important, the fastener delivery machine

8    or system is also very important, and they understand that

9    and they request AHG's technology.

10   Q.     Did you look at RFPs from Boeing, Spirit, Vought, any

11   of those companies, did you look at those in performing your

12   analysis?

13   A.     If you tell me that you produced them, then I will

14   say I looked at them.

15   Q.     I don't know that we produced them.  I was wondering

16   if you looked at them?

17   A.     I don't know, then.

18   Q.     So you don't know whether or not Spirit bought

19   Boeing, Northrop Grumman, Apache, any of the big companies

20   that manufacture all of these airplanes, whether they are

21   saying to the integrators, you know, you got to use an AHG

22   system here, or you got to use a cassette system here?  You

23   don't know, do you?

24   A.     I do know two things.  I know --

25   Q.     Can you please answer my question.

Ellis - cross

1   A.      I am telling you I don't.

2            THE COURT:  Mr. Cahr, you are asking some long,

3   difficult questions.

4            MR. CAHR:  My apologies, Your Honor.

5            THE COURT:  Let's stop interrupting one another.

6   Only one of us can talk at a time.

7            Mr. Cahr, if you want more focused, shorter

8   answers, ask more focused, shorter answers.

9            MR. CAHR:  I will, Your Honor.

10  BY MR. CAHR:

11  Q.      Do you believe that the Boeing, Spirit and Vought

12  request for proposal specify AHG products?

13  A.      I have no way -- no information one way or the other

14  to even know that.

15  Q.      You said a few minutes ago that these are smart

16  engineers and they know what they are purchasing.  Does that

17  mean that that is going to reduce the chance that they are

18  going to purchase the wrong system?

19            You were talking about damages.  Let me go back.

20  You were talking about what drives demand.  And am I correct

21  in believing that you are saying that confusion, which is

22  what trade dress infringement is, drives demand for the

23  Broetje project?

24  A.      I hadn't thought about it that way.  But that sounds

25  right to me.

602

Ellis - cross

1   Q.      So you believe that Boeing, Spirit, and Vought, who

2   are buying these gigantic machines, are confused about whose

3   automatic fastener feed system they are purchasing?

4   A.      For the accused sales, I think there was confusion,

5   yes.

6               Now, confusion in terms of the look, we saw the

7   Coke can, for example, at the beginning, I buy the Coke, or

8   Diet Coke, for me, not because the can looks a certain way

9   but because I look at the can and I see it and I know what's

10  inside.

11  Q.      How much does a can of Coke cost?

12  A.      Not very much.

13  Q.      How much does a riveting system cost?

14  A.      It costs a lot.

15  Q.      And do you put more -- you do work on damages.

16  A.      Sure.

17  Q.      Do you put more work into your purchasing decisions

18  when they are small or when they are big?

19  A.      I usually put more work into a big decision maybe

20  like a car.

21  Q.      And would you purchase the car because of the tires

22  on the car?

23  A.      I purchase the car because of how it looks, who makes

24  it, the reputation they have.  I don't look at everything

25  under the hood.  If I know it's a certain make, then I have

Ellis - cross

1   an expectation of a certain performance.

2   Q.     Let me rephrase it differently.  Would you buy the

3   car because of what the tires looked like?

4   A.     The tires alone?

5   Q.     Yes.

6   A.     I don't know.  I don't think I would.

7   Q.     You heard Mr. Hage say yesterday that they told their

8   customers back in 2008 about this dispute and they were

9   suing Boeing; correct?

10  A.     I'm sorry.  Could you repeat that?  I told someone?

11  Q.     No, no, no.  Mr. Hage yesterday told this Court that

12  they told their customers in 2008 about this dispute and

13  that they were suing Broetje.  Did you hear that testimony?

14  A.     I hear a lot of dates with regard to disputes.

15  Q.     But if it turned out that they told their customers

16  in 2008 about this dispute, do you believe that would make

17  it highly unlikely that anyone could be confused after 2008?

18  A.     I don't know exactly who was told, who that might

19  have been, if it ever made it out of a legal department.  I

20  don't know.

21  Q.     Let's say that Boeing was told.  Do you think that

22  would reduce the likelihood of confusion?

23  A.     Boeing is a giant company with 100,000 employees.  It

24  just depends on who they told and whether that made it out

25  to the person making a decision.  I don't know.

Ellis - cross

1                    MR. CAHR:  Okay.  Can we put up PDTX-100,

2         please?

3         BY MR. CAHR:

4         Q.     Now, you mentioned the fact that the loading

5         stations, the racks, and the cassettes are inextricably

6         linked?  Is that a correct summation of your position?

7         A.     I didn't use those words, but if you want to say

8         that, that's fine.

9         Q.     Well, you would you say it?

10        A.     I would say there was a functional link, a marketing

11        link, and an economic link.

12        Q.     You are aware that I think around 34 percent of the

13        fastener cassettes sold by Broetje before the patents

14        expired had round tubes; correct?

15        A.     I'm actually not aware of that.  I'm aware that that

16        is what you are saying.  I'm sorry.  I'm aware that that is

17        what you are saying but I'm not sure exactly what you mean

18        when you say that.

19        Q.     Okay.  Let's phrase it this way.  Hypothetically, if

20        Broetje sold fastener cassettes with round tubes and let's

21        say 34 percent of them were round tube cassettes during the

22        patent period from 2004 -- or 2003 we'll give you, 2003

23        until 2006 when -- in 2009 when the patents expired.  Would

24        racks and loadings stations sold with those round tube

25        cassettes be properly included with the damages?

605

Ellis - cross

1    A.    I can't answer that.  I haven't done that analysis.

2    But I can tell you which analysis I would need to do to come

3    to that conclusion, if you would like to hear it.

4    Q.    But you didn't do that analysis before?

5    A.    That was impossible for me to do.

6    Q.    Why was it impossible for you to do?

7    A.    You haven't shown me even one of these.  You call it

8    round.  I don't know if it's round.  All these tubes are

9    round on the outside.

10        My level of distrust with regard to Broetje's

11   information is very high as this point.  They said the cost

12   data was this, and it wasn't true.  They said the price is

13   were very low, but that wasn't true based on the underlying

14   documents.  They gave me four sales summaries and said this

15   is the right one each time.  All of them are wrong.  And

16   then they said, all of a sudden, after the technical experts

17   were filed, that there is this round tube and nobody has had

18   a chance to look at it.

19        To be a substitute, the thing has to be

20   noninfringing, and I don't -- I can't say that it's

21   noninfringing.  I have no information.  The technical

22   experts haven't even looked at it.  How can I answer this?

23   Q.    Let me ask you two quick questions then.  You

24   excluded the round tube cassettes from your calculations;

25   right?

Ellis - cross

1    A.     That's right.  Because I wasn't sure if they were

2    noninfringing.  I know they're not accused, for now, in this

3    case, but that doesn't mean that they're not infringing and

4    that they're a substitute.  They have to be technically

5    feasible, which means noninfringing, and a technical expert

6    has to tell me that and they haven't.

7    Q.     You heard Dr. Kytomaa yesterday on the stand say that

8    round tubes do not infringe the patent, didn't you?

9    A.     I heard him answer a hypothetical, and you are trying

10   to say that the real world facts are the same and they are

11   not.  We don't know that.

12          I have something else to say.

13   Q.     Go ahead.

14   A.     Thank you.  I also know that the round tubes that

15   were identified to me late in the game are a completely

16   different size than all of the other tubes that we're

17   looking at.  They're not a substitute.  So I also know that.

18   Q.     And correct me if I'm wrong, so what you did was you

19   subtracted the round tubes because they were not accused

20   but you didn't subtract the convoyed sales associated with

21   loading stations and distribution racks sold with those

22   round tube cassettes?

23   A.     I only kept in the distribution racks and loading

24   stations associated with what is accused.  That remains in.

25   That's what I kept in and that's all I kept in.

Ellis - cross

1    Q.      So if there a project that sold that involved just

2    round tubes and you included the loading station or the

3    rack, then that would be incorrect?

4    A.      Not necessarily.  There a project, 1600, that had a

5    loading station and distribution rack and some round tubes,

6    but if you look at project 1599, the one right before that,

7    they ordered a whole bunch of accused cassettes for that

8    same location.

9    Q.      Well, that 1599, if I recall, is 50 something percent

10   round tubes, and so did you apportion it out?

11   A.      No, I did not.

12           MR. CAHR:  While we're talking about

13   apportioning and fractions, can you please go to 103,

14   please.

15   BY MR. CAHR:

16   Q.      Now, you say on this slide that components were sold

17   in the same proportions; is that correct?

18   A.      That's right.

19   Q.      And you used these pie charts to illustrate that;

20   correct?

21   A.      Yes.

22   Q.      But the number of cassettes sold in the first chart

23   is 28 percent larger than the number of cassettes sold in

24   the chart on the far right; isn't that correct?

25   A.      It goes from, one is 21 percent and one is

Ellis - cross

1    29 percent, yes.

2    Q.    And then I took out a calculator last night and did

3    the math and it's 28 percent?

4    A.    If you tell me that.

5    Q.    Is 28 percent the same proportion as?  Is something

6    that is 28 percent different the same proportion?

7    A.    I think it's not exactly the same, but I think you

8    are mischaracterizing the data here.

9    Q.    Well, the number of loading stations in the second

10   chart is about 40 percent larger than the percentage in the

11   first chart.  Is 40 percent the same proportion, 40 percent

12   larger the same proportion?

13   A.    These are not the same proportions.  They are

14   similar.  And what I mean by that is every job is different,

15   so one job might be big and have two or three distribution

16   racks, and one loading station; one job might be small and

17   just have one distribution rack, and a loading station; and

18   they might order extra cassettes for one and not the other.

19         But the bottom line here is that the proportions

20   are generally the same, and every time you see the sale of

21   the cassette, you will see the sale of a distribution rack

22   and loading station to the same customer.  It happens every

23   time.

24   Q.    So just to reiterate, you are not disagreeing with

25   me that 40 percent and 28 percent larger are not the same

Ellis - cross

1   proportions?

2   A.     I agree that these are not exactly the same, and I

3   think I said that when I first testified.

4   Q.     I just want to make sure we agreed on that.

5          We can go to PTX-621 -- I'm sorry 621.41.  If

6   you can please highlight the third grouping from the top.

7   Going to 2002 and 2003.

8          Now, this is a section on incremental costs;

9   correct?

10  A.     Yes.  I think that chart, it's hard to read, but that

11  is incremental profit.

12  Q.     And just to clarify, this is just a small part of a

13  few pages which lists by year all of the different

14  incremental costs that Broetje indicated?

15  A.     Yes, by court order.  I think it's historical.

16  Q.     And if I represent to you that the incremental costs

17  represented by these royalties, these inventor royalties and

18  the Dassault royalties come to about $2.8 million during the

19  relevant time frame, do you have any reason to disbelieve me

20  on that?

21  A.     No, I will accept that representation.

22  Q.     Royalties when paid to nonparties in the case are

23  typically subtracted from the award that you are trying to

24  obtain; correct?

25  A.     It depends.

610

Ellis - cross

1   Q.      If you were making a lost profits claim, would you

2   typically subtract the royalties that you have to pay to a

3   third party?

4   A.      I would have to say again it depends.  Sometimes it's

5   appropriate, sometimes it's not.

6   Q.      When would it be not appropriate?

7   A.      In this case, when there is an obligation to pay but

8   say AHG gets a check for the sales it would have made, then

9   it would have an obligation to pay that royalty out of that

10  check.

11  Q.      So if there is no obligation to pay a judgment, then

12  it should be subtracted; correct?

13  A.      No obligation to pay a judgment?

14  Q.      Well, that is what you are seeking; right?  A

15  judgment of damages.

16  A.      It's an obligation to pay a royalty is kind of what I

17  was thinking.

18  Q.      Well, there is an obligation to pay a royalty on

19  a damage award as opposed to an award of sales, let's say.

20  Then you don't have to subtract them, but if there is an

21  obligation -- well, let me get -- I'm getting a little bit

22  too convoluted with that.  Let me clarify.

23          If you are obligated to pay the royalties from a

24  judgment, then they are properly not deducted; correct?

25  A.      I would not subtract them from my incremental profit

Ellis - cross

1   calculation because I will have to subtract them later.  So,

2   yes.  It's like taxes.

3   Q.      Right.

4   A.      If you get a judgment, you still have to pay the IRS.

5   Q.      Right.

6   A.      So you ask for that amount so that you can.

7   Q.      Right.  That totally makes sense.  And if you are

8   not obligated to pay that out, then you would deduct it;

9   correct?

10  A.      If you are not going to pay it out, then you would

11  deduct it.

12  Q.      And isn't it true that you have not been presented

13  with any document showing that the plaintiffs are obligated

14  to pay proceeds from this litigation?

15  A.      I'm not sure I agree with that statement.

16  Q.      Have you seen a document that says that the

17  plaintiffs are obligated to pay Dassault the proceeds from

18  litigation?

19  A.      The Dassault agreement, it requires a payment on

20  sales, and these we're characterizing as lost sales.  So if

21  you interpret it that way, I would say I have.  If you are

22  saying that the Dassault agreement would somehow predict

23  some lawsuit in the future, I don't think it does.  I

24  probably didn't think about that.

25  Q.      So the same thing would apply to the inventor

Ellis - cross

1    royalties then.  So the inventor royalties, you are saying,

2    should not be subtracted because they are obligated to pay

3    those out.

4    A.    That's part of the reason for inventor royalties.

5    The other part is it's an accounting thing, so it's recorded

6    as an expense, but it's from F2C2 to AHG.  So when you

7    collapse the two, there is no difference.  It's taking money

8    from one pocket and putting it into the other.  You really

9    haven't paid someone outside, so to subtract that may be a

10   mistake.

11   Q.    Maybe I'm misremembering, but I think we concluded

12   that 97.5 of the inventory royalties are being paid to

13   non-plaintiffs in this case.  Isn't that correct?

14   A.    I think it's -- and it's been a few years since I

15   looked at this.  I think the group that is receiving the

16   royalties is still AHG.

17   Q.    So you think that Phillippe Bornes is AHG?

18   A.    Phillippe Bornes worked at AHG at the time.

19   Q.    He is not at AHG now.

20   A.    Right.  So in that case, so there is, I agree with

21   you there is a part that is going from one pocket to

22   another, and consistent with my earlier discussion of

23   Dassault, I specifically asked AHG what they would do, and

24   they said they would pay it out.

25   Q.    And so if the $2.8 million should have been

Ellis - redirect

1    subtracted, that would reduce your damages claim on the lost

2    profits by 90 percent, wouldn't it?

3    A.    If you say -- if you did the math, I would accept

4    that.

5    Q.    And I noticed that about 80 percent of the damages

6    you allege derived from non-accused products, the loading

7    stations and the racks.  Would you accept that as true?

8    A.    Yes, I think AHG received the benefit -- basically

9    received benefits from the cassette and the whole system

10   they designed around it, yes.

11   Q.    So 80 percent of the royalties would be from loading

12   stations and racks.  That is, 80 percent of the damages

13   would come from loading stations and racks?

14   A.    From a mechanical sense, yes.  But from a substantive

15   sense, I would disagree with that.

16            MR. CAHR:  No further questions.

17            THE COURT:  Okay.  Redirect.

18                    REDIRECT EXAMINATION

19   BY MS. SHARP:

20   Q.    Mr. Ellis, I want to make sure that we're all clear

21   on some of the testimony that you gave.  Since the last

22   topic had to do with royalties, let's talk about that first.

23            When does the obligation to pay a royalty arise?

24   A.    When the sale happens usually.

25   Q.    If AHG can't make sales because Broetje infringed,

614

Ellis - redirect

1    does AHG have an obligation to pay royalties on sales it

2    didn't make?

3    A.      On the sales it lost, it wouldn't have made a payment

4    at the time, no.

5    Q.      Is that why you didn't back out royalties?

6    A.      Yes, because once -- if there is an award for lost

7    profits, then I'm satisfied, by talking to the company, I'm

8    satisfied that they will pay those royalties, just like they

9    will pay their taxes.

10   Q.      And that was the tax analogy.  The obligation arises

11   later?

12   A.      That's right.  After you -- if you collect an award.

13   Q.      There a little bit of discussion about vibratory

14   bowls.  Are vibratory bowls acceptable noninfringing

15   substitutes for the AHG cassettes?

16   A.      No, they're not.

17   Q.      Why not?

18   A.      We've heard a lot of testimony about the problems

19   with those, but I think even Dr. Peters, in his testimony,

20   said they just don't use that on their systems.  It's either

21   AHG's technology or their accused technology for these rivet

22   systems.

23   Q.      Okay.  And you were asked a hypothetical about some

24   hypothetical round tubes.  Are round tubes acceptable

25   noninfringing substitutes for AHG's cassettes?

Ellis - redirect

1   A.      They cannot be in this case because I can't say that

2   they're noninfringing, among other things.

3   Q.      And what are the other things?

4   A.      Again, they're a completely different size than all

5   of the other cassettes sold.  They cannot be a substitute

6   for the different sized cassette.

7   Q.      Despite that opinion, did you back out the round

8   tube cassettes from your calculations when you did your

9   supplemental report?

10  A.      I did.

11  Q.      So your supplemental report does not include damages

12  for any round tube cassettes; is that right?

13  A.      That's right.  When I discovered that and I was able

14  to quantify that, I was able to take them out.

15  Q.      You continued to include -- if I understood the

16  question and answer with Mr. Cahr, you continued to include

17  the rest of the system that was sold with the round tube

18  cassettes.  Why?

19  A.      Because they were also sold to the exact same

20  location where a bunch of accused cassettes were ordered

21  first.

22  Q.      And the last topic, if we can clear it up, had to

23  do with these dates, and the columns in which a number

24  appears.

25          Focusing on the first category of damages we

Ellis - redirect

1   had.  When does patent infringement occur?

2   A.      As I understand it, when there is a sale or offer

3   for sale, that's even the make or use of something in the

4   United States, is infringing.

5   Q.      To determine whether there was an offer of sale, did

6   you rely on purchase orders?

7   A.      Yes.  So when I saw a purchase order with the company

8   and a U.S. address on it, we request ordering this stuff.

9   I counted it as an offer for sale or sale.  I'm not the

10  attorney on that, but that is when I counted it for patent

11  infringement.

12  Q.      And was there typically a lag between the purchase

13  order and the actual delivery on the purchase orders?

14  A.      Almost always.  It could be a year, two years.

15  Q.      Did you match purchase orders to delivery slips and

16  count those sales only once or did you count them twice?

17  A.      I would like to have done that with all of them, but

18  there some giant holes.  But I am confident, 100 percent

19  confident I only counted everything once.

20  Q.      So does it matter to your total number whether you

21  count the purchase order from 2003, delivered in 2005 or 6

22  or 7, in the 2003 column or in the column when the delivery

23  occurred?  Does it change your numbers?

24  A.      In substance, it doesn't change the math or the total

25  number at all.

Benczkowski - direct

1                    MS. SHARP:  Thank you.

2                    THE COURT:  All right.  Mr. Ellis, you may step

3        down.

4                    Mr. Lindvall, what is next?

5                    MR. LINDVALL:  Your Honor, subject to just

6        making sure we haven't checked all our exhibits that have

7        been admitted, plaintiff is going to rest its case.

8                    THE COURT:  Okay.  Thank you.  Mr. Kelleher.

9                    MR. KELLEHER:  Your Honor, we would make the

10       usual motion.  We can elaborate at a later time.

11                   THE COURT:  Okay.  We'll do that.

12                   MR. KELLEHER:  Defense calls for its first

13       witness, Mr. Ken Benczkowski.

14                   ... KENNETH BENCZKOWSKI, having been first duly

15       sworn, was examined and testified as follows ...

16                   MR. KELLEHER:  Your Honor, may I approach?

17                   THE COURT:  Good morning.  Welcome,

18       Mr. Benczkowski.

19                   THE WITNESS:  Thank you.

20                   (Brushing against microphone.)  Sorry.

21                   THE COURT:  You may approach, Mr. Kelleher.

22                   (Binders passed forward.)

23                         DIRECT EXAMINATION

24       BY MR. KELLEHER:

25       Q.    Good morning, Mr. Benczkowski.  Could you please

Benczkowski - direct

1    introduce yourself to the jury?

2    A.    Yes.  My name is Ken Benczkowski.  I am the President

3    of Broetje Automation USA.

4    Q.    And where do you live?

5    A.    I live in Buffalo, New York.

6    Q.    Now, could you tell us where you went to school?

7    A.    I went to school at the State University of New York

8    in Buffalo, and I'm a graduate from the year of 1980.

9    Q.    Could you please tell us your job history?

10   A.    Right out of school, I actually went to work at

11   Gemcor, and I worked at Gemcor holding various positions

12   there for a little more than 20 years -- 20 years and some

13   months.

14         I then left Gemcor and went to work for a

15   company in Minnesota called Power Systems which is a

16   robotics company also serving the aerospace industry.

17         And in 2006, I began working with Broetje USA.

18   Q.    And in what capacity did you begin with Broetje?

19   A.    I began as the Vice President and Chief Operating

20   Officer, and I held that position until 2008, where I was

21   named President.

22   Q.    What did you do at Gemcor for 20 years?

23   A.    At Gemcor, I had several positions.  I started there

24   working in their operations group.  I was basically trying

25   to get their spare parts and deliveries for mechanical parts

619

Benczkowski - direct

1    in line.  And I held that position for about six months.

2              And I was then more or less transferred or moved

3    into a customer service department which they put me in

4    charge of where we handled the spare parts sales and then

5    the order fulfillment process.

6              From that, I had various other positions.  I

7    was basically moving to the application engineering group

8    because I had some tendencies to go for innovation and

9    basically I like to interface with the customers.  So I

10   was at application engineering for about three-four years

11   and then various sales positions, and I ended up being the

12   director of sales, director of operations at the end.

13   Q.    At Gemcor, what use did you make of F2C2 or AHG

14   products?

15   A.    We made no use of F2C2 or AHG products.

16   Q.    Why not?

17   A.    They were not reliable.

18   Q.    Tell me, do you have any patents?

19   A.    Yes.  I'm co-named on five patents awarded in the

20   U.S. with one pending and co-named on two European patents.

21   Q.    So, Mr. Benczkowski, you are the president of Broetje

22   USA.  Could you tell us, what is Broetje's business?

23   A.    Broetje is a turnkey provider of solutions for

24   automatic airframe assembly challenges.  So what we have is

25   basically a tool kit or tools that we use when we go into a

Benczkowski - direct

1    supplier, an aircraft manufacturer's facility such as Boeing

2    and we will look at their actual production flow line.

3            So we will look at the product we want to build,

4    the rate they need to build it at, and then what we're going

5    to do is come up with the plant layout, the flow of the

6    material through the plant, all of the equipment that they

7    need, whether it be the fixtures, the automatic fastening

8    machines which also play a part in that because that is our

9    core competence, and then we look at the material transport

10   systems, all the scaffolding, all the hand tools, everything

11   that is required in order to produce that product.

12           And at the end, what we basically are known for

13   is our know-how.  We're known for know-how and we're known

14   for throughput because that is what customers are buying

15   from us.  They're buying throughput and reliability.

16   Because every line is at a high production rate.  Failures

17   on the line are completely unacceptable.

18           And along with that, we have full services,

19   meaning spare parts business, the service business,

20   follow-on contracts, hotlines, things of that nature that

21   we manage to make sure that our customers at Boeing, the

22   Gulfstreams are all in operation 100 percent of the time.

23   Q.     Mr. Benczkowski, if we identify a video that we can

24   show the jury that shows the products and services of Broetje?

25   A.     Sure.

Benczkowski - direct

1                MR. KELLEHER:  Can we please show the video?

2                Can we turn the lights down a little.

3                THE COURT:  How long is the video?

4                MR. KELLEHER:  Six minutes, I believe, Your

5     Honor.

6                THE COURT:  Okay.  We'll turn the lights down.

7                (Video played.  Music heard but no commentary.)

8                MR. KELLEHER:  It looks like it was only two

9     minutes.

10               THE COURT:  All right.  We'll turn the lights

11    back on.  For the record, does it have an exhibit number?

12               MR. KELLEHER:  Yes, Your Honor.  I'll have that

13    in one moment.

14               THE COURT:  Okay.  When you have it, let us

15    know.

16               MR. KELLEHER:  I think DTX-1217 is the number I

17    have written down.

18    BY MR. KELLEHER:

19    Q.    Mr. Benczkowski, could you tell us what we just saw

20    in the video?

21    A.    Yes.  What you saw was one of our -- well, it was

22    formerly one of the most popular machines, we call it an

23    IPAC, Integrated Panel Assembly Cell, and they're used

24    predominantly for fuselage and in some cases for the

25    assembly of aircraft wings, depending on the processes.

Benczkowski - direct

1              What you will see in that video, there is a

2     whole science to drilling a hole and filling it back up

3     again.  So we'll have processes that automatically drill,

4     that will install sealant, we inspect the hole before the

5     fastener goes in, we inspect the quality of the installed

6     fastener, and then move on to the next hole.

7              The machine will put in basically 17 rivets a

8     minute, which is more than eight times as productive as a

9     man could be.

10             MR. KELLEHER:  Your Honor, I think it was

11    DTX-1820.

12             THE COURT:  Okay.  Thank you.

13    BY MR. KELLEHER:

14    Q.    Mr. Benczkowski, who are Broetje's customers in the

15    United States?

16    A.    Broetje's customers in the United States, of course,

17    are Boeing, and they have multiple facilities.  So we have

18    equipment in Seattle and Long Beach.  We also have equipment

19    in St. Louis and in Charleston for the Boeing facilities.

20             We have Vought or Triumph.  It was Vought.  They

21    were bought out by Triumph.  And they have facilities in

22    Dallas, Texas.

23             And we have Gulfstream in Savannah, Georgia as

24    our main customer base, but our largest customer is Spirit

25    Aerosystems, which was Boeing Wichita in Wichita, Kansas.

Benczkowski - direct

1  Q.     And you mentioned, Mr. Benczkowski, doing

2  installations on giant machines like that IPAC.  Could you

3  walk us through what the purchasing process is like for one

4  of those customers for a machine like that?

5  A.     Yes.  It's a very long and detailed process.

6  Basically, our business comes, our equipment comes from

7  usually through two avenues.  One is someone is launching a

8  brand new airplane.  Like right now, the big word is on the

9  777X.  That is the replacement for the 777 aircraft.

10          Or there is a rate increase.  Like, right now,

11  the 787 is at 10.  They're talking about 12 and then 14.

12          The 737 is at 38, it's going to go to 42

13  airplanes a month, and then 45, and eventually get to 60.

14  So these are opportunities for the equipment.

15          So what happens is that a Boeing will come out

16  with a request for information, and they will send it out to

17  five to eight different suppliers.  Some of them will be

18  riveting companies, or integrators like us.  Others will be

19  just plain integrators.  They have to go out and find the

20  technologies.

21          So then we will come together.  We have a

22  bidders' conference, usually at the customer's site.  They

23  will state the requirements and give us some documents.

24  They will send us all off.

25          Basically a month later we will come back with a

624

Benczkowski - direct

1   proposal.  Once that proposal is received it will be

2   reviewed by Boeing.  Boeing will call the parties in which

3   they have interest for presentation and detailed discussion

4   on their response to the RFI, request for information.

5         Then Boeing will basically spend a little bit of

6   time, determine who it is they want to participate in the

7   formal bid process.  Then what they will do is put together

8   a specification, taking basically the best ideas from

9   everybody who has presented, and they will go out for a

10  formal bid.

11        We will usually get four to six weeks to respond

12  to that bid.  There will usually be a bidders' conference

13  where you have separate conferences to meet with the

14  customer, such as Boeing, in order to respond to the

15  proposal.

16  Q.   Mr. Benczkowski, you mentioned a specification a

17  moment ago.  What does the specification look like?

18  A.   The specification is a very, very detailed document.

19  That document will be, it could be a hundred, 200 pages

20  long.  It will define every aspect of the equipment.  It

21  will tell you, basically, how long the work piece is, it

22  will say, we are drilling these materials.  It is, you must

23  use this drill spindle or this rpm in our machine, you need

24  to have a certain clamp force pressure, you need to have a

25  CNC control, and all the tolerances for every aspect of the

625

Benczkowski - direct

1    machine.

2    Q.    Is there ever any discussion of the fastener feed

3    system in the specification?

4    A.    There are fastener feed systems that are discussed.

5    Usually, that is a user preference item.  Sometimes, they

6    will just say you need to provide a written fastener feed

7    system for this spectrum of fasteners, various diameters,

8    various lengths.  In other cases they will simply say that

9    they want a certain style of a fastener feed assembly.

10   Usually, it is a user preference.

11   Q.    What kind of styles?

12   A.    There are styles available.  It could be, of course,

13   the subject of this whole discussion or meeting here, the

14   cassettes.  It could be laboratory bowls.  It could be

15   hoppers.  It could be a magazine.  Or something else.

16   Q.    I interrupted you as you were going through the

17   process.  Could you continue?

18   A.    Yes.  So after we submit our final proposal, they

19   evaluate them.  Boeing will call the parties in and

20   basically go through a detailed review of our proposal.  As

21   part of the response to the proposal, we have to respond

22   paragraph by paragraph to this hundred-plus pages of

23   specification documents in terms of how we are going to

24   fulfill that requirement, what brands we are going to use,

25   what the feed speeds are, the rates that we are going to

Benczkowski - direct

1    achieve.

2              So, then, they make their selection based on the

3    technical and of course cost data.

4              Once you are selected, the whole process begins

5    actually for fulfilling the order.  In that case we normally

6    have set up design review meetings.  There is a preliminary

7    design review, which we call a PDR, which happens at about

8    the 20-percent interval.  There is a critical design review,

9    which is about 60 to 80 percent through the project.  Then

10   there is a final design review, which is at basically 95-100

11   hundred percent.

12   Q.    Where would that occur?

13   A.    Normally, the first PDR is at the customer site.  We

14   do that, we bring all of our skills over to interface with

15   that customer because the customer will have a large party

16   involved in this whole process of their own expertise.

17             We will then have that particular meeting, which

18   is normally a three-day meeting, to go through all of the

19   preliminary designs.  That's where we set the foundation and

20   define, again, all of the components that we are going to

21   use.

22             Then at the critical design meeting, that is

23   normally held in our factory.  And the reason for that is

24   because once we get past the PDR stage we can go ahead and

25   begin to order all the materials that we need.

Benczkowski - direct

1    Q.     Is that in Germany?

2    A.     It's in Germany.  When they come to Germany, they can

3    see the materials arriving on the floor.  And at the final

4    designing stage, much of it is already assembled there, so

5    they can get a status as well as the final design statuses

6    as we go through the whole product.

7            During that whole period, they are welcome any

8    time to check the status of where we stand.

9            MR. HOROWITZ:  Your Honor, objection.  Calls for

10   a narrative.  There is no Q&A going on.

11           THE COURT:  Sustained.  Let's have some

12   questions.

13   BY MR. KELLEHER:

14   Q.     After the final design stage, what happens next

15   concerning the acceptance?

16   A.     The customer will basically come in.  They will bring

17   in a test panel.  With their test panel they will send the

18   fasteners that they require.  They require a part program.

19   And we will demonstrate the operation called for the

20   machine.

21   Q.     How many people will come from the customer?

22   A.     It varies between six and 12, sometimes 14.

23   Q.     Would there be any demonstration of the fastener feed

24   system?

25   A.     Yes.  That would be an integral part of the system.

Benczkowski - direct

1    So basically, we identify the spectrum of fastener feed that

2    are employed.  Those would be sent over.  They would be

3    tested in advance.  It is tested in test articles, and they

4    actually test the test article.

5    Q.      Assuming the machine passes this acceptance phase in

6    Germany, what happens next to the machine?

7    A.      If there is an acceptance, we tear the machine down.

8    We ship it the U.S.  It is installed in the factory.  Then

9    we re-perform the acceptance test.

10            Now, when it goes back into the customer's

11   facility, there is another level.  Actually, the commitment

12   has to be certified before it can go into production.

13   Q.      When you say certified, what do you mean?

14   A.      It means it has to meet Boeing process standards.  In

15   this whole process, Boeing has usually a process specialist.

16   They look at things to make sure the fastener does not have

17   a nick or mark in it, to make sure all of the holes are

18   drilled daily and they are all within control.

19   Q.      Why would they care about it meeting --

20   A.      Because it has to do with flight safety.  So it is

21   very, very critical.  They have their own process where they

22   certify it themselves.  Then, of course, the FAA comes in

23   and has to certify the machine.  Basically, what happens is

24   they need to keep a log of any changes or serious faults

25   that they can present to the FAA to make sure there is

629

Benczkowski - direct

1   configuration control.

2   Q.      About how long does the certification take?

3   A.      It could take six weeks.

4   Q.      So assuming the machine passes certification, what

5   happens then?

6   A.      Once it passes certification, it is put into

7   production, and they are certified to actually run a

8   product.

9   Q.      What are the things that the customer is primarily

10  looking for when it makes a decision to purchase an airplane

11  assembly machine like you are describing?

12  A.      What a customer is looking for, number one, is

13  throughput.  Throughput, quality, reliability, are all key

14  criteria that they are looking for.

15  Q.      Why do they care about those things?

16  A.      Because there are penalties, and their reputations

17  are all at stake.  If Boeing -- for example, if Spirit does

18  not deliver their fuselage assemblies on time, they get a

19  lot of help from Boeing, and there are penalties associated

20  with late delivery.

21  Q.      Monetary penalties?

22  A.      Monetary as well as damage to their reputation.

23          For example, for certain components, they have a

24  five-hour tack time.  Meaning that every five hours the

25  product has to move down the line.

Benczkowski - direct

1                    If we have a machine down situation, let's say

2       it takes an hour, that's 20 percent of the downtime, there

3       are five outages across multiple machines, you are one part

4       behind on one shift.

5       Q.    When you say one part, what do you mean?

6       A.    One component, one subassembly.  And you need all the

7       subassemblies in order to feed the lines at the end of the

8       day.

9       Q.    Mr. Benczkowski, what kind of aircraft are made in

10      the United States using Broetje machines?

11      A.    Basically all commercial aircraft and private

12      aircraft.  We have the 747.  We have the 787.  We have 737.

13      We have the C17.  We have Gulfstream, various models of

14      Gulfstream product as well, G650 being the most recent.

15      Q.    What kinds of prices does Broetje charge on this

16      machine?

17      A.    The machine ranges, as you saw on the video, the

18      smaller ones are about 5 million dollars.  The larger

19      machine might be up to 13 million dollars.

20      Q.    You mentioned earlier a couple of different kinds of

21      fastener feed systems.  What is a vibratory bowl?

22      A.    There are a multiple of systems.  A vibratory bowl

23      feed system is a very, very popular system.  Pour a bag of

24      rivets into a bolt and it vibrates around the bowl until

25      they exit the top.

Benczkowski - direct

1              When it gets to the top, there is usually a

2      track, so unlike the testimony you heard testimony where a

3      bowl is slower than a receptor.  That is not true, because

4      in production there is a little escapement track and

5      passengers are lined up and dispensing, similarly, just like

6      they are in a cassette.

7      Q.    Has Broetje sold any of its machines with vibratory

8      bowls?

9      A.    Yes.

10     Q.    How many?

11     A.    A handful.

12     Q.    Could you tell us when was the last time?

13     A.    It was probably late eighties.

14     Q.    What about hoppers?

15     A.    Hoppers are another fastener feed system.  They are

16     quite popular in certain facilities.  We offer hoppers as an

17     alternative in a fastener feed system.

18              If you go into certain facilities -- for

19     example, I spent a lot of time at Boeing Brighton, and they

20     have 18 machines from ElectroImpact, ten of which have been

21     delivered over the last five years, which have hopper type

22     feed systems.

23     Q.    Which company is that?

24     A.    That was from ElectroImpact.

25     Q.    I am curious, do you visit facilities for Boeing and

632

Benczkowski - direct

1   Spirit periodically?

2   A.      Regularly, yes.

3   Q.      How often do you see machines that are still using

4   vibratory bowls or hoppers?

5   A.      Always.  They are still in use, regular use.

6   Q.      Could you give a few examples?

7   A.      Yes.  If you walk into say the Spirit facility, you

8   are going to see machines with hoppers.  You are going to

9   see machines with bowl feeders.  You are going see machines

10  with drop tube stations on them that are manually indexed.

11          If you go into a Boeing Everett facility, you

12  are going to see ElectroImpact cassettes being used on the

13  Spire machines, of which there are at least four.

14  Q.      Is this, PTX-507, an ElectroImpact cassette?

15  A.      Yes, it is.

16  Q.      Is this what you were talking about being in use

17  today?

18  A.      In the Everett facility and also at the what were on

19  the C17.

20  Q.      I would like to talk some more about the customers.

21  Could you describe the level of sophistication of your

22  customers?

23  A.      They are highly sophisticated.  Normally, when we are

24  in discussions with the customers, you are going to have a

25  project engineer, a project manager.  Then you are going to

Benczkowski - direct

1    have specialists from the facilities group.  You are going

2    to have the mechanical engineering group.  Controls group.

3              There will be a process specialist involved.  A

4    quality assurance specialist involved.

5              The process is very, very detailed.  As a matter

6    of fact, we are in discussion on a system right now, and we

7    went as far as to have to provide the length of the tube

8    inside the rivets so that Boeing could calculate how heavy

9    that cassette would be in case it had to lift it up over

10   their head to load it so it doesn't violate ergonomic

11   constraints.

12   Q.    Obviously, we are here in a lawsuit against F2C2 and

13   AHG.  Is F2C2 a competitor of Broetje?

14   A.    No, F2C2 would not be a competitor to Broetje.

15   Broetje builds automated fastening machines and systems.

16   They provide a subsystem that could be integrated into any

17   automatic fastening machine.  There would be a supplier,

18   such as someone who would buy a bowl system or the like.

19   Q.    Is AHG a competitor?

20   A.    AHG would not be a competitor of Broetje.  AHG, I

21   believe, sells fasteners.  We sell machinery that installs

22   fasteners.

23   Q.    Who are Broetje's competitors?

24   A.    Broetje's competitors are primarily Gemcor and

25   ElectroImpact.

Benczkowski - direct

1    Q.     Does Gemcor have a particular market niche?

2    A.     Yes.  Gemcor fits into a specific market niche where

3    they have more or less the lower cost market.  I would say

4    if I would own a piece of equipment, they would tend to sell

5    machines in a market where we can't compete.

6    Q.     Why not?

7    A.     It would be too expensive.  For example, if they were

8    awarded a contract which we were not even invited to bid

9    just because then our price is going to be higher, that was

10   for a project which was for the off-load of what's called

11   the window belt at Boeing, where they are basically using a

12   Broetje machine right now to install those fasteners.  They

13   offered it to a small company with a limited budget, say

14   about three million dollars, they would work the contract.

15   We were not invited to bid because we could not a make a

16   machine for 3 million dollars.

17   Q.     ElectroImpact, do they have a particular market

18   niche?

19   A.     Yes.  They are known more or less as the "college

20   whiz kids," so that if you were to -- a lot of young people

21   out of college, very creative, very innovative, so if you

22   were to basically draw an analogy with automotive companies

23   or models, you would say that Gemcor is the Chevy Cruze,

24   ElectroImpact is the Volt, and we would be the Mercedes in

25   this industry.

Benczkowski - direct

1    Q.      Have you heard a company called Kuda?

2    A.      Yes.  Kuda --

3    Q.      Let me ask a question.  We heard yesterday about an

4    opportunity where there was consideration of whether Kuda

5    would buy Broetje's automatic fastener feed system.  Can you

6    tell us what happened there?

7    A.      Yes.  I was actually contacted directly by Kuda to

8    provide a location for a fastener feed system.

9    Q.      Did you do that?

10   A.      Yes, we did.  We gave them a premium price.

11   Q.      Why is that?

12   A.      Well, because it involves a lot of know-how.  You

13   just don't take one of these fastener feed systems and plug

14   it into a machine and expect it to work.  You need to

15   integrate it.  We charged a healthy fee to integrate it.

16   Q.      What did they do in response to that price offer?

17   A.      They basically rejected our offer, and as you heard,

18   they selected F2C2 as the supplier.

19   Q.      Then what happened next?

20   A.      Well, the project was actually, had many, many

21   issues, and Spirit ended up canceling the contract with

22   Kuda.

23   Q.      Then what happened after that?

24   A.      After that Broetje was awarded the machine to build

25   the 787 equipment.

Benczkowski - direct

1    Q.      I would like to know, could you please identify what

2    is DTX-1223B?  I'm holding it here.

3              MR. KELLEHER:  May I approach, Your Honor?

4              THE COURT:  You may approach.

5              THE WITNESS:  This is a Broetje cassette.

6    BY MR. KELLEHER:

7    Q.      This one has rivets in it?

8    A.      This one has rivets in it.

9    Q.      What is this in the back, the upper right hand

10   corner?

11   A.      We call that the separator.

12   Q.      When did you first see one of these?

13   A.      I first saw the metal cassette when I was employed by

14   Par in about 2005.  We had installed a machine at Triumph,

15   which was then Vought, in Dallas.  And I was going to

16   basically meet with the executive management for the

17   demonstration, that they were happy with the machine we just

18   installed.

19   Q.      When you saw it, did you recognize what it was?

20   A.      Well, I was walking down the floor, and going to the

21   office.  When I saw the rack with the metal cassettes in it,

22   I stopped and said, What's that?

23   Q.      What did you hear?

24   A.      Well, I was basically told that from --

25              MR. CAHR:  Objection, Your Honor.  Calls for

Benczkowski - direct

1    hearsay.

2              MR. KELLEHER:  It is not for the truth.  It is

3    merely for what other people said.

4              THE COURT:  Don't tell us exactly what was said.

5    Just tell us what you recall generally.

6              THE WITNESS:  What I recall generally is I saw

7    the metal cassette and I thought that that was good.

8    BY MR. KELLEHER:

9    Q.    Why was that good?

10   A.    Well, because the other plastic version just seemed

11   flimsy.

12   Q.    When you say the plastic version, what do you mean?

13   A.    The original AHG version that was provided in the

14   past that you would see, such as Spirit.

15   Q.    I notice that this Broetje cassette, it has the

16   Broetje label here on the front.  Why does it have that?

17   A.    It is there to identify that it's manufactured by

18   Broetje.

19   Q.    We see some other cassettes that say F2C2 and AHG in

20   the middle.  Why does ours not say that?

21   A.    Because it's not manufactured by AHROA CT.

22   Q.    Why is ours made of metal?

23   A.    Because it is an industrial environment, it is more

24   sturdy.  These guys manhandle things.  So they have to be

25   durable.

Benczkowski - direct

1   Q.      What color tape does Broetje use to coil up the tubes

2   in its cassettes?

3   A.      Broetje uses a clear type.

4   Q.      Why not a color?

5   A.      Well, color tape is really no longer necessary.  That

6   color tape is solser (phonetic), there is a whole language

7   in this business.  The colors designate different fastener

8   diameters.  The movie you saw, you saw a model that has that

9   Fastener 5 diameter.  Dash 5 is a red.  Then there is a

10  blue, there is a green.  And if we were to put colors in our

11  cassettes for the round tubes that were just previously

12  discussed, those would be either yellow -- white or brown

13  because those are for larger diameter fasteners.  That is

14  why the tube is bigger.

15  Q.      There is a handle here on the front.  Why is there a

16  handle?

17  A.      There is a handle there so you can create it and

18  insert it into the workstation from the loading station.

19  Q.      There are not any physical counters on the front,

20  number counters on the front of the cassette.  Why not?

21  A.      We don't use it.  Just like we don't use the color

22  tape, because our systems are used in an automated system.

23  So when we load that cassette, we put all the data on that

24  clip that is on the back that tells you what the fastener

25  style is, how many are in there, where it is located.  As

Benczkowski - direct

1    the machine reads that information, it automatically

2    subtracts all the time.

3    Q.      Is this the component you are talking about here?

4    A.      On the back, the little white disk, yes.

5    Q.      Okay.  So we pointed to this a moment ago.  Why is

6    this on the inside, this escape mechanism?

7    A.      The escape is on the inside because that is where we

8    felt it was best placed and most effectively escapes the

9    ribbon.

10   Q.      And this knob here that comes off for the rivets to

11   go into the cassette, I notice it's not held by a metal

12   chain.  Why not?

13   A.      Well, the chain was always the problem.  It would

14   always break.  So that is why we had the threaded portion

15   next to it.  You screw it on, that's where it stays.  It

16   doesn't get lost.

17   Q.      I notice the bottom is metal as well.  Why is that?

18   A.      It's, again, for sturdiness.  You are an industrial

19   environment.

20   Q.      But the top is clear.  How come?

21   A.      The top is clear so that you could check to see if

22   there are fasteners in it, if you have a problem with

23   anything in that coil.

24   Q.      Is there any reason in particular besides for the

25   size and shape of the cassette?

Benczkowski - direct

1   A.    It has to be convenient to handle.  It has to be

2   carried and inserted into the machine.  The square shape

3   basically nicely packages the circular tube.

4   Q.    Okay.  How many customers have you personally told if

5   we are selling F2C2 cassettes?

6   A.    I have never told anyone we are selling F2C2

7   cassettes.

8   Q.    How many customers have asked you if we are selling

9   F2C2 cassettes?

10  A.    No customers have ever asked us if we are selling

11  F2C2 cassettes.

12  Q.    In the industry, is there any common knowledge

13  concerning this dispute that is going on here today?

14  A.    Yes.  It is known in the industry that this dispute

15  is ongoing.

16  Q.    What kind of documentation does Broetje provide to

17  its customers about the cassettes?

18  A.    We typically provide information related to where

19  it's built, what it is constructed of.

20  Q.    Will you please look to Exhibit No. 1137, DTX-1137 in

21  your book?

22  A.    Okay.

23  Q.    Could you tell us what this is?

24  A.    This is a budgetary proposal to a former buyer at --

25  Q.    I'm sorry, Mr. Benczkowski.  1137.

Benczkowski - direct

1    A.    1137.  I'm sorry.  Wrong tab.  I'm sorry.

2              Okay.  This is basically what we call the

3    delivery note.

4              MR. KELLEHER:  Your Honor, I'd like to offer

5    this into evidence.

6              MR. HOROWITZ:  No objection, Your Honor.

7              THE COURT:  It's admitted.

8              (DTX-1137 is admitted into evidence.)

9    BY MR. KELLEHER:

10   Q.    So, Mr. Benczkowski, can you explain what this is for

11   the jury?

12   A.    Yeah.  So we call it a delivery note, but most people

13   would identify it as a packing slip.  This is actually

14   telling us that it's going to Vought Aircraft.  It is --

15   Q.    And where is Vought?

16   A.    Vought is in Dallas, Texas.

17   Q.    Does this document have a date?

18   A.    Yes, it does.  It's basically 10/29/2004.

19   Q.    So that is October 2004?

20   A.    Correct.

21   Q.    And what does it say is being delivered?

22   A.    It says that seven rivet cassettes are being

23   manufactured.  They're manufactured of aluminum and plastic,

24   and the manufacturer was Broetje Automation.  The country of

25   origin was Germany, and the harmonized tariff schedule, that

Benczkowski - direct

1   is the HTS number, is as you see stated there.

2   Q.     When does the customer get this?

3   A.     When did the customer get this?

4   Q.     Yes.  When would the customer get this?

5   A.     This is what is in the packing information that goes

6   with it.  So at the time of delivery he would get this.

7   Q.     Could you please look at Exhibit PTX-387 in your

8   book?

9   A.     All right.

10  Q.     Could you tell us what this is, briefly?

11  A.     Yes.  This is basically a delivery note and this one

12  is going to Boeing.

13         MR. KELLEHER:  Your Honor, I would offer this

14  into evidence.

15         MR. HOROWITZ:  Your Honor, I should have made

16  this objection to the last one, but that horse left the

17  barn.

18         There needs to be some foundation laid with this

19  witness before you can just offer it into evidence other

20  than identifying it.

21         THE COURT:  Mr. Kelleher.

22         MR. KELLEHER:  I can ask the questions.

23         THE COURT:  All right

24  BY MR. KELLEHER:

25  Q.   Mr. Benczkowski, when Broetje ships a rivet

Benczkowski - direct

1    cassette to a customer in the United States, what kind of

2    documentation comes with it?

3    A.    Documentation just as you see here.

4    Q.    What is the purpose of the documentation?

5    A.    It is to let them know where the -- what is included

6    in the shipment, where it comes from, and what the HTS or

7    the harmonized code number is.

8    Q.    And who prepares this kind of document?

9    A.    This is prepared by our shipping department.

10   Q.    Is it prepared in the ordinary course of business?

11   A.    It is normal course of business, yes.

12   Q.    Is it the practice of this company to keep this

13   document?

14   A.    It is.

15            MR. KELLEHER:  I would offer 387 into evidence,

16   Your Honor.

17            MR. HOROWITZ:  Your Honor, I'm going to renew my

18   objection.  This is 2005, before he is at the company.  This

19   is Broetje Germany, not Broetje USA.

20            MR. KELLEHER:  Your Honor, you actually

21   overruled this objection yesterday.

22            THE COURT:  I'll overrule it again.  The

23   document is admitted.

24            (DTX-387 is admitted into evidence.)

25   BY MR. KELLEHER:

Benczkowski - direct

1    Q.    So, Mr. Benczkowski, could you tell us what is shown

2    on this document?

3    A.    Which one is this?

4    Q.    387.

5    A.    Okay.  Yes.  What is shown is that it was, this is a

6    shipment going to the Boeing Company in Macon, Georgia --

7    excuse me.  I'm sorry.  (Clearing throat.) -- basically in

8    November 10th of 2005.  And it states the fastener, four

9    fastener cassettes or rivet cassettes made of

10   aluminum/plastic, combination were manufactured by Broetje

11   in Germany.  And the harmonized code number is there.

12         It also says that it has tubing, made of

13   plastic, also supplied by Broetje in Germany and also the

14   code.

15   Q.    Mr. Benczkowski, we'll move on to the next one.

16   Could you please look at Exhibit 380?

17   A.    (Witness complies.)

18   Q.    Could you tell us briefly what this is?

19   A.    Okay.  This is a similar shipping document or

20   delivery note that is going to Spirit Aerosystems in

21   Wichita, Kansas.

22         MR. KELLEHER:  Your Honor, I would offer 380

23   into evidence.

24         MR. HOROWITZ:  No objection, Your Honor.

25         THE COURT:  It's admitted.

Benczkowski - direct

1              (DTX-380 is admitted into evidence.)

2       BY MR. KELLEHER:

3       Q.     So, Mr. Benczkowski, could you look forward, I'm

4       sorry, to page -- I'm sorry, you don't have to look forward

5       at all -- the very first item on the shipping note and tell

6       us what is shown there?

7       A.     The very first item says 10 fastener cassettes made

8       of steel.  Manufacturer Broetje, country of origin Germany.

9       Q.     What is the date on this document?

10      A.     The date of this document is 11/23/2006.

11      Q.     And which customer is this?

12      A.     This is Spirit Aerosystems in Wichita, Kansas.

13      Q.     Why don't we look at one more of these,

14      Mr. Benczkowski.  Could you look at PTX-398?  I'm sorry.

15      394.

16      A.     (Witness complies.)  Okay.

17      Q.     Could you tell us very briefly what this is?

18      A.     Yes.  This is the same shipping document for items

19      shipped to Gulfstream Aerospace in Savannah, Georgia.

20              MR. KELLEHER:  Your Honor I would offer PTX-394

21      into evidence.

22              MR. HOROWITZ:  No objection, Your Honor.

23              THE COURT:  It's admitted.

24              (PTX-394 is admitted into evidence.)

25      BY MR. KELLEHER:

Benczkowski - direct

1   Q.      So, Mr. Benczkowski, could you please explain what is

2   shown in this document?

3   A.      This was a shipment that took place in April 16th of

4   2008.  It identifies that we're shipping some upper anvils,

5   which are made of steel, which are a tool on the machine.

6   Country of origin.  It's stating we have grippers that are

7   made of steel.

8   Q.      Mr. Benczkowski, for this one, why don't we turn

9   forward to page dot 4.

10  A.      (Witness complies.)

11  Q.      And could you tell us what is the fourth item shown

12  on this page?

13  A.      It's showing that each fastener cassette, mixed

14  material from Broetje Automation, country of origin Germany,

15  were shipped to Gulfstream.

16  Q.      So we have seen shipping documents for Boeing,

17  Spirit, Vought, and Gulfstream.  Has Broetje Automation

18  sold any of its Broetje brand metal cassettes to any other

19  customers in the United States?

20  A.      No.

21  Q.      Could you please look at DTX-1136?

22  A.      (Witness complies.)

23  Q.      Very briefly, could you tell us what this is?

24  A.      Yes.  This is a proposal, a budgetary proposal to,

25  at the time it was Boeing Wichita, now it is Spirit

Benczkowski - direct

1    Aerosystems.

2    Q.     Is this the kind of document that is prepared in the

3    ordinary course of business?

4    A.     Yes, it is.

5    Q.     Is it prepared around the time around March 2005?

6    A.     Yes.

7    Q.     Who would prepare this kind of document?

8    A.     This would be prepared by our sales office in

9    Germany.

10   Q.     Would it be kept in the ordinary course of business?

11   A.     Yes, it would.

12            MR. KELLEHER:  Your Honor I would offer into

13   evidence, DTX-1136.

14            MR. HOROWITZ:  No objection.

15            THE COURT:  It's admitted.

16            (DTX-1136 is admitted into evidence.)

17   BY MR. KELLEHER:

18   Q.     So, Mr. Benczkowski, could you tell the jury what is

19   shown by this document?

20   A.     Yes.  This is basically a document that is submitted

21   for planning purposes.  So every year, our customers come to

22   us for a number of budgetary quotes so they can establish

23   their financial plans for the following year.

24   Q.     And what is shown on the second page?

25   A.     The second page is showing that we have the fastener

Benczkowski - direct

1    cassette and it is identifying the Broetje-build fastener

2    cassette.

3    Q.      What does that mean Broetje-build?

4    A.      It means it is manufactured by Broetje Automation.

5            It is also showing we have various price

6    structures and price discounts for varying quantities.

7    Q.      Mr. Benczkowski, could you turn now to Exhibit 1135?

8    And I will go slow on this one.

9    A.      (Witness complies.)

10   Q.      Could you tell us what this is?

11   A.      Yes.

12   Q.      Very briefly.

13   A.      Yes.  This is an e-mail from Laura Ballard.

14   Q.      Who is Laura Ballard?

15   A.      Laura Ballard is our spare parts engineer at Broetje

16   Automation.  She is basically the focal point for the

17   request for information and supply of quotes back out into

18   the marketplace.

19   Q.      And who is Ms. Ballard talking to in these e-mails?

20   A.      She is talking with a Mr. Dana Hamilton who at that

21   time was employed at Vought.

22   Q.      Is that part of her ordinary business

23   responsibilities to communicate with customers?

24   A.      Yes.

25   Q.      Does she make records of those communications?

Benczkowski - direct

1    A.     Yes, all records are recorded and maintained in the

2    file.

3    Q.     And does she make these records at around the time

4    indicated on the document?

5    A.     Yes.

6              MR. KELLEHER:  Your Honor, I would offer into

7    evidence DTX-1135.

8              MR. HOROWITZ:  Your Honor, I would make the same

9    objection I made yesterday morning.

10             THE COURT:  All right.  Overruled.  It is

11   admitted.

12             (DTX-1135 is admitted into evidence.)

13   BY MR. HOROWITZ:

14   Q.     So, Mr. Benczkowski, can you tell us what is shown on

15   the first page of this document?

16   A.     The first page of the document is basically the

17   e-mail that is from Laura Ballard to Dana Hamilton.  And she

18   is --

19   Q.     Who is Dana Hamilton?

20   A.     Dana Hamilton is a maintenance lead that was at

21   Vought Aircraft in Dallas, Texas.

22   Q.     Okay.  And so she is saying Hello, Dana.  Here's what

23   we have for F2C2.

24             And the contact is Dominique Hage; correct?

25   A.     Correct.

Benczkowski - direct

1   Q.      Hopefully, Dominique should be able to help you or

2   find someone who can.  Do you see that?

3   A.      Yes.

4   Q.      Why is she saying that?

5                   MR. HOROWITZ:  Objection, calls for speculation.

6                   THE COURT:  Overruled.  You can answer if you

7   know.

8                   THE WITNESS:  I can answer it.  Yes, Your Honor.

9   Thank you.

10  BY THE WITNESS:

11  A.      She is saying that because we had received a request

12  from this particular customer asking us for some spare parts

13  for an F2C2 fastener feed system.  And we, of course, do not

14  stock or store fastener feed components so we contacted

15  F2C2.  They would not sell to us so we passed on the contact

16  information to the customer, to Mr. Dominique Hage so that

17  a customer that has a rack could actually maintain his

18  equipment.

19  Q.      Could we turn to the second page?

20  A.      (Witness complies.)  The second page is blank.  The

21  third page.

22  Q.      I'm sorry.  I believe the third page.

23  A.      (Witness complies.)

24  Q.      Could you tell us what is shown here?

25  A.      Yes, this is another e-mail from a Laura Ballard to a

651

Benczkowski - direct

1  Barbara Dean who is a buyer at Spirit Aerosystems.

2  Q.    And why was this e-mail being sent?

3  A.    Well, this is being sent to inform Barbara also that

4  we have no access to the F2C2 components and that they

5  should go directly to F2C2 for those parts.

6  Q.    Could you please turn to page 5?

7  A.    (Witness complies.)

8  Q.    Could you tell us what is shown here on page 5?

9  A.    Yes.  This is also an e-mail from Laura Ballard to

10  Daniel Rinke.  Daniel Rinke was a planner on the 787 program

11  with Spirit Wichita, Kansas.

12  Q.    And why was this e-mail sent?

13  A.    It basically was to inform Daniel that we had no

14  access to the F2C2 parts.  We didn't know where any

15  distributors were, and the contact information at F2C2 AHG

16  said they could fulfill their need directly.

17  Q.    Could you turn to the last page?

18  A.    (Witness complies.)

19  Q.    What is shown here?

20  A.    This is basically the e-mail from Laura Ballard again

21  to Daniel Rinke advising him that we can't supply cassettes.

22  To go directly to F2C2.

23  Q.    Mr. Benczkowski, you can put that exhibit aside.

24        There is actually a dispute in this case about

25  how many Broetje cassettes have been sold in the United

Benczkowski - direct

1    States.  Are you familiar with any documents that have been

2    prepared to show the number of spare cassettes that have

3    been sold?

4    A.    Yes, I'm very familiar with it.

5    Q.    When I say spare cassettes, what do I mean?

6    A.    By spare cassettes, you mean those that are basically

7    supplied after the equipment is in production, not part of

8    the original equipment order.

9    Q.    Could you look at Exhibit 1887?  DTX-1887.

10   A.    Okay.

11   Q.    Do you recognize this document?

12   A.    Yes.  This is a document --

13   Q.    Let me ask, do you know how it was prepared?

14   A.    Yes, this was prepared at my direction by Laura

15   Ballard.

16   Q.    Do you know, what is this document intended to show?

17   A.    This is intended to provide the total of spare

18   cassettes that were sold in the United States.

19   Q.    And how did Ms. Ballard create this document?

20   A.    This document was created through polling of our

21   enterprise system, which we call it the AMS system.  So

22   it's how we handle our business documents.  So I'll order

23   entries.  All appeals, all shipments, all cost data is all

24   recorded into the system, and we can basically retrieve that

25   information by part number description and other means.

Benczkowski - direct

1            MR. KELLEHER:  Your Honor, I would like to offer

2    into evidence DTX-1187.

3            MR. HOROWITZ:  No objection, Your Honor.

4            THE COURT:  It's admitted.

5            (DTX-1187 is admitted into evidence.)

6    BY MR. KELLEHER:

7    Q.    So, Mr. Benczkowski, could you explain what is shown

8    on this sheet?

9    A.    Yes.  What is shown on this sheet is basically, if

10   you start in the left-hand corner, basically the first one

11   is the drawing number, and that is the unique identifier

12   for the particular cassette.  Then you have a description

13   which identifies the diameter.  How many we have sold is the

14   quantity.  UOM is the unit of measure.  The price that we

15   have before discount, because our customers based on volume,

16   is entitled to some level of discount.  Then what the total

17   price of the contract was.

18            Then we have an order number which is the order

19   number from the customer, who the customer was, the date

20   that we shipped it, and then in the blue or some of the

21   colored columns, you will see that we have the shape of the

22   actual tube.  And then, of course, our reference project

23   number as it goes over to Germany.

24   Q.    And I see there is a category called ROS.  Do you

25   know what that is?

Benczkowski - direct

1    A.      Yes, that is Return On Sales.  Okay?  And then our

2    profit.  Return on sales is the terms of the percentage

3    profit in terms of dollars.

4    Q.      And I see a ROS, and a (BAO) underneath it?

5    A.      Yes, Broetje is Broetje Automation.  We were located

6    in Omaha previously, so that is a reference.

7    Q.      So that is Broetje USA?

8    A.      That is Broetje USA.

9    Q.      And then at the end it says ROS (BAW)?

10   A.      Yes, that stands for Broetje Automation, Wiefelstede,

11   Germany.

12   Q.      There is a column that says shape.  The first one

13   says pentagonal, and there then there is five that says

14   round?

15   A.      Correct.

16   Q.      What does that mean?

17   A.      That is basically defining the interior, the ID

18   configuration of the tube in a cassette.

19              MR. KELLEHER:  Your Honor, may I approach?

20              THE COURT:  You may.

21   BY MR. KELLEHER:

22   Q.      I would like to show you what is marked as Exhibit

23   DTX-1223D.

24   A.      This is a Broetje cassette with the round tube.

25   Q.      What do you mean by a round tube?

Benczkowski - direct

1    A.     The round tube means it has no shape, no form shape

2    inside.  It's not a soft pentagon.  It's just a round tube.

3    Q.     Could you show it to the jury?

4    A.     (Indicating.)

5    Q.     There appears to be some kind of fiber or

6    reinforcement in the tubing; is that right?

7    A.     Yes.  The tube is reinforced externally so as it is

8    coiled, it won't kink.

9    Q.     Thank you.

10             THE COURT:  Mr. Kelleher, are you nearly done

11   with your examination.

12             MR. KELLEHER:  I am.  Have I offered it into

13   evidence?

14             THE COURT:  I'm not sure.  Offer it again to be

15   sure.

16             MR. KELLEHER:  Your Honor, if I could offer it

17   into evidence, DTX-1223D.

18             MR. HOROWITZ:  No objection, Your Honor.

19             THE COURT:  Okay.  It's admitted.

20             (DTX-1223D is admitted into evidence.)

21             THE COURT:  Do you have more for this witness?

22             MR. KELLEHER:  Just about two questions, Your

23   Honor.

24             THE COURT:  Okay.

25             MR. KELLEHER:  Can we go to the very bottom of

Benczkowski - direct

1    this document?

2    BY MR. KELLEHER:

3    Q.      There is a box in green here, Mr. Benczkowski.  Could

4    you tell us what this means?

5    A.      The box in green says there are a total number of

6    spare cassettes sold over this time period of 220.  And of

7    that 220, the very next slide, they're, of round shape

8    there is 132.  So that means there are basically 88 that are

9    remaining that are of our soft pentagon configuration.

10             MR. KELLEHER:   Thank you, Mr. Benczkowski.

11             I have no more questions, Your Honor.

12             THE COURT:   All right.  Thank you.  It's a good

13   time to give the jury their break this morning.  No talking

14   about the case during the break, and we'll get you back here

15   shortly.

16             (Jury left courtroom.)

17             THE COURT:   We will be in recess.

18             (Brief recess taken.)

19             *      *      *

20             (Proceedings reconvened after recess.)

21             THE COURT:   Bring the jury in.

22             (Jury returned.)

23             THE COURT:   Welcome back.

24             Mr. Horowitz, you may proceed.

25             MR. HOROWITZ:   Thank you.

Benczkowski - cross

CROSS-EXAMINATION

1

2    BY MR. HOROWITZ:

3    Q.    Good morning, Mr. Benczkowski.

4    A.    Good morning.

5    Q.    You told the jury that AHG and F2C2 are not

6    competitors of Broetje.  Correct?

7    A.    Correct.

8    Q.    But Gemcor is, is it not?

9    A.    Correct.

10   Q.    In fact, you worked at Gemcor, the main competitor to

11   Broetje, for about 20 years.  Right?

12   A.    Correct.

13   Q.    And you told the jury that working at Gemcore, that's

14   like driving I think you said a Chevrolet Cruze.  Is that

15   right?

16   A.    Correct.

17   Q.    And you said that working for Broetje is like a

18   Mercedes, a Mercedes Benz.  Right?

19   A.    Yes.

20   Q.    So you traded in your Chevy for a Mercedes when you

21   went from Gemcor to Broetje.  Right?

22   A.    That's accurate, yes.

23   Q.    When you upgraded, you said you don't use AHG-F2C2

24   cassettes.  Right?

25   A.    Correct.

658
Benczkowski - cross

1    Q.      But you got to Broetje USA -- was it 2006 or 2008?

2    A.      2006.

3    Q.      That's when Broetje USA first started.  Right?

4    A.      Correct.

5    Q.      So in 2006, the cat was out of the bag.  Right?  AHG

6    and F2C2 had parted ways.  Right?

7    A.      Yes.

8    Q.      So, of course, customers weren't requesting AHG and

9    F2C2 secrets from you because you weren't providing them at

10   that time.  Right?

11   A.      I don't think that is really the decision point.  I

12   would argue that the decision point is the reliability of

13   the equipment.  Remember, what a customer is buying from us

14   is throughput.

15   Q.      Sir, I didn't ask you for a decision point for

16   argument.  I asked you to answer my question.  Isn't it true

17   that in 2006 Broetje and F2C2 and AHG were no longer doing

18   business?  Isn't that correct?

19   A.      That's correct.

20   Q.      You were not at Broetje in 2003 when they designed

21   their cassette, were you?

22   A.      No, I wasn't.

23   Q.      In fact, that happened in Broetje Germany.  Right?

24   A.      Yes, it did.

25   Q.      You don't work for Broetje Germany.  You work Broetje

Benczkowski - cross

1    USA?

2    A.    Broetje USA is a subsidiary of Broetje Germany.

3    Q.    Very well.  You answer to the folks in Germany.

4    Right?

5    A.    Correct.

6    Q.    Even though you weren't at Broetje Germany in 2003

7    when this cassette was designed, you told the jury about the

8    reason for the size and shape of the Broetje cassette, did

9    you not?

10   A.    Yes.

11   Q.    If we could pull up JTX-14, please.  This is in

12   evidence, in fact, JTX-14.17 and 14.18.

13            Sir, you have been sitting through this trial as

14   the corporate representative.  Right?

15   A.    Correct.

16   Q.    You saw the testimony so far about these documents.

17   Right?

18   A.    Yes.

19   Q.    And you saw Mr. Peters describe that these are the

20   two documents -- well, this one slide deck and these two

21   slides from this slide deck, JTX-14.17 and 14.18, you saw

22   Dr. Peters testify that JTX-14.17 and JTX-14.18 are the

23   internal Broetje development documents where they used AHG

24   and F2C2's cassette as an example.  Correct?

25   A.    No, I don't believe he said that.  He said that they

660

Benczkowski - cross

1    were internal documents for training.

2    Q.      Isn't it true that Dr. Peters said that these were

3    the documents where they used the AHG cassette as an

4    example?

5    A.      I did not hear him say that.  I heard him say that

6    those were documents used for training.

7    Q.      You believe these are training documents?

8    A.      They are used for -- we are a provider of machine

9    tools.  And if we have subsystems of various types, whether

10   they are similar or not, there is some awareness that has to

11   be made to the various employees.  So that could be a

12   training document.  That could be an instructional document.

13   Q.      You weren't there, were you, sir?

14   A.      I was not there, sir.

15   Q.      Would you defer to the designated corporate

16   representative who was put up by your company in Germany to

17   talk about these documents?  Would you defer to him?

18   A.      I would defer to him, yes.

19   Q.      So the jury's recollection as to what he said is what

20   is said.  Right?  You would defer to Dr. Peters?

21   A.      I would defer to Dr. Peters.

22   Q.      Now, when you joined Broetje, and upgraded to the

23   Mercedes, the Mercedes has team colors, does it not?

24   Broetje has colors?

25   A.      Yes, it does.

Benczkowski - cross

1    Q.      It's got corporate colors.  Right?

2    A.      Yes, it does.

3    Q.      The corporate colors are red and black?

4    A.      Yes.

5    Q.      You showed the jury a video, a very impressive video.

6    Do you recall doing that?

7    A.      Yes.

8    Q.      And in that videotape, the corporate colors red and

9    black are pretty prominent, are they not?

10   A.      Yes.

11   Q.      If we could pull up PDTX-122, this should be a screen

12   shot.  This was done in 2012.  Right?  July of 2012.  Does

13   that sound right?

14   A.      Probably.

15   Q.      If we could go to PDTX-121.  These are the cassettes

16   in July of 2012 that were shown in the video, were they not?

17   A.      I believe so.

18   Q.      If we could go to -- Mr. Benczkowski, I am pulling up

19   the video that you showed the jury.  Correct?

20           Broetje Automation, Composed to Compete.  Do you

21   see that there?

22   A.      Yes.

23   Q.      Is that Broetje's slogan, "Composed to Compete"?

24   A.      Yes, it is.

25   Q.      And when the jury saw this, there was very emphatic

Benczkowski - cross

1    music and a hard beat.  Right?

2    A.    Yes.

3    Q.    It is a competitive company.  Right?

4    A.    Yes.

5    Q.    And you have competitive colors, red and black.

6    Right?

7    A.    Yes.

8    Q.    Let's go back to PDTX-121.  You put the company

9    colors on these cassettes in 2012.  Right?

10   A.    And earlier.

11   Q.    Not when you first came out with the cassette, did

12   you?

13   A.    I believe when we first came out with the cassette

14   that it had identification that it was Broetje --

15   Q.    It did have identification, didn't it?  Let's look at

16   JTX-3.

17              MR. HOROWITZ:  Your Honor, forgive me.

18              (Pause.)

19              MR. HOROWITZ:  I am going to use instead

20   DTX-1223B, since we can't find JTX-3.  It's absconded.

21   BY MR. HOROWITZ:

22   Q.    Mr. Benczkowski, there is no red logo, is there?

23   A.    No, there is no red on it.  But the red is

24   meaningless.  What we are selling that product to is a very

25   highly educated customer that participates with us through

Benczkowski - cross

1    the whole process and knows that in significant detail.

2            This is not on a shelf in a Wal-Mart.

3    Q.    I didn't ask you if it was on a shelf at Wal-Mart.  I

4    didn't ask you if you thought it had significance.  My

5    question simply was did Broetje put red on this logo.  Yes

6    or no?

7    A.    No.

8    Q.    But Broetje's logo -- could we go back to the screen

9    shot with the logo --

10           That is Broetje's logo.  Right?

11   A.    That's Broetje's current logo.  The logo that you

12   were showing in that previous video had the meatball on the

13   end of it and had AHG Controls.  This all changed after we

14   separated from CLAAS.

15   Q.    You are testifying that that logo changed?  Are you

16   telling this jury that when this cassette came out that

17   wasn't the company's logo, the red and black?  Is that what

18   you just said?

19   A.    What I said was this is the current logo from 2012.

20   Q.    Please pull up JTX-14 again.

21           Let's look at the first page of JTX-14.

22           Do you see the red and black?

23   A.    Yes.

24   Q.    It was red and -- that says June 23, 2003.  Correct?

25   A.    Exactly.

664

Benczkowski - cross

1   Q.      Those were the company colors.  Right?

2   A.      Those are the company colors.

3   Q.      In fact, when you were told by your company's lawyer,

4   patent lawyer, that you had to redesign the cassette because

5   of the French Court's opinion recently, this is what it

6   looks like.  Right?  I am showing you PTX-0650.  This is the

7   redesign.  Right?

8   A.      That is a redesign that has not yet been introduced

9   into the U.S. market.

10  Q.      And you would agree with me that the company's logo

11  is all over this cassette.  Right?

12  A.      It is prominent, yes.

13  Q.      It is prominent.  Right?

14  A.      Yes.

15  Q.      And the color of the cassette is actually red.

16  Right?

17  A.      It will be red, maybe.

18  Q.      And it's got a red-and-black logo.  Right?

19  A.      It has a black-and-red logo, yes.

20  Q.      That is not the same logo that was used when the

21  cassette first came out in 2004-2005, is it?

22  A.      No.  It was the logo on the other cassette.

23  Q.      No red in the logo.  Right?

24  A.      There was no red in the logo.

25  Q.      Now, you told us you have some patents yourself.

Benczkowski - cross

1    Right?

2    A.    Yes.

3    Q.    You are familiar with the concept of proprietary

4    information then.  Right?

5    A.    Yes.

6    Q.    You are familiar with the concept of intellectual

7    property.  Right?

8    A.    Yes.

9    Q.    If somebody used your invention that you have

10   patented without your permission, you would want to be

11   compensated for that, wouldn't you?

12   A.    Yes.

13   Q.    Now, Broetje, as a company, understands the

14   importance of proprietary information, too, does it not?

15   A.    Yes, it does.

16   Q.    Let's pull up, for example, JTX-8.  This is a

17   marketing presentation that you share with customers of

18   Broetje USA.  Correct?

19   A.    Yes, it is.

20   Q.    In fact, you stamp every page of this marketing page

21   with that gigantic word "Proprietary" there.  Do you see

22   that?

23   A.    Yes.

24   Q.    It says, "This drawing and all information thereon is

25   the property of Broetje Automation GMBH and is

Benczkowski - cross

1   confidential."

2           Did I read that correctly so far?

3   A.    Yes.

4   Q.    "It must not be made public or copied."

5           Did I read that correctly?

6   A.    Yes.

7   Q.    "Unless authorized by them and is subject to return

8   upon demand."

9           Correct?

10  A.    Yes.

11  Q.    That is on every single one of these pages.  Correct?

12  A.    Yes.

13  Q.    And the reason is you don't want people copying your

14  proprietary information.  Right?

15  A.    The reason for such a document is so it is not

16  distributed to competition once it's presented to a

17  customer.

18  Q.    The purpose of this proprietary sticker is to protect

19  Broetje's intellectual property from being copied.  Yes or

20  no?

21  A.    Yes.

22  Q.    If you would turn to JTX-108.10 while we have this

23  up, by the way.

24          That's an AHG and F2C2 cassette, is it not?

25  A.    Yes, it is.

Benczkowski - cross

1    Q.    In this presentation, you whited out, or somebody

2    whited out AHG F2C2, did they not?

3    A.    I can't speak to whether or not it was whited out or

4    not.

5    Q.    Well, you don't see it in the picture, do you?

6    A.    No, I don't see it in the picture.

7    Q.    So we can speak to it.  The jury can see it.  There

8    is no AHG and F2C2 in that cassette, is there?

9    A.    In that particular view, there is not.

10   Q.    It's underneath the Broetje Automation sign.  Right?

11   A.    Yes.

12   Q.    The red-and-black logo.  Yes?

13   A.    There would be various reasons for such a document.

14   Q.    I didn't ask you that, sir.  If you could answer my

15   question.  This is the Composed to Compete logo.  Right?

16   A.    No, that is not the Composed to Compete logo.

17   Q.    That is what your videotape said, is it?

18   A.    That is not the logo with Composed to Compete.

19   Q.    You talked to the jury about round tubes.  Do you

20   recall that?

21   A.    Yes.

22   Q.    And you used an exhibit I would like to pull up,

23   DTX-1887.  You focused in this exhibit on the highlighted

24   round.  Right?

25   A.    Yes.

Benczkowski - cross

1   Q.      But the rest of the exhibit has the word Pentagon on

2   it.  Right?

3   A.      Yes.

4   Q.      And there is more pentagons than there are rounds.

5   Right?  Trust me, I did it before I asked you the question.

6   A.      Well, there are more highlighted.  You have to look

7   at the quantities over on the left and multiply them.

8   Q.      You see the word pentagon, or pentagonal?

9   A.      Right.

10  Q.      That is the shape of AHG and F2C2's tube, is it not?

11  A.      I believe F2C2 and AHG's tube is a pentagon with

12  grooves down the length of that.

13  Q.      Who told you that?  Where did you get that from?

14  Have you done that research yourself?

15  A.      We looked at the actual tubes.

16  Q.      Who is "we"?  Not you.  Right?

17  A.      No.

18  Q.      You are not a technical expert, are you, sir?

19  A.      No, I am not.

20  Q.      You can't tell us whether these tubes infringe our

21  patents, can you?

22  A.      No, I can't.

23  Q.      You don't see the words Soft Pentagon here, do you?

24  A.      No.  But that is an abbreviation for an XL

25  spreadsheet in order to conserve space.

669

Benczkowski - cross

1    Q.    Now you can answer my question.  Do you see the word

2    Soft Pentagon on the sheet of paper you talked to the jury

3    about?

4    A.    I do not see the word soft.

5    Q.    Now, let's look at a couple of other documents you

6    talked to the jury about.

7              Take a look at PTX-387.1.

8    A.    Okay.

9    Q.    You told the jury that this document meant that

10   Broetje manufactured the cassettes that were sent to the

11   company in Macon, Georgia, to Boeing.  Right?  That's what

12   you told the jury?

13   A.    Yes.

14   Q.    This is dated, by the way, 10/11/2005.  Right?

15   A.    Yes.

16   Q.    It's 11.10.2005.

17              Where were you working on November 10, 2005?

18   A.    I was at Par Systems.

19   Q.    You weren't working at Broetje?

20   A.    I wasn't.

21   Q.    By the way, this only says a quantity of four

22   cassettes were sent.  Right?

23   A.    Yes.

24   Q.    You actually didn't read the word -- we can play it

25   back or I can go back to it -- but you said instead of

670

Benczkowski - cross

1    supplier for Broetje you said manufacturer.  Do you recall

2    saying that?

3    A.     On some of these documents it says manufacturer and

4    on some it says supplier.

5    Q.     That is exactly right.  Some of these say -- the

6    documents take the trouble to make the distinction, do they

7    not?

8    A.     They should.  But what's really of note here, this is

9    a document, this is a shipping document.

10   Q.     Sir, my question was, some documents say supplier and

11   some say manufacturer?

12   A.     If that's what it says, you are correct.

13   Q.     We will show the jury, because we have another one

14   that says manufacturer.  But before we do that, supplier,

15   that was Broetje's job.  Right?  When they would send out

16   AHG and F2C2 cassettes, they did that as the supplier.

17   Right?

18   A.     Yes.  We would do that as the supplier.  But more so,

19   I believe, I don't think we were very religious on whether

20   it was supplier or manufacturer because they are buying a

21   system from Broetje.

22   Q.     You weren't there in 2005.  You can't say that, can

23   you, sir, who was religious and who wasn't?  You weren't

24   there?

25   A.     I was not there in 2005, but the practice remains

Benczkowski - cross

1    unchanged.

2    Q.     Were you there in 2005?

3    A.     No, I was not there in 2005.

4    Q.     This document says supplier.  Right?

5    A.     It says supplier.  You are correct.

6    Q.     And in 2005 AHG and F2C2 cassettes were still being

7    supplied by Broetje.  Correct?

8    A.     Matter of semantics, but, yes.

9    Q.     Let's look at the semantics on the Broetje document

10   that you pointed out to the jury.  Let's look at PTX-380.

11   This is now a year later.  Right?  Now we are in November of

12   2006.

13   A.     Correct.

14   Q.     Okay.  This document doesn't say supplier, this says

15   Broetje.  This says manufacturer; right?

16   A.     Yes.

17   Q.     And by the way, it only says 10 cassettes; right?

18   A.     Yes.

19   Q.     Now, you talked to the jury about one more of these

20   documents or maybe a couple more but I want to ask you about

21   one in particular, DTX-1137.

22   A.     Okay.

23   Q.     Now, this document reflects a transaction you said

24   between Broetje in Germany, because there is no Broetje USA

25   at the time, and Vought in Dallas, Texas; correct?

Benczkowski - cross

1    A.    Yes.

2    Q.    Where were you working at this time?

3    A.    I was working at Par.

4    Q.    Okay.  So you weren't there yet?

5    A.    I was not there yet, no.

6    Q.    But you told the jury that this -- well, let's forget

7    what you told the jury.  Let's just look at the document.

8              There is a purchase order on here, is there not?

9    A.    There should be.

10   Q.    Let's look at the top corner there.

11   A.    Yes, there is.

12   Q.    Okay.  You can trace that purchase order number to

13   see when it originated, could you not?

14   A.    Yes.

15   Q.    Let's do that.  Let's go to DTX -- well, let me do

16   this.  Let me hand you ... (Pause.)  I apologize.  Okay.

17   Here it is.

18             MR. HOROWITZ:  Your Honor, the Court's

19   indulgence, I'm sorry.

20             THE COURT:  That's fine.

21             MR. HOROWITZ:  I wasn't sure I was going to do

22   this.

23             Your Honor, may I approach?

24             THE COURT:  You may.

25             (Document passed forward.)

673

Benczkowski - cross

1    BY MR. HOROWITZ:

2    Q.      Now, I have handed you DTX-1265.002.  This is the

3    date of this purchase order as March 17, 2003; correct?

4    A.      Yes.

5    Q.      Okay.  And this is, by the way --

6                MR. HOROWITZ:  Your Honor, may I publish to

7    the jury while I examine on this document?

8                THE COURT:  DTX-1265, the one you just handed

9    the witness?

10               MR. HOROWITZ:  Yes, .002.

11               THE COURT:  Is there any objection?

12               MR. KELLEHER:  No objection.

13               THE COURT:  You may publish.

14               MR. HOROWITZ:  Your Honor, I would also offer it

15   into evidence.

16               THE COURT:  Is there any objection to it?

17               MR. KELLEHER:  No objection.

18               THE COURT:  All right.  It is admitted.

19               (DTX-1265.002 is admitted into evidence.)

20   BY MR. HOROWITZ:

21   Q.      Now, this document in March of 2003 is three months

22   before June of 2003; correct?

23   A.      Yes.

24   Q.      Okay.  It's three months before the document that we

25   were talking about before we had the dispute about what Dr.

674

Benczkowski - cross

1    Peters said the document meant; correct?

2              I'll keep it simple.  March is three months

3    before June; right?

4    A.      Exactly.

5    Q.      And this is the date that this purchase order

6    originated.  Let's go to the next document.  Well, let's

7    leave it up.

8              The next document I want to show you is

9    DTX-1265.0051.

10             (Document passed forward.)

11             THE COURT:  Do you plan to offer this one as

12   well into evidence?

13             MR. HOROWITZ:  I would like to offer it, please,

14   Your Honor.

15             THE COURT:  Is there any objection?

16             MR. KELLEHER:  No objection.

17             THE COURT:  All right.  It is admitted.

18             (DTX-1265.0051 is admitted into evidence.)

19   BY MR. HOROWITZ:

20   Q.      Now, this was the same purchase order in the upper

21   corner; correct?

22   A.      Correct.

23   Q.      And, in fact, for this very same purchase order that

24   you talked to the jury about, you see the 50 cassettes that

25   were sent?  Do you see that there?

Benczkowski - cross

1    A.    Yes.

2    Q.    It says country of manufacturer France; right?

3    A.    That's what it says, yes.

4    Q.    That's where F2C2 is located, in France; correct?

5    A.    Yes, they are.

6    Q.    Okay.  And these are 50 cassettes that were sent to

7    Grand Prairie, Texas; correct?

8    A.    That is correct.  However --

9    Q.    I didn't ask you for however.  And you would agree

10   with me that this is before October of 2004; correct?

11   A.    It is before October of 2004.

12   Q.    It's before the document you showed the jury with the

13   seven cassettes; correct?

14   A.    Yes, it is.

15   Q.    Okay.  And let's go back to DTX-1137.

16   A.    I'm sorry.  What was the number again?

17   Q.    DTX-1137.  That is the one that your counsel asked

18   you about.

19   A.    Okay.

20   Q.    Now, again, this is seven cassettes where it says the

21   manufacturer is Broetje Automation; right?

22   A.    Yes.

23   Q.    And it says aluminum/plastic; correct?

24   A.    Yes.

25   Q.    That doesn't tell you exactly how it's formed; right?

Benczkowski - cross

1    Aluminum/plastic.  They're all made of aluminum/plastic;

2    right?

3    A.    What that is, that document is a shipping document.

4    It is telling you according to the requirements of the

5    harmonized tariff schedule that that is the information you

6    require on a document to get it into the country.

7              There are meetings.  We are involved with the

8    customer much before this product shipped.  He knows exactly

9    what he is getting.

10   Q.    Sir, you weren't there, were you?

11   A.    I was not there but the rules haven't changed.

12   Q.    You weren't there, were you?

13   A.    I was not there, no.

14   Q.    And to be clear, the document that we just went over,

15   that I showed you, that your lawyer didn't show you when

16   this sale originated, when cassettes were first sent to

17   Texas, it was 50 AHG and F2C2 cassettes that were sent;

18   correct?

19   A.    I believe that what is on this document is a

20   typographical error because previously, prior to this award,

21   what was the first customer to get the Broetje cassette?  So

22   I would assume this to be a typographical error because they

23   were accustomed to putting France down as the country of

24   origin for this document.

25   Q.    Let's put back up DTX-1265.  I just want to make sure

Benczkowski - redirect

1    I'm getting this.

2    A.    Um-hmm.

3    Q.    Country of manufacturer, France; right?

4    A.    Yes.

5    Q.    Okay.  50 cassettes; right?

6    A.    Yes.

7    Q.    Okay.  You weren't there; right?

8    A.    I was not there.

9    Q.    You didn't type the document?

10   A.    I did not type the document.

11   Q.    You don't know who typed the document?

12   A.    I do not know who typed the document.

13   Q.    But you know it says country of manufacturer, France;

14   correct?

15   A.    Yes, I know that.

16   Q.    And AHG and F2C2 is located in France; correct?

17   A.    Correct.

18   Q.    And Broetje is located in Germany; correct?

19   A.    They're located in Germany.

20            MR. HOROWITZ:  No further questions, Your Honor.

21            THE COURT:  Okay.  Redirect.

22                    REDIRECT EXAMINATION

23   BY MR. KELLEHER:

24   Q.    Mr. Benczkowski, so the project number for this

25   Vought project was 1588?

Benczkowski - redirect

1    A.      Correct.

2    Q.      Do you recognize that number?

3    A.      Yes, I do.

4    Q.      Have you ever seen the machine that this project

5    refers to?

6    A.      Yes, I have.

7    Q.      Where?

8    A.      At Vought.  Dallas, Texas.

9    Q.      Have you seen the cassettes used with that machine?

10   A.      Yes, I saw the cassettes on the machine while I was

11   working at Par.

12   Q.      And approximately how much cassettes are there for

13   that machine?

14   A.      48 that fit on one machine, and there is another

15   machine right next to it that has another 16.

16   Q.      Are there any labels or company logos on that

17   cassettes?

18   A.      The Broetje logo is on those cassettes.

19   Q.      Is the F2C2 or AHG logo on any of them?

20   A.      No.

21   Q.      This is JTX-14 that was being looked at a moment ago.

22   And, Mr. Benczkowski, I'm going to hold up -- this is JTX-3

23   that we were looking at earlier.

24           Your Honor, can I approach the witness?  I

25   promise to be very careful when I walk up.

Benczkowski - redirect

1                THE COURT:  I imagine.

2   BY MR. KELLEHER:

3   Q.    Mr. Benczkowski, is this the same logo that is shown

4   on the screen here?

5   A.    Yes, it is, except in black and white.

6   Q.    What is that third letter?

7   A.    It's an O with an umma over it which we have

8   transferred to the B-r-o-e-t-j-e, which is the English

9   translation since there is not an umma on an American

10  keyboard.

11  Q.    When you said the 2012 logo was different, what do

12  you mean?

13  A.    The 2012 logo is different in that we have changed

14  the name to B-r-o-e-t-j-e, and we have also eliminated or

15  removed what I call, what I call a meatball at the end of

16  the logo.

17  Q.    And is that what is shown here on PTX-650?

18  A.    That is our current logo.

19                MR. KELLEHER:  Nothing further, Your Honor.

20                THE COURT:  Okay.  Thank you.  Mr. Benczkowski,

21  you may step down.

22                Defendants may call their next witness.

23                MR. KELLEHER:  Your Honor, I would called to the

24  stand Mr. Holger Maylander.

25                THE COURT:  Okay.  Is this an interpreter we

Maylander - direct

1      have with Mr. Maylander?

2              MR. KELLEHER:  That's correct, Your Honor.  He

3      is going to attempt to do as much in English as possible,

4      but she is there for his convenience and need.

5              THE COURT:  All right.  Let's swear in the

6      interpreter first as we did previously.

7                  (Interpreter Lilly Olm placed under oath.)

8              ... HOLGER MAYLANDER having been first duly

9      sworn, was examined and testified as follows ...

10             THE COURT:  Good morning, Mr. Maylander.

11     Welcome.

12             THE WITNESS:  Good morning.

13             MR. KELLEHER:  May I approach?

14             THE COURT:  You may approach, yes.

15                  (Binders passed forward.)

16                     DIRECT EXAMINATION

17     BY MR. KELLEHER:

18     Q.    Mr. Maylander, could you please introduce yourself to

19     the jury.

20     A.    My name is Holger Maylander.

21     Q.    Where do you work?

22     A.    I work for Broetje Automation in Germany.

23     Q.    Where do you live?

24     A.    Also in Germany in the Northwest.

25     Q.    How long have you worked at Broetje?

Maylander - direct

1   A.      I work for Broetje since 1991.

2   Q.      What is your current job title?

3   A.      My current job title is an Executive Vice President

4   for Sales and Marketing.

5   Q.      Mr. Maylander, could you pull your microphone a

6   little bit closer to yourself?

7   A.      (Witness complies.)

8           THE COURT:   Thank you.

9   BY MR. KELLEHER:

10  Q.      What have been your job titles over the years at

11  Broetje Automation?

12  A.      I started as a Project Manager for Sales and

13  Marketing -- for Sales.  Sorry.  Then I became Director of

14  Sales and Marketing to finally Executive Vice President.

15  Q.      Could you tell us about your education?

16  A.      I graduated from a university in the military,

17  University of Munich as an engineer for aerospace

18  technology.

19  Q.      So have you ever had occasion to work with AHG or

20  F2C2?

21  A.      Yes.

22  Q.      When was the first time?

23  A.      That was my very first project in 1991.

24  Q.      And who was the customer?

25  A.      The customer was British Aerospace and a company in

Maylander - direct

1    England.

2    Q.      Are they sometimes called BAE?

3    A.      Yes, that is the abbreviation.

4    Q.      What was your role?

5    A.      My role was project manager.

6    Q.      Was AHG involved?

7    A.      AHG was involved.

8    Q.      What was their role?

9    A.      Their role was to be a supplier to us.

10   Q.      For what component?

11   A.      For a single cassette.

12   Q.      Could you repeat that?  I'm sorry.

13   A.      For a single cassette.

14   Q.      Just one cassette?

15   A.      Just, as far as I know, yes, it was just one

16   cassette.

17   Q.      Okay.  Any racks or loading stations?

18   A.      No.  The single rack was in a kind of housing which

19   took over more or less function of a rack.

20   Q.      Do you remember what the cassette looked like?

21   A.      No.  It was directly shipped to England to the

22   customer.  It was a military project.  It was very secret,

23   so we just delivered it from AHG directly to England.

24   Q.      When did you next work with AHG or F2C2?

25   A.      It was in 1994.

683

Maylander - direct

1    Q.      On what project was that?

2    A.      That was a project here in the United States.  It was

3    Boeing in Wichita, Kansas.

4    Q.      Do you remember the project number or numbers that

5    were used for that?

6    A.      Yes, it was 1501 and 1502.

7    Q.      How did it come to happen that you were working again

8    with AHG?

9    A.      Our general manager at that time, Mr. Holtmeier, he

10   asked me to try the product from AHG for this project, which

11   were two big riveting machines.

12   Q.      And what did you do then?

13   A.      I personally contacted AHG and asked for a quotation.

14   Q.      Could you turn to Page 116 -- Exhibit 116 in your

15   binder.

16   A.      Yes.

17   Q.      That was the wrong one.

18           Could you turn to 119?

19   A.      Yes.

20   Q.      Could you tell us very briefly what is 119?

21   A.      119 is a fax where I ask for a quotation to AHG, to

22   Mr. Bornes.

23           MR. KELLEHER:  I believe this is already in

24   evidence.

25           MR. LINDVALL:  No objection if it is not.

Maylander - direct

1        THE COURT:  It is admitted, or already admitted.

2    BY MR. KELLEHER:

3    Q.      Paragraph 4 says Will your rack provide an electrical

4    signal about the quantity of rivets available and/or left in

5    one cassette?  Do you see that?

6    A.      Yes.

7    Q.      What were you asking there?

8    A.      This was a kind of light barrier we were asking for

9    to make sure we had information in our system if a single

10   rivet was selected and passed a certain position.

11   Q.      What was AHG's response to that?

12   A.      They integrated that in the system.

13   Q.      Could you please turn to Exhibit PTX-188?

14        MR. KELLEHER:  Your Honor, I believe this is

15   also in evidence already.

16        THE COURT:  Any objection to PTX-188?

17        MR. LINDVALL:  Either way.

18        THE COURT:  All right.  It is admitted.

19   BY MR. KELLEHER:

20   Q.      Could you look to the second page, Mr. Maylander.  I

21   know this is a difficult copy to read.  This is the only one

22   that the plaintiffs have been able to find.  Could you look

23   at Paragraph No. 6?

24   A.      Yes.

25   Q.      It says, "Is there any fix assignment of the

Maylander - direct

1    cassettes to the rack places or is it possible to code the

2    cassettes so that the control of the system can identify

3    which cassettes are placed at which position in the rack?"

4                Do you see that?

5    A.    Yes.

6    Q.    What is this talking about?

7    A.    This is talking about the kind of coding system for

8    each cassette, which allows our machine control system to

9    know what is in this cassette, what kind of information

10   about the fasteners, quantity of fasteners, type fasteners.

11   Q.    What did AHG do in response to this?

12   A.    They found a solution to integrate this code system

13   into the cassette.

14   Q.    What was that solution?

15   A.    That was a design I think in the back side of the

16   cassette to integrate the code right there.

17   Q.    Do you know if AHG or F2C2 still uses that idea?

18   A.    Yes.

19   Q.    Were there any other ideas that Broetje had for this

20   purchase in 1994?

21   A.    Not specifically that I can remember.

22   Q.    Could you please look at Exhibit 151.

23              THE COURT:  PTX-151.  Correct?

24              MR. KELLEHER:  Correct, Your Honor.

25   BY MR. KELLEHER:

Maylander - direct

1    Q.      Mr. Maylander, do you recognize this document?

2    A.      Yes.

3    Q.      Could you tell us what it is?

4    A.      It is a kind of advertising page from the F2C2 system

5    about our machine and a rack system from AHG.

6              MR. KELLEHER:  Your Honor, I would move the

7    admission into evidence of PTX-151.

8              MR. LINDVALL:  No objection.

9              THE COURT:  It is admitted.

10             (Exhibit PTX-151 received in evidence.)

11   BY MR. KELLEHER:

12   Q.      What is that large contraption there in the middle,

13   Mr. Maylander?

14   A.      That is the frame on our machine, carrying a fuselage

15   panel of an aircraft.

16   Q.      And the lower portion, there is another photograph.

17   Do you see that?

18   A.      Yes.

19   Q.      What is that?

20   A.      That is the rack system from AHG, including

21   cassettes, and two columns of racks.

22   Q.      Do you know for which project this particular rack

23   is?

24   A.      I don't know for which particular project it is.  It

25   is definitely not for the machine shown in the background.

687

Maylander - direct

1    Q.      Why do you say that?

2    A.      Because it has three columns instead of two.

3    Q.      The cassettes that AHG delivered for the Boeing

4    Wichita project, what material were they made out of?

5    A.      They were basically made on the sides of plastic.

6    Q.      And are those the ones that were ultimately delivered

7    to Wichita?

8    A.      Yes.

9    Q.      Were there any problems with this particular project?

10   A.      Yes.  We had several, numerous issues with the

11   system, which had to be straightened out.

12   Q.      Could you tell us what those were?

13   A.      This was, the first one, inside the cassettes, there

14   is a separator, where we had the problems that the single

15   fastener which had separated has been stuck in the

16   separator, as well as the part which comes afterwards inside

17   the rack, which was at that time a rotator block.

18   Q.      Could you explain what the rotator is?

19   A.      A rotator is a kind of mechanical device, with a

20   channel in between.  This channel is in the direction of the

21   output of the cassette, which we call separator, so when a

22   rivet is selected, it is pushed by pressurized air into this

23   rotator block, so out of the cassette into this rotator

24   block.  Then the rotator block turns 90 degrees, and lets

25   the fastener fall down to the bottom of the rack.

Maylander - direct

1          And behind each of the cassettes, there is this

2     rotator device.  So when we have a rack of 12 cassettes, you

3     have behind each cassette in the rack a rotator.  And if

4     you, for example, have a cassette selected for a fastener in

5     the upper portion, you can imagine when all 12 rotators have

6     to be aligned that the fastener can fall down to the bottom.

7     From there, there is pressurized air to be shot into the

8     riveter machine head.  This alignment is extremely important

9     and we had tremendous problems to get this alignment solved.

10    Q.     I am going ask you to look at JTX-27.

11           Do you know what this document is?

12    A.     Yes.  This is a document from AHG about a former

13    cassette feeder system.

14           MR. KELLEHER:  Your Honor, I would offer into

15    evidence JTX-27.

16           MR. LINDVALL:  No objection.

17           THE COURT:  It's admitted.

18           (JTX-27 received in evidence.)

19    BY MR. KELLEHER:

20    Q.     Is there a photograph here of the AHG system on the

21    front page?

22    A.     Yes.

23    Q.     That is circled?

24    A.     That is circled.  It is the former version, yes.

25    Q.     Why don't we turn to the third page of this.  Does

689

Maylander - direct

1    this have anything to do with the rotator system you were

2    talking about a moment ago?

3    A.      Yes.

4    Q.      Could you explain how?

5    A.      Yes.  This is a kind of step-by-step description how

6    it operates.  On the left upper figure, the Step 0, just

7    called the waiting point, the upper portion is the rotator

8    and separator picture of a cassette.  From the right-hand

9    side you see the tube with the fasteners in a row, and the

10   little black bars vertically orientated are showing the

11   microactuator phase, and the last one is holding the last

12   fastener on its head.

13   Q.      What happens after this?

14   A.      It happens after this Step 1 that the spindle

15   fastener gets into the regulator.

16   Q.      Is that shown in Step 2?

17   A.      Step 1.  The next step the regulator rotates by 90

18   degrees.

19            So you can see, the fastener can go into the

20   rotator.  And the next step is then, this is to the left,

21   the fastener is now in.  Now the regulator can rotate so

22   that the channel is closed.  So it can fall down to the

23   bottom, as shown here.

24   Q.      Were there difficulties with this system?

25   A.      Yes.  Because these are 12 systems on top of each

690

Maylander - direct

1    other, they had to be straightly aligned, so that the very

2    sharp edges of the fastener head are not sticking there on

3    the edges of these rotators.  So there were a lot of

4    problems with the alignment.

5    Q.    How well did these rotators work at Wichita?

6    A.    I can't say how much, but we had almost every week an

7    issue with it is.  There was a special, let me say,

8    mechanical maintenance person assigned just to fix the

9    problem with the rotators, and he got a nickname.  They

10   called him "The Rotator Man."

11   Q.    Was there any solution for this problem?

12   A.    By the time, being as it was more or less no longer

13   acceptable, we proposed to use another mechanical situation.

14   Q.    What was that?

15   A.    That was a sled system.

16   Q.    Would you tell us what a sled means?

17   A.    A sled is, let me say, comparable to an elevator.  In

18   our alternative system to the cassette system, we call it a

19   hopper system, we had this kind of sled.  So that there is a

20   device moving to the single position of the cassette in the

21   rack, and accepting the fastener which has been requested.

22   Then it is moving very fast in the background of the rack.

23   Q.    Do you know whether AHG adopted this idea of a sled?

24   A.    Yes, they did.

25   Q.    Do you know if they still use it today?

Maylander - direct

1    A.    I think so, yes.

2    Q.    After this Wichita project, did Broetje continue

3    working with AHG?

4    A.    Yes.

5    Q.    Did there come a time when Broetje began working with

6    F2C2?

7    A.    Can you ask that again?

8    Q.    Yes.  Did there come a time when Broetje began to

9    hear the name F2C2?

10   A.    F2C2, yes, sorry.  About the beginning of 2000, 2001.

11   Q.    Can you explain the change?

12   A.    Mr. Bornes informed me that they had set up a known

13   company as a daughter company to AHG just to do the business

14   we were in, cassettes, racks, and load installations.

15   Q.    During the early 2000s, did Broetje work with F2C2 as

16   a supplier for these machines?

17   A.    Yes.

18   Q.    Were there any difficulties during that period?

19   A.    Yes.  We had constantly these technical problems to

20   fix.

21   Q.    What kind of technical problems?

22   A.    This was, for example, the, let me say, the

23   workmanship was always requesting us to make fixes.  And

24   most of the time we asked AHG or F2C2, in particular, Mr.

25   Bornes, to come and do the fixes either in our house before

Maylander - direct

1   we delivered this to our customer or sometimes also at the

2   customer site.

3   Q.      Were they able to respond satisfactorily?

4   A.      Yes, they always did that.

5   Q.      Did there come a time when their responses were no

6   longer acceptable?

7   A.      Yes.  There were certain times, depending on the

8   amount of work to be done -- because, in our kind of

9   business, we very often have waves of business coming, very

10  high.  And sometimes low.  In these periods where we had

11  very high business situations, the small group of people had

12  tremendous problems to deliver in time and also to solve the

13  technical problems on top of them.

14  Q.      Was there any way that these technical problems were

15  communicated to F2C2?

16  A.      Yes.

17  Q.      How?

18  A.      We have assigned a special person in our house, Mr.

19  Lutz Neugebauer, to communicate and be the interface to AHG

20  and F2C2.  And he wrote always a kind of followup report.

21  Q.      Do you know if Mr. Neugebauer is here in Wilmington,

22  Delaware here today?

23  A.      Yes, he is.

24          MR. KELLEHER:  We will be hearing from him next,

25  Your Honor.

Maylander - direct

1    BY MR. KELLEHER:

2    Q.    You mentioned timing of delivery problems.  How was

3    Broetje's reaction to that communicated to F2C2?

4    A.    Of course, we were always in very close communication

5    with F2C2 at that time, and asked them to respond to us or

6    to come to face-to-face meetings.

7    Q.    Could you please look in your exhibit book to

8    DTX-1460?

9    A.    (Witness complies.)

10   Q.    What is this?

11   A.    This is a letter from me writing to Mr. Bornes that

12   we --

13   Q.    One second.  This is an e-mail from you to

14   Mr. Bornes.  Do you know the date?

15   A.    The date was November the 7th of 2002.

16         MR. KELLEHER:  Your Honor, I would offer into

17   evidence DTX-1460, if it is not already in.

18              MR. LINDVALL:  No objection.

19              THE COURT:  It's admitted or readmitted.

20              (DTX-1460 is admitted into evidence.)

21   BY MR. KELLEHER:

22   Q.    So, Mr. Maylander, what are you saying here?

23   A.    So I'm actually explaining my concern about the

24   upcoming deliveries.  These are numerous rack, cassettes,

25   and loading stations.  And we learn from our customer the

Maylander - direct

1    word "bottleneck."  Boeing in Wichita, Kansas.  They used

2    this also to remind us that we are having tremendous amount

3    of machines coming inline and they want to make sure that

4    everything is on time.

5    Q.    And do you request a meeting here?

6    A.    Yes.

7    Q.    Did that meeting ever occur?

8    A.    Yes.

9    Q.    Did the problems resolve?

10   A.    We found a solution, but it was always, let me say,

11   delay in the deliveries at that time.  And we had to

12   combinate it with our work.

13   Q.    What did you mean by that?

14   A.    That means we had to rearrange schedules and explain

15   and ship the equipment afterwards.

16   Q.    Did there come a time when Broetje learned they were

17   not F2C2's only customer?

18   A.    Yes.

19   Q.    Could you please explain?

20   A.    I got information from Mr. Bornes, that he formed me

21   that they are also going to work together with our

22   competitor, Gemcor.

23   Q.    When was that?

24   A.    I think that was in 2002.

25   Q.    And how did you react?

Maylander - direct

1   A.      Our reaction was extremely disappointing.

2   Q.      Mr. Maylander, you said disappointing?  Is that what

3   you intended to say?

4   A.      Sorry.  Probably my English.  It was an emotional

5   situation.  You worked for so long time, and we also helped

6   AHG to make a very professional system out of their cassette

7   system.  We spent a lot of money and time on that, and you

8   hear that they are also using this system at our most

9   important competitor, and this was like feeling divorced

10  from the partner.

11  Q.      Why did F2C2 say they were doing this?

12  A.      Of course, I asked the question, and the answer was

13  that they said that in certain areas of time, it is not

14  enough business for them to do with Broetje.

15  Q.      Could you look at JTX-66?

16          MR. KELLEHER:  I believe this is already in

17  evidence.

18          THE COURT:  No objection?

19          MR. LINDVALL:  No objection.

20          THE COURT:  Okay.

21          (JTX-66 is admitted into evidence.)

22  BY MR. KELLEHER:

23  Q.      Mr. Maylander, what is this?

24  A.      Yes.  This is my e-mail from 18th of June, 2002 where

25  I gave the feedback that I talked to our general manager

Maylander - direct

1    Mr. Holtmeier and expressed our situation that we were very

2    disappointed and unhappy about that behavior.

3    Q.      And it says, because our both companies have

4    developed an ARS with a lot of cost on both sides.

5                    Do you see that?

6    A.      Yes.

7    Q.      What do you mean that?

8    A.      The ARS system is the name for the automated riveting

9    system.  We gave them different names, but in principle,

10   that is the rack system, cassette system.

11   Q.      And when you say both companies have developed an ARS

12   with a lot of cost on both side, what did you mean by that

13   part?

14   A.      So we helped AHG over the time to make a professional

15   system out of it.  When you have a machine like our

16   machines, our customers expecting from us a very high

17   availability of the system.  If not, they ask for penalties.

18   So we have spent a lot of money and time to support AHG to

19   bring it to a certain level.

20   Q.      And then it goes on in the next sentence to say:  Now

21   you are deal with our main competitor Gemcor and with this

22   deal Gemcor gets all the experience we have paid for.

23                   What do you mean by that?

24   A.      That means that we have spent the money to help AHG

25   developing this, status of this level of system, ARS system.

Maylander - direct

1    And all this as a result will be given to Gemcor.

2    Q.    So then you have another sentence here:  You may

3    think about the additional cost for Gemcor to split with us

4    in order to compensate also our part of development.

5                Do you see that?

6    A.    Yes.

7    Q.    What did you mean by that?

8    A.    That was a discussion I had with Mr. Bornes, and he

9    offered the compensation as a possibility to us in the form

10   of giving Gemcor a higher price and sharing some money with

11   us.

12   Q.    Did that ever happen?

13   A.    No.

14   Q.    Did you ever have any face-to-face discussions with

15   Mr. Bornes about this?

16   A.    Yeah, there were several discussions, and the final

17   face-to-face feet meeting we had in 2004 at SAE conference

18   in St. Louis.  St. Louie.

19   Q.    Was there any discussion during that big meeting in

20   2004 about compensation?

21   A.    We only had one phone conference call there.

22   Q.    When was the decision made to stop using F2C2 as a

23   supplier of the rivet feed system?

24   A.    I think it was some time in 2003.

25   Q.    So who made that decision?

Maylander - direct

1    A.      Our general manager at the time, Mr. Holtmeier.

2    Q.      Why was that decision made?

3    A.      The decision was made basically on two reasons.  One

4    reason is that we have been under such a pressure from our

5    customer, especially Boeing in Wichita, Kansas that they

6    expected from us to deliver a system which is professionally

7    robust and solid for the process.  They expect it from us.

8            The second is, of course, that we felt so

9    disappointed by the decision of AHG to go to our competitor,

10   Gemcor.

11   Q.      So when the decision was made to build a Broetje

12   system, how similar did Broetje want the cassette to be

13   F2C2's cassette?

14   A.      Similar is very much depending on the functionality

15   from my point of view.  So one request from our customers

16   was that they said we expect from you a system which is

17   still interchangeable with the old existing racks.

18   Q.      Were there any changes to be made?

19   A.      Of course, there were several changes.  One of the

20   changes were that we made the sides basically out of metal,

21   to make them more robust for the process.  Another one was,

22   we put our label on, clearly saying Broetje Automation.

23   Q.      During the phase of when the Broetje product was

24   being developed, was any thinking given to the issue of

25   patents that might be out there?

Maylander - direct

1    A.    Yes, of course.  Because we were aware that patents

2    were existing from AHG.  So we involved at that time the

3    patent lawyer from our owner.

4    Q.    And when you say "owner," who is that?

5    A.    That is the CLAAS company at that time.

6    Q.    I'm sorry.  Who was the person that got involved?

7    A.    The person was Dr. Steffen Budach.

8    Q.    And I'll ask you were you personally involved after

9    that with Dr. Budach?

10   A.    No.

11              MR. KELLEHER:  Your Honor, I have no further

12   questions at this time.

13              THE COURT:  Thank you.  I assume cross will be

14   more than five minutes; is that correct?

15              MR. LINDVALL:  Yes, Your Honor.

16              THE COURT:  Then we'll let the jurors have their

17   lawn.  No talking about the case during the break, and we'll

18   get you back during this afternoon.

19              (Jury left courtroom.)

20              THE COURT:  All right.  We will be in recess.

21              (Brief recess taken.)

22              *      *      *

23              Afternoon session - 12:45 p.m.

24              THE COURT:  Bring the jury in.

25              At the next break I will give you a chance to

Maylander - cross

1    make your argument on the motion.

2                    (Jury returned.)

3                    THE COURT:  Welcome back.  Your lunch smelled

4    very good.  I hope it tasted as good as it smelled.

5                    We are ready to proceed.  Mr. Lindvall.

6                    MR. LINDVALL:  Thank you, Your Honor.

7                              CROSS-EXAMINATION

8    BY MR. LINDVALL:

9    Q.       Good afternoon, Mr. Maylander.

10   A.       Good afternoon.

11   Q.       The way I understand your testimony is that you have

12   had a relationship or been dealing with AHG or F2C2 from

13   approximately 1991 to 2005.  Does that sound about right?

14   A.       Yes.

15   Q.       Approximately 14 years.  Correct?

16   A.       Correct.

17   Q.       Now, during this 14-year period, you had been dealing

18   with AHG and F2C2 relating to their cassette-based rivet

19   feeding system.  Correct?

20   A.       We had been dealing with that system, yes.

21   Q.       Now, you testified earlier that Mr. Bornes told you

22   that AHG was going to start doing business with Gemcor.

23   Correct?

24   A.       I can't remember exactly his wording.  He informed me

25   about that they are dealing or already in contact about

Maylander - cross

1    that.

2    Q.      Okay.  Let's look at JTX-66, please.

3            This is the e-mail you were shown during your

4    direct examination.  Correct?

5    A.      That's correct.

6    Q.      And in this e-mail, you state that -- you mention in

7    here or indicate that Mr. Bornes had told you that AHG is

8    going to start doing business with Gemcor.  Correct?

9    A.      I have made reference that I informed him about

10   activities with Gemcor.

11   Q.      And you agree that means that you knew from Mr.

12   Bornes that AHG was going to start selling to Gemcor.

13   Correct?

14   A.      No, not selling.  I can't say that.  I just got the

15   information about activities.  That could mean selling or

16   dealing or exchanging quotations.

17   Q.      What about right here?  It says, "You may think about

18   the additional cost for Gemcor to split with us in order to

19   compensate also part of our development."

20           Is that talking about selling to Gemcor?

21   A.      That's not talking about selling to Gemcor.  It is

22   just if they do that, to compensate.

23   Q.      It is your testimony that Mr. Bornes here just said,

24   oh, I am just talking to Gemcor, I don't have any plans to

25   sell to Gemcor?  Is that correct?  Is that what your

Maylander - cross

1   testimony is?

2   A.     I can't say that he sold it.  His wording was, as far

3   as I remember, that they had activities to exchange and that

4   he informed me about that they are going also to Gemcor.  My

5   interpretation is that they are selling their equipment.

6   Q.     Okay.  So you interpreted Mr. Bornes' conversation

7   with you that they were going -- that AHG was going to sell

8   to Gemcor.  Correct?

9   A.     Which has been proven later on that they did, yes.

10  Q.     That wasn't my question.  Please listen to my

11  question.  Your counsel here can ask you questions in

12  followup later on.

13          My question is, you understood Mr. Bornes'

14  conversation with you that Mr. Bornes said that AHG was

15  going to start doing or start selling or some type of

16  business activity with Gemcor.  Correct?

17  A.     Correct.

18  Q.     And as a result of that conversation in which Mr.

19  Bornes actually told you that, Mr. Holtmeier was extremely

20  disappointed and unhappy.  Correct?

21  A.     Mr. Holtmeier was extremely unhappy, yes.

22  Q.     And Mr. Holtmeier was the general manager of Broetje.

23  Correct?

24  A.     Mr. Holtmeier was at that time the general manager.

25  Q.     For the jury's edification, general manager means he

Maylander - cross

1   was at the top, he was at the top of Broetje.  Correct?

2   A.    He was responsible for the business of the company.

3   Q.    He is like the CEO in the United States.  Correct?

4   A.    We don't use that in Germany.

5   Q.    I understand.  But there was no one above Mr.

6   Holtmeier at this particular time.  Correct?

7   A.    No.

8   Q.    Mr. Bornes here, he didn't have any obligation to

9   tell you he was going to start having activities with

10  Gemcor.  Correct?

11              I will rephrase the question.

12              Mr. Bornes did not have an obligation to tell

13  you, We are going to start selling our cassette-based

14  systems to Gemcor.  Correct?

15  A.    From a point of view of the -- of a very good

16  partnership we told at that time or before that time, I

17  would call it a certain obligation.

18  Q.    Yes.  So Mr. Bornes recognized that partnership and

19  that good faith that should enter into that kind of

20  situation.  Correct?

21  A.    He took that information as a kind of obligation,

22  from what I understand, yes.

23  Q.    Okay.  I believe you testified that -- well, you

24  understand that AHG didn't find out about the Broetje

25  cassette-based system that they had developed on their own

Maylander - cross

1    until it was discovered by them in Germany in 2005.

2    Correct?

3    A.    I was not part of that.

4    Q.    But you never told Mr. Bornes that we are going to

5    develop our own cassette and we are not going to use you

6    anymore.  Correct?

7    A.    I was not involved with him anymore at that time.

8    Q.    All I am trying to say, Mr. Bornes, he understood the

9    good-faith partnership you had, Broetje, though, never

10   indicated to AHG back and said, you know what, we have had

11   all these problems, you are dealing with Gemcor, we are not

12   going to deal you anymore, good luck you guys, we are going

13   to develop our own cassette?  They went behind the back and

14   went and developed their own cassette without telling AHG.

15   AHG had to discover that on their own.  Correct?

16   A.    I can't agree on that.  I personally did not.  But I

17   can't speak for the company.

18   Q.    I understand.  You speak for yourself.

19         Let's turn to PTX-358T, please.  If we could

20   turn to Page 10 of 358T.

21         You were involved with AHG in 1994.  Correct?

22   A.    I was involved, yes.

23   Q.    You know that AHG and Broetje entered into an

24   agreement in approximately 1994.  Correct?

25   A.    No.  I was not involved in that agreement.

Maylander - cross

1   Q.     So you never knew that there was a contract between

2   AHG and Broetje?

3   A.     I was involved that Mr. Holtmeier informed me that I

4   should be in contact with AHG to try their system for our

5   project.  But not on the contract.

6   Q.     So there is 14 years of you dealing with AHG, you

7   never knew there was a contract between AHG --

8   A.     There was no contract is what I am referring to.

9   Q.     Let's look at this document.  That is Mr. Holtmeier's

10  signature?

11  A.     Yes.

12  Q.     He is the one who heads up Broetje at this time.

13  Correct?

14  A.     Yes.

15  Q.     And he says, "With signing the contract, please let

16  us have more detailed technical information as well as a

17  reference visit to Dassault."

18         Do you see that?

19  A.     Yes.

20  Q.     Let's turn to the next page.

21         Do you recognize Mr. Holtmeier's signature on

22  the contract here?

23  A.     Yes, that is his signature.

24  Q.     Contract as fax'd.  Do you see that?  "Accepted"?

25         Do you see the word accepted?

Maylander - cross

1   A.      I see that, yes.

2   Q.      Let's turn to Page 13, please.  You understand that

3   AHG was perfectly within their bounds in your partnership,

4   as you have described it, to sell to anyone else anywhere in

5   the world except for in Germany.  Correct?  You understood

6   that?

7   A.      I understand that.

8   Q.      So AHG was perfectly within their bounds to sell to

9   Gemcor, who was located in the United States.  Correct?

10  A.      That's what I understand, yes.

11  Q.      Now, if we turn to Page 13, please.

12              If we look at the bottom part here.  You see

13  here that Broetje, it says, This is an agreement that Mr.

14  Holtmeier has made with AHG.  Broetje agrees to promote the

15  sales of AHG feed systems in the most loyal, serious and

16  efficient way possible."

17              Do you see that language?

18  A.      Yes.

19  Q.      Kind of like the loyalty Mr. Bornes felt when he told

20  you that we are going to start looking at Gemcor now.  He

21  felt obligated because that was part of the good-faith

22  partnership.  Correct?

23  A.      I don't understand the question.

24  Q.      We will move on.  We will talk about it a little bit

25  more.

Maylander - cross

1              If we go to Page 14, please, in Article 4, the

2       first paragraph.  This is another obligation that Broetje

3       agreed to in this contract between AHG, it says, "The dealer

4       Broetje agrees not to sell, directly or indirectly, feed

5       systems with identical or similar tubes to those under this

6       contract and likely to compete with them, i.e., using the

7       tube and box principle."

8              We have testimony earlier indicating a box is a

9       cassette.

10             Did you see this?

11      A.     Yes.

12      Q.     Were you aware of this provision between the

13      companies?

14      A.     I wasn't aware on the details here.

15      Q.     Let's turn to Page 16, please.  After 11, let's look

16      at the first paragraph.  It says, "The dealer," who is

17      Broetje, "agrees not to disclose to third parties the

18      confidential documents and information provided to it by AHG

19      in connection with this contract.  This secrecy clause shall

20      survive the expiration of this contract."

21             Let's turn to the next portion of this section.

22             It says, "In addition the dealer," who is

23      Broetje, "agrees not to use, directly or indirectly, such

24      documents and information after the expiration of this

25      contract."

Maylander - cross

1          Do you see that?

2   A.    Yes.

3   Q.    And you understand that Broetje had made that

4   obligation to AHG.  Correct?

5   A.    When their contract was active, yes.

6   Q.    Now, let's go back to JTX-66, please.  This is the

7   e-mail we were looking at a couple of minutes ago.  Looking

8   at the e-mail, do you see the word faults in that e-mail?

9   A.    I can't see that faults.

10  Q.    Exactly.  The word is not in there.  Is it?

11  A.    Okay.

12  Q.    So you are not -- you didn't mention in this e-mail

13  anything about any faults with the system.  Correct?

14  A.    I can't see the word fault in that e-mail.

15  Q.    Just to answer my general question.  There is no

16  discussion about faults with AHG's system in this e-mail.

17  Correct?

18  A.    That's correct.

19  Q.    Now, let's turn to JTX-14, please.  Have you seen

20  this document before, Mr. Maylander?

21          Why don't we turn to Page 2 of this.  Do you

22  recognize this document, Mr. Maylander?

23  A.    I was not involved.  What I read, it is a paper from

24  us or a presentation from us about development.

25  Q.    It's about development?

Maylander - cross

1    A.        Development.

2    Q.        Now, for us, like myself, who can't read German, can

3    you read that in English for me, please?

4    A.        Development of innovative rivet feeding technique.

5    Q.        So this is not a training document for Broetje.

6    Correct?

7    A.        It's development.

8    Q.        It's not what Mr. Benczkowski referred to as a

9    training document, it is a development document.  Correct?

10   A.        That's what the title is saying, yes.

11   Q.        If we could look at Page 13 of this.  In this with

12   development document for Broetje's cassette-based rivet

13   system?  We have some photographs in it, don't we?

14   A.        Yes.

15   Q.        And the photographs you see, are those AHG's system?

16   A.        These pictures are AHG.

17   Q.        Let's look at Page 15, please.  I don't know if you

18   know this or not.  But you understand, these are pictures of

19   AHG's system?

20   A.        I don't know.  There are so many details, I can't say

21   that.

22   Q.        This is too detailed a photograph for you to tell?

23   A.        It is a photograph showing something, with tubing,

24   yes.

25   Q.        It's showing some details of AHG's system?

Maylander - cross

1    A.      No, because it's not AHG.

2    Q.      So if Dr. Peters said this was AHG, would you believe

3    it then?

4    A.      If Dr. Peters was saying that?

5    Q.      Yes.

6    A.      I believe him.

7    Q.      Let's look on Page 17, please.  Do you recognize that

8    rack?  Is that an AHG rack or a Broetje rack?

9    A.      That is just a storage.

10   Q.      Do you know who makes that storage?

11   A.      I don't know.

12   Q.      What if Dr. Peters said that was an AHG rack, would

13   you believe him?

14   A.      We use the rack here not for storage.  This is

15   different.

16   Q.      I understand.  If Dr. Peters described this here in

17   his testimony that that was an AHG rack, would you believe

18   him?

19   A.      Yes, same way.

20   Q.      Let's look at Page 18, do you recognize this?

21   A.      Yes.

22   Q.      And that's a cassette made by AHG/F2C2 Systems?

23   A.      Yes.

24   Q.      And you see inside there it has the AHG/F2C2 Systems?

25   A.      Yes, I see the logo on there.  Yes.

Maylander - cross

1    Q.      And this is in the development document to develop

2    Broetje's cassette; correct?  This picture.

3    A.      It belongs to Broetje.

4    Q.      Let's go to the next page, please.

5            Whose cassette is that?  Is that Broetje's or

6    AHG's?

7    A.      It doesn't say that, but it looks like an AHG

8    cassette.

9    Q.      Let's go to the next one.

10           Whose is that?  Is that AHG's or is that

11   Broetje's?

12   A.      That's the back side of a rivet cassette.  It doesn't

13   say anything, who it is.

14   Q.      Okay.  We're not sure who it is.  Let's go to the

15   next slide.

16           Whose cassette is that?  Can you tell?

17   A.      That's a separator.

18   Q.      Do you know if that is Broetje or AHG?

19   A.      I can't say that.

20   Q.      You can't say.  Okay.  Now, just bear with me for one

21   second.

22           So approximately a little less than a year after

23   your e-mail where you informed Mr. Holtmeier that Mr. Bornes

24   said you were going to do work with Gemcor, you understand

25   that Broetje then decided to go ahead and develop their own

Maylander - cross

1    cassette; correct?

2    A.      There a decision in our company.

3    Q.      Yes.  And that was an internal decision in the

4    company; correct?

5    A.      I was not part of that.

6    Q.      Okay.  And that was Mr. Holtmeier was part of it,

7    though?  The one who signed the contract?

8    A.      Mr. Holtmeier was part of the development team.

9                    MR. LINDVALL:  Okay.  Thank you very much.

10                   THE COURT:  Thank you.  Redirect.

11                   MR. KELLEHER:  Nothing further, Your Honor.

12                   THE COURT:  Okay.  You may step down.  Thank you

13   very much.

14                   You may call your next witness.

15                   MR. KELLEHER:  Thank you.  Your Honor, we call

16   to the stand Mr. Lutz Neugebauer.

17                   THE COURT:  Okay.

18                   ... LUTZ NEUGEBAUER, having been first duly

19   sworn, was examined and testified as follows ...

20                   THE COURT:  Good afternoon to you,

21   Mr. Neugebauer.  Welcome.

22                   You may proceed, Mr. Kelleher.

23                   MR. KELLEHER:  May I approach?

24                   THE COURT:  You may.

25                   (Binders passed forward.)

Neugebauer - direct

1                        DIRECT EXAMINATION

2     BY MR. KELLEHER:

3     Q.      Mr. Neugebauer, could you please introduce yourself

4     to the jury?

5     A.      So my name is Lutz Neugebauer.

6     Q.      Where to you live?

7     A.      I live in Farber in Northern Germany.

8     Q.      For who do you work?

9     A.      I work for Broetje Automation Germany, which is a

10    subdivision of Broetje Automation.

11    Q.      And for how long have you worked for Broetje

12    Automation?

13    A.      I started to work for Broetje Automation in 1991.

14    Q.      And what is your current job title?

15    A.      I'm a general manager of the company, Broetje

16    Automation Germany.

17    Q.      When -- I'm sorry.  What was your job title in the

18    early 2000s?

19    A.      I have worked as a project manager for Broetje

20    Automation.

21    Q.      What were your job responsibilities in that role?

22    A.      I worked for -- as a project manager for riveting

23    machine for these big fastening machines we have installed.

24    And I have also managed the F2C2 or AHG company.

25    Q.      Mr. Neugebauer, could you move the microphone a tiny

Neugebauer - direct

1    bit closer to yourself?  I'm not sure everyone can hear.

2    A.    (Witness complies.)

3    Q.    When did you first begin working for AHG or F2C2?

4    A.    Actually, 1994-1995.  Around these years, I started

5    to work with them.

6    Q.    Do you remember the project?

7    A.    Ya.  It was the project for Boeing Wichita.  It was

8    the Em Juliet machine for the fuselage assembly.

9    Q.    Do you remember the project numbers?

10   A.    1501.

11   Q.    What do you remember about that project?

12   A.    Actually, we received in March, April, something like

13   that, 1995, the first AHG fastening system that was in the

14   rack.  And we unbox the rack and have our first look into

15   the rack with our electricians and our mechanics and myself,

16   and we opened the electrical cabinet which was located on

17   top of the rack, and our electrician stands next to me

18   and looked into it, and he said directly:  What the hell is

19   that?  He said that because the wiring was not wiring

20   against the standard, industrial standard, it was racetrack

21   wiring.  A racetrack, the racetrack like you have for little

22   kids.

23   Q.    What did you do in response?

24   A.    So the first thing, what we did, before we start the

25   machine, we have to completely rewire the machine.  We put

Neugebauer - direct

1     out all the wires and put in real industrial standard wires.

2               And we produced, because we haven't had any

3     electrical circuit diagrams, also a circuit diagram.  The

4     documentation we got from AHG at that time was more or less

5     a Word documentation and not a CID documentation.

6     Q.    What did you do with the circuit diagram?

7     A.    Actually, later on, we provided it also to AHG, that

8     they can wire according to this circuit diagram for their

9     system.

10    Q.    Do you know whether AHG continued to use that circuit

11    diagram?

12    A.    Ya.  They used it a long time, for a very long time.

13    Q.    What was the reason that you would open up the rack

14    when it arrived?

15    A.    Because we have to -- we have to -- of course, we

16    have to connect our cables that you can start with the

17    startup of the machine.  It was original reason why we have

18    to do that.

19    Q.    Other than the wiring, were there any other changes

20    that were suggested for AHG's system at that time?

21    A.    Ya.  We started very early then to introduce

22    additional sensors to figure out where the rivets are in the

23    system.  So when we started to feed the system, the machine,

24    we need to know where the rivet is, of course.  So there

25    were sensors not installed or missing also at the beginning.

Neugebauer - direct

1    Q.      That would be sensors, s-e-n-s-o-r-s?

2    A.      Yes, right.  Sensors.  Ring sensors.

3    Q.      Any other changes?

4    A.      Ya.  Later on, we introduce proposition all to

5    control the airflow in the cassettes we introduce a

6    separator.  We introduced several stuff.  So additional

7    equipment that we can make sure that the rivet is feed

8    constantly right.

9    Q.      Could you turn to exhibit -- I'll skip this exhibit.

10           Could you describe how well that system for

11   Wichita worked?

12   A.      It was at very beginning, it worked definitely total

13   not so.  We have had constantly problems with the system

14   over the years.  We were constantly working on the system to

15   improve the performance, but we have had a lot of problems

16   with it.

17   Q.      Did Boeing Wichita ultimately accept the machine?

18   A.      Not really.  So one of the reason why we have, for

19   example, to rewire the system, because Boeing would never

20   accept these kind of machines into their facility.  Never.

21   Q.      But eventually it was installed?

22   A.      It was installed, yes.

23   Q.      So were the problems solved?

24   A.      It took, it took really awhile that it can solve all

25   the problems.  But at the end, we haven't really solved all

Neugebauer - direct

1      the problems but we get the system to work so we can work

2      with the machine.

3      Q.      Now, Broetje continued to work with AHG after this

4      project, yes?

5      A.      Yes.

6      Q.      And did there come a time when, instead of AHG, you

7      started working with a company F2C2?

8      A.      Yes.

9      Q.      Do you remember when that was?

10     A.      Around 2000-2009 -- 2001.  Sorry for that.  2001,

11     they started to get another name to F2C2, but it was still

12     the same company.

13     Q.      When you say it was the same company, do you mean

14     they're the same corporations or the same people?

15     A.      Ya.  They just change the name, obviously for us.

16     Q.      Overall, how would you describe the quality of F2C2's

17     products and services?

18     A.      The quality of the product and services was really

19     over the nine years was not really sufficient.  So we have

20     constant problem.  We have had constant problems to get the

21     system to work.  The cassettes, we have to rework the

22     cassettes.  We have to rework the system.  We have to

23     rebuild the system.  So there a constant fight to get the

24     system in a mode that we can feed the fasteners.

25     Q.      What did you do to inform F2C2 about these problems?

718

Neugebauer - direct

1    A.       Actually, we have sent a lot of e-mails and faxes.

2    At some point in time when I was a project manager, I start

3    to develop this fault reports, we have sent fault parts to

4    Phillippe Bornes to have a more formal way that we can put

5    all the faults we have into the fault reports.

6    Q.       When you say Phillippe, you mean Mr. Bornes?

7    A.       Excuse me?

8    Q.       When you say Philippe, do you mean Mr. Bornes?

9    A.       Yes.  Sorry.

10   Q.       Can you turn to exhibit DTX-1077 in your book?

11   A.       (Witness complies.)

12   Q.       Can you tell us very briefly what this is?

13   A.       Ya.  In principle, we have the fault reports for the

14   customer Domier here and we complained that we have --

15   Q.       Mr. Neugebauer, let me ask a question.  Who is the

16   author of this document?

17   A.       I'm the author of this document.

18   Q.       And when was it created?

19   A.       It was created in -- let me just see.  The 14th of

20   November, 2000.

21   Q.       When you created this document, did you have personal

22   knowledge of what is reported in it?

23   A.       Yes, of course.  I wrote it.

24   Q.       And was this document created in the ordinary course

25   of business?

Neugebauer - direct

1    A.    Ya.

2    Q.    And was it kept in the ordinary course of business?

3    A.    Yes, of course.

4          MR. KELLEHER:  Your Honor, I would move the

5    admission of exhibit DTX-1007.

6          MR. LINDVALL:  No admission.

7          THE COURT:  It's admitted.

8          (DTX-1007 is admitted into evidence.)

9    BY MR. KELLEHER:

10   Q.    We have this now on the screen, Mr. Neugebauer.  Can

11   you tell the jury, please, what this document shows?

12   A.    So the document shows the customer, so also my name

13   as the responsible, as the responsible, and it shows also a

14   rivet cassettes, and the rack.  Ya, it's a rack separator.

15   The unit is a rack separator, and we have problems with the

16   rivet, with the codes LN and DUN that they do not go through

17   the separator.  So there was obviously a design problem, the

18   distance between the two sticks in the separator.  So the

19   rivet drops down without the function of the separator.

20   Q.    Could you explain for the jury what the separator is?

21   A.    In fact, that is a little device at the end, where

22   the rivet comes out the fastener feed system, where the

23   rivet stops on two barrels, and then if we have the right

24   orientation, then we remove it and the rivet drops into

25   the tube, and we feed the air through the tube and then the

Neugebauer - direct

1    rivet.

2    Q.    Is this, what I'm pointing to now where it comes out,

3    where the rivet comes out on the rack?

4    A.    Yes.  This is not separator, this is a microactuator,

5    and the separator is at the end of the fastener feed system

6    of the rack, not of the cassette.

7    Q.    So in the rack?

8    A.    Ya, somewhere in the rack.

9    Q.    Could you turn to Exhibit 1078, DTX-1078?

10   A.    Ya.

11   Q.    Is this a fax from you?

12   A.    Ya.

13   Q.    When was it sent?

14   A.    I'm not sure where the date is.

15         It was sent at the beginning of 2001, in

16   February 2001.

17         MR. KELLEHER:  Your Honor, could I move into

18   evidence, Exhibit 1078, assuming no objection.

19         MR. LINDVALL:  No objection.

20         THE COURT:  It's admitted.

21         (DTX-1078 is admitted into evidence.)

22   BY MR. KELLEHER:

23   Q.    So it's up on the screen now, Mr. Neugebauer.  Could

24   you tell the jury what is happening here?

25   A.    This was really major problem.  It was really a

Neugebauer - direct

1    major problem.  We have had a machine at Deutsche Airbus in

2    Nordenham, and we have the problem that the machine, we are

3    not able to feed fastener, so we have really a failure on

4    the complete line.  So, therefore, I have written very, very

5    big letters, Please Help Us!

6              This is really urgent.  We shut down the

7    complete line because of the feeding systems.

8    Q.    What kind of reaction do you get from a customer when

9    Broetje's giant fastening machine shuts down because of the

10   rivet feeding system?

11   A.    At that time, they were so annoyed about it, they are

12   already shouting at me about it, because I was in front of

13   the customers there and they were shouting at me.  So it is

14   shown here, this is urgent.

15   Q.    Could you turn to DTX-1080?

16   A.    Yes.

17   Q.    Is this another fault report from you to Mr. Bornes?

18   A.    Yes.

19              MR. KELLEHER:  Your Honor, I would move the

20   admission of exhibit DTX-1080, assuming no objection.

21              MR. LINDVALL:  No objection.

22              THE COURT:  It's admitted.

23              (DTX-1080 is admitted into evidence.)

24   BY MR. KELLEHER:

25   Q.    Mr. Neugebauer, could you tell the jury what this

722

Neugebauer - direct

1  fault report is about?

2  A.     This is a fault report for our customer Shorts.

3  Today, they are named for McGee in Ireland.  And we claim

4  there that all these cassettes have problems to feed

5  fastener.  So the rivet sticks in the microactuator.  There

6  a chamfer problem of the microactuator.  Rivets sticks

7  during loading process in the fitting, so we were not able

8  to get rivets into the cassettes.  And also the rivets there

9  were sticking in the tubes.  And you see a lot of cassettes

10  there, so it was really a dramatic problem because we cannot

11  feed the machine rivets at that time.

12  Q.     Mr. Neugebauer, I see at the bottom it says:  We

13  expect a solution which do not look self-made.  What do you

14  mean by that?

15  A.     Some of the, some of the equipment we received were

16  really, have had the look and feel as a self-made.  And what

17  we don't want to have is that somebody is working with a

18  kind of file on the microactuator or on the inlet of the

19  cassette, that it gets better.  So we want to have a robust

20  solution on that.  And that was the reason we have written

21  down:  Please send me something which is not self-made.

22  Q.     Could you please turn to Exhibit 1082 of your binder?

23  A.     Yes.

24  Q.     Is this a letter from you to Mr. Bornes and to Mr.

25  Girard at F2C2?

Neugebauer - direct

1    A.      This is a fax to F2C2, yes.

2                MR. KELLEHER:  I move the admission of DTX-1082.

3                MR. LINDVALL:  No objection.

4                THE COURT:  It is admitted.

5                (Exhibit DTX-1082 received in evidence.)

6    BY MR. KELLEHER:

7    Q.      Could you explain what this document is?

8    A.      We have fax'd certain reports, they are coming on the

9    next page, they are fault reports.  There are fault reports

10   which we have sent to fix this equipment which was

11   delivered.

12   Q.      I have a question, Mr. Neugebauer.  These fault

13   reports, do they concern equipment that is being assembled

14   at Broetje's facility in Germany or does it concern

15   equipment that is on site at customers?

16   A.      It is a concern on site of the customer.  The fault

17   report was generated by me but I received any information

18   from our field engineers in Wichita where the machines were

19   at that time.

20   Q.      Could you turn to Exhibit 1088, please.

21   A.      Yes.

22   Q.      Is this also a fault report from you to Mr. Bornes?

23   A.      Yes.

24                MR. KELLEHER:  Your Honor, I move the admission

25   of DTX-1088, assuming no objection.

Neugebauer - direct

1          MR. LINDVALL:  No objection, Your Honor.

2          THE COURT:  It is admitted.

3          (Exhibit DTX-1088 received in evidence.)

4     BY MR. KELLEHER:

5     Q.     Would you please tell us, what is this fault report

6     about?

7     A.     This is also a fault report with fastener cassettes

8     which we received from the customer Beck, where we had

9     really constant feeding problems and we need to have rework.

10    Line by line, I have not that much space on the page, so I

11    have written in this way.

12    Q.     It says Rework, what does that mean?

13    A.     Rework.  Just rework, that you make sure that the

14    fastening, that the cassettes are working.  So he has to do

15    rework.  Because of the massive amount of these cassettes, I

16    don't want to explain for everything because of what needs

17    to be done.

18    Q.     Could you turn in your binder to DTX-1018.

19    A.     Yes.

20    Q.     Is this a letter from you to Mr. Bornes?

21    A.     Yes.

22    Q.     When is it dated?

23    A.     It's dated October 5th, 2001.

24    Q.     Do you remember this letter?

25    A.     I remember this letter, yes.

Neugebauer - direct

1              MR. KELLEHER:  Your Honor, assuming no

2    objection, I would move the is admission of DTX-1018.

3              MR. LINDVALL:  No objection.

4              THE COURT:  It is admitted.

5              (Exhibit DTX-1018 received in evidence.)

6    BY MR. KELLEHER:

7    Q.    Could you please tell me what this letter is about,

8    Mr. Neugebauer?

9    A.    So, actually, this was really kind of a wake-up call,

10   not a call, but a letter, a wake-up letter is much better,

11   to explain to him that we have so many problems with, for

12   example, the Shorts machines, we have five machines at

13   Shorts, five racks at Shorts.

14             So we were not really satisfied with the

15   workmanship, as you can see, we have had constant problems.

16   We have installed an acceptance test.  And due to the

17   problems, that we really were not relying on the acceptance

18   test from Mr. Bornes, we had to carry out our own acceptance

19   test, to take them out.  That some of the cassettes had

20   never seen any fasteners.  Therefore, on the second page, at

21   the end, that we really start to investigate other solutions

22   for other companies of other rivet feeding systems, because

23   we cannot accept that anymore.  But we gave him also the

24   option to sit down, to find other solutions to feed the

25   rivets out of the fastener systems.

1    Q.      This was sent in 2001?

2    A.      Yes.

3    Q.      Did you receive a response?

4    A.      I believe we have then got together in a meeting to

5    figure out what needs to be done to improve the system so

6    that the system will work.

7    Q.      Could you turn to DTX-1479.

8    A.      Yes.

9    Q.      What is this, Mr. Neugebauer?

10   A.      This is a meeting, a report of minutes of meeting.

11           MR. KELLEHER:   Your Honor, assuming no objection

12   I would move DTX-1479 into evidence.

13           MR. LINDVALL:   No objection, Your Honor.

14           THE COURT:   It is admitted.

15           (Exhibit DTX-1479 received in evidence.)

16   BY MR. KELLEHER:

17   Q.      Looking to the second page, Mr. Neugebauer, the

18   meeting minutes?

19   A.      Yes.

20   Q.      There is a reference in Point No. 10 to Open Point

21   List.  Do you see that?

22   A.      Yes.

23   Q.      What is that?

24   A.      We have started at some point in time to open an open

25   point list, because with the fault reports, they were not

Neugebauer - direct

1    enough.  So we started an open point, an action item list,

2    to describe things he has to do and we have to do.

3    Q.      And that Broetje has to do?

4    A.      Yes, that Broetje has to do.

5    Q.      Why would it include things that Broetje has to do?

6    A.      There are some commercial items or project management

7    items, timing items, to send information somehow about other

8    projects.

9    Q.      On the next page, there is a reference to Item No. 4,

10   New Rack.  What is that referring to?

11   A.      Yes.  During the years we have discussed with

12   Philippe Bornes a new way of feeding the rivet out of the

13   system.  So instead of that these rotators where we have

14   constantly problems over the years, we are required to have

15   a slide, a slide according to our other feeding systems

16   which we have had, which is based not on cassettes, which is

17   based on containers.

18   Q.      Containers?

19   A.      Yes.  So on this slide, we want to have to integrate

20   this kind of slide into the system, and Mr. Bornes came up

21   with the first sketch how it should look, and we had some

22   recommendations, because we found out that from our point of

23   view we need better guiding of the slide.  Instead of one

24   guide, we had to have two guides for the slides.

25   Q.      Do you know whether they adopted having two points of

Neugebauer - direct

1    contact for the slide?

2    A.    Yes, I believe so, if I remember right.

3    Q.    Could you please turn to Exhibit 1090.

4          Is this another fault report?

5    A.    Yes.  This is another fault report.

6          MR. KELLEHER:  Your Honor, assuming no

7    objection, I would move into evidence DTX-1090.

8          MR. LINDVALL:  No objection, Your Honor.

9          THE COURT:  It is admitted.

10         (Exhibit DTX-1090 received in evidence.)

11   BY MR. KELLEHER:

12   Q.    Mr. Neugebauer, what is this fault about?

13   A.    This is a fault report for a machine at Wichita.  You

14   see the amount of cassettes, I am not sure, maybe 20, 25

15   cassettes, which are not fitting in the rack.  We were not

16   able to shift it in the rack.

17         So it seems to me that these cassettes were

18   never in the rack before.

19   Q.    Did the situation with F2C2 ultimately improve

20   following this?

21   A.    Yes.  Of course, Mr. Bornes did something on the rack

22   that we can shift the cassettes in this.

23   Q.    He changed the rack?

24   A.    No.  They were not changing the rack, but a

25   modification of the racking system.

Neugebauer - direct

1    Q.      This was in 2001.  So that the relationship continued

2    on, obviously, after that?

3    A.      Yes.

4    Q.      Could you please turn to Exhibit DTX-1457.

5    A.      Yes.

6    Q.      Is this a letter from you to Mr. Bornes?

7    A.      Yes.

8    Q.      In January 2002?

9    A.      Yes, sir.

10            MR. KELLEHER:  Your Honor, assuming no

11   objection, I would move DTX-1457 into evidence.

12            MR. LINDVALL:  I would have to check.  There is

13   no foundation.  It's not signed.

14   BY MR. KELLEHER:

15   Q.      Are you the author of this document, Mr. Neugebauer?

16   A.      Yes.

17   Q.      Why did you write it?

18   A.      Because Philippe Bornes announced alleged delivery of

19   this process caused for us a major problem because we cannot

20   start with the machines if the feeding system is not right.

21   Q.      Mr. Neugebauer, when you wrote this letter, did you

22   have knowledge what you were talking about in here?

23   A.      Of course.

24   Q.      Is it an ordinary part of Broetje's business to write

25   letters like this to vendors?

Neugebauer - direct

1    A.      Yes.

2    Q.      Is it an ordinary part of Broetje's business to keep

3    letters like this?

4    A.      Yes.

5    Q.      I notice this is not signed.  Can you explain why?

6    A.      The technology was just printing out and sign it and

7    scan it and bring it back into the e-mail was not fixed at

8    that time.  We are talking about 2002.  So there were, of

9    course, a scanner.  But it took so long.  So we sent a

10   letter out with e-mail without any signature.

11            MR. KELLEHER:  Your Honor, I would move the

12   admission of DTX-1457.

13            MR. LINDVALL:  I still object.  I don't think

14   the foundation has been laid yet.

15            THE COURT:  Overruled.  DTX-1457 is admitted.

16            (Exhibit DTX-1457 received in evidence.)

17   BY MR. KELLEHER:

18   Q.      Mr. Neugebauer, could you please explain what this

19   letter is about?

20   A.      The letter explained that we have tremendous problem.

21   They are starting not to deliver the racks on time which we

22   have ordered.  So I warned him it is possible we would even

23   start to get penalties from him because we have really had a

24   major problem with the customer at the time.  So that forced

25   us to make sure that we are delivering our machines on time.

Neugebauer - direct

1    Q.      Could you please turn to DTX-1094.

2    A.      Yes.

3    Q.      Is this another fault report from you?

4    A.      Yes.

5            MR. KELLEHER:  Your Honor, assuming no

6    objection, could we offer DTX-1094 into evidence.

7            MR. LINDVALL:  No objection.

8            THE COURT:  It is admitted.

9            (Exhibit DTX-1094 received in evidence.)

10   BY MR. KELLEHER:

11   Q.      Could you tell me what this report is about?

12   A.      This is a fault report about Wichita.  And we had

13   sent, I am not sure if we have sent back, because that's

14   early -- in any case, we have announced there is a problem

15   with defective tubes, no escapement, only working with

16   maximum pressure, the cassettes were not working and the

17   customer refused them, rejected them.

18   Q.      So to shift topics a little bit, Mr. Neugebauer, did

19   there come a time when Broetje learned that it was not the

20   only customer of F2C2?

21   A.      Yes.  There was a time that we figured out that Mr.

22   Bornes -- let me start in a different way.

23           Mr. Bornes explained to me that he wanted to

24   work with our heaviest competitor, Gemcor, which is really

25   the heaviest competitor.  We figured at that time he had

1    already sent cassettes to our customers and we didn't know

2    that.  But it was acceptable for us, as far Mr. Bornes, and

3    Mr. Maylander talked about some provisions or something like

4    that.

5    Q.    What was your reaction to finding out that F2C2 was

6    going to come dealing with Gemcor?

7    A.    I wasn't present because of that.

8    Q.    Could you explain why?

9    A.    Together with Philippe, we have developed the system,

10   and I was personally told that.  I have written a command.

11   And I have had also phone discussion with him about that.

12   Q.    Did there come a time when Broetje decided to build

13   its own automatic fastener feed system?

14   A.    At some point in time we had started to think about

15   it.  It was never our intention.  But having in mind these

16   massive problems which we have had, the total massive

17   problems that the customer also had, we had to come up with

18   a different solution.  That was not the way it should work.

19   Q.    Do you remember approximately when that was?

20   A.    2003, something around 2003.

21   Q.    Could you look at Exhibit DTX-1304.  Can you tell me

22   what this is?

23   A.    This is an excerpt out of the presentation I have

24   made for Vought Dallas in 2003.

25   Q.    Who is Vought Dallas?

Neugebauer - direct

1    A.    Vought Dallas is a customer.  They are building a

2    Dallas 787 aircraft parts.

3    Q.    Were they building 787s back in 2003?

4    A.    747s.

5          MR. KELLEHER:  Your Honor, assuming no

6    objection, I would move into evidence DTX-1304.

7          MR. LINDVALL:  No objection.

8          THE COURT:  It's admitted.

9          (Exhibit DTX-1034 received in evidence.)

10   BY MR. KELLEHER:

11   Q.    Mr. Neugebauer, could you translate this for us?

12   A.    This is an excerpt out of the presentation for Vought

13   in Dallas.

14   Q.    Could we please look at the second page?  Would you

15   please explain what this page shows?

16   A.    The picture shows the first set of design cassettes

17   from our site, our intention was to design 50 new cassettes

18   there, with 25 different fastener diameters and the system

19   should be able to feed five shank diameters, which has

20   nothing to do with the cassette at the time.

21   Q.    Who attended this presentation?

22   A.    The project management team from Vought in Dallas,

23   and everybody who was involved in the project.

24   Q.    Mr. Neugebauer, were you at all involved in Broetje's

25   efforts to design its own automated fastener feed system?

1   A.      Yes.

2   Q.      Could you please describe your involvement?

3   A.      I have given the design team ideas to start the

4   design, bringing in all my experience we have gained with

5   the system over the years.

6   Q.      Was there any thought given by Broetje during this

7   development project about patents belonging to other people?

8   A.      At the very beginning, not.  Later on, yes.

9   Q.      What happened?

10  A.      So, actually, we started to talk to suppliers for

11  tubes, and we sent them some requests for information for

12  tubes which we have designed on our own.  At some point in

13  time we started to ask Dr. Budach, which was our patent

14  expert, to look at that, what we are doing to figure out if

15  we have -- if there is any patent infringement.

16  Q.      Why would you ask Dr. Budach to give you advice about

17  that?

18  A.      Just to make sure we are not infringing any patents.

19  Q.      Why would you want to avoid patent infringement?

20  A.      It's against the law.  It was never our intention to

21  do any patent infringement, of course.

22  Q.      Did Dr. Budach give any advice concerning any patents

23  belonging to AHG?

24  A.      Yes.  He responded on my question with the advice

25  that we should change the design because we may infringe the

Neugebauer - direct

1    patent from Philippe Bornes.

2    Q.    Why don't we look at JTX-61.

3          Mr. Neugebauer, there is an English language

4    translation in front of this, if you flip forward to page

5    Doc 9, could you tell me if you recognize this document?

6    A.    Yes.

7    Q.    What is this document?

8    A.    This document is the request for information, in

9    principle, it is a request for information for a tube, which

10   we have designed, where we are showing the design on the

11   next page.

12   Q.    Before you go on, Mr. Neugebauer, when was this

13   letter sent?

14   A.    This was sent in November 2003.

15         MR. KELLEHER:  Your Honor, assuming no

16   objection, I would move the admission of JTX-61.

17         MR. LINDVALL:  No objection, Your Honor.

18         THE COURT:  It's admitted.

19         (JTX-61 is admitted into evidence.)

20         MR. KELLEHER:  Could we move forward to page 9?

21   BY MR. KELLEHER:

22   Q.    So Mr. Neugebauer, this is the page in German.  What

23   date was this sent?

24   A.    In November 2003.

25   Q.    And could you flip forward to page 11?

Neugebauer - direct

1    A.    Ya.

2    Q.    What is this?

3    A.    In fact, this is a cross section of a tube which we

4    have designed to fulfill at that time our requirements.

5    Q.    Okay.  And why were you sending this to a third

6    party?

7    A.    Because the third party was the supplier of the

8    tubes, foreseen supplier of the tubes.

9    Q.    Could you please look at DTX-1599?

10   A.    Yes.

11   Q.    Do you know what this document is?

12   A.    This is a document in which we require the supplier

13   for the tubes to have a different shape of the tube.

14          MR. KELLEHER:  So, your Honor, assuming there is

15   no objection, I would move DTX-1599 into evidence.

16          MR. LINDVALL:  No objection, Your Honor.

17          THE COURT:  It's admitted.

18          (DTX-1599 is admitted into evidence.)

19   BY MR. KELLEHER:

20   Q.    So Mr. Neugebauer, what is the date of this e-mail?

21   A.    19th of November, 2003.

22   Q.    A few weeks after the previous one?

23   A.    Two weeks, Ya.  Almost.

24   Q.    Could you please turn to the next page, page 2?

25   A.    Ya.

Neugebauer - direct

1    Q.      So what is that in the middle of the page?

2    A.      This is also a cross section from a tube but instead

3    of these grooves, we have then changed the design to a soft

4    pentagon because of the recommendation said from Mr. Budach

5    to avoid any possible infringement of the patent.

6    Q.      So what did Dr. Budach do to make the company request

7    this change?

8            I'll ask that again.  What was it that

9    Dr. Budach said to make the company request this change from

10   the tube manufacturer?

11           MR. LINDVALL:  Objection, Your Honor.  Hearsay.

12           MR. KELLEHER:  It's not offered for the truth of

13   the words spoken, Your Honor.

14           THE COURT:  Overruled.

15   BY THE WITNESS:

16   A.      In fact, he give us the order to avoid any possible

17   infringement of the patent.  We have to redesign the tube to

18   come up with the kind of soft pentagon.

19   Q.      What did the company do in response to that direction

20   from Dr. Budach?

21   A.      Ya, we immediately changed it a couple days, a day

22   later to this design here, what we are showing here in this

23   picture.

24           MR. KELLEHER:  I don't have any more questions

25   right now, Your Honor.

Neugebauer - cross

1          THE COURT:  Cross-examination.

2                    CROSS-EXAMINATION

3    BY MR. LINDVALL:

4    Q.     Good afternoon, Mr. Neugebauer.  If I pronounce it

5    wrong or your name wrong, I apologize.

6    A.     You did it correctly.

7    Q.     Now, Mr. Kelleher was just talking to you about

8    Exhibit JTX-61.

9              Can we please put it on the screen, please.

10   A.     Yes.

11   Q.     And this is dated November 3rd, 2003?

12   A.     Ya.

13   Q.     And this is about six months after Broetje had

14   already started their own development of the cassette;

15   correct?

16   A.     Something like that, Ya.

17   Q.     Now, if we could turn to JTX-61.11.  Page 11.

18             And is this a copy of AHG's tube, right here?

19   A.     This is our own development for that.  You see that

20   this is the own complete own design there.

21   Q.     Okay.  Did you look at AHG's tube to come up with

22   this design?

23   A.     Not really.

24   Q.     Not really?  Okay.  So this looks nothing like AHG's

25   tube; is that correct?

Neugebauer - cross

1    A.      I wouldn't say that.

2    Q.      It does look like AHG's tube then?

3    A.      No, this is our own design.

4    Q.      But have you seen AHG's tube design before?

5    A.      Not in this cross-section.  In reality, yes.  Not in

6    the cross-section.

7    Q.      Okay.  AHG has an pentagon; correct?

8    A.      On this groove design, yes.

9    Q.      Okay.  And you have a pentagon in your ultimate

10   design, too; correct?

11   A.      I can't really say that.

12   Q.      I believe you used the word "soft pentagon;" correct?

13   A.      Soft pentagon, Ya.

14   Q.      Is that word "soft pentagon" used in any of the

15   documents that we talked about today?

16   A.      I have not seen the soft pentagon mentioned in the

17   document.

18   Q.      When did you first start using the words "soft

19   pentagon?"

20   A.      Very early.

21   Q.      How early?

22   A.      When we started to design the soft pentagon.

23   Somebody came up with the idea this was a soft pentagon.

24   Q.      Is there something in writing here that we can see?

25   A.      I don't -- I haven't seen that.

Neugebauer - cross

1   Q.      Now, I believe your testimony was then, if we move to

2   JTX -- no, DTX-1599.

3   A.      (Witness complies.)

4   Q.      Do you see this?

5   A.      Ya.

6   Q.      And we just talked about this; right?

7           And if you turn to page 3.  And if you can blow

8   that up a little bit.

9           Is that the soft pentagon?

10  A.      Ya, as you can see there.

11  Q.      Okay.  And is that, for example, accurate of what

12  Broetje's tube looked after -- well, is that an accurate

13  depiction of what Broetje's tube looked like after it

14  finished its development and began selling it?

15  A.      Ya, it's very accurate.

16  Q.      Pardon?

17  A.      It's very accurate.

18  Q.      Thank you.  Now, did you have any discussions with

19  Dr. Budach about the design yourself?

20  A.      Not really.  Just give us a hint that there is an

21  infringement possible on the AHG groove.  So when we started

22  to look into other patents to see if there, if we may be

23  infringing other patents, of course, and figure out what is

24  now the real technology behind that, what is the real need

25  to create this kind of soft pentagon.

Neugebauer - cross

1                    MR. LINDVALL:  Just a moment.

2                    (Counsel confer.)

3       BY MR. LINDVALL:

4       Q.     I'm sorry.  I'm a little disorganized here.

5       A.     No problem.

6                    MR. LINDVALL:  If I may approach, Your Honor?

7                    THE COURT:  You may.

8                    (Document passed forward.)

9       BY MR. LINDVALL:

10      Q.     Okay.  I just handed you what has marked as PTX-579.

11      Did you see this document before?

12      A.     No.

13      Q.     Do you see there at the top, it says in consultation

14      with Mr. Neugebauer on 11/6/2003?  Do you see the first

15      sentence there?

16      A.     Ya.

17      Q.     And I assume that is you; correct?

18      A.     Ya.

19      Q.     And do you recall having any discussions with, is it

20      Volk, Mr. Volk, around this time frame?

21      A.     I just need to look at it.

22      Q.     Sure.

23      A.     So there was a, there a was a patent investigation.

24      Q.     Now, you were involved in this; correct?

25      A.     I have discussed it with Mr. Budach, as he is

Neugebauer - cross

1    explaining here.

2    Q.    Now, who wrote this memo?  Can you tell?

3    A.    No.

4    Q.    Well, do you see the second page at the bottom?

5    Mr. Volk, V-o-l-k?

6    A.    I don't know.  It was something Mr. Budach has dealt

7    with.  He may ask Mr. Budach about.

8                   MR. LINDVALL:  I move to admit this document.

9                   MR. KELLEHER:  No objection, Your Honor.

10                  THE COURT:  It's admitted, PTX-579.

11                  (PTX-579 is admitted into evidence.)

12   BY MR. KELLEHER:

13   Q.    Now, look at the front page of this document.  And

14   the title at the top is:  Cassette/F2C2 magazine.  Do you

15   see that?

16   A.    Yes.

17   Q.    And a magazine is a cassette; right?

18   A.    No, a cassette is a cassette.

19   Q.    What is a magazine then?  Is that like something in a

20   paper magazine?

21   A.    I don't know.

22   Q.    Okay.  So you don't have an understanding of what the

23   cassette/F2C2 magazine is?

24   A.    I don't know why it is written there.  It is a

25   cassette.  We are talking about a cassette.

743

Neugebauer - cross

1    Q.    Well, let's look at the German.  Were you looking at

2    the German version here?  We have the English version here,

3    so you understand that.  What does the word "magazine" in

4    German as stated there?

5    A.    Magazine is something where you are storing

6    something.

7    Q.    Okay.  Storing something.  So it says:  In

8    consultation with Mr. Neugebauer on November 6th, 2003.

9          And you said you had -- did you have a

10   consultation with Mr. Volk?

11   A.    No, I cannot remember.  We have, I remember that we

12   have several sit-togethers with Mr. Budach, Dr. Budach.

13   Q.    So if we turn to the next page, and a little bit

14   further down.  You don't remember having a consultation with

15   Mr. Volk in 2003?

16   A.    I'm not sure about that.

17   Q.    You're not sure.  Okay.  Let's go back to the front

18   page, please.

19          Do you recall having a consultation with him:

20   of particular importance is the profiled tube in the

21   cassette as well as the general structure.

22   A.    Ya.  It may, may be something which we may have

23   discussed with Mr. Volk just to explain where we are.  That

24   he has made the order to investigate into the patents,

25   clearly.

Neugebauer - cross

1    Q.      And that was of particular importance; correct?

2    A.      Something like that, Ya.

3    Q.      And down here, this paragraph here, it says:  A

4    cassette with tube and grooves is under patent protection in

5    AHG's property right -- and that's the European patent

6    number.  AHG -- again that's the European patent -- protects

7    a magazine with tube and grooves in connection with a rivet

8    selecting system.

9            Did you ever review these patents?

10   A.      Ya.  It was the order from Mr. Budach what I told.

11   What is the point now?  I have explained that we have, after

12   we receive the information, the formal information, that we

13   cannot use this tube because we are maybe infringing the

14   patent.  We have changed it to the soft pentagon.

15   Q.      Okay.  So you have changed from a pentagon to a soft

16   pentagon; is that correct?

17   A.      No, we are changing from grooves to a soft pentagon.

18   Q.      I thought you said --

19   A.      Grooves, five grooves.  Five grooves are not maybe

20   pentagon.  The pentagon is what you see there.

21   Q.      Well, you have a soft pentagon; correct?  You do call

22   it a pentagon shape; correct?

23   A.      You have a pentagon shape.  Soft pentagon.

24   Q.      Now, you could have -- there almost an infinite

25   amount of shapes that Broetje could have used other than a

Neugebauer - cross

1    pentagon; correct?  You could have used six sided, eight

2    sided, ten sided, three sided; correct?  You could have used

3    any of those sides; correct?

4    A.     But you have to produce them all.

5    Q.     My question is you could produce any of those sides?

6    A.     We can also use maybe also other side tubes, yes.

7    Q.     And you choose to use the pentagon shape which you

8    call the soft pentagon shape; correct?

9    A.     Right.

10   Q.     Now, let's switch gears for a minute.  Let's go to

11   these fault reports.  Let's turn to, for example, DTX-1080.

12          And I believe you testified about this, and

13   there is a list of cassettes here; correct?

14   A.     Ya.

15   Q.     And I'm guessing there is about, what, 12, 14

16   cassettes there; is that correct?

17   A.     Probably, Ya.

18   Q.     Approximately?

19   A.     Maybe it's 16 cassettes.

20   Q.     And we saw four or five of these; correct?  It's in

21   your testimony.

22   A.     Of the fault reports.

23   Q.     Yes.

24   A.     Probably more, Ya.

25   Q.     We may have gone through six then.  I can bring you

Neugebauer - cross

1    through with them.

2    A.      I'm comfortable with six.

3    Q.      Okay, six.  And you see these serial numbers here for

4    the cassette?

5    A.      Yes.

6    Q.      Are you aware that every time that AHG made a

7    cassette, the serial number was unique to that cassette?

8    A.      Stated that way, there was a kind of method to give

9    them the serial number, yes.

10   Q.      Yes.  And you probably heard -- well, you did hear

11   Mr. Bornes' testimony if you were here for his testimony,

12   but, for example, this cassette here, 3626 was the 3,626

13   cassette made by AHG and given to you guys.  Okay?  So today

14   we saw about five or six fault reports which we could go

15   through and we probably came up with 40 or 50 defective

16   cassettes out of about 2,500 to 3,000 cassettes; correct?

17   A.      No, that's not true.

18   Q.      Oh.  I'm just saying do you understand that the

19   AHG -- I mean that Broetje received about 2,500 to 3,000

20   cassettes; is that correct?

21   A.      You are just referring to something.

22   Q.      Mr. Neugebauer, that's not the answer to my question.

23   Listen to my question.  You understand by the serial number

24   that Broetje received, this here shows you received over

25   2,500 cassettes; right?

747

Neugebauer - cross

1    A.      I have never counted the cassettes.

2    Q.      Okay.  You never counted cassettes.  Thank you.

3            Now, let's turn to DTX-1013.04.

4            And I believe you testified this was a

5    presentation at Vought in Dallas, Texas?  I'll give you a

6    chance to get there.

7    A.      (Witness complies.)

8    Q.      And this was on, to get this right, January 23rd,

9    2003; correct?

10   A.      It is mentioned there.  You may be right.  I cannot

11   really remember when we were at Vought in Dallas.

12   Definitely in 2003, yes.

13   Q.      Yes, you can't quite remember if it was January or

14   February or March.  Some time in 2003?

15   A.      Yes.

16   Q.      Okay.  You are not sure if that date is correct;

17   right?

18   A.      Right.

19   Q.      Now, let's turn to the next page.

20           And this is a cassette; correct?

21   A.      This is a cassette, right.

22   Q.      Right.  And the cassette you have there has colored

23   bands like AHG; correct?  Do you see the color bands there?

24   A.      This was an example of a cassette, Ya.

25   Q.      And it has the black handle like AHG; correct?

748

Neugebauer - cross

1    A.      At that time, yes.

2    Q.      But you decided not to put AHG's branding on there,

3    did you?

4    A.      No.

5    Q.      Okay.

6    A.      Because it was our design.  It had nothing to do with

7    AHG.

8    Q.      This is your own design?

9    A.      Yes.

10   Q.      Okay.  And this document -- well, we're not sure what

11   the date of the document is or you are not sure.  But

12   according to the document, it was January 23rd, 2003, and

13   you didn't start developing your own cassette until six

14   months later; correct?

15   A.      No.

16   Q.      In June 2003?

17   A.      No, we started maybe a little bit earlier.  So in

18   2003.  Let's keep these wording.

19              MR. LINDVALL:  Okay.  So let's look at JTX-14.

20   If you could turn to the next page, please, page 2.

21   BY MR. LINDVALL:

22   Q.      Have you seen this document before?

23   A.      Yes.

24   Q.      Okay.  And this is dated June 23rd, 2003; correct?

25   A.      That is what it says, Ya.

Neugebauer - cross

1   Q.      And this is when you began development of your own

2   cassette; correct?

3   A.      Maybe, yes.

4   Q.      Maybe?  So you are not quite sure if it actually

5   started on June 23rd of 2003?

6   A.      Well, you have a meeting, an internal meeting to show

7   this document may be on the 23rd of 2006, or June of 2003.

8   Q.      But it was a long time ago, so it's hard to remember

9   exactly?

10  A.      Ya.

11  Q.      Let's look as DTX-1018.  There was some testimony

12  about this document, correct, earlier with your counsel?

13  You recall that?  Do you recall you testified about this

14  document?

15  A.      We have talked about that.

16  Q.      This is dated when?  This is dated October 5, 2001?

17  A.      Yes.

18  Q.      And I guess based on what you have testified before,

19  you are not quite -- maybe sometime in 2001 you sent this

20  letter?

21  A.      No.  This is definitely on October 5th.

22  Q.      The presentation you gave you are not quite sure, but

23  this one you definitely know, 14 years ago, you sent this on

24  October 5th, 2001.  Correct?

25  A.      Yes.

Neugebauer - cross

1    Q.    You specifically remember that.   Right?

2    A.    No, no.

3    Q.    You don't remember sending this letter.  Is that

4    correct?

5    A.    I remember that I sent the letter.  I see the date is

6    on top here.

7    Q.    There is no fax header on this, is there?

8    A.    No.

9    Q.    If you turn the page of this document, there is no

10   signature to this document, is there?

11   A.    There is no signature.  As I explained before --

12   Q.    I know you explained before --

13   A.    Sorry.  Let me finish my point.

14   Q.    I didn't ask you why, Mr. Neugebauer.

15             THE COURT:  You will have a chance to answer

16   when your attorney asks questions.

17   BY MR. LINDVALL:

18   Q.    You didn't sign this document.  Correct?

19   A.    At that time it was not feasible to do that.

20   Q.    And at this time you did not fax this document.

21   Correct?

22   A.    I sent it by mail, because --

23   Q.    You didn't fax it.  Correct?

24   A.    I didn't fax it.

25   Q.    But you were faxing documents around this time frame.

Neugebauer - cross

1    Correct?

2    A.    Yes.

3    Q.    You decided not to fax this one.  Correct?

4    A.    Possibly.

5    Q.    Now, bear with me for a minute.  You can never find

6    something when you want to find it.

7              If you could look at PTX-657.  It's already in.

8    This is an e-mail the jury hasn't seen today.  If we blow up

9    the top here.  This is an e-mail from yourself.  Correct?

10   A.    Yes.

11   Q.    And this was sent in July 2003.  Is that correct?

12   A.    Yes.

13   Q.    And let's go to the body, let's go to this part right

14   here.  You are writing to Mr. Bornes.  Is that correct?

15   A.    Yes.

16   Q.    Mr. Bornes, sitting right over here.  Correct?

17   A.    Yes.

18   Q.    And you say to Mr. Bornes, "PS.  Just between you and

19   me" -- you are keeping this conversation between you and Mr.

20   Bornes?

21   A.    That's what it says.

22   Q.    "The company is very, very deeply unsatisfied

23   concerning the situation with Gemcor."

24              At this point in time, Broetje was very, very

25   deeply unsatisfied because AHG was dealing with Gemcor.

Neugebauer - cross

1   Correct?

2   A.      Yes.

3   Q.      And it says here, "There are several discussions in

4   house, also with our mother company."  The mother company is

5   CLAAS.  Correct?

6   A.      No.  The CLAAS Fertigungswerke.  It was CLAAS

7   Fertingungswerke.

8   Q.      Part of the CLAAS group.  Correct?

9   A.      Yes.

10  Q.      "So there are several discussions in house also with

11  our mother company how to react on that obstacles."

12          So you had involved CLAAS -- pronounce that

13  second word you said?

14  A.      CLAAS Fertigungswerke.

15  Q.      You and that company were going to have discussions

16  about this, correct, and how to react to the obstacle?

17  A.      Not really.  I just have to send this because I want

18  to put them further under pressure at that time.

19  Q.      These discussions actually weren't going on in house?

20  This is something you told him?

21  A.      The discussions weren't in house going on.

22  Q.      You told Philippe there were several discussions in

23  house, but in fact there weren't.  Is that correct?

24  A.      Yes.

25  Q.      And do you typically do that in e-mails and letters,

Neugebauer - cross

1    where you say something that is actually not true?

2    A.    Not really.

3    Q.    But you did it this time, though.  Yes?

4    A.    To put him under pressure, yes.

5    Q.    To put someone under pressure, you might put an

6    untruth there?

7    A.    To put him under pressure.

8    Q.    You may say an untruth to put someone under pressure?

9    A.    There may also have been some discussion with CLAAS

10   that, We really regret it.  Mainly I sent it to put him

11   under pressure to consider what he is doing there.

12   Q.    What you did, you basically told him a lie to put him

13   under pressure.  Correct?  Correct?

14   A.    Not really.

15   Q.    Well, you just told me these several discussions in

16   house weren't going on, the only reason you put it in there

17   was to put him under pressure?

18   A.    I put it there to put him under pressure and there

19   may be some discussion with CLAAS Fertigungswerke.  I cannot

20   really personally remember.

21   Q.    "It seems to be that there is a possibility that we

22   will quit the relationship with you.  You should really

23   think about a possible solution.  It's my opinion."

24         So you are basically telling Mr. Bornes you

25   better quit selling to Gemcor or we are going to make our

754

Neugebauer - cross

1    own cassette or we are going to do something else.  Correct?

2    A.    In principle, yes, that's right.

3    Q.    And, in fact, you end up quitting your relationship

4    because Mr. Bornes and AHG would not drop their relationship

5    with Gemcor.  Correct?

6    A.    Yes.  We have so many years together --

7    Q.    I am not asking for a long explanation.  I am just

8    saying, you quit -- let me withdraw that question.

9              Broetje decided to stop its relationship with

10   AHG because AHG had decided to do dealings with Gemcor.

11   Correct?

12   A.    Not at that time.

13   Q.    Well, you said there is a possibility?

14   A.    Yes.  It's my opinion it is a possibility, yes.

15   Q.    Now, what is the date on this again, please?  This is

16   July 2003.  Right?

17   A.    Yes.

18   Q.    Is that July 29th, 2003?

19   A.    July 29, 2003.

20   Q.    Let's go back to JTX-14, please.  This is

21   development, a month before you sent this e-mail.  Correct?

22   June 23, 2003?

23   A.    We have started to investigate other solutions.  At

24   that time we knew Philippe Bornes wanted to deal with

25   Gemcor.  So we had started to investigate other solutions.

Neugebauer - cross

1   Q.      My question is, you began the development -- look at

2   the second page of this document, please.  What is this in

3   English?

4   A.      Development of an innovative rivet feed technology.

5   Q.      So you had begun development of that as of June 23,

6   2003?

7   A.      Yes, but not with the cassette at that time really.

8   Q.      Let's look at Page 19 of this document.

9           Page 1.  Whose cassette is that?

10  A.      That is an AHG cassette as an example.

11  Q.      As an example, correct.

12          Let's go to the next page.  Whose cassette is

13  that?

14  A.      That's also an AHG cassette as an example.

15  Q.      Let's go to the next page?

16  A.      As well.

17  Q.      And what's the next page?

18  A.      As well.

19  Q.      You have seen this document.  Correct?  Before?

20  A.      Yes.  I saw something like that.

21  Q.      You said AHG cassettes is in there.  There is no

22  other example in this complete development document other

23  than an AHG as an example.  Correct?

24  A.      Yes.

25          MR. LINDVALL:  No further questions.

Neugebauer - redirect

1            THE COURT:  Redirect.

2                    REDIRECT EXAMINATION

3    BY MR. KELLEHER:

4    Q.     Very briefly, Mr. Neugebauer.

5            I am going to put up again PTX-657.  Mr.

6    Lindvall was asking you about that a moment ago.

7            In that paragraph where you said, PS, I think

8    the discussion got a bit confused there.  I want to make

9    sure the transcript is clear.  You said there are several

10   discussions in house.

11   A.     Yes.

12   Q.     Were there discussions in house?

13   A.     Yes.

14   Q.     What kind of discussions?

15   A.     So that Philippe has explained to Maylander and to

16   myself that we want to in principle sell the technology to

17   our heaviest competitor.

18   Q.     And people within Broetje were talking amongst

19   themselves about that?

20   A.     Yes.

21           MR. KELLEHER:  Nothing further, Your Honor.

22           THE COURT:  You may step down.

23           (Witness excused.)

24           THE COURT:  Call your next witness.

25           MR. KELLEHER:  Your Honor, I think at this point

Auriol - designations

1    we have some videotape deposition to play.

2                   THE COURT:  About how long do you expect that

3    will be?

4                   MR. KELLEHER:  Four different witnesses, Your

5    Honor.  I thought we should split it up, Your Honor.  The

6    first one is about ten minutes, I believe.

7                   THE COURT:  Let's do that first one, then we

8    will take our break.

9                   MR. KELLEHER:  This will be Jean-Marc Auriol.

10                  (Designations placed in record.)

11                  "Question:  As of today, what percentage of the

12   revenue for AHG comes from selling rivets?

13                  "Answer:  About 85 percent.

14                  "Question:  Does AHG sell rivet cassettes?

15                  "Answer:  Not that I know of.

16                  "Question:  Does it sell filling stations to put

17   rivets into the cassettes?

18                  "Answer:  No.

19                  "Question:  Does it sell --

20                  "Answer:  No, that's done by F2C2.

21                  "Question:  Right.  And just for completeness, I

22   will ask does AHG sell the racks into which the cassettes

23   slide?

24                  "Answer:  Neither.  No.  No, it's still F2C2

25   which does that.

Auriol - designations

1        "Question:  So those three items, the cassettes,

2    the filling stations and the racks, those are sold by F2C2?

3        "Answer:  The entire system is manufactured by

4    F2C2.

5        "Question:  Mr. Auriol, I suppose it's

6    worthwhile getting on the record, but did the United States

7    Patent Office make a mistake and spell your name incorrectly

8    on the two patents?

9        "Answer:  Absolutely.  I'm not sure it's on

10    both.

11        "Question:  I think the European Patent Office

12    got it right.

13        "Answer:  On this one there's no mistake.  It's

14    Aurtoi also here.  Indeed.

15        "Question:  But it's you?

16        "Answer:  We cannot hide anything from you.

17        "Question:  So I think the -- there was a patent

18    application filed in France in 19888.  Is that correct?

19        "Answer:  It's very possible, yes.

20        "Question:  That was December 1988, does that

21    sound correct?

22        "Answer:  Yes.  It doesn't shock me.

23        "Question:  So it would have been before this

24    testing was done?

25        "Answer:  Before or during the filing of the

759

Auriol - designations

1    patent, because you do tests which allowed us to have a

2    machine with 100-meter-long tube, but before that, we had a

3    machine that produced much shorter tubes and it was much

4    easier.

5            "Question:  Do you remember, to the best of your

6    memory, how long before this December 1988 filing date that

7    this process began?

8            "Answer:  Several months.

9            "Question:  So now before, before clients came

10   and were complaining that there were these false brothers

11   mixed together, did you have any experience in rivet-feeding

12   systems?

13           "Answer:  Not systems based on a tube, for sure.

14           "Question:  Now, were you aware that people in

15   the past had used rivets -- I'm sorry, had used tubes for

16   holding and feeding rivets?

17           "Answer:  I don't have any experience in

18   particular in relation to that.  Putting a rivet inside a

19   tube is not terribly original in itself.  The issue is to

20   manage to make it move.

21           "Question:  Right.  Why do you need to put

22   things at the end of the tubes?

23           "Answer:  So as to avoid that the rivets leave

24   the tube by themselves.

25           "Question:  So that is just something you would

Auriol - designations

1     automatically think of?

2           "Answer:  You need to design a system, yes, for

3     that.

4           "Question:  So I'll ask this question:  Would a

5     square internal passageway have longitudinal passageways or

6     grooves?

7           "Answer:  It's obvious.

8           "Question:  And is the answer obviously yes?

9           "Answer:  I don't know.  No, because you have to

10    compare this with the text of the patent.  Anyway, what is

11    important is to have airflow.  In fact, if you wanted, you

12    could have circulation of air in a double-wall element with

13    the communication holes which would make it work perfectly.

14    So you can, you know, think of different, you know,

15    possibilities with a pentagon and hexagon, a square, any

16    kind of shape.

17          "Question:  Do you know if anyone used cassettes

18    with coiled tubes of rivets before AHG?

19          "Answer:  With tubes and grooves, certainly not.

20          "Question:  Do you understand that it is not a

21    violation of United States law to have a product that has

22    four of five patent claim limitations?

23          "Answer:  For me it sounds a bit like Chinese.

24    You know, it's -- it's a technical language for me and I'm

25    not a technician of patent law.

Auriol - designations

1          "Question:  So what I'm -- one thing I'm curious

2     about is there is a phrase in your patents that in the

3     European patent is Unguidageperi Pherique.  In the English

4     language, that is called "peripheral guidance."

5          "If someone wanted to make a tube for rivets

6     that would not have peripheral guidance, what should they

7     do?

8          "Answer:  I don't know.

9          "Question:  Does every tube have peripheral

10    guidance?

11         "Answer:  It all depends on the diameter of the

12    tube in relation to the diameter of the rivets.

13         "Question:  So if the diameter is too big of the

14    tube, then there would not be peripheral guidance.  Is that

15    correct?

16         "Answer:  I don't understand what you mean.

17         "Question:  Well, you indicated that it depends

18    upon the diameter?

19         "Answer:  Yes, of the relationship between the

20    diameters.

21         "Question:  Okay.  And so could you explain the

22    point at which the relationship changes from being one of

23    peripheral guidance to not peripheral guidance?

24         "Answer:  I have no idea what is the meaning of

25    your question.  I don't understand what you are asking me.

Auriol - designations

1           "Question:  If I were to look at a tube, say it

2     has a circular inside, and let's say that the inside of the

3     tube is two centimeters and I put inside of it a rivet that

4     has a head of one centimeter.  And we will say that the

5     shank of the rivet is three millimeters -- three

6     centimeters.

7           "Answer:  Okay.

8           "Question:  And if I were to apply compressed

9     air in that tube, as the rivet flowed through the tube,

10    would there be peripheral guidance?

11          "Answer:  Once again, it would be pure

12    speculation because the purpose and the interest of this

13    patent is not to guide or pilot one rivet, but a column of

14    rivets, and that's it.  Now, you can think of anything, but

15    you would have to try it out to see if it works.

16          "Question:  Does the concept of peripheral

17    guidance have any particular meaning to you in the field of

18    rivet-feeding devices?

19          "Answer:  I'd like to know what it means for

20    you.

21          "Question:  I honestly don't know.

22          "Answer:  Me neither.

23          "Question:  The top of the cassette is clear

24    plastic.  Is there a reason for that?

25          "Answer:  Well, for one thing, so that you can

763

Auriol - designations

1    see through it.

2                 "Question:  So that, for example, you --

3                 "Answer:  Because on the operational level you

4    have a tube that is clear or transparent, which allows you

5    to see the rivets moving through it, and if you have a

6    problem of rivets not moving through the tubes, then you can

7    see why.  And therefore, in order to be able to see the tube

8    on one side of the cassette, you need to have a clear or

9    transparent side.  That allows also to make this different

10   from similar things by putting the names AHG and F2C2 on it.

11                "Question:  The walls on the sides of the

12   cassette, the F2C2 cassette, are made of metal.  What is the

13   reason for that?

14                "Answer:  No.  Why should they not be made of

15   metal?

16                "Question:  This is United States Patent

17   4,662,206, to Mauer, M-A-U-E-R, and it is entitled

18   Rivet/Feeder.  Could you please look at figure number 6.

19                "If I was to use figure number 6 as the tube for

20   feeding a rivet, would there be longitudinal passageways or

21   grooves?

22                "Answer:  My attorney is perfectly right, and I

23   prefer not to answer.

24                "Question:  At first, I don't have anything that

25   tells me what this drawing corresponds to.  I would have to

Auriol - designations

1    read the text to know that.  So I don't know where we're

2    going with this.

3                    "Question:  In your patent do you have any tubes

4    shaped like this?

5                    "Answer:  No, the there's no shape like this

6    one, which is a particular shape.

7                    "Question:  I'm merely trying to find out

8    whether, if I placed a circular rivet head in the middle of

9    this tube, would, for example, there be a longitudinal

10   passageway at the very top?

11                   "Answer:  You know the answer.

12                   Question:  What is it?

13                   "Answer:  Of course the air flows through.

14                   "Question:  So the answer is yes.

15                   "Answer:  Your question is pernicious.

16                   "Question:  If my client used a tube with this

17   shape, would you still be suing them?

18                   "Answer:  Why didn't you do it?

19                   "Question:  Could you please answer my question?

20                   "Answer:  I choose not to answer this question."

21                   (Designations end.)

22                   THE COURT:  Okay.  I think it's a good time for

23   our afternoon break for the jury.  No talking about the

24   case.  I will see you back here in a little bit.

25                   (Jury left courtroom.)

1          THE COURT:  All right.  Most of you can probably

2     have a break.  We are going to give Mr. Kelleher an

3     opportunity to make the argument on the motion that was made

4     earlier today.  I am going to charge you for this time.

5          MR. KELLEHER:  Your Honor, we would move under

6     Rule 50(a) for judgment as a matter of law on the trade

7     dress infringement and unfair competition claims.

8          AHG failed to prove that the product configuration

9     of its cassette is non-functional.

10    AHG presented no evidence that the product configuration of

11    the cassette had acquired secondary meaning in the U.S. before

12    Broetje used the alleged trade dress in commerce in the United

13    States.

14          AHG presented no evidence that any consumers are

15    likely to confuse the source of the AHG's cassette with that

16    of the Broetje's parties cassette.

17          AHG failed to prove that it is the owner or the

18    senior user of the alleged trade dress because AHG failed to

19    prove that the Broetje parties cassettes infringed AHG's

20    alleged trade dress.

21          AHG also fails to prove its unfair competition

22    claims.

23          Concerning intentional interference with

24    perspective economic advantage.

25          AHG presented no evidence that either of the

1    Broetje parties knew that AHG and any third party were in

2    an economic relationship that probably would have resulted

3    in an economic benefit to AHG.

4            AHG failed to prove that the Broetje parties

5    engaged in wrongful conduct through trade dress infringement

6    or patent infringement which we contend is preempted.

7            AHG presented no evidence that either of the

8    Broetje parties intended to disrupt the relationship or that

9    any relationship was in fact disrupted.

10           AHG failed to prove that the Broetje parties

11   conduct, wrongful or otherwise, was a substantial factor in

12   causing AHG's alleged harm.

13           Concerning nonpatent damages, Your Honor.

14           AHG presented no evidence that it is entitled to

15   recover actual damages for:

16           One, injury or loss to AHG's reputation.

17           Two, injury or loss to AHG's goodwill.

18           Three, lost profits that AHG would have earned

19   but for the Broetje parties alleged infringement.

20           Four, the expense of preventing customers from

21   being deceived.  And,

22           Five, the cost of future corrective advertising

23   reasonably required to correct public confusion caused by

24   the infringement.

25           AHG presented no evidence it is entitled to

1    recover the Broetje parties profits from using the alleged

2    trade dress in the sale of rivet cassettes or any other

3    product.

4              AHG failed to present evidence that the Broetje

5    parties used AHG's alleged trade dress intentionally knowing

6    it was an infringement.

7              AHG presented no evidence that:

8              One, either of the Broetje parties engaged in

9    unfair competition and/or that they did so with malice,

10   oppression or fraud, and/or

11             Two, either of the Broetje parties engaged in

12   intentional interference with AHG's prospective economic

13   advantage and/or that it did so with malice, oppression,

14   fraud.

15             AHG failed to prove that before May 12, 2006, it

16   did not discover or did not know the facts that would have

17   caused a reasonable person to suspect that it suffered harm

18   in the U.S. that was caused by trade dress infringement or

19   unfair competition under the Lanham Act.

20             AHG failed to prove that before May 12, 2007, it

21   did not discover and did not know facts that would have

22   caused a reasonable person to suspect that it suffered harm

23   in the U.S. that was caused by unfair competition under

24   common law or intentional interference with perspective

25   economic advantage under California state law.

1          The expert testimony and the report proffered in

2     support of the damages claim is unreliable and overstated.

3          AHG has not proved it is entitled to any

4     injunctive relief.

5          AHG produced no evidence:

6          One, that it suffered irreparable injury.

7          Two, the remedies available at law are

8     inadequate to compensate for the injury,

9          Three, considering the balance of hardships

10    between it and the Broetje parties, a remedy in equity is

11    warrant.

12         Last, concerning the patents.

13         No reasonable jury could find that the tube in

14    the Broetje parties rivet cassettes directly infringed the

15    asserted claims of the '216 patent or the '339 patent.

16         AHG failed to prove that all of the elements of

17    any of the asserted claims were met by Broetje's cassettes.

18         No reasonable jury could find that either of

19    the Broetje parties induced a third party to infringe the

20    asserted claims of the '339 patent.

21         AHG -- used throughout this speech, Your Honor,

22    to mean both AHG or F2C2 or both -- failed to prove that a

23    third party directly infringed the '339 patent.

24         AHG presented no evidence that either of the

25    Broetje parties took action during the time the '339 patent

1    was enforced intending to cause any third party to perform

2    infringing acts.

3            AHG presented no evidence that either of the

4    Broetje parties, one, knew that the act as taken would

5    constitute infringement of the '339 patent, or subject to,

6    we believe, that there is a high probability that the acts,

7    if taken, would constitute infringement of the '339 patent

8    but deliberately avoided confirming that belief.

9            No reasonable jury could find that either of the

10   Broetje parties contributed to the infringement by a third

11   party of the asserted claims of the '339 patent.

12           AHG failed to prove that the Broetje parties

13   sold, offered to sell, or imported within the U.S. a tube

14   for use in the process that infringe an asserted claim of

15   the '339 patent during the time the '339 patent was in force.

16           AHG presented no evidence that either of the

17   Broetje parties knew that the tube was especially made to be

18   used in a manner to infringe the '339 patent.

19           No reasonable jury could find that the Broetje

20   parties willfully infringe the '216 patent or the '339

21   patent.

22           AHG presented no evidence that either of the

23   Broetje parties acted despite an objectively high likelihood

24   that its actions would infringe a valid patent.

25           AHG presented no evidence that either of the

1    Broetje parties knew or should have known that its actions

2    constituted an unjustifiably high risk of infringement of a

3    valid patent.  And,

4            Last, AHG is not entitled to patent damage.  No

5    damages based on the entire market value rule should be

6    awarded.

7            AHG presented no evidence that customers

8    demanded the Broetje cassettes or the rack and/or loading

9    stations because of the tubes and/or cassette.  There should

10   be no recovery of AHG lost profits.

11           AHG failed to prove any of the Panduit factors.

12   There is no evidence of entitlement to damages based on

13   convoyed or derivative sales, and the expert report and

14   report offered in support of the damages claim is unreliable

15   and overstated.

16           That is my list, Your Honor.  If you have any

17   questions, I can obviously answer them.

18           THE COURT:  Not at this time.

19           MR. KELLEHER:  I understand, Your Honor.

20           THE COURT:  I'm going to reserve judgment on

21   the motion, but if plaintiffs wish to be heard they can be.

22           MR. LINDVALL:  I probably think the only thing I

23   can say is I think they pretty much preserved their rights.

24           THE COURT:  I doubt that they missed anything.

25           MR. LINDVALL:  It didn't sound like it.  He may

Peters - direct

1    have but we will wait and see.

2              THE COURT:  All right.  We will take a break.

3    Thank you.

4              (Brief recess taken.)

5              *      *      *

6              (Proceedings reconvened after recess.)

7              THE COURT:  We'll bring the jury in.

8              (Jury returned.)

9              THE COURT:  Welcome back.

10             Mr. Kelleher, what is next?

11             MR. KELLEHER:  Your Honor, we'll call our next

12   witness, Dr. Axel Peters.

13             THE COURT:  Okay.

14             ... AXEL PETERS, having been first duly sworn,

15   was examined and testified as follows ...

16             THE COURT:  Good afternoon, and welcome,

17   Dr. Peters.

18             And I'll just note for the record that our

19   interpreter is nearby in case needed.

20             Mr. Kelleher.

21             MR. KELLEHER:  (Indicating with binders.)

22             THE COURT:  You may.

23             (Binders passed forward.)

24                        DIRECT EXAMINATION

25   BY MR. KELLEHER:

Peters - direct

1    Q.    Dr. Peters, could you please introduce yourself to

2    the jury?

3    A.    My name is Axel Peters, working for Broetje since

4    2008.

5    Q.    And what is your job title there?

6    A.    I am COO, Vice President of Operations.

7    Q.    Could you tell us about your education?

8    A.    I'm a Ph.D. in Automation, and before I study

9    mechanical engineering at the University of Aachen.  It's

10   one of the famous universities in Germany also.

11   Q.    And before you worked at Broetje, where did you work?

12   A.    I work for Kuka.  Kuka is also a little bit famous

13   for the car industry.  So it's also automation company

14   dealing with automation stuff for assembly lines and so on.

15   Q.    That's K-u-k-a?

16   A.    K-u-k-a.  It's a robot manufacturer, like ABB.  I

17   don't know who is familiar with that.

18   Q.    Dr. Peters, in your role as Chief Operating Officer,

19   how familiar are you with Broetje's recordkeeping?

20   A.    I am responsible for the CAD here, that is the

21   drawing system, and also for our ERP system where we store

22   our records for producing parts.  Material handling is

23   inside there.  Production is inside there.  What we have to

24   do with the parts to do.

25   Q.    That ERP system, that is a computerized system?

Peters - direct

1    A.     That's an enterprise resource system that is dealing

2    with the information that you have.

3    Q.     Dr. Peters, in this case, have you been involved with

4    trying to determine the exact number of rivet cassettes that

5    Broetje has sold in the United States?

6    A.     Yes, I have done that with my colleagues who prepared

7    the data and got that out of the database.

8    Q.     Could you please look at Exhibit No. DTX-1888?

9    A.     What was the number?

10   Q.     1888.

11   A.     (Witness complies.)

12   Q.     Without discussing the contents of this, could you

13   tell us briefly what is this?

14   A.     Sorry.  This is an overview we prepared to get the

15   numbers of our cassettes.

16   Q.     Okay.

17   A.     That's an Excel sheet where we putting together all

18   the data we got from the database.

19   Q.     Where does the information come from?

20   A.     From the ERP system.  We selected it.

21   Q.     How does information get put into the ERP system?

22   A.     The information is typed in by people who work for

23   us.  For example, designers, if they design a new machine,

24   they take in a BOM.  That is a Bill Of Material, and then

25   after which we know what it has to be in the machine.

Peters - direct

1    Q.      Do the people who enter information into the system

2    have knowledge of what it is they're entering?

3    A.      Sure.  We are even one expert who was directly

4    dealing with all of the material that is in the machine, and

5    he is also arranging it directly so we that know what is in

6    the machine.

7    Q.      Do they enter the information around the time the

8    events that they are reporting occurs?

9    A.      Yes.

10   Q.      And is the information in the system kept in the

11   ordinary course of business?

12   A.      Yes, it is kept there.

13   Q.      Is it the usual practice of Broetje to collect and

14   maintain this information in your ERP system?

15   A.      That's the usual, ya.  Because even if you want to

16   buy it with the supplier, you have to have it in the system.

17   Otherwise, you can't buy it from the market.

18           MR. KELLEHER:  Your Honor, I would offer into

19   evidence DTX-1888.

20           MR. LINDVALL:  No objection, Your Honor.

21           THE COURT:  It's admitted.

22           (DTX-1888 is admitted into evidence.)

23   BY MR. KELLEHER:

24   Q.      So this is going to be a little bit difficult for

25   people to See, I know.

Peters - direct

1    A.    I can't see anything here.

2    Q.    But we can blow it up a little bit on the screen.

3    Just looking at the very top, there are a few rows,

4    Dr. Peters.  Can you explain to us what it is that the

5    columns here mean?

6    A.    Ya.  What we've done, because we don't have a system

7    where we can see each cassette.  We are not a cassette

8    seller, nor anything else.  We just sell machines, and we

9    normally build this within projects, so we are project-based

10   company.  So that is why we had to select the data from the

11   database and put it in an Excel sheet.

12         And on the opposite side, for example, then we

13   did a calculation what we thought might be the price, for

14   example, for the components, the cassettes, the rivet

15   filling station that we started work.

16         And then we got through each project, we knew

17   that was done in the U.S., took the order number.  That is

18   the Auftrag in Germany.  That is the second column you see

19   there.  We took out the customer who bought it.  For this

20   example, it was Vought in Dallas.

21         Then we looked into the bill of material of this

22   project and looked what we delivered for rivet cassettes,

23   loading station, and also the racks, put that together into

24   this document.

25   Q.    So, Dr. Peters, that second column you just talked

776

Peters - direct

1    about it says Auftrag, A-u-f-t-r-a-g, that is the project?

2    A.    That is the job number or the company for the

3    project.

4    Q.    Yes.  So the number that is below that, it says

5    315881?

6    A.    Yes.

7    Q.    Is that the project that we usually call project

8    1588?

9    A.    That is the project 1588 because the leading number

10   is just to show that it's a project and the end number is

11   just to, if you have more to do in a job, maybe the issues

12   so you have additional numbers in the project.

13   Q.    So is there a column that shows the quantity of

14   fastener cassettes?

15   A.    Yes.  The second right column where it's in German,

16   Gesamtmenge.  Can you point?

17   Q.    Yes.

18   A.    That's the number of items in the row.

19         So the first you see there is, for example,

20   is Niekassete 4.8-8, and there are 20, I think 25 -- I can't

21   really read it -- about 25 in this project produced.

22   Q.    Is there a place in this document where it shows the

23   revenue for the project?

24   A.    If you go further right, then we did the revenue

25   project base because --

Peters - direct

1    Q.      Technical difficulties.

2    A.      Because we sell this as a part of the project, we

3    took the revenue of the complete project and calculated it,

4    and also for the component shown here for the rivet cassette

5    for the rack and the loading station.

6    Q.      So are we showing it now, Dr. Peters, the revenue?

7    A.      No, it's still far to go on the right side.  Yes,

8    there is the ROS.  That is the Return Of Sales.  There a

9    loss in this case in this project.  And then we show it was

10   the profit for the equipment within this project.

11   Q.      Is that a negative sign there at the beginning?

12   A.      That's a minus, yes.  That is a negative sign.  We

13   don't do it in records in Germany.  That is a minus we use

14   there.

15           And we also show the sale price, the total sale

16   price of the machine.  That is the VK Gesamt.

17           To the left, that is the old price.  That is the

18   7 million Euro.

19   Q.      This one here?

20   A.      Yes, that is right.  And for each equipment, we have

21   for the rivets itself and also for the loading station and

22   the filling station we have then the estimated sales price

23   for the equipment.

24   Q.      Does this document show the quantity of rivet

25   cassettes delivered for all of the projects shown throughout

Peters - direct

1    the document?

2    A.    Yes.

3    Q.    I wanted to ask a question.

4          Can you go back a little to the left and show

5    both this project, 1588, and the one below it, 1589.

6          There is a line here that says NBS AHG, and

7    below it NAS AHG.

8    A.    Yes.  This was the first project to Vought Dallas

9    where we first sold our own cassettes, and we still had an

10   AHG rack and loading station included.  That's why we

11   pointed out, that's still an AHG system included.

12   Q.    What does NAS mean?

13   A.    (Witness speaking in German).  That is the rack.

14   Q.    And BAS?

15   A.    That is (Witness speaking in German).  A rivet

16   loading station.  That is the loading station.

17   Q.    You showed earlier that the revenue received is shown

18   here.  Is any revenue shown here on this document for the

19   AHG or F2C2 shown?

20   A.    No, we didn't include it.

21   Q.    Why not?

22   A.    Because we didn't deliver -- we just delivered the

23   accused product, it was an AHG original product.

24   Q.    Dr. Peters, for some of the cassettes, there is a

25   line that says r-u-n-d-s-c-h-l-a-u-c-h.  Do you see that?

Peters - direct

1    A.      It's rundschlauch.  It is showing the round tubes we

2    also used in cassettes.

3    Q.      What do you mean by that, round tubes?

4    A.      It's just the round shaped tube.  It's not a

5    pentagon-shaped tube.  The round shape, we used it also, but

6    we have reinforced fiber in so that it stays in the original

7    position if we put it in the cassette.

8    Q.      Dr. Peters, I am holding up DTX-1223D.  Do you see

9    this from there?

10   A.      Yes.

11   Q.      Can you tell what the shape of this tube is from

12   where you are?

13   A.      This is a round tube.

14   Q.      How can you tell?

15   A.      Because you see the fiber reinforcement there.

16           MR. KELLEHER:  Your Honor, may I approach the

17   witness?

18           THE COURT:  You may.

19   BY MR. KELLEHER:

20   Q.      Dr. Peters, I am handing you what has been marked

21   DX-1353C.  Can you tell me what this is?

22   A.      This is one of the round tubes.  You see here the

23   fiber end.  And it's also packed and colored.  So we use it

24   in the cassettes.

25           MR. KELLEHER:  Your Honor, I move into evidence

Peters - direct

1   DTX-1553C.

2              MR. LINDVALL:  No objection.

3              THE COURT:  Admitted.

4              (Exhibit DTX-1553C received in evidence.)

5   BY MR. KELLEHER:

6   Q.    Dr. Peters, we also saw a little bit to the left, we

7   see something called a collaradaterpasette.  Do you see

8   that?  What is that?

9   A.     That is something special we use on the lower tube.

10  It doesn't go in direct itself.  It's used for collars,

11  normally on the outside of the rivets.  On the outside you

12  put in a fastener and you put a collar from inside.  We also

13  store these circular cassettes.  They don't go in direct.

14  There we use the rectangular shape.  They are near the

15  tooling.

16  Q.    And we you are talking about the tooling, are you

17  speaking maybe at the top of the machine or --

18  A.     Somewhere on the machine below on the upper tube

19  where we rivet together.  This is on the lower tube.

20  Q.    What kind of machine tubes are used for the charges?

21  A.     It is rectangular, rectangular, because this is a

22  knot discolor.  That is because you have this rectangular

23  shape needed for the tube.

24              MR. KELLEHER:  Your Honor, may I approach the

25  witness again?

Peters - direct

1                THE COURT:  You may.

2    BY MR. KELLEHER:

3    Q.    Dr. Peters, I am showing you what is marked DTX-1553.

4    Can you tell us what this is?

5    A.    Yes.  This is one of our rectangular shapes.  You

6    see, that is really like a rectangle.

7    Q.    Thank you very much.

8                MR. KELLEHER:  Your Honor, I would move into

9    evidence Exhibit DTX-1553D.

10               MR. LINDVALL:  No objection.

11               THE COURT:  It's admitted.

12               (Exhibit DTX-1553D received in evidence.)

13   BY MR. KELLEHER:

14   Q.    Dr. Peters, could we go to the very bottom of this

15   document.  There is a green rectangle there.  Could you tell

16   us what this means?

17   A.    This is the total number of cassettes that are in

18   this sheet.  We also pointed out how many are round shaped

19   of them.

20   Q.    So 871 total, and 330 round?

21   A.    Yes.

22   Q.    Now, the cassettes that we are talking about here, do

23   these include cassettes that are sold as spare parts?

24   A.    No.  We have a separate slide for that.

25               MR. KELLEHER:  Your Honor, the jury saw that

Peters - direct

1    earlier today with Mr. Benczkowski.

2    BY MR. KELLEHER:

3    Q.    How reliable, Dr. Peters, can we believe this total

4    is?

5    A.    We did several versions because we had to.  We found

6    always some things, for example, we had shipping documents

7    showing one test more than we believed we shipped.  We had

8    to look it up.  At the end we found out we got some

9    cassettes back from the former projects for the customer.

10   We had to do some pretesting and after that we had to ship

11   it back.  There was one more in the data than in this sheet.

12          We discussed that eternally.  But in the end,

13   this exit sheet is based all on what we have built in our

14   accounting.  All the cassettes, and all the NAS system we

15   have built in our company.  In the project, what happened,

16   the customer, he buys 16 cassettes, and then maybe he needs

17   different rivets, he may also change the type of rivet

18   cassettes he gets.

19          So that's always confusing.  At the end you have

20   to ask, did the program manager, for example, what he did in

21   this program.  In the end, this is all we get.  And we have

22   to order more cassettes than this from the company.

23   Q.    The next exhibit in your book, Dr. Peters, DTX-1889.

24   Can you tell us what this is?

25   A.    I believe this is the projects we have done after

1   2012 or '11.

2           MR. KELLEHER:  Your Honor, with permission, I

3   would move into evidence DTX-1889.

4           MR. LINDVALL:  No objection, Your Honor.

5           THE COURT:  It is admitted.

6           (Exhibit DTX-1889 received in evidence.)

7   BY MR. KELLEHER:

8   Q.    We can blow it up now.  Is this an update we did a

9   few months ago?

10  A.    Yes, we did, because the case went on and we updated

11  this Excel sheet.

12  Q.    Can we look at the very bottom.  There is another

13  green rectangle here?

14  A.    This is an additional 215 cassettes with rectangular

15  shape.

16  Q.    In this case, there is no round tubes?

17  A.    No.

18  Q.    When you say pentagon-shaped tubes, what do you mean?

19  A.    It's another line of pentagonal shape we used for

20  these cassettes.

21  Q.    Have you prepared a demonstrative slide to show what

22  you mean by a pentagonal-shaped tube?

23  A.    Yes, we have that.

24  Q.    If we can just pull that up, Your Honor.

25           Dr. Peters, can you please explain what is shown

Peters - direct

1   in this demonstrative slide?

2   A.      This is a typical situation we have where the tube,

3   you see the rivet head, a rounded part, you see the rivet

4   itself, the tube, and you see the space that is around the

5   rivet, so that we have the outflow in the tube.

6   Q.      How typical is this as an example of what a rivet

7   looks like in one of Broetje's patented tubes?

8   A.      This is the typical usage we have.

9   Q.      How do you know that?

10  A.      Because that's how we design it.  We know that we

11  need merely a millimeter space in the tube to get the

12  airflow through that.

13  Q.      Next, Dr. Peters, I would like to ask if you could

14  please turn to DTX-1218.  Could you tell us what this is?

15  A.      This is a sheet for RLS calculation in the project.

16  Q.      We saw in the large cell spreadsheet a column called

17  ROS.  What does ROS mean?

18  A.      Return of sale.

19  Q.      Is that a way to calculate profit?

20  A.      It is always.  It is comparable to the EBIT.

21              MR. KELLEHER:  Can I move into evidence

22  DTX-1218, Your Honor?

23              MR. LINDVALL:  No objection.

24              THE COURT:  It is admitted.

25              (Exhibit DTX-1218 received in evidence.)

Peters - direct

1    BY MR. KELLEHER:

2    Q.    Looking at this first page, what is this?

3    A.    This shows for the project, first what we have in

4    there, we have Gewahrieistung, that's the machine.  It's an

5    upgrade for the injector station.  It's also Gewahrieistung

6    in there, it's the guarantee of the machine.

7              So there are different positions taken together

8    under these project numbers.  After that we have the

9    budgetary side of the material, for example, of the design.

10   We have the documentation, that's all compiled together in

11   this document.  And at the end -- there is also SG&H, sales,

12   for example.  At the end we see how much money we have gone

13   with this complete project.

14   Q.    I see 7,025,000 then a 3000?

15   A.    This is our sales price for the total machine,

16   7-million-and-2000-some small additions.

17   Q.    Is that revenue?

18   A.    That's not revenue -- revenue -- it's revenue.

19   Q.    So if we could go to the left-hand side, if you

20   could -- you don't need to read them aloud, but as you go

21   down the right side here on these rows, what do each of

22   these lines represent?

23   A.    It shows the different things we did.  If we are in a

24   project, material, you can read it in English, material,

25   then production, manufacturing, fertigung, then we have all

Peters - direct

1   the design, mechanical, electrical design we do in our

2   machines.

3   Q.      In English can we call these costs?

4   A.      These are the costs in each department involved in

5   our machines.

6   Q.      Could we go down farther?

7   A.      Also traveling costs, all included.

8   Q.      Eventually, we get down to this red or purple line

9   called ROS.  Do you see that?

10  A.      The yellow line, that is the revenue we had before,

11  the 7 million, and then we have the total cost we had in

12  this project, the red line is ROS, that is what we earn on

13  this project.

14  Q.      Did Broetje make money on this project, 1588?

15  A.      Yes, we did.

16          I am sorry, we didn't, because, we have to go

17  up, in the first line, that is the budgetary role.  When we

18  quoted it that's what we thought we would get for this

19  project.  The second one, Prognose, that's the forecast that

20  the project manager says where we will be with the project

21  at the end.  Then we have in the third row HSK, that is then

22  the real costs we had on this project.

23  Q.      Dr. Peters, where in this document can I find the

24  profit or loss that the company experiences from having sold

25  the cassettes for this project?

Peters - cross

1    A.      That's not really possible with our calculation

2    because, for example, if we design for a cassette, we not

3    just design the cassette because it's a rivet in the

4    cassette.  We also have to design tubes in the machine.  We

5    also may design the rivet exchanger, the tooling that is

6    able to install this rivet in the machine.  So we don't get

7    a number for the cassette, because we are machining the

8    cassettes.

9    Q.      Be does that mean I won't able to find individual

10   profit or loss amounts for components of the giant machine?

11   A.      No.  Material, for example, it is included in the

12   design, it is also included in production.

13   Q.      Is there any more reliable way a company can think of

14   to calculate its profits or losses on its components?

15   A.      We don't do that on components.

16   Q.      Is this the most reliable way to calculate whether or

17   not the company makes a profit or loss on projects?

18   A.      Yes.

19              MR. KELLEHER:  I don't have any more questions,

20   Your Honor.

21              THE COURT:  Okay.  Cross-examination.

22                   CROSS-EXAMINATION

23   BY MR. LINDVALL:

24   Q.    Good afternoon, Dr. Peters.

25              You mentioned a thing called an ERP.  Is that

1    right?

2    A.      Yes.

3    Q.      What is ERP?

4    A.      Enterprise Resource Plan, membership, I think,

5    manufacturing, I think it's known.

6    Q.      Have you ever heard of AMS?

7    A.      AMS is American Manufacturing System.

8    Q.      So AMS New York is the same?

9    A.      AMS is the manufacturing system.

10   Q.      I believe you testified that your ERP system and the

11   AMS system are reliable?

12   A.      Yes.

13   Q.      I understand these systems are used by your outside

14   auditors WHEN they audit you.  Is that correct?

15   A.      Yes, they are used from these guys and also there

16   from the design department.

17              MR. LINDVALL:  May I approach, Your Honor?

18              THE COURT:  Yes, you may.

19   BY MR. LINDVALL:

20   Q.      Let me show you what has been marked as DTX-1005.  Do

21   you recognize this?

22   A.      Yes.

23   Q.      Is this created through your AMS or ERP system?

24   A.      That is created from USA side, yes.

25   Q.      Is it created from your ERP system?

Peters - cross

1    A.      Also from AMS system, yes.

2    Q.      This is the type of data you expect to be reliable.

3    Correct?

4    A.      Yes.

5              MR. LINDVALL:  I move this into evidence,

6    DTX-1005.

7              MR. KELLEHER:  No objection.

8              THE COURT:  It's admitted.

9              (Exhibit DTX-1005 received in evidence.)

10   BY MR. LINDVALL:

11   Q.      If you look at the second page, DTX-1005, I want to

12   look at the columns real quickly, if you look at Column F,

13   that's the ship date.  Correct?

14   A.      Yes.

15   Q.      Is that the shipment date?

16   A.      Yes, I expect that.

17             MR. LINDVALL:  I don't have any further

18   questions, Your Honor.

19             THE COURT:  Redirect?

20             MR. KELLEHER:  Nothing further, Your Honor.

21             THE COURT:  You may step down, Dr. Peters.

22   Thank you.

23             (Witness excused.)

24             THE COURT:  You may call your next witness.

25             MR. KELLEHER:  Your Honor, next we will call Dr.

Budach - direct

1     Steffen Budach.

2                ... STEFFEN BUDACH, having been first duly

3     sworn, was examined and testified as follows ...

4                THE COURT:  Good afternoon.  And welcome to you,

5     Dr. Budach.

6                I'll note for the record, the translator is

7     nearby if you need her assistance.

8                THE WITNESS:  Thank you.

9                (Documents passed forward.)

10                     DIRECT EXAMINATION

11    BY MR. KELLEHER:

12    Q.    Dr. Budach, could you please introduce yourself tote

13    jury?

14    A.    Yes.  Hello.  I'm Steffen Budach.

15    Q.    For what company do you work?

16    A.    I work for CLAAS.

17    Q.    What is the relationship between CLAAS and the

18    Broetje company?

19    A.    Broetje used to be a subsidiary of CLAAS, the CLAAS

20    company.

21    Q.    When did that end?

22    A.    Sorry?

23    Q.    Until when?  Until which year?

24    A.    Between, between 2003 and 2011 or 12.

25    Q.    What kind of business is CLAAS in primarily?

791

Budach - direct

1    A.      CLAAS is a farm equipment manufacturer, like forage

2    harvesters, combine harvesters or tractors, farm equipment

3    for like cattle, mowing devices and so on.

4    Q.      Who are CLAAS's main competitors?

5    A.      The main competitors of CLAAS are all United States

6    companies:  John Deere, CNA, Case, New Holland, and Echo.

7    Probably, you know Echo from Massey Ferguson, some company

8    of the Echo group.

9    Q.      Does CLAAS have any employees in the United States?

10   A.      Yes.  We have about 360 I believe in the United

11   States.

12   Q.      What is your current job with CLAAS?

13   A.      I'm the head of the Patent Department.

14   Q.      The Patent Department?

15   A.      Yes.

16   Q.      Since what year?

17   A.      Since August 2001, I have the responsibility for the

18   patent issue in the CLAAS group.

19   Q.      Can you explain a bit more?  What are your job

20   responsibilities?

21   A.      Okay.  My most important thing is to, I work with a

22   team.  The most important thing is we have to monitor our

23   patent publications from our competitors.  That's the first

24   one.

25                   And the second one is that we give infringement

792

Budach - direct

1    opinions or noninfringement opinions to our R&D department

2    worldwide.  We have R&D departments in Europe and also in

3    the United States.  In Russia and India, for example.

4    Q.    Why do you monitor the patent publications of your

5    competitors?

6    A.    Okay.  What we expect is that competitors respect

7    our patents, and the same applies for us.  That we do not

8    infringe any competitor patents.  That's the most important

9    thing for us, because it's very expensive to delete a

10   product from the market if you get information years later

11   that you infringe any third party's patents.

12             And that's why we have to.  That's our main job.

13   That's our main business, to monitor our products and the

14   patent publications of our competitors to avoid patent

15   infringement.

16   Q.    Dr. Budach, could you tell us about your education?

17   A.    Yes.  Okay.  I have studied agriculture engineering.

18   I finished it with a doctorate degree in agriculture

19   engineering.  And subsequently, subsequently, I got a German

20   patent lawyer degree.

21   Q.    When you were studying to become a German patent

22   lawyer --

23   A.    Yes.

24   Q.    -- will you tell us what types of law you studied?

25   A.    Okay.  To get the degree of a German patent lawyer,

793

Budach - direct

1    it's a completely separate study.  In Germany, we have to

2    study three years:  two years of this in a law firm or in a

3    Patent Department of an industrial company, and the first

4    year in the German Patent and Trademark Office and in the

5    German Federal Patent Court.  It is a specific court which

6    has to decide about relativity and irrelativity of patents,

7    and at this time you work together with Judges in Germany.

8    And altogether, we study about three years.

9    Q.      During your studies, how is United States patent law

10   treated?

11   A.      Sorry?

12   Q.      During your course of studies, does United States

13   patent law ever come up?

14   A.      Yes.

15   Q.      Could you tell us how?

16   A.      Okay.  What we have to study is at first the German

17   patent law, and then international patent law, and there we

18   have to study European patent law and also United States

19   patent law.  At least, key figures of the United States

20   patent law.

21   Q.      What kind of test or tests do you have to take to

22   become a German patent lawyer?

23   A.      To become a German patent lawyer, you have to do

24   two tests, one in written form and an oral test.  The

25   written test, you will have a five hour written test and

Budach - direct

1    five hour oral examination.  And the oral examination is

2    with five candidates and five hours in front of five Judges

3    or Patent Examination Officers from the Patent and Trademark

4    Office.  And they can ask you any question they want and

5    will also questions about the United States patent law.

6    Q.    Dr. Budach, could you tell us, how well to you speak

7    English?

8    A.    I would say well enough to understand and to speak

9    and to read English texts.

10   Q.    What language did you and I use to speak to each other?

11   A.    We, all the time we talk, we are talking in English.

12   Q.    Why do you have an interpreter with you to help you

13   testify?

14   A.    I testify under oath, and I don't want to make any

15   mistakes.  That is why I would like to use from time to

16   time, from question to question, an interpreter.

17   Q.    When did you first start working at CLAAS?

18   A.    I start working at CLAAS in 1997.

19   Q.    And what was your first job?

20   A.    My first job was as a patent engineer.

21   Q.    What did you do as a patent engineer?

22   A.    As a patent engineer, you have to monitor patent

23   publications and you have to craft patent applications, but

24   you are not entitled to represent a company at the court.

25   That's just for German patent attorneys.

795

Budach - direct

1    Q.     When the company is thinking about having new

2    products, what kind of, what kind of patent policies are

3    there for new products under development?

4    A.     We have two policies.   The first one is freedom to

5    operate.   That means the products that we launch should not

6    be withdrawn from the market, any infringement issues.

7    That's the first one.

8              And this process is done under our company in

9    the so-called CLAAS product development process.   That means

10   we have, from time to time, to monitor our R&D projects,

11   and we have to give opinions about infringement and

12   noninfringement.

13             We have five milestones from the beginning of an

14   R&D process until the end of the development projects.   We

15   have five stages where we have to look to the product, and

16   we have to give an opinion that we do not infringe any

17   patents of any competitors.

18   Q.     What happens if during this process you have actually

19   determined that a product would infringe someone's patent?

20   A.     Well, at first we do -- we not allow, are not

21   entitled to infringe any patents.   If we find any disturbing

22   patents, then we have to design-around these patents.   That

23   is the usual case.

24             Sometimes we also buy license agreements with

25   third parties, if it's applicated.   It depends on the order

Budach - direct

1   of the patents.  But normally we have to design-around the

2   patents.

3   Q.      What do you mean by design-around?

4   A.      Design-around means we have to respect patents, and

5   we have to look for a lot for another solution.  And the

6   solution does not -- have not to infringe -- has not infringe

7   these patents, what we have identified.

8   Q.      Do you have anyone assisting you in your work?

9   A.      Yes.  In 2003, that is the primary talk about here, I

10  have one patent engineer, and today I have one patent

11  engineer and three German patent lawyers.

12  Q.      How much experience do you have working with United

13  States patents?

14  A.      I would say we have, for the moment we have about

15  300 filed or granted United States patents.  Sometimes I

16  personally draft patent applications for the U.S. in English,

17  and we support our United States patent lawyers in drafting

18  claims of the patent applications.

19          For example, if we are in the patent examination

20  procedure, the examiners sometimes presents disturbing prior

21  art, and then we have to amend the claims.  And in most

22  cases, it is our job to give support in amending the patent

23  claims.

24  Q.      How often do you deal with United States patents that

25  are owned by CLAAS's competitors?

797

Budach - direct

1    A.      I would say that is our daily business because we

2    have to watch the patent issues worldwide, worldwide any

3    patent issue.

4    Q.      Dr. Budach, were you involved when the Broetje

5    fastener cassette was being developed?

6    A.      Yes.

7    Q.      Could you tell us how you got involved?

8    A.      Okay.  I remember in the beginning of the 2000s,

9    Broetje got more and more problems with the AHG cassettes.

10   And I remember that in the middle of 2003, Broetje decided

11   to develop its own cassette system.  And in this time,

12   Broetje did at first a patent search in their own company

13   without our involvement, and some weeks or months later we

14   were involved in this project.  And that was my first

15   contact, that Broetje came to us and ask for assistance in

16   doing any patent searches worldwide to avoid any patent

17   infringement.  That was my first contact with this issue.

18   Q.      Dr. Budach, could you please look at -- do you have

19   an exhibit in your book, DTX-1594?

20   A.      1031?

21   Q.      I'm sorry.  1594.

22   A.      Okay.  Yes.

23   Q.      Could you tell us what this is?

24   A.      That's a meeting report of an internal meeting within

25   Broetje.

Budach - direct

 1              MR. KELLEHER:  Your Honor, assuming there is no

 2    objection, could I move into evidence DTX-1594.

 3              MR. HOROWITZ:  He assumes correctly.  No

 4    objection.

 5              THE COURT:  It's admitted.

 6              (DTX-1594 is admitted into evidence.)

 7    BY MR. KELLEHER:

 8    Q.    So, Dr. Budach, now the exhibit is up on the screen

 9    so the jury can see it --

10    A.    Okay.

11    Q.    -- more easily.  Could you tell us what was this

12    meeting about?

13    A.    This meeting about patent examination.  You can see

14    its regarding patent examination.

15    Q.    And I see there is a list of patents, a review of

16    patents.

17    A.    Yes.

18    Q.    Numbers.

19    A.    Ya.

20    Q.    Why were patents being looked at?

21    A.    It's a lot of AHG patents, and one of them is the

22    European part of the AHG patents we talk about here.

23    Q.    The two United States patents?

24    A.    Yeah, it's the two United States patents.  Yes.  I

25    guess the EP 0 373 685.

Budach - direct

1    Q.      Do you know what the result was of this meeting?

2    A.      The result of that meeting was that Broetje decided

3    to come to CLAAS, to the group Patent Department to ask for

4    support in search prior art worldwide, to avoid any patent

5    infringement.

6    Q.      Could you please look at DTX-1168?

7    A.      Yes.

8    Q.      And what is this?

9    A.      It's the European patent, the corresponding European

10   patent to the United States AHG patents.

11           MR. KELLEHER:  Your Honor, may I move into

12   evidence DTX-1168?

13           MR. HOROWITZ:  No objection, Your Honor.

14           THE COURT:  It's admitted.

15           (DTX-1168 is admitted into evidence.)

16   BY MR. KELLEHER:

17   Q.      So, Dr. Budach, this is the corresponding European

18   patent that corresponds to the two United States patents

19   owned by AHG in this lawsuit?

20   A.      Yes.

21   Q.      Could you tell me, does the European patent --

22   A.      That's a European patent.

23   Q.      Does it have claims like a United States patent does?

24   A.      Based on the rules of the European, of European

25   patents, that is necessary, to grant the European patents,

Budach - direct

1    they have been published in three languages, at least the

2    claims.  Namely, in English, in German and in France --

3    French.

4              So you can see here, the claims are written in

5    English, in German, and in French.

6    Q.    Are you able to read these?  Are you able to read the

7    English, German, and French claims?

8    A.    Sorry.  Okay.  Yes.  I can read English and French --

9    English and German, but for French, if necessary, we use

10   engineers for some.  But normally it's okay to understand

11   English and German.

12   Q.    So after the meeting minutes that we looked at just a

13   second ago, what happened next?

14   A.    I guess I had the personal meeting with Mr. Brinkies

15   probably, yes.

16   Q.    Who is Mr. Brinkies?

17   A.    Mr. Brinkies -- at that time, Mr. Brinkies was a

18   project manager of the new riveting system.

19   Q.    And could you look at DTX-1596?

20   A.    Yes.

21   Q.    Can you tell us what this is?

22   A.    It's the minutes of the meeting between Mr. Brinkies

23   and me in October of 2003.

24              MR. KELLEHER:  Assuming no objection, may I move

25   into evidence DTX-1596?

Budach - direct

```
 1              MR. HOROWITZ:  No objection, Your Honor.

 2              THE COURT:  It's admitted.

 3              (DTX-1596 is admitted into evidence.)

 4    BY MR. KELLEHER:

 5    Q.      So, Dr. Budach, we have an English language

 6    translation on the first page.  If you need to refer to the

 7    German, it's farther back in the document.

 8    A.      Okay.

 9    Q.      Can you tell us what happened at this meeting?

10    A.      It's the meeting about patent examination.

11    Q.      Did you attend this meeting?

12    A.      Yes, Mr. Brinkies and myself.

13    Q.      What was the result of this meeting?

14    A.      The result of the meeting was that we have different

15    issues.  The first one is that we have to monitor our own

16    development.  Probably, we have some inventive ideas we can

17    protect by own patents.  That was the one issue.  And the

18    other issue is that we have to research the prior art.

19    Q.      And when you say research the prior art, what do you

20    mean?

21    A.      It means that we have to monitor or to use

22    international patent databases to find any disturbing patent

23    issues, for example.

24    Q.      When you say "disturbing patents," what do you mean?

25    A.      These are patents that we cannot -- that is not
```

802

Budach - direct

1    allowed to infringe these patents.  Disturbing patents means

2    if you use such an idea, we would infringe these patents.

3    That means disturbing patents.  Disturbing patents means we

4    do not want to infringe these patents.

5    Q.    Could we turn to the second page?

6    A.    Okay.  Yes.

7    Q.    And I see there is an Item 3.0:  Timeline.  Do you

8    see that?

9    A.    Yes.

10   Q.    What timeline is being set up here?

11   A.    There is -- okay.  Here is written what we have, what

12   we have to do and what Broetje has to do that we can do this

13   research.  And under point one, you can read that all

14   information from Broetje Automation must be with Dr. Budach

15   by October 2003.

16         The first one is what we have to receive from

17   Broetje to do this patent search, we talk about here.

18         And the next one is then an employee, in this

19   case Mr. Volk, will undertake an examination of the patents

20   directly with respect to F2C2 by the end of October.

21         Then the next step, that we have to do the

22   patent search end of October 2003.

23   Q.    So, Dr. Budach, why is F2C2 specifically being spoken

24   about here?

25   A.    Okay.  That is our -- we use both languages, AHG or

Budach - direct

1    F2C2.  That is one and the same.  The patent holder is AHG

2    but the company who manufactures the cassette of AHG is

3    F2C2.  That is why we use internal proposals alternately,

4    AHG or F2C2.

5    Q.    Why were AHG or F2C2's patents being discussed?

6    A.    It was necessary to avoid any patent infringements.

7    Q.    Could you please look at Exhibit 1597?

8    A.    Yeah.

9    Q.    Could you tell us what this is?

10   A.    That's Mr. Volk's conclusion about the patent search.

11            MR. KELLEHER:  Your Honor, assuming the patent

12   search, may I offer 1597 into evidence?

13            MR. HOROWITZ:  No objection.

14            THE COURT:  It's admitted.

15            (DTX-1597 is admitted into evidence.)

16   BY MR. KELLEHER:

17   Q.    Turn to the second page of this document.

18   A.    Yes.

19   Q.    What is shown here?  On the top it says search TIZ.

20   What is that?

21   A.    In the first step we did a different patent search on

22   international computer databases in the United States and

23   European patent databases.

24            TIZ, it's a library, you could say it is a

25   library where we have paper documents, with instructions to

1    find anything that is prior art.

2    Q.    Who prepared this document?

3    A.    Mr. Volk prepared this document.

4    Q.    What was the purpose of this report?

5    A.    It is listed what countries we considered, in which

6    technical fields we did the research, and what the result

7    was.

8    Q.    Were any United States patents searched for this?

9    A.    You can read it in these countries, there is listed

10   where we have researched, in DE, and also in the United

11   States, and Japan, and France.

12   Q.    Did Mr. Volk do any analysis on AHG patents?

13   A.    Yes.

14   Q.    For which countries?

15   A.    As you can read, in Europe, France, all these

16   countries that are listed here.  And most of them are

17   countries where AHG or F2C2 patents were avoided at that

18   time to avoid any infringement of AHG patents.  And you can

19   read or see here, EP means European patents, FR is France,

20   US is United States, GP is Japan, NCA is Canada.  That's all

21   these countries where AHG has patents.

22   Q.    The list that is here later in this document, are any

23   of the AHG patents involved in this lawsuit in Europe in

24   this report?

25   A.    In this report, we should probably talk about the

Budach - direct

1    international patent search.  We did some other

2    computer-based patent searches before we went to the patent

3    documents in the building.  That is why you cannot find in

4    this document the AHG United States patents we talk about

5    here.

6    Q.    Did you actually do any analysis, personally, on

7    AHG's patents?

8    A.    Yes.

9    Q.    For which countries?

10   A.    For relevant countries, Europe means France, Germany,

11   Japan, Canada and United States.

12   Q.    Could you read the Japanese patents?

13   A.    No, I cannot.  But at that time it was of no interest

14   because at that time we didn't sell machines to Japan.

15   That's why we didn't consider the Japanese patents.

16   Q.    Did you look at the United States patents?

17   A.    Yes.

18   Q.    What parts of the United States patents did you look

19   at?

20   A.    We started with the claims, that's what you have to

21   consider, it's the same things that you have, at least at

22   first to look into the claims.  Second, you recognize what

23   is claimed and what is the scope of the invention.  The

24   claims define infringement or noninfringement.  And if you

25   have looked into the claims, then you have to go to the

Budach - direct

1   description.  To understand what is claimed in the claims,

2   because each description of the patent, there is a

3   dictionary for that patent, if you do not understand what's

4   in it, the meaning of the claims, you have to look into the

5   description to understand what is the technical

6   functionality of the words used in the claims.

7   Q.      When you looked at the claims of the United States

8   patent, did you notice any differences between the U.S.

9   claims and the claims in the European patent?

10  A.      Okay.  First one, in functionality, there are no

11  differences.  It is exactly the same patent.  The United

12  States patent, they use different ways for passageways and

13  grooves.  In Europe we use grooves.  In HP we use grooves.

14  Q.      How did you evaluate the meaning of groove and

15  passageway in the United States patents?

16  A.      We start with the description of the United States

17  AHG patents.  They interchangeably use the word groove or

18  passageway for one and the same thing.  Namely, probably,

19  later on, we can come to this subject, with the United

20  States patents, the word groove and passage are used

21  interchangeably.  That was the first one.

22          The second one is, we looked into the

23  description of the European and the United States patent.

24  And in both cases, we have the same technical description,

25  what does it mean, groove or passageway.  That was our first

807

Budach - direct

1   conclusion, that passageway and groove had no difference in

2   the technical functionality.

3   Q.      Did you also look at the prosecution histories of

4   United States patents?

5   A.      Yes.

6   Q.      Why did you do that?

7   A.      It's the usual thing, what we do at all times, in

8   other cases, to understand what the United States patent

9   examination officer understands the claims.  That's

10  important for us, to understand what is relevant in the

11  prior art to understand what's claimed in the claims.

12  That's why regularly we looked at the file histories of the

13  U.S. patents.

14  Q.      How did you use the prior art that had been cited in

15  the prosecution histories of the United States patents?

16  A.      We looked in this prior art to understand what the

17  meaning of groove and passageway in the eyes of the United

18  States patent examiner that was involved for us to

19  understand what is the meaning of the examiner, thinking

20  about passageway and groove.

21  Q.      Can you please look at DTX-1180.

22  A.      Yes.

23  Q.      Dr. Budach, do you recognize what this is?

24  A.      Yes.  That is one of the prior art patent documents,

25  what is recognized in the United States as an examination

Budach - direct

1    procedure.

2    Q.    This is one of the patents cited during the

3    prosecution of the United States patents?

4    A.    Yes.

5                MR. KELLEHER:  Your Honor, I would move into

6    evidence DTX-1108.

7                MR. CAHR:  No objection, Your Honor.

8                THE COURT:  It is admitted.

9                (Exhibit DTX-1108 received in evidence.)

10   BY MR. KELLEHER:

11   Q.    This appears to be a patent to a Mr. G.E. Byassee?

12   A.    Yes.

13   Q.    For what did you use this patent?

14   A.    To understand what does groove mean.

15   Q.    What did it lead you to believe improve means?

16   A.    Yes.  You can see it on Figure 4, Exhibit No. 4, No.

17   35, the examiner, that is the groove product line in the

18   patent application that was described.  Namely, that it is a

19   groove which opened into a space.  However, the space is

20   exactly configured.

21   Q.    Next, Dr. Budach, could you please look at DTX-1193?

22   A.    Yes.  That is prior art, what the examiner recognized

23   or considered.

24                MR. KELLEHER:  Your Honor, I would move into

25   evidence DTX-1193.

Budach - direct

1          MR. CAHR:  No objection.

2          THE COURT:  It is admitted.

3          (Exhibit DTX-1193 received in evidence.)

4    BY MR. KELLEHER:

5    Q.    Dr. Budach, this appears to be a patent to a Mr. or

6    Ms. Horstmann.  Is that right?

7    A.    Yes.

8    Q.    For what did you use this patent?

9    A.    That is also to understand what does it mean,

10   passageway or groove.

11   Q.    What did it teach you?

12   A.    You can see that there is Figure No. 9, 1b, 1b is in

13   more detail.  And the corners, here is No. 9, it is

14   understood as grooves or passageways as claimed in the AHG

15   United States patent.

16          Based on this prior art, the examiner rejected

17   the United States patent application two times, because it

18   was, his meaning, they are disclosed passageways in the

19   meaning of the United States patents.

20   Q.    Dr. Budach, could you also look at DTX-1031, please?

21   A.    Yes.

22   Q.    Is this something else that you also looked at?

23   A.    Yes.

24          MR. KELLEHER:  Your Honor, I would move into

25   evidence DTX-1031.

Budach - direct

1          MR. CAHR:  No objection.

2          THE COURT:  It's admitted.

3          (Exhibit DTX-1031 received in evidence.)

4     BY MR. KELLEHER:

5     Q.     Dr. Budach, what is this?

6     A.     That is also prior art.  And this prior art is

7     considered in the description of the AHG United States

8     patents and in the entire patent family of AHG.  It is the

9     closest prior art, in patent cases, one would say here it's

10    the closest prior art.  It's the next prior art.

11          And this patent, this documents has been

12    considered during the examination procedure of the AHG

13    patents.

14    Q.     So to be sure we understood you, this is a patent

15    application from England?

16    A.     Sorry?

17    Q.     Is this a patent application from England?

18    A.     Yes, that's U.K. patent application.  There is also a

19    German parallel document.

20    Q.     Among the inventors named are Shinjo and a Komaki.

21    Is that right?

22    A.     Yes.  Shinjo and Komaki.

23    Q.     If I use the word Shinjo or Komaki, it will be okay

24    if I am referring to this?

25    A.     Okay.

Budach - direct

1    Q.      What did looking at this document cause you to

2    believe groove or passageway meant?

3    A.      Okay.  Probably, we should start with Figure 2.

4    Q.      What is shown in Figure 2?

5    A.      Figure 2 -- sorry, Figure 1, just for your

6    understanding, Figure 1 shows the cassette, which is coiled,

7    and inside the cassette there will be transported or

8    delivered knots instead of rivets.  They are knots inside

9    the tubes.

10           If you go to Figure 2, that is a detail, it is a

11   cross-section detail of the tube.  And what you can see is,

12   with 2a, 2a is the inner space of the tube.  There we have

13   four tubes side by side.  And 2a is the inner space of the

14   tube.  And No. 8 is a nut.  In this case, in our cases, we

15   would talk about fasteners.

16           What you can see is the input is situated inside

17   the space 2a.  And in the description of this patent, you

18   can read, it says, in the space 2a is compressed air

19   filtered or delivered, that each nut gets in contact with

20   the compressed air, each nut, to avoid any junk.

21           That is the same motivation or the same problem

22   as solved by the AHG patent.  And the examiner said this

23   patent does not disturb the granting of the AHG patent.

24           That would mean that what we see here --

25   Q.      Is this the text you were referring to?

812

Budach - direct

1   A.      Okay.  There you can read it.  The channels 2A are

2   dimensioned so that there is sufficient space for compressed

3   air to exert a force on the individual nut 8, thereby

4   ensuring a smooth movement towards the other end 5 of the

5   tube 2.

6   Q.      What does that text help you understand?

7   A.      Yes.  They are exactly the same, describing what AHG

8   patents want to get protected.  Namely, that you have enough

9   space inside the tube to deliver rivets or in this case

10  nuts, and also the compressed air.

11          And, if that's important, there we have corners,

12  in Figure 2, in the cross-section of Figure 2 you can see

13  corners, but this is a rectangular cross-section.

14          Similarly, the examiner came to the conclusion

15  that it does not disturb the teaching of the AHG patent.

16  Q.      Did you come to an understanding about how the claims

17  of these patents relate to corners of what I will call a

18  polygon, in this case a rectangle?

19  A.      In the patents, in the AHG United States patent, we

20  can read in the claims, passageways or grooves have to open

21  in two or open out to a space or a channel.  Here we have

22  just the channel without any further grooves or passageways

23  to open this.  There we have just a space, and the space is

24  large enough to deliver the nuts or for compressed air as

25  well.

Budach - direct

1              So we do not need, instead of the AHG patent, we

2     do not need any grooves to deliver compressed air.

3     Q.      Did there come a time where you communicated your

4     understanding and opinion about the AHG patents to the

5     people at Broetje?

6     A.      Could you repeat the question?

7     Q.      At some point in time, did you communicate your

8     opinion --

9     A.      Yes.

10    Q.      -- to the people at Broetje?

11    A.      Yes.

12    Q.      Why don't we look at Exhibit 1598.

13             Your Honor, there is a better exhibit number for

14    that.  It's JTX-61 at the front of the book.  This document

15    is already in evidence.

16    A.      Okay.

17    Q.      Dr. Budach, do you recognize this document?

18    A.      Yes.  I recognize this document.

19    Q.      What is it?

20    A.      That's a lot of nomenclature for a manufacturing

21    advertisement.

22    Q.      Why don't we look at the third page of this.  Dr.

23    Budach, what is this, the circle in the middle?

24    A.      It is a cross-section of the tube, just manufactured

25    by Teichmann.

Budach - direct

1    Q.      Teichmann is the outside tube manufacturer?

2    A.      Is the outside tube manufacturer.

3    Q.      What did you do when you found out that Broetje had

4    made an inquiry to a tube manufacturer about this tube?

5    A.      My understanding was that if we wanted to use such a

6    cross-section, that would be patent infringement of the AHG

7    United States patent.  And I gave the order that we have to

8    change this cross-section.

9    Q.      Why don't we look at DTX-1599.

10   A.      Yes.

11           MR. KELLEHER:  This exhibit is already in

12   evidence as well, Your Honor.

13   BY MR. BUDACH:

14   Q.      Dr. Budach, do you recognize this document?

15   A.      Yes.

16   Q.      Could you tell us what it is?

17   A.      We have different cover sheets.

18           1598.  99.  Sorry.  Okay.  Yes.

19   Q.      So what is this document?

20   A.      Okay.  It's the second order from Broetje to

21   Teichmann.  It's the manufacturer of the tubes.

22   Q.      So let's look at the second page.

23   A.      Okay.  And probably one has to look into the text

24   which contrary to our first intention.  We want to use not

25   with longitudinal grooves but in the pentagonal shape.

815

Budach - direct

```
 1              And in the second page, you can see that is a

 2    changed cross-section of the tube which Broetje asked for,

 3    and what you can see is that we here have a smooth pentagon

 4    shape cross-section of the tube.

 5    Q.    So whose idea was this tube shape?

 6    A.    That's based on my -- sorry.  That is based on my

 7    opinion about what does it mean, grooves or passageways in

 8    the AHG patents and to avoid any infringements.

 9    Q.    What did Broetje do after you gave this opinion to

10    them that if they used a circle tube with the five grooves

11    that it might infringe?  What did they do?

12    A.    Okay.  So they follow my opinion and change the

13    cross-section structure, as you can see here, and that all

14    of the grooves are in a pentagon shape.

15    Q.    Now, after this, did you have -- let me ask the

16    question this way.  Could you please look at Exhibit 1602?

17    A.    Okay.

18    Q.    Could you tell us what this is?

19    A.    Yes.  That's our statements about our patent search

20    that we done in October/November 2003.

21              MR. KELLEHER:  Your Honor, could I move into

22    evidence DTX-1602.

23              THE COURT:  Is there any objection?

24              MR. HOROWITZ:  No objection, Your Honor.

25              THE COURT:  It's admitted.
```

Budach - direct

1        (DTX-1602 is admitted into evidence.)

2              MR. KELLEHER:  Thank you, Your Honor.

3    BY MR. KELLEHER:

4    Q.    So, Dr. Budach, can you tell us what this is?

5    A.    Yes.  That's our letter to Mr. Brinkies, and we talk

6    about the results of the different patent searches and what

7    we have to do to avoid any patent infringements.  And in

8    the first chapter, we talk about AHG cassettes and the

9    relevant AHG patents which we have to consider to avoid any

10   patent infringements.

11   Q.    And for which countries was this advice being given?

12   Which countries' patents?

13   A.    That's based on Mr. Fritz patent search, which we saw

14   some minutes ago that is considered, it's a worldwide patent

15   search and all the relevant countries of the AHG patents.

16   Q.    So at the time, you sent this letter to Mr. Brinkies

17   in December of 2003?

18   A.    Yes.

19   Q.    What was your understanding of the shape of the tube

20   that Broetje was going to use for their cassette?

21   A.    My understanding was that we could use a smooth

22   pentagon shape tube, where we have enough space to deliver

23   compressed air from rivet to rivet without, without to have

24   grooves or passageways punched into the wall from the tube,

25   for example.

817

Budach - direct

1    Q.    So, Dr. Budach, why don't we look at DTX-1604.

2    A.    Yes.

3    Q.    What is this?

4    A.    That is the further review.  It's a letter from

5    Broetje to me --

6    Q.    And what --

7    A.    -- to look again to the cross-section of the tubes

8    which was used by Broetje.

9              MR. KELLEHER:  Your Honor, I would move into

10   evidence DTX-1604.

11             MR. HOROWITZ:  No objection.

12             THE COURT:  It is admitted.

13             (DTX-1604 is admitted into evidence.)

14   BY MR. KELLEHER:

15   Q.    So, Dr. Budach, can you tell us again, I'm sorry,

16   what is this?

17   A.    Ya.  Okay.  That's a question for Mr. Hoffmann.

18   Mr. Hoffmann was the designer of the Broetje rivet cassette.

19   He asked me again that I have to give an opinion about the

20   different cross-sections shown on the upper end of the

21   slides, whether to avoid any patent infringements of the AHG

22   patents.

23             And you can see on the left that this, the F2C2

24   profile from 2005, and in the middle, that is the smooth

25   pentagon shape profile from Broetje, and Sketch No. 3 is

Budach - direct

1    just a further profile from Broetje, could we use that or we

2    couldn't use it.

3              And I confirmed again that we could use the

4    smooth shape, pentagon shape cross-sectional tube as a

5    smooth, pentagon shape cross-section.

6    Q.    Why don't we look at DTX-1605?

7    A.    Yes.

8    Q.    Can you tell us what this is?

9    A.    It's an e-mail from Mr. Harstorff, the former CEO of

10   Broetje, to me.

11   Q.    Is it --

12   A.    I'm sorry.  Okay.  That's my answer.  That's my

13   answer.  To Mr. Harstorff.

14              MR. KELLEHER:  Your Honor, could I move into

15   evidence DTX-1605?

16              MR. HOROWITZ:  No objection.

17              THE COURT:  It's admitted.

18              (DTX-1605 is admitted into evidence.)

19   BY MR. KELLEHER:

20   Q.    So, Dr. Budach, this was your response e-mail?

21   A.    Yes.

22   Q.    Okay.  So for which countries' patents are you

23   responding?

24   A.    It's for the United States, Japan, and Canada.

25   Q.    And also Europe?

Budach - direct

1    A.      It's European.

2    Q.      And what do you tell the people at Broetje?

3    A.      That we can use -- the conclusion is that we can use

4    a smooth five pentagon-shape cross-section for our tubes in

5    the rivet cassettes.

6    Q.      Now, Dr. Budach, have you prepared a demonstrative

7    slide to help explain --

8    A.      Yes.

9    Q.      -- what your opinion was that you had in your mind

10   that you communicated to Broetje?

11   A.      Yes.  I would like to show it to give you better

12   understanding for my thinking what is my understanding from

13   groove and passageway.

14   Q.      Could you please explain this?

15   A.      Yes.  Could I use a laser pointer?

16           MR. KELLEHER:  May I approach, Your Honor?

17           THE COURT:  You may.

18           (Laser pointer passed forward.)

19   BY THE WITNESS:

20   A.      Okay.  What you see here, you have three figures.  On

21   the left, you can see the Shinjo reference mentioned ten

22   minutes before.

23           What you can see here, that this is enough.

24   That is the cross-section of the tube in the Shinjo

25   reference.

820

Budach - direct

1          Inside the Shinjo reference, there are yellow

2     colors.  That is space, and inside the space is situated the

3     nut, blue color.  And you have a huge number of nuts inside

4     this tube.

5          And here, you can deliver the tube -- the nuts

6     and the compressed air as well as in the yellow space.   In

7     this solution, you do not need any grooves to deliver

8     compressed air to each nut or fastener in this case.

9          In the middle, we have the AHG United States

10     patents.  And what you can see here, the outside is the

11     cross-section of the tube, and the blue one here is the head

12     of the rivet inside of the tube.  And you see that the tube

13     corresponds with the inner diameter -- outer diameter of the

14     tube correspond with the inner diameter of the tube.  And

15     you have no space to deliver compressed air from one rivet

16     to the next, and that's why the AHG patent suggested to use

17     passageways or grooves -- see the yellow color? -- to

18     deliver or transport compressed air to each rivet.

19          And on the right-hand side, that's Broetje

20     solution.  See how you have the tube?  Inside the tube is a

21     smooth pentagon-shaped cross-section, yellow color, and the

22     blue one is the head of the rivet.  And what you can see,

23     that you have a huge space between the rivet head and the

24     inner surface of the tube to deliver compressed air.

25          So that's now my conclusion or my understanding

Budach - direct

1    from what does it mean, passageway or groove.  If you have

2    such a solution, you have no space.  You need --

3                MR. HOROWITZ:  Your Honor, forgive me.  I

4    apologize, Dr. Budach, but it calls for a narrative

5    objection.

6                THE COURT:  Sustained.

7    BY MR. KELLEHER:

8    Q.    So, Dr. Budach, you have an arrow going from the

9    right-hand tube to the middle tube saying no infringement.

10   What does that mean?

11   A.    Okay.  I have not finished my explanation.  Okay?

12   It's just my understanding.  It's not an interpretation of

13   the claims.  It's my understanding what does it mean.

14                Our solution, Broetje solution would be the same

15   like this one.  We have enough space to deliver compressed

16   air (indicating), and we have the rivet as well in one and

17   the same channel.

18                The question, I didn't make my argumentation.  I

19   have to start again.

20                THE COURT:  I think you had better ask him a

21   question.

22                MR. KELLEHER:  I think so, Your Honor.

23   BY MR. KELLEHER:

24   Q.    Dr. Budach, there is an arrow going from the

25   right-hand tube to the Shinjo rectangular tube that says

Budach - direct

1    invalidity.  What does that mean?

2    A.     Could I show it?  It is a little bit easier.  Is it

3    okay?

4                (Continuing through translator):  I'm going to

5    briefly explain myself in German.

6                What I said already before in English is that

7    what you see on the left is the actual Broetje solution

8    which we have nowadays.  In the middle, you see the solution

9    according to AHG.

10   BY MR. KELLEHER:

11   Q.     And what is on the left?

12   A.     On the left, we have the Shinjo.

13               (Through translator):  And on the left you have

14   the Shinjo example.  And Shinjo is cited within the AHG

15   patent in the U.S.

16   BY MR. KELLEHER:

17   Q.     Dr. Budach, what is the significance of the yellow

18   colored portions of the three tubes?

19   A.     (Through translator):  What you see in yellow is the

20   Broetje solution, on the right is the space.

21               THE COURT:  Mr. Kelleher, I am afraid we reached

22   the end of the time with our jury today.  So we have to

23   finish this up in the morning.

24               MR. KELLEHER:  I understand.

25               THE COURT:  Bear with me a minute, Dr. Budach.

1          Ladies and gentlemen of the jury, a couple

2     things before we let you go tonight.  Tomorrow is going to

3     be a little bit different than the other days.

4          First off, we're not going to start until 9:30.

5     I have had another matter come up that I have to deal with

6     first thing in the morning, so if you could be here in time

7     to order lunch and start at 9:30, that will be fine.

8          Rest assured we are on track.  I know sometimes

9     it may seem like we're not but we are where we expected to

10    be at this point in the trial.  So don't worry about that.

11         Beyond that, I guess I will just say no talking

12    about the case, no research or anything like that.  We'll

13    look for you tomorrow.  Have a good evening.

14         (The jurors respond, "thank you.")

15         (Jury left courtroom.)

16         THE COURT:  Dr. Budach, you are free to step

17    down.

18         I want to talk about a couple things.  Then

19    we'll take a short break and we'll come back and argue about

20    the jury instructions and the verdict sheet.  So if anyone

21    wants to go or needs to go feel, free to do so.

22         So I may be available to see all of you at 8:30

23    tomorrow.  Basically, I have a criminal trial scheduled to

24    start Monday and I need to have a proceeding related to that

25    tomorrow morning.  It will start whenever everybody gets

824

1    here, which could be 8:30, it could be 8:45, could be 9:00.

2    It shouldn't take more than a half hour.  So be available to

3    me at 8:30 but I may need to put you off depending on how

4    the criminal proceeding is going.

5              I don't have the actual time, but my sense is

6    we probably have about five and-a-half hours total left for

7    both sides, something on that order.  Give me a sense as to

8    how you expect to use that time and when you think you would

9    ideally like to be doing closings.

10             First, Mr. Kelleher since I guess --

11             MR. LINDVALL:  He beat me up.

12             THE COURT:  It's still his case so we will start

13   with him.

14             MR. KELLEHER:  We are almost done with

15   Dr. Budach, Your Honor.  After that, we have our two expert

16   witnesses to put on, and then I guess we have a few more

17   videos as well to show.  Then we will rest our case-in-chief.

18             THE COURT:  What is your rough estimation as to

19   how long you want to save for closing?

20             MR. KELLEHER:  I would like to save an hour for

21   closing.

22             THE COURT:  But certainly not more than an hour

23   is your anticipation.

24             MR. KELLEHER:  Yes, Your Honor.

25             THE COURT:  Similar question.  Mr. Lindvall, how

1    does it look to you?

2              MR. LINDVALL:  We would have obviously

3    cross-examinations of the two witnesses.  Then we would put

4    on a small rebuttal case for the invalidity, maybe a little

5    bit on noninfringement with our expert Dr. Kytomaa.  And for

6    closing, probably an hour and 15 minutes, with 15 minutes

7    on the rebuttal.  That is what I'm looking at.

8              THE COURT:  Okay.  And my guess is that the

9    instructions are probably a good hour is my guess.

10             With the criminal matter coming up, I don't

11   know if it's going to be possible to get through all of

12   the evidence, all of the closings and my reading of the

13   instructions tomorrow.  It may be possible.

14             Do either of you have a strong view as to

15   whether we should be trying to fit that all in or if you

16   want to just aim for closing on Friday morning?

17             MR. LINDVALL:  I would love to aim for closings

18   on Friday morning, if possible.

19             THE COURT:  How do you feel about that,

20   Mr. Kelleher?

21             MR. KELLEHER:  I strongly concur.

22             THE COURT:  Strongly concur.  Should I push my

23   luck and see what else you can agree to?

24             All right.  Well, I know I had scheduled another

25   matter for Friday morning.  Let me take a quick look at

1    whether I can maybe move that, and I have to collect my

2    notes on the jury instructions.  So we'll take a recess for

3    ten minutes, and I will come back and give you guidance on

4    all that.

5              (The attorneys respond, "Thank You, Your

6    Honor.")

7              (Brief recess taken.)

8              *    *    *

9              (Proceedings reconvened after recess.)

10              THE COURT:  So we will let you do the closings

11    on Friday.  It's possible, unlikely, but possible we will

12    start at 9:30.  I am trying to move things around.  I don't

13    want to start you any later than that, so we can get things

14    to the jury by lunchtime.  But I will let you know that

15    tomorrow whether we are starting late on Friday or not.

16              Here is how I want to proceed with the argument

17    on jury instructions and on the verdict form.

18              You all narrowed things down.  I greatly

19    appreciate that.  I have maybe a dozen or so that I need a

20    little bit of feedback on.  I think it will work best, you

21    can probably, as long as you speak loudly enough for me to

22    hear and the court reporters, just to stay at counsel table

23    and I will just bounce back and forth between you.  Then

24    after we go through what's on my list, I will ask you if you

25    have got any others that you want to be heard on and give

827

 1    you a chance to do that.

 2           We will start with the jury instructions.  My

 3    first question is at 6.8, I am working from the version that

 4    was filed yesterday, the most recent version.  Obviousness -

 5    Level of Ordinary Skill.  My question there is, does Broetje

 6    have a proposal as to what one of ordinary skill is and

 7    should I tell the jury that?

 8           MR. KELLEHER:  Our only proposal, Your Honor, is

 9    that it's someone who is capable of combining references in

10    the case.  We don't have an education listing for such a

11    person.

12           THE COURT:  Okay.  I guess the question to AHG

13    is, although that seems a little bit unusual, if I am going

14    to tell the jury what your view is as to what one of

15    ordinary skill is, shouldn't I tell the jury what the

16    defendant's view is as well?

17           MR. LINDVALL:  Well, my only comment is, I don't

18    think defendants' view of what one of skill in the art is is

19    a proper description because it doesn't cover the law of who

20    one of ordinary skill is.

21           THE COURT:  Your proposal is I tell the jury

22    what your proposal is but don't even tell the jury what

23    their proposal is?

24           MR. LINDVALL:  Your Honor, they don't disclose

25    one in the experts reports.  That's why they don't have one

828

1    .  We shouldn't be penalized by them having some ambiguous

2    one by saying a person who knows all about the prior art.

3    That is really so ambiguous that it would lead the jury

4    astray.  They need something just like the law would say it,

5    someone who is defined, who is that person, the educational

6    background and professional background.  We have done that.

7              I think what we should do is use AHG's, because

8    they haven't given a proper one.

9              THE COURT:  Would you object to me telling the

10   jury Broetje doesn't have a similar proposal or hasn't

11   identified a person of any particular --

12             MR. LINDVALL:  I don't have a problem with that.

13             THE COURT:  Mr. Kelleher, do you object to that?

14             MR. KELLEHER:  I think conceptually we could

15   work out language to that effect, Your Honor.  Broetje does

16   not propose any particular education level as being

17   necessary for a person to be a person of ordinary skill.

18             THE COURT:  All right.  That sounds better to me

19   than what you had in here.

20             Mr. Lindvall, would you object to something

21   along those lines?  Broetje does not propose any particular

22   education level for one of ordinary skill in the art.

23             MR. LINDVALL:  The only thing I would object to,

24   Your Honor, they have never given that opinion.  That is the

25   first time we have heard it.

829

1          THE COURT:  They have never given you

2    affirmatively any definition.

3          MR. LINDVALL:  That's correct, Your Honor.  So

4    they are basically saying, one skilled in the art doesn't

5    need any education or any work experience.

6          THE COURT:  Is that a new position to you?

7          MR. LINDVALL:  I don't know if that's their

8    position.

9          THE COURT:  If that is their position is that

10   news to you?  Is that new?  Or has that been their position

11   all along?

12         MR. LINDVALL:  That is new, Your Honor.  They

13   never gave an opinion.

14         THE COURT:  Mr. Kelleher, is that new?

15         MR. KELLEHER:  I don't think so, Your Honor.

16   When we were here in January we discussed this impact issue

17   about the Graham factors and the issue of what exactly the

18   level of ordinary skill is that would allow Mr. POSITA to

19   jump that gap of the claimed invention in the prior art.

20   The question is what is the skill set of such a person.  Not

21   how many years did this person go to school.  Our position

22   is, however you define whoever a person of ordinary skill

23   is, they have the ability to drop a rivet into the Shinjo

24   reference.  Certainly, the definition they have come up

25   with, that skill set, I think the skill level is relatively

830

 1    low and we need to define it that way.  It is not a very

 2    difficult thing to imagine people's skill set.

 3              THE COURT:  We will give that more thought.

 4    Thank you very much.

 5              Next is 8.0, Unfair Competition.  It is a joint

 6    instruction.  Unless I missed it, this is the only place

 7    where you would have tell the jury about the Lanham Act and

 8    Section 43(a).

 9              As I understand it from I guess looking at the

10    verdict sheet and sort of the totality, I think the parties

11    are in agreement that liability, if any, on state unfair

12    competition and federal unfair competition has to come out

13    the same way and has to come out the same way as trade dress

14    infringement.  Is that the parties' positions?

15              MR. CAHR:  Yes, Your Honor.  I believe we are in

16    agreement on that.

17              MR. LINDVALL:  We are in agreement on that, Your

18    Honor.

19              THE COURT:  I am glad we are in agreement on

20    that.  I don't want to unnecessarily confuse or worry the

21    jury.

22              It seems to me, if I am going to reference any

23    of that at all, I should simply tell them, the parties agree

24    that the outcome on state and federal unfair competition

25    should be the same as your outcome on trade dress

1    infringement.

2              MR. CAHR:  Absolutely, Your Honor.  We would be

3    in agreement with that.

4              THE COURT:  Do plaintiffs disagree with that?

5              MR. LINDVALL:  No problem on that instruction,

6    Your Honor, depending on how we do the verdict form.

7              THE COURT:  Right.  There are implications on

8    how we do the verdict form.  If I am going to say anything

9    about unfair competition, I think I should say in substance

10   what I have just outlined.

11             Do I need to mention the unfair competition

12   claims to them?  Is there a reason to instruct the jury on

13   it and then get a verdict from them on it?

14             MR. LINDVALL:  That's a good question.  I can

15   understand what you are proposing.  If they find a violation

16   of the Lanham Act, then automatically they would have the

17   unfair competition, federal and state unfair competition.

18             THE COURT:  That seems what you all have agreed.

19   What I am not sure is whether you think the damages analysis

20   may be different, and therefore you want the jury to go

21   through the mental exercise, I guess, of deciding whether

22   they accept the parties' agreement after the trade dress

23   decision, whether to further analyze.

24             MR. LINDVALL:  I think the only difference, at

25   least under the state unfair competition, there is punitive

1    damages.  And there is not under the Lanham Act.

2              I am not sure if -- what you are saying is if

3    they find Lanham Act and then they find the other ones

4    automatically, it should go to punitive damages.  I think

5    that would still be fine.

6              THE COURT:  What do the defendants think?

7              MR. CAHR:  I think that's okay, Your Honor.

8    Since it probably doesn't have to be dealt with in the

9    instruction but reflected on the verdict form, I think

10   that's probably all right.

11             THE COURT:  So where would that --

12             MR. CAHR:  Maybe I misunderstood you.  Say that

13   one more time?

14             MR. LINDVALL:  If you are going to -- the way

15   the Court is proposing, we will instruct the jury, if you

16   find Lanham Act, you will find unfair state and federal

17   competition.  And will there be separate jury questions,

18   though?  Because that can cause -- you can imagine what

19   would happen there, could happen there.

20             If you instruct it there, you probably need some

21   way to force them to find a consistent result from those

22   three claims on the verdict form.

23             MR. CAHR:  I think we are fine with that.

24             MR. LINDVALL:  Actually, the verdict form does

25   exactly what we are talking about.

833

1            MR. CAHR:  I think it does.

2            MR. LINDVALL:  On Page 7 of our proposed verdict

3    form.

4            THE COURT:  Right.  I think it needs some

5    modification.

6            MR. CAHR:  If we just got rid of that thing at

7    the bottom and said if you answer yes to this, just go to

8    the punitives, skip the whole discussion at the end with the

9    unfair competition about being the same thing, that will

10   avoid any confusion.

11           Basically, what we have is that -- Page 7.

12           THE COURT:  Of the plaintiffs' proposal.

13           MR. CAHR:  Basically just get rid of the whole

14   discussion of unfair competition federal law, and basically

15   have it set up so that if you find yes, you go to the

16   punitive damages question.

17           THE COURT:  Let's come back to that.  For now,

18   my plan is, on the instructions, at 8.0, I am going to tell

19   the jury that the parties agree that their finding on unfair

20   competition under state and federal law should follow what

21   they find on the Lanham Act trade dress infringement.

22           MR. CAHR:  Your Honor, to clarify, the trade

23   dress under the federal law is the Lanham Act.

24           THE COURT:  The trade dress is.  But I

25   understood there was a federal unfair competition claim as

1    well.  Is that inaccurate?

2              MR. CAHR:  I believe the federal unfair

3    competition claim is the trade dress claim.

4              THE COURT:  Is that correct, Mr. Lindvall?

5              MR. LINDVALL:  I am getting confused.

6              MR. CAHR:  Are there are any extra unfair

7    competition allegations?

8              MR. LINDVALL:  It's based on the Lanham Act.

9              THE COURT:  So the full extent of the unfair

10   competition claim under federal law is the trade dress

11   infringement under the Lanham Act.

12             MR. CAHR:  Yes.

13             THE COURT:  All I need to say at 8.0 is that

14   whatever you find on trade dress infringement -- and I could

15   say, which is a federal claim for unfair competition, you

16   should also -- the parties agree, you must also find the

17   same way on the state unfair competition.

18             MR. CAHR:  Yes.

19   MR. LINDVALL:  That's fine, Your Honor.

20             THE COURT:  And I don't need to mention Lanham

21   Act or Section 43.  Do you disagree, Mr. Lindvall?

22             MR. LINDVALL:  I don't disagree.

23             MR. CAHR:  I don't disagree.

24             THE COURT:  All right.  Bear with me a moment.

25             (Pause.)

835

```
 1                    THE COURT:  All right.  Next, at 9.0, this

 2    is where preemption comes up.  I guess let me start with

 3    defendants.  What authority would I look to to determine

 4    whether state proscription I suppose on patent infringement

 5    is preempted by federal law.

 6                    MR. KELLEHER:  Your Honor, the Supreme Court

 7    Bonito Boats case comes to mind.  As I stand here right now,

 8    that is the only Supreme Court case.  There are other cases.

 9                    THE COURT:  Do you know how to spell that?

10                    MR. KELLEHER:  B-o-n-i-t-o, pretty in Spanish,

11    Boats.

12                    THE COURT:  Boats?

13                    MR. KELLEHER:  Yes.

14                    THE COURT:  All right.  And you believe that

15    holds that the whole patent area is, what, is preempted from

16    state regulation?

17                    MR. KELLEHER:  My memory is that particular case

18    found that federal patent law policy preempted the ability

19    of states to regulate concerning inventions.  I don't recall

20    some of the facts of the case but that is my memory of the

21    case.

22                    THE COURT:  Okay.  That is where I would look

23    then.

24                    Mr. Lindvall.

25                    MR. LINDVALL:  Your Honor, we actually have a
```

1   couple cases that have gotten very close to this exact

2   issue.

3          Since this is under California law, it says

4   independently wrongful is unlawful under this if it's

5   constitutional statutory, regulatory common law or other

6   determinative legal standard.

7          Since the intentional interference has five

8   elements, one of them is whether it's a wrongful act under a

9   statutory, federal or state.  That said, the preemption

10  doesn't exist here because we're not looking at an overlap

11  of elements.  It just has to be a separate wrongful act, and

12  that's the element itself.

13          I have some citations here for you.  There is

14  another one that says, for example, independently wrongful

15  conduct include "actions which are independently actionable

16  violations of federal or state law or unethical business

17  practice, for example, unfounded litigation or trademark

18  infringement."

19          THE COURT:  Those are California authorities?

20          MR. LINDVALL:  That is a Northern District

21  of California case.  And I have a Central District of

22  California case.

23          THE COURT:  So there is a number of authorities

24  cited at the bottom of page 68 here.

25          Are the things you are relying on now among what

1      is cited there in footnote 3?

2                  MR. LINDVALL:  Is Korea Supply is one of them?

3                  THE COURT:  Right, that is listed here.

4                  MR. LINDVALL:  These are probably actually new

5      ones we had done.  Would you like me to give citations?

6                  THE COURT:  Tell me the citations.

7                  MR. LINDVALL:  Okay.  The Theme Promotions v

8      New, it would be, American Marketing.  That is 546 F 3d 991.

9      That is the Ninth Circuit 2008.

10                 THE COURT:  Okay.

11                 MR. LINDVALL:  I also have another citation.

12     It's 2000.  It's Biston Corporation.  It's 2011 Westlaw

13     1544796.  That is at star 9; and that is the Northern

14     District of California on April 25th, 2011.

15                 And the last one I have is Marvel v NCSoft.

16     Tell me if I am speaking too fast.

17                 THE COURT:  No, that's fine.

18                 MR. LINDVALL:  2005 Westlaw 878090 at star 6.

19     That is a Central District of California 2005.  And that

20     held that the copyright and trademark infringement are

21     wrongful acts independent of the act of competition itself.

22                 THE COURT:  And what about Bonito Boats?  Do you

23     have any --

24                 MR. LINDVALL:  I don't have that.  What I don't

25     understand, preemption, I know probably more from law school

838

1   than anything else, that the presumption doctrine says the

2   elements have to overlap regardless of what it is.

3                    THE COURT:  Okay.

4                    MR. LINDVALL:  I would be happy to provide the

5   Court something if you would like.

6                    THE COURT:  I may need that.  I will tell you in

7   a second.

8                    MR. LINDVALL:  Thank you.

9                    THE COURT:  Mr. Kelleher, any thoughts?

10                   MR. KELLEHER:  Only that I think the idea from

11  the Bonito Boats case and perhaps its probably progeny is

12  that it's field preemption.  That the Constitution gives to

13  Congress the ability to regulate inventions and provide

14  proper the proper rewards for it.  Under their theory, they

15  can do the state tort to get extra damages for patent

16  infringement, including punitive damages.

17                   THE COURT:  And your view is it's settled that

18  there is field preemption on the whole patent area?

19                   MR. KELLEHER:  I think so, Your Honor.  Yes.

20                   THE COURT:  All right.  Thank you.  Hold on a

21  second.

22                   (Court and law clerk confer.)

23                   THE COURT:  All right.  Do you all want to put

24  something in writing for me by tomorrow morning on this or

25  would you rather we just do our best with what honestly

1    limited resources you have given us on this issue?

2              MR. LINDVALL:  Maybe we should suggest for

3    everybody's benefit like one page each, double spaced.

4              THE COURT:  Large font.

5              MR. LINDVALL:  Very large font.

6              THE COURT:  Would you find it helpful to give

7    me, let's say, up to two pages or would you rather I just

8    struggle through the best I can?

9              MR. LINDVALL:  We probably can help you, Your

10   Honor.  We'll give you two pages.

11             MR. KELLEHER:  Two pages.

12             THE COURT:  So let's say two pages per side,

13   file it by 8:30 tomorrow morning.

14             MR. LINDVALL:  That would be fine.

15             THE COURT:  I will take a look at it.

16             MR. LINDVALL:  Thank you, Your Honor.

17             THE COURT:  And that is just on preemption.

18             MR. KELLEHER:  (Nodding yes.)

19             THE COURT:  All right.  I'm next at page 86.

20   This is Damages For Trade Dress Infringement and Unfair

21   Competition.

22             Basically, both sides have proposals here, and

23   Broetje's argument seems to be that the plaintiffs' proposal

24   gets into ideas that are not really at issue and I need not

25   burden the jury with.  Speak to that and do I understand

1      that is the dispute?

2                    MR. CAHR:  Sure.  Yes, Your Honor.  In this

3      case, injury or loss of plaintiffs' reputation, injury or

4      loss of the plaintiffs' goodwill, including to the

5      plaintiffs' general reputation.  Those are not in their

6      expert report.  There is not any support for that, and they

7      already had an interrogatory saying that all of their

8      damages were supported solely by what is in their damages

9      expert report.  So those just aren't in the case and to have

10     them there would just be confusing.

11                    THE COURT:  So it's a correct statement of the

12     law that you think is unnecessary?

13                    MR. CAHR:  It's a correct statement of the law

14     in total, but it's not what is relevant to this particular

15     case.

16                    THE COURT:  Okay.

17                    MR. CAHR:  And corrective advertising also.

18                    THE COURT:  Okay.

19                    MR. CAHR:  Because there are three things

20     they're just not seeking.

21                    THE COURT:  All right.  What is the plaintiffs'

22     view?  Why do I need to burden the jury with this

23     complication?

24                    MR. LINDVALL:  Your Honor, we got this out of

25     the Ninth Circuit model, exactly like it is.  These are

1    just factors they are to consider.  They're not factors they

2    have to get from an expert.  They can get from testimony or

3    anything else that they heard through the trial and weigh

4    these and consider them.

5              THE COURT:  Well, have you presented evidence

6    about injury to your client's reputation?

7              MR. LINDVALL:  I think you can argue there has

8    been in our case-in-chief through that.

9              THE COURT:  And the same with respect to

10   goodwill?  You think you have evidence from which you can

11   argue there has been injury to your goodwill?

12             MR. LINDVALL:  Yes, I believe we can make an

13   argument on there.

14             THE COURT:  And how about cost of corrective

15   advertising?

16             MR. LINDVALL:  No, Your Honor.  I don't think we

17   can make a case on that one.  I agree we haven't had any

18   evidence on that one.

19             THE COURT:  Do you think I should tell the jury

20   they can consider it?

21             MR. LINDVALL:  You can take that one out.

22             THE COURT:  All right.  But the other four

23   factors you think should remain in?

24             MR. LINDVALL:  Yes, Your Honor.

25             THE COURT:  All right.  I'll give that some

1      further thought.

2                You can respond if you want.

3                MR. CAHR:  Just to say I disagree about whether

4      or not there is evidence on the first two factors.  And in

5      their Interrogatory No. 16 -- in our Interrogatory No. 16

6      their response to it, AHG says that they respond -- and

7      this interrogatory was the one asking for, identifying all

8      monetary damages of AHG has suffered, specific cause of

9      the damage or injury resulting in those damages, the method

10     of calculating such damages, and all documents supporting

11     the amount of monetary damages, the cause of that damage or

12     injury.

13               And it says subject to their objections, AHG

14     responds by incorporating by reference the damages expert

15     report of Mr. Thomas Britven which was the predecessor to

16     Mr. Ellis, served on July 28th, 2010.  Actually, I think it

17     should have been 2011.

18               So they basically just said that those are

19     their damages, and to get into the other things, especially

20     given the paucity of testimony on this before, would be

21     prejudicial.

22               THE COURT:  Just respond to the point that you

23     have made this too late for you to, even if you have

24     evidence of it, maybe it's too late for you to argue about

25     damages.

1          MR. LINDVALL:  Your Honor, I don't think that

2      it is too late.  I think it's just talking about the

3      quantification of the damages, not necessarily the factors

4      the jury should consider in awarding damages.  Because

5      they've heard the damages.  They see what we're asking for:

6      profits and unjust enrichment.  Those numbers are going to

7      be the same no matter what.  That is what we disclosed to

8      them, how those numbers came about.  The factors to whether

9      or not you get damages are contained in here.

10          THE COURT:  All right.  Let's talk about 11.3,

11     Damages For Trade Dress Infringement, Monetary Compensation,

12     Broetje's Profits.  There is a competing construction, pages

13     90 and 92.  It seemed to me that the only difference was the

14     plaintiff wants me to discuss that gross revenue is based

15     on the sale of the entire automated rivet-feeding systems,

16     including cassettes, rack, or loading stations where the

17     defendants just want me just to talk about revenues from the

18     rivet cassettes.

19          Mr. Lindvall, is that the nature of the dispute?

20     And, if so, why should I tell the jury to factor in all of

21     the entirety of the automated rivet-feeding systems?

22          MR. LINDVALL:  Your Honor, we have cases on

23     this.  We've looked at this.  And the situation here is in

24     trade dress or trademark infringement, it's the ill gotten

25     gains.  When you look at the ill gotten gains, what they

1   would have sold or not sold here.

2           And here, if we don't -- because of their

3   infringement, we missed out on the sale of the whole system.

4   You probably heard lots and lots of systems that these

5   operate as a functional unit.  If you miss you out on one

6   sale, you miss out on a sale of a loading station, the rack,

7   and the cassette sales.  Just like you have convoyed sales

8   and lost profits in the patent arena, it's the same

9   situation here.

10          I believe we have a couple cases we have

11  recently seen.  One is, for example, Nintendo v Dragon,

12  which is 40 F3d 1007, Ninth Circuit.  And in that case, the

13  Court didn't require damages to be apportioned where

14  defendant's product, which is video game cartridges,

15  partially contain the copyright Nintendo video games.  It's

16  the exact same situation here where the Court allowed

17  damages of the whole product, on the whole system.

18          THE COURT:  Is there any evidence that your

19  trade dress is allegedly misused in connection with the

20  racks or the loading stations?

21          MR. LINDVALL:  Well, the trade dress we're

22  obviously arguing is on a cassette.  But you see what

23  happens.  You can't, you can't parcel this out.  Once we

24  lose it on the cassette, once you have got the infringement

25  on the cassette, then everybody buys the whole system.  So

1    once they copied the cassette.

2              THE COURT:  Hasn't the evidence been that people

3    were buying the system from Broetje before?  When it was

4    your cassette, they were still buying the racks and the

5    loading stations.

6              MR. LINDVALL:  No, Your Honor.  Absolutely not.

7              THE COURT:  No?

8              MR. LINDVALL:  They made the cassette first and

9    they were continuing to use the AHG racks and loading

10   stations until a number of years later.  Broetje did not

11   even begin to make racks or loading stations until well in

12   2005, 2006.

13             THE COURT:  Okay.  Thank you.  I'll hear from

14   defendants.

15             MR. CAHR:  First of all, there is, as far as we

16   can find, no cases at all saying that convoyed damages are

17   appropriate in a trade dress case.  Literally, we were

18   unable to find any.

19             THE COURT:  Have you heard of this Nintendo

20   case?

21             MR. CAHR:  I had not heard of that.  I don't

22   believe -- is that a trade dress case?

23             MR. LINDVALL:  I believe it's a copyright case.

24             MR. CAHR:  See, copyright is completely

25   different than trade dress and trademark law, and there

1    are -- we were unable to identify a single trademark or

2    trade dress case where convoyed damages were applied, and

3    there is a reason for that.  Exactly what you pointed out.

4    If there is no trademark on the rack, no trademark on the

5    loading station or trade dress on the loading station or

6    trade dress on the rack, then it's defeating the whole point

7    of why you're protecting the trademark.

8              And I think your question to Mr. Lindvall was

9    were we selling racks and loading stations before when we

10   were actually working together?  And we were.  We were

11   selling AHG racks and AHG loading stations when we were

12   selling AHG cassettes.  And then we were selling AHG racks

13   and AHG loading stations with Broetje cassettes.  And then

14   later we were selling Broetje cassettes with Broetje racks

15   and Broetje loadings stations.  It just sort of defeats the

16   whole argument.

17             THE COURT:  All right.

18             MR. LINDVALL:  I have one more citation counsel

19   just brought to me.

20             THE COURT:  Okay.

21             MR. LINDVALL:  Which is this Roulo, R-o-u-l-o, v

22   Rustbury, and it's 866 F2d 931.  And the pinpoint cites are

23   941 through 942.  That is a Seventh Circuit decision 1989.

24             Keep in your mind the statute itself says the

25   revenue that the defendant loses as a result of the

1      infringement.  And the revenue we've lost in the Lanham Act,

2      the Lanham Act statute, says the revenue we lost is the

3      revenue for the system.  You can't part and parcel.  In

4      other words, we didn't keep on selling racks and loading

5      stations forever to Broetje.  If that was true, it would

6      just be the cassettes then.

7              THE COURT:  Mr. Cahr represents that he has

8      never seen a case where this convoyed sales argument was

9      accepted in a trade dress context.  If I read these two

10     cases you just cited and the other authorities you have

11     cited at 11.3A, am I going to find he is wrong about that.

12             MR. LINDVALL:  It won't say convoyed.  In fact,

13     what Mr. Cahr will say also -- he is not going to find a

14     case the other way around, either.

15             In this area of the law, the concept of convoyed

16     sales doesn't exist.  It's not like a patent case where you

17     have convoyed sales and lost profits.

18             THE COURT:  Do they call it something else?

19             MR. LINDVALL:  No.  They look at the damages and

20     the system and say what is the damage to the plaintiffs in

21     this situation?  What is the plaintiffs' lost revenue?

22             For example, if it's Coca-Cola and someone is

23     knocking off the Coca-Cola bottle and they make revenue from

24     that, they say they get revenue for all the sales of the

25     Coca-Cola bottle.

1          THE COURT:  How do you fit it into the facts

2     here, which I understand I misstated earlier, but we do have

3     time frames in which Broetje was selling all three pieces

4     that were yours that went into a larger system, where they

5     did other parts of it, and then at times they were selling

6     just one part that you provided, and then other times

7     ultimately they provided no parts that you provided and you

8     have only provided evidence that you have your trade dress

9     on the one part, the cassette?

10          So with all that, how could a jury find that all

11     of the lost sales for all of the components were due to

12     trade dress infringement just at the cassette level?

13          MR. LINDVALL:  Because once they have copied the

14     cassette, that leads them to copy the whole system.  Now we

15     have lost the whole system, the sale of the whole system, as

16     a result of that wrongful act with the cassette.  If they

17     continued buying racks and loading stations from us, we

18     would have no problem with that.  It would just be the lost

19     sales off the cassette.  But they didn't.

20          We lost the system.  There is lots of testimony

21     saying these all act as one functional unit and because they

22     act as one functional unit we lost the sale of that whole

23     system as a result of the wrongful acts, in other words,

24     what they copied.

25          MR. CAHR:  I would just add that the two cases

1    that are probably most relevant to the way the Third Circuit

2    looks at product configuration trade dress and damages in

3    general for trademark cases would be, the controlling case,

4    as they have cited, is Banjo Buddies v. Renowsky, which is

5    399 F.3d 168, which has the specific test of equitable

6    tests, which you are to undergo, that is the Court, to

7    determine whether or not these damages are appropriate in

8    general.  Then the Versa Products case, which actually talks

9    specifically about the distinctions between how you think

10   about harm, really, in the larger sense, in a trade dress

11   case, when you are dealing with product configuration.

12           Product configuration is very different, as you

13   have noted just now, than really any other kind of trademark

14   case, let alone other kinds of intellectual property.

15           If you actually say in a trade dress case that

16   the trade dress of the cassette allows you to effectively

17   monopolize all of these other things which have none of the

18   non-functional distinctive elements that you have to have in

19   order to have trade dress, you are effectively granting a

20   permanent monopoly to things that are functional items that

21   are reserved in the patent law.

22           The Versa Products case --

23           THE COURT:  That is also Third Circuit?

24           MR. CAHR:  Yes.  Has been affirmed as still good

25   law.  It's still good law in the Third Circuit.  A&R

1    Sportswear versus Victoria's Secret.

2              The Versa Products case is considered to be the

3    leading case on these types of product configuration issues

4    and has been cited by appellate courts around the country.

5              THE COURT:  We will take a look at the

6    authorities that you have all cited and figure that one out.

7              Next, at 11.4, the plaintiffs have a proposal.

8    I am not sure if the defendants object to it.  It relates to

9    damages and intentional infringement.  Is that objected to?

10             MR. CAHR:  No, Your Honor.

11             THE COURT:  Okay.

12             All right.  On the back end here, there is a lot

13   of disagreement about dates and statute of limitations.  It

14   seemed like that was maybe the same dispute multiple times.

15   Help me understand what I need to decide about what I need

16   to tell the jury about the dates and the statute of

17   limitations.

18             MR. LINDVALL:  Your Honor, the first thing is

19   that California recognizes the continuous accrual doctrine,

20   which means for every act of infringement there is a

21   separate cause of action.

22             So that starts the statute over again.  As a

23   result of that instruction, as we see, our instruction is

24   very close to theirs, but ours says, it's for each time.  So

25   if you see -- I am trying to look --

1          THE COURT:  For instance, Page 99 was the first

2     place I see it come up.  Statute of limitation, trade dress

3     infringement.

4          MR. LINDVALL:  Right, we say each of AHG's

5     claims harms.  Broetje says a claim harms.  So Broetje is

6     taking the position that there is no continuous accrual

7     doctrine or it shouldn't be applied and there is only one

8     harm that has occurred.  And we are saying every time you

9     have an act of trade dress infringement that starts the

10    statute over again.  That is the proper statute of

11    limitations under California law, because California law has

12    a number of common law exceptions and we cite a case there,

13    and this is one that they use.

14         THE COURT:  Do you disagree?

15         MR. CAHR:  We disagree on how this works when

16    you have got a continuing tort.  They are basically saying

17    it restarts it.  We are saying it just moves the framework.

18    This may be an issue where it might be useful for the

19    parties to provide a paragraph or two, just describing the

20    relevant cases.  Because this is something where -- it is

21    fairly intricate.  I don't know that we will get much help

22    to you just going back and forth like this.

23         THE COURT:  If I understand the plaintiffs'

24    position, it is that the first act, let's say, of

25    infringement, that is January 1st, 2005.  Say the statute is

1   three years.  If they sue after January 1st, 2008, they are

2   out of luck on that first act of infringement.  They can't

3   recover damages or accrued liability for that.

4           But if there has been another act, January 1st,

5   2006, and their suit is within three years of that, then

6   they are fine on that second one.  They just can't get back

7   the first one.

8           MR. LINDVALL:  That's correct, Your Honor.

9           THE COURT:  Do you disagree with that?

10           MR. CAHR:  That is correct.  But that's not how

11   I understood Mr. Lindvall's description.  It's a sliding

12   window that moves.  It's not something that sort of restarts

13   the whole process over again.

14           THE COURT:  You agree with that, Mr. Lindvall.

15   Right?

16           MR. LINDVALL:  Right, because there were

17   multiple acts of infringement here, you have got to look at

18   each act, because there are two.  You had two instances.  If

19   you took 20 acts during the course of time, you go there and

20   add --

21           THE COURT:  But you don't go back to the

22   beginning of the three-year period.

23           MR. LINDVALL:  Yes, Your Honor.

24           MR. CAHR:  We just disagree about the dates.

25           THE COURT:  So we disagree conceptually.  Your

1    belief, Mr. Lindvall, if we adopt your language, we will

2    capture what we all agree is the California law.

3                MR. LINDVALL:  Agree, Your Honor.

4                THE COURT:  What about the dates?  There are

5    apparently disagreements about what actual dates I should be

6    telling the jury.  What do I need to know about that?

7                MS. BEYER:  Your Honor, one issue relating to

8    the priority language, AHG's proposal that the infringing

9    parties must prove that each of AHG's harms occurred before

10   May 12th, 2006.  I think it has the possibility of being

11   misleading to the jury and that they would misunderstand

12   that it is restarting the clock, as opposed to a sliding

13   window we are talking about.

14                I think if we move -- we need to wordsmith that

15   a bit and move each of AHG's harms in the sentence.

16                THE COURT:  How long is the statute of

17   limitations?

18                MR. CAHR:  It varies.

19                MS. BEYER:  Three years.

20                MR. CAHR:  Three years for federal.  Two years

21   for state.

22                THE COURT:  Do you agree with that, plaintiff?

23   Three years federal, two years state is the length of the

24   statute of limitations?

25                MR. LINDVALL:  Your Honor, to be honest with

1    you, I can't answer that right now.

2               THE COURT:  We will work on the language and do

3    our best to convey what California law is on the continuous

4    accrual.

5               But in terms of what actual dates we should be

6    telling the jury, maybe we should go one by one.  At 11.6,

7    everyone is in agreement, May 12, 2006 is the date I should

8    be telling them.  Correct?

9               MR. LINDVALL:  Yes, Your Honor.

10              MR. CAHR:  Yes, Your Honor.

11              THE COURT:  Then at 11.7, Page 101, we are all

12   in agreement, May 12th, 2006 again.

13              MR. LINDVALL:  Yes, Your Honor.

14              MR. CAHR:  Yes, Your Honor.

15              THE COURT:  11.8, you propose different dates.

16   Let's talk about that.

17              Mr. Lindvall, it looks like plaintiffs propose

18   May 12th, 2005 and Broetje proposes May 12, 2007.  What's

19   going on there?

20              MR. CAHR:  Your Honor, this relates to the

21   difference in how you apply the statute of limitations.  If

22   it is a California state common law state unfair competition

23   claim, it is under 7-200, the infamous California statute on

24   unfair competition.  That one has a four-year statute of

25   limitation.  It is a two-year statute of limitation for

1    common law unfair competition.  In fact, we have extensive

2    case law on this issue.

3              A number of courts have decided this exact

4    issue.  We would be happy to provide that to you.

5              THE COURT:  Your view is it should only be two

6    years.

7              MR. CAHR:  Yes, it should only be two years.

8              MR. LINDVALL:  That kind of rings a bell.

9              There is a California statute that says four

10   years for unfair competition.  And we can provide that

11   citation for you, along with theirs.  California, I have to

12   be honest with you, in this area, it's kind of confusing.

13   There is a two-year and a four-year.  Four year is a

14   statutory statute of limitations.

15             THE COURT:  Here is what we will do.  I am

16   expanding your two pages to three pages.  Address this 11.8

17   dispute as well, the two years versus four years.  So get

18   that to us by 8:30 tomorrow morning, the previous issue we

19   talked about, as well as this one we were just talking about

20   now.

21             Then my final thing on jury instructions, at

22   11.13B, No Duplicative Damages - Nonpatent Damages, you both

23   have proposals on this.  One of the differences, maybe the

24   only difference was whereas Broetje had sort of an

25   introductory couple sentences at the beginning of 11.13B,

856

1    the top of Page 113, which would have me tell the jury, AHG

2    seeks damages from the Broetje parties under more than one

3    legal theory.  However, each item of damages may be awarded

4    only once regardless of the number of legal theories

5    alleged.

6                My question to Broetje is, punitive damages, are

7    they available on more than one claim here?  If they are,

8    this may be a little misleading.

9                MR. CAHR:  They are available under state law

10   unfair competition and under intentional interference.

11               THE COURT:  Then if I were inclined to use your

12   introduction here, would you object to me modifying it,

13   However, other than punitive damages --

14               MR. CAHR:  How about AHG's compensatory damages,

15   to distinguish it from the punitive damages.

16               THE COURT:  So we are only talking about

17   compensatory damages here.

18               MR. CAHR:  Yes.

19               THE COURT:  I am not trying to tell them they

20   can't award punitive damages more than once.

21               MR. CAHR:  We have no objection.

22               MR. LINDVALL:  In ours, we actually have that

23   kind of language.

24               THE COURT:  I will do something with that to

25   make that clear.

1           Before getting to the verdict sheet, were there

2      jury instruction disputes anyone else wanted me to focus on

3      that we haven't talked about?  I thought I could resolve it.

4      But if you want to make it more confusing, go ahead.

5           MR. LINDVALL:  They have one instruction, 4.6

6      called product Design-Around, which doesn't come from any

7      model or anything else.  I believe that it's an improper

8      instruction.  It's not really an instruction of law, because

9      it's just -- that's one of the factors that they consider.

10     To take it out and put it by itself is improper.

11          THE COURT:  You object to that?

12          MR. LINDVALL:  Yes, Your Honor.

13          THE COURT:  Any others you want to touch on?

14          MR. LINDVALL:  The only other ones where we have

15     competing ones, all we have done, we have cited to Your

16     Honor's earlier ones.  I think they may have changed up.  We

17     would just say we would request that you leave them as

18     before.  I don't see any others that come up to me that look

19     troublesome at all.

20          THE COURT:  Okay.  Any for Broetje, if you want

21     to respond on the design-around and/or raise another issues,

22     you can.

23          MR. KELLEHER:  It's a proper statement of a

24     federal policy, Your Honor.  There are cases that support

25     that proposition and certainly that is the facts of the

 1   case.

 2                THE COURT:  I think my concern is calling out

 3   the policy on design-around, when there are certainly

 4   policies underlying almost every instruction, and I am

 5   definitely not getting into them.  Is there that need to

 6   call out the policy underlying design-around?

 7                MR. KELLEHER:  I think where there is

 8   accusations of copying, when there are actually differences

 9   between the products, then letting the jury know that

10   federal law encourages people to actually make differences

11   when they are making a similar product, that that would fit

12   the facts of the case and help the jury.

13                THE COURT:  Any others you want to touch on?

14                MR. CAHR:  Just a couple, Your Honor.  On 5.0,

15   willful Infringement, we object to this in its entirety

16   because our position is that it's the Court's decision.  And

17   if the Court chooses to reserve its decision until after the

18   jury deliberates, we will accept it.

19                THE COURT:  Right.  I intend to get the jury's

20   view.  But your rights are certainly preserved there.  I

21   understand what the law is.

22                Any others you want to touch on?

23                MS. SHARP:  Your Honor, there was discussion

24   about the Versa Products and Nintendo issue.  May we add one

25   page for the submission on that issue?

1          THE COURT:  Make it four pages?

2          MS. SHARP:  Yes.

3          THE COURT:  Any objection to that?

4          MR. CAHR:  No, Your Honor.

5          THE COURT:  We will take four-page letters.  But

6     we are not going any longer than that.

7               Other issues from defendants?

8          MR. CAHR:  No, Your Honor.

9          THE COURT:  Okay.  Let's talk briefly about the

10    verdict sheet disputes.  I guess first, to plaintiff,

11    shouldn't I, for the claims that have a scienter element,

12    break it out as between the two different defendants?  That

13    is sort of an overriding theme on a number of the claims.

14         MR. LINDVALL:  Your Honor, we would have no

15    problem with that.  Our goal was to try to make it simple.

16    This is tough.  Ours is nine pages.  Theirs is 16.  We are

17    trying to simplify it.  I have no problem.

18         THE COURT:  We will be doing that.  Willful

19    Infringement, I already noted I will be asking the jury

20    about that.

21              Mr. Lindvall, on invalidity, the question is,

22    should I break out anticipation and obviousness?  Is it just

23    the simplicity concern, or is there something else?

24         MR. LINDVALL:  I think it is simplicity.  They

25    are primarily relying on from seeing the slides is

1    anticipation.

2              THE COURT:  You are not dropping obviousness,

3    are you?

4              MR. KELLEHER:  We are not, Your Honor.

5              THE COURT:  I am going to split it out.  It will

6    make it easier for any further proceedings in this case or

7    any other court for us to know whether the jury thought the

8    patents, if they do, were invalid due to obviousness or

9    anticipation.

10             I guess to defendants, there is a couple of

11   these where you want me to have the jury walk step by step

12   through all of the elements of certain defenses and actually

13   make certain affirmative elements of some of the claims.

14   That does seem unduly confusing, given they will have the

15   jury instructions and we are not doing that, for instance,

16   on invalidity, we are not telling them to walk through each

17   and every limitation, for instance.

18             But maybe there is something I am not seeing

19   there.  Why should I entertain the possibility of all of

20   those questions you have broken out for us?

21             MR. CAHR:  I am assuming you are talking about

22   the trade dress infringement?

23             THE COURT:  It comes up at least there.

24             MR. CAHR:  In the trade dress context, there are

25   independent determinations that need to be made.  And for

1    ease of the Court, in the JMOL process and also for ease of

2    review on appeal, I think given the fact there are these

3    independent considerations, like the functionality element,

4    which is, in a product configuration trade dress case, as

5    you will see in the Versa Products case, is overwhelmingly

6    important.

7               I think that it will just be incredibly helpful

8    to the Court and incredibly helpful to a reviewing Court if

9    they have that information.

10              THE COURT:  All right.  Do you want to respond?

11              MR. LINDVALL:  Your Honor, I think it would be

12   actually extremely confusing to the jury because you are

13   taking your instruction basically on trade dress and

14   breaking it down, element by element:  Your Honor's

15   example, for example, obviousness or trademark.  I mean

16   patent infringement, that is like breaking it down element

17   by element and going through that way.

18              Your instructions should be clear on that.  You

19   are basically taking your instructions and listing them all

20   out in the area.  This verdict form I think is confusing

21   enough as it is.  And if you enter that in there, we are

22   just inviting problems coming in and out of that.  And to

23   ask them a simple question like this would be a lot easier

24   for them and, in light of the instructions you give them,

25   would be fine.

 1              THE COURT:  Okay.  Is there anything further on

 2      that, Mr. Cahr?

 3              MR. CAHR:  No, Your Honor.  I mean I just think

 4      that given the fact the product configuration trade dress is

 5      so unusual relative to even trade dress law normally that I

 6      think that it will just be helpful to the jury.

 7              THE COURT:  All right.  I will give that some

 8      more thought.

 9              One quick question on damages.  At least the

10      plaintiff and maybe the defendant, too, is asking the jury

11      to separately find an amount of patent damages for each of

12      the two patents.

13              So, for instance, I'm looking at page 6 of the

14      plaintiffs' proposal which would have them separately

15      provide a damages number for the '339 and the '216.

16              MR. LINDVALL:  That part, our intent is not to

17      ask for separate damages for each patent.  I agree there

18      should be one damages number for the infringement of these

19      patents.  But I think what the problem is here, what happens

20      if they find one patent invalid and infringed?

21              THE COURT:  Right.

22              MR. LINDVALL:  You get into that issue.  So

23      I'm not sure.  That's why we split it out.  But we're not

24      looking for a double recovery.

25              THE COURT:  Right.

1           MR. CAHR:  Your Honor, there is also a notice

2    issue for one of the patents, and so there is some

3    difference in that regard as well.  And I mean I presume

4    that some things could be addressed with remittitur, if need

5    be, but I think having them separate is probably easier.

6           THE COURT:  And I am trying to find what the

7    defendants proposed.

8           Are you comfortable with what the plaintiffs

9    have proposed at page 6 of their proposal as of yesterday,

10   questions 10A and 10B?

11          MR. LINDVALL:  Your Honor, I just overheard

12   Ms. Sharp's suggestion that maybe you can have an

13   introductory thing:  If you find infringement and the patent

14   valid for either of the patents, then you award X.

15          THE COURT:  Right.  Because there certainly has

16   not been -- I know you don't want a double recovery.  The

17   law wouldn't allow that.

18          MR. LINDVALL:  Yes.

19          THE COURT:  But there has been no evidence as to

20   how patent damages are broken down between the two patents.

21          MR. LINDVALL:  No.

22          THE COURT:  So you don't want to ask the jury to

23   do that either.

24          It seems to me, unless I go with the defendants'

25   proposal which has a number of other hurdles, what I should

1    try to do is rewrite Question 10 as proposed by the

2    plaintiffs to make it clear you come to the patent damages

3    question either through a finding of infringement and no

4    invalidity on the claim of the '339 and/or of the '216.

5              MR. LINDVALL:  And then there is one line, you

6    can put in a number.

7              THE COURT:  Right.  The '339 and '216; is that

8    right?

9              MR. LINDVALL:  Yes.

10             THE COURT:  That is what I'm going to try to do.

11             Are there any other issues about the verdict

12   sheet that I haven't brought up that anybody wants to raise?

13             MR. CAHR:  Your Honor, on the last one, hold on

14   one moment.

15             THE COURT:  Sure.

16             MR. CAHR:  We're fine with that as long as we

17   still have the separate issue, the separate instruction on

18   the actual notice.

19             THE COURT:  The separate instruction and/or

20   separate question.

21             MR. CAHR:  Separate subparts.

22             THE COURT:  Right.  And that is a separate issue

23   which I am going to give more thought to, but at least if I

24   do choose to go with the plaintiffs on the larger question,

25   I'm going to still rewrite what the plaintiffs have proposed

1    along the lines of what I have said but I haven't made a

2    final decision.  Maybe I will just go with what the

3    defendants have proposed.

4             Do either side have other issues on the verdict

5    sheet that we should talk about?

6             MR. CAHR:  I don't think so, Your Honor.  I

7    think most of them are substantive disputes over who should

8    win.

9             THE COURT:  Right.  Okay.

10            MR. LINDVALL:  The only thing I can -- with

11   respect to their instructions on the statute of limitations,

12   and they have on page 14 of their proposed instructions.

13   They have the instruction:  Did AHG discover or know of

14   facts that would have caused a reasonable person to suspect

15   ...

16            If Your Honor is going to be deciding the

17   equitable tolling issue and not have the jury decide it, it

18   may be even more, make more sense, and the Judge can decide.

19   Your Honor can decide that.

20            THE COURT:  Well, you are all in agreement I'm

21   not giving the jury equitable tolling; right?

22            MR. LINDVALL:  Yes, I think they have had

23   enough.  That is why I am taking it off.

24            THE COURT:  And you don't want anything

25   regarding statute of limitations to be asked of this jury?

1              MR. LINDVALL:  Yes, I prefer not to.  It's

2    trying to simplify it for them.

3              THE COURT:  Right.

4              MR. LINDVALL:  I think it's something Your Honor

5    could deal with.

6              MR. CAHR:  I think it's important to have a

7    finding of fact on these issues.  The jury has heard all of

8    this evidence.  I think it would be helpful to Your Honor to

9    hear from them.  Obviously, it's within your ability to make

10   all of the alterations relative to it, but I think that as a

11   fact-finding that it will be helpful to you.

12             THE COURT:  Well, I understand that is the

13   parties' positions and we'll give that some more thought.

14             Is there anything else on the verdict sheet?

15             MR. LINDVALL:  No, Your Honor.

16             THE COURT:  All right.  So here is where we are.

17   We'll finish the evidence tomorrow.  Be available at 8:30.

18   Get your letters in at 8:30, and I'll see you as soon after

19   8:30 as I can.

20             My intent is that we'll finish the evidence

21   tomorrow, and my further intent is that I will have the

22   instructions done such that I can read to the jury through

23   section, I think it's 12, basically everything but the

24   deliberation portion.  That's going to take me about an

25   hour.  I'll get that out of the way some time tomorrow.

1          Then when we come in on Friday, whatever time

2     that is, we'll start with the closing arguments which I

3     understand won't exceed two and-a-half hours altogether.

4     And I will read that last little bit of jury instructions.

5     I'll read the verdict sheet to them.  And then they'll

6     deliberate however long they wish to deliberate.

7          So to make that all work, that means I have to

8     get the jury instructions finished and docketed some time

9     before I sit down to read them tomorrow afternoon, which

10    we'll do, and it means we have to have the verdict sheet

11    done by Friday morning, which we will make sure we do as

12    well.

13         Is there any questions or anything else,

14    Mr. Lindvall?

15              MR. LINDVALL:  No, Your Honor.

16              MR. CAHR:  Just one quick thing.

17              THE COURT:  Yes.

18              MR. CAHR:  We actually have a deadline at 7:00

19    for our demonstratives.  Can we extend that out a little

20    bit?

21              THE COURT:  Certainly I would be agreeable to

22    extending it.

23              Is there any objection?

24              MR. LINDVALL:  No, I don't have any objection.

25              MR. CAHR:  So if we can have until 8:00.

1                    MR. LINDVALL:  That's fine.

2                    THE COURT:  8:00 o'clock, that's fine.

3                    MR. LINDVALL:  We would have agreed to that on

4        our own.

5                    THE COURT:  All right.  Mr. Kelleher.

6                    MR. KELLEHER:  Since you have a matter here

7        tomorrow morning, is it all right to leave the exhibits in

8        the well of the court or should we move things around for

9        you?

10                    THE COURT:  That's a really good question.  I

11        think it would be better if you could clear that area.  So

12        if you could stick around for a couple minutes and do that,

13        that will help.  Thank you.

14                    MR. LINDVALL:  And leave that stuff?

15                    THE COURT:  I think that will be fine back

16        there.

17                    Thank you very much.  Have a good night.

18                    (Proceedings adjourn at 5:44 p.m.)

19

20            I hereby certify the foregoing is a true and accurate
         transcript from my stenographic notes in the proceeding.

21

22                              /s/ Brian P. Gaffigan
                              Official Court Reporter
23                              U.S. District Court

24

25