```
 1                    IN THE UNITED STATES DISTRICT COURT

 2                    IN AND FOR THE DISTRICT OF DELAWARE

 3                              - - -

 4   ATELIERS DE LA HAUTE-GARONNE (French  :   CIVIL ACTION
     Corporation) and F2C2 SYSTEMS S.A.S.  :
 5   (French Corporation),                 :
                                           :
 6              Plaintiffs,                 :
                                           :
 7         v.                              :
                                           :
 8   BROETJE AUTOMATION-USA INC. (Delaware :
     Corporation), BROETJE AUTOMATION GMBH :
 9   (German Corporation),                 :
                                           :   NO. 09-598-LPS
10              Defendants.
                              - - -
11
                        Wilmington, Delaware
12                    Thursday, April 10, 2014
                       Jury Trial - Volume D
13
                              - - -
14
     BEFORE:  HONORABLE LEONARD P. STARK, U.S.D.C.J., and a jury
15
     APPEARANCES:                  - - -
16

17              YOUNG CONAWAY STARGATT & TAYLOR, LLP
                BY:  MELANIE K. SHARP, ESQ., and
18                   JAMES L. HIGGINS, ESQ.

19                   and

20              KAYE SCHOLER, LLP
                BY:  SCOTT G. LINDVALL, ESQ., and
21                   JEFFREY H. HOROWITZ, ESQ.
                     (New York, New York)
22
                     and
23

24
     Kevin Maurer                      Brian P. Gaffigan
25   Official Court Reporter           Official Court Reporter
```

```
 1    APPEARANCES:  (Continued)

 2

 3              KAYE SCHOLER, LLP
              BY:  PAUL I. MARGULIES, ESQ.
 4                 (Washington, District of Columbia)

 5                 and

 6              KAYE SCHOLER, LLP
              BY:  MICHELLE MAREK, ESQ.
 7                 (Chicago, Illinois)

 8                     Counsel for Plaintiffs Ateliers De La
                      Haute-Garonne and F2C2 Systems S.A.S.
 9

10              DRINKER BIDDLE & REATH, LLP
              BY:  JOSEPH C. SCHOELL, ESQ., and
11                 TODD C. SCHILTZ, ESQ.

12                 and

13              DRINKER BIDDLE & REATH, LLP
              BY:  PATRICK J. KELLEHER, ESQ.,
14                 DARREN S. CAHR, ESQ., and
                   CARRIE A. BEYER, ESQ.
15                 (Chicago, Illinois)

16                     Counsel for Broetje Automation-USA Inc.
                      and Broetje Automation GmbH
17

18

19

20

21

22                     - oOo -

23                   P R O C E E D I N G S

24              (REPORTER'S NOTE:  Jury trial proceedings were

25    held in open court, beginning at 9:45 a.m.)
```

```
 1                    THE COURT:  Good morning, everyone.

 2                    (The attorneys respond, "Good morning, Your

 3      Honor.")

 4                    THE COURT:  Any issues from the plaintiffs?

 5                    MS. SHARP:  Your Honor, I think we resolved the

 6      issues enough to report on that in the first morning break

 7      so the record is clear.

 8                    THE COURT:  Okay.  Fine.  Any issues from the

 9      defendant?

10                    MR. CAHR:  No, Your Honor.

11                    THE COURT:  Let's bring the jury in then.

12                    (Jury returned.)

13                    THE COURT:  Good morning, everyone.

14                    THE JURORS:  Good morning.

15                    THE COURT:  I hope you didn't mind getting to

16      sleep in a little.

17                    A JUROR:  No, Your Honor.  We didn't.

18                    THE COURT:  Whatever you did with your extra

19      time.  We are ready to proceed.  So I believe Dr. Budach is

20      on the stand; correct?

21                    MR. KELLEHER:  Yes, Your Honor.

22                    THE COURT:  We'll have Dr. Budach come back

23      please.

24                    THE WITNESS:  Sorry.

25                    THE COURT:  That's okay.
```

Budach - direct

 1          MR. KELLEHER:  I'm sorry, Your Honor.

 2          THE COURT:  Good morning to you, Dr. Budach.

 3          THE WITNESS:  Good morning.

 4          THE COURT:  I remind you that you remain under

 5     oath.

 6          THE WITNESS:  Thank you.

 7          ... STEFFEN BUDACH, having been previously

 8     sworn, was examined and testified further as follows ...

 9          THE COURT:  Again, he is joined by the

10     translator.  And, Mr. Kelleher, you may proceed.

11          MR. KELLEHER:  Thank you, Your Honor.

12          DIRECT EXAMINATION (Continued)

13     BY MR. KELLEHER:

14     Q.     Dr. Budach, we will get to the demonstrative slide we

15     were talking to you about yesterday.  First, let me ask you,

16     is it accurate that the plaintiffs here also sued Broetje in

17     France?

18     A.     Yes.

19     Q.     What was the result in the trial court?

20     A.     In the first instance, we won the litigation.  And in

21     the second instance, we lost two of six claims.  The second

22     decision stands, the decision, in Paris.  Afterwards, we

23     went to the supplemental Court in France.

24     Q.     And am I accurate that the plaintiffs also sued

25     Broetje in Germany?

Budach - direct

1    A.     Yes.

2    Q.     What was the result there?

3    A.     Yes.  There we won the first and the second instance.

4    And in both cases the Court decided that we do not infringe

5    or that Broetje does not infringe the patents of AHG.  And

6    in the third lawsuit, in the German Patent Court, it has

7    been decided that AHG patent is invalid in view of the

8    Shinjo reference.

9    Q.     Dr. Budach, yesterday we were looking at a summary

10   slide which we were trying to get on the screen but we are

11   having problems connecting.

12           Could you briefly, very briefly, summarize what

13   it is that you understood the examiner in the United States

14   prosecution to understand the meaning of grooves or

15   passageways to mean in the AHG patents?

16   A.     Okay.  Probably it's a bit difficult to understand

17   for the jury, what I am now explaining.  I will try to

18   answer.

19           Okay.  We have it.

20           That shows my opinion how the United States

21   patent examiner understood grooves.  And I thought the

22   patent examiner meant grooves have to be something extra,

23   namely, that the groove, the groove has been cut or punched

24   into the wall of the rivet -- of the tube.

25   Q.     Dr. Budach, how is that different from what is shown

Budach - direct

1    on the tube on the right?

2    A.    On the right, that one, okay, that's the Broetje

3    structure.  And we also consider the examination procedures

4    in the United States.  And the United States examiner didn't

5    understand the corners of the Shinjo like grooves of AHG.

6    And why is it the case?  Because the corners seem to be the

7    same like grooves at AHG, then he would not have gone into

8    the United States patents in light of Shinjo.

9          And that was my conclusion, that corners like

10   Shinjo doesn't infringe AHG patents.  And that's why I

11   proposed, or I suggested to use corners like here to

12   transport the compressed air.  And so we came to the

13   conclusion that there is no infringement of the AHG patents.

14   Q.    Thank you very much, Dr. Budach.

15   A.    Thank you.

16   Q.    We mentioned the litigation in Germany and in France.

17   Could you tell us what is the status of those litigations

18   right now?

19   A.    Yes.  In both cases, we are, went to the separate

20   court and no case is finally decided.  All cases are pending

21   in the German or the French separate court.

22          MR. KELLEHER:  Thank you very much, Dr. Budach.

23   No further questions.

24          THE WITNESS:  Thank you.

25          THE COURT:  Thank you.  We will have

Budach - cross

1    cross-examination.

2              THE WITNESS:  I will use a translation of the

3    questions and from time to time I will decide whether I

4    answer English or not.  It's okay?

5              THE COURT:  It's okay if you need to.

6              MR. HOROWITZ:  Your Honor, may I approach?

7              THE COURT:  You may.

8              (Binders passed forward.)

9                        CROSS-EXAMINATION

10   BY MR. HOROWITZ:

11   Q.     Good morning, Dr. Budach.

12   A.     Good morning.

13   Q.     Now, you and I have actually never met before, have

14   we?

15   A.     Yes.

16   Q.     And your deposition was taken in this case.  It was

17   taken by Mr. Lindvall; right?

18   A.     Yes.

19   Q.     Real quick.  The German litigation that you were just

20   telling the jury about, the German decision was based on the

21   Shinjo patent; correct?

22   A.     (Through translator):  In Germany, we have two

23   different kinds of decisions.  In the first instance, the

24   decision was with regard to the patents in Germany.  And

25   then, before the German federal patent court, the validity

Budach - cross

1    of the patent was at stake.  And in August of these cases,

2    the Shinjo reference played either a direct or indirect

3    role.

4                    MR. HOROWITZ:  Your Honor, may we approach?

5                    THE COURT:  Yes.

6                    (Sidebar conference held.)

7                    THE COURT:  All right.  Mr. Horowitz.

8                    MR. HOROWITZ:  During direct examination,

9    Dr. Budach spoke in English.  In fact, during the

10   questioning of him at the beginning by defense counsel, he

11   declared that he spoke and wrote and read English and they

12   communicated all the time in English as part of the direct

13   examination.

14                   Direct examination occurred without the use of

15   interpreter except occasionally, and suddenly Dr. Budach is

16   now using the interpreter, and I'm deeply concerned about

17   time.  You have mentioned this at the beginning and it

18   just strikes me, the contrast.  I would rather not have to

19   cross-examine him about that to the jury because I don't want

20   to look like the bad guy but the contrast is extraordinary.

21                   THE COURT:  All right.  Well, what are you

22   proposing?

23                   MR. HOROWITZ:  I am not sure except that I think

24   that his use of an interpreter, perhaps you could ask him to

25   try to answer in English, just as he did for defense counsel.

Budach - cross

1                THE COURT:  All right.  Mr. Kelleher, what is

2       your view?

3                MR. KELLEHER:  I don't think there has been any

4       abuse so far.  The witness knew what I was going to be

5       asking him.  We practice like we always practice with

6       witnesses on direct.  And he is going to need a little bit

7       of help for cross-examination questions, especially when we

8       talk quickly.  And this particular question, the way it was

9       asked about Shinjo, there were three different proceedings

10      in Germany where they had different issues with the Shinjo

11      reference, so that is why he gave a more complicated answer.

12      I think for complicated questions he will need the

13      assistance of an interpreter.

14               THE COURT:  Do you have an objection to me

15      giving him an instruction at this time just saying:  The

16      parties are under time constraints.  Could you initially see

17      whether you could answer some of the questions in English,

18      and if you find you can't, then it is okay to use the

19      interpreter.

20               MR. KELLEHER:  I don't object to that, just like

21      I didn't object when Mr. Bornes needed an interpreter when I

22      was cross-examining him.

23               THE COURT:  That is how we will start.  I will

24      politely remind him it is a timed trial, ask him to try his

25      best.  If it turns out that you think it is being abusive

Budach - cross

1    or in any way wasting your time, then I will say the next

2    step is let's have another sidebar and I will consider

3    reallocating time.  I don't think it's likely that I am

4    going to require him to testify without a translator.

5    Hopefully, we won't get to that point.

6            MR. HOROWITZ:  Thank you, Your Honor.

7            THE COURT:  All right.

8            (Sidebar conference ends.)

9            THE COURT:  Dr. Budach, I would just like to --

10   you may know the parties are under time constraints, and

11   obviously it takes some time if we use the translator.  If

12   you need the translator, that is fine, but I would ask you

13   if you could try initially and see if you could answer some

14   or all of the questions without the translator.  Do you

15   understand?

16           THE WITNESS:  Yes.

17           THE COURT:  Okay.  Thank you very much.

18           Mr. Horowitz.

19   BY MR. HOROWITZ:

20   Q.    Dr. Budach, all three decisions in Germany that you

21   just described to the jury were based on something in the

22   Shinjo patent; correct?

23   A.    Yes.

24   Q.    Now, sir, you are employed by a company called CLAAS;

25   right?

Budach - cross

1    A.     Yes.

2    Q.     And CLAAS is a German company.  You told us that.

3    A.     Yes.

4    Q.     And your job at CLAAS is Head of the Patent

5    Department; right?

6    A.     Yes.

7    Q.     And your office, you work in the headquarters at

8    CLAAS in Germany; correct?

9    A.     Yes.

10   Q.     And CLAAS bought Broetje, the defendant in this case,

11   in the Spring of 2003?

12   A.     Yes.  I guess in -- I was involved in this case at

13   first time in Summer or Autumn of 2003.  I do not remember

14   exactly the time.

15   Q.     Right.  You told us in your deposition you got

16   involved in June of 2003, shortly after CLAAS brought

17   Broetje a couple months before that.  Does that sound right?

18   A.     My direct, my direct involvement was in 2005.

19          (Through translator):  My personal involvement

20   happened in either Summer or Fall of that year.  I had a

21   personal communication with Mr. Brinkies.  That is what I

22   recall of that period.

23   Q.     And CLAAS brought Broetje in the spring of 2003

24   before your communication that you just described?

25   A.     Yes.

Budach - cross

```
 1    Q.     And CLAAS you told us has about 360 employees in the

 2    United States?

 3    A.     Yes.

 4    Q.     And it's got --

 5    A.     Today.  Today.

 6    Q.     Today.  And it has around eight or 9,000 employees

 7    around the world; right?

 8    A.     Today, we have about 10,000 employees because we

 9    acquired a Chinese company and one Italian.  I don't know.

10    I guess about 10,000.

11    Q.     So about 10,000?

12    A.     Today.

13    Q.     Today.

14    A.     But not in 2003.

15    Q.     Around the world; right?

16    A.     Yes.

17    Q.     And CLAAS owned Broetje, you told us, until 2011?

18    A.     I guess.  Between 2011 and 2012.  I do not remember

19    exactly when they sold Broetje.

20    Q.     Now.  Your employer CLAAS still has an interest in

21    the outcome of this case; correct?

22    A.     We speak German.

23           (Through translator):  We do have a contract or

24    an agreement with the new owners of Broetje, and they desire

25    that we kept on working with them.
```

881

Budach - cross

1    Q.      You have what is called an indemnification agreement

2    or contract; right?

3    A.      (Through translator):  But that does not fall under

4    the scope of my activities.  I can only talk to the

5    instructions I got from our management with whatever I have

6    to deal with.

7    Q.      But your employer has a contract, CLAAS still has a

8    contract with the defendant.  In fact, if the defendant

9    loses and the jury awards money, your company that you work

10   for is on the hook to pay for some or all of that judgment;

11   right?

12   A.      (Through translator):  I do not know the details but

13   it's possible that that is the case.

14   Q.      Now, sir, do you understand me when I am asking you

15   these questions?

16   A.      (Through translator):  One or the other question, I

17   do understand.

18   Q.      Okay.  Let's keep going.  As a CLAAS patent lawyer,

19   you provided advice to Broetje in the time frame of 2003,

20   2004, 2005; right?

21   A.      Ya.  Yes.

22           (Through translator):  Yes.

23   Q.      And you are testifying here today about that advice

24   you gave to Broetje; right?

25   A.      Yes.

Budach - cross

1   Q.     And you understand that what the jury is going to

2   be looking at today and has been looking at is whether that

3   advice was given to Broetje in good faith; right?

4   A.     (Through translator):  And they were given in good

5   faith because we did not want to infringe the patents.

6   Q.     Your main job, you told the jury yesterday -- this is

7   what you said.  Your main job is to monitor our products in

8   the patent publications of our competitors to avoid patent

9   infringement.  That is your main job; right?

10  A.     (Through translator):  Yes.  That is one of the most

11  important responsibilities I do have.  That together with my

12  team, we make sure that no third-party patents are infringed.

13  Q.     You make sure of that; right?

14  A.     Yes.

15  Q.     And you made sure that you are telling the jury in

16  the case of Phillippe Bornes' patent; correct?

17  A.     (Through translator):  As I explained some minutes

18  ago, yes.

19  Q.     Now, sir, you are a German patent attorney; correct?

20  A.     Yes.

21  Q.     And you understand this case before this jury in this

22  courtroom involves two United States patents; correct?

23  A.     Ya.  (Speaking German.)

24  Q.     And I think the jury -- I'm sorry.

25  A.     (Through translator):  Yes.  This has to do with the

883

Budach - cross

1    training I received as a patent lawyer because that also

2    pertains to international law.

3    Q.      You told the jury yesterday that you studied United

4    States law as part of your schooling to become a German

5    patent lawyer; right?

6    A.      Yes.

7    Q.      You understand, do you not, that patent law is not

8    the same in every country?

9    A.      Yes, I did understand it, but it is, it is quite

10   similar, especially where we talk about here about novelty

11   or anticipation and obviousness means inventive step.

12   Q.      Sir, German patent law is not exactly the same as

13   United States patent law, is it?

14   A.      Yes, it is not exactly the same.  Of course.

15   Q.      And you went to school.  You were trained in Germany;

16   right?

17   A.      Yes.

18   Q.      You are not a United States patent attorney; correct?

19   A.      Yes, that is correct.

20   Q.      You are not qualified as a United States lawyer; is

21   that correct?

22   A.      Yes, that's correct.

23   Q.      You have never taken a bar exam here in the United

24   States?

25   A.      Ya.  Yes, that is correct.

Budach - cross

1    Q.      You are not licensed to practice law here in the

2    United States?

3    A.      Yes.

4    Q.      Yes?

5    A.      Ya.   (Speaking German.)

6                  (Through translator):   Yes, that is correct.   I

7    never studied law in the United States, nor did I ever

8    practice in the United States.

9    Q.      And the answer to my question:   Nor do you have a

10   license to practice in the United States?

11   A.      I'm not a United States patent attorney or lawyer.

12   I'm just a German patent lawyer and a European patent

13   lawyer.   There is two patent lawyer degrees, what I have.

14   Q.      German and European; correct?

15   A.      Yes.

16   Q.      And, in fact, you have no formal training in

17   determining infringement under United States patent law, do

18   you?

19   A.      (Through translator):   When we do the German and

20   European training or when we study to become a German or

21   European patent attorney, we do focus on some specific

22   topics regards U.S. patent law.   And these topics involve

23   novelty and the inventory step and there is no difference.

24   Q.      Sir, you gave a deposition in this case.   Do you

25   remember?

Budach - cross

1    A.    Yes.

2    Q.    You testified under oath just as you are today?

3    A.    Yes.

4    Q.    My partner, Mr. Lindvall, asked you questions.

5    A.    In 2011 or when?

6    Q.    Before we came in to talk to this jury today, you

7    answered questions under oath; correct?

8    A.    Ya.

9              (Through translator):  Yes.

10             MR. HOROWITZ:  Page 22, line 13 to page 22, line

11   15 from that deposition, Your Honor.

12             THE COURT:  You may play it.

13             "Question:  Did you have any formal training on

14   determining infringement under U.S. patent law?

15             "Answer:  No."

16   BY MR. HOROWITZ:

17   Q.    Now, part of your job is to help protect the

18   intellectual property of CLAAS; right?

19   A.    Yes.

20   Q.    You make sure the patents are filed for CLAAS and its

21   subsidiaries like Broetje?

22   A.    Yes.

23   Q.    And you filed patents on Broetje's inventions and

24   CLAAS's inventions to protect the company's inventions;

25   right?

1    A.      Yes.

2    Q.      You would expect a company to pay CLAAS or Broetje

3    for the right to use its intellectual property?

4    A.      (Through translator):  I am employee of company

5    CLAAS.  And in this case, I am just like any other employee

6    working for a company responsible for this particular

7    domain.

8    Q.      Okay.  Forgive me.  That is not the question I asked.

9    So let me try it again, sir.

10   A.      Ya.

11   Q.      You would expect a company to pay CLAAS were it to

12   use one of CLAAS's inventions that was under patent

13   protection?

14   A.      (Through translator):  If other companies use CLAAS's

15   inventions, then we need to come to some kind of agreement.

16   It does not need to be a financial agreement but it can also

17   be something like a cross-licensing agreement.

18   Q.      If a company used one of CLAAS's inventions, a

19   patented invention without CLAAS's permission, you would

20   consider taking action against that company; correct?

21   A.      (Through translator):  No.  In the first step, we

22   would have discussions or conversations with that company.

23   Q.      Well, you told us yesterday, you told the jury -- I

24   have the transcript from yesterday so I got to read it last

25   night, and here is what you said.  You said:  What we expect

Budach - cross

1    is that competitors respect our patent rights and the same

2    applies for us.

3                Didn't you tell the jury that yesterday, about

4    4:15 in the afternoon?

5    A.    Yes.

6    Q.    Now, when you got involved in 2003, in the summer of

7    2003, with Broetje in this issue of making cassettes, you

8    told the jury you needed to do research to see if there were

9    patents covering the cassette; right?

10   A.    Yes.

11   Q.    In fact, Broetje already had the patents on this

12   cassette, did they not?

13   A.    (Through translator):  I do not understand how you

14   mean that question.  What do you mean by that question?

15   Q.    All right.  I will show you what I mean.  You can

16   look at my binder, PTX-167.  This is in evidence.

17   A.    (Through translator):  What is it, PTX-167?

18   Q.    Yes.

19   A.    (Through translator):  Yes.

20                (The Witness in English):  Okay.  I have it.

21   Q.    I just want to ask you, yesterday, Dr. Budach, when

22   Mr. Kelleher was asking you questions, you were asked the

23   following question and you gave the following answer:

24                "Question:  Dr. Budach, could you tell us how

25   well, you speak English?

888

Budach - cross

1               "Answer:  I would say well enough to understand

2      and to speak and to read English text."

3               Is that what you said yesterday?

4      A.      Yes.

5      Q.      And, in fact, Mr. Kelleher asked you:

6               "Question:  What language did you and I use to

7      speak to each other?

8               "Answer:  We, all the time we talk, we are

9      talking in English."

10              Correct?

11     A.      Mr. Kelleher and I talk all the time in English.

12     Yes.

13     Q.      Now, coming back to my questions here in this

14     courtroom today while I'm asking you questions.  Let's take

15     a look at PTX-167.

16              This is a letter dated January 4, 2000 to

17     Mr. Phillippe Bornes, who is sitting right here, to

18     Dr. Holtmeier of Broetje.  Do you see that there?

19     A.      Yes.  (Speaking German.)

20              (Through translator):  I see that, yes.

21     Q.      And he says:  I send you the patent we had in Europe

22     so that it will be also in German, this is on the rifles

23     into the tube.

24              Do you see that there?

25     A.      (Speaking German.)

Budach - cross

1   Q.      I'm just asking if you see it.

2   A.      (Through translator):  Well, this, that is written

3   here, but this letter dates from the year 2000, and it is a

4   letter drafted by Mr. Bornes to Mr. Holtmeier.

5   Q.      Right.  We got it.

6   A.      (Through translator):  And we just established that

7   we started working in 2003.

8   Q.      Exactly.  I'm not a mathematician but 2003 is three

9   years after 2000; right?

10  A.      (Through translator):  I am not a mathematician

11  either but that is correct.

12  Q.      So we can agree then that Broetje had in its files

13  the patent covering this invention, Mr. Bornes' invention

14  from the very first second you got involved in this case.

15  A.      (Through translator):  I don't know whether this

16  letter pertains to the patent which we are working on right

17  now.

18  Q.      Well, let's turn the page then.  PTX-167.2.  Let's go

19  one more page.

20          Sir, that is the patents you are working on in

21  this case, is it not?

22  A.      Yes.  (Speaking German.)

23          (Through translator):  Yes, but there is no link

24  here between this letter and the patent.

25  Q.      That's the European version of the United States

1    patents at issue in this case?

2    A.    Yes.

3    Q.    Okay.  Now, you found the patents yourself in 2003;

4    right?

5    A.    I don't understand this question.

6    Q.    You did a patent search in September 2003?

7    A.    Yes.

8    Q.    Okay.  And you found the United States patents;

9    right?

10   A.    Yes.

11   Q.    Will you do your best to speak English to me like you

12   did to Mr. Kelleher?  Will you do that for me?

13   A.    Until now, I didn't hear your accent.  That is a

14   little bit tricky for me to answer or to understand each

15   question correctly.

16   Q.    As the head of the Patent Department at CLAAS, you

17   had the ability to seek advice from United States counsel;

18   correct?

19   A.    Yes.  (Speaking German.)

20            (Through translator):  Yes, but we used this

21   only if for some reason we think that is necessary to use

22   such a service.

23   Q.    You made a decision here you didn't think that was

24   necessary.  Is that what you are saying?

25   A.    (Through translator):  It has to do with the fact

Budach - cross

1  that the claims and the technical description are

2  essentially the same.

3  Q.     They're not identical, are they?

4  A.     (Through translator):  There are some deviations for

5  the U.S. patents were separately issued for processes and

6  for instruments or apparatus.

7              THE WITNESS:  In Europe --

8              MR. HOROWITZ:  You answered my question.

9              Your Honor, can I approach?

10             THE COURT:  Yes.  Doctor, you have answered the

11  question.  We'll have a sidebar.

12             (Sidebar conference held.)

13             MR. HOROWITZ:  Ms. Sharp would like to argue

14  this.

15             THE COURT:  Speak up.

16             MS. SHARP:  He continues to use the interpreter

17  for the questions and answers without making any effort to

18  comply with Your Honor's request that he try to communicate

19  in English.  When the interpreter asks him a question in

20  German, he then, it induces him to respond in German.  And

21  principally the interpreter is being used to elaborate on

22  answers.

23             My observation is that it's turning into a

24  situation where it's an abuse of the time.  I understand

25  the position that Your Honor is in in denying somebody an

892

Budach - cross

1   interpreter so our request is that we simply get an

2   adjustment in the time taken into account.

3                THE COURT:  Do you have any specific proposal as

4   to how to do that?

5                MS. SHARP:  I think at the end of the testimony,

6   we would have to add up the time, compare it against how

7   long the examination would have been done or how long it

8   would have taken in English --

9                THE COURT:  Right.

10               MS. SHARP:  -- had he done what he did yesterday.

11               THE COURT:  Mr. Kelleher.

12               MR. KELLEHER:  I think the witness is actually

13  trying quite well to answer in English.  The translator is

14  trying to do simultaneous translation to do things.  Just

15  before he walked over here, he was trying to answer

16  something in English as well.

17               We ran into the same problem with Mr. Bornes and

18  we didn't ask for time.  He used the interpreter quite a bit

19  when I was cross-examining him.

20               THE COURT:  I don't recall it being nearly as

21  much delay or an inhibition on the ability to cross-examine

22  with Mr. Bornes.

23               What I think would be appropriate is if I charge

24  one-third of the cross-examination time to the defendants,

25  because among other things, my ability to jump in and say,

Budach - cross

1    for instance, you have already answered the question or it

2    just called for a yes or no is hampered by the fact I don't

3    speak German so I don't know for sure he is not just saying

4    yes in a very long way.  And I think that from where we are

5    now, it would be fair going forward if I charge a third of

6    whatever time it has taken to complete the cross-examination

7    to the defendants.

8                    Is there anything else?

9                    MR. HOROWITZ:  No, Your Honor.

10                   THE COURT:  Ms. Sharp?

11                   MS. SHARP:  No, Your Honor.

12                   THE COURT:  Is there anything else?

13                   MR. KELLEHER:  We understand the ruling.

14                   THE COURT:  Okay.  Thank you.

15                   (Sidebar conference ends.)

16                   THE COURT:  You may continue.

17                   MR. HOROWITZ:  Thank you, Your Honor.

18   BY MR. HOROWITZ:

19   Q.    Dr. Budach, you have lawyers -- you have consulted

20   with lawyers in the past to get opinions or advice about

21   patents and infringement, United States lawyers; correct?

22   A.    (Through translator):  Up to this point, we did not

23   use such advice or consultations.

24   Q.    Are you saying that you didn't consult with United

25   States lawyers?  You didn't have the ability to do that in

Budach - cross

1  2003?  That wasn't something you did?

2  A.    (Through translator):  I am talking with regards to

3  this case.  We did not use the advice, separate advice of

4  U.S. patent attorney.

5  Q.    Right.  You answered my next question.  You had the

6  ability to do that; correct?

7  A.    Yes.

8  Q.    You choose not to do that.

9  A.    (Through translator):  We only used the U.S. patent

10  attorneys with regards to issuing the file history.

11  Q.    Okay.  You didn't get an opinion from United States

12  lawyers relating to infringement of these United States

13  patents?

14  A.    (Speaking German.)

15  Q.    That's a yes or no question.  That's nein or ya.

16  Either you did or you didn't.  You did not get an opinion

17  from United States lawyers relating to infringement of these

18  United States patents?  Yes or no.

19  A.    Okay.  If it is a yes or no question, then I would

20  say no, we haven't used any assistance from United States

21  patent lawyers.

22  Q.    And here is another yes or no question.  You did

23  not get an opinion from United States lawyers relating to

24  validity of these United States patents?

25  A.    Nein.  No.

1    Q.      You did not; correct?

2    A.      Yes.

3    Q.      Let's turn in your binder to DTX-1602.

4            Are you -- it's the big binder.  The defense

5    binder.  This is a document Mr. Kelleher asked you about.

6    A.      Which number?

7    Q.      It's up on the screen.  DTX-1602.

8            You talked to the -- I'm sorry.  This thing is

9    driving me crazy.  (Referring to microphone.)

10           You talked to the jury yesterday about this

11   document with Mr. Kelleher?

12   A.      Yes.

13   Q.      You didn't show certain parts of this document to the

14   jury, did you?

15   A.      (Through translator):  But not intentionally.  Nobody

16   asked me to see that.

17   Q.      Mr. Kelleher didn't ask you.  He didn't point you

18   there, did he?

19   A.      Ya.

20           (Through translator):  Yes.  But I mean you can

21   ask me those questions.

22   Q.      Thank you.  Thank you.  I'm going to do that.  I just

23   want to make sure the jury knows what this is.  This is

24   December 2nd, 2003.  This is the report you prepared after

25   you told us you did a patent search and found Mr. Bornes'

Budach - cross

1    patent.

2              THE COURT:  Is that a question, Mr. Horowitz?

3              MR. HOROWITZ:  Yes.

4    BY MR. HOROWITZ:

5    Q.    Correct?

6    A.    That was a question?

7    Q.    Yes.

8    A.    Okay.  Yes, that is my report to the patent issues

9    between AHG and Broetje.

10   Q.    And this is December 2nd, 2003; right?

11   A.    That's the written document.  Yes.

12   Q.    If you go down to the first paragraph here, it says:

13   On the open questions, we would like to comment as follows:

14             And it says -- no, a little above that.  There

15   we go.  Yes.  No, in between.  I'm sorry, Jeff.

16             On the open questions, we would like to comment

17   as follows:

18             Do you see that?

19   A.    On the open question, we would like to comment as

20   follows:

21   Q.    Just answer.

22   A.    Yes.  I say yes.

23   Q.    Let's look at the very first open question you

24   address.

25             Just in the first paragraph there, Jeff.

Budach - cross

 1             It says:  From the meeting minutes of September

 2    29, 2003, Item 1, and in consultation with Mr. Neugebauer on

 3    November 6, 2003, of particular importance is the profiled

 4    tube of the AHG cassette as well as the general design.

 5             Correct?

 6    A.     Yes.

 7    Q.     And the "particular importance" of the AHG cassette

 8    was the patents that covered it; right?

 9    A.     Yes, that's right.

10    Q.     And if you go down to the next paragraph.

11    A.     Okay.

12    Q.     You say:  We first wish to draw attention to the AHG

13    patent.

14    A.     Yes.

15    Q.     And it gives the patent number.  That is the European

16    version of Mr. Bornes' patent; correct?

17    A.     Yes.

18    Q.     You were concerned about whether there was an

19    infringement with the product that Broetje was developing of

20    Mr. Bornes' patent?

21    A.     Yes, we were worried any patent infringement, and

22    that's why we have to investigate it.

23    Q.     My question is you were concerned about infringement,

24    right?

25    A.     (Through translator):  It was not so that I was

Budach - cross

1    concerned, it is our responsibility, my responsibility to

2    avoid any kind of patent infringement.

3    Q.    It was your responsibility to avoid patent

4    infringement; correct?

5    A.    Yes.

6    Q.    And to make sure Broetje, the company you were

7    advising, avoided patent infringement?

8    A.    Yes, that was and is my responsibility.  Do not

9    infringe any patents.  Not copying, do not infringe.

10   Q.    Don't copy, don't infringe; right?

11   A.    Don't copy, don't infringe patents.

12   Q.    Let's go to the next page here.

13   A.    Next page?

14   Q.    For the record, it's, yes, 1602.2.  It's just the

15   second page.

16         It's in the planned cassette.  Do you see that,

17   Jeff?  The planned cassette design.  The top of the first

18   paragraph.

19         You didn't show this to the jury yesterday, did

20   you?

21         Let's read it together.  "The planned cassette

22   design, in particular the tube/rivet head diameter, the

23   connection pieces and the grooves, must be specified in

24   greater detail, in order to be able to rule out an

25   infringement."

899

Budach - cross

1              Did I read that correctly?

2  A.     Yes.

3  Q.     And you were referring to Mr. Bornes' patent; correct?

4  A.     Yes.

5  Q.     And you were unable, in December of 2003, to rule out

6  an infringement; correct?

7  A.     Ya.  (Speaking German.)

8              THE COURT:  Do you want a yes or a no?

9              MR. HOROWITZ:  I would hope, yes, Your Honor.

10             THE COURT:  Dr. Budach, when you can, answer the

11  questions yes or no.  And then if counsel wants more

12  explanation, he will ask for it.

13             Would you ask the question again.

14             THE WITNESS:  Okay.  I understand.  Okay.

15  BY MR. HOROWITZ:

16  Q.     In December of 2003, you were unable to rule out an

17  infringement of Mr. Bornes' patent; correct?

18  A.     No.

19  Q.     "In order to be able to rule out an infringement,"

20  that's what the words say; right?

21  A.     In the German one, it is written.  (Speaking German.)

22             MR. HOROWITZ:  Objection.

23             THE COURT:  The question is, is that what the

24  words say in English?

25  BY MR. HOROWITZ:

Budach - cross

1    Q.      That is what the words say in the certified English

2    translation; correct?

3    A.      Yes.  Okay.

4    Q.      You also testified about this in deposition; right?

5    A.      I guess, yes.

6    Q.      Page 84, line 12 to page 84, line 17 of your

7    deposition.

8            "Question:  Okay.  So as of this particular

9    date, on December 2nd, 2003, until you received the

10   information about the tube/rivet head diameter, the

11   connection pieces and the grooves, the more detail, that you

12   could not rule out infringement, correct?

13           "Answer:  Yes."

14           You provided no other written reports, written

15   reports with respect to infringement to Broetje of AHG's

16   patents until 2005; is that correct?

17   A.      (Through translator):  No written reports, yes.

18   Q.      Now, this document, DTX-1602, was written in 2003,

19   December of 2003; right?

20   A.      Yes.

21   Q.      And this was your written report to Broetje about

22   your prior art search; right?

23   A.      (Speaking German.)  Yes.

24   Q.      I'm sorry.  You said yes.

25   A.      (Through translator):  Okay.

Budach - cross

```
 1              THE COURT:  But he said other things before

 2    "yes."

 3              MR. HOROWITZ:  I'm sorry.  I heard the yes.

 4    BY THE WITNESS:

 5    A.     (Through translator):  For the development stage at

 6    that time of the cassette, yes.

 7    Q.     They ruled out the cassette before you gave them

 8    another written opinion, did they not?

 9    A.     (Through translator):  A written opinion, but we were

10    in direct contact for the whole entire time.

11    Q.     Written opinion was my question.

12    A.     Yes.  Yesterday I called about the CLAAS Broetje --

13    Q.     I didn't ask you anything about whether you gave them

14    any written opinion.

15    A.     Sorry.  Sorry.  Yes.  No written opinion until 2005.

16    Yes.

17    Q.     And this report is one, two, and if you go to the

18    next page, it's about four paragraphs long; right?

19    A.     It depends on what the paragraph is.

20    Q.     On Mr. Bornes' patent, it's four paragraphs.  You

21    wrote four paragraphs where you said you couldn't rule it

22    out; right?

23    A.     It depends on what do you mean the paragraph.

24    Q.     I'll tell you what I mean.  Let's go back.  I thin,

25    everybody knows but we'll go back.
```

Budach - cross

```
 1              One paragraph, two paragraphs.  Do you see the
 2    laser pointer?  Three paragraphs, four paragraphs.  Do you
 3    see that?
 4    A.    Okay.  Yes.
 5    Q.    That was your written report of 2003.
 6    A.    And all the next pages of this written opinion.
 7    Q.    Is about Mr. Bornes' invention?  It's only this
 8    section; right?
 9    A.    Okay.  (Speaking German.)
10              (Through translator)   the entire report is
11    about a cassette system, per se.
12    Q.    You came into court yesterday with a slide.  Do you
13    remember that?
14    A.    Yes.
15    Q.    Do you see this?  You showed this to the jury?
16              And you can take it down for the jury.
17    A.    Yes.
18    Q.    You created that at 10:00 o'clock on Wednesday night,
19    did you not?  Tuesday night.
20              I'm sorry.  I withdraw the question.
21              You created this slide at 10:00 p.m. on
22    Wednesday night; correct?
23    A.    (Through translator):  You mean Tuesday or Wednesday?
24    Q.    I mean Tuesday.
25    A.    Okay.  (Speaking German.)
```

Budach - cross

1               (Through translator):  Well, that day, yes.  I

2     don't recall the point in time.  We were busy.

3     Q.      You were busy working with Mr. Kelleher.  Right?

4     A.      (Through translator):  No.

5     Q.      You came into court and testified about that slide

6     that you made at 10:00 the night before that talked about

7     the Shinjo reference.  Right?

8     A.      (Through translator):  Yes.

9     Q.      Your report in December 2003 doesn't talk about the

10    Shinjo reference, does it?

11    A.      (Through translator):  The report went to our

12    development department.  And for the development

13    department --

14              MR. HOROWITZ:  Objection.  Move to strike.

15    Non-responsive.  It was a yes or no question.

16              THE COURT:  That is granted.

17              Dr. Budach, you can answer yes or no.

18              Do you want the question again?

19              THE WITNESS:  Yes.

20    BY MR. HOROWITZ:

21    Q.      In your December 2003 report you do not cite the

22    Shinjo reference, do you?

23    A.      (Through translator):  No.

24    Q.      Your report in 2003 doesn't contain the pictures that

25    you created at 10:00 p.m. the night before you came in to

Budach - cross

1    testify before this jury, does it?

2    A.    No.

3    Q.    Now, in 2005 you wrote another report?

4    A.    (Through translator):  The further report, yes.

5    Q.    That was actually an e-mail that you wrote.  Correct?

6    A.    I don't know.  Probably, yes.

7    Q.    You showed it to the jury yesterday.  Let's pull up

8    DTX-1605.

9    A.    Let me look, okay.

10            Yes.

11   Q.    This e-mail was written on September 8, 2005, after

12   the German litigation was getting under way.  Correct?

13   A.    I don't know when the German case started exactly.

14   Q.    You wrote this e-mail to advise Broetje of what your

15   position was within the context of the German proceeding.

16   Correct?

17   A.    Yes.

18   Q.    And at that time, this was now two years after

19   Broetje had developed its cassettes or begun its development

20   of its cassettes?

21   A.    (Through translator):  In 2003 the cassette was not

22   fully developed yet.

23   Q.    It was under development.  Correct?

24   A.    Yes.

25   Q.    And you were consulted in 2003, as you have told us

1    several times, as part of that development?

2    A.    Yes.  Between 2003 and 2005.

3    Q.    Let's make this simple.  You wrote this opinion after

4    Broetje had begun selling its cassettes.  Correct?

5    A.    This final statement, yes.

6    Q.    And at the time you wrote this e-mail in September of

7    2005, you still had not obtained an opinion from United

8    States lawyers about the United States versions of these

9    patents.  Correct?

10   A.    Yes.

11   Q.    The opinion that you wrote in this e-mail in

12   September of 2005 was never reviewed by any United States

13   lawyers.  Correct?

14   A.    (Through translator):  Not before I wrote it.

15   Q.    When you sat down and wrote this e-mail, that's

16   right, it was never reviewed, you never consulted with,

17   never got any input from a United States lawyer, did you?

18   A.    Yes.

19   Q.    And this e-mail is the entirety -- let's show the

20   Court, let's show, this is your opinion in 2005 about

21   infringement?

22   A.    Yes.

23   Q.    Let me just clarify, when you said yes to my last

24   question, just so we are clear, what you meant was you did

25   not get an opinion from a United States lawyer or any input

906

Budach - cross

1     from a United States lawyer when you drafted this e-mail?

2     A.     (Through translator):  We are talking here about the

3     same claims and the same descriptions for that --

4                MR. HOROWITZ:  Objection.  Move to strike.

5     Nonresponsive.  It is a yes or no question.

6                THE COURT:  I will grant the motion to strike.

7     If you are trying to clarify the record, you are going to

8     have to give him a little chance to explain.

9                MR. HORWITZ:  I apologize.

10               THE TRANSLATOR:  Should I finish, Judge?

11               THE COURT:  No.  But counsel can ask another

12    question if he wants.

13    BY MR. HOROWITZ:

14    Q.     It is a yes or no question.  When you sat down at

15    your keyboard and wrote this e-mail, you had not consulted

16    with or gotten any input from a United States lawyer?

17    A.     (Through translator):  Not pertaining to the AHG

18    patents.

19    Q.     This e-mail that you wrote in September 2005 was the

20    entirety of your written opinion to Broetje.  Correct?

21    A.     Yes, in 2005, in this e-mail.

22    Q.     When you wrote this -- let's look at how long this

23    e-mail is.  You got one page.  Let's go to the next page.

24    It's about almost a page and a half.  Right?

25    A.     Yes.

907

Budach - cross

1    Q.      And again, you came in and showed the jury a slide

2    that you created the night before you came in and testified

3    that talked about the Shinjo reference.  Correct?

4    A.      Yes.

5    Q.      DTX-1605, your September 2005 e-mail, contains no

6    discussion of Shinjo.  Correct?

7    A.      Yes.

8    Q.      It's correct Shinjo is not in there?

9    A.      (Through translator):  Only not, it is not contained

10   in this e-mail to the management.

11   Q.      And the pictures on the slide that you created the

12   night before you came to talk to the jury, they are not in

13   there, either, are they?

14   A.      (Through translator):  The slide I showed yesterday,

15   which you saw this morning was not contained in there, of

16   course.

17   Q.      Now, you talked to the jury about some of the foreign

18   or, I will call them foreign, the French and German

19   decisions outside of the United States.  Correct?

20   A.      Yes.

21   Q.      And you mentioned the French Court's ruling.  Right?

22   A.      Yes.

23   Q.      Now, before the ruling, the recent ruling from the

24   French Court, you had never given a written opinion to

25   Broetje about whether its cassettes infringed the trade

Budach - cross

1    dress of AHG's cassettes?

2    A.    (Through translator):  The trade dress was not

3    infringed.  We always took into consideration the physical

4    aspect of the cassette.

5    Q.    That is not what the French Court said, is it?

6    A.    (Through translator):  The Court, the second instance

7    Court in France decided that there were more similarities

8    here contained but they did not follow the rule that form

9    follows function.

10            MR. HOROWITZ:  Let me move to strike as

11    nonresponsive.  It was a yes or no question.

12            THE COURT:  I will overrule that one.

13    BY MR. HOROWITZ:

14    Q.    Let's pull up the French decision.  This is it right

15    here.  PTX-613T.  Right?  You recognize that?

16    A.    (Through translator):  Is that in the binder?

17    Q.    It's in the smaller binder.  You talked to the jury

18    about this opinion when Mr. Kelleher asked you questions.

19    Right?

20            Before we look at this, I am going to ask you

21    the following question again:  You never gave Broetje a

22    written opinion about whether its trade dress infringed AHG

23    and F2C2's cassettes, did you?

24    A.    (Through translator):  You do have all the written

25    statements I ever made and I do not remember all the

Budach - cross

1    details.

2    Q.     It's a yes or no question.  Did you give them a

3    written opinion on trade dress?  Yes or no?

4    A.     No.

5    Q.     Now, the French Court found -- let's go to 613T.23 --

6    you said something about some similarities.  Let's go to the

7    third paragraph from the bottom.  It says in the third line

8    there towards the end, "...this company commercializes

9    cassettes that are identical to those from AHG at F2C2

10   system."

11             Correct?

12   A.     I am looking for this page.

13   Q.     You can see it up here, sir.  Those are what the

14   words in the opinion say.  That's all I am asking.

15   A.     Okay.

16   Q.     Yes?

17   A.     (Through translator):  That is written there, yes.

18   Q.     After you got this opinion, you spoke to employees of

19   Broetje.  Right?

20   A.     Yes.

21   Q.     And you told them, you gave instructions to them to

22   change the appearance of their cassettes.  Correct?

23   A.     (Through translator):  Because of the decisions which

24   were given in the world with regards to the cassette and in

25   our country the third instance.

Budach - cross

1    Q.     Yes or no?  You got this opinion, you told Broetje

2    they had to change the exterior appearance of their

3    cassettes.  Correct?

4    A.     After conversation with the French lawyers, yes.

5    Q.     And they did so, did they not?

6    A.     Yes.

7                MR. HOROWITZ:  Your Honor, may I approach?

8                THE COURT:  You may.

9    BY MR. HOROWITZ:

10   Q.     PTX-650, can you see it from there, sir?

11   A.     (Through translator):  I see it.

12   Q.     This is how Broetje, PTX-650, redesigned their

13   cassette after you told them they had to.  Correct?

14   A.     (Through translator):  This was according to the

15   recommendation we received, or the consultation with our

16   French lawyers.

17   Q.     You told them to make a different cassette.  Right?

18   A.     Yes.

19   Q.     I want to go back to your 2005 e-mail opinion.  You

20   have told us several times that CLAAS designs around

21   patents.  Correct?

22   A.     Yes.

23   Q.     You told us, in fact, that CLAAS is not allowed to

24   infringe any patents.  Correct?

25   A.     Yes.

Budach - cross

1    Q.      And you told us yesterday, you told all of us, the

2    Judge, jury, everybody in this courtroom, that CLAAS expects

3    competitors to respect our patents, and the same applies for

4    us.  Right?

5    A.      Yes.

6    Q.      Turning back to DTX-1605, this is your September 2005

7    opinion, there is something else in this opinion you didn't

8    show the Judge or jury.  Isn't there?

9    A.      I don't know what you mean.

10   Q.      Let's turn to DTX-1605.2.  This is at the conclusion

11   of your September 2005 e-mail to Broetje?

12   A.      Yes.

13   Q.      Let's read the last two sentences of your e-mail to

14   Broetje in September of 2005.  I will read them to you.

15            "With deliberate use of third-party property

16   rights, CLAAS-internal management approval would have to be

17   obtained."

18            Did I read that correctly so far?

19   A.      Yes.

20   Q.      It says, "Deliberate use of third-party property

21   rights."

22            That's what it says.  Correct?

23   A.      Could we go to the German version?

24   Q.      That's what it says in English, the certified English

25   translation.  Correct?

Budach - redirect

1    A.    Yes.

2    Q.    "With deliberate use of third-party property rights,

3    CLAAS-international management approval would have to be

4    obtained.  We could possibly discuss briefly by phone

5    beforehand whether that is necessary here."

6            Did I read that correctly?

7    A.    No.  It's not "CLAAS international."  It's "CLAAS

8    internal" management.

9    Q.    Then I will read it again.

10           "With deliberate use of third-party property

11   rights, CLAAS-internal management approval would have to be

12   obtained.  We could possibly discuss briefly by phone

13   beforehand whether that is necessary here."

14           Did I read it correctly that time, sir?

15   A.    Yes.

16           MR. HOROWITZ:  No further questions, Your Honor.

17           THE COURT:  Redirect.

18                    REDIRECT EXAMINATION

19   BY MR. KELLEHER:

20   Q.    Dr. Budach, I am going to ask you a question about

21   the same document that we were just looking at.

22   A.    Okay.  It's not necessary, but we could use it.

23   Q.    So we are going to look at DTX-1605, your 2005

24   e-mail.  We are going look at the very bottom paragraph.

25   Dr. Budach, am I reading this correctly:  "If Broetje,

Budach - redirect

1    instead of the cylindrical cross-section, uses a pentagonal

2    cross-section, there is already no infringement according to

3    the wording."

4    A.    Yes.

5    Q.    Dr. Budach, we looked at a portion of the French

6    Appellate Court ruling.  Did the French Appellate Court --

7    was it correct?

8              MR. HOROWITZ:  Objection, Your Honor.

9              THE COURT:  What is the basis of the objection?

10             MR. HOROWITZ:  Calls for argument and calls for

11   an opinion this witness --

12             THE COURT:  Are you withdrawing that question?

13             MR. KELLEHER:  I withdraw the question.

14   BY MR. KELLEHER:

15   Q.    Do you agree with the French Court Appellate

16   judgment?

17   A.    (Through translator):  We are not in agreement with

18   the decision of the French Appellate Court.

19   Q.    Why not?

20   A.    (Through translator):  In France, European patent law

21   applies.

22             (In English):  And an infringement is defined by

23   looking into the claims.  And the Judge has to compare each

24   claim with the probably French solution.

25   Q.    Dr. Budach, let me withdraw that question and ask

914

Budach - redirect

1    this question:  Do you agree with the French Court decision

2    that Broetje was selling an identical cassette?

3    A.    No.

4    Q.    Why not?

5    A.    (Through translator):  Because there is neither an

6    infringement of the trade dress nor an infringement of the

7    patent.

8              MR. KELLEHER:  That will be the end of it, Your

9    Honor.

10             THE COURT:  Okay.  Dr. Budach, you may step

11   down.  Thank you.

12             THE WITNESS:  Thank you.

13             (Witness excused.)

14             THE COURT:  Who is going to be next?

15             MR. KELLEHER:  Your Honor, we have a deposition

16   video next.

17             THE COURT:  About how long?

18             MR. KELLEHER:  About 20 minutes.

19             THE COURT:  We'll take a break then.  We will

20   give the jury maybe a little bit shorter break than normal

21   since we started a little bit late.

22             No talking about the case during the break.

23   We'll get you back in the courtroom.

24             (Jury left courtroom.)

25             THE COURT:  All right.  I just wanted to talk

1    briefly about the jury instructions.  Have a seat, if you

2    wish.  And also, I don't know.  Any progress, Ms. Sharp?  Do

3    you know, on the other issue, whether you have an issue?

4              MS. SHARP:  We haven't had a chance.

5              THE COURT:  All right.  Just briefly on the jury

6    instruction issues, primarily the ones in the letters.

7              On preemption, do the defendants have a response

8    to the plaintiffs' argument that there are multiple elements

9    to the California claim and, therefore, it's not really

10   directed just to patent infringement?

11             MR. KELLEHER:  I can respond, Your Honor.

12             First, I want to correct myself one thing I said

13   yesterday when we were speaking somewhat extemporaneously.

14             I don't think field preemption is at issue here.

15   I think it is conflict preemption.  I do think there is

16   conflict preemption here for the reason that it is for

17   Congress to define what remedies are available for infringing

18   a patent, and they have said you can get punitive damages in

19   the form of exceptional case.

20             THE COURT:  And I understood that argument, but

21   why should I view it as a penalty for patent infringement as

22   opposed to a penalty for unfair competition, one of the many

23   elements of which may be shown by patent infringement?

24             MR. KELLEHER:  Because, Your Honor, it imposes a

25   lower burden of proof preponderance to give the kind of

1   damages, punitive, that Congress has determined can only be

2   granted by clear and convincing evidence.

3            THE COURT:  While you are up there, feel free to

4   pass the baton as it were, if you wish.

5            On damages for trade dress infringement, the

6   plaintiffs have proposed an alternative construction.  I

7   want to know if defendants have an objection to that

8   alternative.

9            MR. KELLEHER:  I don't know, Your Honor.

10           THE COURT:  That's fine.

11           MR. KELLEHER:  I'll see if one of my colleagues

12  do.

13           THE COURT:  Fair enough.  Essentially it doesn't

14  specifically say rivets.  It doesn't specifically say

15  cassettes or the other elements.  It just, in substance, as

16  I understand it, says anything you find that the trade dress

17  contributed to you can award damages for, something to that

18  effect.

19           MR. CAHR:  I guess we would, in light of what

20  they're going to be arguing on closing arguments, I guess

21  the problem is this:  If we didn't know that they were going

22  to be arguing that they're entitled to convoyed sales on

23  things sold in connection with the trade dress, which do not

24  themselves contain the trade dress, then this probably would

25  be fine, but that is what they're going to argue for.  And

1    so if you have this instruction, it doesn't address the

2    specific thing which is required under these circumstances.

3                THE COURT:  Okay.  Thank you.

4                And to plaintiffs on the California unfair

5    competition claim.  Is it you that are bringing that claim

6    pursuant to the statute or are defendants right that is only

7    brought under common law?

8                MR. LINDVALL:  Just one moment, Your Honor.

9                THE COURT:  Sure.

10               (Counsel confer.)

11               MR. LINDVALL:  Your Honor, we're bringing it

12   under common law, but we're saying under the code the

13   California Code, Section 343 gives you a four year statute

14   of limitations.  So it's not --

15               THE COURT:  So you're simply not asserting that

16   you have a statutory claim; correct?

17               MR. LINDVALL:  That's correct.  It's the common

18   law.

19               THE COURT:  You agree with the defendants there

20   is a four year statute of limitations on the statutory claim?

21               MR. LINDVALL:  Yes.

22               THE COURT:  You agree with that.  That is not

23   your argument.  That is irrelevant, correct?

24               MR. LINDVALL:  Yes.  The last time, we realized

25   we don't really need to make that argument because if you

1    look at the California Code, Section 343, we should get a

2    four year limitation in any event.

3            THE COURT:  All right.  And so if we don't think

4    343 applies, then it's a two year statute of limitations;

5    correct.

6            MR. LINDVALL:  I believe that is the default

7    under California law.

8            THE COURT:  Okay.  From defendants, why does 343

9    not apply?

10           MR. CAHR:  Your Honor, based on the precedent we

11   cited in the letter, I think it's pretty clear that there

12   is two different kinds of unfair competition claims you can

13   make under these circumstances.  You can make statutory ones

14   or ones that aren't.  And if you are making statutory ones

15   under 17-200, then you get that whole panoply of very

16   specific rules that apply to that kind of unfair competition

17   claim.

18           If you are not, if you are making them under the

19   common law, courts have repeatedly said that this is what

20   applies.

21           THE COURT:  Okay.  Thank you.

22           Then to both sides, first with the plaintiffs,

23   we've been spending an awful lot of time on foreign

24   proceedings where we all know the laws are different, the

25   patents are different, trade dress infringement standards

1   I'm sure are different.  I have suggested from time to

2   time maybe I should instruct the jury of this.

3              No one has proposed such an instruction.  I have

4   not been able to restrain myself from drafting one which I

5   will happily share with you.  But, conceptually, is there an

6   objection to me telling the jury, in substance:  You have

7   heard about foreign proceedings between the parties.  This

8   evidence was introduced largely for background between the

9   parties.  It may also be relevant to induced infringement,

10  contributory infringement, willful infringement, but the

11  laws are different, patents are different -- something to

12  that effect.

13             The plaintiffs, would they object to me crafting

14  such an instruction?

15             MR. LINDVALL:  No, Your Honor.  I think that

16  would be fair.

17             THE COURT:  All right.  What do defendants

18  think?

19             MR. KELLEHER:  I agree.

20             THE COURT:  Then we'll put together a proposal

21  and we'll run it by you.  And we will take a short recess.

22             (Brief recess taken.)

23             *     *     *

24             (Proceedings reconvened after recess.)

25             THE COURT:  We're prepared to proceed?

1               (The attorneys nod "yes.")

2               THE COURT:  Okay.  We'll bring the jury in.

3               (Jury returned.)

4               THE COURT:  We're ready to go.  Mr. Kelleher,

5       who is next?

6               MR. KELLEHER:  Your Honor, we have an additional

7       deposition video to play.  This is of a Mr. Dominique Hage,

8       who the jury met a few days okay.

9               THE COURT:  Okay.  Thank you.

10              Mr. Looby, will you turn the lights down.

11              (Deposition designations placed into the record.)

12              "The Videographer:  And will the court reporter

13      please swear in the witness.

14              (Dominique Hage placed under oath.)

15              "Question:  Can you please state your name for

16      the record?

17              "Answer:  Dominique Hage on behalf of AHG/F2C2.

18              "Question:  And you will be testifying on behalf

19      of both F2C2 and AHG in this deposition?

20              "Answer:  Yes.

21              "Question:  And so just to -- just to choose one

22      of these at random, what was the shape and size of the

23      cassette in 1994?

24              "Answer:  Okay.  I'll get to the point that --

25      I'll have to do a little bit of history then perhaps.

1          "Question:  Go ahead.

2          "Answer:  1994, Dassault had been involved

3     designing or industrializing the racks for us as a

4     partnership, Dassault Aerospace or Aircraft.  Then the

5     cassettes have, had and always had, the shape, the form, the

6     dimensions, the look that they have nowadays in term of

7     volume, and in term of evolution in time they have acquired

8     their final look.

9          "The cassette is something that had to be

10    carried around, and it's kind of a wink to the period of

11    time where the system was thought and started to be

12    developed in the '80s.  It's basically a briefcase.

13         "Question:  So you wanted it to be a size that

14    you could carry it around?

15         "Answer:  Yes.  Absolutely.  It's something

16    that had to look -- had its own identity in term of a

17    contraption that you could recognize and identify.  Because

18    for years, since the first system has been sold and put

19    into production, all you were seeing was these boxes with a

20    handle, briefcases with handles that were either stacked

21    into the distribution unit or stacked into a buffer area.

22         "I don't know if you can call that our signature

23    or whatever, but F2C2 equipment, that's what it was looking

24    like.

25         "Question:  And was there a particular reason

Hage - designations

1  why it was that particular size?

2          "Answer:  Oh, there's always a reason for that.

3  I mean, you have -- you have a look, you have a size, you

4  have a shape.  Then don't forget that the finality of this

5  equipment are to store and supply rivets to the machine.

6          "Question:  Right.

7          "Answer:  So the dimensions of being probably

8  and certainly designed to accommodate the coils inside and

9  so on.

10          "Question:  Right.  And the -- the chrome color

11  of the cassette, is that sort of the color of bare metal?

12          "Answer:  That's aluminum.

13          "Question:  And with aluminum, unless you

14  actively put a color on it, it is that particular color?

15          "Answer:  Yes.

16          "Question:  And so any -- anything made out of

17  aluminum would look like that unless you actively anodized

18  it, for example, or colored it in some way?

19          "Answer:  That's a choice.  That would be a

20  choice, yes.

21          "Question:  And when did you -- when did you

22  learn that Broetje was making a competing cassette?

23          "Answer:  Well, in Europe I think Phillippe had

24  the idea that there something wrong or fishy there in terms

25  of having a large order for a rack system, I think that was

Hage - designations

1    six or eight columns, but no order for cassettes.

2                    "So that doesn't happen.  This is a -- this is a

3    system as a whole.  You can't have the racks without the

4    cassettes.  It's totally useful.  Or you can't have the

5    cassettes without the rack.  It's the same thing.  And if

6    you don't have a load station, you're going to spend a hell

7    of a long time filing the cassettes with rivets by hand,

8    which is not very productive.

9                    So that dates back probably something like 2005

10   for what they discovered in Europe, but the -- but the

11   enduser was Vought Aircraft I believe in the U.S.

12                   We discovered that there were some machineries,

13   rack cassette, and load station, at one of our customers in

14   Wichita, namely, Spirit Aerospace, when I sent one of my

15   engineers on an emergency intervention at this customer's

16   site in September 2007.

17                   "Question:  So do you believe that someone

18   seeing the Broetje cassette would be confused into believing

19   that it was the AHG cassette?

20                   "Answer:  Certainly.

21                   "Question:  And why?

22                   "Answer:  Because if you look, if you look at

23   them, put them on the table, if you don't read what's on the

24   label, you won't make a difference.

25                   "Question:  In the United States, have you --

Hage - designations

1    are you aware of any instance of confusion?

2              "Answer:  In the U.S., not personally.

3              "Question:  You say "not personally."  Does that

4    --

5              "Answer:  I have not witnessed it.

6              "Question:  What?

7              "Answer:  I have not witnessed it.

8              "Question:  Have you heard of any?

9              "Answer:  Not personally.

10             "Question:  When you say "not personally," have

11   you heard somebody else recount that they have heard of it?

12             "Answer:  No, what I'm leading to is, okay, I'm

13   selling machines, right?

14             "Question:  Uh-huh.

15             "Answer:  And I suppose Broetje Automation has

16   got a sales force, too.  Broetje Automation machines are

17   being sold for the past -- not for the past ten years, but

18   for ten years, equipped with our system.  And suddenly we

19   are in 2011, that was in 2005 or 2004, God knows when

20   exactly, so we're talking about six, seven years ago.  They

21   keep marketing their machines, but with a product that they

22   are making themselves and which is a copy of ours, but

23   they're not telling their customers.

24             "Question:  And do you believe that the

25   integrators and the endusers are sophisticated?

1          "Answer:  What do you mean by "sophisticated?"

2          "Question:  Are they -- do they -- well, that's

3     actually a reasonable, a reasonable question.  Do they --

4     are they conscious of who makes the products that they're

5     buying?

6          "Answer:  Oh, certainly.

7          "Question:  But when is the opportunity for

8     confusion to occur before the products are sold?

9          "Answer:  Okay.  I would say that a term of

10    sale when the -- the sale and technical team of Broetje

11    approaches a potential customer or a customer that has need

12    for their equipment, do they early, earlier on than when

13    they're started to be produced, do they advertise their

14    systems as being equipped with their own feed system or

15    don't they tell the customer that it is not -- it is not

16    F2C2 made or something like that.

17         "You know, the trend of the current affair of

18    business in this case were for ten years these machines come

19    equipped with F2C2 fastener feed system, and suddenly, from

20    one day to the other, this feed system is replaced by a feed

21    system looking very much alike but made by Broetje.  I call

22    that confusion.

23         "Question:  Do you have any evidence that

24    Broetje at any point told its customers that it was

25    continuing to sell F2C2 cassettes when it was no longer --

1          "Answer:  Fortunately, I'm not in the

2     negotiating room with them, so I can't tell you.

3          "Question:  But do you have any evidence that

4     that took place?

5          "Answer:  What do you call 'evidence?'

6          "Question:  Do you have any support for the

7     statement?

8          "Answer:  No.  No.

9          "Question:  I asked, I -- the specific question

10    I asked was:  Do you believe that -- and I'll be more

11    defined -- do you believe that Broetje customers purchasing

12    Broetje cassettes from Broetje will be confused into

13    believing that those cassettes originated from F2C2 or AHG?

14         "Answer:  Well, I'll give you a gut answer.

15         "When I do my job, just as you do yours, you can

16    run into some enraging or frustrating situation where you

17    will see a clone of your product being marketed and sold to

18    customers that could have been or should have been your

19    customers.

20         "I'm not trying to define the right or wrong in

21    the saying, but what I mean is, in my opinion, it is what

22    I'm going to call a precedence -- 'precedence' in French --

23    that's we were there before with this product in the shape

24    it has, and in the certain future you see the same product

25    coming from a company you had a business relationship with

Hage - designations

1  in term of distributing your product with their products and

2  one day they turn out just selling a copy of it.  This is my

3  gut feeling.

4            "Question:  Sorry about that.  Can you identify

5  what this is?

6            "Answer:  It's a cassette.

7            "Question:  Who makes the cassette?

8            "Answer:  We do.

9            "Question:  And how can you tell?

10           "Answer:  How can I tell?  Well, a few things

11  would tell me it's one, but you have to look closely.

12           "Question:  Does the large use of the logo on

13  the front assist?

14           "Answer:  The way I'm holding it, I can't see

15  it.

16           "Question:  Well, if you turn it towards you?

17           "Answer:  Okay.

18           "Question:  You can see that it says F2C2 System

19  AHG?

20           "Answer:  It does, yes.  Yes.

21           "Question:  In very large lettering?

22           "Answer:  Absolutely.

23           "Question:  And then on the blue tape it also

24  says F2C2 System?

25           "Answer:  It does, yes.

Hage - designations

1             "Question:  And then in the corner it says F2C2

2    System as well?

3             "Answer:  Tube Diameter 8.  Yes.

4             "Question:  And do you think that those would

5    indicate to a consumer that it was made by F2C2/AHG?

6             "Answer:  I certainly think so.

7             "Question:  All right.  Well, can we grab

8    Exhibit 7 then?

9             "Answer:  Pass me the other one.  Yes.

10            "Question:  Now, Exhibit 7 on the front says

11   Broetje Automation?

12            "Answer:  Yes.

13            "Question:  Do you think that -- did any of the

14   cassettes -- do any of the cassettes made by AHG say

15   'Broetje Automation' on the front?

16            "Answer:  Certainly not.

17            "Question:  And do you believe that the -- that

18   the fact that the name and logo are clearly displayed has

19   any impact on whether someone would be confused prior to

20   purchasing the product?

21            "Answer:  I believe this is a clone.

22            "Question:  What has been copied that is

23   protected -- let me rephrase that.  What has been copied

24   that is proprietary to F2C2 and AHG?

25            "Answer:  Okay.  It might be silly of me to say

1    it, but it's so obvious that I won't beat about the bush.

2    To point it, I mean, you take those two cassettes, put them

3    one on top of the other, wow, they're twin sisters,

4    absolutely.  You put them side by side, you got exactly the

5    same opinion.

6              "Question:  Now, you mentioned a couple of

7    minutes ago that if you were looking at these two items on

8    the shop floor, that you thought that they looked very

9    similar.  Is that a correct characterization --

10             "Answer:  Yes.  Absolutely.

11             "Question:  Would -- would a consumer ever see

12   these two products near each other before they purchased

13   them?

14             "Answer:  No.

15             "Question:  And the clear cover, does that serve

16   any purpose?

17             "Answer:  Yes.

18             "Question:  What does the clear cover serve?

19             "Answer:  Well, number one, it enables you to

20   see whether there's some rivets in the tube.  And that's the

21   same purpose with Broetje's cassette as with the AHG

22   cassette.

23             "That saves a manipulation.  When you put it in

24   the rack, automatically, the system is going to come and

25   read the indications on the magnetic tags, and then you will

 1    know whether the cassette is full or not.

 2              "But to save time, because there's usually a

 3    fair distance between the buffer, the cassette buffer

 4    storage and the machine, so it's very handy to be able to

 5    look at it directly.

 6              "Question:  Yes, no, I understand.

 7              "Now, the white connectors on the back?

 8              "Answer:  The what?

 9              "Question:  The white connectors?

10              "Answer:  Yes.

11              "Question:  Can you explain what those are for,

12    just so I can make sure for the record?

13              "Answer:  Here, this is filling end of it.

14              "Question:  Actually, you know what?  Let's use

15    the AHG one.  It probably is a little bit --

16              "Answer:  That's the new one.

17              "Question:  Yes.

18              "Answer:  And it's fresh.  Right.

19              "Question:  Can you explain what the -- what

20    they're for?

21              "Answer:  That's what I was doing.  Here you

22    have the filling spout.

23              "Question:  Okay.

24              "Answer:  Through which rivets are fed into the

25    cassette.

1          "Question:  Okay.

2          "Answer:  Then once you've filled the cassette,

3   you will close this filling port again.

4          "Question:  Uh-huh.

5          "Answer:  A, to prevent rivets from falling, and

6   B, to enable pressuring of the cassette coil, which is

7   acting as the force pushing the rivets through the

8   escapement into the end effector.

9          "Question:  Now, is the shape of the connectors

10  important?

11         "Answer:  They certainly are.

12         "Question:  And why is the shape important?

13         "Answer:  The shape is important because you

14  have a locking device that comes here or here (indicating)

15  that locks the cassette in place in the rack, and there's a

16  cassette presence switch that is actuated when you lock it.

17         "So the -- the linear axis support that carries

18  the Baluff head will come to read what's on the magazine tag

19  here to inform the system of what is now available, because

20  we have a new cassette on board.

21         "Question:  Okay.  So if the shape was

22  different, it wouldn't work with that?

23         "Answer:  It would not.

24         "Question:  Okay.  And the -- I see that it's

25  colored white.  Is that just sort of the plain plastic

932

Hage - designations

1    color?

2                "Answer:  No, that's the -- that's the type of

3    material that has this color.

4                "Question:  Okay.  What type of material is it?

5                "Answer:  Delrin or something or Nuance.  I

6    can't remember the name of it.

7                "Question:  But that's just the color of the

8    material?

9                "Answer:  That's just a specific plastic, yes.

10               "Question:  And if you could turn it around,

11   just the top one, it'll be a little easier to see where we

12   are.

13               "Answer:  Like this?

14               "Question:  Yes.  Actually, all the way around.

15               "Answer:  Like this?

16               "Question:  Now, what is the purpose of the

17   handle?

18               "Answer:  The handle is there to carry the

19   cassette.

20               "Question:  Okay.  And do you know if there was

21   an effort to try to have the cassette be a specific size so

22   that it would be easier to carry around or -- or was the

23   size chosen for any particular reason?

24               "Answer:  There are quite a few reasons,

25   actually.  I did talk about the shape previously.  We wanted

1   to have a form that was perfectly -- could perfectly be

2   identified.  The handle has got a specific shape.  It's a

3   nice feel so that people carrying it won't hurt themself.

4              "Question:  Do you -- does F2C2 make the handle

5   or do they purchase the handle?

6              "Answer:  No, the handle is purchased.  It's off

7   the shelf.

8              "Question:  Other than the chrome color of the

9   cassette, the shape and size of the cassette, the shape,

10  size, color and placement of the handle, the placement, size

11  and shape of the white connectors, and the clear case cover,

12  are there any other -- are there any other elements of the

13  appearance of the cassette and which AHG and F2C2 claim is

14  trade dress?

15             "Answer:  I would -- I would repeat what I said

16  before the break.  Small briefcase.  When I was younger,

17  back in the seventies, I remember there was a big thing

18  about the Halliburton briefcases.

19             "Question:  Okay.

20             "Answer:  If you remember.

21             "Question:  I actually think I do.

22             "Answer:  They were then in aluminum color.

23  After that, some years later, they produced them in various,

24  oxidized by color.  You know how aluminum can be oxidized

25  with some pigment and you have black or whatever ?

Hage - designations

1          "Question:  Has AHG or F2C2 ever advertised any

2     of those particular features and drawn attention to any of

3     those features in its advertising or marketing materials?

4          "Answer:  No.

5          "Question:  And how much money has AHG spent on

6     advertising its -- its cassettes?

7          "Answer:  We don't advertise.  We do

8     communication through some professional shows like the SAE

9     show or the Bourget in Paris.  We talk to a very limited --

10    well, we address a very limited number of persons.  This is

11    a very small world.

12         "Question:  So is it a -- I don't know if you're

13    familiar with the word, but is it -- so is it a

14    specification process where you --

15         "Answer:  Yes.

16         "Question:  Okay.  So, so you're not going to

17    them and saying, 'Here's our off-the-shelf products,' you're

18    working with them to come up with a solution for their

19    system?

20         "Answer:  You said it exactly.

21         "Question:  Which integrators does AHG sell its

22    cassettes with right now?

23         "Answer:  Then in the U.S. you have Gemcor, Kuka

24    System, ElectroImpact.  I'm forgetting some of them.

25         "Question:  Now, do you sell the feeding systems

Hage - designations

1     to work with ElectroImpact machines?

2           "Answer:  Yes.

3           "Question:  And ElectroImpact also sells its own

4     feeding systems, too, right?

5           "Answer:  Yes.  Depending on the application,

6     they will choose to use our system or their system.

7           "Question:  Do you know the reason why they

8     would choose yours or theirs in a given application?

9           "Answer:  Feasibility.

10          "Question:  Visibility?

11          "Answer:  Feasibility.

12          "Question:  Oh, feasibility.  What about the

13    application of one is different than the other?

14          "Answer:  Right.  The scope, the scope that --

15    the scope of the fastener in our machines -- maybe that's

16    the wrong term.  The population of fasteners in our machines

17    are capable of handling are --

18          "Question:  Number of fasteners?

19          "Answer:  -- pretty big, so if you have a pretty

20    small type of different fastener, you don't need to go for

21    the bug guns.  Use a more rustic system.

22          "Question:  Okay.  And how is ElectroImpact's

23    system different from yours?  Like their feed system?

24          "Answer:  They don't -- they don't -- they don't

25    use a cassette feed system, ElectroImpact.  They -- they

1    did -- they prototyped one, but it never left prototype

2    stage.

3              "Mr. Cahr:  I'd like to mark this as Exhibit 69.

4              "Question:  Have you seen this document before?

5              "Answer:  Yes, I know this document.

6              "Question:  What is this document?

7              "Answer:  Is it a letter or a fax?  It's a fax

8    from Mr. Stehmeier or Holzer from Broetje who are stating a

9    few points after contacting me for some spares or Lord knows

10   what.  I ended up telling him that we're not supplying you

11   anything because we've got a big problem with you, so forget

12   about any business relationship.

13             "Question:  Okay.

14             "Answer:  Present, future, or whatever,

15   basically.

16             "Question:  And what -- what inspired this

17   reaction here?  What made you -- what was the problem that

18   you had?

19             "Answer:  This -- this occurred probably a few

20   weeks after I joined the company, so I asked how do I handle

21   this?  Because I knew there was -- Broetje was a hard cookie

22   in terms of a relation, this company was not really what I'm

23   going to call a reliable business partner, and saying 'No

24   communication.'

25             "Question:  Now, you, but you had -- by you,

Lawrence - direct

1    obviously, you joined in 2007, so by you, I mean AHG --

2                "Answer:  Yes.

3                "Question:  -- F2C2 had been aware of Broetje's

4    exit product for a couple of years?

5                "Answer:  That's right.

6                "Question:  What -- what happened in 2007 to

7    cause you to decide to cut off all business relationship?

8                "Answer:  In my opinion, and that's only my

9    opinion, I believe that Philippe has tried to communicate

10   with Broetje during that period, stressing the fact that

11   their action was totally unfair, and if they were carrying

12   on, it was going to seek legal action."

13               (Designations end.)

14               MR. KELLEHER:  Your Honor, as our next witness

15   we call Michael Lawrence.

16               THE COURT:  Okay.  We will turn the lights back

17   on then.

18               ... MICHAEL LAWRENCE, having been duly sworn as

19   a witness, was examined and testified as follows ...

20               THE COURT:  Good morning.  Welcome, Mr.

21   Lawrence.

22               Mr. Kelleher, you may proceed.

23                         DIRECT EXAMINATION

24   BY MR. KELLEHER:

25   Q.    Good morning, Mr. Lawrence.

Lawrence - direct

1                     Could you please introduce yourself to the jury?

2    A.      My name is Michael Lawrence.

3    Q.      Where do you live?

4    A.      In Madera, California.

5    Q.      And where do you work?

6    A.      At my own company, Lawrence Technical Services

7    Company.

8    Q.      What is your company's business?

9    A.      We provide technical services to the aerospace

10   industry, both military and commercial.

11   Q.      Who are your clients?

12   A.      Primarily the Boeing Company.

13   Q.      What particular systems do you work on?

14   A.      We work on automated fuselage assembly systems,

15   automated wing assembly systems, automated fastener feed

16   systems, machine vision systems.  And many others.

17   Q.      What particular fastener feed systems are you

18   familiar with?

19   A.      I have worked with the Broetje fastener feed systems,

20   the F2C2 fastener feed systems, ElectroImpact feed systems,

21   and Gemcor feed systems.

22   Q.      Do you primarily work at the Boeing Long Beach

23   facility?

24   A.      Yes.

25   Q.      Are there any other fastener feed systems currently

Lawrence - direct

1    in use at the Long Beach facility today?

2    A.    Yes.  We have an ElectroImpact fastener feed system,

3    which has been running there since 1998.

4    Q.    Is that a cassette feed system?

5    A.    Yes, it is.

6    Q.    How did you gain your familiarity with fastener feed

7    systems?

8    A.    I have been working with these systems for almost 20

9    years now.  And we are required to maintain and repair these

10   systems.

11   Q.    Could you tell us about your college education?

12   A.    I graduated from New Hampshire Vocational/Technical

13   college with an associate's degree in mechanical engineering

14   in 1982.

15   Q.    Could you tell us about your work history?

16   A.    I began with the McDonnell Douglas Aircraft Company

17   in April of 1988 as a machine technician.  And I worked

18   there through July of 1997.

19   Q.    And where after McDonnell Douglas?

20   A.    McDonnell Douglas Aircraft was acquired by the Boeing

21   Company.  So that employment continued from July 1997

22   through September 2001 with the Boeing Company as a

23   maintenance technician, repairing the equipment, the

24   automated fuselage and assembly systems that were there.

25   Q.    In 2001, what did you begin doing?

Lawrence - direct

1   A.      At that point I formed my own company, Lawrence

2   Technical Services Company.  And I have been doing that up

3   until this point.  And over the last 12 years, I have been

4   continuously full time, I have been retained by the Boeing

5   Company to work on their systems.

6           MR. KELLEHER:  Your Honor, I would tender Mr.

7   Lawrence as an expert in the field of fastener feeding

8   technology.

9           MR. LINDVALL:  I will not object except as to

10  the extent we have a motion.

11          THE COURT:  He is so recognized.

12  BY MR. KELLEHER:

13  Q.      Mr. Lawrence, do you feel qualified to offer opinions

14  on the technology of fastener feed systems?

15  A.      Very, very qualified.  I spent many, many years

16  working on these systems and also the systems in question.

17  Other than the legal terms that are connected to this, I was

18  definitely not familiar with them when I first started with

19  this case.

20  Q.      Have you ever served as an expert witness in

21  litigation before?

22  A.      No, I have not.

23  Q.      And have you ever testified as a witness in a trial

24  before?

25  A.      No, I have not.

Lawrence - direct

1   Q.      And are we compensating you for your time working

2   with us on this project?

3   A.      Yes, you are.

4   Q.      At what rate?

5   A.      One hundred dollars per hour.

6   Q.      What is your understanding of the idea of patent

7   infringement?

8   A.      Well, to this we look to the claims of the patent.

9   Those are the numbered paragraphs at the end of the patent.

10  There is elements listed within these claims.  And we

11  compare each one of these elements to the system in

12  question.  And if all of the elements are contained in that

13  system, then the system infringes.

14  Q.      When you look at those elements of the patent claims,

15  how do you interpret their meaning?

16  A.      The Judge has ordered through construction of the

17  Court how to interpret the meaning of these elements.

18  Q.      Have you formed any opinions about whether Broetje's

19  fastener cassettes infringe AHG's patents?

20  A.      Yes, I have.

21  Q.      What is that opinion?

22  A.      In my opinion, the Broetje fastener cassettes do not

23  infringe the AHG patents.

24  Q.      Why don't we look first at the '216 patent, Claim 1.

25  Could you please tell us why my client does not infringe

Lawrence - direct

1   this claim?

2   A.     We see here, one of the elements is that the

3   cross-sectional area of the heads substantially equals the

4   cross-sectional area of the tube.  And it is my opinion that

5   in the Broetje tubes, if we look at those, that the heads do

6   not substantially equal the cross-sectional area of the

7   tube.

8   Q.     Have you done anything to help the jury understand

9   your opinion?

10  A.     Yes.  I provided a photograph.

11  Q.     Is that on the right?

12  A.     Yes.

13  Q.     Could you please explain?

14  A.     So when we look at this, we see the head of the

15  fastener is installed into the Broetje tube.  And you can

16  see that there is space around the head of the fastener.

17  And it does not substantially equal the cross-sectional area

18  of the tube.

19  Q.     Now, Dr. Kytomaa, the plaintiffs' expert, has told

20  the jury that he thinks Claim 1 is infringed.  Can you tell

21  us why you disagree?

22  A.     Well, if we look at Dr. Kytomaa's report, he has

23  provided us with a dashed line that is contained within a

24  pentagonal shape.  And he states that this is the diameter

25  of the pieces.

Lawrence - direct

1       So when we look at that as a figure, yes, that

2  substantially equals -- this is what I would say is an

3  interpretation of substantially equals the cross-section of

4  what would be the hollow center of the tube.  But yet when

5  we go back to the photograph, we can see that the head of

6  the rivet is much smaller than the cross-sectional diameter,

7  or cross-sectional area of the tube.

8  Q.    Why don't we go to Claim 2 of the '216 patent.  Could

9  you please tell the jury why you believe my client does not

10  infringe this claim?

11  A.    Well, in this claim it says a dispensing apparatus as

12  in Claim 1, so that would be a dependent claim, so that

13  would mean that all of the elements of Claim 1 would have to

14  be true or present.  So when you go back and look at Claim

15  1, we see that the heads of the fasteners are not

16  substantially equal.  So that claim is also non-infringing.

17  Q.    Okay.  Why don't we now look at the '339 patent,

18  claim 1?

19       Could you please tell the jury why my client

20  does not infringe this claim?

21  A.    Here, in claim 1 of the '339 patent, we see that the

22  pieces must have their axes of resolution extending along

23  the longitudinal axis of said tube.

24       So when we look here, I provided a few

25  photographs and we can see here that the axes of resolution

Lawrence - direct

1    of each of these fasteners is in a zig-zag pattern within

2    the tubes.  So you can -- I have also provided some lines

3    there to show the axes of the rivet and how these crisscross

4    through the tubes.

5    Q.    Was air pressure being applied when you took these

6    photographs?

7    A.    Yes, air pressure is being applied to the Broetje

8    tubes.

9    Q.    Why?

10   A.    Because this is a method patent.  And we can see

11   here, it says:  Feeding one end of said tube with a

12   compressed fluid.

13            So you must do that in order to meet the

14   element.  That is one element within the claim.

15   Q.    Now, Dr. Kytomaa has told the jury that he thinks my

16   client infringes this claim 1.  Can you tell us why you

17   disagree?

18   A.    Well, when we look to his report, you can see here

19   this is just a piece of tubing, appears to be laying on a

20   tabletop.  It's not part of the cassette coil, and it really

21   couldn't appear that compressed air has been applied to this

22   tube.  And if you did apply the compressed air, the rivets,

23   you would see some zigzagging of these rivets as the heads

24   would meet one wall and the shanks of the fasteners would

25   meet the other wall.

945
Lawrence - direct

1    Q.     So now we have claims 2 and 6 of the '339 patent.

2    Could you tell the jury why my client does not infringe

3    these claims?

4    A.     Both of these are dependent claims.  So when we look

5    at claims 2 and 6, we must also have all of the elements of

6    claim 1 as a process as in claim 1.

7                So we know that our fasteners, what we saw

8    from the previous photographs, that the fasteners' axial

9    alignment is not the same as the longitudinal axis of the

10   tube.

11   Q.     Now, Mr. Lawrence, I'd like to switch over to a

12   different topic and talk about the prior art.  Do you have

13   an understanding of what the term "prior art" means?

14   A.     Prior art is technology that predates the patent.

15   Q.     First I'd like to look at this, which is Exhibit 1173

16   in your book.

17   A.     Okay.

18                MR. KELLEHER:  I believe this is already in

19   evidence, Your Honor.

20   BY MR. KELLEHER:

21   Q.     Mr. Lawrence, could you please tell us, what is this?

22   A.     This is a coiled tube which has fasteners inside of it.

23   Q.     Do we have a name for this?

24   A.     It's the Shinjo/Komaki patent application.

25   Q.     When is it from?

946

Lawrence - direct

1    A.    1981.

2    Q.    Do you know which country it was filed in?

3    A.    The U.K.

4    Q.    Could you please tell us what Figure 1 shows?

5    A.    Okay.  And this is showing that it is a coiled tube

6    with fasteners installed inside.

7    Q.    And what is shown in Figure 2?

8    A.    This is a cross section of that tube.  If we sit it

9    on its side and cut it, then we can see a cross section of

10   the tube with the rectangular tube, individual tubes with

11   the fasteners inside the tube.

12   Q.    And what does Figure 3 show?

13   A.    Figure 3 shows two of these coils installed on a

14   machine, and there has been through Figure -- or not Figure

15   17 but Part No. 17, compressed air has been applied to these

16   cassettes to feed the self-piercing nuts into the machine.

17   Q.    So I've highlighted a portion of the text of the

18   Shinjo/Komaki application in the lower right-hand corner.

19   Could you please tell us what is the significance of this

20   language for the '339 patent, claim 1?

21   A.    Well, I'm going to read that.

22         "The channels 2a are dimensioned so that there

23   is sufficient space for the compressed air to exert a force

24   on the individual nuts thereby ensuring a smooth movement

25   towards the" outer "end of the tube."

947

Lawrence - direct

1   Q.      The other end?

2   A.      Or "the other end of the tube."

3   Q.      What is significant about that phrase for the '339

4   patent, claim 1?

5   A.      Well, this is the basis of the AHG patent, and what

6   they're specifying or what is an element of claim 1 here.

7   So if we read that, it is we're distributing the fluid along

8   the length of the tube through at least one longitudinal

9   passageway on an internal surface of said tube and opening

10  into the hollow center thereof for exerting the pressure of

11  the fluid along the hollow center in the spaces between the

12  pieces, to the piece closest to the dispensing end.

13  Q.      So looking at Figure 2 here, Mr. Lawrence, of the

14  Shinjo patent application.  Does that have any relevance to

15  portions of claim 1 of the '339 patent you just read?

16  A.      Well, we can see here that there are longitudinal

17  passageways at each corner of this rectangular tube and

18  these self-piercing nuts would not necessarily be exactly

19  aligned on the bottom of the tube, so there could be many

20  different, maybe an infinite number of passageways here and

21  different sizes and shapes going around each one of these

22  individual nuts.

23  Q.      Is there any element of claim 1 of the '339 that is

24  missing from the Shinjo/Komaki reference?

25  A.      We see the pieces, one after another, in the interior

948

Lawrence - direct

1   of the tube, which is true.

2              The next element, with their axes of revolution

3   extending along the longitudinal axis of said tube.  That is

4   not true.  Because we can see the way the fasteners are

5   installed in the tube, the fasteners are perpendicular to

6   the axis of the tube.

7   Q.    Now, can I ask the elements you said are present?

8   A.    Those other elements are present.  Yes.  The pieces

9   one after another in the tube, that element is present.

10  Q.    So that and all other elements that you have said are

11  present?

12  A.    And also, feeding one end of said tube, which we

13  already know which is part of the elements before, for

14  ensuring a transfer of pieces toward the open dispensing

15  end.

16  Q.    So for those elements and the ones we spoke about

17  before, how convinced are you that those elements are

18  present in Komaki/Shinjo?

19  A.    I am completely convinced those are present.

20  Q.    Can you tell us why?

21  A.    Because it is right there on the paper.  It is what

22  it says.

23  Q.    What would be different if instead of that

24  self-piercing nut in Shinjo/Komaki we used a rivet?

25  A.    Well, if we're using a rivet, then we would have the

Lawrence - direct

1  longitudinal axis of the part in alignment -- or excuse me.

2  The axis of the rivet would then be in alignment with the

3  longitudinal axis of the tube.

4  Q.     Would there be any elements missing of the claim

5  then?

6  A.     Then there would be no elements missing from this

7  claim.

8  Q.     Why would someone in the field of fastener feed

9  technology consider using rivets with Komaki?

10  A.     I think it makes sense.  The fact we have

11  longitudinal, obviously longitudinal passageways in this

12  tube to help assist in the guidance of the rivets down the

13  tube.

14  Q.     Is Komaki/Shinjo limited to self-piercing nuts?

15  A.     No, it is not.  As you can see, "wherein component

16  parts," and this is mentioned in the patent that it is for

17  component parts, and rivets are component parts.

18  Q.     So let's look at claim 2 of the '339 patent.

19  Assuming rivets were used with Shinjo/Komaki, are there

20  any elements of claim 2 of the '339 patent missing?

21  A.     So here we add the plurality of linear grooves.  And

22  as we discussed before in Figure 2, there is grooves or

23  passageways contained in those rectangular tubes.  So all of

24  those would be met with rivets.

25  Q.     Why don't I ask the same question about claim 6.

Lawrence - direct

1    A.      In claim 6, we add the additional element of, with

2    stop members provided at the end of the tube.

3               So if we look to Figure 1, we can see that there

4    is elements acting as stop problems in the right angle

5    connector for the compressed air in figure 6, and then we

6    see a coupling down in Figure 7 that has a clasp on it that

7    can be used to contain fasteners into the tube.  So those

8    would be stop members, so claim 6, the elements would be

9    present.

10              I think we already went through these slides.

11   Q.    I think we did.  Mr. Lawrence, could you please look

12   in your book to Exhibit No. 1175?

13   A.      Okay.

14   Q.      Can you tell us what this is?

15   A.      This is a rivet ejector.

16              MR. KELLEHER:  Your Honor, I would move into

17   evidence, Exhibit 1175.  DTX.

18              MR. LINDVALL:  No objection.

19              THE COURT:  It's admitted.

20              (DTX-1175 is admitted into evidence.)

21   BY MR. KELLEHER:

22   Q.    So, Mr. Lawrence, what is shown here in Figure 2?

23   A.      Figure 2 is the actual ejector apparatus which would

24   be -- and we can see there are rivets aligned in a column

25   within this apparatus.

1    Q.      Okay.  What is shown in Figure No. 8 here?

2    A.      So here we have a riveter, the man that is pictured

3    there.  He has a coil around his body filled with rivets.

4    And the ejector mechanism would be in his one hand, and then

5    we can also see that there is a small valve pictured in 47

6    to control the compressed air that would be flowing through

7    this tube to push the rivets through to the other -- to the

8    ejector mechanism.

9    Q.      Mr. Lawrence, what is shown up here on Figure No. 6?

10   A.      This is a component of the ejector mechanism which

11   would be stop members.

12   Q.      And what is shown here in Figure No. 9?

13   A.      This would be the valve that would be on the other

14   end which, if it was closed, would be a stop member.  It

15   would keep the fasteners from coming out of that tube.

16   Q.      So why don't we look at claim 1 of the '339 patent,

17   Mr. Lawrence.

18           Could you tell us what is the significance of

19   the Offutt patent for this portion of claim 1?

20   A.      So we can see here, it's a relatively long tube.  The

21   free end which is mounted, rivet ejecting head.  There is a

22   coiled portion around his body, mounted, mounted about his

23   body.  And it is possible to provide space for a very large

24   number of rivets.

25           So when we look to the patent there, we see this

952

Lawrence - direct

1    is a process for dispensing identical pieces, rivets, having

2    a symmetry of revolution about an axis which we explained

3    before.  And providing a tube, having a hollow center and

4    a shape corresponding to the transverse section of the

5    greatest diameter of the pieces; that would be peripheral

6    guidance.  And we also have compressed fluid in the coiled

7    tube.

8    Q.    Are you able to find those elements in the Offutt

9    present?

10   A.    Yes, they are all present.

11   Q.    What about this section of the text I have

12   highlighted here?  What is the significance for claim 1 of

13   the '339?

14   A.    So here we see that the air will pass down through

15   the tube and into the horizontal bore, part of it passing

16   out around the rivets.

17   Q.    What is the significance for claim 1 of that

18   language?

19   A.    So then when we look down to claim 1 here, that there

20   is a longitudinal passageway opening into a hollow center,

21   with spaces between the pieces.

22         So when we look at that, we can see that air is

23   passing completely through this tube and out the end of the

24   ejector mechanism.  So there are passageways.  These are not

25   pistons installed in the tube, these are rivets, and there

Lawrence - direct

1    is passageways around the rivets, around the heads and the

2    shapes of the rivets down to the ejection mechanism.

3    Q.     Mr. Lawrence, have you identified any elements of

4    claim 1 that are missing from the Offutt patent?

5    A.     No, I haven't.

6    Q.     Let's look at claim 2.  Have you identified any

7    elements of claim 2 of the '339 that are missing from the

8    Offutt patent?

9    A.     Here we see that the plurality of linear grooves,

10   which under the Court's construction are the same as

11   passageway.  We already identified there are passageways in

12   and around the rivet heads and shanks all the way around

13   and air is passing through this tube, and so we do have a

14   plurality of linear grooves.

15   Q.     Mr. Lawrence, I have claim 6 up on the screen here.

16   Are there any elements of claim 6 missing from the Offutt

17   patent?

18   A.     No, there are not.  So here we have a mention of stop

19   members.  As we can see from the patent themselves, and

20   they're both highlighted here in this photo, that they're

21   stop members on the ejector mechanism, and we also have a

22   valve that could be closed and act as stop member on that

23   end to keep the rivets from coming out of the tube.

24   Q.     Why don't we look at the '216 patent now,

25   Mr. Lawrence, claim No. 1.

954

Lawrence - direct

1           Are there any elements of claim No. 1 missing

2   from the Offutt patent?

3   A.      No, there are not.  We can see it is a relatively

4   long tube, and a tube have a hollow center aligned, said

5   pieces aligned one after another.  So we can see that in the

6   figures.  Open to a hollow center.  That the rivets are

7   arranged in a column.  And that we could also see that the

8   transverse cross-section of the heads correspond.  And you

9   can see they're fitting into the tube so that the heads

10  correspond to the cross-section of the tube.  And we

11  could also see here that it also substantially equals the

12  diameter of the tube.  It is not a tight fit but it does

13  substantially equal.  There is some room around the heads

14  but it was substantially equal.

15  Q.      Then looking at claim 2 of the '216 patent.  Is there

16  any element of claim 2 missing from the Offutt patent?

17  A.      Again, here we talk about the plurality of said

18  grooves.  And as I mentioned before, air will pass down

19  through the tube into the horizontal bore, passing around

20  the fastener heads and shanks and through to the ejector

21  mechanism.

22  Q.      Thank you.  Could you look in your book to DTX-1183?

23  A.      Yes.

24  Q.      Could you please tell us what this is?

25  A.      This is a stud feeding mechanism.

Lawrence - direct

1    Q.      Is this a U.S. patent?

2    A.      Yes, it is.

3    Q.      And who is the inventor?

4    A.      Mr. Brosene.

5            MR. KELLEHER:  We'll have it up on the screen in

6    just a second.

7            Your Honor, I will move into evidence DTX-1183.

8            MR. LINDVALL:  No objection.

9            THE COURT:  It's admitted.

10           (DTX-1183 is admitted into evidence.)

11   BY MR. KELLEHER:

12   Q.      Mr. Lawrence, could you please tell us, looking to

13   page 5 of the patent, and then looking at Figure No. 14,

14   what exactly is it that is shown here in Figure No. 14?

15   A.      So this appears to be a cassette with a coiled tube

16   installed where studs are installed into these coiled tubes.

17   Q.      Looking above that, that is Figure No. 13, what is

18   shown in Figure No. 13?

19   A.      So we see here that the cassette has been installed

20   on a pole.  There is a supply of compressed air coming in,

21   No. 42 there, the supply of compressed air comes into the

22   cassette and out the other end of the cassette that the

23   studs are fed down through the tube into the stud-feeding

24   mechanism.

25   Q.      And in what year was Brosene's patent filed with the

1    Patent Office?

2    A.      This was filed in 1968.

3    Q.      Thank you.  Was it initialed 1968?

4    A.      Yes.

5    Q.      Thank you, Mr. Lawrence.  I don't have any more

6    questions.

7                  THE COURT:  Okay.  Cross-examination.

8                       CROSS-EXAMINATION

9    BY MR. LINDVALL:

10   Q.      Good morning, Mr. Lawrence.

11   A.      Good morning.

12   Q.      Good afternoon, sorry.

13           I have a couple questions to ask you.

14   A.      Okay.

15   Q.      Let's go back a little bit through your background.

16           You don't have a Bachelor's degree in

17   engineering, do you?

18   A.      No, I do not.

19   Q.      And you don't have a Master's degree in engineering?

20   A.      No, I do not.

21   Q.      You don't have a Ph.D. like Dr. Kytomaa in

22   engineering?

23   A.      No, I do not.

24   Q.      You have never been a professor at any university?

25   A.      I have not been a professor at a university, no.

Lawrence - cross

1    Q.      And you have never designed any type of automated

2    rivet feeding system which uses tubes to deliver rivets.

3    Correct?

4    A.      No, I have not.

5    Q.      And, in fact, you have never designed a cassette such

6    as the AHG cassette.  Correct?

7    A.      No, I have not.

8    Q.      Now, your primary job at your company is the

9    maintenance and repair of automated rivet feeding systems.

10   Correct?

11   A.      It is one of the jobs we do, yes.

12   Q.      And in 2011 your company had two employees, which

13   included yourself.  Correct?

14   A.      Yes.

15   Q.      And you are not the named inventor on any U.S.

16   patents.  Correct?

17   A.      No.

18   Q.      Now, I am going to digress from your opinions you had

19   today.  What I am going to do is focus you on your job and

20   your experience you had with AHG cassettes.  I believe you

21   testified earlier you work in a Boeing facility.  Correct?

22   A.      Yes, I do.

23   Q.      And in that Boeing facility at least one of the

24   Broetje machines uses AHG cassettes.  Correct?

25   A.      We use AHG cassettes, yes.

Lawrence - cross

1    Q.      That Boeing facility is at Long Beach, California.

2    Correct?

3    A.      Yes.

4    Q.      And you still work there?

5    A.      Yes, I do.

6    Q.      Now, at the Long Beach facility at Boeing where you

7    work, there are three Broetje riveting machines.  Correct?

8    A.      Yes, there are.

9    Q.      And at least as of June 2011, back when I took your

10   deposition, two of the Broetje rivet machines used the AHG

11   automated rivet feeding systems.  Correct?

12   A.      Yes, they did at that time.

13   Q.      And these two Broetje rivet machines were installed

14   in the 1998-1999 time frame.  Correct?

15   A.      Yes, they were.

16   Q.      And so these two Broetje rivet machines had been used

17   in the AHG automated riveting feeding system for about 11 to

18   12 years, at least as of the point of your deposition in

19   2011.  Correct?

20   A.      That's correct.

21   Q.      Now, with respect to the two AHG automated rivet

22   feeding systems, there are about a total of 80 cassettes

23   used between these two systems, correct, as of 2011?

24   A.      Yes, that's correct.

25   Q.      And these 80 cassettes were delivered by AHG to

Lawrence - cross

1    Boeing about 11 to 12 years ago.  That was as of 2011.

2    Correct?

3    A.     Yes, that's correct.

4    Q.     And Boeing performed extensive testing on AHG's

5    automated rivet feeding systems, which includes the

6    cassettes, before it purchased the AHG rivet feeding system.

7    Correct?

8    A.     That's correct.

9    Q.     And after Boeing conducted extensive testing on AHG's

10   automated rivet feeding system, it accepted AHG's feeding

11   system for use on the Broetje rivet machines.  Correct?

12   A.     Yes, it did.

13   Q.     Now, to the best of your knowledge, at least as of

14   June 2011, with respect to those 80 cassettes, the AHG 80

15   cassettes that had been operating for 11 to 12 years as of

16   2011, there had been only one technical issue with them.

17   Correct?

18   A.     No, that's not true.

19   Q.     Could you please play Clip L-19, please?

20          "Question:  Do you know approximately how many

21   AHG cassettes that are at the Long Beach facility?  Number.

22          "Answer:  I believe there are 80 cassettes.

23          "Question:  Okay.  And of these 80 -- these 80

24   cassettes were delivered approximately 11 to 12 years ago,

25   best of your knowledge?

Lawrence - cross

1          "Answer:  Yes.

2          "Question:  Okay.  So these 80 AHG cassettes

3     were ones that were designed back in the late 1990s, to the

4     best of your knowledge?

5          "Answer:  Yes, they are that vintage.

6          "Question:  And so, to the best of your

7     knowledge, with respect to at least 70 out of the 80 AHG

8     cassettes in the last 11 to 12 years, there's only been one

9     issue, hardware issue, relating to those cassettes and

10    that's with the micro-actuator.  Correct?

11         "Answer:  Yes."

12         THE COURT:  Please state for the record the page

13    numbers.

14         MR. LINDVALL:  Sure.  Just a moment, Your Honor.

15         It would be Page 58, Line 19 through Page 59,

16    Line 6, and Page 60, Line 5 to Page 60, Line 10.  And then

17    Page 60, Line 13 to 60, Line 13.

18    BY MR. LINDVALL:

19    Q.    Now, you prepared two expert reports in this case.

20    Correct?

21    A.    Yes, I did.

22    Q.    And these expert reports are what contain all the

23    opinions that you have given to the jury today.  Correct?

24    A.    Yes.

25    Q.    Now, attached to your expert report was a chart which

Lawrence - cross

1   you used to support your claim that AHG's patents were

2   invalid.  Correct?

3   A.      That's true.

4   Q.      And these are some of the opinions you gave today.

5   Correct?

6   A.      Yes.

7   Q.      And the charts supporting your opinions on patent

8   invalidity were prepared by Broetje's lawyers.  Correct?

9   A.      Along with myself, yes.  I sat with the Broetje

10  lawyers and we prepared this information.

11  Q.      So the lawyers, when you initially got these charts

12  which showed your analysis, your opinions, that was

13  originally given to you by Broetje's lawyers.  Correct?

14  A.      The initial charts were given to me.  So they had

15  initial charts and patent research that was done.  So we

16  went through the prior art, you know, examined the prior

17  art.

18  Q.      Now, in forming your opinions, you understand you

19  were supposed to presume that the patents were valid.

20  Correct?

21  A.      Yes.

22  Q.      And what is that presumption based on, do you know?

23  A.      I think this has to do with the burden of proof.

24  Like I said, these legal terms, I mean, I am definitely not

25  familiar with all of them.

Lawrence - cross

1    Q.     You understand the presumption is based on the fact

2    that the U.S. Patent Office, who has examined the patents,

3    the AHG patents, and has issued them, that they get a

4    presumption that they acted properly and correct.  Right?

5    A.     Yes.

6    Q.     And you understand as a result of that the burden of

7    proof for Broetje to prove the patents are invalid is clear

8    and convincing evidence.  Correct?

9    A.     Yes.

10   Q.     Which is higher than to show infringement.  Correct?

11   A.     Yes.

12   Q.     Now, in addition to your report on invalidity of the

13   AHG patents, you have a report which attempts to rebut Dr.

14   Kytomaa's opinions that the Broetje cassettes infringe the

15   patents.  Correct?

16   A.     Yes.

17   Q.     And you based your opinions that the Broetje

18   cassettes do not infringe the AHG patents by examining a

19   Broetje cassette.  Correct?

20   A.     Yes, I did examine a Broetje cassette.

21   Q.     In fact, you showed some photographs to the jury.

22   Correct?

23   A.     Yes.

24   Q.     And that was based on a cassette that you had.

25   Correct?

Lawrence - cross

1    A.    Yes.

2    Q.    In fact, your expert report has these same

3    photographs you have up on the slides.  Correct?

4    A.    That is correct.

5    Q.    But the cassette that you used was provided to you by

6    Broetje's attorneys.  Correct?

7    A.    That's correct.

8    Q.    And the cassette had been loaded with rivets when you

9    received it.  Correct?

10   A.    That's correct.

11   Q.    And it was Broetje's attorneys who decided what

12   rivets were loaded in the cassette.  Correct?

13   A.    It was actually, I think, two different -- I believe

14   there was two different types of fasteners depicted in the

15   images.  So it would have been with two different types of

16   rivets, or two different lengths of rivets.

17   Q.    I would like to play Page 137, Line 18, to Page 137,

18   Line 25, L.

19          "Question:  Okay.  Now, when you received the

20   cassette from the attorneys for Broetje, did you specify

21   what type of rivets that you wanted?

22          "Answer:  No.

23          "Question:  They gave it to you filled with

24   rivets, though?

25          "Answer:  Yes.  Yeah, with these -- with the

Lawrence - cross

1    fasteners that you see in Figure 1 and 2A."

2              Now, these four photos you showed the jury today

3    for your noninfringement opinion, these photos were taken at

4    your home.  Correct?

5    A.    That's correct.

6    Q.    These weren't taken at a factory?

7    A.    No, they were not.

8    Q.    So the Broetje cassette was delivered to you, you had

9    it at home, and you took photographs of the cassette at

10   home?

11   A.    Yes.

12   Q.    And you didn't have it hooked up to a rack.  Correct?

13   A.    No.  But I have a device --

14   Q.    Listen to my question, please.  You didn't have it

15   hooked up to a rack.  Correct?

16   A.    No, I did not.

17   Q.    So you had no way of having the separator hooked up

18   to a rack so that each of the rivets would slowly separate

19   in that fashion.  Correct?

20   A.    No, I did not.

21   Q.    And when you took these photos of the rivets that you

22   showed to the jury, they weren't moving.  Correct?

23   A.    No, they were not.

24   Q.    Now, in actual operation, if they were hooked up to a

25   rack, and you were in the plant, like at Gemcor, like Dr.

Lawrence - cross

1    Kytomaa did, as the rivets are ejected into the Broetje

2    rivet machine, there is movement of the rivets through the

3    tube.  Correct?

4    A.    Yes, there is.

5    Q.    You don't have any videos of that, do you?

6    A.    No, I do not.

7    Q.    But when you took your photos, you did not attempt to

8    look at the orientation of the rivets as they moved through

9    the tube.  Correct?

10   A.    Well, I was not able to eject the rivets, so I

11   couldn't take multiple photos of that.

12   Q.    So you observed them, you observed the rivets only in

13   a stationary or static position.  Correct?

14   A.    Yes.

15   Q.    Now, you just had some testimony about this patent

16   called Shinjo, which the jury has heard quite a bit about

17   today, both from Dr. Budach yesterday and today and

18   yourself.  Correct?

19              And I believe that Dr. Budach had characterized

20   Shinjo as the closest prior art to the AHG patents.  Is that

21   correct?

22   A.    I did not hear Dr. Budach's testimony.

23   Q.    You didn't sit through Dr. Budach's testimony?

24   A.    No.

25   Q.    Now, in forming your opinions, your validity

Lawrence - cross

1    opinions, relating to whether the AHG patents are valid or

2    not, you considered this Court's definitions of the various

3    terms in the patent claims.  Correct?

4    A.     Yes, I did.

5    Q.     In forming your opinions relating to the validity of

6    the AHG patents, you used the Court's definitions of the

7    patent claim terms groove and passageway.  Correct?

8    A.     Yes, I did.

9    Q.     Now, let me show you what has been marked as

10   DTX-1031.

11          Now, this is the prior art that you rely on to

12   show that the AHG patents are invalid.  Correct?

13   A.     Yes.

14   Q.     And you understand that all the claims of the AHG

15   patents contain as a required element grooves or

16   passageways.  Correct?

17   A.     One more time?

18   Q.     Let me rephrase.  Probably wasn't very well asked.

19          You understand the AHG patents, each one of the

20   claims require, to show it's invalid, that you have to show

21   that there is a groove in Shinjo.  Correct?

22   A.     A groove or a passageway.

23   Q.     Yes.  And you understand groove and passageway have

24   been defined by the Court as meaning the same thing.

25   Correct?

1    A.    Yes.

2    Q.    So when I use passageway or groove, just for the

3    jury's edification, they mean the same thing.  Correct?

4    A.    Yes.

5    Q.    So to show that Shinjo is an invalidating piece of

6    prior art, you have to show that Shinjo discloses a groove.

7    Correct?

8    A.    Or a passageway, yes.  Because they are the same.

9    Q.    They are the same.  If I just say groove, that would

10   be fine with you?

11   A.    Say groove.

12   Q.    Groove has been used throughout the whole

13   proceedings?

14   A.    Yes.

15   Q.    So the jury doesn't get confused, okay.

16         Now, you agree with me that Shinjo does not

17   disclose grooves as required by the AHG patent claims.

18   Correct?

19   A.    It discloses passageways and thereby grooves.

20         MR. LINDVALL:  Could you please play L-05.

21         "Question:  Now, let me show you what I've

22   marked as Exhibit 55, which is a Patent Application GB

23   2,067,149.

24         "It's the Shinjo patent.

25         "Are you familiar with this?

Lawrence - cross

1              "Answer:  Yes.

2              "Question:  And this is on Page 48 of Exhibit 2

3      to your expert rebuttal report.

4              "And the shape of the tube in the Shinjo patent

5      application is rectangular.  Correct?

6              "Answer:  That is correct.

7              "Question:  Okay.  And does it show any grooves,

8      though?

9              "Answer:  No."

10             Now, you also agree that the Shinjo patent

11     application also does not disclose a required element of the

12     claims of the '339 patent that have, with axis of revolution

13     extending along the longitudinal axis of said tube.

14     Correct?

15     A.      That is correct.

16     Q.      So that is two elements that we have seen.

17             You agree that all elements of the '216 patent

18     expressly require the use of rivets.  Correct?

19     A.      One more time with that one?

20     Q.      You will agree with me that all of the claims of the

21     '216 patent expressly require the use of rivets.  Correct?

22     A.      All of the elements?

23     Q.      Well, let's say this, the claims of the '216 patent

24     expressly require the use of rivets.  Correct?  Do you

25     understand my question?

969

Lawrence - cross

1    A.       No, I don't understand your question.

2    Q.       Let me try to be a little more clear.  I am sorry if

3    I am not.

4                  The claims of the '216 patent, one of the

5    elements, it must be a rivet that is being used in the

6    claim.  Do you agree with that?

7    A.       Yes.

8    Q.       And you agree that Shinjo does not expressly disclose

9    the term rivet in it.  Correct?

10   A.       It doesn't expressly disclose rivet, but component

11   parts.

12   Q.       Now, if I could show you PTX-124, please.  I believe

13   that one of the things that you considered in forming your

14   opinions is what we call the patent file history.  Have you

15   ever seen this document?

16   A.       This is fuzzy.

17   Q.       Can you blow it up a little bit for the witness so he

18   can see it.

19                  Let me give you the exhibit books.

20                  THE COURT:  Do you have a hard copy, Mr.

21   Lawrence?

22                  THE WITNESS:  I can't see that at all.

23                  MR. LINDVALL:  May I approach, Your Honor?

24                  THE COURT:  You can.

25   BY MR. LINDVALL:

Lawrence - cross

1    Q.      So now you have a paper copy in front of you.  I

2    apologize for not having given that to you earlier.

3    A.      We are looking at what?

4    Q.      PTX-124.  Do you see that?

5    A.      Yes, I do.

6    Q.      Have you ever seen this?

7    A.      I do not recall seeing this document.

8    Q.      Look at the top right-hand corner, do you see this?

9    That's the patent number for the '216 patent.  Correct?

10   A.      Yes.

11   Q.      So in forming your opinions you don't recall ever

12   considering the patent file history of the '216 patent?

13   A.      At least I did not see this particular form.  I mean,

14   I certainly considered the patent and the elements in the

15   patents.  But I do not recall seeing this particular form.

16   Q.      Okay.  Do you recall whether you were even provided

17   the patent file histories of the AHG patents?

18   A.      I am not exactly sure what that term means.  So it

19   would be hard -- the patent file history?  I don't know if

20   this would be supporting documentation to the patent.  Is

21   that what --

22   Q.      Let me explain to you what a patent file history is.

23   A patent file history is a record of the back-and-forth

24   between the applicant -- first the applicant files a patent

25   application.  And then the U.S. patent examiner, who is

Lawrence - cross

1    trained in this area, examines the application for a number

2    of different things, including whether the claims should be

3    allowed over the prior art.  And the applicant and the

4    examiner may go back and forth until the examiner either

5    says the patent can issue or the patent is not going to

6    issue because I believe the claims are not sufficiently

7    novel.

8                  Have you heard that before?

9    A.     I believe there is a record of this, maybe as part of

10   the patent.  But I have never seen any of the supporting

11   documentation.

12   Q.     Well, this is the record.  This is the official

13   record from the Patent Office.

14   A.     Okay.  No, I have never seen this.

15   Q.     Okay.  Well, let any just show you real quickly.

16   Look down at the bottom, these right here.  This box here.

17   A.     Okay.

18   Q.     And you see that when the '216 patent was being

19   examined by the Patent Office, there is an Examiner

20   Patterson.  Do you see that?

21   A.     Yes.

22   Q.     And there is a Supervisory Patent Examiner,

23   Mr. Sewell.  Do you see that?

24   A.     Yes.

25   Q.     These are Examiners who actually examined the

Lawrence - cross

1    application which ended up issuing as the '216 patent.

2    A.    Okay.

3    Q.    You got that?

4    A.    (Nodding yes.)

5    Q.    Now, do you understand these two Examiners,

6    particularly Mr. Patterson, specifically considered the

7    Shinjo reference before they issued the patents?

8    A.    Well, I'm sure they've got to take that into account

9    when they examined it.

10   Q.    But since you have never seen this document, you

11   don't realize that the Examiners actually specifically

12   looked at Shinjo before they allowed these claims to be

13   issued; correct?

14   A.    Correct.

15   Q.    Now, let's look at, for example, page 49 of this

16   exhibit, Exhibit P-124.

17          Okay.  Right here.  What I'm showing you here,

18   this is Mr. Bornes' patent attorney who sent correspondence

19   to the United States Patent Office, trying to get the patent

20   issued.  And this is the correspondence to the Patent

21   Office.

22          Right here, Mr. Bornes patent attorney is

23   actually giving a copy.  He doesn't have an obligation to

24   do that but he is actually giving a copy of Shinjo for the

25   Examiner's consideration.  So he actually, not only did the

Lawrence - cross

1    Examiner not find this but they actually gave a copy of

2    Shinjo to the Patent Office for their consideration.

3              Do you see that?

4    A.    Yes, I believe this is regularly done when prior art

5    is included.

6    Q.    Yes.  Usually the Examiner finds it, but actually

7    it's quite unusual, do you understand that, for the

8    applicant to find something and give it to them.  This

9    was also mentioned in the specification to Shinjo?

10   A.    Yes.

11   Q.    Okay.  So let's turn to page 51.  Again, this is the

12   file history.  This is something we ordered from the Patent

13   Office.  So if you were to order it, this is what you would

14   get, and you can see what is right in the file history.  And

15   this is the copy of Shinjo that we gave, that Mr. Bornes'

16   attorneys gave the United States Patent Examiners so they

17   can consider Shinjo to see whether or not the patents should

18   be valid or not, or should be issued.

19             Do you understand that?

20   A.    Yes.

21             THE COURT:  Mr. Lindvall, how much more do you

22   think you have with this witness?

23             MR. LINDVALL:  Maybe another 10 or 15 minutes.

24             THE COURT:  Well, we'll give the jury their

25   lunch break then, and we'll come back and finish up.

Lawrence - cross

1          Lunch is here.  No talking about the case during

2   the break.  We'll gets you back in a little while.

3          (Jury left courtroom.)

4          THE COURT:  All right.  We're going to be in

5   recess.  Before you step out, I have three copies for each

6   side of our proposed instruction on foreign law.  Take a

7   look at that, and before we come back with the jury after

8   lunch, I'll see if both sides have any view as to our

9   proposed instruction.  But we will be in recess.

10          (Lunch recess taken.)

11          *       *       *

12          Afternoon session - 1:10 p.m.

13          THE COURT:  Is there anything we should discuss

14   before we bring the jury in?

15          MS. SHARP:  Your Honor, we reached agreement on

16   the disputes that relate to Langenfeld except for one scope

17   dispute.  They proposed to introduce testimony that relates

18   to apportionment that is not mentioned anywhere.

19          THE COURT:  I'm sorry.  This is an objection

20   that is beyond the scope?

21          MS. SHARP:  Yes.

22          THE COURT:  Okay.  Mr. Cahr.

23          MR. CAHR:  Your Honor, that is not the argument

24   that is being made.  It was an argument made in his reports

25   and that I discussed with Mr. Ellis that selling --

Lawrence - cross

1          THE COURT:  Let me ask you this:  Is there any

2     reason for me to rule on this?

3          MR. CAHR:  No.

4          THE COURT:  All right.  Ms. Sharp, is there any

5     reason for me to depart from the Farnan rule as we have been

6     calling it?

7          MS. SHARP:  I think what is different here is

8     slides exhibited the intent in advance so we know it is

9     coming, but if Your Honor desires the Farnan rule and we

10    proceed that way we understand.

11         THE COURT:  Then the objection as beyond the

12    scope of the expert report is noted and we'll deal with it

13    consistent with all the others.

14         MS. SHARP:  There is one more brief question.

15    As Your Honor can imagine, everyone is counting time.  We're

16    unclear whether the sidebars are counted against us.

17         THE COURT:  The sidebars, the ones that came up

18    during your cross, are counted against you.  You are partly

19    getting some of that time back, probably more than that

20    given my ruling, but that factored into my ruling.

21         MS. SHARP:  Understood, Your Honor.

22         THE COURT:  Is there anything else?

23         MR. LINDVALL:  No, Your Honor.

24         THE COURT:  All right.  We'll bring the jury

25    back in.

Lawrence - cross

1                    (Jury returned.)

2              THE COURT:  Welcome back.  I hope you enjoyed

3    lunch.  We are ready to proceed.

4              Mr. Lindvall, you may proceed.

5              MR. LINDVALL:  Thank you, Your Honor.

6              Back to PTX-124.

7    BY MR. LINDVALL:

8    Q.    Now, remember, this is from the United States

9    patent file history.  We established that; correct?

10   A.    Yes.

11   Q.    And you understand this is actually the official

12   record from the Patent Office that shows what we call the

13   prosecution history that led to the issuance of the '216

14   patent; correct?

15   A.    Yes.

16   Q.    And as I explained to you before, the Shinjo patent

17   or patent application was actually given to the Examiner

18   so the Examiner considered it before he or she actually

19   issued the patents or decided whether they're valid or not;

20   correct?

21   A.    Yes.

22   Q.    Okay.  Now, let's look at page 85, please.

23              Do you see here what finally came of that?

24   After consideration of the Shinjo patent, the United States

25   patent was finally issued, the '216 patent, and it was

1    issued over the Shinjo patent.

2              If you could bring up JTX-1, please.  And if you

3    could zero right in here (indicating).

4              Do you see this?  And you understand that the

5    1307052 is the Shinjo patent?

6    A.    Yes.

7    Q.    Okay.  And this shows you that the Examiner

8    considered this right on the face of the patent; correct?

9    A.    Yes.

10   Q.    And if you look -- take this down, this part down,

11   please.

12             And the Examiners, the Examiners that we just

13   saw right here, the Primary Examiner and Assistant Examiner.

14   And both allowed the patent over the Shinjo reference.  Do

15   you see that?

16   A.    Yes, I do.

17   Q.    Let's go to PTX-125, please.

18             Now, you probably don't recognize this because

19   you didn't recognize the file history of the '216, but this

20   is the file history for the '339 patent.  Do you see up

21   here?  And this comes from the United States Patent and

22   Trademark Office.

23             And if we go down from this, the front page, we

24   have here, again, we have a different Examiner examining the

25   '339 patent.  A -- I don't know of if it is a Ms. Or Mr. --

Lawrence - cross

1    Palomar.  Then we have a different Supervisor Patent

2    Examiner.

3              So now we have a different Examiner examining

4    the '339 patent.  Do you see that?

5    A.    Yes, I do.

6    Q.    So let's go to JTX-2, please.

7              And right here, the United Kingdom.  Do you see

8    this reference on the front face of the '339 patent is the

9    Shinjo reference.  Correct?

10   A.    Yes.

11   Q.    Okay.  And you see the Examiners who examined the

12   '339 patent are different Examiners than examined the '216

13   patent; correct?

14   A.    Yes.

15   Q.    Essentially we have four different Examiners who have

16   all considered the Shinjo patent and allowed the '339 and

17   '216 patent to issue; correct?

18   A.    That's correct.

19   Q.    And these are Examiners of the United States Patent

20   and Trademark Office who are trained in patent law and may

21   be trained in the technical area who examine these patents.

22   You understand that; correct?

23   A.    Yes.

24   Q.    Now, there some other kind of art, some other art

25   that you discussed with the jury that you said invalidates

979

Lawrence - cross

1    the patent.  We're going to briefly go over a couple of

2    those.  One was the Offutt patent and the Engeln patent;

3    right?  I may not be pronouncing that right.

4    A.    Engeln.

5    Q.    Do you know the Offutt, O-f-f-u-t-t, patent?

6    A.    Yes, that patent I am aware of.

7    Q.    And that is one of them you gave testimony about today?

8    A.    Yes.

9    Q.    And the other was the Engeln, E-n-g-e-l-n?

10   A.    Yes, Engeln.  There was no testimony on that patent.

11   Q.    Okay.  No testimony on that.

12         Now, the Offutt patent doesn't have any grooves

13   as required by all the claims of the '216 and '339 patent;

14   correct?

15   A.    But there are passageways which equals grooves as we

16   have discussed going by the heads, as the air flows past

17   the heads of the fasteners and shanks of the fasteners.

18   Q.    If we could play page 150 of your deposition, line 3

19   through page 150, line 10.  It's L44.

20         "Question:  If you -- let's go back to

21   Exhibit 52, the Engeln or prior art, E-n-g-e-l-n.  It's

22   Exhibit 52.

23         "In the same way that the Offutt patent has a --

24   kind of a perfectly effectually shaped circle tube shown, it

25   doesn't have any grooves, also; correct?

Lawrence - cross

1          "Answer:  They're not represented, so I would

2     assume they're not there, yes."

3     Q.     Thank you.  Now, you also gave testimony about the

4     Bronson patent; correct?

5     A.     Brosene.

6     Q.     Brosene.  I told you I'm -- the Brosene patent;

7     correct?

8     A.     Yes.

9     Q.     And it's your opinion the Brosene patent claims have

10    all the elements of the claim of the patent, the '216 and

11    the '339 patent; correct?

12          MR. KELLEHER:  Objection, Your Honor.  Beyond

13    the scope.

14          THE COURT:  Beyond the scope of the direct?

15          Mr. Lindvall.

16    BY MR. LINDVALL:

17    Q.     Did you use the Brosene patent --

18          MR. LINDVALL:  Withdraw the question, Your

19    Honor.

20          THE COURT:  We will withdraw the question.

21    BY MR. LINDVALL:

22    Q.     Did you use the Brosene patent during your testimony

23    today?

24    A.     Brosene, yes.

25    Q.     Yes.  And did you give an opinion that the Brosene

Lawrence - cross

1    patent contained grooves?

2    A.     That there are passageways within the tube that

3    are --

4             MR. KELLEHER:  Objection again, Your Honor.

5    Beyond the scope.

6             THE COURT:  Mr. Lindvall.

7             MR. LINDVALL:  Your Honor, I think the testimony

8    is clear that he just said that he gave testimony about

9    Brosene, and I asked him whether or not Brosene has grooves.

10   I don't think there's -- I think it is an improper objection.

11            THE COURT:  Mr. Kelleher.

12            MR. KELLEHER:  He did not give testimony

13   concerning whether there were grooves or passageways in

14   Brosene.

15            THE COURT:  Did he give testimony about Brosene

16   and whether it invalidates it?

17            MR. KELLEHER:  He did not.

18            THE COURT:  He did not.

19            Mr. Lindvall.

20            MR. LINDVALL:  Under that condition that Brosene

21   does not invalidate any of the claims of the patent, I don't

22   have any ...

23            THE COURT:  He is not expressing an opinion that

24   Brosene invalidates?

25            MR. KELLEHER:  He is not today.

Lawrence - redirect

1          THE COURT:  And he is not in this trial?

2          MR. KELLEHER:  That's correct, Your Honor.

3          THE COURT:  Okay.  Then I will sustain the

4     objection.

5          MR. LINDVALL:  Thank you.  Just to make sure

6     I'm clear, because we had six references.  You are using

7     Shinjo --

8          THE COURT:  Mr. Lindvall, if you want a chance

9     to talk to Mr. Kelleher, you may do so.

10          (Counsel confer.)

11          MR. LINDVALL:  Thank you.

12          Okay.  I don't have any further questions under

13     that condition.  Thank you, Mr. Lawrence.

14          THE COURT:  All right.  Redirect.

15                    REDIRECT EXAMINATION

16     BY MR. KELLEHER:

17     Q.    Mr. Lawrence, when you expressed an opinion that

18     there were passageways in Shinjo and Offutt, what definition

19     did you use?

20     A.    This is under -- I used the Court's construction for

21     those.

22     Q.    Do you remember offhand what that is?

23     A.    That grooves equals passageways.

24     Q.    And for passageways, could you turn to PTX-103 in

25     your book?  The small one.

Lawrence - redirect

1   A.      Which one?

2   Q.      103.  On the second page, paragraph D.  Does that

3   refresh your memory as to the definition of longitudinal

4   passageway?

5   A.      Longitudinal passageway.

6   Q.      So what was the definition that you used for

7   passageway in Shinjo and Offutt?

8   A.      A passageway which can be of any hollow shape

9   regardless of the cross-section -- the cross-sectional of

10  the tube extending in the direction of the length of the

11  tube.

12  Q.      Under that definition, you found there were

13  passageways?

14  A.      Yes.

15  Q.      And looking at paragraph G, what is the definition of

16  grooves in this case?

17  A.      The term "grooves or groove" means "passageways."

18          MR. KELLEHER:  No further questions, Your Honor.

19          THE COURT:  Thank you, Mr. Lawrence.  You may

20  step down.

21          MR. KELLEHER:  Next, Your Honor, we're going to

22  play another video.  This time it is Mr. Bornes.

23          THE COURT:  Mr. Bornes.  And about how long do

24  you think?

25          MR. KELLEHER:  Six minutes.

Bornes - designations

1              THE COURT:  Six minutes.  Turn down the lights,

2      please.

3              (Deposition designations placed into evidence.)

4              (Witness Phillippe Bornes placed under oath.)

5              "Question:  Could you please state your name for

6      the record?

7              "Answer:  My name is Phillippe Bornes.

8              "Question:  So, if we used a tube that has an

9      internal shape like an oval that where the sides are smaller

10     than the rivet head so the rivet head cannot get in there,

11     would those be grooves?

12             "Answer:  What we call groove is what is defined

13     in this patent.  It's not a test that I run, so I really

14     can't answer that question.

15             "Question:  So you don't -- you don't have any

16     ovals in the patent, right?

17             "Answer:  There's no oval in the patent, but

18     what is for sure is that in the patent we have coiled tubes,

19     and I can guarantee you that the coiled tube is oval inside,

20     is an oval inside, and that's all I can say about this.

21             "Question:  Why would it be an oval if it is

22     coiled?

23             "Answer:  Because when you fold the tube, the

24     segment is not round any longer.  It's a matter of physics.

25             "Question:  The circular portion of the tube is

985

Bornes - designations

1    deformed by bending; then it becomes an oval?

2            "Answer:  Yes.

3            "Question:  Now I would show you Exhibit No. 54.

4    This is also a United States patent, this one to a gentleman

5    named Brosene, and it is entitled Study Feeding Mechanism?

6            "Answer:  I don't know.  I don't know this word.

7            "Question:  So would you look to Figure No. 14.

8            "Yes, that is the page.  So does this show a

9    cassette filled with a coiled tube filled with fasteners?

10           "Answer:  It's the box with a coil in it, and I

11   suppose it is filled with rivets.  I don't know.

12           "Question:  How would your invention be

13   different from that?

14           "Answer:  I don't know the geometry of this tube

15   so I can't compare.

16           "Question:  Well, I see it's coiled, so that

17   means that the inner shape would be an oval?

18           "Answer:  Yes.

19           "Question:  If you were going to sell what is

20   shown in Figure 14, would you leave the ends of the tube

21   open as they are shown?

22           "Answer:  Actually, I can't tell you if I would

23   be able to sell this unit because I can't tell if the rivets

24   would move smoothly through this unit.

25           "If it was my tube, I would put something at the

986

Bornes - designations

1    end, yes, because if it was my tube and if it was a

2    cassette, I would have to use it as a transfer unit between

3    the feeding machine and the rack and I need to be sure that

4    no foreign element would get mixed into it during the

5    storage process.

6              "Question:  And so is the principle of

7    peripheral guiding shown in Figure No. 2?

8              "Answer:  Peripheral guiding is only to show

9    that an object is going to move through the matter.  So the

10   spaces that are indicated here cannot necessarily be an

11   indication of anything.  In the patent, in fact, there's no

12   indication of the minimum or maximum amounts of space and so

13   on and so forth.

14             "Question:  Right.  Right.  And that's -- so let

15   me ask the question this way:  In Figure No. 2, there's a

16   very little amount of space in between the rivet head and

17   the internal wall.  If I were to start making that space

18   bigger, is there a point where we no longer would have

19   peripheral guiding of the column of rivets?

20             "Answer:  You still have guiding as long as the

21   rivet is not able to flip on itself inside a tube or be at

22   an angle that would be sufficient to create jamming inside

23   the tube.

24             "Question:  So I believe you said that in the

25   year 2005 you discovered a cassette with a Broetje brand

987

Bornes - designations

1    name on it at Airbus in Bremen?

2              "Answer:  Yes.

3              "Question:  After you learned that, what did you

4    do?

5              "Answer:  I mentioned it to Jean-Marc Auriol.

6              "Question:  Then there came a point where it was

7    discovered that Broetje cassettes were also in France?

8              "Answer:  Yes.

9              "Question:  When was that?

10             "Answer:  I think it was in 2006.

11             "Question:  So, by that point, you knew that

12   Broetje was selling their cassettes in multiple countries?

13             "Answer:  Yes.  Let me be more detailed or let

14   me elaborate here.  I knew that they had delivered cassettes

15   at that time, but I didn't know if they had been sold or if

16   they had been simply given in order to do some testing.

17             "Question:  Did you have any reason to believe

18   that they had not also been delivered to the United States?

19             "Answer:  I can't say.  Unless I know if it

20   really happened, I don't know if it really happened.

21             "Question:  Did Broetje do anything to lead you

22   to believe that the cassettes had not been delivered to the

23   United States?

24             "Answer:  I could have some doubts about that,

25   but I could not have any certainty.

Bornes - designations

1          "Question:  What kind of doubts?

2          "Answer:  Since they had done that in Europe,

3     one could infer that they could have done that in the United

4     States, but that's all I could -- that's it.  That's all I

5     could think, and I had no data to prove that it had been

6     done."

7               MR. CAHR:  The defense calls Dr. James

8     Langenfeld.

9               ... JAMES LANGENFELD, having been duly sworn as

10    at witness, was examined and testified as follows ...

11              THE COURT:  Good afternoon.  Welcome, Dr.

12    Langenfeld.

13              Mr. Cahr, you may approach.

14              MR. CAHR:  Thank you, Your Honor.

15              If I could give an introductory statement?

16              THE COURT:  That is fine.

17              MR. CAHR:  Our next witness is James Langenfeld.

18    Dr. Langenfeld is an economist who specializes in the

19    calculation of damages in matters just like this.  He is

20    the managing director of Navigant Economics.  Dr. Langenfeld

21    is not here to offer any opinions about liability, about

22    whether there is infringement or not.  He is not a legal

23    or technical expert.  He is simply here to offer his opinion

24    on the amount of damages Broetje should pay if AHG should

25    win.

Langenfeld - direct

1                    DIRECT EXAMINATION

2    BY MR. CAHR:

3    Q.      Good afternoon, Dr. Langenfeld.

4    A.      Good afternoon.

5    Q.      By whom are you employed?

6    A.      Two places.  Navigant Economics and Loyola University

7    in Chicago.

8    Q.      And what is Navigant Economics?

9    A.      Navigant Economics is a consulting firm that does a

10   variety of things.  Partially this type of work, also

11   working for the government agencies on a variety of economic

12   topics.

13   Q.      What is your position at Navigant Economics?

14   A.      I am a managing director.

15   Q.      What do you do as a managing director?

16   A.      Well, for one thing, I work on projects like this

17   quite regularly.  But most of the time I spend is on

18   analyzing competition in a variety of markets and what the

19   implications of, for example, a change in the market would

20   be.

21   Q.      And, Dr. Langenfeld, you also work as a professor?

22   A.      Yes.  I teach at Loyola University.  I am the token

23   economist at Loyola University Law School.  I teach law and

24   economics there, which includes actually teaching the proper

25   way to do damages in a case like this.

Langenfeld - direct

1  Q.     Can you please list your degrees for us?

2  A.     I have a Bachelor's degree from Georgetown University

3  in Washington, D.C.  I have a Ph.D. from Washington

4  University in St. Louis.

5  Q.     Dr. Langenfeld, can you tell us about your employment

6  history?

7  A.     Yes.  I worked for a number of years for the Federal

8  Trade Commission.  That's a government regulatory body.  I

9  supervised actually 45 Ph.D. economists, so each one had

10  their own ideas, obviously.

11            I then worked as a consultant.  I worked at

12  General Motors as an in-house senior economist for a few

13  years, too.

14            That is sort of the general sweep.

15  Q.     Do you belong to any professional organizations?

16  A.     Yes.  The American Economic Association, a variety of

17  other associations, including the litigation section of the

18  American Bar Association.

19  Q.     And what type of publications have you made in your

20  professional life?

21  A.     I have over a hundred publications.  A large chunk of

22  those deal with the appropriate way to calculate damages in

23  intellectual property cases, unfair competition cases, and

24  the like.

25  Q.     Have you worked on matters related to the aerospace

Langenfeld - direct

1  industry, in particular?

2  A.    Yes.  It goes back a ways.  But since the late 1980s

3  I have worked in the aerospace industry probably on about

4  two dozen different matters on different aspects of

5  aerospace.

6  Q.    And have you testified at trial in intellectual

7  property cases or damages cases in the past?

8  A.    I have been involved in a great number of them.  I

9  actually testified in trial probably a dozen or so times.

10  Q.    Have you worked for both plaintiffs and defendants in

11  these cases?

12  A.    Yes, I have.

13  Q.    Dr. Langenfeld, what was the assignment for you in

14  this case?

15  A.    Well, the assignment was to look at the asserted

16  claims here, which were patent infringement and the other

17  claim, shall we say, and to estimate what damages might be

18  based on normal economic criteria and analysis, and then

19  specifically to look at what Mr. Ellis has done to see

20  whether that is reliable, and follow the appropriate

21  evidentiary and analytical standards.

22  Q.    And can you please tell us a little bit about the

23  work you performed to complete this assignment?

24  A.    It was an extensive assignment.  I had people work

25  with me.  We reviewed over 13,000 pages of transcript and

Langenfeld - direct

1    documents and financials and things like that.  Financials

2    are actually larger than that.  These are records from both

3    Broetje and AHG.  We looked at that.  We analyzed, I and my

4    staff, looked at the reliability of those documents and data

5    to see whether they were solid.

6    Q.    Did you talk to anyone?

7    A.    Yes.  I talked to several people at Broetje, Ken

8    Benczkowski, he testified earlier, and Axel Peters, and

9    others at Broetje.

10   Q.    Did you perform any independent research?

11   A.    Yes.  There is literature, I guess, for everything.

12   There is literature about this.  It is published in journals

13   and such.  So I carefully reviewed that, to see what the

14   outside parties, not just the parties involved, what was

15   said about competition, what was important to me.

16   Q.    Did you visit anyplace?

17   A.    Yes, I visited two facilities.  I visited the

18   Gulfstream facility in Savannah and the facility where

19   Boeing makes 787s in Charleston, South Carolina.

20   Q.    Did you learn about the patents in the case?

21   A.    Yes, understood as much as, not being a technical

22   person, but assuming that there are damages or could be

23   damages from the infringement and from the other acts, I did

24   look at those.

25   Q.    Did you prepare any expert reports or analyses?

Langenfeld - direct

1    A.      Yes.  I actually prepared several reports over time,

2    as new information came up.  And that was evidentiary, a lot

3    of spreadsheets, a lot of computations and a lot of review

4    of materials.

5    Q.      And did you have a team assisting you?

6    A.      Yes.  I had several people helping me.

7    Q.      Why do you perform all of these analyses as part of

8    your work?

9    A.      Well, to do this type of work, you have to be very,

10   very, very careful.  You have to consider the other side is

11   going to get everything that you do, and there is a

12   professional standard that you have to follow.  To do that,

13   to achieve that, you really have to make every effort to be

14   a hundred percent, you have to make every effort to do the

15   most careful job.

16   Q.      Like all the experts in this case, I am assuming you

17   are not doing this for free.  What does Navigant charge for

18   you and your team?

19   A.      Navigant charges $725 an hour for my time.  It

20   charges for this case, the people that worked on it, between

21   about $100 an hour to about 425 was the top, other than me.

22   Q.      Does your income or Navigant's income depend on the

23   outcome of this trial?

24   A.      No.

25   Q.      I would like to offer Dr. James Langenfeld as an

Langenfeld - direct

1    expert on damages.

2              MS. SHARP:  Your Honor, if it is the practice in

3    this district to always offer -- I neglected to offer Mr.

4    Ellis.  I assume that is not a problem.

5              THE COURT:  Not a problem.  And you have no

6    objection?

7              MS. SHARP:  Subject to what was earlier

8    reserved, nothing.

9              THE COURT:  Fine.  He is so recognized.

10   BY MR. CAHR:

11   Q.    Dr. Langenfeld, have you reached opinions in this

12   matter?

13   A.    I have.

14   Q.    Did you issue reports that reflect those opinions?

15   A.    I did.

16   Q.    Were those opinions accompanied by attachments that

17   summarize your findings?

18   A.    Yes.

19   Q.    Can you please turn in your witness binder to

20   DTX-1945?

21   A.    I have turned to that page.

22   Q.    Do you recognize this document?

23   A.    Yes.  The first part of it appears to be my vitae, my

24   resume, my experience, basically.  And then the rest of it

25   seems to be some of the documents that I considered in my

995

Langenfeld - direct

1   expert report, additionally.  Then a number of tables that I

2   used that showed my calculations for damages.

3   Q.     These are the tables that were provided with your

4   most recent report?

5   A.     Yes, they are, it appears to be complete.

6              MR. CAHR:  Your Honor, pursuant to our agreement

7   with opposing counsel, I would ask that DTX-1945 be entered

8   into evidence.

9              MS. SHARP:  No objection.

10             THE COURT:  It is admitted.

11             (Exhibit DTX-1945 received in evidence.)

12  BY MR. CAHR:

13  Q.     Can you please publish the first page.

14             If I could flip through a few pages so the jury

15  can see the type of tables and calculations that were

16  performed here, which were obviously very similar types of

17  calculations?

18  A.     You are going through a bunch of my publications

19  here.  So you should skip forward.

20             That is some of the documents that I and my

21  staff reviewed.

22  Q.     These reflect the calculations that you made in order

23  to come to your conclusions.  Is that correct?

24  A.     That is correct.

25  Q.     If we can go back to the slides, tell us a little bit

Langenfeld - direct

1    about the conclusions that you reached after performing

2    these various analyses?

3    A.    Okay.  I think it's helpful to think about this as

4    sort of splitting the analysis at least in two parts.  One

5    part is the patent damages part.  And the other part is what

6    they call copying, I think is what has been accused here,

7    which summarizes several other claims.

8             So the first thing that I did -- well, one of

9    the things I do and I will discuss first, at least, is to

10   look at the patent damages aspect, to focus on that, because

11   that is what Mr. Ellis did initially in his report.

12            And although you can use reasonable royalty

13   rates or lost profits, he chose to use lost profits under

14   what is called the Panduit criteria.  That's what he called

15   it.  It's named after a court case.

16   Q.    What are some of the things that you discovered that

17   he failed to do?

18   A.    Well, let me first make a point.  Mr. Ellis said that

19   he analyzed things under the Panduit criteria.  And I want

20   to say that I completely agree with him, that that was the

21   right thing to do, because the Panduit criteria are a series

22   of economic tests to see whether you can get reliable

23   estimates of damages.  So he and I are in complete agreement

24   that that is the right approach.

25            The problem I have, and it's very brief, and

Langenfeld - direct

1    there is a lot of work very briefly summarized on this

2    slide, is that there are various steps, and I do not

3    believe, based on my experience and my analysis, that he did

4    an adequate job in, frankly, any one of these.

5    Q.    And so can you just describe some of these things

6    that you failed to do?

7    A.    Well, as he discussed, first of all, you are supposed

8    to show the patented feature, not a cassette but the

9    patented features are demanded.  And people are willing to

10   pay extra for them.  And that but for, in this case but for

11   Broetje, if Broetje had not attempted to sell the cassettes

12   or the tubes at issue here, those cassettes, that no one

13   would have bought them.  That's really what he is saying.

14   That that is the key element.  Those patents drive that

15   demand.

16   Q.    And can you explain the second point that you make

17   here about noninfringing substitutes?

18   A.    Can I just finish?

19   Q.    Oh.  My apologies, Mr. Langenfeld.  I didn't realize

20   you weren't finished.

21   A.    There are lots of things that drive demand here.  It's

22   not just the patents, it's other aspects of reliability.

23   It's other aspects of the cost.  It's a variety of things.

24   It's not, in my opinion from what I have seen in the record,

25   not just those patented features.  The shape of the tube

1    basically.  And he attempts to show that there is demand.

2    And what he does, he shows the dollars figures or the

3    purchases of cassettes that Broetje or AHG sold F2C2 sold.

4    Q.    And you don't believe that is adequate?

5    A.    It's meaningless.  What that shows is that the

6    cassettes, somebody wanted to buy the cassettes.  It doesn't

7    show that anybody wanted to buy the cassettes just because

8    of the patented feature.  It's a complete non-analysis.  And

9    you really shouldn't.  It's just not right.

10              (Brushing against microphone.)  Oops.  Sorry.  I

11   get excited.  I'm an economist.  I get excited about things

12   like this and I hit the microphone.  I'm sorry.  We can move

13   on now.

14   Q.    No, that's okay, Dr. Langenfeld.  Can you explain

15   your second point about noninfringing substitutes?

16   A.    Well, the second point, the second element of the

17   Panduit analysis is are there noninfringing substitutes?

18              So the question is the ultimate customer, the

19   people who want to buy and sell all this stuff, do they have

20   alternatives to purchasing a system that doesn't contain the

21   patented feature, the tubes with the appropriate shape?

22              And the answer is yes, they do.  In fact, we

23   see people go out and buy them.  We see they're not exactly

24   the same.  They're not perfect substitutes, don't get me

25   wrong, but there are other cassettes.  There are some other

Langenfeld - direct

1    vibratory bowls and hoppers.  I have seen them in facilities.

2    And at least during a part of the damage period here,

3    because remember the patent period was from 2000-2009,

4    during that period, at least some time, ElectroImpact was

5    selling cassettes that weren't accused of infringing.  So

6    those are those other choices out there.

7            And the question is -- and this is important.

8    The question is if it turned out that Broetje was not

9    selling its products with the patented feature, what would

10   customers buy?  And what Mr. Ellis has assumed, and not

11   analyzed in my opinion, is that every single one of those

12   sales that Broetje made, AHG and F2C2 would have made not a

13   single one of those.

14   Q.    And this is what is known as but-for causation; is

15   that correct?

16   A.    Right.  Because we are trying to go back and

17   economists are not good for predicting the future but we're

18   pretty good for predicting the past.

19           So you go back into the past and you say let's

20   pretend, let's assume Broetje had not produced these units.

21   What would the world have looked like?  Would all of the

22   sales that Broetje made for all of those systems, 100

23   percent, gone to AHG/F2C2?  And the answer is there is

24   nothing that shows that in the record.  In fact, it would be

25   shocking if that were true.  Now, maybe they would have made

Langenfeld - direct

1   a lot of them.  I'm not saying that.  But the assumption for

2   the damages that Mr. Ellis is using, that's his assumption.

3   Q.      And so the next part of the Panduit test is the

4   marketing and production limitations.  Can you describe that

5   for us, please?

6   A.      This one actually goes to what would have happened

7   in the but-for world again.  If AHG and F2C2 could not have

8   quickly, I mean quickly, ramped up and manufactured all the

9   units that Broetje sold during the damage period -- which

10  is before, which is the before 2009; right? -- then they

11  couldn't have made all those sales.  They just didn't have

12  the capability.  And it was a small operation and during

13  that period of time they didn't ramp up.

14          Now, eventually, afterwards, afterwards, they

15  did eventually ramp up, but during that period of time there

16  is no evidence they could have easily.  In fact, it's not

17  just whether they could have made it but whether they could

18  have sold it, and the record I show is that AHG only had one

19  person responsible for selling these products in the United

20  States.  One.

21          So you are not, they would have to expand to

22  make that work.  And during the period of time, at least

23  during the patent violation period, there is really no

24  evidence they could have done it.  And it could have

25  expanded but not -- I mean it's a 45 percent increase in

Langenfeld - direct

1    their sales they would have had to make to cover all of

2    the Broetje units during that period.

3    Q.      And the last Panduit factor is reliably quantifying

4    lost profits.  Can you describe that as well?

5    A.      Yes.  Basically, you have to be able to calculate the

6    numbers right and make sure that the assumptions you are

7    making in calculating the numbers are verified around it.

8            Part of the problem with this is he did a couple

9    of things, Mr. Ellis did a couple of things that I think are

10   incorrect.  One is that he excluded some costs and, in

11   particular, he excluded some royalty costs which typically

12   appear in the books and they would typically be left in as a

13   cost.

14           Because, remember, he is calculating out lost

15   profits which is the sales that AHG would have made at AHG

16   prices minus AHG cost.  That is the profit.  That is the

17   lost profit times the number of, appropriate, I would say,

18   number of units that it would have picked up had Broetje not

19   been in the market.  That's the story.

20           And with these costs, he is eliminating costs,

21   he is adding profits.  And, in my opinion, that is what he

22   has done.  He excludes about $2.8 million in royalty costs

23   that are technically paid to people who are not plaintiffs

24   in this case as I understand.

25           Secondly, he over-counts the number of Broetje

Langenfeld - direct

1    sales units and in a big way I think over-counts the number

2    of units as a general matter.  Units that don't even include

3    the alleged infringing tubes.

4    Q.    And just so that the jury can understand, can a

5    plaintiff show one of these or two of these or three of

6    these and obtain lost profits damages?

7    A.    Well, I'm not -- you're the jury, and the Judge will

8    instruct you I'm sure.  As an economist, I have to tell you

9    that for me, to be able to end up accurately estimating lost

10   profits, you have to have each one of these steps checked

11   off.  You can't check off two or three and say I got them.

12   Because each one of these is integral into having a reliable

13   damages calculation, a lost profits damage calculation.

14   It's a chain here.  To pull a good estimate of lost profits

15   through, each one of the links has to be strong.

16   Q.    And can you describe some of the other errors that

17   you were able to uncover in looking at the calculations of

18   Mr. Ellis?

19   A.    Well, these relate both to -- well, for the lost

20   profits, these -- the first one of these, that I already

21   mentioned he assumes that F2C2 would have sold every Broetje

22   cassette and accused tube, and also every loading station

23   and rack that Broetje sold.  And these are a big problem

24   because they greatly affect not only his patent damages but

25   his other damages, too.  This affects all the damages that

Langenfeld - direct

1    he does.  The patents plus the others for lost profits.

2    Q.    What are some of the other issues you have identified?

3    A.    For unjust enrichment.  And this is an important

4    concept, unjust enrichment.  Unjust enrichment is, okay, I

5    made profits.  You may have lost but I'm the bad guy.  I

6    made profits off of you.  It's not that I made revenue off

7    of you, because as a bad guy, just like in lost profits for

8    a damage to AHG, you have to play the game the same on both

9    sides.  You have to give revenue and you have to subtract

10   out incremental costs, and those incremental costs are what

11   I have been unjustly enriched by and I'm going to give those

12   over to the other side.

13              He doesn't subtract out costs.

14   Q.    Is that unreasonable to do?

15   A.    It's economically -- I'll say it's economically

16   inappropriate.  Let's put it that way.  It's playing the

17   game, you know, it's through the heads I win/tails you lose.

18   We'll do one analysis on one side one way but we're just

19   going to completely ignore costs oh the other.

20   Q.    So costs should have been deducted?

21   A.    Absolutely.  And that obviously makes a huge

22   difference in unjust enrichment damages, the fact he ignores

23   costs.

24   Q.    And your final point, does this relate to something

25   called convoyed sales?

1004

Langenfeld - direct

1    A.      Yes, this certainly relates to convoyed sales.  There

2    are a huge chunk.  80 percent of his damages, sliced another

3    way, are due not to the sales actually of cassettes which

4    have the tubes in them.  So if we make the assumption that

5    the tubes entirely drive the demand for cassettes.  Let's

6    make that assumption.  Economists make these assumptions,

7    simplifying assumptions.

8              He calculate damages based on that.  But, he on

9    top of that, calculates damages based on loaders and on

10   racks, and those loader and rack damages are 80 percent of

11   the damages that he calculates, and the tubes aren't even in

12   those products.

13             Yeah, here.  This gives you an example.

14             Basically, it's one of those things where he is

15   balancing all of his damages on the point of the two patents.

16             Yes, this one I like.  And maybe this couldn't

17   speak to you.  I like triangles, one way or the other.

18   Q.      Yes.  So explain what the cassettes are at the bottom

19   and the distribution racks are at the top?

20   A.      Yes.  If you look at this, the cassettes are at the

21   bottom and the patented item, the tube, the shaped tube is

22   actually inside the cassettes.  Now, you think, well, that

23   is what I would think.  That is, well, that is where most

24   of the damages would be.

25             Well, that is just not true.  20 percent of his

1005

Langenfeld - direct

1   damages are in the cassettes and the other 80 percent are in

2   distribution racks and loading stations.  So he is balancing

3   all of these sales on the shape of the tube.  100 percent.

4   That is what he is assuming.

5   Q.      Unfortunately because it's a timed trial we're

6   going to get the hook here momentarily, but I would like to

7   make sure that we address a couple of slides, the primary

8   conclusions that you were able to reach after performing

9   your analysis.

10          So what was the first type of calculation you

11  did, and then what was the second type of calculation that

12  you did?

13  A.      Well, yes.  The first type of calculation I did after

14  dealing with these things and appropriately dealing with the

15  cost issues and all of that for unjust enrichment is to make

16  assumptions that I don't think are supported by the facts

17  but are in favor of the claim.

18          So, first of all, I'm going to say that the

19  Panduit discussion that I had about the limitations there

20  and that the chain was broken in several places, I'm going

21  to pretend the chain is glued back together.  I'm just going

22  to pretend that analysis doesn't really apply.

23          And I'm going to assume for purposes of this

24  that that inverted triangle, I'm going to assume that they

25  all go together.  The sides, the shape of the tubes drives

Langenfeld - direct

1   all those sales.

2   Q.    So in this analysis, you are presuming Mr. Ellis's

3   assumptions are correct?

4   A.    Not all of them but most of them.  He actually counts

5   wrong in the number of units and some other things, but,

6   yes, mostly this follows what he does.

7   Q.    And what was your conclusion in this analysis for

8   patent infringement?

9   A.    For patent infringement, as it says here, it's about

10  $1 and-a-half, a little over $1 and-a-half million for the

11  patent infringement period.

12  Q.    And for the other claims?

13  A.    Well for the lost profits, it's about $2.5 million,

14  let's say.  That is about right, for the other claims.

15        And for the unjust enrichment, it's about

16  $1.9 million.  And that subtracts out costs.  I subtract out

17  costs in the unjust enrichment one.

18  Q.    And, Dr. Langenfeld, just to be clear, do you believe

19  these numbers are correct?

20  A.    No, I think he has overstated the damages here.

21  Q.    And what do you believe the damages would be, taking

22  into account proper economic analysis here?

23  A.    Well, I'll still make the assumption that the chain

24  is not broken for Panduit or the other items.

25  Q.    So just to interrupt.  Do you believe that there

Langenfeld - cross

1    should be no damages awarded here?

2    A.    Well, I think that absent showing the length --

3              MS. SHARP:  Objection, Your Honor.  His personal

4    belief is irrelevant.

5              MR. LINDVALL:  That's true.  That's true.

6    BY THE WITNESS:

7    A.    My analysis -- I shouldn't say belief, you are right.

8    My analysis tells me that there is inadequate evidence to

9    show any damages here.

10   Q.    But if there were damages, what would your

11   conclusions be?

12   A.    My conclusions would be that lost profits based on

13   cassette sales, assuming the shape of the tube drives the

14   cassettes, would be about $233,000.  And for the other

15   claims for lost profits, about $454,000.  And for unjust

16   enrichment, about $509,000.

17   Q.    And you believe Mr. Ellis's damages numbers are

18   overstated?

19   A.    Yes, they're highly overstated.

20             MR. CAHR:  Thank you.  No further questions,

21   Your Honor.

22             THE COURT:  Okay.  Cross-examination.

23                    CROSS-EXAMINATION

24   BY MS. SHARP:

25   Q.    Good afternoon --

1008

Langenfeld - cross

1   A.      Good afternoon.

2   Q.      -- Dr. Langenfeld.  We have not had the opportunity

3   to meet before; is that correct?

4   A.      That is correct.

5   Q.      I just have a few questions for you.  You made

6   references to having issued several reports in this case,

7   and I want to talk about the others that are not in

8   evidence.

9           You first generated a report in this case on

10  August 12th of 2011; correct?

11  A.      Yes.

12  Q.      And then you corrected that first report on August

13  19th, 2011?

14  A.      Yes, there were some minor corrections that came to

15  my attention which I immediately corrected.

16  Q.      And then you supplemented your corrected report on

17  August 25th of 2011?

18  A.      Yes, when there was information disclosed that the

19  financials that had been provided to me by AHG were not what

20  they were represented to be, and therefore I had to go back

21  and re-do some analyses because they said one thing and then

22  it was disclosed they actually were calculated a different

23  way.

24  Q.      Dr. Langenfeld, it's not that they said one thing.

25  It's that you understood them incorrectly to say something,

Langenfeld - cross

1   and as a result you included a regression analysis.

2   Correct?

3   A.      Regression analyses can be useful.  I authored

4   several articles.  I am an expert on regression analysis.

5   But the problem was your client had financial statements

6   that labeled something called fixed costs.  It wasn't my

7   interpretation.  It's what it said.  That's what it said.

8   It's what was represented in Mr. Ellis's report as fixed

9   costs.

10           So I took it at its word, because there was no

11  additional description of what that was.  I looked at it.  I

12  took it at its word.  And then after the fact was disclosed,

13  well, we are just estimating base costs, and that certainly

14  made the regression analysis not useful because it was

15  modeled so it would be actually fixed costs and not what it

16  was later disclosed to be.

17  Q.      The costs that you are referring to is information

18  that AHG allocated its costs to each and every one of its

19  products based on revenue.  Right?

20  A.      Right, that was not disclosed.

21  Q.      And Broetje didn't do that at all.  Broetje didn't

22  allocate costs to any of the three system components.

23  Correct?

24  A.      No.  It has costs for the system components.  That's

25  not correct.

Langenfeld - cross

1   Q.      So you are saying that you have cost data for the

2   cassettes that is specific to the cassettes?

3   A.      Yes.  Well, it's similar to what -- I should correct

4   that.  It's similar to what the cost information that AHG

5   has, where you have a certain amount of overhead costs, and

6   you have input costs that go into a variety of different

7   products.

8           So it's very similar to what AHG does.  It's not

9   everything that is -- it is specific to a project.  It's not

10  always specific to every single piece of the project.

11  Q.      Doctor, after your first report and your second

12  report, you supplemented your corrected report on August

13  25th and then you did a fourth supplemental report on March

14  21st, 2014.  Right?

15  A.      Right.  Just the way Mr. Ellis had done when we got

16  updated information, that's correct.

17  Q.      And it's that fourth report that is in evidence.

18  Correct?

19  A.      That would be the most current because it reflects

20  the best information.  So the answer to that would be yes.

21  Q.      You made reference in your testimony to your

22  assignment.  Your assignment was made to you by Broetje.  Is

23  that correct?

24  A.      By the attorneys I was working with, not directly

25  from Broetje.  To clarify.  The attorneys are the ones who

1   asked me.

2              MS. SHARP:  Your Honor, in the interests of

3   time, we will call Mr. Ellis in rebuttal to address the

4   criticisms that were leveled at him here.

5              THE COURT:  Okay.  No further questions?

6              MS. SHARP:  No further questions.

7              THE COURT:  Any redirect?

8              MR. CAHR:  No further questions, Your Honor.

9              THE COURT:  You may step down.  Thank you.

10             (Witness excused.)

11             MR. KELLEHER:  Your Honor, we are prepared to

12  rest our case, subject to a motion to move exhibits that may

13  not be in yet.

14             THE COURT:  Do you want to do that now?

15             MR. KELLEHER:  Now or outside the presence of

16  the jury?

17             THE COURT:  Let's do it now.

18             MR. KELLEHER:  Exhibits 188, 1173, 1290, 26,

19  1223B, 1223C, 1173.  And there may be others, Your Honor.

20  With your permission, we can move them later on.

21             THE COURT:  Any objection to those that were

22  just admitted?

23             MR. LINDVALL:  No, Your Honor.

24             THE COURT:  Any objection to them supplementing

25  later?

1012

1     MR. LINDVALL:  No.  I assume this list comes

2  from the testimony.

3     THE COURT:  Can you represent that?

4     MR. KELLEHER:  These have been used, Your Honor,

5  yes.

6     THE COURT:  Those are all admitted and you are

7  permitted to supplement.

8     (DTX-188, DTX-1173, DTX-1290, DTX-26, DTX-1223B,

9  DTX-1223C, DTX-1173 admitted into evidence.)

10     THE COURT:  So the defense has rested.

11     Mr. Lindvall.

12     MR. LINDVALL:  Your Honor, we have a rebuttal

13  witness.  But also, with respect to Rule 50, would you like

14  to hear those now?

15     THE COURT:  We will wait until later.  But it's

16  noted that you have such a motion.  So you can call your

17  witness.

18     MR. LINDVALL:  I would like to call Mr. Ellis.

19     MS. SHARP:  Your Honor, AHG's next witness on

20  rebuttal is Mr. Ellis.

21     THE COURT:  Mr. Ellis, come on back.

22     ... DOUGLAS N. ELLIS, having been previously

23  sworn, was examined and testified further as follows...

24     THE COURT:  I remind you that you are under

25  oath.  You may proceed.

Ellis - direct

1           MS. SHARP:  Thank you, Your Honor.

2                     DIRECT EXAMINATION

3     BY MS. SHARP:

4     Q.     Mr. Ellis, you heard the command.  We have only a few

5     minutes to do this.  Let's get right to it.

6                You were present in the courtroom to hear Dr.

7     Langenfeld's criticisms of your testimony.  Is that correct?

8     A.     Yes.

9     Q.     So let's start first with the Panduit factors.  Is

10    Dr. Langenfeld's analysis of demand correct under the

11    Panduit factors?

12    A.     As I understand it, no.  The test actually is, is

13    there demand for the patented product?  Do customers buy it?

14    It's a simple test.

15    Q.     And how is that test satisfied?

16    A.     Through sales.  I have done dozens, hundreds of

17    cases.  It's the same every time.

18    Q.     Is Dr. Langenfeld conflating the demand requirement

19    with some other analysis?

20    A.     Yes.  It's an analysis that's not needed with that

21    factor in Panduit.  It is a different idea.

22    Q.     Let's just stick with that idea before we go back to

23    the remainder of the Panduit factors.

24                Did you express an opinion about what drives the

25    sales of the accused cassette systems?

Ellis - direct

1    A.     Yes.  It's the patented technology, the tube and the

2    stop member.  It is the whole reason for the cassette.  And

3    the cassette is the whole reason that the system was

4    designed, and that's what people buy and that's what drives

5    the sale.

6    Q.     There was an inverted triangle.  Does the testimony

7    that you are giving now relate at all to the inverted

8    triangle that Dr. Langenfeld referred to?

9    A.     It does.  I see this, I mean, my every-day comparison

10   is a razor and a blade.  You might have a patent on the

11   razor itself, but the money is in the blade.  And the

12   patentholder tries to capture all of the value it can

13   through the sales of both of those components.  So it's not

14   unusual to see a patented device with smaller sales and all

15   the things that go with it have bigger sales.

16   Q.     Then if we can go back to the Panduit factors.  You

17   have already talked about demand.  I think you previously

18   gave testimony regarding manufacturing and marketing

19   capacity.  Do you have any response on the criticisms that

20   Dr. Langenfeld aimed at you on those propositions?

21   A.     Yes.  My response is that AHG at the time they were

22   working with Broetje was maintaining the actual level of

23   sales that we calculated that AHG would have lost.  So they

24   were already able to do that.  And then in the more -- of

25   course, the sales dropped off.  And it's very hard to ramp

1015

Ellis - direct

1    up a sales force when you have no sales.  So they were low

2    for a while.  And recently they have taken off and shown

3    that they can handle those sales as well at the back end.

4    Q.      Dr. Langenfeld said -- and I am paraphrasing --

5    something like F2C2 only has four employees; therefore, they

6    cannot do the manufacturing.  Do you agree with that?

7    A.      No.  They always had that many.  And look at what

8    they are doing now.  Their sales are about eight times

9    Broetje's sales in the U.S. today, for the last two years.

10   Q.      Is AHG's manufacturing outsourced or is it done at

11   F2C2?

12   A.      I think both.  It's primarily outsourced.  So outside

13   suppliers are the ones who meet that extra demand.  And

14   that's how they have always done it.

15   Q.      Going to the proposition of acceptable non-infringing

16   substitutes, are hoppers acceptable non-infringing

17   substitutes?

18   A.      No.  And neither are bowls.  These are things that

19   have been around since the eighties, and they kind of faded

20   out in the nineties.  And for this application, the only

21   game in town is automated fastener feed systems and cassette

22   delivery systems.

23   Q.      Dr. Langenfeld made reference to the ElectroImpact

24   cassette.  Is that an acceptable non-infringing substitute?

25   A.      No, it's not.  We can't trace the one sale of

Ellis - direct

1    ElectroImpact that was made.  But we can't show that it

2    happened any time during the damages period.  And by the

3    way, ElectroImpact's technology did not survive.  They are

4    actually a customer of AHG.  They buy their stuff from AHG.

5    Q.     In your expert opinion, are the Panduit factors

6    satisfied in this case?

7    A.     Yes.

8    Q.     Another area of disagreement between your two reports

9    relates to the calculation of the Broetje units sold.  What

10   did you rely on for the number of units sold?

11   A.     I relied on the sales summaries, the same one that

12   Dr. Langenfeld relied on, that was a secondary source for

13   me.

14          My real source was invoices and delivery slips

15   and things like that.

16   Q.     Just to divert to those sales summaries very briefly,

17   how many of those sales summaries did Broetje generate here?

18   A.     There were seven.  And they were all inconsistent

19   with each other and inconsistent with the underlying

20   documents.

21   Q.     Is that what made you go to the underlying documents

22   to get the unit sales correct?

23   A.     I think I felt like I had to do that after the second

24   or third one.

25   Q.     Another area of disagreement that you have relates to

Ellis - cross

1    costs and how costs are used in unjust enrichment.  What is

2    your understanding of who bears the burden of proof on the

3    issue of costs?

4    A.    Broetje does.  And if they don't give me the stuff I

5    need, I can't calculate it.

6    Q.    Did they give you reliable cost data here?

7    A.    No.  But I asked for it.

8    Q.    What was unreliable about their cost data?

9    A.    It's at the giant project level.  And this thing is

10   so tiny, there is no relation.  These projects are custom.

11   The automated fastener feed system was designed once.  It's

12   not a custom deal.  Custom things are expensive.  This

13   system is not.

14   Q.    I am now getting the hook.  So I thank you for

15   joining us again.

16           THE COURT:  Thank you.  Cross-examination.

17                    CROSS-EXAMINATION

18   BY MR. CAHR:

19   Q.    Mr. Ellis, I have one question for you.  You said

20   that, just now, that the patent on the tube drives the sales

21   of the cassette.  Is that correct?

22   A.    I might have said the tube and the stop member.  The

23   patented technology is the reason for the existence of the

24   cassette, yes.

25   Q.    So all sales are driven by the demand for the

Ellis - cross

1  patented features.  Is that what you are saying?

2  A.      The sales of the accused cassettes are driven by the

3  demand for the patented technology, yes.

4  Q.      So did the trade dress drive any of the sales?

5  A.      The trade dress -- again, this is the Coke example --

6  when I look at the Coke bottle, or I guess the can that you

7  guys showed at the beginning, I really want what's inside.

8  But I recognize that by the way it looks.  So when people

9  see AHG's cassettes or the ones that look like AHG, they

10 expect something that works and they expect it to be good.

11 Q.      So you calculated trade dress damages going back to

12 2003.  Correct?

13 A.      Again, there is that distinction, if you look at

14 patent damages --

15 Q.      I am not making that argument.  Just a simple

16 question.

17 A.      2005, or '03, I would be wanting to look at it.

18 Q.      And you calculated patent damages up to 2009.

19 Correct?

20 A.      December 7, 2009, correct.

21 Q.      So there was a period of time when you were

22 calculating damages for both trade dress and patent

23 infringement.  Correct?

24 A.      Yes.

25 Q.      And so it is not possible that the trade dress and

1019

Kytomaa - direct

1    the patented technology were both driving a hundred percent

2    of the sales at the same time.  Correct?

3    A.    I don't know that I can separate those for that time

4    period.

5              MR. CAHR:  No further questions.

6              THE COURT:  Redirect.

7              MS. SHARP:  I am told I don't have any.

8              THE COURT:  You may step down.  Thank you.

9              (Witness excused.)

10             THE COURT:  What's next?

11             MR. LINDVALL:  We have one last witness.  Dr.

12   Kytomaa, please.

13             ... HARRI KYTOMAA, having been previously sworn,

14   was examined and testified further as follows ...

15             MR. LINDVALL:  Dr. Kytomaa will be talking about

16   testimony relating to Mr. Lawrence's testimony about

17   validity.

18             THE COURT:  Welcome back, Dr. Kytomaa.  I remind

19   you you remain under oath.

20                    DIRECT EXAMINATION

21   BY MR. LINDVALL:

22   Q.    Could we have DTX-149, please.  You listened to the

23   testimony of Mr. Lawrence.  Correct?

24   A.    Yes, I did.

25   Q.    You understand he gave testimony about invalidity

Kytomaa - direct

1    based on Shinjo and Offutt.  Correct?

2    A.    Yes, that's correct.

3    Q.    And there wasn't any other references that you heard.

4    Correct?

5    A.    That's correct.

6    Q.    Now, with respect to Shinjo, could you explain to the

7    jury -- first of all, is it your opinion that Shinjo does

8    not invalidate any of the claims of the two patents?

9    A.    Yes.  It's my opinion that it does not invalidate.

10   Q.    What is that opinion based on?

11   A.    It's based on my review of the patents.

12   Q.    Okay.  Could you give the jury an explanation of why

13   you believe that with Shinjo?

14   A.    Yes.  To render the patent invalid, the Shinjo patent

15   must have all the elements of any one claim.  And so I went

16   through the analysis, as did Mr. Lawrence earlier today, and

17   it just does not.  It is as simple as that.  It does not

18   contain all the elements of any one claim.

19   Q.    Which elements does Shinjo not contain, after hearing

20   Mr. Lawrence's claim?

21   A.    There are many elements it does not contain.

22   Q.    Can you give the jury a couple?

23   A.    It does not have any passageways or grooves.

24   Specifically, the Shinjo patent describes a channel, which

25   is the entire cross-sectional area of the tubes that are

Kytomaa - direct

1   shown here.

2              It does not provide peripheral guiding, which is

3   in the elements of the claim.

4              It does not have objects that have axes of

5   symmetry, inputs don't have axes of symmetry.

6              The nuts are not aligned in the direction of the

7   length of the tube, as is required by both the '216 and the

8   '339 patent.

9              Those are some examples.

10  Q.    If we turn to PDTX-150, please.  What does this

11  represent?

12  A.    This image represents what I just mentioned.  In

13  fact, there is a definition here.  As you can see, I will

14  read it, "As shown in Figure 2, the tube 2 has a rectangular

15  cross-sectional configuration and the inner walls of the

16  tube 2 define channels 2a."

17             So the grooves that Mr. Lawrence spoke about,

18  actually, are actually the yellow channel.

19  Q.    These yellow channels, are these grooves, according

20  to the patent?

21  A.    Those yellow channels are not grooves or passageways.

22  According to this patent, they are just the channel of the

23  rectangular tube.

24  Q.    Now, if I could turn to -- let me ask you this

25  question:  Does Shinjo have any stop members?

Kytomaa - direct

1    A.      No, it does not.

2    Q.      If we could pull up DTX-1031, please.

3            This is it.

4            Why not?

5    A.      Well, what I am showing you here is actually Mr.

6    Lawrence's exhibit.  And as you can see, Mr. Lawrence put up

7    this slide that says stop members and then he highlights

8    Items 6 and 7, right out of the Shinjo patent, and says

9    these are stop members.

10   Q.      If we could turn to Slide PDTX-148.  What does this

11   represent?

12   A.      If you read the Shinjo patent as to what Item 6 and 7

13   are, and I have just provided the language here, I will

14   read, "The body 2 includes a pneumatic inlet opening 6 at an

15   inner end 4 and a pneumatic output opening 7."

16           So 6 and 7 are the opposite of stop members.

17   They are actually designed to allow air in and out.  They

18   are openings, not closings.

19   Q.      Okay.  If we could turn to PDTX-151, please.

20           I believe you testified just a minute ago that

21   Shinjo does not show peripheral guiding; is that correct?

22   A.      That's correct.  The claim elements of both the '216

23   and '339 patents require guiding of the rivets and the

24   objects that pass through the tube.

25           The Shinjo patent, and specifically peripheral

Kytomaa - direct

1    guiding, so guiding around the periphery of those objects,

2    if you read the detail of Shinjo -- and I will read here and

3    I highlighted the key piece:

4              The self-piercing nuts 8 are disposed so as to

5    be slideable on only one of the inside walls.

6              Okay?  So this is not peripheral guiding, and

7    this is actually also shown in an image that we had at the

8    very beginning.  If you could bring that back up, because I

9    want do show the surface that is guiding in Shinjo is not

10   the periphery, it's the image of the nuts within.

11   Q.    Let's have PDTX-149, please.

12   A.    So you can see the nuts are up against the right

13   side.  So the nuts are only sliding on that surface, make no

14   contact with any other part of the channel.  That is because

15   they go around and centrifugal force is pushing against that

16   side.

17   Q.    All right.  Let's switch quickly to PDTX-142, please.

18             And you heard Mr. Lawrence give some testimony

19   about Offutt; is that correct?

20   A.    I did.

21   Q.    And does Offutt invalidate any of the claims of the

22   patent?

23   A.    It does not.

24   Q.    Why not?

25   A.    Well, Offutt as a matter of background, Offutt is

Kytomaa - direct

1    the Second World War era patent, of the very era of Rosy the

2    Riveter.  This is a male riveter.  And this is filed during

3    the war, awarded immediately after the war.  And it shows

4    the technology, obviously very old technology which was a

5    circular tube technology.  As you heard from Mr. Lawrence, I

6    agree that the tube contains rivets, and you sort of kind of

7    hang it over your shoulder as you can see here.  And No. 20,

8    in the fellow's left-hand side here, is simply a device like

9    a chuck that allows him to place rivets into predrilled

10   holes.

11   Q.    Okay.  Let's look at DTX-1029, please.

12         And this is the Offutt patent; correct?

13   A.    That's right.  So this is the device that the

14   gentleman is holding in his left hand.

15   Q.    Now, are there any grooves in any of these devices?

16   A.    There are no grooves at all.  These are circular

17   cross-sections.

18   Q.    And you are looking at Figures 2 and 4 and 1; is that

19   correct?

20   A.    Yes.  I have actually looked at all of the figures of

21   this entire patent.

22   Q.    Let's switch quickly to PDTX-66, please.

23         And this is a slide that the Broetje showed

24   during their opening statement.  And do you recall this

25   slide?

Kytomaa - direct

1    A.      I remember seeing this slide, yes.

2    Q.      Okay.  And it says it does not infringe and this

3    might infringe.  Do you agree with that?

4    A.      I do not agree with that.

5    Q.      Let's look at PDTX-67, please.

6            Now, you have modified this slide; correct?

7    A.      Yes.

8    Q.      And why did you modify it?

9    A.      Well, all I did here is I utilized -- as you can see,

10   the right-hand side drawing which is from Broetje is an

11   excerpt from an engineering drawing, and the excerpt from

12   the engineering drawing shows, along a black dotted line,

13   the hollow center of the tube.  And that's a very important

14   concept in the patents, in the '216 and '339 patents because

15   the rivets have to be compatible with that hollow center as

16   you have already heard many times I'm sure.

17   Q.      Okay.

18   A.      So I highlighted, in yellow, the hollow center in

19   both.

20   Q.      Let's look at PDTX-68, please.

21           So what are you showing here?

22   A.      What I'm showing here are the passageways or the

23   grooves in both of these geometrical shapes, cross-sections

24   of tubes.

25   Q.      Okay.  And this one is represented as Broetje's;

1    correct?

2    A.     Yes.  As you can see, both the grooves open into the

3    hollow center as required by the claim construction in both

4    cases.

5    Q.     What is your opinion again with respect to Broetje's

6    product, whether it infringes or not?

7    A.     So both of these infringe.

8              MR. LINDVALL:  Thank you.  I have no further

9    questions.

10             THE COURT:  Any cross?

11             MR. KELLEHER:  Nothing at this time, Your Honor,

12   in the interest of time.

13             THE COURT:  Okay.  You may step down.

14             THE WITNESS:  Thank you.

15             THE COURT:  Thank you.

16             Mr. Lindvall.

17             MR. LINDVALL:  No further witnesses, Your Honor.

18             THE COURT:  Okay.  So you rest?

19             MR. LINDVALL:  Yes, Your Honor.

20             THE COURT:  Okay.  Mr. Kelleher.

21             MR. KELLEHER:  We rest as well, Your Honor,

22   subject to making a motion on the exhibits submitted.

23             THE COURT:  So that completes the evidence?

24             MR. KELLEHER:  And we make the usual motion.  We

25   renew the usual motion.

```
 1              MR. LINDVALL:  We may have some exhibits.  We'll
 2    look at it.  We'll both look at our notes and see if we have
 3    exhibits.
 4              THE COURT:  Okay.  Is there anything else,
 5    Mr. Kelleher?  No?
 6              MR. KELLEHER:  We move under 50(a) we carried
 7    the burden on our defense.
 8              THE COURT:  Right.  Okay.  We'll talk about the
 9    motions further at a break, but no further evidence from
10    either side; correct, Mr. Kelleher?
11              MR. KELLEHER:  (Nodding yes.)
12              MR. LINDVALL:  Correct.
13              THE COURT:  All right.  Thank you.  Ladies and
14    gentlemen of the jury, as you have heard, we are done with
15    the evidentiary portion of the trial.  There are no further
16    witnesses or testimony.
17              What remains is for me to instruct you on the
18    law and for you to hear closing arguments from both sides.
19    The way we're going to proceed is I'm going to read you most
20    but not all of the jury instructions today, but as you will
21    see shortly, it's a fairly lengthy document and it's not
22    100 percent finished yet, so I'm going to need a little bit
23    of time to finish up my work and pull that together.  So as
24    a result, I'm going to give you your afternoon break now and
25    it's going to be a longer break.
```

1    Please be ready to begin at 3:15.  So you're

2  free, if you wish, to go out.  That's fine.  But be back

3  here in time so that if I do manage to get my work done,

4  I'll be ready to read these instructions to you at 3:15.

5    Once I have finished reading the portion of

6  instructions you need to hear today, we'll let you go for

7  today, and then tomorrow morning you will hear the closing

8  arguments, and you will hear the remainder of my

9  instructions.

10    In the time between now and when I next see you,

11  no talking about the case; and you are free until 3:15.

12    (Jury left courtroom.)

13    THE COURT:  All right.  Just a few quick

14  questions -- have a seat -- regarding the jury instructions

15  before we go print them off for everyone.

16    On the foreign law proposal that we had, any

17  comments or concerns or objections from the plaintiff?

18    MR. LINDVALL:  No, Your Honor.

19    THE COURT:  And how about from the defendant?

20    MR. KELLEHER:  Your Honor, we had one

21  suggestion.  Four lines up from the bottom where it says

22  "United States law," to say after that, "and the plaintiffs

23  are not asserting a breach of contract claim here."

24    THE COURT:  Is there any objection to me adding

25  that?

1        MR. LINDVALL:  Your Honor, I think it just

2   complicates the matter and brings it, the concept of breach

3   back into the case.  I guess -- I don't want to say we're

4   asserting it, but, you know, there has been representations

5   they don't breach, and I just think it causes confusion.

6   It's better to leave it the way you had it.  I think it's a

7   lot clearer that way.

8        THE COURT:  I'm going to add that because

9   I'm afraid otherwise it might imply to the jury that they

10   should be concerned about a breach when I'm telling them

11   that they shouldn't be concerned about a breach and that

12   they shouldn't be concerned about a breach overseas.  So

13   in any event, I will add the phrase requested by the

14   defendants.

15        On statute of limitations -- and by the way,

16   after I read through the instructions, either later today or

17   sometime tomorrow, I'll put on the record our reasoning for

18   the decisions that you will see embodied in the instructions

19   but I'm not going to make the jury sit here waiting for me

20   to do that.

21        On statute of limitations, there, the conceptual

22   agreement yesterday, the first time it comes up, what I have

23   in front of me now is currently labeled 11.6.  I don't know

24   what it was yesterday, but let me just read this to you and

25   make sure it sounds as if it accurately reflects the agreement

1    that conceptually that two or three year whatever window

2    changes going forward and that plaintiffs aren't trying to

3    recapture older infringement under the continuous infringement

4    doctrine.

5           So I'm going to say something along the lines

6    of:  The Broetje Parties contend that AHG's lawsuit was not

7    filed within the time set by law.  I instruct you that you

8    can only find the Broetje Parties liable for trade dress

9    infringement that AHG proves occurred after particular date,

10   here May 12th, 2006.  You cannot find the Broetje Parties

11   liable for any trade dress infringement that may have

12   occurred before May 12th, 2006.

13          Does that sound consistent with the plaintiffs'

14   view?

15          MR. LINDVALL:  I believe so, Your Honor.

16          THE COURT:  Okay.  Defendants, does that sound

17   consistent?

18          MR. CAHR:  Yes, I think that is correct.

19          THE COURT:  All right.  Well, we'll go pull

20   these together.  We will try to get you copies to look at

21   before I start reading them to the jury.  But in any event,

22   I'll be reading them to the jury at 3:15 or thereabouts.

23          We will be in recess.

24          (Brief recess taken.)

25              *      *      *

```
 1              (Proceedings reconvened after recess.)

 2              THE COURT:  All right.  Before we bring the jury

 3    in, for the record, we finished the jury instructions.  We

 4    sent in two copies for each side as soon as we got them

 5    printed.  We'll get them docketed.

 6              I will be reading as much as I can, certainly

 7    not past page 95 and I'm doubtful I will get that far.  I

 8    have another matter at 4:30 so I'll be stopping no later

 9    than 4:25 and we'll see how far I get.

10              The verdict sheet we'll get to you some time

11    this evening you will be seeing it.

12              Are there any questions before I bring the jury

13    in?

14              MR. LINDVALL:  No.  The only thing, Your Honor,

15    on the statute of limitations, I know you read it in, but do

16    you accept these factors continue to accrue doctrine.

17              THE COURT:  Yes, what I have written and read to

18    you was meant to capture that.

19              MR. LINDVALL:  I see.

20              THE COURT:  Which was by agreement as I

21    understood it yesterday.  Is there anything from defendants?

22              MR. KELLEHER:  No, Your Honor.

23              THE COURT:  Okay.  And I will put my reasoning

24    on the record.

25              MR. LINDVALL:  Your Honor, there is our motions,
```

1    our post-trial motions.

2             THE COURT:  Not right now.

3             MR. LINDVALL:  Okay.

4             THE COURT:  We'll do that probably tomorrow

5    morning at this point.

6             MR. LINDVALL:  Okay.

7             THE COURT:  Okay.  Thank you.  We'll bring the

8    jury in.

9             (Jury returned.)

10            THE COURT:  Welcome back, ladies and gentlemen.

11   Mr. Golden, before you sit down, if you could pass to our

12   jurors their copy of the final instruction.  It's a very

13   long document, as you can see.  We will not get through all

14   of it this afternoon.  I promise you that you will be out of

15   here by 4:30 today and we'll pick up wherever we leave off

16   in the morning.

17            As with the preliminary instructions, this is

18   your copy.  Feel free to read along as I read it to you,

19   your choice, but you will have your copy with you in the

20   juryroom when I deliberate.  I'm going to begin on page 1.

21            Section 1 is entitled General Instructions - End

22   of Trial.

23            1.1.  Introduction.

24            Members of the jury, now it is time for me to

25   instruct you about the law that you must follow in deciding

1    this case.

2              I will start by explaining your duties and the

3    general rules that apply in every civil case.

4              I will explain some rules that you must use in

5    evaluating particular testimony and evidence.

6              I will then explain the positions of the parties

7    and the law you will apply in this case.

8              Finally, I will explain the rules that you must

9    follow during your deliberations in the juryroom and the

10   possible verdicts that you may return.

11             Please listen very carefully to everything I

12   say.

13             You will have your written copy of these

14   instructions with you in the juryroom for your reference

15   during your deliberations.  You will also have a verdict

16   form, which will list the questions that you must ask answer

17   to decide this case.

18             1.2.  Duty of the Jury.

19             You have two main duties as jurors.  The first

20   one is to decide what the facts are from the evidence you

21   saw and heard here in court.  Deciding what the facts are is

22   your job, not mine, and nothing that I have said or done

23   during this trial was meant to influence your decision about

24   the facts in any way.

25             Your second duty is to take the law that I give

1  you, apply it to the facts, and decide under the appropriate

2  burden of proof, which party should prevail on each of the

3  issues presented.  It is my job to instruct you about the

4  law, and you are bound by the oath that you took at the

5  beginning of the trial to follow the instructions that I

6  give you, even if you personally disagree with them.  This

7  includes the instructions that I gave you before and during

8  the trial, and these instructions.  All of these instructions

9  are important, and you should consider them together as a

10  whole.

11       Perform these duties fairly.  Do not let any

12  bias, sympathy or prejudice that you may feel toward one

13  side or the other influence your decision in any way.

14       1.3.  Evidence Defined.

15       You must make your decision based only on the

16  evidence that you saw and heard here in court.  Do not let

17  rumors, suspicions, or anything else that you may have seen

18  or heard outside of court influence your decision in any way.

19       The evidence in this case includes only what the

20  witnesses said while they were testifying under oath

21  (including deposition testimony that has been played or read

22  to you), the exhibits that I allowed into evidence, and the

23  stipulations that the lawyers agreed to.  I don't believe

24  there were any, but if there were, I would have read them to

25  you at the beginning of the case.

1        Nothing else is evidence.  The lawyers'

2    statements and argument are not evidence.  Their questions

3    and objections are not evidence.  My legal rulings are

4    not evidence.  Any of my comments and questions are not

5    evidence.  The notes taken by any juror are not evidence.

6        During the trial I may have not let you hear the

7    answers to some of the questions that the lawyers asked.  I

8    also may have ruled that you could not see some of the

9    exhibits that the lawyers wanted you to see.  You must

10   follow my orders and completely ignore all of these things.

11   Do not even think about them.  Do not speculate about what a

12   witness might have said or what an exhibit might have shown.

13   These things are not evidence, and you are bound by your

14   oath not to let them in fluens your decision in any way.

15       Further, sometimes I may have ordered you to

16   disregard things that you saw or heard, or struck things

17   from the record.  You must follow my instructions to

18   completely disregard such things you saw or heard, and

19   completely ignore those things struck from the record.  Do

20   not even think about them.  These things are not evidence,

21   and you are bound by your oath not to let them influence

22   your decision in any way.

23       Make your decision based only on the evidence,

24   as I have defined it here, and nothing else.

25       1.4.  Direct and Circumstantial Evidence.

1    You may have heard the terms "direct evidence"

2    and "circumstantial evidence."

3    Direct evidence is simply evidence like the

4    testimony of an eyewitness which, if you believe it,

5    directly proves a fact.  If a witness testified that he saw

6    it raining outside, and you believe him, that would be

7    direct evidence that it was raining.

8    Circumstantial evidence is simply a chain of

9    circumstances that indirectly proves a fact.  If someone

10   walked into the courtroom wearing a raincoat covered with

11   drops of water and carrying a wet umbrella, that would be

12   circumstantial evidence from which you could conclude that

13   it was raining.

14   It is your job to decide how much weight to give

15   the direct and circumstantial evidence.  The law makes no

16   distinction between the weight that you should give to

17   either one, nor does it say that one is any better evidence

18   than the other.  You should consider all of the evidence,

19   both direct and circumstantial, and give it whatever weight

20   you believe it deserves.

21   1.5.  Consideration of Evidence.

22   You should use your common sense in weighing

23   the evidence.  Consider it in light of your everyday

24   experience with people and events, and give it whatever

25   weight you believe it deserves.  If your experience tells

1    you that certain evidence reasonably leads to a conclusion,

2    you are free to reach that conclusion.

3              1.6.  Statements of Counsel.

4              A further word about statements and arguments

5    of counsel.  The attorneys' statements and argument are not

6    evidence.  Instead, their statements and arguments are

7    intended to help you review the evidence presented.  If you

8    remember the evidence differently from the attorneys, you

9    should rely on your own recollection.

10             The role of attorneys is to zealously and

11   effectively advance the claims of the parties they represent

12   within the bounds of the law.  An attorney may argue all

13   reasonable conclusions from evidence in the record.  It is

14   not proper, however, for an attorney to state an opinion as

15   to the truth or falsity of any testimony or evidence.  What

16   an attorney personally thinks or believes about the testimony

17   or evidence in a case is not relevant, and you are instructed

18   to disregard any personal opinion or belief concerning test-

19   imony or evidence that an attorney has offered during opening

20   or closing statements, or at any other time during the

21   course of the trial.

22             1.7.  Credibility of Witnesses.

23             You are the sole judges of each witness's

24   credibility.  You should consider each witness's means of

25   knowledge; strength of memory; opportunity to observe; how

1  reasonable or unreasonable the testimony is; whether it is

2  consistent or inconsistent; whether it has been contradicted;

3  the witness's biases prejudices or interests; the witness's

4  manner or demeanor on the witness stand; and all circumstances

5  that, according to the evidence, could affect the credibility

6  of the testimony.  If you find the testimony to be contra-

7  dictory, you must try to reconcile it, if reasonably possible,

8  so as to make one harmonious story of it all.  But if you

9  can't do this, then it is your duty and privilege to believe

10  the testimony that, in your judgment, is most believable

11  and disregard any testimony that, in your judgment, is not

12  believable.

13         In determining the weight to give to the

14  testimony of a witness, you should ask yourself whether

15  there was evidence tending to prove that the witness

16  testified falsely about some important fact and whether

17  there was evidence that at some other time the witness said

18  or did something, or failed to say or do something, that was

19  different from the testimony the witness gave at the trial.

20  You have the right to distrust such witness's testimony in

21  other particulars and you may reject all or some of the

22  testimony of that witness or give it such credibility as you

23  may think it deserves.

24         You should remember that a simple mistake by a

25  witness does not necessarily mean that the witness was not

1  telling the truth.  People may tend to forget some things or

2  remember other things inaccurately.  If a witness has made

3  a misstatement, you must consider whether it was simply an

4  innocent lapse of memory or an intentional falsehood, and

5  that may depend upon whether it concerns an important fact

6  or an unimportant detail.

7          This instruction applies to all witnesses.

8          1.8.  Number of Witnesses.

9          One more point about the witnesses.  Sometimes

10  jurors wonder if the number of witnesses who testified makes

11  any difference.

12          Do not make any decisions based on the number of

13  witnesses who testified.  What is more important is how

14  believable the witnesses were, and how much weight you think

15  their testimony deserves.  Concentrate on that, not the

16  numbers.

17          1.9.  Expert Witnesses.

18          Expert testimony is testimony from a person who

19  has a special skill or knowledge in some science, profession,

20  or business.  This skill or knowledge is not common to the

21  average person but has been acquired by the expert through

22  special study or experience.

23          In weighing expert testimony, you may consider

24  the expert's qualifications, the reasons for the expert's

25  opinion, and the reliability of the information supporting

1    the expert's opinions, as well as the factors I have

2    previously mentioned for weighing testimony of any other

3    witness.  Expert testimony should receive whatever weight

4    and credit you think appropriate, given all the other

5    evidence in the case.  You are free to accept or reject the

6    testimony of experts, just as with any other witness.

7              1.10.  Deposition Testimony.

8              A deposition is the sworn testimony of a witness

9    taken before trial.  The witness is placed under oath and

10   swears to tell the truth, and lawyers for each party may ask

11   questions.  A court reporter is present and records the

12   questions and answers.  The deposition may also be recorded

13   on videotape.

14             During the trial, certain testimony was

15   presented to you by the reading of a deposition transcript

16   or the playing of video excerpts from a deposition.

17   Deposition testimony is entitled to the same consideration

18   and is to be judged, insofar as possible, in the same way as

19   if the witness had been present to testify.

20             1.11.  Burdens Of Proof.

21             AHG is accusing the Broetje Parties of patent

22   infringement, trade dress infringement, unfair competition,

23   and intentional interference with prospective economic

24   advantage.  AHG has the burden of proving its claims and the

25   amount of its money damages, if any, by what is called a

1   preponderance of the evidence.  That means AHG has to

2   produce evidence which, when considered in light of all of

3   the facts, leads you to believe that what AHG claims is more

4   likely true than not.  To put it differently, if you were to

5   put the evidence of AHG and the Broetje Parties concerning

6   infringement on opposite sides of a scale, the evidence

7   supporting AHG's claims would have to make the scales tip

8   somewhat on its side in each instance.  If the scale should

9   remain equal or tip in favor of the Broetje Parties, you

10  must find for the Broetje Parties.  If you find that the

11  Broetje Parties infringed one or more of the patent claims

12  that have been asserted in this case, then as a separate

13  question, AHG has the burden of proving its additional

14  contention that the infringement was willful by clear and

15  convincing evidence.  Clear and convincing evidence is

16  evidence that produces an abiding conviction that the truth

17  of a factual contention is highly probable.  Proof by clear

18  and convincing evidence is, thus, a higher burden than proof

19  by a preponderance of the evidence.

20          In this case, in addition to denying AHG's

21  claims, the Broetje Parties assert that all of the asserted

22  patents are invalid.  The asserted patents, however, are

23  presumed to be valid.  The Broetje Parties have the burden

24  of proving that the asserted patents are invalid by clear

25  and convincing evidence.  As I just mentioned, clear and

1    convincing evidence is evidence that produces an abiding

2    conviction that the truth of a factual contention is highly

3    probable.  Proof by clear and convincing evidence is, thus,

4    a higher burden than proof by a preponderance of the

5    evidence.

6              Those of you familiar with criminal cases will

7    have heard the term "proof beyond a reasonable doubt."  That

8    burden does not apply in a civil case and you should,

9    therefore, put it out of your mind in considering whether or

10   not AHG or the Broetje Parties have met their burden of

11   proof.

12             1.12.  Use Of Notes.

13             You may use notes taken during trial to assist

14   your memory.  However, you should use caution in consulting

15   your notes.  There is always a tendency to attach undue

16   importance to matters that you have written down.  Some

17   testimony that is considered unimportant at the time

18   presented and thus not written down takes on greater

19   importance later on in the trial in light of all the

20   evidence presented.  Therefore, you are instructed that your

21   notes are only a tool to aid your own individual memory, and

22   you should not compare notes with other jurors in

23   determining the content of any testimony or in evaluating

24   the importance of any evidence.  Your notes are not

25   evidence, and are by no means a complete outline of the

1    proceedings or a list of the highlights of the trial.  You

2    should not be overly influenced by your notes or those of

3    your fellow jurors.  Above all, your memory should be the

4    greatest asset when it comes time to deliberate and render a

5    decision in this case.

6              We are now up to Section 2.  The Parties And

7    Their Contentions.

8              2.1.  The Parties.

9              I will now review for you the parties in this

10   action, and the positions of the parties that you will have

11   to consider in reaching your verdict.

12             The plaintiffs are Ateliers de la Haute-Garonne

13   and F2C2 Systems S.A.S.  When I refer to the plaintiffs

14   collectively, I will refer to them as AHG.

15             The defendants in this case are Broetje

16   Automation-USA Inc. and Broetje-Automation GmbH.  When I

17   refer to the defendants collectively, I will refer to them

18   as "Broetje" or "The Broetje Parties."

19             AHG is the owner of U.S. Patent Nos. 5,143,216

20   and 5,011,339.  I will refer to these patents as the '216

21   and '339 patents respectively, or collectively as "the's AHG

22   patents" or the "asserted patents."

23             2.2.  The Parties' Contentions.

24             AHG contends that Broetje's rivet dispensing

25   cassettes infringe Claims 1, 2 and 6 of the '339 patent, and

1   Claims 1 and 2 of the '216 patent.  These claims may be

2   referred to as the "asserted claims."

3          Broetje contends that its rivet dispensing

4   cassettes do not infringe the asserted claims of the '339

5   and '216 patents.  Broetje further contends that the

6   asserted claims of the '339 and '216 patents are invalid.

7          AHG also contends that Broetje's cassettes

8   infringe on AHG's trade dress, that Broetje unfairly

9   competes with AHG through its manufacture and sale of

10  cassettes, and that Broetje intentionally interfered with

11  AHG's prospective economic advantage with respect to such

12  cassettes.  Broetje denies these claims.

13          3.0.   Patent Claims.

14          3.1.   Summary Of Patent Issues.

15          I will now summarize the patent issues that you

16  must decide and for which I will provide instructions to

17  guide your deliberations.  You must decide the following

18  main issues:

19          1.   Whether AHG has proven by preponderance of

20  the evidence that the Broetje Parties' accused products

21  infringed any of Claims 1, 2, or 6 of the '339 or Claims 1

22  or 2 of the '216 patent, either directly or indirectly.

23          2.   Whether AHG has proven by a preponderance of

24  the evidence that the Broetje Parties induced or contributed

25  to the infringement by a third party of any of Claims 1, 2,

1    or 6 of the '339 patent.

2         3.   Whether AHG has proven by clear and

3    convincing evidence that the Broetje Parties willfully

4    infringed any of Claims 1, 2 or 6 of the '339 patent, or

5    Claims 1 or 2 of the '216 patent.

6         4.   Whether the Broetje Parties have proven by

7    clear and convincing evidence that any of Claims 1, 2, or 6

8    of the '339 patent, or Claims 1 or 2 of the '216 patent, are

9    invalid due to anticipation, obviousness, or indefiniteness.

10        3.2.   The Patent Laws.

11        At the beginning of the trial, I gave you some

12   general information about patents and the patent system and

13   a brief overview of the patent laws relevant to this case.

14   I will now give you more detailed instructions about the

15   patent laws that specifically relate to this case.  If you

16   would like to review my instructions at any time during your

17   deliberations, you will have your copy available to you in

18   the jury room.

19        3.3.   Infringement Of Patent Claims.

20        Before you can decide many of the issues in this

21   case, you will need to understand the role of patent

22   "claims."

23        The claims of a patent are the numbered

24   paragraphs at the end of the patent.  The claims are

25   important because it is the words of the claims that define

1   what a patent covers.  Only the claims of a patent can be

2   infringed.  Each claim is a separate statement of the

3   patented invention, and each of the asserted claims must be

4   considered individually, comparing that claim to a

5   particular product.

6           In patent law, the requirements of a claim are

7   often referred to as "claim elements" or "claim

8   limitations."  When a thing (such as a product) meets each

9   and every requirement of a claim, the claim is said to

10  "cover" that thing, and that thing is said to "fall" within

11  the scope of that claim.

12          The law saws that it is my role to define terms

13  of the claims and it is your role to apply my definitions to

14  the issues that you are asked to decide in this case.

15  Therefore, I will explain to you the meaning of some of the

16  words of the claims in this case.  In doing so, I will

17  explain some of the requirements of the claims and you must

18  accept my definitions of these words in the claims as

19  correct.

20          It is your job to take these definitions and

21  apply them to the issues you are deciding, such as

22  infringement and validity.

23          3.4.  Claim Construction For The Case.

24          It is the Court's duty under the law to define

25  what the patent claims mean.  I have made my determinations

1    and I will now instruct you on the meaning of the claim

2    terms.  You must use the meaning that I give you for each

3    claim term to make your decision as to whether the claim is

4    infringed or invalid, and you must apply the same meaning

5    for purposes of both your infringement and your invalidity

6    analyses.  You must ignore any different definitions used by

7    the witnesses or the attorneys.  You should not take my

8    definition of the language of the claims as an indication

9    that I have a view regarding how you should decide the

10   issues that you are being asked to decide, such as

11   infringement and validity.  For a claim term for which I

12   have not provided you with a definition, you should apply

13   the plain and ordinary meaning.  These issues are yours to

14   decide.

15            I instruct you that the following claim terms

16   have the following definition:  The following words and

17   groups of words from the '339 patent claims have the

18   following meanings:

19            1.  The term "shape corresponding to the

20   transverse section of the greatest diameter of the pieces"

21   means "the shape of the hollow center of the tube is

22   compatible with the greatest diameter of the pieces."

23            2.  The term "a peripheral guiding" means

24   "provides for guiding of the pieces along the internal

25   surface of the tube."

1         3.  The term "arranging the pieces one after

2    another in the interior of the tube (2) with their axes of

3    revolution extending along the longitudinal axis of said

4    tube" means "pieces inserted one after another with their

5    axes of revolution extending in the direction of the length

6    of the tube."

7         4.  The term "longitudinal passageway (2b)...

8    opening into the hollow center (2a)" means "a passageway

9    which can be of any hollow shape, regardless of the

10    cross-sectional of the tube, extending in the direction of

11    the length of the tube."

12         5.  The term "the spaces (E) between the pieces"

13    means "the openings, if any, separating the pieces."

14         6.  The term "linear grooves (2b)" means

15    "passageways extending along the parallel axis of the tube."

16         7.  The term "grooves" or "grooves (2b)" means

17    "passageways."

18         8.  The term "stop members (3,4)" and "stop

19    member 4" mean "components at the ends of the tube that

20    retain the pieces."

21         The following words and groups of words from the

22    '216 patent have the following definitions:

23         1.  The term "aligned one after another" means

24    "pieces are in line one after the other."

25         2.  The term "grooves (2b)...to open into a

1    hollow center" means "any passageway, regardless of the

2    cross-sectional shape of the tube, extending along the wall

3    of the tube, this passageway being able to be linear,

4    helical, et cetera and opening into the hollow center of the

5    tube."

6         3.   The term "stop members (3,4)" means

7    "components at the end of the tube that retain the pieces."

8         4.   The term "arranged in a column" means

9    "rivets placed one after the other in a tube."

10        5.   The term "transverse cross-section of the

11   heads correspond to the transverse cross-section of the tube

12   such that the cross-sectional area of the heads

13   substantially equals the cross-sectional area of the tube"

14   means "the shape of the head of the rivet is compatible with

15   the shape of the hollow center of the tube such that the

16   cross-sectional area of the head of the rivet is of

17   sufficient size as compared to the cross-sectional area of

18   the hollow core of the tube such that there is sufficient

19   space between the rivet and the surface of the hollow core

20   to permit the rivet to move without difficulty from upstream

21   to downstream as a result of the compressed fluid ."

22        6.   The term "grooves (2b)" means "passageways."

23        3.5.   Independent And Dependent Claims.

24        This case involves two types of patent claims:

25   independent claims and dependent claims.

1        An independent claim sets forth all of the

2   requirements that must be met in order to be covered by that

3   claim.  Thus, it is not necessary to look at any other claim

4   to determine what an independent claim covers.  In this

5   case, Claim 1 of the '339 patent and Claim 1 of the '216

6   patent are independent claims.

7        The remaining asserted claims are dependent

8   claims.  A dependent claim does not itself recite all of the

9   requirements of the claim but refers to another claim or

10  claims for some of its requirements.  In this way, the claim

11  "depends" on another claim or claims.  A dependent claim

12  incorporates all of the requirements of the claims to which

13  it refers.  The dependent claim then adds its own additional

14  requirements.  To determine what a dependent claim covers,

15  it is necessary to look at both the dependent claim and any

16  other independent claim to which it refers.

17        3.6.  Open-Ended Or "Comprising" Claims.

18        The beginning portion or preamble of several of

19  the asserted claims has the word "comprising."  The word

20  "comprising" means "including the following but not

21  excluding others."  A claim that uses the word "comprising"

22  or "including" is not limited to products having only the

23  elements that are recited in the claim, but also covers

24  products that have additional elements.

25        If you find, for example, that the accused

1    products include all of the elements of a particular claim,

2    the fact that the accused products might include additional

3    elements would not avoid infringement of the claim.

4                    Now, 4.0.  Patent Infringement.

5                    4.1.  Patent Infringement Generally.

6                    I will now instruct you on the rules that you

7    must follow when the deciding whether AHG has proven by a

8    preponderance of the evidence that the Broetje Parties

9    infringed the asserted claims.

10                   Patent law gives the owner of a valid patent the

11   right to keep others from making, using, selling, or

12   offering to sell a patented product within the United States

13   during the term of the patent.  The claims of AHG's patents

14   each specifically define a particular type of method and

15   apparatus for dispensing and storing rivets.  Any person or

16   business entity that has made, used, sold, or offered to

17   sell a patented product in the United States during the term

18   of the patent, without the patent owner's permission,

19   infringes the patent, so long as the patent is not found to

20   be invalid.

21                   To prove infringement, AHG must prove by a

22   preponderance of the evidence that each accused product,

23   standing alone, contains each and every one of the elements

24   of the patent claim that is asserted against the product.

25   If a particular product does not contain each and every

1   element of the claim, you must find that the product does

2   not infringe.

3          If, as here, the patent owner asserts multiple

4   patent claims against the same product, then you must

5   compare each claim separately against the product to

6   determine whether the product infringes that individual

7   patent claim.

8          4.2.  Direct Infringement.

9          To prove direct infringement, AHG must prove

10  that it is more probable than not that one of the Broetje

11  Parties' accused products includes every requirement in at

12  least one of the asserted claims.  The presence of other

13  elements beyond those claimed does not avoid infringement,

14  as long as each and every claimed element is present in the

15  accused product.  Additionally, a component or feature of

16  the accused products can be part of a larger integral

17  structure (a single structure that has two or more connected

18  parts) and still satisfy a claim requirement.  In such a

19  case, the remainder of the integral structure is considered

20  extra structure and is irrelevant to whether the claim

21  requirement is satisfied by the accused products.  However,

22  if the accused product omits a single requirement recited in

23  one of the asserted claims, then that accused product does

24  not directly infringe that claim.

25          For direct infringement, AHG is not required to

1  prove that the Broetje Parties intended to infringe or knew

2  of the patent.

3        4.3.   Indirect Infringement - Inducing Patent

4  Infringement.

5        A party induces patent infringement if it

6  causes, urges or encourages another to infringe a claim of

7  the patent which it is aware of or of which it is willfully

8  blind.  Inducement to infringe a claim cannot occur

9  unintentionally.  This is different from direct

10  infringement, which, as I have told you, can occur

11  unintentionally.

12        AHG alleges that the Broetje Parties are liable

13  for infringement by actively inducing others to directly

14  infringe the '339 patent.  More particularly, AHG asserts

15  that the Broetje Parties induced patent infringement after

16  they became aware of the '339 patent.  To be liable for

17  inducement to infringe, the accused inducer must have known

18  of the patent and encouraged or instructed another person

19  how to use a product in a manner that you, the jury, find

20  infringes the asserted claims and must have had knowledge,

21  or have acted with willful blindness, that the induced acts

22  constituted patent infringement.  Willful blindness exists

23  where an alleged inducer believed there was a high

24  probability that its acts, if taken, would constitute

25  infringement, but the alleged inducer deliberately avoided

1    confirming that belief.

2             As with direct infringement, you must determine

3    whether there has been active inducement on a claim-by-claim

4    basis.

5             The Broetje Parties are liable for active

6    inducement of infringement of a claim only if AHG proves by

7    a preponderance of the evidence that:

8             1.  The acts actually carried out by the third

9    party directly infringed the claim;

10            2.  The Broetje Parties took action during the

11   time the '339 patent was in force intending to cause the

12   infringing acts by the third party; and

13            3.  The Broetje Parties were aware of the '339

14   patent and (i) knew that the acts, if taken, would

15   constitute infringement of that patent; or (ii) the Broetje

16   Parties believed that there was a high probability that the

17   acts, if taken, would constitute infringement of the '339

18   patent but deliberately avoiding confirming that belief.

19            In order to establish active inducement of

20   infringement, it is not sufficient that the third party

21   directly infringed the claim.  Nor is it sufficient that the

22   Broetje Parties were aware of the act or acts by the third

23   party that allegedly constitute the direct infringement.

24   Rather, you must find that the Broetje Parties specifically

25   intended that the third party infringe the '339 or that the

1    Broetje Parties believed there was a high probability the

2    third party would infringe the '339, but remained willfully

3    blind to the infringing nature of the third party's acts, in

4    order to find inducement of infringement.

5            For example -- assuming all of the other

6    requirements of inducing infringement that I have described

7    to you are satisfied -- an accused infringer can indirectly

8    infringe the patent in suit by selling the accused product

9    with instructions leading end-users to use the product as

10   claimed in the patent, since it is inferred that the

11   end-users follow those instructions with respect to the

12   accused product.

13           When considering whether the Broetje Parties

14   knew or acted with willful blindness, that the induced

15   actions would constitute infringement, you may consider all

16   of the circumstances, including whether or not the Broetje

17   Parties obtained the advice of a competent lawyer.  There is

18   no affirmative duty to seek opinion of counsel regarding

19   infringement.  However, opinion of counsel evidence -- or

20   lack of such evidence -- may be probative of whether the

21   Broetje Parties knew, or acted with willful blindness, that

22   its actions would cause direct infringement.  While the

23   decision not to obtain an opinion of counsel may be

24   probative circumstantial evidence that a defendant knew, or

25   acted with willful blindness, that its action would cause

1    direct infringement, that fact cannot replace any of the

2    requirements to prove inducement.

3            If you find that no claim of the '339 patent has

4    been directly infringed, you cannot find the Broetje Parties

5    liable for inducement.

6            4.4.  Indirect Infringement - Contributory

7    Infringement.

8            Contributory infringement occurs when a party

9    with knowledge of the patent supplies a part, or a

10   component, to another for use in a product, machine, or

11   process that infringes a patent claim.  Contributory

12   infringement arises only if one who received the component

13   actually infringes a patent claim.

14           AHG asserts that the Broetje Parties have

15   contributed to another's infringement of the '339 patent.

16   In order to prove contributory infringement, AHG must show:

17           1.  The Broetje Parties sell, offer to sell, or

18   import within the United States a component for use in a

19   process that infringes a claim of the '339 patent during the

20   time the '339 patent is in force;

21           2.  The component is a significant part of the

22   invention of at least one claim of the '339 patent, and the

23   Broetje Parties knew that the component was especially made

24   to be used in a manner which infringed one or more of the

25   claims of the '339 patent; and

1     3.  The component does not have a significant

2  noninfringing use.

3     All three of the requirements above must be

4  proven by direct or circumstantial evidence, by a

5  preponderance of the evidence, before you may find that the

6  Broetje Parties contributed to patent infringement.  As with

7  direct infringement, you must determine contributory

8  infringement on a claim-by-claim basis, for each defendant.

9     4.5.  Infringement Despite Accused Infringer's

10  Improvements.

11     Whether or not an Accused Product represents an

12  improvement over the inventions defined in AHG's patent

13  claims does not determine whether or not that product can

14  infringe the asserted patent claims.  As long as an accused

15  product includes all of the elements of at least one of the

16  asserted patent claims, then the patent claim is infringed

17  by the Accused Product despite any improvements.

18     5.0.  Willful infringement.

19     AHG alleges that the Broetje Parties infringed

20  the '339 patent and the '216 patent willfully.  If you have

21  decided that the Broetje Parties have infringed one or more

22  of the asserted claims in the '339 patent or the '216

23  patent, you must go on and address the additional issue of

24  whether or not this infringement was willful.

25     Willfulness requires you to determine by clear

1   and convincing evidence that the Broetje Parties acted

2   recklessly.  To prove that the Broetje Parties acted

3   recklessly, AHG must prove two things by clear and

4   convincing evidence.

5          The first part of the test is objective:  AHG

6   must persuade you that the Broetje Parties acted despite an

7   objectively high likelihood that its actions would infringe

8   a valid patent.  In making this determination, you may not

9   consider the Broetje Parties' state of mind.  Legitimate or

10  credible defenses to infringement, even if not ultimately

11  successful, demonstrate a lack of recklessness.

12         Only if you conclude that the Broetje Parties'

13  conduct was reckless do you need to consider the second part

14  of the test.  The second part of the test depends on the

15  Broetje Parties' state of mind.  AHG must persuade you that

16  the Broetje Parties actually knew or should have known that

17  their actions constituted an unjustifiably high risk of

18  infringement of a valid patent.

19         To determine whether the Broetje Parties had

20  this state of mind, consider all facts, which may include,

21  but are not limited to:

22         1.  Whether or not the Broetje Parties acted in

23  accordance with the standards of commerce for their

24  industry;

25         2.  Whether or not the Broetje parties

1    intentionally copied a product of AHG that is covered by the

2    patents in suit;

3              3.   Whether or not there is a reasonable basis

4    to believe that the Broetje Parties did not infringe or had

5    a reasonable defense to infringement; and

6              4.   Whether or not the Broetje Parties made a

7    good faith effort to avoid infringing the patents in suit,

8    for example, whether the Broetje Parties attempted to design

9    around the patents in suit.

10             I'm now up to 6.0.  Patent Invalidity.

11             Patent invalidity is a defense to patent

12   infringement.  Even though the United States Patent Office

13   has allowed the claims of a patent, you have the ultimate

14   responsibility for deciding whether or not the claims of a

15   patent are valid.

16             For a patent to be valid, the subject matter

17   claimed in the individual claims of the patent must be new

18   and nonobvious.  A patent cannot take away from the right of

19   anyone who wants to use what was already known or would have

20   been obvious to those of skill in the art at the time when

21   the invention was made.

22             The Broetje Parties have challenged the validity

23   of the asserted patents.  In making your determination as to

24   invalidity, you should consider each claim separately.

25             6.1.  Presumption Of Validity.

1    The granting of a patent by the Patent Office

2  carries with it the presumption that the patent's subject

3  matter is new, useful, and constitutes an advance that was

4  not, at the time the invention was made, obvious to one of

5  ordinary skill in the art.  The law presumes that the Patent

6  Office acted correctly in issuing the patent.  Nevertheless,

7  when the validity of a patent has been put at issue as part

8  of patent litigation, it is the responsibility of the jury

9  to review what the Patent Office has done consistent with

10  the Court's instructions on the law.

11    The Broetje Parties' burden of proof remains

12  exactly the same regardless of whether the references on

13  which the Broetje Parties are relying on to invalidate a

14  patent have been previously been before the Patent Examiner.

15  Thus, the Broetje Parties have the burden of proving

16  invalidity of each patent claim by clear and convincing

17  evidence.

18    6.2.  Anticipation - Generally.

19    A person cannot obtain a patent on an invention

20  if someone else has already made the same invention.  If the

21  invention is not new, we say that it was "anticipated" by

22  prior art.  Prior art is the legal term used to describe

23  what others had done in the field before the invention was

24  made.  Prior art is the general body of knowledge in the

25  public domain, such as articles or other patents before the

1    invention was made.  It is not necessary that the prior art

2    has been available to every member of the public.  It must

3    have been available, without restriction, to that segment of

4    the public most likely to avail itself of the prior art's

5    contents.

6         An invention that is "anticipated" by the prior

7    art is not entitled to patent protection.  In order to prove

8    that an invention is "anticipated," a party must prove by

9    clear and convincing evidence that a single piece of prior

10   art describes or discloses all of the elements of the

11   claimed invention.

12        6.3.  Anticipation - Previously Known Or

13   Published.

14        The Broetje Parties contend that the asserted

15   claims of the Asserted Patents are invalid because all

16   elements of each asserted claim existed in a single device

17   or method that predates the claimed invention, or were

18   described in a single previous publication or patent that

19   predates the claimed invention.  In patent law, such

20   previous device, method, publication or patent is called a

21   "prior art reference."  If a patent claim was disclosed by a

22   prior art reference, we say it is "anticipated" by a prior

23   art reference.  The Broetje Parties must prove by clear and

24   convincing evidence that the claim was anticipated.

25        The disclosure in the prior art reference does

1    not have to be made in the -- does not have to be in the

2    same words as the claim.  Instead, it is sufficient if

3    all requirements of the claim are in the prior art, either

4    stated or necessarily implied, so that someone of ordinary

5    skill in the field looking at that one reference would be

6    able to make and use at least one embodiment of the claimed

7    invention.

8         To meet this requirement, the Broetje Parties

9    must prove that their prior art reference would allow a

10   person of ordinary skill in the art to practice the claimed

11   invention without undue experimentation.

12        6.4.  Anticipation - Inherency.

13        In determining whether the single item of

14   prior art anticipates a patent claim, you should take into

15   consideration not only what is expressly disclosed in the

16   from item of prior art, but also what is inherently present

17   or disclosed in that prior art or what inherently results

18   from its practice.  Prior art inherently anticipates a

19   patent claim if the missing element or feature would be the

20   natural result of following what the prior art teaches to

21   persons of ordinary skill in the art.  A party claiming

22   inherent anticipation must prove by clear and convincing

23   evidence that the claim is inherently anticipated.  Evidence

24   outside of the prior art reference itself may be used to

25   show that the elements not expressly disclosed in the

1    reference are actually present.  Mere probabilities are not

2    enough.  It is not required, however, that persons of

3    ordinary skill actually recognized the inherent disclosure

4    at the time the prior art was first known or used.  Thus,

5    the prior use of the patented invention that was

6    unrecognized and unappreciated can still be an invalidating

7    anticipation.

8                    6.5.  Obviousness.

9                    In order to be patentable, an invention must not

10   have been obvious to a person of ordinary skill in the art

11   at the time the invention was made.  A claimed invention is

12   invalid as obvious if it would have been obvious to a person

13   of ordinary skill in the field of the invention at the time

14   the invention was made.

15                   Obviousness must be shown by clear and

16   convincing evidence considering one or more than one item of

17   prior art.  Obviousness is determined from the perspective

18   of a person of ordinary skill in the field of the invention.

19   The issue is not whether the claimed invention would about

20   obvious to you as a layman, to me as a judge, or to a genius

21   in the art, but whether it would have been obvious to one of

22   ordinary skill in the art at the time it was made.  Thus,

23   the question is, would it have been obvious for a skilled

24   person who knew of the prior art to make the claimed

25   invention?  If the answer to that question is yes, then the

1064

1    patent claims are invalid.  The Broetje Parties have the

2    burden of proving obviousness by the clear and convincing

3    evidence standard.

4           The Broetje Parties contend that the Asserted

5    Claims are invalid because the claimed inventions are

6    obvious.

7           Keep in mind that the existence of each and

8    every element of the claimed invention in the prior art does

9    not itself prove obviousness.  Most, if not all, inventions

10   rely on building blocks of prior art.  Accordingly, you must

11   be careful not to determine obviousness using hindsight to

12   reconstruct or piece together the invention.  Many true

13   inventions can be seen as obvious after the fact.  You

14   should not consider what is known today or what was learned

15   from the teachings of the patent.  You should not use the

16   patent as a roadmap for selecting and combining items of

17   prior art.  You must put yourself in the place of a person

18   of ordinary skill in the art at the time the invention was

19   made.

20          You must also keep in mind that the test for

21   obviousness is not whether or not it would have been obvious

22   to try to make the invention, but rather, whether or not the

23   invention would have been obvious to a person of ordinary

24   skill in the inventor's field at the time the invention was

25   made.  In determining whether or not these claims would have

1    been obvious, you should make the following determinations:

2                        First.  What is the scope and content of the

3    prior art?

4                        Second.  What differences, if any, are there

5    between the invention of the claim of the patent and the

6    prior art?

7                        Third.  What was the level of ordinary skill in

8    the art at the time the invention was made?

9                        Fourth.  Are there any objective indications of

10   nonobviousness?

11                       6.6.  Obviousness - Scope and Content of the

12   Prior Art.

13                       As I have just instructed you, in arriving at

14   your decision on the issue of whether or not the claimed

15   inventions were obvious to one of ordinary skill in the art,

16   you must first determine the scope and content of the prior

17   art.  This means that you must determine what prior art is

18   reasonably pertinent to the particular problem that the

19   inventors faced.  Prior art is reasonably pertinent if it

20   is in the same field as the claimed invention or is from

21   another field that a person of ordinary skill would look

22   to in trying to solve the problem the claimed invention was

23   trying to solve.  The prior art may include any of the

24   following items if received into evidence:

25                       1.  Patents that issued more than one year

1    before the earliest of the effective filing date of the

2    patents, which is December 8, 1988, or before the date of

3    the invention of the Asserted Claims of a particular patent;

4           2.   Publications having a date more than one

5    year before the earliest of the effective filing date of the

6    patent, or before the date of invention of the asserted

7    claims of a particular patent;

8           3.   U.S. patents or published applications

9    having a filing date prior to the date of the invention of a

10    particular patent;

11           4.   Anything that was publicly known or used by

12    others in the United States before the claimed invention was

13    made; and

14           5.   Anything that was in public use or on sale

15    in the United States more than one year before the effective

16    filing dates of the asserted patents.

17           6.7.  Differences Between the Claimed Invention

18    and the Prior Art.

19           You must next consider the differences, if any,

20    between the prior art and the claimed invention from the

21    view of a person of ordinary skill in the art at the time

22    of the invention.  Your analysis must determine the impact,

23    of any, of such difficulties on the obviousness or

24    nonobviousness of the invention as a whole and not merely

25    some portion of it.

1    In analyzing the differences between the claimed

2    invention and the prior art, you do not need to look for a

3    precise teaching in the prior art directed to the subject

4    matter of the claimed invention.  You may take into account

5    the inferences and creative steps that a person of ordinary

6    skill in the art would have employed in reviewing the prior

7    art at the time of the invention.  For example, if the

8    claimed invention combined elements known in the prior art

9    and the combination yielded results that were predictable

10   to a person of ordinary skill in the art at the time of the

11   invention, then this evidence would make it more likely that

12   the claim was obvious.

13   On the other hand, if the combination of known

14   elements yielded unexpected or unpredictable results, or

15   if the prior art teaches away from combining the known

16   elements, then this evidence would make it more likely that

17   the claim that successfully combined those elements was not

18   obvious.

19   Importantly, a claim is not proved obvious

20   merely by demonstrating that each of the elements was

21   independently known in the prior art.  Most, if not all,

22   inventions rely on building blocks long since uncovered, and

23   claimed discoveries almost of necessity will likely be

24   combinations of what is already known.  Therefore, you

25   should consider whether a reason existed at the time of the

1    invention that would have prompted a person of ordinary

2    skill in the art in the relevant field to combine the known

3    elements in the way the claimed invention does.  The reason

4    could come from the prior art, the background knowledge of

5    one of ordinary skill in the art, the nature of the problem

6    to be solved, market demand, or common sense.  Accordingly,

7    you may evaluate whether there some teaching, suggestion, or

8    motivation to arrive at the claimed invention before the

9    time of the claimed invention, although proof of this is not

10   a requirement to prove obviousness.

11          If you find that a reason existed at the time of

12   the invention to combine the elements of the prior art to

13   arrive at the claimed invention, this evidence would make it

14   more likely that the claimed invention was obvious.

15          Again, you must undertake this analysis

16   separately for each claim that the Broetje Parties contend

17   is obvious.

18          6.8.  Obviousness - Level Of Ordinary Skill.

19          Obviousness is determined from the perspective

20   of a person of ordinary skill in the art to which the

21   claimed invention pertains at the time the claimed invention

22   was made.  This person is presumed to know all the prior art

23   that you have determined to be reasonably relevant.  When

24   faced with a problem, this ordinary skilled person is able

25   to apply his or her experience and ability to the problem

1    and also look to any available prior art to help solve the

2    problem.

3              Factors to consider in determining the level of

4    ordinary skill in the art include:  (1) the educational

5    level and experience of people working in the field; (2) the

6    types of problems faced by workers in the art at the time of

7    the invention and the solutions found to those problems; (3)

8    the prior art patents, products or devices, and

9    publications, and (4) the sophistication of the technology

10   in the field at the time of the invention, including how

11   rapid innovations were made in the art at the time of the

12   invention.

13             AHG contends that a person of ordinary skill in

14   the art to which the '339 patent and the '216 patent pertain

15   would have at least three years of experience in the design

16   of rivet dispensing systems or held a Bachelor's degree in

17   mechanical engineering.  The Broetje Parties contend that a

18   person of ordinary skill in the art to which the '339 patent

19   and the '216 patent pertain does not need to have any

20   particular level of education.

21             6.9.  Obviousness --  Objective Criteria

22   Concerning Obviousness.

23             In evaluating the issues of obviousness, you

24   must also consider certain factors which, if established by

25   AHG, may indicate that the invention would not have been

1    obvious.  No factor alone is dispositive, and you must

2    consider the obviousness of the invention as a whole.  Some

3    of these indications are:

4                1.  Commercial success or lack of commercial

5    success of products that are used to practice the claims of

6    the patent in suit;

7                2.  A long-felt need in the art which was

8    satisfied by the invention of the patent in suit;

9                3.  Failed attempts by others to make the

10   invention;

11               4.  Copying of the invention by others in the

12   field;

13               5.  Unexpected results achieved by the

14   invention;

15               6.  Praise of the invention by the infringer or

16   others in the field;

17               7.  The taking of licenses under the patents by

18   others;

19               8.  Expressions of surprise by experts and those

20   skilled in the art at the making of the invention; and

21               9.  The patentee proceeded contrary to accepted

22   wisdom of prior art.

23               However, there must be a connection between the

24   evidence showing any of these factors and either the claimed

25   invention, or the advantages that result from practicing the

1    claimed invention, if this evidence is to be given weight by

2    you in arriving at your conclusion on the obviousness issue.

3    For example, if commercial success of products that practice

4    the asserted patents is due to brand recognition, company

5    goodwill, advertising, promotion, salesmanship or the like,

6    or is due to features of the product other than those

7    claimed in the patent in suit, then any commercial success

8    may have no relation to the issue of obviousness.

9              6.10.   Indefiniteness.

10             The patent laws require the claims of a patent

11   to be sufficiently definite that one skilled in the art can

12   determine the precise limits of the claimed invention.  If a

13   claim is found to be indefinite the claim is invalid.  The

14   amount of detail required to be included in claims depends

15   on the particular invention and the prior art, and is not to

16   be evaluated in the abstract but in conjunction with the

17   disclosure.  If the claims, read in light of the disclosure,

18   reasonably apprise those skilled in the art of the proper

19   scope of the invention, and if the language is as precise as

20   the subject matter permits, then the claims are not

21   indefinite.

22             Simply because some claim language may not be

23   precise does not automatically render a claim invalid.  When

24   a word or phrase of degree is used, it must be determined

25   whether the patent disclosure provides some standard for

1   measuring that degree.  One must then determine whether one

2   of ordinary skill in the art would understand what is

3   covered when the claim is read in light of the disclosure.

4   Even if one needed to experiment so as to determine the

5   limits of the claims of the patent, that would not

6   necessarily be a basis for holding the claims invalid.

7           The Broetje Parties contend that the asserted

8   claims of the '339 patent are invalid for indefiniteness

9   because the term "peripheral guiding" is indefinite, since a

10  person of ordinary skill in the art cannot translate the

11  definition of that term into a meaningfully precise claim

12  scope.  The Broetje Parties have the burden of establishing

13  indefiniteness by clear and convincing evidence.

14          I am going to stop there for tonight.  I have

15  been reading for about an hour, and I don't think you should

16  be subjected to me reading any longer than that today.  So

17  tomorrow we will pick up at Page 49 of the jury

18  instructions.

19          We will be able to begin tomorrow at 9:00.  So

20  we will go back to our normal schedule.  So please be here

21  in time to start at 9.  We will take your orders for lunch.

22  I will read the remaining jury instructions.  You will hear

23  closing argument .  We will give you the verdict sheet.  And

24  you will begin deliberating sometime tomorrow.

25          As always, no talking about the case, no

1     research or reading about the case.

2              Please have a very good evening.  We will see

3     you in the morning.

4              (Jury left courtroom.)

5              THE COURT:  I wanted to leave you a few minutes.

6     You can make your motion, because that does come out of your

7     time.  You probably want to know how much time you have

8     left.  So I turn to plaintiffs to make their motion.  The

9     rest of you can have a seat.

10             MR. HOROWITZ:  Your Honor, at this time the

11    plaintiffs would make their Rule 50 motion.

12             On the issues on which the plaintiffs carry

13    their burden, a reasonable jury could only find the

14    following with respect to the patent claims.

15             AHG owns all right and title to the '339 and

16    '216 patents.

17             F2C2 is the exclusive licensee of the '339 and

18    '216 patents.

19             The Broetje Parties directly infringe Claims 1,

20    2, and 6 of the '339 patent and Claims 1 and 2 of the '216

21    patent.

22             The Broetje Parties indirectly infringe the

23    asserted claims of the two patents either by inducement

24    and/or contributory infringement.

25             Infringement by the Broetje Parties was willful.

1     The Broetje Parties had notice of infringement

2  prior to filing of the lawsuit.

3     And the plaintiffs are entitled to damages as a

4  result of the above as set forth during Mr. Ellis's

5  testimony.

6     With respect to the other claims on which the

7  plaintiffs have the burden, AHG has a protectable trade

8  dress, and the Broetje Parties infringe it under the Lanham

9  Act.

10     The Broetje Parties' infringement was

11  intentional.

12     The Broetje Parties engaged in unfair

13  competition under the Lanham Act in common law.

14     Trade dress has been used in commerce as

15  distinctive and nonfunctional.

16     There is a likelihood of confusion between AHG

17  and Broetje's products because of the trade dress.

18     The Broetje Parties intentionally and wrongfully

19  interfered with plaintiffs' prospective economic advantage

20  as to customers seeking to purchase plaintiffs' products.

21     The Broetje Parties' unfair competition involved

22  malice, oppression, or fraud.

23     Also, the plaintiffs are entitled to damages as

24  a result of the above as set forth by Mr. Ellis.

25     And the parties have standing, including F2C2

1    and AHG.

2              With respect to the issues on which the

3    defendants carry the burden, a reasonable jury could not

4    find any claim of either of AHG's patents invalid as

5    obvious, anticipated, or indefinite.

6              No anticipation or obviousness with any

7    combination of Shinjo, Komaki, Brosene, Offutt, Engeln,

8    Minbiole, Offutt-Minbiole combined, or Shinjo-Komaki

9    combined with knowledge of rivets.

10             To the extent this is an issue for the jury,

11   plaintiffs' claims are not barred by the statute of

12   limitations.

13             As to trade dress, unfair competition and

14   intentional interference claims, equitable tolling applies

15   to the statute of limitations, and the continuous accrual

16   doctrine applies to the statute of limitations.

17             That is as fast as I can do it.

18             THE COURT:  Very good.

19             MR. HOROWITZ:  Thank you.

20             THE COURT:  I am going to reserve on the motion.

21             Mr. Kelleher, happy to hear from you if you

22   wish.

23             MR. KELLEHER:  We renew our earlier 50(a)

24   motion.  And with regard to the issues on which we bore the

25   burden of proof, no reasonable jury could find the claims of

1  the '216 and the '339 patents are not invalid under Sections

2  102, 103 or 112 of the Patent Act.

3          No reasonable jury could find that AHG's lawsuit

4  was filed ineffective by law, with regard to their trade

5  dress claims, their unfair competition claims, and their

6  intentional interference with prospective economic advantage

7  claim.

8          THE COURT:  Okay.  I will reserve judgment on

9  that as well.

10          Anything plaintiffs wish to add?

11          MR. HOROWITZ:  No, Your Honor.

12          THE COURT:  Okay.

13          So, tomorrow, we will start at the ordinary

14  time.  So be here at 8:30 and I will be available to discuss

15  any further issues.  To the extent there is time, I will put

16  my thoughts on the record about the jury instructions.  As I

17  said, you will see the verdict sheet some time tonight.  I

18  don't know what time.  But you will have it, and feel free

19  to use it as part of your closing arguments tomorrow, if you

20  wish.

21          That was it for me.  Anything else from

22  plaintiffs?

23          MR. LINDVALL:  No, Your Honor.

24          THE COURT:  Anything from defendants?

25          MR. KELLEHER:  It is fine to refer to the

1    instructions during closing argument?

2              THE COURT:  It is definitely fine to do so.

3    Exactly.

4              Thank you.  Have a good evening.

5              (Court adjourned at 4:21 p.m.)

6

7         I hereby certify the foregoing is a true and accurate
     transcript from my stenographic notes in the proceeding.

8

9                            /s/ Brian P. Gaffigan
                             Official Court Reporter
10                            U.S. District Court

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25