<pre>
 1                    IN THE UNITED STATES DISTRICT COURT

 2                    IN AND FOR THE DISTRICT OF DELAWARE

 3                              - - -

 4   ATELIERS DE LA HAUTE-GARONNE (French  :   CIVIL ACTION
     Corporation) and F2C2 SYSTEMS S.A.S.  :
 5   (French Corporation),                 :
                                           :
 6               Plaintiffs,               :
                                           :
 7          v.                             :
                                           :
 8   BROETJE AUTOMATION-USA INC. (Delaware :
     Corporation), BROETJE AUTOMATION GMBH :
 9   (German Corporation),                 :
                                           :   NO. 09-598-LPS
10               Defendants.
                                   - - -
11
                             Wilmington, Delaware
12                           Friday, April 11, 2014
                             Jury Trial - Volume E
13
                                   - - -
14
     BEFORE:  HONORABLE LEONARD P. STARK, U.S.D.C.J., and a jury
15
     APPEARANCES:                       - - -
16

17            YOUNG CONAWAY STARGATT & TAYLOR, LLP
              BY:  MELANIE K. SHARP, ESQ., and
18                 JAMES L. HIGGINS, ESQ.

19                 and

20            KAYE SCHOLER, LLP
              BY:  SCOTT G. LINDVALL, ESQ., and
21                 JEFFREY H. HOROWITZ, ESQ.
                   (New York, New York)
22
                   and
23

24
     Valerie J. Gunning               Brian P. Gaffigan
25   Official Court Reporter          Official Court Reporter
</pre>

1    APPEARANCES:  (Continued)

2

3                KAYE SCHOLER, LLP
                 BY:  PAUL I. MARGULIES, ESQ.
4                     (Washington, District of Columbia)

5                     and

6                KAYE SCHOLER, LLP
                 BY:  MICHELLE MAREK, ESQ.
7                     (Chicago, Illinois)

8                         Counsel for Plaintiffs Ateliers De La
                          Haute-Garonne and F2C2 Systems S.A.S.
9

10               DRINKER BIDDLE & REATH, LLP
                 BY:  JOSEPH C. SCHOELL, ESQ., and
11                    TODD C. SCHILTZ, ESQ.

12                    and

13               DRINKER BIDDLE & REATH, LLP
                 BY:  PATRICK J. KELLEHER, ESQ.,
14                    DARREN S. CAHR, ESQ., and
                      CARRIE A. BEYER, ESQ.
15                    (Chicago, Illinois)

16                        Counsel for Broetje Automation-USA Inc.
                          and Broetje Automation GmbH
17

18

19

20

21

22                        - oOo -

23                    P R O C E E D I N G S

24               (REPORTER'S NOTE:  Jury trial proceedings were

25    held in open court, beginning at 8:48 a.m.)

```
 1                    THE COURT:  Good morning.

 2                    MR. LINDVALL:  Good morning.

 3                    THE COURT:  Any issues from plaintiff this

 4      morning?

 5                    MR. HOROWITZ:  Yes, Your Honor.  Two brief.

 6                    THE COURT:  Okay.

 7                    MR. HOROWITZ:  Very brief.  We don't want to use

 8      a lot of time.

 9                    THE COURT:  All right.

10                    MR. HOROWITZ:  As you know, but, of course,

11      we've exchanged at 7:00 a.m., as only we could come up with

12      that schedule, geniuses that we are, two brief objections to

13      the plaintiffs' slides.

14                    THE COURT:  You're objecting to their slides?

15                    MR. HOROWITZ:  Yes.  Two.  The first is slide

16      36, the Brosene reference, and I'm hoping I don't have to

17      pull out the record.

18                    Perhaps Your Honor remembers this, but when

19      Mr. Lindvall was cross-examining their expert, Mr. Lawrence,

20      and there was an objection beyond scope, we were told they

21      were not relying on Brosene to invalidate the patent and so

22      we didn't cross-examine their expert about Brosene based on

23      that representation.  It was moved into evidence.  I'm not

24      sure we realized this.  This is our mistake.  At the end of

25      the day when defense counsel moved in several exhibits and
```

1081

```
1    they were talked about with a witness, and we think that it
2    is inappropriate for them to now put it on a slide and rely
3    on it for invalidity.
4              THE COURT:  All right.  Let me hear a response
5    on that one.
6              MR. KELLEHER:  Your Honor, I actually thought I
7    moved it in with Michael Lawrence.  I'm not a hundred
8    percent certain.
9              THE COURT:  In any event, it's in evidence.
10             MR. KELLEHER:  Yes.
11             THE COURT:  What do you intend to do with it?
12             MR. KELLEHER:  We put it in.  I asked, what is
13   this?  It's the Brosene patent.  What does it show?  It
14   shows the work with rivets in tubes in the prior art and
15   then I stopped.  I didn't ask him to read the claims onto
16   it.  He didn't offer any opinions that it would invalidate
17   it.
18             THE COURT:  What are you going to do with it
19   today?
20             MR. KELLEHER:  It is the scope and content of
21   the prior art that was disclosed a long time ago.
22             THE COURT:  Are you going to argue that it is
23   part of what invalidates the patent?
24             MR. KELLEHER:  No.  Shinjo and Offutt were the
25   two that we specifically offered opinions on.
```

1    THE COURT:  Those are the ones you have opinions

2  on, but what are you going to argue?

3    MR. KELLEHER:  Brosene is the background.

4  Coiled-up tubes of rivets were in the prior art.

5    THE COURT:  Are you going to argue or suggest

6  that Brosene in part in combination with something else

7  leads to an obviousness conclusion?

8    MR. KELLEHER:  No, Your Honor.  The obviousness

9  argument is Shinjo when used with rivets.

10    THE COURT:  All right.  What are you going to

11  say about Brosene today?

12    MR. KELLEHER:  Brosene shows that there were

13  cassettes in the prior art with rivets in tubes.

14    THE COURT:  That's all you're going to say?

15    MR. KELLEHER:  Yes, Your Honor.

16    THE COURT:  And why is that relevant?

17    MR. KELLEHER:  It is relevant, Your Honor,

18  because, it's relevant both to their trade dress and their

19  patent claim.  We had testimony, for example, from

20  Mr. Auriol that putting rivets in tubes was not very

21  original.  This is an example of that.

22    THE COURT:  All right.  Mr. Horowitz?

23    MR. HOROWITZ:  Just very briefly, Your Honor.

24  This is what happened yesterday.

25    Mr. Lindvall:  Under that condition that Brosene

1    does not invalidate any of the claims of the patent, I don't

2    have any questions.

3              He didn't say questions, but that's what he was

4    about to say.

5              The Court:  He is not express than go an opinion

6    that Brosene invalidates?

7              Mr. Kelleher:  He did not today.  And here is

8    Brosene underneath a slide that says invalidity and the

9    prior art.

10             THE COURT:  This is a very tricky area, but I'm

11   going to overrule the objection.  There's going to be no

12   argument that Brosene per se contributes to invalidating the

13   patent-in-suit.  No opinion was offered to that effect.

14             I'm told Brosene was only offered for

15   background.  It's a very fine line distinction between

16   background and whether in an overall obviousness analysis

17   it helps support a finding of obviousness.  But it's not

18   how things played out and what Mr. Kelleher represented he

19   was going to do.  I'm not going to make them strike the

20   slide and I will let him say what he represented he would

21   say.

22             MR. HOROWITZ:  Mr. Lindvall has given me eight

23   seconds for the next one, so slide 18.  All I'm going to say

24   is we believe this violates directly the instruction you're

25   going to give on the foreign law and we think that that runs

1   afoul on that instruction.

2            THE COURT:  All right.  Mr. Kelleher?

3            MR. KELLEHER:  Yes, Your Honor.  They're still

4   quoting from the French judgment concerning the supposedly

5   identical cassette and infringement of the European patent.

6   We want the jury to understand that both sides have won

7   various things in Europe and it's still open.

8            THE COURT:  All right.  I mean, if I could turn

9   back time, I would keep all of this out because I don't

10  think it has been helpful to anybody, but I've proposed and

11  you all agreed to an instruction that I think makes it clear

12  hopefully to the jury what limited, if any, relevance any of

13  this has to anything.  And so I'm not going to strike the

14  slide although it certainly is, I think, an attempt to drive

15  home something that is irrelevant, but if you want to show

16  pictures of gavels, go ahead.

17           MR. KELLEHER:  Thank you, your Honor.

18           THE COURT:  Anything else from plaintiff?

19           MR. LINDVALL:  No, Your Honor.

20           MR. KELLEHER:  No, Your Honor.

21           THE COURT:  Issues from defendant?

22           MR. KELLEHER:  Nothing, Your Honor.

23           THE COURT:  All right.  So on the verdict form,

24  I appreciate you all finding the typographical errors.  We

25  made the changes that you all had agreed on.

```
 1              Was there anything else before we docket and
 2    make that the verdict form, the one that you sent to us last
 3    night?  Anything from plaintiff?
 4              MR. LINDVALL:  I don't believe so, Your Honor.
 5              THE COURT:  Okay.  Anything from defendant?
 6              MR. KELLEHER:  No problems with it, Your Honor.
 7              THE COURT:  All right.  And in terms of time,
 8    before we argue for a few seconds here this morning, as I
 9    have it, the plaintiff has an hour and 11 minutes left.
10    Defendants have 35 minutes left.  You're aware of that?
11              MR. LINDVALL:  Yes.
12              MR. HOROWITZ:  Yes, Your Honor.
13              THE COURT:  You're aware of that, Mr. Kelleher?
14              MR. KELLEHER:  Yes.
15              THE COURT:  I imagine I have at least another
16    hour of reading to do, so what I thought I would do, rather
17    than make the jury sit through three straight hours
18    uninterrupted is, we'll get started as close to 9:00 as we
19    can.  I will read the instructions through the foreign law
20    one, Section 13, and then give them a break, probably,
21    hopefully, a shortish break and then try to plow through
22    both of the closings and my final instructions and reading
23    the verdict sheet and then send them back there with their
24    lunch to begin deliberating.
25              Any questions about any of that?
```

1    MR. LINDVALL:  No, Your Honor.

2    MR. KELLEHER:  No, Your Honor.

3    THE COURT:  Mr. Kelleher?

4    MR. KELLEHER:  No.

5    THE COURT:  Okay.  Anything else?  No?  All

6  right.  I'm not going to take the time to bore you with my

7  ruling on the jury instructions right now.  We'll do that

8  probably when the jury is off deliberating.  We'll be in

9  recess.

10    (Brief recess taken.)

11    *    *    *

12    (Proceedings reconvened after recess.)

13    THE COURT:  Bring the jury in.

14    (Jury returned.)

15    THE COURT:  Good morning, ladies and gentlemen.

16  Welcome back.

17    A JUROR:  Good morning.

18    THE COURT:  Mr. Looby, before you sit, I'm going

19  to have him pass out to you more paper.  This is the verdict

20  sheet which will become relevant to you later today.  I

21  wanted you to have that.  I will read it to you when I'm

22  done with all the final instructions which will be after you

23  hear closing arguments, but you may see it or hear reference

24  to it during the lawyers' closing arguments so I wanted you

25  to have your copy, but before we get to closing arguments, I

1    have some instructions to read to you, as you know.  So I'm

2    going to pick up where I left off, at the end of yesterday,

3    which is page 49.

4              I am at now Section 7.0, entitled Trade Dress

5    Instructions.

6              7.1 is called Definition of a Trade Dress.

7              Trade dress is the nonfunctional physical detail

8    and design of a product or its packaging, which identifies

9    the product's source and distinguishes it from the products

10   of others.

11             Trade dress is the product's total image and

12   overall appearance, and may include features such as size,

13   shape, color, color combinations, texture or graphics.  In

14   other words, trade dress is the form in which a person

15   presents a product or service to the market, its manner of

16   display.

17             A trade dress is nonfunctional if, taken as a

18   whole, the collection of trade dress elements is not

19   essential to the product's use or purpose or does not affect

20   the cost or quality of the product even though certain

21   particular elements of the trade dress may be functional.

22             Trade dress concerns the overall visual impression

23   created in the consumer's mind when viewing the nonfunctional

24   aspects of the product and not from the utilitarian or useful

25   aspects of the product.  In considering the impact of the

1    nonfunctional aspects, which are often a complex combination

2    of many features, you must consider the appearance of features

3    together, rather than separately.

4         A person who uses the trade dress of another may

5    be liable for damages.

6              7.2.  Functionality.

7         Only nonfunctional trade dress is protectable.

8         The term "functional" has a specific meaning in

9    trade dress law.  Trade dress is not considered "functional"

10   merely because the trade dress, or its components, perform

11   useful functions.  Thus, for example, all bottles perform

12   the same function of holding a liquid, but this does not

13   mean that the specific design chosen for a bottle is

14   necessarily considered "functional" and unprotectable.

15        A design feature of a product is considered

16   "functional" and thus unprotectable as trade dress if that

17   design feature is essential to the use or purpose of the

18   product or if it affects the cost or quality of the product.

19   Put another way, a feature is functional if the product

20   works better because of that particular feature, such as a

21   shape, texture, color design, et cetera.

22        In determining whether AHG's trade dress is

23   functional, you should consider the trade dress as a whole.

24   A trade dress consisting of a combination of features may

25   be nonfunctional and thus protectable, even though the

1    combination includes functional features that, taken

2    separately, would not be protectable.  However, where the

3    combination as a whole is functional, the trade dress is not

4    protectable.

5              7.3.  The Plaintiffs' Burden of Proof.

6              In this case, the plaintiffs, AHG, contend that

7    the defendants, Broetje, has infringed AHG's trade dress.

8    AHG has the burden of proving by a preponderance of the

9    evidence that it is the owner of a valid trade dress and

10   that Broetje infringed that trade dress.  Preponderance of

11   the evidence means that you must be persuaded by the

12   evidence that it is more probably true than not true that

13   Broetje infringed AHG's trade dress.

14             7.4.  Infringement - Elements and Burden of

15   Proof - Trade Dress.

16             On AHG's claim for trade dress infringement, AHG

17   has the burden of proving by a preponderance of the evidence

18   each of the following elements:

19             1.  That the product configuration of AHG's

20   cassettes has acquired secondary meaning;

21             2.  That AHG owns the product configuration of

22   its cassette as trade dress;

23             3.  That the product configuration of AHG's

24   cassette is nonfunctional; and

25             4.  That Broetje used a product configuration

1    for its cassettes that was similar to AHG's product

2    configuration without AHG's consent in a manner that is

3    likely to cause confusion among ordinary consumers as to the

4    source, sponsorship, affiliation, or approval of Broetje's

5    product configuration.

6            If you find that each of the elements on which

7    AHG has the burden of proof has been proved, your verdict

8    should be for AHG.  If, on the other hand, AHG has failed to

9    prove any of these elements, your verdict should be for

10   Broetje.

11           7.5.  Ownership and Priority.

12           One of the things that AHG must prove is that

13   AHG owns the chrome color of its cassette; the shape and

14   size of its cassette; the shape, size, color and placement

15   of the handle; the placement, size and shape of the white

16   connectors; the clear case cover; and the overall look and

17   feel of the cassette as trade dress.

18           AHG owns the chrome color of its cassette; the

19   shape and size of its cassette; the shape, size, color and

20   placement of the handle; the placement, size and shape of

21   the white connectors; the clear case cover; and the overall

22   look and feel of the cassette as a trade dress in the

23   cassette if AHG used the trade dress in the United States in

24   a manner that allowed consumers to identify the trade dress

25   with AHG or its product before the Broetje Parties began to

1    use the current product configuration on their rivet

2    cassettes.

3           Among the factors you may consider are the

4    volume of sales of AHG's product, the nature of AHG's sales

5    and purchasers, the amount of AHG's advertising, and

6    publicity relating to the product.

7           7.6.  Acquired Distinctiveness - Secondary

8    Meaning.

9           Only distinctive trade dress is protectable;

10   generic trade dress is not.

11          A "generic" trade dress is a common or general

12   trade dress for a product whose primary significance to the

13   consuming public is to identify a class of similar products,

14   regardless of who sells them.  The consuming public consists

15   of people who may buy or use, or consider buying or using,

16   the product or similar product, for example, bear-shaped

17   gummy candies are common in the candy industry and are

18   generic shapes for this type of candy.

19          You should find that the trade dress at issue

20   in this case is "distinctive" only if you find that it had

21   acquired secondary meaning in the United States by the date

22   the Broetje Parties first sold a product in the United

23   States that AHG claims infringes that trade dress.  I will

24   now explain to you the idea of "secondary meaning."

25   Secondary meaning distinguishes the goods it represents from

1   similar goods offered by others and refers to the ability of

2   trade dress to relay to the public that the product or

3   service comes from a particular source.  Trade dress

4   acquires secondary meaning when it has been used in such a

5   way that its primary significance in the minds of

6   prospective purchasers is not the product itself but the

7   identification of the product with a particular source.  In

8   addition to your common sense and common experience as

9   citizens in the community, you may also consider the

10  following factors in determining whether a particular trade

11  dress has acquired secondary meaning:  (1) AHG's advertising

12  expenditures, measured primarily with regard to those for

13  advertisements which highlight the supposedly distinctive,

14  identifying feature; (2) length of use; (3) exclusivity of

15  use; (4) the fact of copying; (5) customer surveys; (6)

16  customer testimony; (7) the use of trade dress in trade

17  journals; (8) the size of the company; (9) the number of

18  sales; (10) the number of customers; and (11) actual

19  confusion.

20          The presence or absence of any particular factor

21  should not necessarily resolve whether AHG's trade dress had

22  acquired secondary meaning.

23          AHG has the burden of proving that its trade

24  dress has had acquired a secondary meaning.

25          The mere fact that AHG may be using its trade

1    dress, or that AHG may have begun using it before Broetje,

2    does not mean that the trade dress had acquired secondary

3    meaning.  There is no particular length of time that a trade

4    dress must be used before it acquires secondary meaning.

5                    7.7.  Likelihood of Confusion.

6              I will suggest some factors you should consider

7    in deciding likelihood of confusion.  The presence or

8    absence of any particular factor that I suggest should not

9    necessarily resolve whether there was a likelihood of

10   confusion, because you must consider all relevant evidence

11   in determining this.  As you consider the likelihood of

12   confusion you should examine the following:

13             1.  Strength or weakness of AHG's trade dress.

14   The more the consuming public recognizes AHG's trade dress

15   as an indication of origin of AHG's rivet cassettes, the

16   more likely it is that consumers would be confused about

17   the source of the Broetje Parties' rivet cassettes if the

18   Broetje Parties use a similar trade dress;

19             2.  Similarity of AHG's trade dress and the

20   Broetje Parties' product configuration.  If the overall

21   impression created by AHG's trade dress is similar to that

22   created by the Broetje Parties' product configuration, there

23   is a greater chance that consumers are likely to be confused

24   by the Broetje Parties' product configuration;

25             3.  Similarity of AHG' and the Broetje Parties'

1    goods or services.  If the Broetje Parties and AHG market

2    the same or related kinds of rivet cassettes, there may be a

3    greater likelihood of confusion about the source of rivet

4    cassettes than others;

5          4.  Actual confusion.  If there is evidence of

6    actual buyer confusion concerning AHG's trade dress and the

7    Broetje Parties' product configuration, this strongly

8    suggests a likelihood of confusion.  However, AHG need not

9    produce evidence of actual buyer confusion in order for you

10   to find that a likelihood of confusion exists;

11         5.  The Broetje Parties' intent in adopting

12   their product configuration.  Any evidence that the Broetje

13   Parties adopted their product configuration with the intent

14   to cause confusion between their rivet cassettes and AHG's

15   rivet cassettes should be weighed heavily in favor of a

16   finding of likelihood of confusion if: (a) the Broetje

17   Parties' intent to confuse or deceive is demonstrated by

18   clear and convincing evidence, and (b) the rivet cassettes'

19   labeling and marketing are also affirmatively deceiving.  On

20   the other hand, any evidence of the Broetje Parties' good

21   faith in seeking to avoid confusion (including the prominent

22   use or placement of the Broetje Parties' name or trademark

23   on its rivet cassettes) should be weighed against a finding

24   of likelihood of confusion;

25         6.  Distribution channels.  If AHG's and the

1095

1   Broetje Parties' rivet cassettes are likely to be sold to

2   the same or similar customers or through the same

3   distribution channels, this increases the likelihood of

4   confusion;

5           7.   The degree of purchaser care.  The more

6   costly the rivet cassettes, the more sophisticated, careful

7   and discriminating the buyers are likely to be.  Thus,

8   they may be less likely to be confused by similarities in

9   AHG's trade dress and the Broetje Parties' product

10  configuration.

11          8.   The length of time the Broetje Parties have

12  used their product configuration without evidence of actual

13  confuse arising;

14          9.   The extent to which the targets of AHG's and

15  the Broetje Parties' sales efforts are the same;

16          10.  The relationship of the goods in the minds

17  of consumers because of the similarity of function; and

18          11.  Other facts suggesting that the consuming

19  public might expect AHG to manufacture a product in

20  Broetje's market, or that AHG is likely to expand into that

21  market.

22          Although you should consider all of the above

23  factors as part of making your decision, the above list is

24  not intended to be exclusive and you should consider any

25  other factors or evidence that bear on likelihood of

1    confusion.

2              In considering these factors, your general

3    knowledge, and any other evidence, you should not treat any

4    single factor as dispositive; nor should you treat this as a

5    simple mathematical exercise where the party with most of

6    the above factors in its favor wins.  In other words, while

7    you should consider all the above factors, some factors may

8    be more important than others in the context of this case.

9    Thus, you should balance all the above factors and any other

10   relevant factors or evidence to determine whether, in light

11   of all the circumstances of this case, consumers are likely

12   to be confused.

13             Section 8.0 relates to unfair competition.

14             The parties agree that the same standard governs

15   infringement of an unregistered trade dress as governs the

16   claim for unfair competition under the same federal statute.

17   The parties further agree that the same standards govern the

18   claims for unfair competition in violation of state law.

19   Therefore, if you find for AHG on its trade dress

20   infringement claim, you should also find for AHG on its

21   unfair competition claims.  Similarly, if you find for

22   Broetje on its trade dress infringement claim, you

23   should also find for Broetje on AHG'S unfair competition

24   claims.

25             9.0.  Intentional interference with prospective

1    economic relations.

2              9.1.  Elements of claim.

3              AHG claims that the Broetje Parties

4    intentionally interfered with an economic relationship

5    between AHG and third parties that probably would have

6    resulted in an economic benefit to AHG.  To establish this

7    claim, AHG must prove all of the following:

8              1.  That AHG and the third party were in an

9    economic relationship that probably would have resulted in

10   an economic benefit to AHG;

11             2.  That the Broetje Parties knew of the

12   relationship;

13             3.  That the Broetje Parties engaged in wrongful

14   conduct through trade dress infringement or patent

15   infringement;

16             4.  That by engaging in this conduct, the

17   Broetje Parties intended to disrupt the relationship;

18             5.  The relationship that was disrupted.

19             6.  That AHG was harmed; and

20             7.  That the Broetje Parties' wrongful conduct

21   was a substantial factor in causing AHG's harm.

22             Now we're at Section 10.0, patent damages.

23             10.1 is patent damages generally.

24             I previously instructed you as to the law

25   governing patent infringement and invalidity.  If you find

that the Broetje Parties infringed one or more of claims 1,
2, or 6 of the '339 patent, or claims 1 or 2 of the '216
patent, by making, using, selling, or offering for sale any
of their accused products, you must determine the amount of
money damages to be awarded to AHG for the patent
infringement.  The amount of damages must be adequate to
compensate AHG for the infringement.  If you do not find
patent infringement by the Broetje Parties' accused
products, you will not consider patent damages at all.

AHG is entitled to damages that it has proven
with reasonable certainty.  On the one hand, reasonable
certainty does not require proof of damages with
mathematical precision.  Mere difficulty in ascertaining
damages is not fatal to the patent owner.  On the other
hand, the patent owner is not entitled to speculative
damages; that, you should not award any amount for loss,
which, although possible, is remote or left to conjecture or
guess.  You may base your evaluation of reasonable certainty
on any evidence, including expert or opinion evidence.

AHG has the burden of proving each element of
its damages by a preponderance of the evidence.  In other
words, you should award only the amount of lost profits that
AHG establishes that it more likely than not would have
received in profit but for Broetje's infringement of AHG's
patents.  The damages award should be based on sound

1    economic proof of the nature of the market.

2          It is not relevant to the question of damages

3    whether the Broetje Parties benefited from, realized profits

4    from, or even lost money as a result of the acts of

5    infringement.  The only issue is the amount necessary to

6    adequately compensate AHG for the Broetje Parties' patent

7    infringement.  Adequate compensation should return AHG to

8    the position it would have been in had there been no patent

9    infringement.

10         The fact that I am instructing you as to the

11   proper measure of damages should not be construed as

12   intimating any view of the Court as to which party is

13   entitled to prevail in this case.  Instructions as to the

14   measure of damages are given for your guidance in the event

15   you find the evidence in favor of AHG.

16         10.2.  Date patent damages may begin and end.

17         In this case, for any infringement of the '216

18   patent that you find, you should begin calculating damages

19   as of the date AHG first notified the Broetje Parties of its

20   claim for patent infringement of the '216 patent.  The

21   parties do not agree on that date, and it is up to you to

22   determine what that date is.  AHG must prove that it is more

23   likely than not that the Broetje Parties actually were

24   notified of the claim for patent infringement of the '216

25   patent as of the date alleged by AHG.  AHG can give notice

1   of the '216 patent by notifying the Broetje Parties with a

2   specific claim that the accused products infringed the '216

3   patent.  Such notice starts from the date the Broetje

4   Parties received the notice.  If you find that AHG, before

5   filing this lawsuit, did not notify the Broetje Parties with

6   a specific charge that the accused products infringed the

7   '216 patent, then AHG can only recover damages for

8   infringement of the '216 patent that occurred after it sued

9   the Broetje Parties on May 12, 2009.

10          For any infringement of the '339 patent that you

11  find, you should begin calculating damages as of the date

12  you find that the Broetje Parties began making, using,

13  selling, or offering for sale any of the accused products

14  that infringed any claim of the '339 patent.

15          The date that patent damages end in this case is

16  the date the '339 patent and the '216 patent expired, which

17  is December 7, 2009.

18          There are two common methods for computing

19  damages in a patent infringement case.  One is called lost

20  profits damages and the other is called reasonable royalty

21  damages.  In this case, AHG is seeking only lost profits in

22  connection with its patent infringement claims.  Lost

23  profits damages compensate the patent owner for the

24  additional profits it would have made if the accused

25  infringer had not infringed.  You may here this referred to

1    as the but-for test.

2              10.4, entire market value rule.

3              The entire market rule allows for the recovery

4    of damages based on the value of an entire product

5    containing several features, even though only one feature is

6    patented, when the patented feature constitutes the basis

7    for consumer demand for the product.  In other words, a

8    plaintiff can receive damages for lost sales of non-patented

9    components where plaintiff proves that the patented feature

10   drove customer demand for the non-patented components.

11   Further, the plaintiff must prove that the infringing and

12   noninfringing components are sold together so that they

13   constitute a functional unit or are parts of a complete

14   machine or single assembly of parts.  Lastly, the plaintiff

15   must prove that the individual infringing and noninfringing

16   components are analogous to a single functioning unit.  So,

17   if you find that AHG has proven by a preponderance of the

18   evidence that customers demanded Broetje's cassettes because

19   of the patented features, you may award damages based on the

20   value of the entire cassette.  However, if you find that

21   customers' demand for Broetje's cassettes is based on

22   something other than the patented feature, you should award

23   damages based on the value of the patented features and not

24   the value of the entire cassette.

25              10.5, patent lost profits -- but-for test.

1    AHG is seeking its lost profits as its patent

2    damages.

3    AHG must prove the amount of its lost profits.

4    To recover lost profits for some or all of the infringing

5    sales, AHG must show by a preponderance of evidence that,

6    but for the infringement, AHG would have made profits.  The

7    lost profits may be profits that would have resulted from

8    AHG's sales or a portion of them that the Broetje Parties

9    made of the accused product.  Thus, part of your job is to

10   determine what the customers who purchased the accused

11   product from the Broetje Parties would have done if the

12   alleged infringement had not occurred.  The profits I have

13   been referring to are the profits allegedly lost by AHG, not

14   the profits, if any, made by the Broetje Parties.

15   10.6, patent lost profits from lost sales (the

16   Panduit factors).

17   AHG has proven its lost profits if you find that

18   AHG has proven each of the following factors by a

19   preponderance of the evidence.

20   1.  There was demand for the patented product;

21   2.  There was an absence of acceptable

22   noninfringing substitutes.

23   3.  That AHG had the manufacturing and marketing

24   ability to make all or a part of the infringing sales

25   actually made by the Broetje Parties; and

1    4.   The amount of profit AHG would have made if

2    it were not for the Broetje Parties' infringement.

3          I will now explain each of these factors.

4          10.7.  Lost profits -- demands.

5          The first Panduit factors asks whether there was

6    demand for the patented product in the relevant market.  AHG

7    can prove demand for the patented product by showing

8    significant sales of AHG's own patented product.  AHG can

9    also prove demand for the patented product by showing

10   significant sales of the Broetje Parties' products that are

11   covered by the patent-in-suit.  To use sales of the Broetje

12   Parties' products as proof of this demand, however, AHG's

13   and the Broetje Parties' products must be sufficiently

14   similar to compete against each other in the same market or

15   market segment.  You should also not consider sales of

16   products that are mainly due to advertising and marketing,

17   or due to unpatented features of the products as evidence of

18   demand for the patented product.

19         10.8.  Lost profits -- acceptable non-infringing

20   substitutes.

21         The second factor asks whether there were

22   noninfringing, acceptable substitutes for the patented

23   products in the marketplace.  If the realities of the

24   marketplace are that competitors other than AHG would likely

25   have captured some or all of the sales made by the Broetje

1   Parties, even despite a difference in the products, then AHG

2   is not entitled to lost profits on those sales.

3           To be an acceptable substitute, the products

4   must have had one or more of the advantages of the patented

5   invention that were important to the actual buyers of the

6   infringing products (not necessarily to the public in

7   general.)  The acceptable substitutes also must not infringe

8   the patent because they were licensed under the patent or

9   they did not include all of the features required by the

10  patent.  The acceptable substitutes, in addition, must have

11  been available during the damages period.  An acceptable

12  noninfringing substitute is available if, during the damages

13  period, a competitor or the Broetje Parties had all the

14  necessary equipment, materials, know-how, and experience to

15  design and manufacture the substitute and sell such

16  substitute instead of its infringing products at the time

17  the sales for the infringing products were made.  If you

18  determine that some of the Broetje Parties' customers would

19  just as likely have purchased a noninfringing acceptable

20  product, then AHG has not shown it lost those sales but-for

21  Broetje's sales.

22          Even if you find that AHG's and the Broetje

23  Parties' products were the only ones with the advantages of

24  the patented invention, it still remains AHG's burden to

25  prove that it in fact would have made the Broetje Parties'

1    infringing sales.

2             10.9.   Lost profits -- capacity.

3             The third factor asks whether AHG had the

4    manufacturing and marketing ability to actually make the

5    sales it allegedly lost due to the Broetje Parties'

6    infringement.  AHG must prove that it could have supplied

7    the additional patented products needed to make the sales

8    AHG said it lost, or that someone working with AHG could

9    have supplied the additional patented products.  AHG also

10   must prove that it had the ability to market and sell those

11   additional patented products.

12            10.10.   Collateral sales -- convoyed or

13   derivative sales.

14            In this case, AHG contends that the patented

15   product is ordinarily sold along with other products, namely

16   AHG's loading stations, distribution racks, and other parts.

17   These other products are called collateral products, and the

18   sales of these types of collateral products are usually

19   referred to as convoyed sales.  Another type of collateral

20   products is spare or replacement parts.  The sales of these

21   types of collateral products are usually referred to as

22   derivative sales.  It is part of your job to determine if

23   AHG has proven that it is entitled to damages for the lost

24   sales of any collateral products.

25            To recover lost profits for lost sales of any

1  collateral products, AHG must prove two things.  First, AHG

2  must prove that it is more likely than not that it would

3  have sold the collateral products but-for the infringement.

4  Second, the collateral products and the patented product

5  must be so closely related that they effectively act or are

6  used together for a common purpose.  Damages for lost

7  collateral sales, if any, are calculated in the same way as

8  for calculating lost profits on the patented product.

9          10.11.  Lost profits -- doubts resolved against

10  infringer.

11          Any doubts that you may have on the issue of

12  damages due to the Broetje Parties' failure to keep proper

13  records should be decided in favor of AHG.

14          10.12.  Patent damages interest.

15          Neither AHG's nor Broetje's calculations include

16  interest.  Therefore, in arriving at your damages

17  calculation, you should not consider interest in any way

18  because it is the function of the Court to award interest.

19          Section 11.0.  Non-patent damages.

20          11.1.  Damages for trade dress infringement and

21  unfair competition -- generally.

22          If you find based on the instructions you have

23  been given that Broetje infringed AHG's trade dress and/or

24  unfairly competed with AHG, you may award AHG damages in an

25  amount you determine to be fair and equitable, consisting of

1   the sum of, (1), AHG's actual damages attributable to

2   Broetje's infringing AHG's trade dress and/or unfair

3   competition; and (2) Broetje's profits attributable to

4   infringing AHG's trade dress and/or unfairly competing with

5   AHG.

6           11.2.  Damages for trade dress infringement and

7   unfair competition -- actual damages.

8           If you find for AHG on its trade dress

9   infringement claim, you must determine AHG's actual

10  damages.

11          AHG has the burden of proving actual damages by

12  a preponderance of the evidence.  Damages means the amount

13  of money which will reasonably and fairly compensate the

14  plaintiff for any injury you find was caused by defendants'

15  infringement of the plaintiffs' trade dress.

16          You should consider the following:  (1) the

17  injury to or loss to the plaintiffs' reputation; (2), the

18  injury to loss of the plaintiffs' goodwill, including injury

19  to the plaintiffs general business reputation.  (3), the

20  lost profits that the plaintiff would have earned but for

21  the defendants' infringement; and, (4), the expense of

22  preventing customers from being deceived.

23          When considering prospective costs, you must not

24  overcompensate.  Accordingly, your award of such future

25  costs should not exceed the actual damage to the value of

1108

1     the plaintiffs' mark at the time of the infringement by the

2     defendant.

3          11.3.  Damages for trade dress infringement and

4     unfair competition -- Broetje's profits.

5          In addition to actual damages, the plaintiff is

6     entitled to any profits earned by the defendant that are

7     attributable to the infringement, which the plaintiff proves

8     by a preponderance of the evidence.  You may not, however,

9     include in any award of profits any amount that you took

10    into account in determining actual damages.

11         Profit is determined by deducting all expenses

12    from gross revenue.  Gross revenue is all of the Broetje

13    Parties' revenues resulting from using the use of AHG's

14    trade dress.

15         Expenses are all operating, overhead and

16    production costs incurred in producing the gross revenue.

17    The defendant has the burden of proving the expenses and the

18    portion of the profit attributable to factors other than the

19    use of the infringed trade dress by a preponderance of the

20    evidence.

21         Unless you find that a portion of the profit

22    from the use of AHG's trade dress is attributable to factors

23    other than the use of the trade dress, you shall find that

24    the total profit is attributable to the infringement.

25         11.4.  Damages for trade dress infringement:

1    Intentional infringement.

2              If you find that Broetje infringed AHG's trade

3    dress, you must determine whether Broetje used the trade

4    dress intentionally, showing it was an infringement.

5              11.5.  Damages for trade dress infringement and

6    state unfair competition:  Punitive damages.

7              If you decide that the Broetje Parties' conduct

8    caused AHG harm, you must decide whether that conduct

9    justifies an award of punitive damages.  The purposes of

10   punitive damages are to punish a wrongdoer for the conduct

11   that harmed the plaintiff and to discourage similar conduct

12   in the future.

13             You may award punitive damages against the

14   Broetje Parties only if AHG proves that the Broetje Parties

15   engaged in unfair competition, and that the Broetje Parties

16   did so with malice, oppression, or fraud.  To do this, AHG

17   must prove one of the following by clear and convincing

18   evidence:

19             1, that the conduct constituting malice,

20   oppression, or fraud was committed by one or more officers,

21   directors, or managing agents of the Broetje Parties, who

22   acted on behalf of the Broetje Parties; or

23             2.  That the conduct constituting malice,

24   oppression, or fraud was authorized by one or more officers,

25   directors, or managing agents of the Broetje Parties; or

1      3, that one or more officers, directors, or

2  managing agents of the Broetje Parties knew of the conduct

3  constituting malice, oppression, or fraud and adopted or

4  approved that conduct after it occurred.

5      Malice means that the Broetje Parties acted with

6  intent to cause sir gee or that the Broetje Parties' conduct

7  was despicable and was done with a willful and knowing

8  disregard for AHG's rights.  A person acts with knowing

9  disregard when he or she is aware of the probable harmful

10  consequences of his or her conduct and deliberately fails to

11  avoid those consequences.  Oppression means that the Broetje

12  Parties' conduct was despicable and subjected AHG to cruel

13  and unjust hardship in knowing disregard of AHG's rights.

14  Despicable conduct is conduct that is so vial, base, or

15  contemptible that it would be looked down on and despised by

16  reasonable people.  Fraud means that the Broetje Parties

17  intentionally misrepresented or concealed a material fact

18  and did so intending to harm AHG.

19      An employee is a managing agent if he or she

20  exercises substantial independent authority and judgment in

21  his or her corporate decision-making such that his or her

22  decisions ultimately determine corporate policy.

23      There is no fixed formula for determining the

24  amount of punitive damages, and you are not required to

25  award any punitive damages.  If you decide to award punitive

1   damages, you should consider all of the following factors in

2   determining the amount:

3           (a) how reprehensible was the Broetje Parties'

4   conduct?  In deciding how reprehensible the Broetje Parties'

5   conduct was, you may consider, among other factors:

6           1.  Whether the Broetje Parties' conduct

7   involved a pattern or practice; and.

8           2.  Whether the Broetje Parties acted with

9   trickery or deceit.

10          (b).  Is there a reasonable relationship between

11  the amount of punitive damages and AHG's harm?

12          (c).  In view of the Broetje Parties financial

13  condition, what amount is necessary to punish it and

14  discourage future wrongful conduct?  You may not increase

15  the punitive award above an amount that is otherwise

16  appropriate merely because the Broetje Parties have

17  substantial financial resources.  Any award you impose may

18  not exceed the Broetje Parties' ability to pay.

19          Punitive damages may not be used to punish the

20  Broetje Parties for their impact of their alleged misconduct

21  on persons other than AHG.

22          11.6.  Statute of limitations:  Trade dress

23  infringement.

24          The Broetje Parties contend that AHG's lawsuit

25  was not filed within the time set by law.  I instruct you

1     that you can only find the Broetje Parties liable for trade

2     dress infringement that AHG proves occurred after May 12,

3     2006.  You cannot find the Broetje Parties liable for any

4     trade dress infringement that may have occurred before May

5     12, 2006.

6             11.7.  Statute of limitations:  Trade dress

7     infringement -- delayed discovery.

8             If the Broetje Parties prove that AHG's claimed

9     harm occurred before May 12, 2006, AHG's lawsuit was still

10     filed on time if AHG proves that before that date, AHG did

11     not discover, and did not know of facts that would have

12     caused a reasonable person to suspect, that it had suffered

13     harm in the United States that was caused by machines

14     wrongful conduct.

15             11.8.  Statute of limitations:  Federal law

16     unfair competition.

17             The Broetje Parties contend that AHG's lawsuit

18     was not filed within the time set by law.  I instruct you

19     that you can only find the Broetje Parties liable for unfair

20     competition under federal law for unfair competition that

21     AHG proves occurred after May 12, 2006.  You cannot find the

22     Broetje Parties label for any federal unfair competition

23     that may have occurred before May 12, 2006.

24             11.9.  Statute of limitations:  Federal law

25     unfair competition -- delayed discovery.

1        If the Broetje Parties prove that AHG's claimed

2   harm occurred before May 12, 2006, AHG's lawsuit was still

3   filed on time if AHG proves that, before that date, AHG did

4   not discover, and did not know of facts that would have

5   caused a reasonable person to suspect, that it had suffered

6   harm in the United States that was caused by someone's

7   wrongful conduct.

8        11.10.  Statute of limitations:  State law

9   unfair competition (state law).

10       The Broetje Parties contend that AHG's lawsuit

11  was not filed within the time set by law.  I instruct you

12  that you can only find the Broetje Parties liable for trade

13  dress infringement that AHG proves occurred after May 12th,

14  2007.  You cannot find the Broetje Parties liable for any

15  trade dress infringement that may have occurred before May

16  12, 2007.

17       11.11.  Statute of limitations:  State law

18  unfair competition -- delayed discovery.

19       If the Broetje Parties prove that AHG's claimed

20  harm occurred before May 12, 2007, AHG's lawsuit was still

21  filed on time if AHG proves that before that date, AHG did

22  not discover, and did not know of facts that would have

23  caused a reasonable person to suspect, that it had suffered

24  harm in the United States that was caused by someone's

25  wrongful conduct.

1        11.12.   Damages for intentional interference

2   with prospective economic advantage:   Generally.

3        If you decide that AHG has proved its claim

4   against the Broetje Parties, you also must decide how much

5   money will reasonably compensate AHG for the harm.   This

6   compensation is called damages.

7        The amount of damages must include an award for

8   each item of harm that was caused by the Broetje Parties'

9   wrongful conduct, even if the particular harm could not have

10  been anticipated.

11       AHG does not have to prove the exact amount of

12  damages that will provide reasonable compensation for the

13  harm.   However, you must not speculate or guess in awarding

14  damages.

15       The following are the specific items of damage

16  claimed by AHG are:

17            1, lost profits; and

18            2.   Punitive damages.

19       11.13.   Damages For Intentional Interference

20  With Prospective Economic Advantage - Compensatory Damages.

21       As compensatory damages, AHG claims lost profits

22  that AHG allegedly would have earned but for Broetje's

23  intentional interference with AHG's prospect ticket economic

24  advantage with third party customers.   To recover damages

25  for lost profits, AHG must prove it is reasonably certain

1    that it would have earned profits but-for Broetje's conduct.

2              To decide the amount of damages for lost

3    profits, you must determine the gross amount AHG would have

4    received but-for Broetje's conduct and then subtract from

5    that amount the expenses AHG would have had if Broetje's

6    conduct had not occurred.

7              The amount of lost profits need not be

8    calculated with mathematical precision, but there must be a

9    reasonable basis for computing the loss.

10              11.14.  Damages For Intentional Interference

11   With Prospective Economic Advantage:  Punitive Damages.

12              If you decide that the Broetje Parties' conduct

13   caused AHG harm, you must decide whether that conduct

14   justifies an award of punitive damages.  The purposes of

15   punitive damages are to punish a wrongdoer for the conduct

16   that harmed the plaintiff and to discourage similar conduct

17   in the future.

18              You may award punitive damages against the

19   Broetje Parties only if AHG proves that the Broetje Parties

20   engaged in intentional interference with prospective

21   economic advantage; and that the Broetje Parties did so with

22   malice, oppression, or fraud.  To do this, AHG must prove

23   one of the following by clear and convincing evidence:

24              1.  That the conduct constituting malice,

25   oppression, or fraud was committed by one or more officers,

1    directors, or managing agents of the Broetje Parties, who

2    acted on behalf of the Broetje Parties; or

3                2.  That the conduct constituting malice,

4    oppression, or fraud was authorized by one or more officers,

5    directors, or managing agents of the Broetje Parties; or.

6                3.  That that one or more officers, directors,

7    or managing agents of the Broetje Parties knew of the

8    conduct constituting malice, oppression, or fraud and

9    adopted or approved that conduct after it occurred.

10               "Malice" means that the Broetje Parties acted

11   with intent to cause injury or that the Broetje Parties'

12   conduct was despicable and was done with a willful and

13   knowing disregard for AHG's rights.  A person acts with

14   knowing disregard when he or she is aware of the probable

15   harmful consequences of his or her conduct and deliberately

16   fails to avoid those consequences.

17               "Oppression" means that the Broetje Parties'

18   conduct was despicable and subjected AHG to cruel and unjust

19   hardship in knowing disregard of AHG's rights.  "Despicable

20   conduct" is conduct that is so vile, base, or contemptible

21   that it would be looked down on and despised by reasonable

22   people.  "Fraud" means that the Broetje Parties

23   intentionally misrepresented or concealed a material fact

24   and did so intending to harm AHG.

25               An employee is a "managing agent" if he or she

1    exercises substantial independent authority and judgment in

2    his or her corporate decision-making such that his or her

3    decisions ultimately determine corporate policy.

4            There is no fixed formula for determining the

5    amount of punitive damages, and you are not required to

6    award any punitive damages.  If you decide to award punitive

7    damages, you should consider all of the following factors in

8    determining the amount:

9            (a)   How reprehensible was the Broetje Parties'

10   conduct?  In deciding how reprehensible the Broetje Parties'

11   conduct was, you may consider, among other factors:

12           1.  Whether the Broetje Parties' conduct

13   involved a pattern or practice; and

14           2.  Whether the Broetje Parties acted with

15   trickery or deceit.

16           (b)   Is there a reasonable relationship between

17   the amount of punitive of damages and AHG's harm?

18           (c)   In view of the Broetje Parties' financial

19   condition, what amount is necessary to punish it and

20   discourage future wrongful conduct?  You may not increase

21   the punitive award above an amount that is otherwise

22   appropriate merely because the Broetje Parties have

23   substantial financial resources.  Any award you impose may

24   not exceed the Broetje Parties' ability to pay.

25           Punitive damages may not be used to punish the

1   Broetje Parties for the impact of their alleged misconduct

2   on persons other than AHG.

3          11.15.  A Statute of Limitations:  Intentional

4   Interference With Prospective Economic Advantage.

5          The Broetje Parties contend that AHG's lawsuit

6   was not filed within the time set by law.  To succeed on

7   this defense, the Broetje Parties must prove that each of

8   AHG's claimed harms occurred before May 12, 2007.

9          11.16.  Statute of Limitations:  Intentional

10  Interference With Prospective Economic Advantage - Delayed

11  Discovery.

12         If the Broetje Parties prove that AHG's claimed

13  harm occurred before May 12, 2007, AHG's lawsuit was still

14  filed on time if AHG proves that before that date, AHG did

15  not discover, and did not know of facts that would have

16  caused a reasonable person to suspect that it had suffered

17  harm in the United States that was caused by someone's

18  wrongful conduct.

19         Page 93.  11.17.  No Duplicative Damages -

20  Nonpatent Damages.

21         AHG seeks damages from the Broetje Parties under

22  more than one legal theory.  However, each item of damages,

23  except punitive damages, may be awarded only once,

24  regardless of the number of legal theories alleged.

25         You will be asked to decide whether the Broetje

1   Parties are liable to AHG under the following legal

2   theories:

3           1.  Trade dress infringement;

4           2.  Federal law unfair competition;

5           3.  State law unfair competition;

6           4.  Intentional interference with prospective

7   business advantage.

8           The following items of compensatory damages are

9   recoverable only once whether under one or more of the

10  foregoing:

11          1.  AHG's damages;

12          2.  The Broetje Parties' profit resulting from

13  the infringement.

14          In other words, the total compensatory damages

15  award for trade dress infringement, federal unfair

16  competition, state law unfair competition, and intentional

17  interference with prospective business advantage,

18  individually or in any combination, cannot exceed the total

19  of all of AHG's damages plus all of the Broetje Parties'

20  profits.

21          Punitive damages, if you determine that AHG is

22  entitled to them, should be awarded separately from the

23  compensatory damages.

24          12.0.  Closing Statement - Damages.

25          The fact that I have instructed you regarding

1    damages should not be construed as suggesting which party is

2    to prevail in this case.  Instructions regarding damages are

3    given for your guidance in the event that the evidence leads

4    you to find in favor of AHG.

5                    13.0.  Foreign Law.

6                    You have heard evidence about legal proceedings

7    involving some of the parties to this lawsuit that have

8    occurred and may be ongoing in France and Germany.  Be

9    mindful, however, that the laws in France and Germany are

10   different than the laws in the United States.  For example,

11   the procedures for determining patent infringement and

12   patent invalidity are different in France and Germany than

13   they are in the United States.  Additionally, the patents

14   at issue in France and Germany are not the same patents at

15   issue in this case.

16                   The evidence of foreign legal proceedings was

17   introduced to provide you background as to the parties'

18   relationship.  You might also find this evidence to be

19   relevant to Broetje's knowledge of the patents in suit and

20   intent, which you may find to be relevant to AHG's claims

21   for induced infringement, contributory infringement, and

22   willful infringement.

23                   Similarly, be mindful that any foreign decision

24   with respect to trade dress infringement or the contractual

25   relationship between the parties was also not based on

1    United States law and AHG is not asserting a breach of

2    contract claim here.  Although the foreign decisions may

3    provide you with helpful background information, your duty

4    with respect to all of the issues before you is to apply the

5    law as I have instructed you to the facts as you find them

6    based solely on the evidence presented here in court.

7              That's all I'm going to read to you for now.

8    I'm going to save the last few pages to read after you hear

9    closing argument.  And because of the time allotted for

10   closing argument, it makes the most sense to give you a very

11   short break now.  This will be hopefully your last break.

12   It will be your morning break.  No talking about the case

13   yet.  When we get you back here shortly, we will hear

14   closing arguments.

15             (Jury left courtroom.)

16             THE COURT:  All right.  We will be checking in

17   with the jury in approximately 10 minutes.  And if they're

18   ready to go, we'll be back in.  We will be in recess.

19             (Brief recess taken.)

20             *     *     *

21             (Proceedings reconvened after recess.)

22             THE COURT:  All right.  The jury is ready.  We

23   will give each side a ten minute and two minute warning, if

24   you get to that point on your time limit.

25             We'll bring the jury in.

```
 1                    (Jury returned.)

 2              THE COURT:  All right.  Ladies and gentlemen,

 3    I'll now call on AHG for closing argument.  Mr. Lindvall.

 4              MR. LINDVALL:  Thank you, Your Honor.

 5              First, I want to sincerely thank you for

 6    spending a week with us.  I know you had a lot better things

 7    to do than spend it here in the courtroom, but I know my

 8    client, clients, and I know Mr. Bornes appreciates your

 9    service.  It gives them their day in court, so to speak.

10              Before I begin talking about what I will, what I

11    want you to understand, you are going to hear a lot of

12    attorney argument.  You are going to hear it from me, and

13    you are going to hear it from my opponent.  As the Judge has

14    instructed you, attorney argument is just that, it is not

15    evidence.

16              What you are supposed to do is look at the

17    evidence.  I want you to look at the documents and the trial

18    testimony that I'm going to show you today.  And when you

19    see the trial testimony and the documents, I am sure you

20    will be convinced that not only did Broetje infringe the

21    patents, infringe the trade dress in this situation, but

22    they did it with malice.  They did it willfully and

23    intentional.  And I'm going to show you evidence.  I'm not

24    just going to tell you this.  I'm going to show you

25    documents and testimony we pulled from the trial transcript
```

1    to show you we proved our case.

2              What I will do, as we go through, I will point

3    out to you certain of the exhibit numbers because when you

4    go back to the juryroom, you will have the exhibits,

5    including even these cassettes, and you will be able to look

6    at these in the juryroom.

7              Okay.  The first part, like I just said.  This

8    case, just like I said in my opening statement, this case is

9    about deliberate copying.  And it's almost there is no

10   dispute about that.  Now, they may try to take the position

11   that we copied them.  We think such a position, of course,

12   is outrageous that they possibly think we copied them.

13             But anyway, we have some very clear documents

14   they copied us on this.  I really don't think that is an

15   issue that can be disputed here.

16             As you can see, we have the cassettes, which you

17   have seen over and over again, and you can see the tube

18   profile of both pentagons.

19             They could have picked a multitude of shapes

20   other than a pentagon shape but they didn't.  Why?  Because

21   we already optimized it.  We already figured out the

22   pentagon was the best shape, as Mr. Bornes testified that

23   he spent several years coming up with this invention and

24   optimize it to where the pentagon shape is the best shape.

25             The other aspect is the willful infringement of

 1    AHG's patent.  They had known about our patent, and we'll

 2    show you this, or existence of foreign patents at least

 3    since the signing of the contract back in 1994.  And

 4    Dr. Budach did not give a written opinion, if we can call

 5    it an opinion, we'll talk about that later, until 2005.  So

 6    you can count how many years went by without any opinion

 7    whatsoever.

 8              Now, they didn't start their own development

 9    until 2003 but they still waited several years until we

10    raised the issue in the German litigation and then they went

11    out and got an opinion.  Again, that is something to talk

12    about later on.

13              All right.  Let's briefly go to what was their

14    state of mind at the time?  Can you go to the next slide,

15    please?

16              This kind of says it all.  This is Dr. Budach's

17    opinion.  This is DTX-1605.  That is the exhibit number.

18    And Dr. Budach's opinion is at the very end, and you can

19    pick up the opinion and read it yourself.

20              They have an option here.  We don't know whether

21    they took the option or not, but they have an option here.

22    Their policy is not we will never infringe a patent, their

23    policy is we will infringe a patent if we get internal

24    management approval.  And all that takes is to discuss

25    briefly by phone beforehand, whether that is even necessary

1       here.

2                   Do you believe Dr. Budach whether they did that

3       or not?  I don't know.  That is for you to decide.  But he

4       makes it clear we think within CLAAS and within Broetje they

5       had the option to infringe deliberately.  And all it took

6       was a brief phone call to CLAAS's internal management.

7                   So that kind of sets the stage, the state of

8       mind how Broetje thinks and what they would allow to happen

9       back in this time frame.

10                  Now, let's go to PDTX-204, please.

11                  It kind of all starts -- and what I'm going to

12      do is give you kind of a highlight first and I will go back

13      to my timeline I used in my opening statement.  It starts in

14      2002.

15                  And can we put up JTX-66, please?

16                  And I know you have seen this e-mail over and

17      over again.  This is the e-mail.  JTX-66 is the e-mail from

18      Mr. Maylander, and it's dated June 18, 2002.

19                  And the subject is:  Our meeting from last week.

20                  Dear Mr. Bornes,

21                  I have informed Mr. Holtmeier -- remember he was

22      the general manager, like the CEO of Broetje at the time --

23      about your activities at Gemcor.

24                  Let's talk about that again.  You heard a lot

25      about this now.  What happened was Mr. Bornes, for whatever

```
 1    reason, felt obligated to act in good faith.  He went up

 2    to Mr. Maylander and said, AHG is now considering selling

 3    to Gemcor.  He didn't have an obligation to tell that to

 4    Mr. Maylander but he did it.  He felt that was the way you

 5    conduct business.

 6              If I'm going to sell to one of the competitors,

 7    I'm going to tell them just so they have some notice.

 8              Obviously, you see how the reaction is.  The

 9    reaction is they were extremely disappointed and very

10    unhappy that they were going to deal with Broetje's main

11    competitor.

12              It kind of set the stage.  Broetje was upset now

13    that AHG was going to do this.  Again, Mr. Bornes is not

14    concealing any facts here.  He told them in a meeting that

15    we're going to deal with Gemcor.  You recall from the

16    contract we were perfectly within our rights to do that.

17    We're going to sell to some other companies.  What is wrong

18    with that?

19              Okay.  So let's go to PDTX-207.

20              So 2002.  So what happens?  About a little less

21    than a year comes by and internally they make a decision.

22    And this document I think is a real very key document in

23    this case.  It's JTX-14.

24              This is the copy document.  This is the document

25    where internally they took our cassette, a rack, our loading
```

1    station.   There are photographs all over it in there,

2    including detailed photographs.   And that is where they did

3    the development, they actual copied our product, and you can

4    pick that exhibit up yourself and you will see it, and you

5    will see all kinds of photos in there, and you will see the

6    testimony later on where he said that is the only example

7    they used.   And lo and behold, you say see what came out is

8    basically an exact replica of what they have done.   So that

9    is what they did.

10            Now, did they tell Mr. Bornes that they were

11   going to do this?   No.   There is no testimony whatsoever in

12   the record that they ever told Mr. Bornes, you know what?

13   If you're going to deal with Gemcor, we're going to develop

14   our own cassette.   They kept it quiet instead of saying they

15   were going to develop their own.   There is no testimony

16   whatsoever.

17            So the title of this document, and that's by

18   testimony, is Development of Innovative Rivet Feeding

19   Technique.   That's the title of the whole thing.   That's an

20   internal document again.

21            If we can turn to the next page, please.

22            Here is some trial testimony.   What I'm going to

23   do today is show you trial testimony.   This is actually from

24   the testimony transcript, and you see I actually cite to the

25   transcript.   Obviously, you don't remember everything but we

1    tried to pull out snippets so you can see the impact.

2              And this is a Broetje employee, Mr. Neugebauer.

3              And I said:

4              "Question:  Let's look at page 19 of this

5    document."

6              This document here.

7              "Answer:  That is an AHG cassette as an

8    example."

9              That's what he answers.  Used as an example.

10             "Question:  You said AHG cassettes is in there.

11   There is no other example in this complete development

12   document other than an AHG as an example.  Correct?

13             "Answer:  Yes."

14             In other words, you pick this document up, the

15   only thing you see in there is basically detailed study of

16   AHG's product, and they're taking it and looking at it and

17   figuring out how to copy this.

18             Turn to the next slide, please.

19             Now here is the trial testimony from Dr. Peters

20   who is the chief operating officer of the company.

21             And he says:

22             "Question:  Do you know why this -- AHG's rivet

23   cassette is being shown in Broetje's internal documentation

24   relating to its development of its own cassette?

25             "Answer:  Because it's an example of the rivet

1    cassette.

2              "Question:  And why would there be an example of

3    a rivet cassette shown?

4              "Answer:  Because you want to develop your own

5    system.  Because we wanted to develop our own system."

6              In other words, they didn't go from scratch and

7    say you know what?  There is a lot of faults with our

8    product.  It's no good.  We don't like it.  It's not

9    technically feasible.  There are lots of problems.  Let's

10   start and develop our own system.

11             If there are all these faults with this cassette

12   like they said there are, why did they copy it?  Why did

13   they use this as an example.  You would think that with all

14   these fault reports, they would say no, forget about theirs.

15   Let's start from scratch.  We're great engineers.  We don't

16   need to use theirs as an example because we know it doesn't

17   work.  That's according to their testimony.  So let's start

18   with a whole different system.

19             You see companies like ElectroImpact had come up

20   with a system, and they claimed that it's even working by

21   now.  We dispute that, but they could have come up with

22   their own unique design.

23             In fact, their cassette was so close to ours,

24   they could take their cassette that they designed from the

25   internal documents and stick it in our racks and it would

1130

1   work.  In fact, that's what you see in factories even today:

2   their cassette in our racks.  That is how closely they

3   copied, the dimensions and everything else.

4           And the last part.  Dr. Peters again.

5           "Question:  And in developing your own system,

6   you used as an example of developing your own system AHG's

7   own product; correct?

8           "Answer:  Yes."

9           So it's undisputed, once this document was shown

10  to them, that they copied it.  They used it as an example.

11          There wasn't one time that they put a witness up

12  in the last four days to explain this document.  You never

13  saw one of their witnesses come up and explain this

14  document.  The only time you saw this document arise is when

15  we cross-examined them on it.  They ran away from this

16  document, and there is a reason for that.

17          Now, let's go back to PTX-205, please, Jeff.

18          Pardon me.

19          This is a point that is extremely important in

20  this case.  You heard the Judge's instructions about

21  punitive damages and intentional concealment and malice.

22  This is where it is.  This is a very important point to

23  understand.

24          This is PTX-657.  This is the e-mail.

25          If you could pull up the actual e-mail.  I like

1  to show the actual evidence instead of slides because

2  sometimes slides can be tricky on this.  But this is the

3  actual e-mail.  And this is the part of the e-mail with the

4  "PS."  This is from Mr. Neugebauer again.  And this is

5  dated, if my French is right, July 2003.

6         And this is the part right here (indicating).

7         Now, remember the internal document, we showed

8  the copy document, I call it, JTX-14?  That is dated in June

9  of 2003.  So they had already created that document, made a

10 decision.  They had already made a decision to create their

11 own cassette and their own rack and loading system.  They

12 already made the decision in June 2003.  Okay?  So that

13 decision has been made.  The ship sailed on that one.

14        But a month later, an e-mail was sent to

15 Phillippe Bornes saying:  Just between you and me, the

16 company is very, very deeply "unsatisfied" concerning to the

17 situation with Gemcor.

18        Again, like Mr. Maylander's e-mail:  Why are you

19 dealing with our main competitor?  Because they realize this

20 AHG cassette system is going to give Gemcor not only, well,

21 maybe an advantage but it will put them on the same par in

22 the competition between Boeing and what have you for their

23 systems because then Gemcor can say, well, we have the AHG

24 system also, so Broetje doesn't have that extra edge over

25 Gemcor.  Obviously, Broetje does not want Gemcor to have

1    that edge.

2              So just between you and me, the company is very,

3    very deeply "unsatisfied" concerning to the situation with

4    Gemcor.  There are several discussions in-house, also with

5    our mother company" -- that is CLAAS, if you remember --

6    "how to react on that obstacle."

7              Well, guess what?  They had already figured out

8    how to react.  They started development a month earlier.

9    Remember, I questioned Mr. Neugebauer and I told him that is

10   not the truth, is it?  And he admitted it was an untruth.

11   And I will show you the testimony, the actual testimony.

12   And he says he does untruths like this to pressure people.

13   He is trying to pressure Mr. Bornes.

14             Did he tell Mr. Bornes in this e-mail, oh, by

15   the way, we already made a decision a month ago we already

16   started development of our cassette?  No.  He didn't tell

17   Mr. Bornes anything.

18             Mr. Bornes was up front.  He was very candid.

19   He said you know what?  We're going to deal with Gemcor.

20   I'm going to give you a heads up.  What do they do?  You can

21   see right here.

22             So what they're doing, they're basically telling

23   Mr. Bornes quit dealing with Gemcor, and behind his back

24   what are they doing?  They're developing their own cassette.

25   What do they gain out of that?  A huge advantage.  They

1    concealed the fact from Mr. Bornes that they are developing

2    their own cassette that gives them a business advantage --

3    a huge business advantage because that means AHG says,

4    okay, well, we'll stay with you, Broetje, and we won't

5    sell to Gemcor.  And, sure enough, behind his back they're

6    developing a cassette.  Once they come out with the

7    cassette, AHG is stuck with nothing.  That is exactly what

8    they wanted basically.

9            So now Broetje has got a fully developed system,

10   AHG doesn't have any customers, and that is it.  So there is

11   no more AHG.  Gemcor won't have AHG but there is Broetje and

12   they have their own system.

13           The only way you can explain this is because

14   he was the program manager who testified he was part of

15   that team developing the cassette, and a month after the

16   development document came out, he is trying to tell Mr.

17   Bornes we haven't made a decision but we are very upset.

18   They had already made a decision.

19           And it says right here.  It says:  "It seems to

20   be that there is the possibility that we will quit the

21   relationship with you."

22           There is not a possibility.  They have already

23   decided.  That is a lie.

24           "You should really think about a possible

25   solution."

1    In other words, he is saying stay with us, wink
2  wink.  Forget about Gemcor, say you can't work with them and
3  we'll continue to develop.  It's a pretty good track record.
4  It's very deceitful.  Very deceitful.
5         Let's go to the next slide of PDTX-206, please.
6         Here is some trial testimony from Mr.  Neugebauer.
7  Again, I'm trying to show you just evidence, not just fancy
8  slides.
9         "Question:  So you are basically telling
10 Mr. Bornes you better quit selling to Gemcor or we are going
11 to make our own cassette or we are going to do something
12 else.  Correct?
13         "Answer:  In principle, yes, that's right."
14         So he is telling him quit dealing with Gemcor or
15 else.  We all know.  They weren't designing their own thing.
16         Now, the interesting thing about his whole
17 testimony, he doesn't say -- well, what is interesting is
18 they brought up these fault reports.  You remember these
19 things, that they called our product, you know, get rid of
20 our product, it's got all these faults.
21         Why are they playing these games with us?  Why
22 they don't they say:  Mr. Bornes, you don't have a good
23 product.  We don't want your product anymore.  Sell it to
24 Gemcor.  In fact, that will give us a tactical advantage
25 because there are so many faults with this cassette, if you

1   give it to Gemcor, then Gemcor, they'll have to deal with

2   it then and we'll have the business.

3              No, they weren't doing that.  They knew there an

4   advantage of having the AHG system.

5              If I was in business and I wanted to destroy the

6   other side, to do damage to another competitor and I knew a

7   product I could get them to start buying, it's no good, that

8   would be the perfect solution.  So I would promote them to

9   sell it to Gemcor if it was such an inferior product as they

10  claim.

11             Now, let's turn to PDX-211.

12             Now, here is another document I wanted you to

13  see.  This document is JTX-8.  And that is the source.

14  JTX-8.  If you can pull up the document again.  Pull up the

15  document, please.  JTX-8.

16             Okay.  The testimony was this is a presentation

17  to customers.  So when they go to customers, this is a

18  document they use for presenting to customers and describing

19  the product.

20             And if we go to the last page.

21             Do you see what they have here?  There is

22  testimony, and everybody realized that is an AHG cassette.

23  Where is the logo?

24             They take the logo out.  Why?  Because obviously

25  they want to conceal the AHG.  This is a presentation to the

1   customers.

2              If we could go back a slide, please.

3              And you see here the trial testimony of the

4   President of Broetje USA.  It says:

5              "Question:  That's an AHG and F2C2 cassette, is

6   it not.

7              "Answer:  Yes, it is.

8              And he is pointing to the cassette I just showed

9   you.

10              "Question:  In this presentation, you whited out

11   or somebody whited out AHG/F2C2, did they not?

12              "Answer:  I can't speak to whether or not it was

13   whited out or not."

14              He can see it was whited out.

15              "Question:  Well, you don't see it in the

16   picture, do you?

17              "Answer:  No, I don't see it in the picture."

18              You are going to see this theme through this

19   testimony.  I'm going to show you more testimony where they

20   basically try not to -- they don't want to admit anything

21   but they can't address a lot of these different situations.

22   It's kind of like the copy document where they never put a

23   witness up there to explain that document.

24              Excuse me.  (Taking a sip of water.)

25              Okay.  Let's go to PDX-212, please.

1          Now, I'm not going to make a big deal about the

2     French court decision and German court decision.  I know my

3     opponent may or may not.  But there is one interesting

4     relevancy about this.  Okay?  And the reason why we bring it

5     up is because of this (picking up Broetje red cassette).

6     And that is really why we are bringing it up.  We're not

7     saying that you should follow the French court and say that

8     is the law.  You heard the Judge instruct you that French

9     law and German law are different than U.S. law.  And nobody

10    disputes that in this courtroom.

11         What the relevancy about this aspect goes to

12    this intent.  Okay?  Once they develop their own system,

13    they continued to make it look like ours (picking up AHG

14    chrome cassette).

15         Same handle, exact same handle, same chrome

16    color, some small differences, we have a clearer side, but

17    they're really insignificant when you look at them.  What

18    could they have done all along if they wanted to not confuse

19    anybody out here?  They could have done this (picking up

20    Broetje red cassette).

21         In fact, you will see Dr. Peters.  In a minute I

22    will show his testimony.  He says there is no functional

23    change.  He says this cassette operates just like their old

24    one.  The only changes are nonfunctional changes.  That

25    means the color, the metal, the handle shape, the color of

1    the handle, all of this.

2              The window now is smaller.  Prominent display of

3    their logo.  It looks different now.  This doesn't infringe.

4    I agree it doesn't infringe.  We don't take a position this

5    infringes.

6              Why didn't they do this when they first

7    developed it?  And then, you know, no one could possibly be

8    confused.  Everybody would say, oh, that is definitely a

9    Broetje product because it looks a lot different than AHG.

10   But they waited until 2000 -- well, it's still even not out

11   today.  It's going to be out any day according to their

12   testimony but they waited until just recently to do this,

13   and it took AHG and F2C2 all these resources and go to

14   France, come here, wherever they have to go, to try to

15   enforce their rights and make it right from a wrong.

16              Okay.  Let's go quickly to the timeline.

17              PDTX-274, please, Jeff.

18              Okay.  Remember this timeline from my opening

19   statement?  And I want to briefly kind of go over the

20   timeline from here.

21              You recall that Mr. Bornes in 1986 and his

22   father-in-law Jean-Marc worked for about approximately a

23   couple years to develop their invention here, which is how

24   to dispense and store many, many, many rivets, and they

25   were solving an age old problem about avoiding getting

1  foreign material in these big vibrating bowls which I will

2  show you in a minute.  And it took them awhile.

3       They didn't work 24/7 on it, but they worked

4  hard to get a solution because there hadn't been a

5  successful solution up to that point in time, and they did

6  get a successful solution, and they ultimately were issued

7  two U.S. patents which were the '216 and '339 patents.

8       But now we go to the 1994 and Broetje and AHG

9  enter into a contract.  You recall once we got these

10  patents, there a beginning of a to-and-fro from Broetje and

11  AHG.  Broetje wanted to use our system.  We went back and

12  forth negotiating.  We finally came to an agreement in the

13  contract, and the contract is between Broetje and AHG.

14       Now, recall that AHG themselves, just to put

15  them in context.  AHG is a small family-owned company and

16  F2C2 is a wholly owned subsidiary of AHG.  The testimony of

17  Mr. Bornes was it had four or five employees at the time.

18  Very small, family-owned business.  Very successful in what

19  they were doing.

20       Now, if we could go to PTDX-214, please.

21       The problem they were solving is we had these

22  big vibrator bowls.  This one was hooked up to a loading

23  machine, but they had these standalones in the factories,

24  but what would happen is with foreign materials or rivets

25  that weren't supposed to belong in there, racks, that they

1    found their way in there, and they went right up into the

2    rivet machine and jammed the rivet machine or caused some

3    problem and shut down the production and it costs a lot of

4    money.  You heard testimony about that.  And that was a

5    problem so you had to avoid that.

6              What they did to avoid that is that created a

7    situation where you could have a cassette like this

8    (indicating) with tubes in it and put lots of rivets in it.

9    But when they did that originally with the tube, we had

10   jamming.  So they spent time trying to figure out how

11   they're going to get all these rivets, thousands of these

12   rivets in tubes to move through with compressed air without

13   jamming.

14             It seems, you know, hindsight is always 20/20,

15   but at the time it was a difficult situation, it was a

16   difficult problem.  They came up with this solution that

17   talked about the grooves, and they came up with the pentagon

18   solution.

19             It was such a good solution that Broetje thought

20   it was a good a solution and they adopted the pentagon

21   shape.  You didn't see them come up with an octagon or

22   triangle shape.  No, they used the pentagon shape because

23   they knew that that was the optimal shape because AHG had

24   already put in the blood, sweat and tears to come up with

25   that.

1        Let's go to the next.

2        Here is the tube shape that AHG developed.

3        The next slide, please.

4        And here is the patents issued to Mr. Bornes and

5    his father in law, Jean-Marc.

6        The next slide.

7        You see lots and lots of these, but just to

8    remind you, the cassette is loaded by the loading station,

9    and then the cassette is put into the rack, and then the

10    rack is delivered to the machine.  They all operate together

11    as a functional unit.

12        This is what you heard about the Judge talking

13    about convoyed sales and damages.  You don't sell these

14    things.  You don't go out and say, hey, you want a loading

15    station?  No.  Because the loading machine is made for the

16    AHG cassette.  The AHG cassette is made for this rack.

17    These are all sold together as a unit.  That is why in the

18    damages area, we are asking for sales of losses of the whole

19    system rather than just the whole cassette, because you

20    can't separate the two.

21        Now, if we can go to the next slide, please.

22        Now, this is PTX-385T.

23        Now, what this is, for some reason, again, it's

24    kind of hard for us to believe, but they're taking the

25    position that they gave us lots of information to help

1    develop this.  Well, you know we already developed it when

2    they contracted with us.  In fact, that is why they entered

3    the contract is because they wanted our system.

4              And then right from the get-go, Mr. Holtmeier

5    who is like the CEO of Broetje says:  With the signing of

6    the contract, please let us have more detailed technical

7    information.

8              So right from the get-go, they wanted to

9    understand how our system worked and operated.

10             And with the contract, we were able to do that,

11   because we were protected under the contract.

12             Excuse me.  (Taking a sip of water.)

13             If we go to the next slide, please.

14             So the first thing we tell them, we just remind

15   them it's subject to patent protection.  Again, this is

16   1994.  We're telling them we're getting a patent.  A common

17   type of thing to do.

18             Next slide, please.

19             And the interesting thing, there is a clause in

20   this contract.  This says:  Broetje agrees to promote the

21   sales of the AHG feed systems in the most loyal, serious,

22   and efficient way possible.

23             They're agreeing to be loyal to them.  Broetje

24   is going to be loyal to AHG.

25             Now, we already know, we kind of -- I'm going to

1    give you a head up on that.  There is no loyalty here.

2              Now, I'm not saying, we're not talking about

3    breach of contract.  Again, you heard the Judge's instruction.

4    And you are not here to determine whether there is a breach of

5    contract or not, but you can understand it is a lot of their

6    intent.  This is an obligation they signed up to:  To be

7    loyal.  Okay?

8              Now, there is a technicality they may bring to

9    your point that a French court said, well, it wasn't a

10   contract with F2C2.  And they're right, the French court

11   said, no, this is a contract with AHG, not F2C2.  So they're

12   technically no longer applied to F2C2, but it depends on

13   what kind of businesspeople they are.  Are they really --

14             You heard Mr. Neugebauer said I always thought

15   they were one company.  So why didn't you operate under the

16   obligations that Mr. Holtmeier signed to?  This is something

17   for you to consider when you are thinking about intent here.

18             If you go to the next slide, please.

19             This, right here, this is again in the contract:

20   Broetje agrees not to sell directly or indirectly feed

21   systems with identical or similar tubes.

22             Again, it's an obligation they're signing up to.

23   Of course, we know now that they do do that.

24             In addition, the dealer -- which is Broetje --

25   agrees not to use, directly or indirectly, such documents

1    and information after the expiration of this contract.

2              In other words, they're not going to use our

3    information after the contract is terminated.

4              So, in other words, they won't do JTX-14, the

5    copy document.  They're not going to do that.  They're not

6    going to use our information.  They are not going to take

7    pictures or use our device.  They agreed not to do it,

8    although they do do it.  We know they do it.

9              Next slide, please.

10             Now, about the technical information.  Where did

11   the technical information come?  We know Mr. Bornes was the

12   inventor, co-founder of F2C2, and developed this system.

13   And his testimony.

14             "Question:  Okay.  What kind of information did

15   Broetje request all the time?

16             "Answer:  They requested all they need to make

17   sure the system is working and including drawings,

18   schematics, everything they need to know exactly what was

19   our testimony.

20             "Question:  Why did you give it to Broetje if it

21   was proprietary to AHG?

22             "Answer:  It was in our agreement in 1994.  I

23   was protected from that."

24             He trusted Broetje.  He gave all the technical

25   information they asked for.  They may have made some

1    suggestions.  We're not denying that.  In fact, a lot of the

2    suggestions, Mr. Bornes thought about and sometimes have a

3    solution, sometimes not.  We don't deny there were some

4    tweaks on the system, maybe, but they didn't create the

5    system.  The system was already there.  The whole invention

6    was already there.  The pentagon was already there.

7              If we can go to the next slide, please.

8              Here is another one, PTX-118, where Broetje

9    again is asking:  Please give us more detailed information

10   (drawings, photos).

11             And this is in 1994 we gave them that information.

12             If we go to the next.

13             Again, what I told you about, I'm going to keep

14   showing you testimony.  Your job is to weigh the evidence

15   not, what I say or don't say.  My attorney argument is not

16   supposed to come back with evidence on.  You look at the

17   documents, look at the testimony.  Here is some more

18   testimony.

19             Trial testimony of Mr. Maylander:

20             "Answer:  I got information from Mr. Bornes,

21   that he informed me that they are also going to work

22   together with our competitor, Gemcor."

23             Back up for a second.  After we decided to give

24   them technical information -- this is when we're going back

25   to, we're going back in more detail.  We're going back in

1    the time frame, we're going back in 2002.  We're going to

2    revisit of the time frame I talked about earlier, and this

3    is where I'm talking about Mr. Bornes being up front with

4    Broetje; and you can see here that:  Mr. Bornes informed

5    me that they are also going to work together with our

6    competitor, Gemcor.

7                Again, Mr. Bornes, you know the type of person

8    is, informed them I'm going to do some work with Gemcor.

9    You know, give me some feedback.  What do you think?  He was

10   upfront.  Very candid.

11               The same thing with Mr. Neugebauer:

12               "Answer:  So that Phillippe has explained to

13   Maylander and to myself that they want to in principle sell

14   the technology to our heaviest competitor."

15               It's interesting because Mr. Bornes hadn't even

16   sold anything to Gemcor.  He is basically going to Broetje

17   and says, look, guys.  This is what I'm going to do.  You

18   have been my partner for many years.  We can sell outside of

19   Germany, the contract is, but I'm going to tell you upfront

20   and get your feedback.  And, boy, did he get feedback.  You

21   saw what happened.  We'll go into that in a minute.

22               Excuse me. (Taking a sip of water.)

23               Next slide, please.

24               So I'm not going to go back through this.  This

25   is the JTX-66 where Mr. Maylander again confirms that he

1  told them that.

2              Let's go to the next one, please.

3              And the next slide, please.

4              And here is the e-mail from Mr. Neugebauer which

5  I talked about.  Again, this is the e-mail that came out

6  after they had already made a decision to start developing

7  and already created the copy document, JTX-14.  So the

8  decision has already been made even though he indicates that

9  it hasn't been made.  He says there is a possibility that we

10  will quit the relationship.

11             That is not true.  And he admitted on the stand

12  it wasn't true.  He said he was just trying to pressure Mr.

13  Bornes.  He was trying to pressure Mr. Bornes to quit working

14  with the competitor Gemcor while they were developing their

15  own behind their back.

16             Turn to the next slide, please.

17             Now, here is the trial testimony of Mr. Neugebauer.

18  And this is when I was questioning him about that e-mail and

19  ask him whether he is being truthful in that e-mail to Mr.

20  Bornes.

21             "Question:  And do you typically do that in

22  e-mails and letters, where you say something that is

23  actually not true?

24             "Answer:  Not really.

25             "Question:  But you did though this time,

1    though.  Yes?

2              "Answer:  To put him under pressure, yes."

3              He admitted he lied to Mr. Bornes.  Do not do

4    any work to Gemcor.  Don't sell your system to Gemcor.

5              But did he tell him, oh, by the way, we're

6    making our own system.  We're not going to deal with you in

7    a couple more months?  No, he just didn't want to deal with

8    Gemcor.  At the same time, behind his back, Mr. Bornes'

9    back, they were developing their system.

10             "Question:  To put someone under pressure, you

11   might put an untruth there?"

12             He agreed:

13             "Answer:  To put him under pressure."

14             Mr. Neugebauer lied to achieve something.  Now,

15   he was the program manager for the whole system and the

16   whole thing there.

17             What about the trial testimony of Mr. Maylander?

18   So we asked him:

19             "Question:  So AHG was perfectly within their

20   bounds to sell to Gemcor, who was located in the United

21   States.  Correct?

22             "Answer:  That's what I understand, yes."

23             So Mr. Bornes, he was within his bounds.  Not

24   only did he tell him, but he was perfectly within his

25   bounds.  AHG never had any obligation from Mr. Bornes not

1149

1    to sell to competitors in another country.  He won't sell to

2    competitors in Germany.  So the next slide, please.

3              Okay.  So as I said, we beat this document to

4    death.  I'm not going to go back through it again.  This is

5    the copy document.

6              The next slide, please.

7              Now, let's fast forward into 2003.  Well, it

8    was 2003 when they start developing their own cassette, June

9    2003.  So they obviously know if they're copying something

10   they had better be careful and see that they don't get

11   themselves in trouble or at least keep it down or concealed

12   so that AHG can't find out anything.

13             So they go to Mr. Budach and they ask about

14   infringement.  Well, ultimately, Mr. Budach says it must be

15   specified in greater detail in order to be able to rule out

16   an infringement.

17             Mr. Budach did not come up with any opinion in

18   2003 whether there is infringement or not.  In fact, there

19   maybe a concern there was infringement, studying our system.

20   Again, this is after they already started developing their

21   own system.

22             So there is no opinion now.  This is still 2003.

23   Remember, they learned about our patent in 1994.  So we go

24   from 1994 to 2003, still no opinion.

25             So let's go to the next slide, please.

1    And here is the trial testimony from Dr. Budach.

2    "Question:  Are you saying that you didn't

3    consult with United States lawyers?  You didn't have the

4    ability to do that in 2003?  That wasn't something you did?

5    "Answer:  (Through translator)  I am talking

6    with regards to this case.  We do not use the advice,

7    separate advice of U.S. patent attorney."

8    CLAAS and Dr. Budach made a decision not to go

9    outside to U.S. attorneys and get independent advice.

10   Dr. Budach is an employee of CLAAS.  Broetje was owned by

11   CLAAS.  It was within the company.  He was given the advice.

12   Whether we call that impartial advice or not, I don't know.

13   It's more maybe let's try to figure out advice and a way to

14   do things where we don't get caught.  That is something for

15   you to decide.

16   Let's go to the next slide, please.

17   The other thing, you probably remember that

18   Dr. Budach had that demonstrative they had up there with

19   the Shinjo reference and three big photos and he got

20   cross-examined on them.  You won't see that and it won't be

21   part of the evidence, but he kept talking about the Shinjo

22   reference.

23   And you heard Mr. Lawrence, their expert, talk

24   about it.  What you will see, he admits that in his 2003

25   report, we said in there, there is no cite to the Shinjo

1    reference.  And we will show you in this 2005 e-mail

2    opinion, which he calls an opinion, there is no citation

3    reference to Shinjo.  That whole slide they showed you

4    about his thing about Shinjo was a conceived, you know,

5    the-night-before-testimony type of situation.

6             So we have already talked about they copied it.

7    They used JTX-14, the development document, that they

8    actually copied it and the situation we have here.

9             If we go to the next slide, please.

10            And the interesting thing, this doesn't show up

11   unfortunately very well on this slide, but in 2005, and you

12   heard the Judge's instruction, just because there is a label

13   on there doesn't mean there is not a trade dress

14   infringement.  That doesn't get you out.

15            All of you, I'm sure in your own common

16   experiences, understand.  I was thinking of an iPhone.

17   iPhone is made by a different company.  It's made in China

18   by another company.  It has Apple things on it but that

19   doesn't necessarily mean that is who manufactures it.

20            Just because you have AHG or Broetje or you have

21   Broetje on there, a customer isn't going to automatically

22   think because it says Broetje on there that this is not

23   manufactured by AHG, because AHG may have given them

24   permission to put their logo on there.

25            The customer may look and say that is an AHG

1    cassette.  Broetje put their name on there because they have

2    the whole system and they got some deal together.  Who

3    knows.  That is pure speculation on that part.

4              What I'm trying to tell you, just because

5    there is a label on there, you can see that in your jury

6    instructions, doesn't necessarily mean that is it.  That is

7    the end of the case.

8              (Holding up chrome cassette with big label by

9    the handle.)  Look how small that label is.  Just a small

10   black, no red.

11             And this is what they, this is what they could

12   have done (holding up red cassette.  There could have been

13   no dispute on this one.  You would have seen it right off

14   the bat.

15             The next slide, please.

16             Now, I'm not going to be too long.  There is

17   this theory that they make that somehow they came up with

18   the trade dress in the United States first.

19             It's almost not worth we think addressing but we

20   will address it briefly here.  Maybe in rebuttal, I'll spend

21   more time on it.  We've been selling cassettes these

22   cassettes through Broetje for a number of years, starting in

23   2002, 2001.  Many of them were in the United States.  In

24   fact, you will going to see something about Vought today

25   from the opponents here.

1    But you can see right here and the same time

2    frame that they sell in 2004, here is the shipping delivery

3    order to Vought, the same shipping order where it says:

4    Country of manufacture:  France.

5    Now, what do you do with these delivery order

6    things?  You heard the testimony of Mr. Benczkowski.  I

7    think he called that a typo.  I don't know how reliable

8    these are.  And I don't know if Mr. Benczkowski knows how

9    reliable they are.

10    The country of manufacture or country of origin.

11    It could be France or Germany.  It's just for customs sake.

12    So we can't identify necessarily whose cassettes they are.

13    Now they're going to show you something that says:

14    Country of manufacture:  Germany.  Like Mr. Benczkowski

15    said, it could have been a typo.  They could have put

16    Germany because it was being shipped from Germany.  These

17    are always being shipped from Germany.  It doesn't

18    necessarily mean it's a Broetje cassette, like they were

19    going to try to tell you that.

20    Go to the next slide, please.

21    Now, finally in 2005, middle of 2005, Mr. Bornes

22    is in a plant.  And you heard his testimony.  And he sees

23    for the first time a cassette that he knows is not his, and

24    he realizes its Broetje.

25    Again, remember back in 2002, when Mr. Maylander

1    sent an e-mail -- in 2003 to Mr. Neugebauer.  Several years.

2    He had no way to know.  It took him a couple years and it

3    was just by pure luck that he discovered it.  He happened to

4    be in a plant where he was near a machine that actually had

5    some Broetje cassettes.  And he was shocked.  You saw him.

6    You heard his testimony.

7              So what would someone naturally do on that?  I

8    didn't know they were designing their own cassette.  No one

9    told me that.

10             So they talked to their lawyers.  Their lawyers

11   sent a letter telling them to stop infringing our intellectual

12   property, our patents.

13             The next slide, please.

14             So that then comes Dr. Budach.  He now is

15   engaged.  2005.  There have been threats and now they

16   realize they had better do something because they saw there

17   was no opinion there from Dr. Budach yet.  It was just we

18   have a problem but we're not sure what to do with it.

19             So he writes the opinion, but it is very

20   interesting, his opinion.  Again, this is DTX-1605.

21             He ends his opinion just like this.  His

22   opinion, if you read it, you will see it is very weak.

23   There is no analysis.  It is very short.  But he ends it

24   with this:  With deliberate use of third party property

25   rights, CLAAS-internal management approval would have to

1   be obtained.  We could possibly discuss briefly by phone

2   beforehand whether that is necessary here.

3              Does that sound like a definitive opinion there

4   is no infringement?  No.  It sounds like there is a concern

5   here.  You know, maybe we're infringing so let's get on the

6   phone and get an okay about our internal management.  Who

7   knows whether that conversation ever took place.  We don't

8   know.

9              AHG has a belief, and I'm going to tell you I

10  think it did take place.  That is purely my argument.

11             Let's go to the next slide.

12             And this is the testimony from Dr. Budach.

13             "Question:  You wrote this e-mail to advise

14  Broetje of what your position was within the context of the

15  German proceeding.  Correct?

16             "Answer:  Yes."

17             So he is writing his e-mail.  He finally does

18  an opinion, and he is really being forced to.  He is being

19  forced to because of the threat now of the German

20  litigation.

21             So it took that to finally come up and try to

22  figure out what they're trying to do.  So he had to figure

23  out do we really infringe?  Because I didn't really didn't

24  do something back in 2003 after I find out we're in trouble

25  there.  Because we know we copied them, we have a pentagon

1    shape, so maybe we can try to tweak some technicality out

2    here or something like that.

3               Let's go to the next slide, please.

4               Here is some more testimony from him.

5               "Question:  And at the time you wrote this

6    e-mail in September of 2005, you still had not obtained an

7    opinion from United States lawyers about the United States

8    versions of these patents.  Correct?

9               "Answer:  Yes."

10              Remember he said we have to make that phone call

11   to internal management and see if we can deliberately use?

12   Well, clearly, they're not going to go to outside counsel in

13   the United States if they're going to do it behind their

14   backs.  That wouldn't make any sense.

15              The smart thing would be to go to U.S. lawyers

16   who know U.S. law, who know how to do U.S. patent law, and

17   get a proper opinion.  You heard Dr. Budach is not qualified

18   in the United States to practice patent law.  He is not a

19   patent lawyer in the United States.  He is not qualified.

20   He is not licensed to do it.

21              Next slide, please.

22              And, again, that 2005 e-mail, just like the 2003

23   e-mail, has no discussion of this Shinjo.  That little

24   slide, they showed you three things on there in Shinjo,

25   again that was created the night before his testimony.

1    There is no mention of Shinjo.  And you can look at that,

2    his e-mail.  And it's DTX-1605.  If you look at DTX-1605,

3    there no discussion of Shinjo.

4              Now, let's go to Broetje USA.  Next slide,

5    please.

6              We were talking about Broetje Germany there,

7    Dr. Budach, with CLAAS in Broetje, Germany.  So a separate

8    company.  But this is Broetje USA.

9              So we asked Mr. Benczkowski, the President of

10   Broetje USA whether he ever received an opinion of whether

11   or not there is infringement of the '216 and '339 patent or

12   the AHG patents.  How did he answer?

13             "Question:  Have you ever seen an opinion,

14   whether in-house" -- in other words, Dr. Budach or someone

15   else like him -- "or outside counsel, relating to the

16   infringement or invalidity of AHG's patents?

17             "Answer:  No."

18             So from the standpoint of Broetje USA, they

19   never received an opinion whether or not there is

20   infringement or not.  And Broetje USA was selling in the

21   United States obviously.  They are located in the United

22   States.  They're selling infringing goods.  They're selling

23   cassettes.  They facilitate the sales.  Mr. Benczkowski's

24   sales team goes out there and sells on behalf of Broetje

25   Germany, but he never received an opinion.

1        Two separate corporations.  In your verdict

2   form, you will see that is separated on willfulness:  Does

3   Broetje USA willfully infringe?  Does Broetje Germany

4   willfully infringe?

5        There is no opinion here.

6        So go to the next slide, please.

7        So these kind of summarize the willful

8   infringement and the wilfulness standpoint.  They first

9   learned about -- they first learned about the patent.

10       (Post-It note passed to Mr. Lindvall.)

11       MR. LINDVALL:  I'm being put under pressure now.

12       They learned about the patent in 1994 with the

13   contract we had.  Then you recall there was a document, and

14   I haven't showed it to you but you have seen it a number of

15   times, in 2000, Mr. Bornes actually sent the European patent

16   to Broetje at their request.

17       Again, in June 2003 -- well, June 2003, Broetje

18   begins to develop copy cassettes.

19       Dr. Budach independently finds the AHG patents.

20   Again, doesn't give a definitive opinion.  He says I need

21   more information.

22       Then in 2005, Dr. Budach's opinion suggests

23   deliberate use of AHG's patents.  He said all I had to do

24   was make that phone call.

25       Now, let's turn to the next slide.

1    This is the French decision.  Again, I've

2    already told you about that, and the Judge has instructed

3    you about French law, but, again, it's relevant from the

4    particular point of view here because what they did with

5    this cassette.  I'm sure they're going to tell you about the

6    German decisions, and all the other decisions.  This is the

7    only decision that has been admitted into evidence.  So all

8    these that talk about German decisions and what have you,

9    you are not going to be able to look at.  They can

10   characterize them any way they want to, but they are not in

11   evidence and you are not going to be able to see them anyway.

12   The fact is there is a relevant part about this.

13   It's not that the French court found infringement, because

14   their law is different, as you heard this Court say.  But

15   they did find, first of all, that there was infringement of

16   the European patent by Broetje.  This goes to willfulness.

17   It's state of mind.  So they were found infringing the same

18   patent Dr. Budach supposedly gave an opinion on.

19   And then the French court, three Judges, found

20   that "Broetje was copying in a servile manner" -- almost a

21   slavish manner, just taking it and making a picture perfect

22   copy of it -- "the appearance of the cassette produced and

23   commercialized by companies AHG and F2C2 System, thus

24   creating a risk of confusion with the activities of these

25   two companies."

1160

1        That's the finding of the French court.  Again,

2   applying French law.

3        What happens as a result of that?

4        Will you turn the slide, please.

5        So we asked Dr. Peters, the Chief Operating

6   Officer of Broetje Germany.

7        "Question:  Okay.  And when did Broetje begin

8   redesigning this cassette?"

9        In other words, make it look differently.

10        "Answer:  After we got a court judgment in

11   France."

12        They went all these years after they developed

13   theirs, basically thumbing their nose at us until they were

14   forced to.  Now they said, you know, what we'll change our

15   appearance.  We'll make sure we're not confusing customers

16   any more.

17        "Question:  And what about the court judgment in

18   France caused you to redesign the cassette?

19        "Answer:  We were informed by our legal staff

20   that we would have to redesign, newly design the cassette."

21        And the next slide, please.

22        He goes on and says, this is trial testimony you

23   heard.

24        "Question:  Okay.  Did they tell you why you had

25   to redesign the cassette?

1    "Answer:  So that the cassette would be clearly

2    recognizable as our cassette."

3    So three Judges in France says this is going to

4    cause confusion.  You have got to change it.  Their lawyers,

5    Broetje's lawyers and CLAAS told them redesign it so we

6    could clearly recognize it so there can't be confusion.

7    "Question:  Now, was there any change" -- this

8    is important -- "was there any change with respect to the

9    function of the cassette?"

10   This cassette here when they redesigned it.

11   "Answer:  We did not make any changes in the

12   function of the cassette."

13   And you may have heard the Court talk about

14   functional versus nonfunctional and you can't protect with

15   trade dress of the functional aspect.  Some things can have

16   both a functional aspect and a non-functional aspect.  It

17   was confusing.  It took me awhile to figure it out myself.

18   The Coke bottle is a good example.  The Coke

19   bottle has a function.  It holds Coke.  Also, it is one of

20   the most protectable trade dresses in the world.  A design

21   it has a certain look and feel.  When you see a Coke bottle

22   you know it's a Coke bottle.  If you go out there and use

23   the Coke bottle and use some other liquid out there, I

24   guarantee you will be getting one of those letters from

25   Coca-Cola because they're protecting their trade dress.

1162

1           Yet it is functional.  So just because something

2    has a functional aspect, you can also have a nonfunctional

3    as spent.

4           Let me show you some aspect.  The handle.  It

5    was exactly like ours.  Same shape, same placement, same

6    color.  Now it's a different color, different shape than it

7    was before.

8           Color of the chrome.  Chrome can be lots of

9    different colors.  So they turned it into their red color

10   because the red and black, they're competitive colors that

11   they have.

12          What about the full plastic front that we talked

13   about?  That is all they need is a little window there.  And

14   this shows that's all they need is a little window.  They

15   didn't need the full plastic look.  That was all they had to

16   do was to do that.  That was a look thing.  This was looks.

17   The color was looks.

18          They're going to make a big deal about the

19   sides, that our side for awhile was clear.  It doesn't --

20   this one.  I mean these are the same thing.

21          There is a slight difference in the size.  But

22   they still, they still look like each other.  Same handles.

23          Just because there are some slight differences

24   doesn't mean they're not protectable anymore.  That is what

25   they should have done a few years go, and except for the

1    patent aspect of it we wouldn't be here today.  We wouldn't

2    be talking about trade dress.  That is all they had to do.

3    Very simple.  Not a difficult chore.

4              Next slide, please.

5              Now let's go very briefly with respect to

6    infringement.

7              I'm not going to go through that.  Dr. Kytomaa

8    brought you through very carefully why they infringed.  Dr.

9    Kytomaa was a professor at MIT in fluid mechanics.  He has a

10   Ph.D.  This is his job.  He walked you through, and what he

11   showed you was a video.

12             And this is a Broetje machine that he actually

13   went to Gemcor and he actually filmed and studied.  You can

14   see the rivets going through there.  They're not zigzag or

15   anything else like that.  They're going through there just

16   like the patent talks about in the claims.  He gave

17   compelling testimony about how that happens.

18             What did their expert do?  The lawyers sent him

19   a cassette to his house.  The lawyers put the cassette in

20   there -- the rivets in there, and then he hooked it to a

21   compressed hose in his house and he took some still photos.

22             That is not how it was used.  It was used like

23   Dr. Kytomaa did in the real situation to see how the rivets

24   are going through there.

25             Who are you going to believe, Mr. Lawrence's

```
 1    testimony where he used a cassette in a home that was

 2    provided by the lawyers, or Dr. Kytomaa who went to Gemcor

 3    and actually saw a Broetje cassette in action and with a

 4    rack and the machine?

 5                Okay.  Let me go to the next one quickly.

 6                You saw this in Broetje's opening slides.  They

 7    talk with this being our design, or Broetje's first design

 8    and it was rejected, and they changed it to this design.

 9    And you heard Dr. Kytomaa's reaction to this slide.

10                Let's go to the next slide, please.

11                Let's go to the next slide, quickly.

12                What Dr. Kytomaa clearly showed -- and it makes

13    perfect sense -- what you have, you still have grooves.  The

14    grooves are a slightly different shape here but there is no

15    difference in there.

16                And as you see, Dr. Kytomaa considered this

17    still infringes.  It's still a pentagon and it still has

18    grooves.  Just because this is maybe a circle here, and you

19    look at the claims, it doesn't say that the groove has to be

20    a circle, it doesn't give any particular shape, it just has

21    to allow the air through when you put the circle in there,

22    and that is what we have done.  That is exactly what they

23    are doing.  They are still infringing.  They didn't get

24    around anything.  The opinion is in good faith because of

25    this.
```

```
 1              Now, let's go quickly to the next slide.

 2              Invalidity.  This is an easy.  This is an easy.

 3    They say our patents are invalid over Shinjo.  Correct?

 4    Now, to do invalidity, it's like the flip side.  They have

 5    to show that all of our elements in the claim are in that

 6    reference in Shinjo.  You have to find them somewhere.  If

 7    that is true, that means Shinjo already came up with the

 8    invention.

 9              Well, you heard Mr. Lawrence.  He admitted that

10    Shinjo does not have grooves.  Grooves is an important part

11    of every one of the claims.  If it doesn't have grooves, it

12    doesn't invalidate the patent.  He admitted it on the stand.

13              And, again, same thing.  He also admitted that

14    it doesn't have, in the '339 patent, the axis of revolution.

15    Again, that is part of the things he had to show regarding

16    invalidity.  He basically admitted there is no invalidity

17    here.

18              Next slide, please.

19              And the same thing with the Offutt patent.

20    We're here looking at Shinjo and Offutt.  Those two patents.

21              He admits here that the Offutt patent does not

22    have grooves.  Again, I'm showing you actual trial

23    testimony.  This isn't a magic slide.  This is all through

24    trial testimony that has been testified under oath and

25    argued.
```

1166

1        Next slide, please.

2        And this is my last slide.  You will see me on

3    rebuttal, and I'm sure you're hoping not very long, but just

4    for your information, you saw this with our damages expert.

5        These are the damages that AHG is seeking.  And

6    you can see for patent infringement, it's lost profits, and

7    then for other claims it can be either the unjust enrichment

8    or the lost profits, and the Judge's instructions will teach

9    you to do that.

10       Of course, the last thing we're going to ask you

11   to award is punitive damages.  You have seen their conduct

12   here.  They concealed material facts.  They deceived, they

13   deceived AHG.  They deceived Mr. Bornes.  Mr. Neugebauer

14   purposely tried to lead him astray while they were

15   developing their own product.

16       That is just the kind of conduct that punitive

17   damages is out there to cover.  It's to punish a company and

18   stop that kind of conduct, that willful-type conduct.  That

19   is not proper conduct, and that is when you award punitive

20   damages.

21       We'll talk about it a little bit more, but you

22   can see the Judge's guidelines on that, but that is why we

23   have punitive damages, why we are asking for wilful.

24   Because this was intentional copying.  You can look at these

25   cassettes.  Look at the third-party cassettes and the other

1    one.  This is a complete knockoff.

2              Thank you.

3              THE COURT:  Thank you, Mr. Lindvall.

4              Mr. Kelleher.

5              MR. KELLEHER:  Thank you, Your Honor, very much.

6              Ladies and gentlemen of the jury, I would like

7    to reiterate Mr. Lindvall's appreciation for giving us your

8    time.  I know it is very valuable, and thus I will try to

9    keep myself short.

10             As has been said, and the Judge has instructed

11   you, this is not a contract case although when I hear my

12   opponent's argument I almost forget that sometimes.

13             As we pointed out, there a decision of the Court

14   of Appeals in France that specifically addressed this issue

15   about a contract.  If there was any kind of a contract

16   between AHG and my client Broetje, the French Court of

17   Appeals found that that relationship ended very peacefully

18   in 2001 when they stopped doing any business with us without

19   any prejudice to them.

20             If there any kind of contract that arose later

21   on when F2C2, a new company, came on the scene, the French

22   Court of Appeals decided that Broetje was within its rights

23   to end the relationship because F2C2 delivered defective

24   product to Airbus and after more than a year still could not

25   fix them.  So this is not a breach of contract case because

1       in France, it has already been decided we didn't breach any

2       contractual obligations.  Specifically, it was decided that

3       there has been no breach of any obligation of confidentiality

4       or loyalty.  So that has been laid to rest in France.

5               So what is the case really about, though?  It's

6       a trade dress case which is about the look of the product.

7       And it's a patent case.  It's about the way the product

8       works.  That is what I told you in my opening.  That is what

9       the evidence has showed.

10              So why don't we go through what is the real

11      story in this case.  So you heard from people from my

12      client:  Mr. Benczkowski, who is at counsel table, Mr.

13      Maylander, Mr. Neugebauer, Dr. Peters, Dr. Budach from

14      CLAAS, the former parent company.

15              So I told you at the very beginning of this

16      case in the opening that the parties worked together for a

17      number of years to develop a better working product that was

18      originally developed to us when we started working, with AHG

19      and then F2C2 in the mid-90s.

20              And you heard from Mr. Bornes agreeing and from

21      Mr. Maylander and from Mr. Neugebauer there were a number of

22      suggestions and improvements that were originally my clients

23      idea:

24              The magnetic code leader in the back of the

25      cassette that allows the rack to know what's inside the

1    cassette.

2              My client rewired the rack when it first arrived

3    because they said it was like a child's racetrack toy.

4              We provided the circuit diagram.

5              We provided software.

6              We provided the idea of a throttle to regulate

7    the air pressure so rivets wouldn't be jammed on the inside.

8              We provided the idea of a slide mechanism in the

9    rack to replace that.  In fact, that crazy rotator thing

10   where the rivets would have to fall down to the bottom and

11   Boeing Wichita had to have a full-time employee called

12   "rotator man" coming out and fixing it every single day.

13             So everyone agrees that my client came up with a

14   whole bunch of ideas that AHG and F2C2 built into their

15   cassette and they're still there today.

16             But around the beginning of the year, the early

17   2000s, troubles began to mount.  They began to have a lot

18   more problems with them.  And Mr. Neugebauer informed you he

19   began to put them into a normal document called a fault

20   report.

21             So the very first one began I believe in 2000.

22   Here, we have some more notable ones from 2001 where they

23   have all kinds of problems with the cassettes.  They have to

24   be sent back or reworked because rivets are sticking inside

25   the tubes in the cassette, they're sticking in the escape

1    mechanism, they can't get out.  They have all kinds of

2    problems.

3              This is one from the United States -- or United

4    States customer I should say.  They delivered all of these

5    cassettes from France to Germany when my client is putting

6    together this gigantic machine to be delivered to Boeing

7    Wichita and these cassettes don't taken fit into their own

8    rack.  They can't even manufacture their cassettes to the

9    proper tolerance so they can slide into these openings.

10             So these problems with quality and, of course,

11   the ultimate betrayal of beginning to work with Gemcor just

12   became intolerable for my client.  They spoke about the

13   quality problems.  They couldn't deliver things on time to

14   us.  You saw the e-mail from Mr. Maylander to them saying

15   that their delivery delays are becoming a bottleneck for our

16   production, and that we learned of our bottleneck from the

17   folks at Boeing Wichita who are complaining about the

18   problem.

19             They complained in particular about F2C2 sharing

20   our improvements our suggestions for their system with their

21   competitor Gemcor because we had worked together for a very

22   long time.  You saw the e-mail, JTX-66, that my opponent

23   showed from Mr. Maylander where he said we worked together

24   to put together the ARA, automatic rivet system.

25             Did we see any writing back from Mr. Bornes

1    saying, no, we didn't, these are all my ideas?  He accepted

2    that as true.  He understood why my client was so angry that

3    our ideas were now to be sold to our chief competitor.  You

4    don't get our know-how for free.

5            Now, you will notice a couple of things.

6            We heard during this case a couple of times that

7    it was maybe when CLAAS assumed full ownership as the parent

8    company in 2003 that things changed.  Maybe it was a bit

9    earlier in 2002 when Gemcor came on the scene.  But here is

10   a letter from October 2001 from Mr. Neugebauer saying by

11   adding all these problems -- and he is talking about

12   technical problems, you can read it in the letter, it's

13   Exhibit 1061 -- we are investigating in other solutions for

14   rivet feeding.

15           So we told them all the way back in 2001, we

16   might have to stop working with them and pursue other

17   relationships because their product had a lot of problems

18   and our name was on the line.

19           Just a few months later, in January of 20002,

20   again, before they say things changed, we say that

21   Mr. Neugebauer again at this point, we feel that we are

22   being penalized for placing our faith in F2C2 because we're

23   having problems with our customers because of their delays

24   and their bad workmanship.

25           So we reach a point in time where we realize we

```
 1    have to make our own system.  We cannot continue to rely
 2    upon these delivery delays and the bad workmanship, getting
 3    complaints back from our customers, so we decide we have to
 4    go through our own R&D process.  And now you've heard that
 5    there's this JTX-14 document that supposedly is the copying
 6    document.  This was the document that shows here's the
 7    example of what we used and have to improve on it.  What's
 8    the name of the document?  It's to build an innovative rivet
 9    feed system.  What does innovative mean?  It means new.  Not
10    a copy.  When you copy, it ends up looking like the thing
11    you copied.
12              Here's the product that they used to sell to us.
13    It's plastic on four of the sides on the top.  It has got
14    these number counter things on the front.  It has got this
15    chain in the back.  It has got colored tape on it.
16              This came out.  Here's what my client came up
17    with.  We decided to make it metal all the way around.  We
18    put a window in the front.  We don't have these bad counters
19    on it.  We have this metal bar here (indicating) for a
20    little bit of extra stability.  Instead of this chain,
21    which could obviously get stuck on things, we came up with
22    this thing in the back that you could just slide it onto.
23    And this thing back here (indicating), this separator where
24    the rivets were always getting stuck on their product, we
25    built a new one that worked on an entirely different
```

1    principle.

2              Instead of having these little pins like this,

3    we had these walls that go like this.  Works a lot better.

4    We put it on the inside so it wouldn't be able to get

5    damaged when it's pulled in and out of the rack.  So if we

6    had copied this plastic box, we would have ended up with a

7    plastic box like theirs.  We didn't.  We got something quite

8    different.  And then what do we do?  We put our label on it.

9    We put our name on it.

10             Now, it's not disputed that my client knew about

11   their patents.  We remember Mr. Bornes sent a letter in 2000

12   to my client saying, here's our patent.  It's on the rifles

13   in the tube.  What's rifles?  Think about a gun, the long

14   tube has carvings, etchings into it so the bullet travels

15   more carefully.  When my client got Dr. Budach from CLAAS

16   involved, he ultimately reached the exact same conclusion:

17   Their patent covers rifles or grooves etched into the walls

18   of the tube.

19             So my client contacted Dr. Budach because we

20   wanted to be sure we didn't infringe anyone's patents,

21   including theirs, which we knew about, and what happened?

22   Development goes forward in 2003.  Dr. Budach is doing his

23   investigations.  He's forming his opinions and then he gets

24   told, oh, in early November of 2003, we just sent this

25   request to a tube manufacturer, asking them if they would be

1      able to make a tube like that.

2              As it happens, this is what F2C2's tube used to

3      look like.  Circle that actually had five grooves in it.

4      That thing is not a pentagon.  I know we've heard that word.

5      That's not a pentagon.  That's a circle with five grooves in

6      it.

7              Dr. Budach hears about this.  He says, oh, my

8      gosh, stop.  That thing might infringe because that has

9      grooves in it and that's what their patent is all about.

10     You can't do that.  Use this instead (indicating).  Use this

11     soft pentagon as we call it.  And because, as he explained,

12     this way the air will still get all the way down the tube to

13     the rivets by using the space that's around it, because as

14     you know, we use a much smaller rivet than this overall

15     space.  That dotted line is not the rivet head here.  It's

16     just the diameter of that soft pentagon.

17             And so what did my client do?  Just a few weeks

18     after they sent this initial order, they wrote back to the

19     same tube manufacturer saying, stop, stop.  We do not want

20     this.  We need you to manufacture this instead (indicating).

21     Can you please do that for us?  And that is the -- that is

22     the tube my client decided to use and they still use it

23     today.  Of course, the patent has expired, so even if they

24     had infringed, it wouldn't matter.  But this is what we

25     chose and my client purposefully did that because they

1    wanted to avoid infringing AHG's patents.

2              Now, these two documents, I used them with Dr.

3    Budach when he was on the stand yesterday, and in the

4    hour-long cross-examination there was not one question put

5    to Dr. Budach about these documents, because I'm sure they

6    would not like the answers.

7              So this is Dr. Budach.  Now, we know that my

8    client went back to Dr. Budach in 2005 with a question

9    because we got an accusation from them that we were

10   infringing their patents.  So management writes to Dr.

11   Budach again in 2005 saying, are you sure about this?  They

12   showed him what we were using at the time.  It's the soft

13   pentagon he told them to use.  And he wrote back.  And

14   this is the same 2005 e-mail that Mr. Lindvall showed you

15   that has a line at the end about deliberate use of someone

16   else's infringement would require us to talk to CLAAS

17   management.  Of course, it would, because that's against

18   company policy.

19             Here's what he wrote on the first page of that

20   2005 e-mail:  If Broetje, instead of the cylindrical

21   cross-section, which is the circle with the grooves, uses a

22   pentagonal cross-section, there is already no infringement.

23   So he knew they were following his advice from 2003 using

24   the soft pentagon.  He told them again, I already told you

25   you aren't infringing, and I reiterate that.  You're already

1176

1    not infringing.

2          Now, they have said, oh, no, but you didn't go

3    and get advice from a United States lawyer.  The Judge has

4    already instructed you, there is no duty in our law to go

5    and get advice of counsel, but they did.  Dr. Budach is a

6    German patent lawyer.  To become a German patent lawyer,

7    you're required to learn quite a bit of U.S. patent law.

8          As you heard, there's an oral examination for

9    five hours and you can be asked any question about law from

10   all over the world, including United States law.  Who are

11   CLAAS' biggest competitors?  Companies like John Deere.  All

12   their patents are United States patents.  On a daily basis,

13   he deals with United States patents.  He's quite competent

14   to interpret United States patents.

15         So what next?  My client introduces into the

16   market in the United States our metal cassette, our new

17   metal cassette.  What do we do for the customers?  We know

18   there are only four customers:  Boeing, Spirit, Vought and

19   Gulf Stream.  We gave, we introduced into evidence shipping

20   documents for all four of them showing them that Broetje is

21   the source, the manufacturer of these cassettes.  We're not

22   tricking our customers.  We're telling them, here's how our

23   new cassette.  We're the manufacturer.  We make them in

24   Germany.

25         Here's another document that we showed you.

1    Boeing asked, could you give us a quotation for budgetary

2    purposes for your new cassettes?  We said the Broetje build,

3    that is the ones we built, it would be this cost.

4              Here is from January 2003, before we began the

5    formal R&D process, a meeting Mr. Neugebauer was at in

6    Dallas with Vought, and we're talking about the 50 new

7    designed cassettes.  Even then we are telling them, we're

8    going to have our own cassettes coming out and, by the way,

9    they're going to be metal.  You can see those are not the

10   F2C2 cassettes.

11             When Mr. Benczkowski was on the stand, he showed

12   you e-mails that our spare parts manager, Laura Ballard,

13   sent back and forth to customers.  They would write to

14   us we need some spare parts for F2C2 products.  She told

15   them, we don't do business anymore with F2C2.  Here's

16   their contact information.  If we were tricking our

17   customers into believing that we were selling cassettes made

18   by F2C2, we wouldn't be telling them we don't do business

19   anymore.

20             So like I said, it's a European litigation.

21   They have stressed that they won parts of the French

22   Appellate Court judgment and I have shown you, we've won

23   part of it as well.  There have been other cases as well.

24   We've won a little bit more.  We are happy about that.

25   Nothing is really final let yet.  Like we said, everything

1    is on appeal to the Supreme Courts in France and Germany,

2    and we all agree that none of the patent and trade dress

3    issues are controlled by what has happened in Europe.

4              So the trade dress case.  What legally is

5    required here?

6              There has to be a likelihood of confusion for

7    them to prevail on their trade dress claim.  There is no

8    possibility whatsoever that our customers, the four of them,

9    could be confused into thinking that our cassette is made by

10   F2C2.  You heard Mr. Hage testify that the entire industry

11   has known since 2008 about this dispute and that they

12   accused us of copying.  So they can't dispute it.

13             We have incredibly sophisticated customers, only

14   four of them.  They're custom products.  They're built to

15   order.  They are not bought off the shelf.  They are not

16   bought side by side.  You can't accidentally pick up one

17   instead of the other.

18             There's a lot of customer contact.  They come

19   and visit us in Germany and they see these things, they pick

20   them up.  They see the brand name.  They slide them in and

21   out to make sure that they work; the racks, that is, not the

22   cassettes.  They're bought in a very selective specification

23   process where things are detailed in incredible detail and

24   they know exactly who the manufacturers are of the

25   components we are giving them.

1          It has been ten years now since we started

2    selling this in 2004 in the United States.  They have not

3    given you one bit of evidence there has ever been a single

4    instance of confusion after ten years.  You'll see in the

5    jury instructions that's incredibly strong evidence that

6    there's no likelihood of confusion if after ten years, none

7    has cropped up.

8          Prominent branding.  They have their name in big

9    letters in the middle of their cassette and we likewise have

10   our name on the front of our cassette.  You can see it when

11   it slid into the rack.  They say it's small, but that's

12   about the best size it can be when it's slid into the rack.

13         Priority of use.  The Judge has read to you jury

14   instructions 7.5.  I hope you pay quite a bit of attention

15   to this one when you are back in the jury room.

16         It says, one of the things AHG must prove is

17   that AHG owns the chrome color of its cassette, and so

18   forth, and the other elements they are part of their trade

19   dress.  It goes on.  And to prove they own this, they have

20   to prove that AHG used the trade dress in the United States

21   in a manner that allowed customers to identify the trade

22   dress with AHG or its product before the Broetje Parties

23   began to use the current product.

24         It's undisputed that we began delivering our

25   metal cassette to Dallas customer Vought in 2004.  Now,

1180

1    ladies and gentlemen, be sure when you are back in the jury

2    room to look at PTX-129.  This is the document Historique

3    Cassette, the document created by them showing the history

4    of the cassettes.  And it shows you these images.

5            This is the product in 2003 that they were

6    selling us, the plastic cassette.  This is what we were

7    delivering into the United States and this is what the

8    customers saw.

9            In 2004, we developed the metal cassette.  In

10   this document, it shows you, they're Generation 5.  They

11   came out with in 2005, a year after we began using the metal

12   Vought in the United States, they decide, oh, now we're

13   going to be metal.  They told you they've gone back to

14   metal.  All they mean by that is they are trying to say that

15   they've gone back to the single metal cassette that they

16   sold to British Aerospace back in 1991 that wasn't in the

17   United States and it was at a secret military facility in

18   Britain.  As you will see by looking at it, it was a blue

19   box with a with a silver handle.  It does not look like

20   anything they say was their trade dress.  Everything is else

21   was plastic in 2005, when they switched to metal after they

22   saw that we had switched to metal.

23           Functionality.  The overall appearance of this

24   cannot be functional and it is the function of these things.

25   The reason they look the way they do is their function is to

1    slide into a rack and to feed it rivets.  Everything about

2    it is necessary for that function.

3           Why do we have a clear case?  Everyone who

4    testified about that said it's to see inside, so you can see

5    if the tube is still full of rivets, to see if there's a

6    jam, to see where it is.

7           The size, shape and placement and color of the

8    handle.  Remember, this thing is meant to be carried around

9    like a briefcase.  You need a handle to do that.  You can't

10   have a handle over here either, where it will be off kilter.

11   It will be tough to carry.  And you need to be able to slide

12   this thing in and out of a rack.  You've got to have a

13   handle for that.  It has to be on the front, too.  It

14   couldn't be on the top or you'd be sticking your hand into

15   this dangerous machine.

16          The chrome color.  It has been discussed a

17   number of times.  The aluminum is much more sturdy than the

18   plastic.  That's its function.  This is an industrial piece

19   of equipment.  It gets thrown around a bit in the airplane

20   facilities.  And numerous witnesses have told you that one

21   of the problems with the plastic box is that it will crack,

22   especially around the handle.

23          The placement of the white connectors.  Now, the

24   white is because that's an ordinary industrial plastic.

25   They exist where they are because that's where the

1    compartments are in the back of the rack that they need to

2    fit into for the rivets to come out of.

3            And on the loading station, that's where the

4    rivets will go, will go into.  That's required by the way

5    these things operate, so the overall look and feel.  There's

6    no distinctive arrangement of look here.  All the components

7    add up to one big functional unit.

8            There's no secondary meaning in the United

9    States.  There are only four customers.  Where is the

10   evidence these four customers associate this box, whether it

11   be metal or plastic, with F2C2?  We didn't hear from any

12   employee of any of these customers.  The only, the close of

13   the we came was our expert witness, Michael Lawrence, who is

14   a former Boeing employee and worked with us now as a

15   consultant now.  He knows full well he works on both Broetje

16   cassettes and AHG cassettes.  It's not surprising,

17   certainly, that there would be any secondary meaning or

18   association by customers with F2C2 about the metal box

19   because, of course, the customers had only seen the plastic

20   box for years and years and years until we introduced the

21   idea of the metal box.

22           So for the trade dress case, AHG failed to prove

23   all the elements that they had to prove.  They didn't prove

24   priority of use.  They didn't prove non-functionality.  They

25   didn't prove secondary meaning in the United States as of

1    2004, when we started selling.  And they didn't prove

2    likelihood of confusion.  So you should return a verdict in

3    my client's favor on all of the trade dress and unfair

4    competition claims.

5              Intentional interference with respect to future

6    economic advantage.  Think about what they are talking about

7    here.  They are talking about money they hoped to get from

8    Boeing, Vought, Spirit and Gulf Stream.  They were our

9    customers.  They were our supplier.  We were their

10   customers.  The only relationship that they have with our

11   customers is the pass through to us.  And think about it.

12   They started doing business with Gemcore, so now they have a

13   new passthrough.  They didn't lose access to these four

14   customers.  In fact, they still say because they sell to

15   Gemcore and now ElectroImpact, they have access to our four

16   customers.  They make sales through Gemcore.  They get

17   revenue from that.  Their economic advantage has not been

18   hurt.  They have the same access to the four customers as

19   they did before.

20             Now, I would like to turn -- so on the

21   intentional interference claim, you should also return a

22   verdict for my client.

23             I want to turn to the patent issues now.  Dr.

24   Kytomaa did get on the stand and I was actually surprised

25   because he went a little bit too fast and he missed some of

1    the elements of the claims and he did not provide you

2    evidence that my client actually has some of these claim

3    elements in our product.

4            He skipped right over peripheral guiding.  He

5    didn't tell you the Judge's claim construction and he didn't

6    tell you why.  He never explained exactly where the supposed

7    grooves are passed in the way he says are in my product open

8    into a hollow center.  We look at the smooth pentagon.  It's

9    just one big hollow center.  Where is the point at which

10   anything opens into anything else?  We didn't hear an

11   explanation of that.

12           Claim 6 --

13           MR. LINDVALL:  Your Honor, I'm sorry.  I have to

14   object.  Could we have a quick sidebar.

15           THE COURT:  All right.

16           MR. LINDVALL:  I hate to object.

17           (Sidebar conference held out of the jury as

18   follows.)

19           THE COURT:  We'll stop the clock, so don't worry

20   about that.  We'll take the time we need to figure this out.

21   What's the issue?

22           MR. LINDVALL:  There has been a

23   mischaracterization of your claim construction.  There's

24   not -- the passageways of grooves, there is not a

25   requirement it has to be cut into a wall and he has been

1    characterizing that.  It must be a situation where there

2    was --

3                    THE COURT:  Hold on a second.  We're

4    interrupting counsel's closing argument for what?  To tell

5    me --

6                    MR. LINDVALL:  Because he's mischaracterizing --

7                    THE COURT:  Hold on.  Let me ask the question.

8                    MR. LINDVALL:  Sure.

9                    THE COURT:  He can argue any reasonable

10   inference consistent with any reasonable interpretation of

11   the claim construction of the evidence that has been

12   presented.  You think that he has gone beyond that?  Tell me

13   how.

14                   MR. LINDVALL:  What I -- why I objected, Your

15   Honor, was I think he is mischaracterizing your claim

16   construction to the jury.

17                   THE COURT:  Well, the jury has my claim

18   construction.  You have ten minutes to respond.

19                   MR. LINDVALL:  Okay.

20                   THE COURT:  If you think -- I mean --

21                   MR. LINDVALL:  I will address that in my

22   rebuttal.

23                   THE COURT:  All right.

24                   (End of sidebar conference.)

25                   THE COURT:  Mr. Kelleher, you have ten minutes

1    left.

2              MR. KELLEHER:  Thank you, Your Honor.

3              Dependent claim 6 of the '339 patent, where I

4    was, calls for withdrawing the stop member.

5              We didn't get an explanation from Dr. Kytomaa

6    about how in the world a stop member is withdrawn from my

7    client's product when rivets are ejected.

8              The mechanism that is in my client's product

9    for advancing one rivet at a time, it's difficult to see on

10   this product.  You can see it on some of the others you will

11   have in the juryroom.  They move back and forth like this

12   (indicating).  And none of them ever become separated from

13   the Cass cassette.  It is never withdrawn from the cassette.

14   So he hasn't proven infringement of claim 6 of the '339.

15             Now, our expert Michael Lawrence got on the

16   stand yesterday and he testified to two particular ways in

17   which my client does not infringe.  He said with regard to

18   the '216 patent, the claim element that the head -- the area

19   of the rivet head has to be substantially equal to the area

20   of the internal cross-section of the tube, and he showed you

21   that that isn't true.  That in fact in our product, the

22   rivet head is quite a bit smaller than the tube.  The

23   proportions are similar to comparing a dime to a nickel.

24   Those are not substantially equal.

25             And when Dr. Kytomaa got back up on the stand.

1187

1   He did not rebut that at all.

2           My expert Michael Lawrence also explained how

3   the Judge's claim construction requires that the axes, his

4   claim interpretation that is, that the axes of the rivets be

5   pointed in the direction of the axis of the tube.

6           And Michael, Mr. Lawrence, here is a photograph

7   showing that the rivets don't actually do that.  When air

8   pressure is applied, they go a zig-zag.  And that actually

9   was not rebutted either when Dr. Kytomaa got on the stand.

10          Now, the earlier testimony that Mr. Lindvall

11  referred to, and where he showed the video of the rivets

12  advancing through the tube, very long rivets, chosen no

13  doubt for that reason, if you look at the video you will see

14  they slightly zig-zag.  The axes don't point in the right

15  direction for them to be covered in the claims.

16          As for passageways, this is an image from Dr.

17  Kytomaa's presentation.  He is pointing to longitudinal

18  passageways, but it's the wall of the tube that he is pointing

19  to, and air is somehow coming out of the wall into the interior

20  of the tube.  And these rivet heads are flush up against the

21  surface of the inside wall.  And as we have just shown you,

22  Broetje doesn't do that with rivets in its tube.  Rivets

23  that are specified for our tubes are much smaller than that,

24  and the rivets don't get anywhere near that big to be able

25  to be flush with the wall.  This is not our product that Dr.

1    Kytomaa was testifying about.

2              I also want to point out there a discussion with

3    Dr. Kytomaa about his drawing imaginary circles.  There is

4    nothing in the patents about drawing imaginary circles to

5    be able to find grooves or passageways.  You will see the

6    Judge's claim interpretation.  He read them to you already.

7    You will have them in the juryroom.  There is nothing in

8    Judge's claim interpretation about drawing imaginary circles

9    in a pentagon to try to find where claim limitations, where

10   claim elements are present.

11             Now, intent is an element of some of these

12   patent issues.  Simple infringement, no.  We could

13   accidently infringe.  We don't but we could.

14             But there are other things:  Induced infringement,

15   contributory infringement and willful infringement.  Those

16   require a bad mental state.  And my client did not have a bad

17   mental state.  Why?

18             We proved it to you because they went out and

19   got advice of a lawyer, Dr. Budach, and he gave them legal

20   advice in 2003.  And what did they do?  They relied upon it.

21   They acted upon it.  They changed their design.  So they

22   believed it wouldn't infringe.  And when they got accused

23   two years later, they went back to him and said we have to

24   double-check with you.  Are you sure?  And he said, yes, you

25   don't infringe.

1      Now, I want to talk a little bit about invalidity,

2  although we're very close to the end of my time here.

3      The patent Patent Office does make mistakes, as

4  you heard in this case.  They literally misspelled the name

5  of the first named inventor.  That is supposed to be

6  Jean-Marc Auriol, and it's spelled Aurtoi on both patents.

7  With all due respect to the Patent Office, these patents

8  should not have issued either.

9      So because we're short, we are short on time in

10  the case, you didn't get to hear everything about the prior

11  art I would have liked to have told you.

12      This is something I showed you in the opening

13  statement.  Michael Lawrence identified it yesterday.  It's

14  the Brosene patent.  It shows back in the '60s people had

15  cassettes with filled with tubes filled with patents.

16      This is the Mauer patent.  This was the patent

17  that at his deposition, we showed the video, Jean-Marc

18  Auriol refused to answer my question as to whether there are

19  grooves or passageways in that pie-shaped tube and called my

20  question pernicious.

21      These are the two prior art references that

22  Mr. Lawrence spoke about.  I want to talk first about the

23  Offutt reference.  So here we see a drawing of a gentleman,

24  perhaps Mr. Offutt, with a coiled up tube around his body.

25  And he has this tool that shows this column of rivets, and

1    there is a tube behind it.  That is what is around his neck.

2            It's got the stop member here at the front.  It

3    has a stop member in the form of a valve here.  There is

4    another valve shown in the drawings by Mr. Lawrence pointed

5    them out to you yesterday.  And the Offutt patent says there

6    is enough room for the air to get around the heads.

7            The Judge's construction of "passageways" which

8    you will see is any hollow shape that goes down the length

9    of the tube.  If there is room around the rivet heads for

10   the air to get through, there is passageways.

11           Now, you were shown the video where Mr. Lawrence

12   during his deposition said he didn't think at the time that

13   there were grooves there.

14           On redirect, I went and asked him:  Are there

15   passageways?

16           He said yes.

17           I said what is the judge's claim interpretation

18   of grooves?

19           And he said passageways.

20           That's the Judge's claim interpretation.  So

21   passageways are there, grooves are there.

22           As Mr. Lawrence explained, every claim

23   limitation of all the claims in this case can be found in

24   Offutt.

25           There is one other thing to think about.  We

1191

1    heard from the deposition video of Mr. Bornes, when you take

2    a round tube and you coil it up, as a matter of physics, he

3    said, it will deform into an oval.  And with an oval, you

4    definitely have two passageways going down the side, even if

5    there is some dispute as to whether you do with a circle or

6    not.

7              So Shinjo, that's the patent application that

8    was cited in the prosecution history.  The examiners knew

9    about it, yes.  But like we said, the patent officers make

10   mistakes.

11             The Shinjo reference, why are we so concerned

12   about that?  It's the one that says because of the shape of

13   the channels, the air will get all the way down the channel

14   from where you're feeding it all the way to very front of it

15   and will touch the very first fastener you have in there.

16   That is what they say in their patent is their invention

17   with rivets.

18             So this has fasteners in it.  We agree they're

19   not rivets.  We agree they're pointed at 90 degrees instead

20   of having their axes pointing in the direction if they were

21   rivets.

22             But Mr. Lawrence explained why it will be

23   perfectly reasonable for a person of ordinary skill in the

24   art to use rivets, and they would be able to use rivets with

25   the Shinjo application, and if they did, everything would

1    point in the right direction and all of the claim limitations

2    would be present, and there would be obviousness as to the

3    '339.

4              THE COURT:  You have two minutes left.

5              Peripheral guiding.

6         I guess it wasn't explained for the infringement

7    purposes, but there is even a bigger problem with it.

8              You will read the Judge's instruction on

9    indefiniteness.  The public is entitled to know what is the

10   precise definition of the claim elements so we can

11   design-around it and make sure not to infringe.

12             I asked Mr. Auriol:  What does it mean?  I want

13   to design a tube that doesn't have peripheral guiding.

14             He had no idea.

15             I asked Mr. Bornes.

16             He said there is no minimum or maximum distance

17   between the wall, how I know how to design-around that.

18             Dr. Kytomaa told us yesterday, when he was

19   talking about Shinjo, it doesn't have peripheral guiding

20   because the rivets -- the fasteners only slide on one wall.

21             I don't see anything about that in the patent or

22   Judge's claim interpretation.  I don't think the public

23   would have enough information to get the precise claim scope

24   on peripheral guiding to be able to designed around it.

25   That means any claim with peripheral guiding in it is invalid.

1        They knew that we were shipping their racks and

2   their cassettes to Vought, Dallas in 2004 and we didn't buy

3   cassettes from them.  They were on notice.  They said it was

4   fishy.  Mr. Hage did.  They complained to Mr. Neugebauer:

5   When are you going to order the cassettes?

6        Their lawyers when they complained to us a

7   couple years later, in -- I'm sorry -- in 2005, said:  You

8   have been buying racks and loading stations without

9   cassettes.  They thought it was suspicious.  Well, it was.

10  They were on notice to do an investigation and they didn't.

11  That is why the statute of limitations has run.

12       So the evidence has proved, ladies and

13  gentlemen, that we don't infringe their trade dress.  You

14  should find in favor of us on everything.  We don't infringe

15  their patents.  We didn't do it willfully certainly, and

16  their patents are invalid.

17       Their damages are grossly overstated.  As you

18  have heard, they ignore costs.  How can you ignore costs?

19       So your verdict, ladies and gentlemen, our

20  customers look for the Broetje name.  You should, too.  On

21  the verdict form, please sign for Broetje wherever you see

22  it.

23       Thank you very much.

24       THE COURT:  Time is up.  Thank you, Mr. Kelleher.

25       Plaintiffs have ten minutes remaining.

1          MR. LINDVALL:  At the beginning, I told you that

2     I was going to show you actual testimony and documents here

3     in my argument, and that is what I have shown you.  The

4     trial testimony, which was the actual testimony that was

5     given for you and the actual documents.

6          What I gave you as kind of a foresight or

7     warning about was that you may see Broetje's counsel's

8     characterization of the testimony.  And I can tell you now,

9     you probably saw that, you never saw one bit of testimony

10    shown to you during his presentation.

11         Remember, when I make an argument it's not

12    evidence.  When Mr. Kelleher makes an argument or he

13    characterizes a witness's testimony that is not evidence.

14    He has to show you the evidence.  And I have showed the

15    testimony and I have showed the documents.  That is what you

16    have to believe, not myself or not Mr. Kelleher.

17         Let me address a couple of the issues that he

18    raised.

19         He made a big issue about, I believe he said no

20    possibility whatsoever that anyone could be confused.  Okay?

21    Actually confused.

22         Now, first of all, the jury's instruction will

23    make it clear that -- the Court's instruction to you will

24    make it clear you don't have to find actual specific

25    confusion to find the trade dress infringement.

1                    Let's look at PDTX-266, please.

2                    Again, this is actual testimony.  This is

3       Mr. Maylander, the Vice President of Marketing and Sales of

4       Broetje.  This is the copy document, the internal document

5       that they used to copy the cassette.

6                    I asked him here in the examination whose

7       cassette that was, in their own document, and walked him

8       through some of the photographs.

9                    And as Mr. Kelleher said, he says it's very

10      simple.  Anyone can figure out by looking at the back of the

11      cassette whose cassette it is.  Anyone in the industry can.

12      So Mr. Maylander's who actually sells this to customers

13      certainly should be able to understand whose cassette this

14      is.

15                   "Answer:  That's the back side of a rivet

16      cassette.  It doesn't say anything, who it is.

17                   "Question:  Do you know if that is a Broetje or

18      AHG?

19                   "Answer:  I can't say that.

20                   So their own Vice President of Sales, who sells

21      these cassettes, on the stand in front of you, when I showed

22      him the back side of this cassette, couldn't determine whose

23      cassette that was.

24                   If that is not confusion, I don't know what it

25      is.  It's their own person who is involved in selling their

1    own product.

2                 Now, let me show you, if you put up PDTX-256,

3    please.

4                 They make a lot of argument about priority, they

5    talk about this plastic cassette, but you will see in the

6    jury instructions we're not claiming we own chrome color.

7    What we're claiming is we have the same, they have the same

8    look and feel.  If you put our cassette side by side, yes,

9    at times we may have had a clear plastic side but they still

10   have the same look and feel.  Someone looking at these could

11   easily say, yeah, they're from the same person.  It doesn't

12   have to be exactly the same.

13                Just because there may be some clearness here,

14   and chrome everywhere else, they're still the same size

15   shape, the same handle, full plastic side.  This could be

16   confused.

17                It wouldn't be confused here, though (picking up

18   red cassette).  Different colors.  Just the little window

19   here.  So there doesn't have to be this actual confusion,

20   although with Mr. Maylander we saw that he even on the stand

21   was confused about what cassette he was looking at.

22                Now, if you also look at, they talk about when

23   they were selling things.  If we could pull up PDTX-105,

24   please.

25                This is a document -- this was a document I used

1197

 1    with Dr. Peters that was admitted into evidence.  And if you

 2    can turn to the next page, please.

 3              What this is, Dr. Peters testified this is from

 4    their AMS accounting system which he said was very reliable

 5    and is used by their auditors.

 6              And right up here, this is the thing called ship

 7    date.  And you see the first ship date?  Shipping date, not

 8    receiving date.  Shipping date from Germany.  The first date

 9    is January 24th, 2005.  Not 2004 but 2005.  They represented

10    to you it was 2004.  This is something that Dr. Peters was

11    an accurate depiction.

12              Now, you heard Mr. Benczkowski say these

13    delivery slips can have typographical errors.  But Dr.

14    Peters said this is what they relied on.  In fact, this is

15    what they gave on us to rely on for damages.  So if you see

16    this, this is a printout from their system, and it shows the

17    first shipment of their cassettes and it was in 2005, not

18    2004.

19              So if we turn to PDTX-256.

20              This whole idea is wrong.  It's wrong for two

21    reasons.  One of all, 2004 is not the right date.  According

22    to Dr. Peters' documents and their internal documents, the

23    ship date was in 2005 somewhere.  So we don't know when the

24    metal, the metal sides mean anything, when that would be done.

25              The second thing is they're assuming just because

1    you have plastic clear sides that that is not the same trade

2    dress.  That is wrong.  Somebody can get confused, and you

3    will look at the factors in the jury instructions when you go

4    through them.  For example, copying is one of the factors.

5    And guess what cassette they used to copy?  It was this one

6    here.

7            And there is also testimony in the record from

8    Mr. Bornes.  And this is probably the first time I said

9    this.  I don't have it in front of me.  Mr. Bornes testified

10   in 2003 that he told Broetje that we should change the sides

11   to metal, and they went and used that idea.  That testimony

12   is in the record.  Unfortunately, I don't have it to show it

13   to you.  It's the one time you will have to trust me on it.

14           Now, with respect to functionality.  PDTX-247.

15   And Broetje's counsel tried to say because everything has a

16   function on the cassette, it can't be protected.  Again,

17   that is wrong.  But even assuming that, when they came out

18   with this cassette, and I asked Dr. Peters whether any of

19   these changes to the color, the look, the feel, the handle,

20   whether any of this had to do with function, was there any

21   functional change, he said:

22           "Question:  Now, was there any change with

23   respect to the function of the cassette?

24           "Answer:  We did not make any changes in the

25   function of the cassette."

1          These were all nonfunctional changes.

2    Nonfunctional changes are protectable.

3          Now, I believe with respect to Dr. Kytomaa, Dr.

4    Kytomaa, again this is an instance where you have to either

5    believe Mr. Kelleher or believe me, but I believe -- you

6    remember Dr. Kytomaa up there.  He went through each element

7    of the claim in laborious fashion.  It probably was tough to

8    follow because it was, he had to read out each claim

9    element.  He went through each of the claim elements and

10   showed you where it was in the Broetje Parties.  He didn't

11   skip any elements.

12         This is not for you to believe me or believe

13   Mr. Kelleher.  You were there.  You watched Dr. Kytomaa.

14   You heard him.  If he skipped something, I'm sure Mr.

15   Kelleher would have pointed out in his testimony.  Did he

16   show you any testimony for Dr. Kytomaa saying, look, he

17   skipped that element?  No.

18         So you are not here to believe me or believe

19   Mr. Kelleher.  Again, it's the witnesses you are here to

20   believe.  They're the evidence.

21         THE COURT:  You have two minutes left.

22         MR. LINDVALL:  Thank you.

23         I think in sum, again, I have to go back to the

24   whole motive here.  They come up with all of these excuses,

25   false.  Okay?  Why do you continue buying our cassette for

1200

```
 1    11 or 12 years?  Okay.  Why, when we said we're going to go
 2    to Gemcore and sell our cassette, why did they get so upset?
 3    If our cassette was such a piece of junk, they would be
 4    happy if we sold it to Gemcore so Gemcore would have to deal
 5    with all of these hundreds and thousands of faults that they
 6    talk about.  Why?  It didn't make any sense.  Well, we know
 7    why.  We now are going to sell our cassette system to
 8    Gemcore.  They were upset.  Now Gemcore was going to have
 9    that same competitive advantage that Broetje had and they
10    compete head to head.
11              That was a big concern with them.  They didn't
12    want to have that advantage of us -- of them having the AHG
13    system also, because when they bid against each other,
14    Gemcore could say we provide the AHG system, too, because we
15    know the AHG system was a standard in the industry.  So it
16    made no sense.
17              So what did they do?  They didn't tell
18    Mr. Bornes, but they went out off and copied ours, our
19    cassette.  They didn't tell them.  And they kept telling
20    Mr. Bornes, put pressure on him by lying to him.  We're
21    going to go to somebody else, we're going to go to somebody
22    else.  You remember Mr. Neugebauer's e-mail.  Six months
23    after the development he said, we're thinking about changing
24    or changing the relationship.  No.  They hadn't thought.
25    They already decided.  They concealed that fact from him.
```

1           Mr. Bornes didn't conceal the fact that he was

2   going to Gemcore and trying to sell from them.  Who are you

3   going to believe in this case?  Broetje or Mr. Bornes and

4   AHG?  I think the documents and the testimony makes it

5   obvious.

6           Thank you very much.

7           THE COURT:  Thank you.

8           Ladies and gentlemen of the jury, let's return

9   to the jury instructions.  I am going to read you the last

10  few pages that I did not read to you yet and talk about

11  the verdict sheet and it will begin time to begin

12  deliberations.

13          I'm picking up with the final jury instructions,

14  14.0, deliberation and verdict.

15          14.1.  Introduction.

16          That concludes the part of my instructions

17  explaining the rules for considering some of the testimony

18  and evidence.  Now let me finish up by explaining some

19  things about your deliberations in the jury room, and your

20  possible verdicts.

21          Once you start deliberating, do not talk to the

22  jury officer, or to me, or to anyone else except each other

23  about the case.  If you have any questions or messages, you

24  must write them down on a piece of paper, sign them, and

25  then give them to the jury officer.  The officer will give

1    them to me, and I will respond as soon as I can.  I may have

2    to talk to the lawyers about what you have asked, so it may

3    take some time to get back to you.  Any questions or

4    messages normally should be sent to me through your

5    foreperson, who by custom of this Court is Juror No. 1.

6              One more thing about messages.  Do not ever

7    write down or tell anyone how you stand on your votes.  For

8    example, do not write down or tell anyone that you are split

9    4-4, or 6-2, or whatever your vote happens to be.  That

10   should stay secret until you are in fished.

11             14.2.  Unanimous verdict.

12             Your verdict must represent the considered

13   judgment of each juror.  In order for you as a jury to

14   return a verdict, it is necessary that each juror agree to

15   the verdict.  Your verdict must be unanimous.

16             It is your duty, as jurors, to consult with one

17   another and to deliberate with a view towards reaching an

18   agreement, if you can do so without violence to your

19   individual judgment.  Each of you must decide the case for

20   yourself, but do so only after an impartial consideration of

21   the evidence with your fellow jurors.  In the course of your

22   deliberations, do not hesitate to re-examine your own views

23   and change your opinions, if you become convinced it is

24   erroneous.  But do not surrender your honest conviction as

25   to the weight or effect of evidence solely because of the

1    opinion of your fellow jurors, or for the purpose of

2    returning a verdict.  Remember at all times that you are not

3    partisans.  You are judges -- judges of the facts.  Your

4    sole interest is to seek the truth from the evidence in the

5    case.

6              A form of verdict has been prepared for you, and

7    you have been provided a copy.  I will read it to you

8    shortly.  You will take this form to the jury room and when

9    you have reached unanimous agreement as to your verdict, you

10   will have your foreperson fill in, date and sign the form.

11   You will then return to the courtroom and your foreperson

12   will give your verdict to my deputy.

13             It is proper to add the caution that nothing

14   said in these instructions and nothing in the form of

15   verdict is meant to suggest or convey in any way or manner

16   any intimation as to what verdict I think you should find.

17   What the verdict shall be is the sole and exclusive duty and

18   responsibility of the jury.

19             14.3.  Duty to deliberate.

20             Now that all the evidence is in and the

21   arguments are completed, you are free to talk about the case

22   in the jury room.  In fact, it is your duty to talk with

23   each other about the evidence, and to make every reasonable

24   effort you can to reach unanimous agreement.  Talk with each

25   other, listen carefully and respectfully to each others

1    views, and keep an open mind as you listen to what your

2    fellow jurors have to say.  Try your best to work out your

3    differences.  Do not hesitate to change your mind if you are

4    convinced that other jurors are right and that your original

5    position was wrong.  But do not ever change your mind just

6    because other jurors see things differently, or just to get

7    the case over with.  In the end, your vote must be exactly

8    that -- your own vote.  It is important for you to reach

9    unanimous agreement, but only if you can do so honestly and

10   in good conscience.

11           No one will be allowed to hear your discussions

12   in the jury room, and no record will be made of what you

13   say.  So you should all feel free to speak your minds.

14           Listen carefully to what the other jurors have

15   to say, and then decide for yourself.

16           14.4.  Do not consider what will happen after

17   trial.

18           Members of the jury, in this case you may have

19   heard or noticed inferences as to what may happen after this

20   trial.  You are to disregard any inferences as to what may

21   happen after you have rendered your verdict.

22           And, finally, 14.5, Court has no opinion.

23           Let me finish up by repeating something that I

24   have said to you earlier.  Nothing that I have said or done

25   during this trial was meant to influence your decision in

1    any way.

2         As I mentioned earlier, the lawyers' statements

3    and arguments are not evidence.  Their questions and

4    objections are not evidence.  Any of my comments and

5    questions are not evidence.  The notes taken by any juror

6    are not evidence.  You must decide the case yourselves based

7    only on the evidence presented.

8         My legal rulings are not evidence, although you

9    are required by your oath to follow my instructions and

10   apply them to the evidence.

11        And that concludes the jury instructions.  Let

12   me turn your attention just briefly to the verdict form,

13   which in itself is a fairly lengthy document, but has many

14   fewer words than the instructions.  I will read it to you.

15   The pages are not numbered.  I'm starting on a page that is

16   entitled "Patent infringement, direct infringement."

17        Question 1 says U.S. Patent No. 5,011,339:  Have

18   Ateliers de la Haute-Garonne and F202 system S.A.S.

19   (collectively, AHG) proven by a preponderance of the

20   evidence that Broetje Automation-USA Inc. and Broetje

21   Automation GmbH (collectively Broetje) infringed the claims

22   of the '339 patent listed below?

23        There's essentially a table there for claims 1,

24   2 and 6 and columns where you mark if you find for AHG or

25   mark "no" if you find for Broetje.

1206

1        Then Question No. 2 relates to U.S. Patent No.

2    5,143,216:  Has AHG proven by a preponderance of the

3    evidence that Broetje infringed the claims of the '216

4    patent listed below?

5        There's a table indicating claims 1 and 2.  You

6    mark "yes" if you find for AHG.  You mark "no" if you find

7    for Broetje.

8        Then we move to questions relating to inducing

9    infringement.  Question 3 relates to the '339 patent:  Has

10   AHG proven by a preponderance of the evidence that Broetje

11   Automation-USA Inc. induced a third party to infringe the

12   claims of the '339 patent listed below?

13       There's a table listing claims 1, 2 and 6.  You

14   mark "yes" if you find for AHG.  You mark "no" if you find

15   for Broetje.

16       Then, again, for the '339 patent, we now ask you

17   in Question 4:  Has AHG proven by a preponderance of the

18   evidence that Broetje Automation-GmbH induced a third party

19   to infringe the claims of the '339 patent listed below?

20       There's the same table, claims 1, 2 and 6.  You

21   mark "yes" if you find for AHG.  You mark "no" if you find

22   for Broetje.

23       Question 4 relates to the GmbH entity whereas

24   question three relates to the USA entities.

25       You see something similar on the next side,

1    which asks you about contributory infringement.

2              Question 5, the '339 patent:  Has AHG proven by

3    a preponderance of the evidence that Broetje Automation-USA

4    Inc. contributed to the infringement by a third party of the

5    claims of the '339 patent listed below?

6              The table lists claims 1, 2 and 6.  Mark "yes"

7    if you find for AHG.  Mark "no" if you find for Broetje.

8              Then Question 6, again related to the '339

9    patent:  Has AHG proven by a preponderance of the evidence

10   that Broetje-Automation GmbH contributed to the infringement

11   by a third party of the claims of the '339 patent listed

12   below?

13             Again, claims 1, 2 and 6.  Mark "yes" if you

14   find for AHG.  Mark "no" if you find for Broetje.

15             That takes us to the question about willful

16   infringement.

17             Instruction:  If you answered yes to any of

18   questions 1, 3 or 5 above, answer question seven.  Otherwise

19   go to Question 8.

20             If you reach Question 7 consistent with that

21   instruction, Question 7 relates to the '339 patent I asks

22   you:  Has AHG proven by clear and convincing evidence that

23   Broetje Automation-USA Inc. willfully infringed the '339

24   patent?  You mark "yes" if you find for AHG.  You mark "no"

25   if you find for Broetje.

1    The instruction below Question 7 then says:  If

2    you answered "yes" to any of questions 1, 4 or 6 above,

3    answer Question 8.  Otherwise go to Question 9.

4    If following the instruction you've reached

5    Question 8, it asks you with respect to the '339 patent:

6    Has AHG proven by clear and convincing evidence that

7    Broetje-Automation GmbH willfully infringed the '339

8    patent?  You mark "yes" if you find for AHG.  You mark "no"

9    if you find for Broetje.

10   Continuing on willful infringement.  On the next

11   page, you find an instruction.  It says, if you answered yes

12   to question two above, answer Questions 9 and 10.

13   Otherwise, go to Question 11.

14   Following that instruction, if you get to

15   Question 9, it relates to the '216 patent and asks you:  Has

16   AHG proven by clear and convincing evidence that Broetje

17   Automation-USA Inc. willfully infringed the '216 patent?

18   Mark "yes" if you find for AHG.  Mark "no" if

19   you find for Broetje.

20   And then Question 10 again with respect to the

21   '216 patent asks you:  Has AHG proven by clear and

22   convincing evidence that Broetje Automation GmbH willfully

23   infringed the '216 patent?

24   Mark "yes" if you find for AHG.  Mark "no" if

25   you find for Broetje.

1          Now I'm at invalidity question.  First,

2    anticipation.

3          Question 11 asks you with respect to the '339

4    patent:  Has Broetje proven by clear and convincing evidence

5    that the following claims of the 33 patent are invalid as

6    anticipated by the prior art?

7          For claims 1, 2 and 6, you mark "yes" if you

8    find for Broetje.  You mark "no" if you find for AHG.

9          Question 12 asks regarding the '216 patent:  Has

10   Broetje proven by clear and convincing evidence that the

11   following claims of the '216 patent are invalid as

12   anticipated by the prior art?

13         For claims 1 and 2, you mark "yes" if you find

14   for Broetje.  You mark "no" if you find for AHG.

15         Obviousness.

16         Question 13 relates to the '339 patent.  It

17   asks:  Has Broetje proven by clear and convincing evidence

18   that the following claims of the '339 patent are invalid as

19   obvious based on the prior art?

20         For each of claims 1, 2 and 6, you mark "yes"

21   if you find for Broetje.  You mark "no" if you find for AHG.

22         Then at question 14, that asks you about the

23   '216 patent:  Has Broetje proven by clear and convincing

24   evidence that the following claims of the '216 patent are

25   invalid as office based on the prior art?

1       For claim 1 and claim 2, mark "yes" if you find

2  for Broetje.  Mark "no" if you find for AHG.

3       Indefiniteness.

4       Question 15.  Has Broetje proven by clear and

5  convincing evidence that the claims of the '339 patent are

6  invalid because the claim term peripheral guiding is

7  indefinite?

8       Mark "yes" if you find for Broetje.  Mark "no"

9  if you find for AHG.

10       That takes us to patent damages, and you have an

11  instruction here, which reads:

12       If, one, you answered yes to any part of

13  questions 1 to 10 above (that is, you found that one or more

14  claims of U.S. Patent No. '339, or U.S. Patent No. '216 were

15  infringed by Broetje);

16       And, two, with respect to any such infringed

17  claim or claims, you answered no to Questions 11 to 15 above

18  (that is, you found that such infringed claim or claims are

19  not invalid);

20       Then answer Question 16.  Otherwise, leave this

21  question blank and go on to Question 17.

22       Question 16.  If following this instruction you

23  reach it, asks you:  What amount of damages is AHG entitled

24  to as compensation for Broetje's infringement of the '339

25  patent and/or the '216 patent?

1           And now we're at trade dress, unfair

2   competition, and intentional interference with prospective

3   economic advantage claims.

4           First, trade dress infringement.

5           Question 17.  Has AHG proven by a preponderance

6   of the evidence that Broetje infringed AHG's trade dress?

7   Mark "yes" if you find for AHG.  Mark "no" if you find for

8   Broetje.

9           Then you are given an instruction:  If you

10  answered yes to Question 17, then proceed to Questions 18

11  and 19.  Otherwise, skip Questions 18 and 19 and proceed to

12  Question 20.

13          If you reach question 18, it asks you:  Has AHG

14  proven that Broetje Automation-USA Inc. intentionally

15  infringed AHG's trade dress?

16          Mark "yes" if you find for AHG.  Mark "no" if

17  you find for Broetje.

18          At Question 19, you're asked:  Has AHG proven

19  that Broetje Automation GmbH intention physically infringed

20  AHG's trade dress?

21          Mark "yes" if you find for AHG.  Mark "no" if

22  you find for Broetje.

23          I'm now at the page with the header unfair

24  competition (Federal and State law).  And it tells you, the

25  parties have stipulated that if you find that Broetje

1    infringed AHG's trade dress, then Broetje is also liable for

2    unfair competition under federal and State law.  Please

3    proceed to the next question.

4              Next is intentional interference with

5    prospective economic advantage.

6              Question 20 asks you:  Has AHG proven by a

7    preponderance of the evidence that Broetje Automation-USA

8    Inc. intentionally interfered with AHG's prospective

9    economic advantage?

10             Mark "yes" if you find for AHG.  Mark "no" if

11   you find for Broetje.

12             Question 21.  Has AHG proven by a preponderance

13   of the evidence that Broetje Automation GmbH intentionally

14   interfered with AHG's prospective economic damage?

15             Mark "yes" if you find for AHG.  Mark "no" if

16   you find for Broetje.

17             Next is damages on trade dress, unfair

18   competition, and intentional interference with prospective

19   economic advantage claims.

20             Question 22.  Before May 12, 2007, did AHG

21   discover, or know of facts that would have caused a

22   reasonable person to suspect, that Broetje was selling

23   its allegedly infringing rivet cassettes in the United

24   States?

25             Mark "yes" if you find for Broetje.  Mark "no"

1    if you find for AHG.

2              Then there's an instruction:  If you answered

3    yes to Question 22, then answer Question 23.  If you

4    answered no to Question 22, continue to Question 24.

5              Question 23, should you reach it, asks you:

6    Before May 12, 2006, did AHG discover, or know of facts that

7    would have caused a reasonable person to suspect that

8    Broetje was selling its allegedly infringing rivet cassettes

9    in the United States?

10             Yes is for Broetje.  No is for AHG.

11             Then Question 24:  What amount of damages is AHG

12   entitled to as compensation for trade dress infringement,

13   unfair competition under federal law, unfair competition

14   under state law, or intentional interference with a

15   prospective economic advantage?

16             There's a blank there for you to fill in an

17   amount.

18             And then Question 25:  If you answered "yes" to

19   question 18 or 19, finding that either Broetje

20   Automation-USA Inc. or Broetje Automation GmbH intentionally

21   infringed AHG's trade dress (which the parties have

22   stipulated to mean Broetje is liable for unfair competition

23   under state law), or "yes" to question 20 or 21, finding

24   that either Broetje Automation-USA Inc. or Broetje

25   Automation GmbH intentionally interfered with AHG's

1    prospective economic advantage, what amount of punitive

2    damages, if any, do you award AHG?

3              And then again a space for you to mark in an

4    amount.

5              And then on the very last page it instructs you,

6    you have now reached the end of the verdict form and should

7    review it to ensure it accurately reflects your unanimous

8    determination.  All jurors should then sign and date the

9    verdict form in the spaces below and notify the Court

10    security officer that you have reached a verdict.  The

11    presiding juror should retain possession of the verdict form

12    and bring it when the jury is brought back into the

13    courtroom.  And there's a space for it to be dated and for

14    all eight of you to sign it.

15              That completes my reading and we'll now call

16    forward our security officer.  Mr. Looby will administer the

17    oath.

18              (Court security officer placed under oath to

19    watch the jury.)

20              THE COURT:  Thank you.  We'll now take the jury

21    out.

22              (Jury left courtroom.)

23              THE COURT:  All right.  Have a seat.  And I'm

24    going to talk for a little while.

25              First, a couple things that I would like you

1    all to meet and confer on during the course of the jury

2    deliberations.  Then we'll have the time sometime today to

3    talk about results of whatever your meet and confer yields.

4              I'm concerned that if there is any

5    inconsistencies on the verdict form, I always review the

6    verdict form before I have it read, but I don't always

7    notice if there are inconsistencies.

8              I will try to be, of course, as careful as I

9    can but it is a complicated verdict form.  I'll probably

10   take some time, probably at sidebar, with the assistance of

11   my law clerk to review it before it is read in open court.

12             If we were to notice an inconsistency, what I

13   would like is your considered views on what should I do at

14   that point.  So take some time over the course of the

15   afternoon to meet and confer on that.  And when we next

16   speak, I'll ask you what your proposals are as to what I

17   should do if I do think I see any inconsistency.

18             Additionally, if both sides agree, assuming we

19   get a verdict whenever we do, I'd like to provide you the

20   opportunity to speak with the jury, if any of the jurors

21   wish to stay afterwards.  But I will only give you that

22   opportunity if both sides agree they want it and if you make

23   a representation on the record at the appropriate time that

24   you won't use anything that you hear in those discussions in

25   any post-trial motions or on appeal.

1        So think about that because I will at some point

2   ask you those questions and see if you want to have that

3   opportunity.

4        Let me take a few minutes and just put on the

5   record some of the thinking that went into our rulings on

6   the jury instructions and the verdict sheet.

7        All right.  I think I've got these notes pretty

8   much in order of the jury instructions.

9        With respect to Broetje's proposed instruction

10  4.6 regarding design-around, we deleted that instruction as

11  we didn't think it was necessary or appropriate to explain

12  the policy behind design-arounds.

13       On 5.0, we kept in the instruction on willful

14  infringement because I thought the jury having heard the

15  evidence, it will be helpful for them to give us their

16  views on whether willfulness has been proven or portions of

17  willfulness.

18       On 6.8, obviousness, level of ordinary skill,

19  we kept AHG's contention of characterization of one of

20  ordinary skill, and we also included Broetje's position

21  though with rewrote it to make it more clear.  We thought it

22  was appropriate to give both sides' views and we were not

23  persuaded that Broetje's view was new or in any way unfair

24  or surprising to AHG.

25       On 6.9, obviousness - objective criteria, we

1    did not add AHG's proposal regarding a presumption of a

2    relationship between commercial success and the patent.  We

3    also didn't include anything about whether that presumption

4    would be rebuttable.  I thought all that was unnecessary and

5    would be confusing.

6         On 6.10, indefiniteness.  We combined the

7    parties proposals, mostly relying on AHG's which we thought

8    was accurate and appeared to be I think derived from the

9    AIPLA and District of Delaware model instruction.

10        7.6, generic trade dress.  We took Broetje's

11   proposal and integrated it into the secondary meaning

12   instruction which we thought was accurate, appropriate and

13   helpful especially given where we placed it.

14        On 7.8, likelihood of confusion.  We resolved

15   the dispute about distribution channels by including both

16   parties' proposals.  That is, if they were likely sold to

17   the same or similar customers or sold through the same

18   distribution channels, that could contribute to a finding of

19   likelihood of confusion.  The test itself is not exhaustive

20   and we thought both of what the parties proposed could

21   support a finding of confusion.

22        On 8.8, unfair competition.  We clarified the

23   parties' agreement about the verdict on unfair competition

24   following directly from the verdict on trade dress

25   infringement.

1218

1          9.1.  On the elements of the intentional

2     interference claim, as you will have seen, we will have

3     concluded that the California state claim was not preempted

4     by federal patent law.  The Federal Circuit has noted there

5     is an underlying presumption disfavoring preemption.  That

6     is at least in the Hunter Douglas decision of the Federal

7     circuit.

8          By agreement, there is no field preemption so

9     the issue was just conflict preemption.  We found no such

10    preemption here as California law requires multiple elements

11    to be proven, only one of which may, but need not necessarily

12    be, satisfied by a finding of patent infringement.  California

13    law is not regulating the protection of innovation but rather

14    regulating how entities compete in the marketplace.  So we saw

15    no conflict, despite the fact that one outcome may be that

16    the type of damages, enhanced damages essentially, that can be

17    obtained on a preponderance finding under California law is

18    different than what could be found based on just a finding of

19    preponderance under federal patent law.  Again, there are all

20    those additional elements in order to reach that decision

21    under California law.

22         At bottom, in the Court's view, the state law

23    here does not "stand as obstacle to the accomplishments and

24    execution of the full purposes and objectives of Congress."

25    It's a quote from a decision in this District.  I believe it

1    was Judge Jordan in the *Cryovac* decision, 430 F. Supp. 2nd

2    at 358.  Just as he found the state law there, we find here

3    there is no obstacle.

4         Moving on, 10.1, patent damages.  Generally, we

5    thought both parties were correct in regards to the one

6    dispute that they had.  So we told the jury that they could

7    base their evaluation of reasonable certainty on either

8    expert or opinion evidence.

9         10.2B, the date for patent damages.  We adopted

10   Broetje's proposal which we thought was more complete and

11   clear but we did move some things around hopefully in at

12   least an effort to make things even more clear.

13        At 10.11, lost profits, doubts resolved against

14   the infringer.  We adopted that proposal with some

15   modification.  We thought it was a correct statement of law.

16   Broetje indicated they thought some motion in limine

17   precluded the inclusion of that instruction, didn't tell

18   us which, if any, motion in limine that was, and we couldn't

19   figure it out, so we didn't find anything that precluded us

20   from finding that instruction.

21        11.2a.  Damages for trade dress infringement.

22   We used AHG's most recent -- no, I'm sorry.  We used AHG's

23   proposal which listed the various factors to consider but we

24   deleted that No. 5, the corrective advertising.  AHG agreed

25   it was proper to delete that one.  We thought the remainder

1    of AHG's proposal was accurate and not unduly confusing, and

2    we thought evidence was presented that the jury might find

3    could support some or all of those other factors.

4              11.3a, damages for trade dress infringement we

5    adopted.  This is the one we adopted AHG's revised proposal

6    which I think we got yesterday morning which we thought

7    correctly instructed the jury that it can award damages

8    based on any revenues it finds "resulted from the use of

9    AHG's trade dress."

10             The parties were permitted to argue whether or

11   not evidence was presented that would allow a finding in

12   this regard of anything other than just the cassettes, but

13   we thought what AHG came up with was an accurate statement

14   of the law.  Notably, neither side found a case that was

15   directly on point, nor did we.  And there is some degree of

16   equitable considerations that has to go into this.

17             I think by the parties' agreement under the case

18   law and in the Court's view, I think equitable considerations

19   support the instruction that we came up with which was AHG's

20   revised proposal.

21             On 11.6, trade dress statute of limitations.  We

22   agreed with Broetje that because it is a common law claim,

23   the applicable statute of limitations was two years and not

24   four years.

25             11.13, no duplicative damages.  We added

1    Broetje's introduction and clarified that the no duplication

2    instruction does not apply to punitive damages.

3            13.0, we added our foreign law instruction.

4            Just one additional note.  Any instructions

5    that Broetje proposed that they were indicating they were

6    expressly proposed for purposes of preserving rights on

7    appeal, we did not adopt any of those instructions.

8            And then just briefly on the verdict form, you

9    figured out undoubtedly what we decided but we did think it

10   was appropriate on all of the intent claims to separate out

11   the two Broetje entities.  We thought it was appropriate

12   to separate out, for separate findings, anticipation and

13   obviousness.

14           On patent damages, we tried to come up with a

15   sort of if-then logical chain that would hopefully lead the

16   jury to what with I think we all agree was the intent as to

17   when and how they should reach that issue.

18           On the statute of limitations, I thought it

19   would be helpful with the jury having heard the evidence

20   to give us some feedback on statute of limitations, and we

21   thought that we could not improve upon defendants' proposal

22   on those two questions and we went with those.

23           You will need to make sure we no how reach you

24   if, and when, any questions come up.  So make sure Mr.

25   Lobby knows how to reach both sides.

```
 1              Any issues or questions from the plaintiffs
 2    before we break?
 3              MR. LINDVALL:  No, Your Honor.
 4              THE COURT:  And defendants?
 5              MR. KELLEHER:  No, Your Honor.
 6              THE COURT:  All right.  Thank you very much.  We
 7    will be in recess.
 8              (Recess taken while jury deliberated.)
 9              *     *     *
10              (Proceedings reconvened after recess.)
11              THE COURT:  Have a seat.
12              So we got a note which says:  "Need
13    clarification on Question 22 and 23," which I think are the
14    statute of limitations questions.  It doesn't say anything
15    else other than being signed and have a juror number on it.
16              So again, in total, it appears to read:  "Need
17    clarification on Question 22 and 23."  So, obviously, I want
18    your thoughts on what to do about this.
19              MR. LINDVALL:  22 and 23 are the damages on
20    trade dress?  That's what we have.
21              THE COURT:  Yes, damages on trade dress.  Before
22    May 12, 2007, did AHG discover and then before May 12, 2006,
23    did AHG discover.  That is what 22 and 23 are on the verdict
24    sheet.  So I assume that is what they're referring to.
25              MR. LINDVALL:  Right.  Okay.
```

```
 1                    THE COURT:  But I know nothing more than what is
 2       on the note, of course.  So take a moment and confer amongst
 3       yourselves and then you can confer with each other, if you
 4       like, about what your proposals are.
 5                    MR. LINDVALL:  Okay.
 6                    (Counsel confer.)
 7                    THE COURT:  Mr. Lindvall, do you need more time?
 8                    MR. LINDVALL:  No, Your Honor.
 9                    THE COURT:  Mr. Kelleher, do you want some more
10       time?
11                    MR. KELLEHER:  May I have one moment, Your
12       Honor, please?
13                    THE COURT:  Sure.
14                    (Counsel confer.)
15                    THE COURT:  Do you want to confer with
16       Mr. Lindvall, see if he might be in the same place?
17                    (Counsel confer.)
18                    THE COURT:  Mr. Lindvall, what is your view?
19                    MR. LINDVALL:  Your Honor, our view is since
20       this was not, neither one of these questions are essential
21       to come up with a verdict, we think probably in the interest
22       of avoiding confusion and any delay is that the jury be
23       told we remove these questions from them and let Your Honor
24       address along with the equitable tolling and all the other
25       statute of limitations.
```

1224

```
1                THE COURT:  These are really advisory findings;
2    is that correct?
3                MR. LINDVALL:  Correct.  We think in that case,
4    just in order to avoid confusion that we bypass them and let
5    them do whatever they have been doing after that.
6                THE COURT:  Mr. Kelleher, does the defendant
7    concur in that?
8                MR. KELLEHER:  Your Honor, we thought about it.
9    We see it as a reasonable fallback position.  Our initial
10   impulse is to refer the jurors back to the instructions and
11   see if reading them again might answer whatever questions
12   they have, which we're not exactly sure what they are.
13               THE COURT:  So what would you have me do?
14   Just tell them I would refer you to -- in response to your
15   question, I would refer you to the following instructions?
16               MR. KELLEHER:  That was our initial impulse,
17   Your Honor.  And if they still express confusion in a
18   reasonable amount of time, I suppose we would concur with
19   taking way the questions.
20               THE COURT:  Mr. Lindvall, what is your view?
21               MR. LINDVALL:  Your Honor, the instructions I
22   don't think will really enlighten them on this anymore than
23   what they say.  I think by doing that, it is just going to
24   end up putting us back in the same situation and bouncing
25   back.
```

1           I think the best way to do this, since it is

2    an advisory opinion, the Court has the discretion to remove

3    them on this period of time since has been a cause of

4    conflict for them.

5           THE COURT:  You are not persuaded, Mr. Kelleher?

6           And I'm not trying -- I will tell you I'm not

7    going to change the verdict sheet unless you all agree that

8    I should do that.

9           MR. KELLEHER:  Right.

10          THE COURT:  So I'm not trying to get you to

11   change your position, if that is your position.  I'm not

12   going to change the verdict sheet yet, but if that is not

13   your position, then we could save ourselves some time

14   possibly.

15          MR. KELLEHER:  I think, Your Honor, I can, given

16   what I have heard, I could agree with Mr. Lindvall's proposal.

17          THE COURT:  All right.  Well, then I take it

18   maybe the way to do this is for me to bring the jury in, for

19   me to tell them in response to their question, I'm directing

20   them that they do not have to answer Questions 22 and 23.

21          And then I will also tell them we would like

22   to know if they intend to stay past 4:30.  If they all

23   unanimously agree they want to stay past 4:30 they should do

24   so, but given the time of day they should let us know that.

25          Any objection from plaintiffs?

```
 1                    MR. LINDVALL:  No, Your Honor.

 2                    THE COURT:  And from defendants?

 3                    MR. KELLEHER:  No, Your Honor.

 4                    THE COURT:  Okay.  Ms. Sharp.

 5                    MS. SHARP:  Just an observation.  Could we

 6       confer?

 7                    THE COURT:  Yes, you can confer.  Sure.

 8                    (Counsel confer.)

 9                    MR. LINDVALL:  I think Ms. Sharp just had a

10       clerical issue.  If you did strike these, then the

11       instruction on 22 where it says to go to 24, they would

12       obviously go to 24 and 25.

13                    THE COURT:  All right.  So I appreciate that.

14                    So I think what I'm going to say to them is, in

15       response to your question, you do not have to answer

16       questions 22 and 23, but regardless of whether you answer

17       question 22 and 23, you must answer question 24 and -- you

18       must go on to question 24?

19                    MR. LINDVALL:  Yes, Your Honor.

20                    THE COURT:  Does that work?  Mr. Kelleher, do

21       you agree with that?

22                    MR. KELLEHER:  I think that's correct, Your

23       Honor.

24                    THE COURT:  All right.  Let me write that down

25       so I get that right.
```

```
 1                All right.  I am going to bring them in and say,

 2   in response to your question, you do not have to answer

 3   questions 22 and 23, but whether you answer question 22 and

 4   23 or not, you must go on to question 24.  Correct?

 5                MR. LINDVALL:  Yes, your Honor.  That's fine.

 6                THE COURT:  Correct, Mr. Kelleher?

 7                MR. KELLEHER:  Yes, your Honor.

 8                THE COURT:  All right.  Let's bring the jury

 9   back in.

10                (The jury entered the courtroom.)

11                THE COURT:  Ladies and gentlemen of the jury, I

12   brought you in here to respond to your note that you sent

13   out.

14                In response to your question, you do not have to

15   answer question 22 and 23, but whether or not you answer

16   question 22 and 23, you should follow the instructions for

17   going on to question 24.  So, again, in response to your

18   question, you do not have to answer question 22 and 23, but

19   whether or not you answer question 22 and 23, follow the

20   instructions for going on to question 24.  That's my answer

21   to your question.

22                Separately, I have essentially a question for

23   you, which I will ask you to go back in, respond to with a

24   note after you go back into the jury room, which is, in

25   light of the time of day it is, we need to know whether you
```

1   have or do unanimously decide to stay beyond 4:30.  If you

2   all agree to do that, you can stay as long as you want.  If

3   you don't all agree to stay beyond 4:30, then you'll come

4   back Monday at 9:00 a.m. and continue with your

5   deliberations.  So please send us a note after you've made

6   that decision.  Thank you.

7                    (The jury was excused to the jury room.)

8                    THE COURT:  All right.  Have a seat.

9                    Any questions or concerns about what just

10  happened here, Mr. Lindvall?

11                   MR. LINDVALL:  No, Your Honor.

12                   THE COURT:  Mr. Kelleher?

13                   MR. KELLEHER:  No, Your Honor.

14                   THE COURT:  All right.  So if we were to get a

15  verdict, have you all talked about what I should do about

16  reviewing that and what I should do if I see any

17  inconsistency?  Mr. Lindvall?

18                   MR. LINDVALL:  Yes.  I believe we've come to an

19  agreement, Your Honor.  What we would do is treat of kind of

20  like a question.  If you see an inconsistency in there, you

21  consult with the two of us, we figure out how, what kind of

22  questions or what instructions you could give them to

23  eliminate the conflict or the inconsistency in the verdict

24  form so that they, they can go back and then remedy it.

25                   THE COURT:  So if I think I see an

1    inconsistency, would you have me tell you the substance of

2    what appears to be the inconsistency?

3                 MR. LINDVALL:  Yes.  Tell us the substance of

4    it.  We would come up with some type of instruction that you

5    could give the jury to eliminate that inconsistency so that

6    you continue to deliberate.

7                 THE COURT:  Okay.  Mr. Cahr?

8                 MR. CAHR:  That's not perfectly our

9    understanding.  Not to say that you are misstating it.

10   There may have been a misunderstanding.  Our understanding

11   was that it was going to be more along the lines of, if

12   there's an inconsistency that you identify, you wouldn't

13   tell us what the inconsistency would be, but you would

14   simply tell them there's an inconsistency in your verdict.

15   Please return to deliberations.

16                THE COURT:  That sounds like no agreement.

17                MR. CAHR:  No, no, no.

18                THE COURT:  They are both reasonable proposals,

19   but they sound different to me.

20                MR. LINDVALL:  Yes.  Sorry.

21                THE COURT:  Okay.  Well, that is helpful.  You

22   know, we'll see if we have a verdict.  We may have a chance

23   to talk about it further.  I'm not quite sure what I will

24   do.

25                And in terms of meeting with the jury, have you

1    all talked about that at all?  Do you have a view?

2                MR. CAHR:  That I think we are definitely in

3    agreement on.

4                THE COURT:  Okay.

5                MR. CAHR:  We both want to do that.

6                THE COURT:  You both want to do that?

7                MR. CAHR:  Yes.

8                MR. LINDVALL:  Yes.

9                THE COURT:  You'll be prepared to make those

10   representations?  Sit tight.  I think we'll hear whether

11   they are going to stick around.  We'll be in recess.

12               (Court recessed while jury continues

13   deliberations.)

14                    *      *      *

15               (Proceedings reconvened after recess.)

16               THE COURT:  You have been provided copies of

17   this note; is that correct?

18               MR. LINDVALL:  Yes.

19               THE COURT:  It looks to me like it says:  "We

20   have completed deliberation."  Maybe I'm being too lawyerly.

21   I don't know if that for sure means it is a verdict, so I

22   thought I would bring them in and say do you have a verdict?

23   And if they say yes, then I'll have them hand it to us.

24               Is there any objection to that approach?

25               MR. LINDVALL:  No, Your Honor.

1       MR. KELLEHER:  No, Your Honor.

2       THE COURT:  All right.  Let's bring the jury in.

3       (Jury returned.)

4       THE COURT:  Welcome back, ladies and gentlemen

5    of the jury.

6       Have you reached a verdict.

7       A JUROR:  Yes, we have, Your Honor.

8       THE COURT:  All right.  Then I will have you

9    hand the verdict sheet to Mr. Golden.

10       (Verdict sheet passed to the Deputy Clerk, and

11    then to the Court.)

12       THE COURT:  I'll ask for your patience while I

13    review it.

14       (The Court goes to sidebar and reviews the

15    verdict sheet with the law clerk.)

16       THE COURT:  Thank you for your patience.  I'll

17    now have Mr. Golden read the verdict.

18       THE DEPUTY CLERK:  As to Question 1.  Patent

19    infringement.  Direct infringement.  U.S. Patent No.

20    5,011,339:

21       The jury has determined that claims 1, 2, and 6

22    have been infringed under the '339 patent.

23       U.S. Patent No. 5,143,216.

24       Has AHG proven infringement of the '216 patent

25    claims for claims 1 and 2?

1232

1       The box "yes" has been checked.

2               Question 3 regarding the '339 patent.

3               Has AHG proven infringement induced a third

4       party to infringe the claims of the '339 patent?

5               The lines for claims 1, 2, and 6 have been

6       checked "yes."

7               Question No. 4.  Has AHG proven that defendant

8       has induced a third party to infringe the claims of the '339

9       patent?

10              Claims 1, 2, and 6, the lines have been checked

11      "yes."

12              Question No. 5.  Has AHG proven defendant

13      contributed to the infringement by a third party of the

14      claims of the '339 patent?

15              The lines "yes" have been checked for claims 1,

16      2, and 6.

17              Question No. 6.  Has AHG proven that defendant

18      contributed to infringement by a third party of the

19      following '339 patent claims?

20              The box "yes" has been checked for claims 1, 2,

21      and 6.

22              Question No. 7.  Has AHG proven by clear and

23      convincing evidence that the defendant willfully infringed

24      the '339 patent?

25              The box "yes" has been checked.

1          Question No. 8.  Has AHG proven by clear and

2     convincing evidence that defendant willfully infringed the

3     '339 patent?

4          The line "yes" has been checked.

5          Question No. 9.  Has AHG proven by clear and

6     convincing evidence that the defendant willfully infringed

7     the '216 patent?

8          The box "yes" has been checked.

9          Question No. 10.  Has AHG proven that defendant

10    willfully infringed the '216 patent?

11         The line "yes" has been checked.

12         Question No. 11.  Has defendant proven by clear

13    and convincing evidence that the following claims of the

14    '339 patent are invalid as anticipated?

15         Regarding claims 1, 2 and 6, the box "no" has

16    been checked.

17         Question No. 12.  Has defendant proven that

18    the following claims of the '216 patent are invalid as

19    anticipated by the prior art?

20         Regarding claims 1 and 2, the box "no" has been

21    checked.

22         Question No. 13.  Has defendant proven that the

23    following claims of the '339 patent are invalid as obvious?

24         Regarding claims 1, 2, and 6, the line "no" have

25    been checked.

1            Question No. 14.  Has defendant proven that the

2    following claims of the '216 patent are obvious based on the

3    prior art?

4            The lines for claims 1 and 2 have been checked

5    "no."

6            Question No. 15.  Has defendant proven that the

7    claims of the '339 patent are invalid because "peripheral

8    guiding" is indefinite?

9            The line "no" has been checked.

10            Question No. 16 under the Patent Damages

11    section.

12            What amount of damages is AHG entitled to as

13    compensation for defendant's infringement of the '339 and/or

14    '216 patent?

15            The amount $2,099,943 has been written in.

16            Question 17.  Has AHG proven that defendant

17    infringed AHG's trade dress?

18            The line "yes" has been checked.

19            Question No. 18.  Has AHG proven that the

20    defendant intentionally infringed AHG's trade dress?

21            The line "yes" has been checked.

22            Question 19.  Has AHG proven that defendant

23    intentionally infringed AHG's trade dress?

24            The line "yes" has been checked.

25            Question No. 20.  Has AHG proven that defendant

1    intentionally interfered with AHG's prospective economic

2    advantage?

3              The line "yes" has been checked.

4              Question No. 21.  Has AHG proven that defendant

5    intentionally ly interfered with AHG's prospective economic

6    advantage?

7              The line "yes" has been checked.

8              Question No. 22.  Before May 12th of 2007, did

9    AHG discover, or know the facts that would have caused the

10   person to suspect that defendant was selling its allegedly

11   infringing rivet cassette case -- cassettes in the United

12   States?

13             The line "no" has been checked.

14             Question No. 23.  Neither box is touched as in

15   checked.

16             Question No. 24.  What amount of damages is AHG

17   entitled to as compensation for trade dress infringement,

18   unfair competition under federal law, unfair competition

19   under state law, or intentional interference with a

20   prospective economic advantage?

21             The amount $6 million has been written in.

22             Question No. 25.  If you answered "yes" to 18 or

23   19, finding, et cetera, to Question 21, what amount of

24   punitive damages, if any, do you award to AHG?

25             The amount $6 million has been written in.

1                    It is dated the 11th day of April, 2014, and

2       signed by all eight jurors.

3                    THE COURT:  Thank you very much, Mr. Golden.

4                    Mr. Lindvall, would you like to have the jury

5       polled?

6                    MR. LINDVALL:  Yes, Your Honor.

7                    THE COURT:  Okay.  Mr. Golden, poll the jury.

8                    THE DEPUTY CLERK:  Certainly, Your Honor.

9                    Juror No. 1, is the verdict read in court -- is

10      the verdict read in court true and correct and supported

11      before your vote?

12                   THE FOREMAN:  Yes, it is.

13                   THE DEPUTY CLERK:  Juror No. 2, is the verdict

14      read in court true and correct and supported before your

15      vote?

16                   JUROR NO. 2:  Yes, it is.

17                   THE DEPUTY CLERK:  Juror No. 3, is the verdict

18      read in court true and correct and supported before your

19      vote.

20                   JUROR NO. 3:  Yes, it is.

21                   THE DEPUTY CLERK:  Juror No. 4, is the verdict

22      read in court true and correct and supported before your

23      vote?

24                   JUROR NO. 4:  Yes, it is.

25                   THE DEPUTY CLERK:  Juror No. 5, is the verdict

1    read in court true and correct and supported before your

2    vote?

3                    JUROR NO. 5:  Yes, it is.

4                    THE DEPUTY CLERK:  Juror No. 6, is the verdict

5    read in court true and correct and supported before your

6    vote?

7                    JUROR NO. 6:  Yes, it is.

8                    THE DEPUTY CLERK:  Juror No. 7, is the verdict

9    read in court true and correct and supported before your

10   vote?

11                   JUROR NO. 7:  Yes, it is.

12                   THE DEPUTY CLERK:  Juror No. 8, is the verdict

13   read in court true and correct and supported before your

14   vote?

15                   JUROR NO. 8:  Yes, it is.

16                   THE DEPUTY CLERK:  Thank you.

17                   THE COURT:  Thank you, Mr. Golden.

18                   And thank you, ladies and gentlemen of the jury.

19   I know it has been a long week and we're here essentially on

20   overtime right now.  I know on behalf the parties and my

21   colleagues and really the entire judicial system, we are

22   very grateful to you.  We could not do our work without the

23   strong efforts and time and devotion of citizens like you

24   and I really appreciate it.

25                   I'm going to need to hold on to you for just a

1238

```
1     couple more minutes.  If you can go back to the juryroom and

2     start collecting your things.  There are a few other things

3     I want to say to you, and I want to thank you personally,

4     and so I will see you very shortly back in the juryroom.

5               Thank you very much.

6               (Jury left courtroom.)

7               THE COURT:  So notwithstanding the hour, if the

8     parties are still interested and any jurors want to stay,

9     I'm happy to have you talk to them.  Is that still something

10    plaintiffs are interested in doing?

11              MR. LINDVALL:  Yes, Your Honor.

12              THE COURT:  And defendants?

13              MR. KELLEHER:  Yes, Your Honor.

14              THE COURT:  All right.  So, Mr. Lindvall, do you

15    represent on behalf of your client that you will not use

16    anything that you learn in discussions with the jury, if

17    there are any, in any further motions in front of me or on

18    appeal or in any other legal proceeding?

19              MR. LINDVALL:  I do, Your Honor.  And I assume

20    there won't -- will not be a written record being taken.

21              THE COURT:  There is no written record.  That's

22    correct.

23              Mr. Kelleher, you agree to the same?

24              MR. KELLEHER:  I do.

25              THE COURT:  All right.  Well, I'll go back and
```

1  if any of them are willing to stay, we'll let you know that.

2            (Jury trial proceedings end at 5:26 p.m.)

3

4        I hereby certify the foregoing is a true and accurate
   transcript from my stenographic notes in the proceeding.

5

6                          /s/ Brian P. Gaffigan
                          Official Court Reporter
7                          U.S. District Court

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25